IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARTIN COUNTY, FLORIDA<br>2401 SE Monterey Road<br>Stuart, FL 34966<br><br>INDIAN RIVER COUNTY, FLORIDA<br>1801 27th Street<br>Vero Beach, FL 32960<br><br>CITIZENS AGAINST RAIL EXPANSION IN<br>FLORIDA<br>7407 SE Hill Terrace<br>Hobe Sound, FL 33455<br><br>INDIAN RIVER COUNTY EMERGENCY<br>SERVICES DISTRICT<br>4225 43rd Avenue<br>Vero Beach, FL 32967<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION;<br>ELAINE CHAO, in her official capacity as Secretary<br>of Transportation; DEREK KAN, in his official<br>capacity as Under Secretary of Transportation for<br>Policy; FEDERAL RAILROAD<br>ADMINISTRATION; and PAUL NISSENBAUM, in<br>his official capacity as Associate Administrator of the<br>Federal Railroad Administration;<br><br>*Defendants*. | Civil Action No. _____<br><br><br>**COMPLAINT** |

Plaintiffs Martin County, Florida ("Martin County"), Indian River County,

Florida ("Indian River County"), Citizens Against Rail Expansion in Florida ("CARE FL"), and

Indian River County Emergency Services District ("Indian River Emergency Services District"),

1

as and for their Complaint against the above-named defendants (collectively, the "Federal

Defendants") allege as follows:

## SUMMARY OF CLAIMS

1.      This is an action under the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701-706, to set aside – as arbitrary, capricious, an abuse of discretion, in excess of

statutory authority and otherwise contrary to law – the Federal Defendants' allocation of

$1,150,000,000 of tax-exempt private activity bonds (the "PABs") to build Phase II of the All

Aboard Florida Project (the "Project"), a proposed passenger railroad between Miami, Florida,

and Orlando, Florida.  In a determination dated December 20, 2017 (attached hereto as Exhibit

1), the Federal Defendants approved the issuance of the PABs, requiring that they be issued by

May 31, 2018.

2.      In approving the Project proposed by All Aboard Florida – Operations

LLC and its corporate affiliates (collectively, "AAF"), the Federal Defendants cast aside their

responsibility to take a hard look at its environmental impacts, rigorously explore and objectively

evaluate all reasonable alternatives, and identify all reasonable means to mitigate the harms from

the Project.  Instead, they acted as its cheerleaders, deferring to AAF as to the scope of

environmental analysis, the range of alternatives to be considered, and the mitigation measures to

be evaluated in the Final Environmental Impact Statement ("FEIS") and imposed in the Record

of Decision ("ROD").  By failing to fully consider the environmental impacts of the Project and

reasonable alternatives, the Federal Defendants violated the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 *et seq.*, and their approval of the FEIS, ROD, and PABs must be

vacated under NEPA and the APA.

3.      The Internal Revenue Code allows the issuance of tax-exempt private activity bonds to finance a project only if it falls into one of 15 specified categories.[1]  Because the Project is not a "high-speed intercity rail facility" as that term is defined in the statute, the Federal Defendants approved the PABs for the Project on the theory that it is a "qualified highway or surface freight transfer facility" under 26 U.S.C. § 142(a)(15) and (m) (hereafter "Section 142(m)").  But the Project is a passenger railroad.  It is neither a highway nor a freight transfer facility.

4.      Even if the Federal Defendants' theory of what constitutes a highway or freight transfer facility were correct, the Project would be required to be the recipient of Title 23 funds to be considered a "qualified" highway or freight transfer facility.  On information and belief, the AAF Project has not received a single dollar of Title 23 funds.

5.      Since the Project does not fall into any of the 15 categories that may be financed by private activity bonds, the approval of the PABs for the Project was *ultra vires* and must be vacated under the APA.

6.      Another provision of Section 142(m) of the Internal Revenue Code requires that 95% of the PABs proceeds be expended for the "qualified highway or surface freight transfer" facility receiving the PAB allocation.  26 U.S.C. § 142(m)(3).  The PABs approval challenged here violates that requirement, because only a small percentage of the PABs

---

[1]      The 15 categories are: "(1) airports, (2) docks and wharves, (3) mass commuting facilities, (4) facilities for the furnishing of water, (5) sewage facilities, (6) solid waste disposal facilities, (7) qualified residential rental projects, (8) facilities for the local furnishing of electric energy or gas, (9) local district heating or cooling facilities, (10) qualified hazardous waste facilities, (11) *high-speed intercity rail facilities*, (12) environmental enhancements of hydroelectric generating facilities, (13) qualified public educational facilities, (14) qualified green building and sustainable design projects, or (15) *qualified highway or surface freight transfer facilities*."  26 U.S.C. § 142(a) (emphasis added).

proceeds (certainly far less than 95%) will be spent on railroad-highway crossing improvements, which are the only Project components that would constitute "qualified highway facilities" under any conceivable definition of that term.

7.      Moreover, the Internal Revenue Code requires that the issuance of PABs be "approved by … each governmental unit having jurisdiction over the area in which any *facility*, with respect to which financing is to be provided from the net proceeds of such issue, is located." 26 U.S.C. § 147(f)(2)(A)(ii) (emphasis added).[2] The facility that is the subject of the Federal Defendants' actions, including their PAB approval, is Phase II of the Project. *See* Ex. 1, p. 2 (requiring that "the proceeds of PABs issued under this allocation" shall be "specifically for the scope of the Project described in the Phase II Environmental Documents [*i.e.*, the FEIS and ROD]").

8.      Phase II spans five Florida counties. Two of those counties – Orange County and Brevard County – may have approved the use of PABs for the Project, but the Internal Revenue Code requires the approval of "*each* governmental unit having jurisdiction over the area in which any facility … is located." 26 U.S.C. § 147(f)(2)(A)(ii) (emphasis added). A substantial part of Phase II is located in Martin County, Indian River County, and St. Lucie County, none of which has granted the approval required by the Internal Revenue Code. The approval of two of the five counties in which the facility is located is not sufficient. Accordingly, the use of PABs to finance Phase II is unlawful.

---

[2]      There is one exception to the requirement of local government approval: "if more than 1 governmental unit within a State has jurisdiction over the entire area within such State in which such facility is located, only 1 such unit need approve such issue." 26 U.S.C. § 147(f)(2)(A)(ii). This exception is inapplicable because there is no government unit with elected representatives that has approved Phase II and which has jurisdiction over the entire project. *Id.* § 147(f)(2)(B)(i) (governmental approval requires action by the "applicable elected representative").

9.     According to AAF, the capital cost of Phase II is $1,425,661,000, comprised of $1,253,641,000 for rail infrastructure, $10,000,000 for the station in Orlando, and $162,020,000 for rolling stock.[3]  Of the total Phase II capital cost of $1,425,661,000, capital costs in Orange County and Brevard County are $448,000,000 and $331,000,000, respectively.[4]  Thus, the total capital costs to be incurred in Orange County and Brevard County are $779,000,000.  Any purported "allocation" of the $1,150,000,000 in bond proceeds exclusively to the portion of the facility in Orange and Brevard Counties would, on the facts, be sophistry.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States identified in the preceding paragraphs.  Also, this Court has jurisdiction pursuant to 28 U.S.C. § 1361 because the suit is brought against officers of the United States.  Declaratory, injunctive, and further necessary relief is proper pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 2201, 2202 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy).

11.     Plaintiffs have a right to bring this action pursuant to, *inter alia*, 5 U.S.C. §§ 701-706.  The Federal Defendants' issuance of the ROD approving the FEIS constitutes a final agency action.  A copy of the ROD is annexed hereto as Exhibit 2.  Their issuance of the PAB approval also constitutes a final agency action.  Moreover, there exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201.

---

[3]     AAF Independent Engineering Report, pp. 68-69 (available at *Indian River County v. Rogoff*, 1:15-cv-00460-CRC, Dkt. # 79-5).

[4]     AAF FDFC Application dated Sept. 24, 2014, p. 11 (available at *Indian River County v. Rogoff*, 1:15-cv-00460-CRC, Dkt. # 22-10).

12.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to this Complaint occurred in the District of Columbia, and the District is the location of the Federal Defendants' principal offices.

## STANDING

13.     The Plaintiffs have standing to bring suit.  They are adversely affected and aggrieved by the Federal Defendants' unlawful approval of the Project.  The Federal Defendants' failure to comply with federal law will result in irreparable harm to the Plaintiffs, the environment, and public safety.  The relief requested will redress these injuries, in that Plaintiff seeks to vacate the Federal Defendants' actions with respect to the Project and enjoin them from taking further action until they comply fully with federal law.

14.     As Plaintiffs have raised issues related to the impacts of the Project on the environment, their interests in this action fall within the zone of interests protected by NEPA.  In prior litigation, this Court held that Plaintiffs had standing to challenge the Federal Defendants' failure to comply with NEPA with respect to their earlier approval of PABs for the same Project. *See Indian River County v. Rogoff*, 201 F. Supp. 3d 1, 14 (D.D.C. 2016).  This was so because, *inter alia*, AAF had "described the PAB financing as 'the *linchpin* for completing our project' and 'a *crucial* factor in ensuring our project is financed and completed'" and because the evidentiary materials before the Court presented in opposition to the Federal Defendants' motion to dismiss for lack of standing established that "AAF was not exaggerating" when it made these statements as to its need for PAB financing to build the Project.  *Id.* at 8 (emphasis in original). This Court found on the evidentiary record that the PAB approval is the crucial factor in financing the Project.  AAF's new PAB application for Phase II (dated December 5, 2017, and annexed hereto as Exhibit 3) is in accord.  It states that the "$1.15 billion of Private Activity

Bonds will allow the Project to complete construction of Phase II." Ex. 3, p 4. As this Court held in the earlier litigation, vacatur of the PAB approval would redress the injuries that the Plaintiffs would suffer if the Project were to proceed pursuant to the terms of that approval.[5]

15.     Moreover, the FEIS and ROD are predicates for the issuance of the federal permits required for Phase II, without which Phase II cannot be built. Accordingly, vacatur of the FEIS and ROD would prevent the issuance of the permits until such time as all NEPA requirements are satisfied, providing redress to the Plaintiffs.

16.     In the earlier litigation, this Court also held that Martin County was not within the "zone of interests" to challenge the determination that the Project fits into one of the 15 categories of projects eligible to be financed with private activity bonds under Section 142(a) of the Internal Revenue Code, because Martin County was "'not itself the subject of the contested regulatory action.'" *Indian River County v. Rogoff*, 201 F. Supp. 3d at 20 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987)). But the facts have now changed. In their approval of $1,150,000,000 of PABs for Phase II of the Project, the Federal Defendants have required AAF to construct, develop, and operate Phase II "in accordance with … the [ROD]." PAB Approval Letter, p. 2 (Ex. 1). The ROD unlawfully purports to require Martin County and Indian River County to fund the maintenance of AAF's grade-crossing equipment within their respective jurisdictions, pursuant to the Federal Defendants' erroneous interpretation of Florida law. *See* ROD, App. C, p. 25 (Ex. 2). By purporting to impose the grade-crossing maintenance costs of the Project on Martin County and Indian River County, the PAB approval challenged herein made these counties "the subject of the contested regulatory action." *Clarke v.*

---

[5]     The PAB approval at issue in the prior litigation before this Court was for $1,750,000,000. That number has not changed. The new PAB approval for Phase II (in the amount of $1,150,000,000) when combined with the Phase I PABs AAF has already sold (in the amount of $600,000,000) sum to $1,750,000,000.

*Securities Indus. Ass'n*, 479 U.S. at 399.  Accordingly, these two Plaintiffs, at least, have

standing and are within the zone of interest to bring suit to challenge the PAB approval as *ultra*

*vires.*

          17.      In discussing the doctrine of prudential standing with respect to Martin

County's claim under the Internal Revenue Code, this Court held that "Congress did not intend

for plaintiffs asserting public-safety, environmental-protection, or historic-preservation interests

to sue for a violation of 26 U.S.C. § 142."  *Indian River County v. Rogoff*, 201 F. Supp. 3d at 21.

But in this lawsuit, Martin County and Indian River County are alleging additional interests.

First, the counties have an interest in requiring compliance with the statutory requirement that

"each governmental unit having jurisdiction over the area in which any facility [financed by the

PABs] ... is located" approve the use of the PABs to finance the facility.  26 U.S.C. §

147(f)(2)(A)(ii).  Second, the counties have a financial interest in not bearing the maintenance

costs of measures required to mitigate the Project's safety risks, which would be foisted upon

them by the terms of the Federal Defendants' approval of the PABs.  Third, the counties are the

direct subject of the Federal Defendants' illegal action in approving the PABs because the

approval requires that they shoulder these maintenance costs.  For these reasons, the counties

have an interest sufficient to satisfy all prudential standing requirements with respect to their

claim that the PAB approval was unlawful under Section 142 of the Internal Revenue Code.

### THE PLAINTIFFS

          18.      **Martin County** is a duly organized county located in the Treasure Coast

region of the State of Florida.  Martin County has over 151,000 residents.  By requiring

substantial construction to accommodate increased rail traffic, the Project would disrupt normal

business activities in Martin County and impact personal activities of its residents.  The Project

will operate 32 passenger trains each day, pulled by diesel locomotives, passing through Martin

County at speeds of over 100 miles per hour.  These operations will cause traffic tie-ups near railroad crossings, risks to the public safety, noise, harm to Martin County parks, and damage to neighborhoods and environmental resources in Martin County.  By the terms of the PAB approval, Martin County would be required to spend over $7.31 million on the maintenance and rehabilitation of Project-related railroad crossing safety improvements from 2019 to 2030 and to pay 100% of the maintenance costs of these improvements in perpetuity.[6]  There are other safety measures requested by Martin County that are not part of AAF's plans submitted to the Federal Railroad Administration ("FRA"), but if installed will cost the County $1.75 million to $2.15 million.

19.    **Indian River County** is a duly organized county located in the Treasure Coast region of the State of Florida.  Indian River County has over 140,000 residents.  Like the effects in Martin County, the Project's construction would disrupt normal business activities in Indian River County and impact personal activities of its residents.  The Project's 32 passenger trains will disrupt the community and result in traffic tie-ups near railroad crossings, risks to public safety, noise, harms to Indian River County parks, and damage to neighborhoods and environmental resources in the County.  By the terms of the PAB approval, Indian River County would be required to spend over $8.8 million on the maintenance and rehabilitation of Project-related railroad crossing safety improvements from 2019 to 2030 and to pay 100% of the maintenance costs of these improvements in perpetuity.[7]  There are other safety measures

---

[6]    AAF has agreed to pay the cost of certain required railroad-crossing safety improvements for the Project, but only if Martin County agrees to pay the maintenance costs of the improvements through an amendment of cross-licensing agreements.  *See* ROD, p. 27 (Ex. 2).

[7]    AAF has agreed to pay the cost of certain required railroad-crossing safety improvements for the Project, but only if Indian River County agrees to pay the maintenance costs of the improvements through an amendment of cross-licensing agreements.  *See id.*.

requested by Indian River County that are not part of AAF's plans submitted to the FRA, but if installed would cost the County $1.41 million to $1.73 million.

20.     **CARE FL** is a non-profit group, organized in 2014 under Florida law, consisting of a coalition of Treasure Coast community leaders, organizations, and residents devoted to protecting the safety, welfare, and way of life of the more than 10 million people living in and around the areas that will be impacted by the AAF Project and related increases in freight rail traffic.  CARE FL members live in West Palm Beach, Martin County, and Indian River County.  CARE FL opposes Phase II of the Project (West Palm Beach to Orlando), as it would run directly through the communities CARE FL represents.  The mission of CARE FL is to protect the safety, welfare, and way of life for the families, businesses, and retirees who live in and around its communities.  CARE FL believes the AAF Project is ill-conceived and would impose unacceptable adverse impacts on coastal Florida with respect to public safety, the environment, maritime navigability, and public financing, to name a few.  As members of the communities in which the Project will be constructed, members of CARE FL will be adversely impacted by the Project and directly injured by the Federal Defendants' approval of the use of PABs to finance the Project.

21.     The **Indian River Emergency Services District** is a dependent special district, formed by Indian River County pursuant to the authority granted in § 125.01(5)(a), Florida Statutes, as documented in County Ordinance No. 90-25.  Its governing body is the Board of County Commissioners of Indian River County, sitting as the Board of Commissioners of the Emergency Services District.  The Emergency Services District has the power to sue and be sued.  The boundaries of the Emergency Services District extend through the entirety of the County, excluding the Town of Indian River Shores (which is on a barrier island east of the

mainland).  The Emergency Services District provides fire, rescue, emergency medical services, and other emergency services to property and persons within the district boundaries described above.  The Project would cause at least 32 passenger trains, pulled by diesel locomotives, to pass through the Emergency Services District daily at speeds of over 100 miles per hour, interfering with the District's operations and burdening the District with responding to accidents and potentially catastrophic releases of hazardous chemicals.

### THE DEFENDANTS

22.     The **U.S. Department of Transportation** ("DOT") is a federal agency responsible for transportation in the United States.  DOT's statutory responsibilities are carried out by different offices, including the Office of the Secretary, and the following "operating administrations": the Federal Highway Administration ("FHWA"); Federal Transit Administration ("FTA"); Federal Aviation Administration ("FAA"); and FRA.  Each operating administration has its own Administrator.  The Office of the Secretary of DOT is responsible for approving or disapproving applications for the allocation of PAB financing under Section 142(a) of the Internal Revenue Code, and for deciding on the terms of any conditions to be imposed in connection with any such approval.

23.     **Elaine Chao** is the Secretary of Transportation.

24.     **Derek Kan** is the Under Secretary for Policy for DOT and was responsible for considering AAF's application for PABs and issuing the approval determination (Ex. 1), one of the final agency actions challenged in this lawsuit.

25.     The **Federal Railroad Administration** is responsible for promulgating and enforcing rail safety regulations, administering railroad assistance programs, conducting research and development in support of improved railroad safety and national rail transportation

policy, and consolidating government support of rail transportation activities.  The FRA issued

the ROD (Ex. 2), one of the final agency actions challenged in this lawsuit.

26.     **Paul Nissenbaum** is the Associate Administrator, Railroad Policy and

Development, of the FRA.  He signed the ROD (Ex. 2), one of the final agency actions

challenged in this lawsuit.

## FACTUAL BACKGROUND

27.     DOT's prior allocation of $1,750,000,000 in PABs for AAF's Project was

subject to extensive litigation in this Court.  *See Martin County v. U.S. Dep't of Transp.*, Case

No. 1:15-cv-00632 (D.D.C.); and *Indian River County v. Rogoff*, Case No. 1:15-cv-00460

(D.D.C.).  Neither the Project nor AAF's financing plans have changed materially since that

earlier litigation.

28.     In September 2014, the FRA released the Draft Environmental Impact

Statement ("DEIS") for the Project.  Before issuing the FEIS and responding to the numerous

comments on the DEIS submitted by interested stakeholders, including the Plaintiffs, the Federal

Defendants approved the $1,750,000,000 PAB allocation to AAF in December 2014, only to

withdraw that approval after this Court denied their motion to dismiss for lack of standing and

failure to state a claim.  The FRA issued the FEIS on August 4, 2015, one day before the Florida

Development Finance Corporation ("FDFC"), the conduit issuer of the PABs, held a public

hearing on the PABs.  After withholding the issuance of the ROD for over 28 months –

strategically during the prior litigation – the FRA issued the ROD on December 15, 2017, just

two weeks after FDFC issued $600,000,000 in PABs to finance Phase I of the Project, ten days

after AAF renewed its PAB application for Phase II, and one week before the Federal

Defendants approved that application.  AAF and the Federal Defendants at every turn have
sought to evade meaningful judicial review of the Project.

29.     Construction of Phase I of the Project (Miami to West Palm Beach) is
complete or nearly complete.  The passenger trains have already begun traversing a section of
Phase I under limited operations.  The northern terminus of Phase I (West Palm Beach) is south
of Martin County and Indian River County.  This lawsuit does not challenge Phase I of the
Project.

30.     The lawsuit challenges the Federal Defendants' decision-making and
actions with respect to Phase II of the Project (West Palm Beach to Orlando).  Phase II would
share tracks with the existing freight rail service operated by Florida East Coast Railway
("FECR") between West Palm Beach and Cocoa, and then run along a new alignment from
Cocoa to Orlando.

31.     The FECR right of way to be utilized by Phase II runs through the
"downtown" areas of numerous towns and cities in Martin County and Indian River County,
with scores of at-grade road crossings.  *See, e.g.*, Ex. 4 (a photograph of the FECR right-of-way
through the center of the City of Vero Beach).  The western areas of these counties are generally
sparsely populated, but the eastern areas, near the Florida coastline and on both sides of the
FECR right of way to be utilized by the Project, are much more densely populated.

32.     The AAF passenger trains would travel at speeds up to 110 mph from
West Palm Beach to Cocoa.

33.     Phase II will not include any stops between West Palm Beach and
Orlando, but would send 32 passenger trains a day speeding along the existing at-grade FECR
freight corridor, to the detriment of the surrounding densely populated communities.

34.     Phase II would also effect improvements to the tracks and infrastructure within the right-of-way that would cause the existing freight traffic to pass through at much higher speeds than those currently maintained, increasing noise, vibration, and dangers to public safety.

**A.     Public Safety**

35.     The Project will significantly increase the number and speed of trains passing through nearly 350 at-grade road crossings along the FECR corridor, 28 of which are located in Martin County and 31 of which are located in Indian River County.  Those at-grade road crossings create what the FRA has euphemistically called "opportunities for conflict between trains and vehicles or people" (FEIS, p. S-20), but what would be more accurately described as "opportunities for catastrophic and fatal collisions between trains and cars and trains and people."

36.     There is nothing hypothetical about the safety risks posed by the Project. During trial runs for Phase I, AAF trains killed two pedestrians in separate incidents – one in July 2017 and one in November 2017.  Since beginning limited Phase I commercial service between West Palm Beach and Ft. Lauderdale in January 2018, AAF trains have struck and killed two additional people and injured others in four separate incidents involving pedestrians and bicyclists.

37.     In addition to the fatalities and injuries described above, on February 11, 2017, an AAF passenger train derailed during a test run, causing substantial property damage and raising further questions as to the safety of the AAF trains.

38.     According to the FRA Accident/Incident Overview for FECR from 2011-2017, the number of fatalities and injuries along the existing FECR corridor from the slow-moving freight trains is staggering:

| | | |
|---|---|---|
| 2011: | 18 fatalities | 14 injuries |
| 2012: | 12 fatalities | 25 injuries |
| 2013: | 12 fatalities | 25 injuries |
| 2014: | 13 fatalities | 31 injuries |
| 2015: | 16 fatalities | 30 injuries |
| 2016: | 20 fatalities | 33 injuries |
| 2017: | 12 fatalities | 27 injuries (2017 data through October 31, 2017) |
| **Total:** | **103 fatalities** | **185 injuries** |

39.     Neither the FEIS nor ROD examined the safety risks posed by the Project in light of the fatality and injury data available for the FECR corridor.  The FEIS provided nothing more than the number of accidents (but not fatalities) at grade crossings from 2007 to 2012, and FECR accidents and fatalities not at grade crossings from 2007 to 2011.  *See* FEIS, p. 4-117.

40.     If AAF's proposed 32 new higher speed passenger trains – as well as freight trains moving at much higher speeds due to the Project's infrastructure investments – are added to the tracks in this corridor, it is inevitable that the number of fatalities and injuries will increase, as evidenced by AAF's alarming track record thus far.

**B.     The Project's Lack of Title 23 Funding**

41.     AAF states in its new December 5, 2017 PAB application to DOT that "$9 million from Section 130 of U.S. Code Title 23 has been invested in the entire [FECR] corridor to improve railway-highway grade crossings and prepare the corridor for growth in rail traffic. Future investments from the Section 130 program are planned for future calendar years."  Ex. 3, p. 16.

42.     In its August 2014 PAB application to DOT, AAF provided a nearly identical statement regarding its description of Title 23 funding, claiming that "approximately $9.3 million in funds from Section 130 of U.S. Code Title 23 has been invested in the corridor."[8]

43.     Accordingly, on information and belief, the AAF Project has received no Title 23 funding between the submission of the August 2014 PAB application and the submission of the December 2017 PAB application.

44.     In neither of its PAB applications to DOT has AAF indicated that the AAF Project *itself* has received a single dollar of Title 23 funds.  Rather, on information and belief, both applications rely on Title 23 funds spent prior to August 2014 on at-grade rail-highway crossings by the Florida Department of Transportation ("FDOT") on the FECR corridor – not the AAF Project.

45.     Upon information and belief, the Title 23 funds relied upon to justify the Project's eligibility for a PAB allocation were expended from 2005-2014.  *See* Decl. of Paul Baumer, dated May 15, 2015.[9]

46.     Upon further information and belief, AAF and FECR were under the same parent company in 2014 – but are no longer.  On July 7, 2017, the FECR corridor was sold to Grupo México Transportes, a leading rail freight transportation company in Mexico.  This entity is not affiliated with AAF.

C.     **DOT's Current PAB Allocation Consumes Over 28% of the Remaining Amount of PABs Authorized by Congress for Qualified Projects.**

47.     Congress limited the total amount of PAB allocations for PAB-eligible transportation projects to $15 billion over the life of the program.  26 U.S.C. § 142(m)(2).

---

[8]     *Indian River County v. Rogoff*, 1:15-cv-00460-CRC, Dkt. # 22-9.

[9]     *Martin County v. U.S. Dep't of Transp.*, 1:15-cv-00632-CRC, Dkt. # 19-2.

According to the DOT's website, as of January 27, 2017, nearly $6.6 billion in PABs had been issued for 17 projects, and an additional eight projects – including $600 million for Phase I of the AAF Project – had been allocated $4.3 billion in PABs.[10]  Based on these publicly available numbers and assuming DOT has not allocated PABs to other qualified projects within the past year, there is $4.1 billion in PABs available for other qualified projects.  Thus, DOT's current PAB allocation to Phase II of the AAF Project would consume over 28% of remaining PABs, an allocation of monies that would otherwise be available to actual qualified highway or surface freight projects.

### D.     Project-Related Harms to Martin County

48.     Plaintiff, Martin County, Florida, is a political subdivision of the state of Florida.  As such, Martin County is responsible for protecting the health, safety, and welfare of its citizens pursuant to Chapter 125, Florida Statutes.  Martin County is a coastal county lying on the south eastern side of the state of Florida, between Palm Beach and St. Lucie counties.

49.     The Project will have multiple adverse impacts on Martin County and its residents, including but not limited to increased financial costs, adverse effects on traffic congestion, marine vessel congestion, noise, vibration, air quality, public safety, the County's economic development plans (especially, but not exclusively, for the County's Community Redevelopment Areas) and historic and cultural resources within the County, as well as on the County's parks, wildlife, ecology, wild and scenic river, threatened and endangered species, property values, economic vitality, and quality of life.  DOT's decision to approve AAF's PAB application all but ensures that the Project will go forward and that its harms will occur.

---

[10]     *See* Private Activity Bonds, Build America Bureau, U.S. Dep't of Transp. (last accessed Feb. 13, 2018) (available at https://www.transportation.gov/buildamerica/programs-services/pab).

50.     Martin County has established a Comprehensive Growth Management
Plan ("Growth Management Plan") which broadens, enhances, and protects the quality of life for
its residents.  The overall goals for the Growth Management Plan are to maintain "quality
residential and nonresidential uses, natural resource conservation and preservation of beneficial
and protective natural systems, enhanced economic development, and fiscal conservancy."
Martin County Growth Management Plan § 2.1 (available at
https://library.municode.com/fl/martin_county/codes/comprehensive_plan?nodeId=COGRMAP
L_CH2OVGODE_S2.1OVGOMACOCOGRMAPL).

51.     Martin County has been proclaimed a "Sustainable County" by the state
land planning agency.  "Sustainable" means meeting the needs of the present without
compromising the ability of future generations to meet their needs.  The Growth Management
Plan mandates that the County consider impacts on the ecology, quality of life, and fiscal
sustainability of such actions, including long-term cumulative impacts.  *Id.*

52.     Martin County provides fire and rescue services for unincorporated Martin
County, including the inter-coastal waterways within the County's geographical boundaries.
Martin County Sheriff's Office and Fire Rescue coordinate resources and efforts to respond to
emergencies in the County.  The Martin County Sheriff's Office operates six vessels for patrol
and response.  Two vessels are stationed on the west side of the St. Lucie River railroad bridge
and four are on the east side.  Fire Rescue coordinates with MCSO to respond with units to the
closest dock to be picked up and transported by MCSO to the incident scene.  Only one of those
MCSO vessels is equipped with a fire pump.  If the Project is built and there are extended
railroad bridge closures, this will negatively impact the ability of public safety personnel to

access an incident scene and provide lifesaving care or incident stabilization. Only two of the smaller MCSO vessels are able to traverse under the bridge when in the down position.

53.     Pursuant to the terms of the Federal Defendants' approval, Martin County would be required to incur millions of dollars of costs to pay for Project-related safety improvements. *See supra* ¶ 18. These are costs that Martin County and its taxpayers would be forced to bear to mitigate the safety impacts of a project built and operated by a private railway company.

54.     Martin County employs many individuals who travel to and from work by motor vehicle and will be burdened by increased traffic congestion resulting from the Project. The same is true for Martin County employees who must use vehicles as part of their job duties, such as various disciplines of inspectors, law enforcement, and first responders.

55.     The Project will cause increased traffic congestion at road crossings throughout Martin County. The FEIS for the Project, for example, identifies five Martin County intersections where passenger trains are anticipated to cause traffic delays of at least one minute (and in some cases more than four minutes) *twice an hour* every day. *See* FEIS, pp. 5-12 – 5-15.

56.     The increase in trains traveling through Martin County will adversely impact emergency response times for Martin County Fire & Rescue, a department of Martin County. There are several large communities served by Martin County Fire & Rescue Stations – including Jupiter Island, Hobe Sound, Port Salerno, Jensen Beach, and South County – requiring Martin County Fire & Rescue to cross railroad tracks to provide essential services.

57.     Martin County Fire & Rescue owns and operates, as needed, over 58 vehicles, including rescues (18), engines (13), quints (3), tankers (6), brush trucks (10), specialty (5), Battalion Chief and Rescue Lieutenant sport-utility vehicles (7), and additional vehicles for

the department's Chiefs and for fire prevention activities in Martin County.  In 2017, Martin County Fire & Rescue vehicles crossed railroad tracks approximately 11,530 times while responding to incidents and more than 5,652 times when transporting patients to area hospitals, for a total of approximately 17,182 times.  This data does not include units returning to quarters or responding to other incidents that required crossing a railroad track.

58.     Martin County Fire & Rescue experienced railroad crossing delays 140 times per year in a recent two year period.  Based on the estimated increase in trains, there will be substantially more delays if the AAF Project proceeds as planned.  These delays hamper Martin County Fire & Rescue in responding to emergencies and while transporting sick or injured patients to hospitals.  These delays could significantly impact service levels adopted by Martin County to respond to emergencies in the community.

59.     Increased delays in emergency services could also lead to increased deaths because ambulances will be delayed in reaching local hospitals.  As Dr. Michael Collins, the Medical Director for the Jupiter Medical Center's emergency department has publicly stated in relation to the Project:

> Sometimes eight seconds, fifteen seconds, thirty seconds is all we have to save a life in the emergency department.  I'm very concerned about multiple trains going through our community, starting traffic jams that keep ambulances from getting to us.  We get twenty percent of our patients via ambulance.  We get almost all of Tequesta's ambulance patients, and the thought of them waiting behind multiple crossings during the day is worrisome to me.  Well, you can say that ambulances can get through traffic jams because they have horns and sirens, but I'm also concerned about physicians that are trying to get to our hospital, obstetricians, surgeons, cardiologists, neurologists.  Seconds do count in the world of critical care, and I feel that All Aboard Florida needs to address these issues to the public.  They need to explain what their plan is

to prevent communities from being cut off from their hospitals.  In critical care times, seconds count.[11]

60.     Martin Medical Center serves as the main hospital for Martin County.

This facility provides cardiac intervention, primary stroke care, and treatment to trauma patients

who cannot safely be transported to a trauma center.  This facility is divided from the majority of

the population by the railroad.  Delays in transporting patients to this facility would significantly

increase as a result of the Project.  In 2017, over 5,652 patients had to be transported over a

railroad track to reach their local hospital.

61.     The St. Lucie Nuclear Power Plant creates a need for Martin County to

have plans to rapidly evacuate residents in the Emergency Planning zone if a plant emergency

occurs.  Due to population density east of the current coastal railway, evacuation times for local

emergencies would be greatly increased with railroad crossings being closed.  All evacuation

routes from the affected areas are crossed by an existing railroad, an impediment that will be

compounded by the AAF Project and directly harm public health and safety in Martin County.

62.     Estimated evacuation of the north Jensen Beach and Hutchinson Island

Emergency Planning Zone shows an optimal time of 5.5 hours.  This evacuation would be

impeded by the increased train operations, affecting evacuation times by as much as an

additional 45 minutes.  This will directly and adversely impact public health and safety in Martin

County.

63.     There are currently no pedestrian crossing facilities at 10 of the 28 track

crossings in Martin County.  Pedestrians and bicyclists will be directed to cross the rail tracks in

the roadway, increasing the probability that Martin County residents will suffer pedestrian

---

[11]     A video of Dr. Collins' comments can be found at
http://www.saveourfl.com/news.html?id=249.

injuries and fatalities.  AAF has refused to provide additional facilities at these 10 crossings

unless they are paid for by Martin County.

64.     As a result of increased rail traffic caused by the Project, it will be difficult

for Martin County Fire & Rescue to evacuate properties east of the track if there is a hazardous

material spill or leak in the rail corridor.

65.     Martin County is home to twelve elementary schools, five middle schools,

and five high schools located throughout the County, owned and operated by Martin County

School District.  Martin County's SE Bridge Road school produces queues at the traffic signal at

SE Gomez Avenue in the morning when school is in session.  In addition to traffic created by

student drop offs at the two schools, service workers travel eastbound on SE Bridge Road in the

morning to work on Jupiter Island.  Currently, the traffic often queues over the tracks and

remains stationary through several signal cycles.  Increasing the number and speed of trains

passing in close proximity to Martin County schools will disrupt the smooth and safe operation

of those schools.

66.     Martin County owns 26 pieces of property that are adjacent to the

proposed AAF route and will be adversely impacted by increased rail traffic.  These properties

include numerous rights-of-way and public parks, such as South County Ball Park, Wojcieszak

Park, and Dixie Park.  The Project bisects two state parks and runs along a third state park in

Martin County.  Additional Martin County properties that will be adversely impacted by the

Project include the Martin County building housing the Veterans of Foreign Wars Hall; the

Martin County Fire & Rescue station on Dixie Highway at Bayview Street; the Martin County

Parks and Recreation Department Headquarters; the Martin County Fairgrounds; and Martin

County's Witham Field Airport.  Increasing the number and speed of trains passing in close

proximity to these Martin County properties will negatively impact the County's operations of these properties.

67. The Project will also have a significant adverse effect on Martin County's economic development plans, including but not limited to its efforts to improve conditions in its Community Redevelopment Areas ("CRAs").

68. Under Florida law (Chapter 163, Part III), local governments are able to designate areas as CRAs when certain conditions exist, such as the presence of substandard or inadequate structures; a shortage of affordable housing; inadequate infrastructure; insufficient roadways; and inadequate parking. Martin County has designated several CRAs, thereby enabling it to access tools needed to foster and support redevelopment of the targeted area. CRAs use these tools to secure improvements to the environment, infrastructure, and real estate property, which stabilize and increase the property values within each area. Such actions involve providing infrastructure to otherwise blighted property to increase market value and to attract private investment. Projects are also undertaken to raise the standard and quality of living to underserved and minority groups.

69. CRAs utilize tax increment financing to fund capital improvements and redevelopment activities in Martin County. The dollar value of all real property in the CRA is determined as of a fixed date, also known as the "frozen value." Taxing authorities that contribute to the tax increment continue to receive property tax revenues based on the frozen value. These frozen value revenues are available for general government purposes. However, any tax revenues from increases in real property value, referred to as "increment," are deposited into the CRA Trust Fund and dedicated to the redevelopment area. If property values adjacent to the rail corridor decline, the funding available for redevelopment will be reduced or eliminated,

adversely impacting the redevelopment of communities in Martin County and reducing property values within the buffer areas.

70.     The FECR freight rail corridor bisects five Martin County CRAs.  The Project will cause increased railroad traffic, noise, and vibration in each of the County's five affected CRAs, thereby making the redevelopment process more burdensome for County officials.  The impacts on the CRAs also reveal that the Project is especially harmful to poorer residents of Martin County.

71.     The St. Lucie River, St. Lucie Estuary, and the Indian River Lagoon-South are located, in part, in Martin County and are part of the greater Florida Everglades. Congress, through the Comprehensive Everglades Restoration Project ("CERP"), sought to "ensure the protection of water quality . . .  and the improvement of the environment of the South Florida ecosystem and to achieve and maintain the benefits to the natural system and human environment . . . ."  Water Resources Development Act of 2000 ("WRDA") § 601(b)(1)(A), Pub. L. 106-541 (Dec. 11, 2000).

72.     Martin County is required to work with state and federal agencies to provide continuing implementation of CERP and the Indian River Lagoon-South CERP component ("IRL-South").  *See* Martin County Growth Management Plan § 2.2C.1.

73.     The IRL-South project was established by Congress.  Its implementing authorizations are found at Section 1001(14) of the Water Resources Development Act of 2007, Pub. L. 110-114 (Nov. 8, 2007), in accordance with Section 601 of the Water Resources Development Act of 2000.

74.     The IRL-South project area is located in Martin and neighboring counties.

Congress intended that the IRL-South project restore, preserve, and protect the St. Lucie River,

St. Lucie Estuary (the "Estuary"):

> The Estuary and Indian River Lagoon are two of the Nation's most productive and most threatened estuaries. These estuaries and surrounding watershed is a mosaic of habitats that supports one of the most diverse assembly of flora and fauna communities in the Continental Unites States of America. Some of these habitats include: pine flatwood, wetland, mangrove, submerged aquatic vegetation, estuarine benthic areas (mud and sand), and near-shore reefs. These habitats provide a number of recreational and aesthetic opportunities for people living in the area and are the primary basis upon which the local economy depends. In addition, the mosaic of habitats provide water quality benefits, a recreationally and commercially important fishery, foraging, roosting, and nesting areas for fish and wildlife, sediment and nutrient removal, and many other benefits. Urban and agriculture developments have heavily impacted the area. These impacts have greatly changed the function of many of the watershed habitats with huge impacts to the estuary.

U.S. Army Corps of Engineers, *Central and Southern Florida Project Comprehensive Everglades Restoration Plan, Project Management Plan, Indian River Lagoon-South* (2013) (available at http://141.232.10.32/pm/pmp/pmp_docs/pmp_07_irl_south/IRLS_PMP_Main_and_App_v3.0% 20_30_Dec_2013.pdf.).

75.     The AAF Project crosses over the St. Lucie River and Estuary.  The St.

Lucie River and Estuary is home to over 30 threatened and endangered species and is a major

tourism generator for Martin County.  The Project will cause increased pollution and disturbance

of the unique environment for aquatic life.  Martin County has spent millions of taxpayer dollars

to achieve the continuous goals and objectives of CERP and the IRL-South.  As will be

explained in more detail, the AAF Project will cause the number of railroad bridge crossings to

increase from approximately 10 per day to up to 52 per day across these impaired but protected

water bodies.  The quadrupling of rail bridge closures will result in extensive marine traffic

queueing and congestion within the shallow but habitat-rich system.  The marine vessel backups

the Project will cause will have adverse secondary and cumulative impacts on the River and the

Estuary and in turn will conflict with Martin County's mandated efforts to restore, protect, and enhance the impaired ecosystem.

76.     Martin County owns or has a real property interest in a substantial amount of property located adjacent to the FECR corridor.  Within 500 feet of the FECR corridor, Martin County owns more than 800 acres of property, more than 200 acres of right-of-ways, more than 100 acres of utility easements, more than 25 acres of drainage easements, as well as sidewalk easements, access easements, and conservation lands.  Martin County also has an interest in the preservation areas that individual land owners are required to maintain in a preserved state under County-issued development orders pursuant to its Comprehensive Growth Management Plan and Land Development Regulations.

77.     In providing for the health, safety, and welfare of its citizens and visitors, Martin County has established the following comprehensive planning elements:

- A Coastal Management Element for the protection of natural resources, protection of health of estuaries, natural systems, including the Indian River Lagoon, Intracoastal Waterway, the St. Lucie River, Manatee Pocket, and the Loxahatchee River.  The latter three systems will be impacted by the AAF Project.

- A Conservation and Open Space Element to manage, conserve, and preserve the natural resources, including air, water, soils, habitat, fisheries, and wildlife within its jurisdictional boundaries.  The Conservation Element also provides for protection and preservation of upland habitat, protection of wetlands, site stabilizations, native vegetation, surface water quality, and wildlife habitats.

- Uplands Protection regulations to promote ecological stability and integrity by preventing the loss of native upland plant habitat, promotion of biological diversity of various forms of plants, and wildlife, including species that are endangered, threatened, or of special concern.

78.     Accordingly, the Project will cause impacts that will disrupt Martin County's plans for the protection and enhancement of its aquatic and other environmental resources.

### E.     Project-Related Harms to Indian River County and the Indian River County Emergency Services District

79.     The Project will have multiple adverse impacts on Indian River County and its residents, including but not limited to increased financial costs incurred, noise and vibration, public safety, quality of life, traffic congestion, air quality, the County's economic growth, historic and cultural resources within the County, as well as on the County's parks, wildlife, ecology, wild and scenic rivers, threatened and endangered species, property values, and economic vitality.

80.     Pursuant to the terms of the Federal Defendants' approval, Indian River County would be required to incur millions of dollars of costs to pay for Project-related safety improvements. *See supra* ¶ 19.  These are costs that Indian River County and its taxpayers would be forced to bear to mitigate the safety impacts of a project built and operated by a private railway company.

81.     In addition the financial harms the Project will cause Indian River County, Indian River County residents, including those who work for the County, who travel to and from work by motor vehicle will be inconvenienced and burdened by increased traffic congestion resulting from the Project and the 32 passenger trains traveling through the County daily.

Employees, goods being transported, public school buses, Senior Resource GoLine, and visitors

traveling east and west in Indian River County will be affected by the delays and be subject to

augmented fuel usage.  Furthermore, the delays will have a negative impact on emergency

response vehicles.

82.     The Project will have a significant negative impact on local businesses.

The noise and vibrations caused by the Project will make it difficult to operate businesses in

locations close to the railway which will directly impact the County's economy.

83.     Indian River County is the home of the Indian River Lagoon, which is

North America's most diverse shallow-water estuary and is a large tourism generator for the

County.  The Project calls for a new bridge over the St. Sebastian River, one of the Indian River

Lagoon's natural tributaries.  Replacement of the bridge will disrupt and jeopardize the Sebastian

waterway and its unique environment for aquatic life.

84.     Indian River County's economy is strongly tied to the eco-tourism

industry.  As such, any environmental impact to the Indian River Lagoon as a result of the

Project will have an adverse impact on County's eco-tourism revenues.

85.     The Project would result in 32 passenger train crossings per day at each of

the approximately 30 at-grade road crossings in Indian River County.  Each train will cause

traffic delays at each at-grade crossing when the gates are closed on the road to allow the train to

cross over the road.  These delays will be significant at many crossings.

86.     For example, at the railroad crossing at Oslo Road in Indian River County,

in the first year of the Project's operation there would be a westbound queue of 1,299 feet every

time a passenger train passes by during the evening peak hour.  *See* FEIS App. 3.3.5-C, Table 3-

10.  Since there are only approximately 350 feet on Oslo Road between the crossing and US

Route 1 (the north-south highway that runs from Maine to Key West), the majority of vehicles will be backed up in queues onto or beyond US Route 1.

87.     By 2036, the eastbound queues at the intersection of Oslo Road and US Route 1 each time a passenger train passes during the evening peak are predicted to extend 7,148 feet – well over a mile.  *Id.*  By 2036, eastbound delays at the Oslo Road and US Route 1 intersection in Indian River County are projected to exceed 656 seconds (i.e., almost 11 minutes) with every train crossing during the evening rush hour.  *Id.*

88.     The morning peak hour traffic backups may be worse, given that school and commuter traffic both occupy the roadways at that time.

89.     These extraordinary queues and delays at the at-grade crossings in the County will not only degrade traffic flow on the streets that cross the tracks, but at numerous other roadways intersecting these streets in the vicinity of the crossings.

90.     The delays at the approximately 30 at-grade crossings in the County will cause traffic backups, threaten traffic safety, impede the ability of police, fire and emergency medical vehicles to respond to emergencies, harm economic conditions in affected business districts, adversely affect the neighborhoods near the grade-crossings, degrade socioeconomic conditions in these areas by blighting the affected areas, and cause negative localized impacts to air quality as numerous vehicles idle for extended periods of time, all of which would adversely affect the County and its Emergency Services District.

91.     The adverse traffic conditions at grade crossings will directly interfere with the operations of the County.  Indian River County owns and insures numerous vehicles used for County purposes.  These include, for example, vehicles used by the County employees

of the Indian River County Sheriff's Office, Environmental Planning and Code Enforcement

Division, Traffic Engineering Division, and Parks Division.

92.     Although the Sheriff of Indian River County is a separate constitutional

officer under Article III, Section 1(d) of the Florida Constitution, the Board of County

Commissioners of Indian River County is responsible for approving the budget and appropriating

County funds to the Indian River County Sheriff's Office ("Sheriff's Office") pursuant to

Section 30.49, Florida Statutes.  The Sheriff's Office has nearly 300 vehicles used for law

enforcement, criminal investigation, and prisoner transport purposes.  To carry out these

responsibilities, the vehicles operated by the Sheriff's Office must regularly cross the railroad

tracks and their operation would be impeded by the frequent queues at these crossings.

93.     The increased traffic caused by the numerous daily train crossings will

interfere with efficient law enforcement activity by the Sheriff's Office and may increase

response times to calls for police assistance.  Further, Sheriff's Office vehicles will spend

additional time idling in traffic, thereby increasing fuel costs borne by the County.

94.     The Indian River County Environmental Planning and Code Enforcement

Division is charged with implementing the County's environmental policies and enforcing

County codes and ordinances.  As part of its duties, the employees of the Code Enforcement

Division travel around the County, including crossing the railroad tracks, using County-owned

vehicles to inspect and issue code violation citations and to perform site inspections.  The Traffic

Engineering Division is responsible for traffic safety and operational efficiency of County roads.

In carrying out these duties, Traffic Engineering Division employees drive County vehicles

throughout Indian River County, including across the railroad tracks, to perform traffic counts

and maintain and repair traffic signals, signs, and pavement markings.  The Parks Division

likewise has County-wide responsibility to maintain existing parks, buildings, and equipment. To perform these responsibilities, Parks Department employees regularly travel around the County in County vehicles to the various parks, necessarily crossing the railroad tracks. These are just three departments of many in Indian River County that use County-owned vehicles to traverse the County in the performance of their duties.

95.     The smooth and effective operation of Indian River County depends on the ability of its employees, like those of the Code Enforcement Division, Traffic Engineering Division, and Parks Department, to move safely and efficiently throughout Indian River County. Lengthy traffic queues caused by Project construction and operation will inhibit Indian River County's ability to deliver necessary County services proficiently and economically. Further, the County will experience increased fuel costs as its vehicles spend additional time idling in traffic created by the Project.

96.     The traffic queues and extraordinary delays caused by the approximately 30 at-grade railroad crossings in Indian River County will also affect the operations of the Emergency Services District. The District provides fire rescue response, medical/trauma emergency response, and hazardous materials response, among other tasks, within its service area, which, as noted above, encompasses almost all of Indian River County.

97.     The Emergency Services District has fifteen fire/rescue stations from which its fire trucks and ambulances depart in response to emergency calls. Ten of these stations are located west of the railroad tracks; five are located east of the railroad tracks.

98.     The Emergency Services District is the only first tier Advanced Life Support (ALS) service provider in its service area and, therefore, is the only provider who can

31

respond to 911 calls for emergency medical services in Indian River County.  ALS vehicles are staffed with paramedics to provide emergency medical care.

99.    It is critical for the Emergency Service District's ambulances to reach patients as rapidly as possible, and to transport them as quickly as possible to a hospital, where they can receive medical care from a physician.

100.    The only two hospitals in the Emergency Service District's service area are located to the east of the railroad tracks: Sebastian River Medical Center, located on US Route 1 in Sebastian and Indian River Medical Center on 36th Street in Vero Beach.  These two hospitals are the only locations to which the District may transport patients in distress in Indian River County.  (If the emergency situation rises to the need for a certified trauma center, the District would transport a patient to the Holmes Regional Medical center in Melbourne, Florida, or Lawnwood Medical Center in Ft. Pierce, Florida.)

101.    The majority of Indian River County's population resides to the west of the railroad tracks, and the majority of the emergency medical assistance calls received by the Emergency Services District are from locations to the west of the railroad tracks.  Service to these locations requires the District's ambulances to cross the railroad tracks to transport patients to the two hospitals east of the tracks.

102.    The Project, during both the construction and operation phases, will increase traffic congestion and delays at grade crossings throughout the District service area and will prevent all traffic flow when the crossings are closed to permit the train to pass by.  As a result of the Project, it can be expected that the District would experience increased response times for emergency service calls and increased delivery times transporting patients to a hospital.

Thus, the Project's adverse impacts on the traffic environment will harm the District's ability to deliver emergency care to Indian River County residents, workers, and visitors.

103.    Indian River County and its Emergency Services District are concerned that once the Project is operational, passenger and freight trains will share the same railway corridor, resulting in potentially catastrophic risks.

104.    A serious accident would harm Indian River County and its Emergency Services District by burdening them with the requirement to provide emergency response services to hundreds of residents, directly harming their employees and causing devastating harm to a local community, requiring Indian River County to provide medical, social, and other services.

105.    Indian River County owns and manages three dedicated nature conservation areas that abut the existing railroad right-of-way that would be utilized by the Project.  They are: (i) the North Sebastian Conservation Area, an approximately 407-acre conservation area located in the northern part of the County and directly adjacent to the railroad right-of-way for about 0.85 miles, (ii) the Hallstrom Farmstead Conservation Area, a 93-acre property located in southern Indian River County, including a wetlands area, that is adjacent to the railroad right-of-way for about 0.45 miles, and (iii) the Harmony Oaks Conservation Area, a 90.7 acre conservation area also located in the southern portion of the County and which abuts the railroad right-of-way for about 0.045 miles.  The North Sebastian, Hallstrom Farmstead, and Harmony Oaks Conservation Areas are all open to the public for recreational purposes including, but not limited to, hiking and bird watching.

106.    These conservation areas were all purchased, in part, with Florida Communities Trust Funds and environmental bond funds.  The Florida Communities Trust was

established by Florida statute to conserve "natural areas" in the state, which are linked to "quality

of life, environmental quality, as well as the viability and vitality of the urban areas."  Fla. Stat. §

380.502(1).  To obtain funding from the Florida Communities Trust, the County was required to

demonstrate that it would "restore areas" to be used for open space or to "enhance natural

resources" that may have "suffered loss of natural and scenic values."  *Id.* at § 380.508(4).

107.    The "primary purpose" of the County's acquisition and maintenance of the

North Sebastian Conservation Area was (and is) to "preserve and restore scrub and wetland

habitats for the benefit of rare and endangered species."  *See* North Sebastian Conservation Area

Annual Stewardship Report, July 11, 2005 (available at

weblink.cityofsebastian.org/weblink/0/doc/41756/Page1.aspx).

108.    In particular, the North Sebastian Conservation Area is a key property for

the preservation and protection of the Florida scrub-jay, a federally listed threatened avian

species, as part of the Sebastian Area-Wide Florida Scrub-Jay Habitat Conservation Plan (the

"Scrub-Jay Conservation Plan" or "HCP"), finalized March 2000.  The Scrub-Jay Conservation

Plan is a local government effort initiated and funded by Indian River County and the City of

Sebastian, which serve as the lead agencies for its implementation.  HCP at 1.  The purpose of

the Scrub-Jay Conservation Plan is to protect the broad range of native species characteristic of

the Atlantic Coastal Ridge scrub ecosystem and to enhance the recovery potential of the local

scrub jay population.  *Id.* at 1, 4.

109.    The goals of the Scrub-Jay Conservation Plan include reducing "extinction

risk" and increasing "population persistence" for the local scrub-jay population, which is the

fourth largest scrub-jay metapopulation in Florida.  HCP at 75.  Further, the Scrub-Jay

Conservation Plan is designed to protect "biological integrity and species diversity" of the scrub

ecosystem by returning the designated areas, including the North Sebastian Conservation Area,

"to conditions representative of the historical landscape and thereby optimal for native species of

conservation concern . . . ."  *Id.*

110.     The Project would harm protected wildlife species and their habitat,

including "effects from construction, grading, vegetation management, and mortality associated

with potential collisions with rail traffic" and "degradation of ecological function and loss of

habitat."  FEIS, p. 5-125.  Indirect effects caused by the Project "may include habitat

fragmentation and associated edge effects, the loss of genetic diversity of rare plant and animal

populations, increased competition for resources, and physical or psychological restrictions on

movements."  *Id.* at 5-133.  In addition, "[n]oise and vibration associated with the active rail line

may cause indirect effects if wildlife avoid habitat near the embankment."  *Id.*

111.     Scrub-jays are present in the North Sebastian Conservation Area along the

railroad tracks.  *See* FEIS App. 4.3.6-A, June 4, 2013 Scrub-Jay Survey, p. 4 and Figure 1a.

Further, scrub-jays observed as part of this survey disappeared into the scrub when a train

approached.  *Id.* at 6.

112.     The scrub-jay has experienced higher mortality and lower reproductive

success in roadside territories.  FEIS, p. 5-133.  Accordingly, the construction of the Project,

with its associated vehicular and construction traffic, as well as the pass-by of an additional 32

trains each day abutting the North Sebastian Conservation Area and other scrub-jay habitat is

expected to harm the local scrub-jay population in direct conflict with the County's management

goals for the North Sebastian Conservation Area.

113.     In addition to serving as a natural habitat area for the scrub-jay and other

species, the North Sebastian Conservation Area includes walking and hiking trails, picnic

pavilions, an equestrian corral, and shoreline fishing areas.  These areas are used by County residents, as well as by the many tourists who visit Indian River County, to enjoy and experience its natural beauty, including bird watching.

114.    Several of these trails lie in the portion of the North Sebastian Conservation Area that is near and adjacent to the railroad right-of-way, including "Reindeer Ridge," "Roseland Trail" and "Osprey Hideaway."

115.    These trails, as well as the other trails and recreational facilities at the North Sebastian Conservation Area, are intended to permit visitors to observe scrub-jay and other native Florida plant and animal species in a quiet, natural setting.

116.    Use of these trails, as well as the other natural areas adjacent to the railroad tracks, will be negatively affected by the noise, vibration, air emissions, and traffic generated by the Project's construction and operation.  Further, to the extent animal species are driven away from the railroad tracks as a result of the train traffic, the trails in the area closest to the tracks will no longer offer the opportunity to observe these species.

117.    In addition, the North Sebastian Conservation Area lies to the west of the tracks.  Many of the hotels and other tourist rentals in Indian River County are to the east of the tracks, closer to the coast.  Access to the North Sebastian Conservation Area thus necessitates crossing the tracks, typically by car, at the at-grade crossings that will be substantially impaired by increased rail operations caused by the Project.

118.    Thus, the Project's environmental impacts will harm the County by frustrating its management objectives for its North Sebastian Conservation Area.

119.    The Project's environmental impacts would also result in similar harms to the County at the Hallstrom Farmstead Conservation Area, which includes sand pine scrub,

maritime hammock, scrubby flatwoods and bottomland forest, and is home to the scrub-jay and the federally listed endangered plant species Lakela's Mint.  The Hallstrom Farmstead Conservation Area surrounds the historic Hallstrom Farmstead home, which is owned and maintained by the Indian River County Historical Society, an entity that provides, in coordination with the County, historic and environmental education tours of the Hallstrom Farmstead Conservation Area.  The Project would also degrade the experience at the Harmony Oaks Conservation Area, which the County manages to protect natural communities, including wetlands, and which includes a canoe and fishing dock, pedestrian and bike trails and a parking area.

120.    The North-South Corridor is rich with historical and archeological resources that abut or are in close proximity to the Project.  The Project threatens harm to numerous historic resources in Indian River County, including without limitation the St. Sebastian River Railroad Bridge; the Vero Man site; the Gifford Bones site; and the Old Town Sebastian Historic District East and Old Town Sebastian Historic District West.

121.    The St. Sebastian River Railroad Bridge, constructed in 1926, spans the St. Sebastian River, which in this area forms the northern border of Indian River County.  The southern half of this bridge is located in Indian River County.  The Project would demolish this historic bridge, which is visible from the County's Roseland Community Center and Park, a County-owned park on the St. Sebastian River approximately 530 feet south of the historic bridge.  The park contains a pier that allows visitors to take in the magnificent view of the St. Sebastian River and this historic railroad bridge.  The Project's demolition of this visual resource will adversely affect the viewshed from the County's park, thereby harming the County.

122.     The Project's harms to the archeological and historic resources also harm the County, as these sites are tourist attractions, and the County's tax revenues are heavily dependent on the County's attractiveness as a tourist destination.

123.     The Old Town Sebastian Historic District East and Old Town Sebastian Historic District West are comprised of nearly 30 contributing sites or buildings.  The two districts are listed on the National Register of Historic Places and would be bisected by the Project.  When a train traveling over 100 miles per hour blasts through this area 32 or more times per day, the resultant vibration affects surrounding receptors, including people and structures.  The FEIS acknowledges that "noise, vibration, and visual impacts, may also affect historic resources."  FEIS, p. 4-125.

124.     Other historic cultural attractions in Indian River County include the Vero Beach Train Station located in Vero Beach, immediately adjacent to the train tracks (within 57 feet), and the historic Hallstrom Farmstead, located on Old Dixie Highway, which runs parallel to the train tracks.  The Vero Beach Train Station was constructed in 1903 and is listed on the National Register of Historic Places.  It has been preserved for use as an office and education center for visitors to learn about the history and cultural heritage of Florida.  The Hallstrom Farmstead is a historic pineapple plantation, originally established in 1909, listed on the National Register of Historic Places.  The home is open to the public during the week, where a collection of artifacts, photographs, paper documents, furniture, and memorabilia are displayed.

125.     The noise, vibrations and other Project-related harms to these historic resources will reduce their attractiveness as tourist destinations, causing fiscal and other harms to the County.

126.    While in operation, the Project would have "severe, unmitigated impacts" to noise at the grade crossings in Indian River County if "locomotive-mounted horns" are used. FEIS, p. 5-45.  Even if AAF installs wayside horns at these grade crossings to be used in lieu of locomotive-mounted horns, which would purportedly "substantially reduce the noise footprint," *id.*, these wayside horns would nevertheless be sounded at each at-grade crossing, generating loud noise an additional 32 times a day as a result of the Project in the first year of operation.

127.    In addition to the noise created by horns, whether locomotive-mounted or wayside, the trains themselves, traveling at speeds in excess of 100 miles per hour and pulled by diesel locomotives, generate intrusive noise levels.

128.    The net result of the Project's construction-associated and operation-associated noise, vibration, air pollution, and increased train and vehicular congestion at railroad crossings will cause adverse socioeconomic impacts to the surrounding communities.  Property values in the immediate area adjacent to the railroad tracks are expected to decline due to the adverse effects of the Project, and the tourism industry essential to Indian River County will be harmed by the effects of traffic, noise, and harms to historic and archeological resources. Moreover, residential, businesses and County-owned properties adjacent to the Project will be adversely affected by air pollution related to both construction and train activity.  At the same time, the purported benefits of the Project will not accrue to the County, which is not slated for any train stops.  All of these effects have the potential to result in blighted socioeconomic conditions along the spine of Indian River County, in the area adjoining the railroad tracks.  Such environmental harms would create adverse socioeconomic conditions in the County and cause it fiscal and other harms through the loss of sales and property tax revenues, a decline in tourism

and other economic activity in the County, and increased demands for County-provided social services.

129.    Indian River County has a 1% county sales tax, over and above the Florida state sales tax of 6%, used to fund infrastructure in the County.  This sales tax helps to take advantage of tourism spending and provides a significant source of revenue for the County.

130.    The County also has a Tourist Development Tax of 4%, pursuant to Section 125.0104, Florida Statutes.  This tax is applied to the rental or lease of any living quarters or accommodations in a hotel, motel, rooming house, trailer camp, condominium, apartment, multi-unit structure, mobile home, trailer, single-family home or any other sleeping accommodations that are rented for six months or less.  This tax is applied over and above the total 7% sales tax in Indian River County (6% state sales tax and 1% County sales tax).  The proceeds from this tax (less administration costs) are returned by the State to the County for the County's use for statutorily-outlined purposes, including beach improvement, maintenance, restoration, and erosion control.

131.    Given the breadth of accommodation types to which the Tourist Development Tax applies and the length of time tourists typically stay in the County, the Tourist Development Tax applies to most tourists who choose to rent or lease overnight accommodations in Indian River County.

132.    Access to and enjoyment of the abundant natural, historic, and cultural resources in the County will be harmed by the construction and operation of the Project.  As traffic, noise, vibration, and local air quality are affected by the Project, tourists may choose to visit other coastal communities that do not have such issues.  As a result, Indian River County may experience a decline in revenue received from its County sales tax and its Tourist

Development Tax, which will harm the County's ability to maintain its operations and its numerous facilities, parks and beaches.

133.    Indian River County collects real property tax from County property owners, based upon the assessed value of that real property – both the land and improvements. Real property tax is due to the County on an annual basis.  The Project would reduce the County's overall property tax revenue because it will adversely affect the value of real property located adjacent to the railroad tracks.

134.    As noted above, the Project, both in the construction and operation phases, will result in increased noise, vibration, and traffic for the surrounding areas, and may have a negative impact on local air quality.  As a result, adjacent real property may become less desirable, and may decline in value.  Further, as the real property becomes less desirable, it is less likely to be developed or redeveloped with improvements to structures.  A decline in property value and a reduction in improvements to track-adjacent real property, in turn, will result in less property tax income to Indian River County.

F.    **Project-Related Harms to CARE FL**

135.    The Project will have multiple adverse effects on CARE FL and its members, including but not limited to noise and vibration, public safety, quality of life, traffic congestion, marine vessel congestion, air quality, and the availability of historic and cultural resources, parks, wildlife, ecology, wild and scenic river, threatened and endangered species, property values, and economic vitality.

136.    The Project will have an adverse effect on the members of CARE FL by disrupting the quality of life.  The trains will make two stops between Miami and Orlando, resulting in adverse impacts on CARE FL members, without the benefit of having stops in the Treasure Coast.  CARE FL members, such as Robert Crandall, Thomas Hewitt, and V. Michael

Ferdinandi, will be adversely impacted by the Project.  Mr. Crandall, the former Chair of

American Airlines, resides in a Martin County community located close to the Project that will

see increased safety risks, traffic, noise, and vibration, as well as decreased property values and

lower air quality levels.  Mr. Hewitt resides in a Palm Beach County community located close to

the Project that will see increased safety risks, traffic, noise, and vibration, as well as decreased

property values and lower air quality levels – and as a boat owner, Mr. Hewitt will be further

impacted by the Project as a result of the increased impediments to navigation caused by the

Project.  Mr. Ferdinandi resides in a Palm Beach County community located close to the Project

that will see increased safety risks, traffic, noise, and vibration, as well as decreased property

values and lower air quality levels.

137.    The Project will have an adverse effect on first responders in the Treasure

Coast community and the CARE FL members they serve.  The Treasure Coast Fire Chiefs'

Association has expressed concern regarding the "additional demands" that will be placed on

first responders as a result of the Project and the risks associated with the increased rail usage.

## FIRST CLAIM FOR RELIEF

## VIOLATIONS OF NEPA

138.    Paragraphs 1 through 137 are repleaded.

139.    NEPA is "our basic national charter for protection of the environment."

40 C.F.R. § 1500.1(a).

140.    NEPA was enacted to serve two significant purposes.  The first is to

ensure that federal agencies undertaking a major federal action take a hard look at a proposed

project's environmental impacts before deciding how to proceed.  The second purpose is to

ensure that relevant information about the impacts of a proposed project and its alternatives is

made available to members of the public, and to provide the public with a meaningful

opportunity for comment and participation, so that federal decisions are made in light of informed public comment.

141.     To effectuate these purposes, NEPA requires federal agencies undertaking any major federal action to prepare a "detailed statement" (*i.e.*, an EIS) to review the environmental impacts of the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action."  42 U.S.C. § 4332(C), (E).

142.     The Council on Environmental Quality ("CEQ") has promulgated regulations applicable to all federal agencies undertaking NEPA review.  40 C.F.R. Part 1500.

143.     A federal agency preparing an EIS must discuss in detail the environmental impacts of the proposed action and its alternatives.  40 C.F.R. § 1502.16.  This discussion must include: any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. *Id.*  The discussion must include: (a) direct effects and their significance; (b) indirect effects and their significance; (c) possible conflicts between the proposed action and the objectives of Federal, regional, State, and local land use plans, policies and controls for the area concerned; (d) the environmental effects of alternatives including the proposed action; (e) energy requirements and conservation potential of various alternatives and mitigation measures; (f) natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures; (g) urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures; and (h) means to mitigate adverse environmental impacts. *Id.*

144.    Thus, under NEPA, an agency must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quotation omitted); *see* 42 U.S.C. § 4332(2).  Agencies must "take a 'hard look' at [the] environmental consequences" of their actions, and "provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21 (1976)).

145.    This "hard look" requirement applies to the "authorization or permitting of private actions" like the AAF Project.  *Sierra Club v. U.S. Army Corps of Engineers,* 803 F.3d 31, 36-37 (D.C. Cir. 2015).

146.    Essential to a federal agency's obligations under NEPA is the duty to insure that "high quality" environmental information is available to the public before decisions are made and before actions are taken.  40 C.F.R. § 1500.1(b).

147.    Under the CEQ regulations, "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking." *Id.* § 1502.22.  Further, if the incomplete information "is essential to a reasoned choice among alternatives" and the costs to obtain complete information are "not exorbitant," the agency must include complete information in the EIS.  *Id.* § 1502.22(a).

148.    Public involvement is crucial under NEPA.  Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id.* § 1506.6(a); *see also id.* § 1500.2(d).  Further, federal agencies must hold or sponsor public hearings or meetings whenever appropriate, including when there is "[s]ubstantial

environmental controversy concerning the proposed action or substantial interest in holding the hearing."  *Id.* § 1506.6(c)(1).

149.     The CEQ regulations require that federal agencies "make every effort to disclose and discuss at appropriate points in the draft [environmental impact] statement all major points of view on the environmental impacts of the alternatives including the proposed action." *Id.* § 1502.9(a).  Federal agencies are required to discuss at appropriate points in the final environmental impact statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.  *Id.* § 1502.9(b).

150.     The CEQ regulations require federal agencies to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  *Id.* § 1500.2(e). The regulations emphasize that the alternatives analysis of an EIS "is the heart of the environmental impact statement," and the regulations therefore require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives."  *Id.* § 1502.14.

151.     The approval of the issuance of $1,150,000,000 of PABs for Phase II of the Project is a major federal action subject to NEPA.

152.     In approving the Project, the Federal Defendants abrogated their responsibility to take a hard look at the Project's environmental impacts, rigorously explore and objectively evaluate all reasonable alternatives to the Project, and identify all reasonable means to mitigate the harms from the Project, and instead, acted as the Project's cheerleaders, deferring to AAF as to the scope of environmental analysis, the range of alternatives to be considered, and the mitigation measures to be evaluated in the FEIS and imposed in the ROD.

45

153.     Thus, the Federal Defendants acknowledged that "AAF's financial model is a primary driver of … which alternatives are feasible for analysis."  ROD, App. C, p. 1 (Ex. 2). Yet even by this debased standard, the Federal Defendants' assessment fell short because they dismissed alternatives and mitigation measures out of hand as objectionable to AAF without presenting any public assessment of their financial impacts to AAF or harm to its "financial model."

**A.     Failure to Take a Hard Look at Environmental Impacts**

154.     The FEIS failed to take the required hard look at the Project's environmental impacts.  Several of these failures are summarized below; others will be addressed in the briefing of this matter.

**1.     Failure to Take a Hard Look at Public Safety Impacts (Pedestrians)**

155.     NEPA encompasses risks to "public health or safety," including catastrophic risks whose "probability of occurrence is low."  40 C.F.R. §§ 1508.27, 1502.22(b)(4).

156.     Currently, the FECR corridor accommodates rail freight traffic traveling at modest speeds through the counties.  The Project will add 32 additional trains to that corridor, which will barrel through the counties at speeds exceeding 100 mph.  The FRA's own guidelines state that "[h]igh-speed passenger trains are difficult to detect visually and can be virtually silent until their arrival at any given location."[12]  The Project will also increase the speed of the freight trains.  Nevertheless, the FEIS presents no meaningful analysis of the impacts the Project will cause to pedestrian safety, or of how such impacts can be mitigated.

---

[12]     FRA, Highway-Rail Grade Crossing Guidelines for High-Speed Passenger Rail, p. 13 (Nov. 2009) (available at https://www.fra.dot.gov/eLib/Details/L03536).

157.     Instead of assessing the Project's impact on pedestrian safety in an open

public process under NEPA, the Federal Defendants shunted the assessment off to a bilateral

negotiation to be held at some unspecified future time.  *See* FEIS, p. 1-23 (stating that

"[c]onsistent with FRA safety requirements, *which are not part of the NEPA process*, AAF will

develop a . . . Safety Program prior to the start of operations" (emphasis added)); *id.* (stating that

AAF will "provide  recommendations" as to fencing the FECR corridor); FEIS, p. 3-44 (a

"hazard analysis" will determine where "fencing is required for safety").

158.     Phase I of the Project, currently in limited commercial operation, has

already killed four pedestrians and injured others in separate incidents,[13] including an accident

just last week when a pedestrian was injured and pinned under an AAF train.[14]  Yet without

having taken a hard look at the Project's impact on pedestrian safety, the ROD concludes that the

Project will "have an overall beneficial effect on public health, safety and security in the rail

corridor."  ROD, p. 26 (Ex. 2).  The postponement of any substantive assessment of pedestrian

safety risks and the Federal Defendants' resulting failure to allow the public the opportunity to

comment on such analysis violated NEPA.

159.     In obeisance to AAF, the Federal Defendants required AAF to install

"pedestrian crossing gates . . . to ensure pedestrian safety" only at locations where the local

municipality agrees to bear the cost of maintaining the gates.  FEIS, p. 3-45; FEIS, p. 3-46;

---

[13]     "After Brightline high-speed rail deaths, Florida lawmakers call for safety rules," USA
TODAY, Jan. 23, 2018; "Brightline deaths in South Florida spur push for state oversight,"
ORLANDO WEEKLY, Jan. 24, 2018; "Brightline fatalities in Boynton Beach polarize,
worry local communities," (Jan. 18, 2018) (available at
https://www.tcpalm.com/story/news/local/shaping-our-future/all-aboard-
florida/2018/01/18/brightline-fatalities-polarize-worry-local-communities/1042709001/).

[14]     Tonya Alanez, "Another person on railroad tracks struck by Brightline train," Sun
Sentinel (Feb. 8, 2018) (available at http://www.sun-sentinel.com/local/broward/wilton-
manors/fl-reg-brightline-hits-fourth-pedestrian-20180208-story,amp.html).

ROD, App. C, p. 26 (Ex. 2).  These safety requirements should in no way depend on who pays

for them.  The Federal Defendants did not take a hard look at the public safety consequences of

not installing the pedestrian crossing gates, or provide any rational explanation as to why AAF

should not bear the cost of these safety measures.  The failure to take a hard look at these issues

violated NEPA.

160.    The Federal Defendants called for AAF "to incorporate recommended

grade crossing safety improvements . . . in conjunction with county and municipal execution of

amendments to existing crossing license agreements . . . ."  ROD, p. 27 (Ex. 2).  AAF has

demanded that these amendments force the counties and local municipalities to bear the cost of

maintaining the safety improvements.  The Federal Defendants failed to provide a rational

explanation as to why the construction of the necessary safety improvements for the Project

should be conditioned on the agreement of the local governments to pay for their future

maintenance, and they failed to take a hard look at the public safety impacts of the Project in the

event that the recommended safety improvements are not implemented due to AAF's refusal to

agree to pay future maintenance costs, as the local governments have requested.  These failures

violated NEPA.

### 2.    Failure to Take a Hard Look at Public Safety Impacts (Catastrophic Collisions and Derailments)

161.    AAF has acknowledged, in a Preliminary Offering Memorandum dated

June 4, 2014 (the "Offering Memorandum"),[15] that co-locating passenger and freight trains on

the same tracks may result in "casualty and property risks as a result of shared use of the corridor

with freight railroad operations."  Offering Memorandum at 25.  This increased risk is of

---

[15]    *Indian River County v. Rogoff*, 1:15-cv-00460-CRC, Dkt. # 15-22.

particular concern, because in the same document, AAF states that "[t]he operation of any railroad carries with it an inherent risk of catastrophe, mechanical failure, collision and property loss" and that "[c]ollisions, derailments, leaks, explosions, environmental mishaps, or other accidents can cause serious bodily injury, death and extensive property damage, particularly when such accidents occur in heavily populated areas." *Id.* at 24.

162. The use of shared railroad tracks between passenger and freight trains requires the passenger trains – moving at speeds up to 110 mph – to switch tracks frequently to pass slower moving freight trains. *See* FEIS, pp. 3-44, 3-59. The FEIS failed to examine the risk of operator error or a mechanical failure in managing this daily ballet of fast-moving, track-switching trains through a densely populated corridor. The Federal Defendants never reviewed AAF's ability to perform this intricate dance, and FRA safety personnel have indicated that AAF has not shown its ability to do so and still meet its target travel time of 3 hours and 15 minutes between Miami and Orlando, a trip time that AAF's ridership study stated it must meet in order to have "the ridership necessary for a sustainable commercial venture." FEIS, p. 3-6.

163. The use of shared railroad tracks between passenger and freight trains also poses the potential for collisions between passenger and freight trains to result in catastrophic releases of hazardous and toxic chemicals.

164. FECR, which operates the freight line and owns the railroad corridor that would be utilized by the Project for passenger trains, services numerous customers who handle hazardous materials. FECR has published a general tariff that sets forth its procedures for shipping "Poison Inhalation Hazardous" and "Toxic Inhalation Hazardous" chemicals. Dozens of such chemicals are listed on the FECR tariff, including anhydrous ammonia, sulfuric acid, and chlorine gas. Freight traffic traveling on the rail lines in this corridor transports hazardous

materials, including ammonium polyphosphate, liquid propane gas, ammonium nitrate, fuel oil, pesticides, and explosives.  FEIS, Table 5.2.4-1.

165.    FECR also intends to transport liquefied natural gas ("LNG") within the same corridor as AAF passenger trains, making it the only carrier in the lower 48 states to transport LNG as a commodity.

166.    The Project will increase the potentially catastrophic risks of shipping these chemicals through Martin County and Indian River County.

167.    Martin County's Fire Rescue Department Division Chief of Operations, Daniel Wouters, conducted several vulnerability analyses to determine the potential harm if an incident were to occur in Martin County.  *See* Declaration of Daniel Wouters dated May 21, 2015.[16]  Chief Wouters concluded that there is "a great potential for a significant negative environmental impact if Martin County Fire Rescue were required to take defensive operations to prevent the plume cloud from dispersing through the community."  *Id.* ¶ 9.  Chief Wouters determined that in a liquefied anhydrous ammonia railcar accident in downtown Stuart would leave 490 people in the "red zone," which includes the population at risk of life-threatening adverse health effects or death; 897 people in the "orange zone," which includes the population at risk of irreversible or other serious, long-lasting adverse health effects or an impaired ability to escape the environment; and 694 people in the "yellow zone," which includes the population at risk of notable discomfort, irritation or sensory effects, but effects are not disabling and are reversible.  *Id.* at Ex. A.  In a liquefied chlorine gas accident in Port Salerno, 5,317 people would be in the "red zone," 5,602 in the "orange zone," and 1,740 in the "yellow zone."  *Id.*  The

---

[16]    *Martin County v. U.S. Dep't of Transp.*, 1:15-cv-00632-CRC, Dkt. # 20-4.

increase in the volume of passenger and freight rail traffic resulting from AAF's Project "will increase the potential for such chemical releases." *Id.* ¶ 10.

168.    An accident causing the release of a tanker car of such chemicals could cause a toxic plume posing a severe safety hazard in an area more than a mile from the accident site, threatening public safety.  The testimony of Robert L. Sumwalt, Vice Chairman of the National Transportation Safety Board, before the U.S. House of Representatives Committee on Transportation and Infrastructure, Subcommittee on Railroads, Pipelines and Hazardous Materials, on January 30, 2007, illustrates these risks.  In his testimony,[17] Mr. Sumwalt discussed a catastrophic railroad accident that occurred in South Carolina on January 6, 2005, resulting in a chlorine vapor plume that killed nine people through chlorine gas inhalation.  Approximately 554 people were taken to local hospitals as a result of respiratory difficulties, of which 75 were admitted for treatment.  An estimated 5,400 residents within a one-mile radius of the accident site were evacuated for several days.

169.    The FEIS failed to take a hard look at the risks of operating passenger trains traveling at speeds up to 110 mph through densely populated areas on the same tracks as slower moving freight trains transporting dangerous and hazardous materials.

170.    AAF is relying on gates to prevent collisions between fast-moving passenger trains and vehicles at scores of at-grade crossings, but there is no discussion in the FEIS of the poor track record of gates at at-grade crossings and the risks that remain even if gates are installed.

---

[17]    *See* Robert L. Sumwalt, Remarks Before the U.S. House of Representatives Committee on Transportation and Infrastructure, Subcommittee on Railroads, Pipelines and Hazardous Materials, Washington, DC, Nat'l Transp. Safety Bd. (Jan. 30, 2007) (available at https://www.ntsb.gov/news/speeches/RSumwalt/Pages/Sumwalt_070130.aspx).

171.    The FEIS failed to take a hard look at the foregoing public safety issues, failed to disclose the public safety risks, and failed to examine reasonable alternatives and mitigation.

### 3.    Failure to Take a Hard Look at Noise Impacts

172.    The Project would operate on the same tracks and right-of-way as an existing North-South freight train corridor from Miami to Cocoa.  To allow faster service, the Project will "double track" large portions of the corridor and upgrade or replace several of the existing railroad bridges.  Such improvements will allow freight trains to travel at significantly increased speeds using the upgraded rail line funded by the PABs.  *See* FEIS, p. 3-60.  The FEIS purported to include a "general assessment" of the Project's noise impacts, but it was manifestly deficient in failing to take hard look at the noise (and vibration) impacts of faster freight trains on the rail corridor.

173.    In many places, the Project's increase in freight train speeds will be dramatic.  For example, the freight trains running through Vero Beach, a densely developed area of Indian River County, currently travel at a top speed of 45 miles per hour, but the Project will upgrade the track infrastructure, causing the freight trains to run through Vero Beach at a speed of 70 mph, and to do so along a new second track closer to many homes.  *See* FEIS, Appendix 3.3.3-A4, sheet 11.  The freight trains running through Roseland, a densely developed area of Indian River County immediately south of the St. Sebastian River Bridge, currently travel at a top speed of 28 miles per hour, *see* FEIS, p. 6-26, but the Project will replace the bridge, causing the freight trains to pass by at a speed of 55 mph, and to run on a new second track closer to many homes.  *See* FEIS, App. 3.3.3-A4, sheet 9.  The FEIS failed to examine the noise impacts of faster freight trains, which cause higher noise and vibration levels than slower trains, an effect

exacerbated by their operation on a new second track closer to the homes of many residents, businesses and other sensitive uses.

174.    The Federal Defendants' explanation for the deficiency in the FEIS noise assessment was irrational and contrary to well established NEPA principles.  In its consideration of several areas of environmental concern, where the increased speed of the freight trains would arguably offset the impact of the Project's new passenger trains (as in the case of calculating the duration of draw-bridge closures adversely affecting navigation), the FEIS touts the increase in freight train speeds and relies upon the increase to paint a picture that minimizes the Project's identified impacts.  *See, e.g.*, FEIS, App. 4.1.3-B1, p. 1-3.  But when asked to assess the noise impacts of the faster freight trains, the Federal Defendants asserted that the Project's effect on freight operations was "outside the scope of the FEIS."  ROD, App. C, p. 8 (Ex. 2).  With this arbitrary blinder to examining the environmental impacts of one of the direct effects of the Project, the Federal Defendants limited their general assessment of the Project's noise impacts to the new passenger trains, allowing them to conclude that the Project would have no adverse noise impacts along the entire North-South rail corridor.  *See* FEIS, p. 5-59.  This conclusion is arbitrary and capricious and irrational, because NEPA requires an examination of the environmental impacts of the direct effects of all major facets of a project, not merely the environmental impacts of one of its components.

175.    In another major deficiency, the FEIS's "general assessment" of noise impacts failed to proceed to the next step: the Detailed Noise Analysis called for in the noise assessment guidelines published by the FRA and FTA, even though the FEIS cited and purported to follow these guidelines.  *See, e.g.*, FEIS, p. S-12.

176.    The FRA guideline states as follows:

The Detailed Noise Analysis is appropriate for assessing noise impacts for high-speed train projects after the preferred alignment and candidate high-speed train technologies have been selected. At this point, the preliminary engineering has been initiated, and the preparation of an environmental document (usually an Environmental Impact Statement) has begun.  Information required to perform a Detailed Noise Analysis includes type of vehicle equipment to be used, train schedules, speed profiles, plan and profiles of guideways, locations of access roads, and landform topography, including adjacent terrain and building features.[18]

177.    The FTA noise guidance similarly requires use of a Detailed Noise Analysis when preparing an FEIS, using a similar description of the information that is needed and which is generally available at the preliminary engineering stage.[19]

178.    All of the information needed for a Detailed Noise Analysis was available at the time of the preparation of the DEIS, and certainly at the time of the preparation of the FEIS.

179.    The FEIS estimated that the Project (Phase I and Phase II) would be *completed* by 2016 (FEIS, pp. 3-29, 3-62, 3-64) and screened out alternatives that would delay construction until after 2016 (FEIS, p. 3-24).  Given that timetable, it would strain credulity to suggest that the information required for a Detailed Noise Analysis was not available to FRA in August 2015, when the FEIS was released.  The FEIS itself contains detailed information as to the type of equipment to be used (FEIS, pp. 3-60, 5-38, 5-193), train schedules (FEIS, pp. 3-59, 3-60), speed profiles (FEIS, p. 3-60 and App. 3.3-B4), plan and profiles of guideways (FEIS

---

[18]    FRA, HIGH-SPEED GROUND TRANSPORTATION NOISE AND VIBRATION IMPACT ASSESSMENT, p. 5-1 (Sept. 2012) (available at https://www.fra.dot.gov/eLib/Details/L04090).

[19]    FTA, TRANSIT NOISE AND VIBRATION IMPACT ASSESSMENT, pp. 1-2, 1-3, 1-4, 6-1 (May 2006) (available at https://www.transit.dot.gov/regulations-and-guidance/environmental-programs/fta-noise-and-vibration-impact-assessment).

App. 3.3-B4), locations of access roads (*id.*), and landform topography (*id.*) – all the elements required for a Detailed Noise Analysis.

180.    No rational explanation was provided for the failure to follow the Federal Defendants' own guidelines for a Detailed Noise Analysis under NEPA.  By failing to undertake the analysis their guidelines recommend, the Federal Defendants acted arbitrarily and capriciously, and the FEIS they prepared failed to take a hard look at the Project's potential noise impacts.

181.    As a result of the foregoing, the Federal Defendants did not have the information before them to assess the potential noise impacts of the Project along the FECR corridor.  Nor did they properly consider a key noise mitigation measure that would reduce noise impacts on residential neighborhoods: the establishment of "quiet zones" in which road and pedestrian crossings are upgraded sufficiently to allow them to operate without audible warnings of the train's approach.  The FEIS discusses the potential implementation of "quiet zones," but in deference to AAF, determined that they would be established only if the local municipality agrees to bear the cost.  FEIS, p. 1-21 ("Municipalities are responsible for funding all improvements and equipment maintenance associated with Quiet Zones within their jurisdictions.").  A hard look at the Project's noise impacts would have enabled the Federal Defendants to make an informed decision as to whether to require AAF to make the upgrades required for the quiet zones.  The basic purpose of NEPA was frustrated by the failure of the Federal Defendants to take a hard look at the Project's noise impacts on residential neighborhoods before approving the Project.

182.    In an implicit acknowledgement of the deficiency in their FEIS, the Federal Defendants, in December 2017, required AAF to perform the Detailed Noise Analysis

that should have been subject to public review and comment during the NEPA process. *See* ROD, p. 19 (Ex. 2). But this post-ROD study is a pointless exercise absent a mechanism to require AAF to comply with any mitigation deemed appropriate as a result of the study. The Federal Defendants' approach to this issue violates the NEPA requirement to take a hard look at a Project's potential environmental impacts *before* making a determination with respect to the Project, and to include the public in the process.

4.      **Failure to Take a Hard Look at Safety and Environmental Impacts Caused by Project-Related Vessel Queueing at Railroad Bridges Over Navigable Rivers**

183.    A central – and highly troubling – feature of the Project is that it will retain the existing St. Lucie River and Loxahatchee River rail bridges, despite the fact that both bridges are antiquated and already significantly impede navigation. On information and belief, the St. Lucie River bridge was completed around 1925 – although the FEIS estimates the date to be 1938 – and the Loxahatchee River bridge was completed around 1935. FEIS, pp. 4-133, 6-7. When these historical bridges are in use (in the down position, so that trains can pass over them) they rest only seven and four feet above the water, respectively, blocking maritime navigation. The opening-closing process for these bridges takes approximately 20 minutes, effectively shutting down navigation for each closure for at least that amount of time, for each closure.

184.    The St. Lucie River bridge is currently in use (impeding maritime navigation) for a total of 6.6 hours per day; with the passenger trains, the waterway is estimated to be impassable for 9.8 hours per day. The Loxahatchee River bridge is currently in use (impeding maritime navigation) for a total of 5.8 hours per day; with the passenger trains, the waterway is estimated to be impassable for 8.6 hours per day. FEIS 5-23.

185. However, the FEIS also included additional assumptions that do not tick and tie to these closure estimates and the number of trains that would be passing over the bridge. Take the St. Lucie River bridge, for example.  On page 5-29 of the FEIS, the FRA estimates that the St. Lucie River bridge would be closed 42 times per day, with a reduced average time of 15 minutes per closure.  First, 42 closures is 10 closures fewer than the 52 trains (32 passenger and approximately 20 freight) per day expected under the Project.  Second, the reduced closure time of 15 minutes per closure is 25% less than the current 20 minute closure cycle.  The cycle time for closing does not account for the amount of time it takes the passenger and freight trains to cross the bridges, including aggravating factors such as the predicted increased lengths of freight trains that will necessarily cause the bridges to be closed longer.

186. Freight train lengths notwithstanding, one could do simple math and multiply the total number of trains per day under the Project (52 total – 32 passenger and 20 freight) by the current average closure time (20 minutes), resulting in a number that would be far higher than the FEIS's 9.8 hour estimate.  Instead, based on these numbers, the St. Lucie River bridge would be closed 17.3 hours per day – a 7.5 hour, or more than 76 percent, increase over the FEIS estimate.  It is the duty of the Federal Defendants in the FEIS/ROD to demonstrate the lower rate is practicably achievable.

187. The "modeling" used to calculate when trains in opposite directions would "overlap" and therefore take advantage of the same bridge closure is deeply flawed, and the uncertainties associated with this modeling were not disclosed, in contravention of the NEPA regulations.

188.    In its comments on the DEIS, Plaintiff CARE FL submitted a detailed analysis from Captain Dana Goward, a former Senior Executive Service official in the U.S. Coast Guard who was responsible for the permitting and regulation of over 18,000 bridges.

189.    In his analysis, Captain Goward pointed out the multiple flaws in the FEIS's data and computer models, concluding:  "The analysis in the FEIS is based upon the entirely unrealistic assumption that the proposed system of 32 short fast passenger trains and 20 long slow freight trains each day, on 230 miles of track, over three bridges, through 8 counties and 10 cities in the most heavily and densely populated section of Florida will run with the precision of a Swiss watch."

190.    Captain Goward continued:  "Even then, the project is only able to get the results it wishes and minimize the negative impact calculated by using a series of unrealistic and unwarranted assumptions as the entering arguments for their computer model.  Even small changes in these assumptions to make them more grounded in the practicalities of day to day operations and greatly change the output of the model reflecting much greater negative impacts."

191.    Captain Goward also noted that many of the navigation-related problems with the Project would be avoided by the selection of an alternative route.  But if the FECR route is used, Captain Goward noted that it is imperative that the St. Lucie River and Loxahatchee River bridges be replaced with higher, more modern, safer bridges that do not create adverse noise, vibration or visual impacts on the surrounding communities.  Such new bridges would not require 20 minutes to open and close (as the current bridges do), thereby resolving the key problem of blocking vessel traffic.  The bridge openings for vessel navigation could be larger and permit safe two way vessel traffic when the bridge is open, not one way traffic as is currently

the safest way to navigate.  The new bridges would also be higher and permit some vessels to proceed below the closed bridge, which cannot occur under the current, low antiquated bridges.

*The St. Lucie River Bridge*

192.    The waterway connects the communities of Palm City, Port St. Lucie, parts of Stuart, and the Okeechobee Waterway to the Atlantic and the north-south portion of the intra-coastal waterway.  The Okeechobee Waterway connects the east and west coasts of Florida, is maintained at a depth of 8 feet and is suitable for both commercial tug-barge and recreational traffic.  The 165 mile waterway from Stuart on the east coast to Ft. Myers on the west coast saves approximately 360 miles compared to rounding the Florida peninsula.  The Army Corps of Engineers reports that approximately 10,000 vessels and 26,000 tons of cargo transit the waterways' nearby St. Lucie lock each year.

193.    The navigable waterway passes through a narrow opening with a horizontal clearance of 40 feet between the protected abutments of the rail bridge.  This is the narrowest point that mariners must navigate on the 154 mile Okeechobee Waterway where the canal varies from 80 to 100 feet wide.

194.    Transiting beneath these three bridges is challenging for many vessels because of the configuration of the waterway.  Vessels must pass through three narrow bridge openings, which are not perfectly aligned, within less than a quarter mile.  As with any choke point between large bodies of tidal waters, currents are strong except for brief windows during slack tide.  Captains of tug and barge operations report that they must time their transits carefully so as to arrive when the tide is changing and the current is at its weakest.  And while smaller vessels are able to pass each other safely, transits of the quarter-mile gauntlet by vessels of any size limit the waterway to one way traffic.

195.     Waterway users from both sides of the bridge transit to use the waterways. Most of the 15 major marina and dockage space in the area is west (upstream) of the bridge. These vessels, and those transiting from the Okeechobee Waterway, must pass through the rail bridge to access the Atlantic Ocean and/or the Atlantic intra-coastal waterway, and contribute to the estimated 88,000 transits per year.

*The Loxahatchee River Bridge*

196.     The navigable waterway passes through a narrow gap of 40 feet between the protected abutments of the Loxahatchee River bridge.  When the railroad bridge is open, waterway vertical clearance is 25 feet which is controlled by the adjacent Route 811 fixed highway bridge.  The 3,000 mile intra-coastal waterway that traverses the Atlantic and Gulf coasts is immediately to the east of the two bridges.  A third of a mile downstream the Route 1/A1A fixed highway bridge has a vertical clearance of 26 feet.

197.     Boats waiting for the bridge to open must often contend with strong tidal currents estimated at 7 to 8 knots.  This is caused by the tide surging through a narrow river neck into and out of the very large basin and recreation area comprised of the three forks of the Loxahatchee River and the extensive, wide confluence area just west of the bridge.  Boats waiting for the bridge to open can have difficulty avoiding being set onto the bridge, the shore, and each other.

198.     The narrow passage and strong current beneath the bridge make it impossible, or at best unsafe, for even small vessels to pass each other.  Accordingly, traffic is almost always limited to one way at a time.

199.     While there are more than 1,200 boat slips upstream, waterway users from both sides of the bridge transit to use the waterway on the other side.  Boaters from the east side

of the bridge transit west to the broader and more sheltered areas of the river to water ski, jet ski, picnic on a wide and long sand bar at low-tide, and visit Jonathan Dickinson State Park.  Boaters from the west side transit east to use the intra-coastal waterway, visit marinas, patronize restaurants, and enter the Atlantic.

*Failure to Take a Hard Look At Safety and Environmental Impacts*

200.     The Federal Defendants failed to take a hard look at the public safety, air pollution, wildlife, and other environmental impacts of AAF's plan to run the new passenger trains over the two historic "draw bridges" that obstruct maritime navigation on the Loxahatchee River and St. Lucie River when they are in the "down" position to allow a train to pass.

201.     The FEIS acknowledges that the Project will cause vessels to queue at the closed bridges.  The FEIS predicts the Project will result in a maximum vessel waiting time – for a single bridge closure at the Loxahatchee River – of 169.7 minutes (*i.e.*, almost 3 hours), and a maximum vessel waiting time – for a single bridge closure at the St. Lucie River – of 167.6 minutes (*i.e.*, almost 3 hours).  FEIS, App. 4.1.3-B2, App. B.  As noted above, the modeling was deficient because it assumed that the AAF passenger trains would always be on time.

202.     But even if the queueing model used in the FEIS were accurate, the FEIS evaluation was grossly deficient in assuming that vessels can "queue" in place for hours when faced with difficult cross-currents and tides.

203.     And even assuming the accuracy of the queue-time modeling presented in the FEIS, that document failed to assess the environmental impacts of the lengthy queues.  The FEIS should have assessed whether the logjam of vessels waiting for a railroad bridge to open will cause adverse impacts to public safety, due to the jostling of vessels in hazardous currents, making queueing in these areas difficult and dangerous.

204.     The FEIS also failed to take the required hard look at adverse impacts to air quality from the queueing vessels (which must run their motors to stay in the queue).  In addition to being at greater risk of collision, grounding and being set upon the bridge by strong currents, vessels idling and trying to position themselves for when the bridges open unnecessarily waste fuel, and spew increased air emissions due to the additional fuel burn and typically low engine speed.  As noted on page 10 of Plaintiffs' July 26, 2017 letter to the FRA requesting an SEIS, the typically strong current makes conditions tough for boaters to stay in neutral without moving with the current and wind and tough to stay within the channel.  Consequently, motors cannot be turned off.  In some cases, motors/engines remain in gear for control of the watercraft, resulting in the emission of nitrogen oxides, particulate matter and other air pollutants not assessed in the FEIS.

205.     The FEIS failed to take the required hard look at the adverse impacts of queueing watercraft to plant life due to "prop dredge" and associated adverse impacts to water quality, adverse impacts to manatees, fish and other wildlife from queueing vessels, and adverse impacts to industries and communities dependent on maritime activities that would be harmed by the more frequent bridge closures.  This secondary impact would harm water quality and aquatic habitats, which are part of what the CERP and IRL-South projects are meant to restore. Thus, allowing the rail bridge to quadruple the number of closures should be analyzed in the context of these federally mandated restoration projects.  The AAF Project, if left unchecked, would threaten the effectiveness of these restoration projects.

206.     Accordingly, the FEIS failed to take a hard look at the potential environmental impacts of the extended and more frequent bridge closures caused by the Project's use of the existing draw bridges over the Loxahatchee and St. Lucie Rivers.

207.    The ROD states that "AAF will mitigate these increased closure times by implementing new measures to notify mariners of the bridge closure times and to make closure times more predictable."  ROD, p. 17 (Ex. 2).  But this "mitigation" does nothing to alleviate the vessel wait times that will increase considerably due to the Project, and in no way addresses the real safety, environmental, and navigation issues raised by vessel queueing at these railroad bridges.

208.    The ROD neither incorporates the substantive mitigation measures recommended by the Plaintiffs nor addresses those measures in its response to comments (Appendix C).  Instead, it mentions only a handful of the measures that Martin County proposed and ignores the rest.  *See* ROD, App. C, p. 19 (Ex. 2).  Without undertaking the rigorous analysis NEPA requires, the Federal Defendants unreasonably rejected as infeasible the alternative of replacing the antiquated St. Lucie River and Loxahatchee River bridges along the proposed route with new, modern bridges that would be both safer and less obstructive of navigation.

## 5.    Failure to Take a Hard Look at Safety and Environmental Impacts of Freight Train and Passenger Train Queueing

209.    The AAF Project proposes to run 16 passenger trains north-to-south and 16 passenger trains south-to-north daily between Orlando and Miami, approximately once an hour from 5 am to 9 pm at speeds of up to 125 mph, with speeds up to 110 mph through Martin and Indian River Counties.  *See* FEIS, pp. 3-59, 5-10.  Even with double tracking of most of the rail corridor, a consequence of this schedule is that freight trains, which operate on a more flexible schedule and travel at a much slower pace, will need to be shunted off to sidings to allow the passenger trains to speed by.  The average freight train is 8,150 feet (*i.e.*, more than 1.5 miles) long.  FEIS, p. 4-5.  The FEIS identifies new sidings in Indian River County and Martin

County to be built to accommodate the Project, with at-grade road crossings at these sidings. FEIS, p. 3-43.

210.     The FEIS failed to take a hard look at the environmental impacts of freight trains using these sidings.  The only traffic analysis in the document assessed the traffic impacts of at-grade road crossings when a road is temporarily closed to vehicular traffic to allow a train to pass by at a relatively high speed on the main tracks.  The FEIS did not present any traffic or other analysis of the impact of slow-moving or stopped freight trains on the sidings, which would result in lengthy road closures that could result in serious traffic congestion, delays to ambulances, fire trucks and other emergency vehicles, and adverse community and quality-of-life impacts.

211.     Similarly, the FEIS failed to take a hard look at the noise and air quality impacts of diesel train engines operating in a stationary position near residential buildings or other sensitive uses adjoining the sidings.

212.     Without substantiation in any public document, the FEIS states that AAF's plans supposedly do not "call for" holding trains at the sidings (FEIS, p. 3-43), but the FEIS does not examine the likelihood that logistics would often require a freight train to be parked on a siding nonetheless.  Given the extraordinary length of the freight trains and the comparatively modest length of the sidings, it is difficult to imagine freight trains moving at any significant speed, if at all, while on a siding waiting for an AAF passenger train to pass.  The failure to take a hard look at the environmental impacts of the freight trains stopped or moving slowly on the sidings violated NEPA.

213.     Even passenger trains may be subject to being idled on a siding.  A key pinch point in the rail corridor is the existing single-track bridge over the St. Lucie River, which

AAF proposes to use for both freight traffic and the new passenger trains.  Since trains cannot pass each other on this segment of the North-South corridor, even passenger trains may be subject to queueing, along with the freight trains, while waiting for another train to cross the bridge.  The FEIS failed to examine the environmental impacts of the use of the sidings by either freight trains or passenger trains.

214.   The single track pinch point at the St. Lucie River bridge will create a bottleneck and backup for the trains at the stopping point of the dual tracks on each side of the bridge.  Consequently, the bottleneck will in turn block vehicle traffic on intersecting roads on each side of the bridge for the lengths of the trains – a troubling public safety threat, given the potential for delays in emergency responses.  The FEIS failed to take a hard look at these impacts.

**6.    Failure to Take a Hard Look at Adverse Neighborhood Character Impacts**

215.   As a result of the Project, the FECR corridor will be transformed from a freight rail corridor with approximately 14 to 20 slow-moving freight trains per day to a rail corridor with 52 trains moving at much higher speeds, including 32 passenger trains traveling at speeds up to 110 mph.  The result will be a barrier that separates the neighborhoods that lie on each side of the rail corridor in closely knit communities such as Vero Beach, Stuart, Hobe Sound, and others along the corridor.

216.   To illustrate the point, attached as Exhibit 4 is an overflight photograph of Vero Beach (in Indian River County) showing the FECR alignment running through the center of town.  AAF's proposal to have 32 passenger trains travel through Vero Beach at 110 mph on a daily basis – with their attendant noise, vibration and warning signals – will have severe adverse

effects on the character of this area.  The FEIS failed to take a hard look at the impacts of the

Project on neighborhood character.

### 7.    Failure to Take a Hard Look at the Adverse Environmental Impacts from Sea Level Rise

217.    The ROD states that there will be no "change in the structure or the

dimensions of the opening for the St. Lucie River or Loxahatchee (Jupiter) River bridges."

ROD, p. 17 (Ex. 2).  However, with respect to the FRA's acknowledgment of "direct, immediate

and severe impacts from climate change" including rising sea levels in Florida, the ROD merely

states that bridge structures in the N-S Segment "would have increased vulnerability over time;

potential infrastructure damage may result from flooding, tidal damage and/or storms."  ROD, p.

20 (Ex. 2).  The FEIS provides the vertical clearances for the bridges within the AAF Project.

*See*, *e.g.*, FEIS, Sec. 4.1.3.2.  Notably, the St. Lucie River bridge (at 7 feet) and the Loxahatchee

River bridge (at 4 feet) have the lowest clearance or vertical distance between the bridge and the

water as compared to all the other bridges identified in the FEIS.

218.    The New River bridge in Ft. Lauderdale has a 40 feet vertical clearance;

the Eau Gallie River bridge in Melbourne has a 11.3 feet vertical clearance; the St. Sebastian

River bridge has a 13 feet vertical clearance; the Crane Creek bridge has a 15 feet vertical

clearance; the Hillsboro Canal bridge has a 9 feet vertical clearance; and the Turkey Creek

bridge has an 11 feet vertical clearance.  All of the bridges will undergo rehabilitation or

replacement, except for the two (the St. Lucie River bridge and Loxahatchee River bridge) with

the lowest elevations and by FRA's own account the greatest susceptibility to the threat of sea

level rise.

219.    Notwithstanding the acknowledgement of "direct, immediate, and severe

impacts" from sea level rise, both the ROD and the FEIS failed to consider the reduction of

clearances for boaters at these bridges or disclose the safety concerns for passengers on the trains crossing these low bridges when the tides are high and the waters rise, or the environmental impacts that would be occasioned by a catastrophic failure of one of these bridges due to rising waters and swift currents.  The acknowledgement of the risk to these bridges from rising sea levels is the reason why a "hard look" at the potential environmental impacts of the rising waters is required.  But merely acknowledging the risk does not itself constitute the required analysis of the environmental impacts of AAF's decision to rehabilitate rather than replace these bridges.

**8.      Failure to Take a Hard Look at Impacts to Threatened and Endangered Species**

220.    The FECR corridor runs through or is in immediate proximity to privately owned and managed scrub habitat preserves, state parks, and across the St. Lucie River. The Project will detrimentally impact these scrub habitats in Martin County in a manner similar to those described as to Indian River County in paragraphs 111-119 above.

221.    These state parks contain threatened and endangered scrub habitats that support listed species such as the Florida scrub jay, the prickly-apple, Florida perforate Cladonia, four petal paw-paw, blue-tailed mole skink, Florida sand skink, Lakela's mint, and the gopher tortoise, to name a few.

222.    The St. Lucie River is a host and critical nursery to over thirty threatened and endangered aquatic species and their habitats including Johnson's seagrass, West Indian Manatee and sea turtles, and commercially important sport fishes such as snook, trout, and snapper species.

223.    As the train crossings increase across the St. Lucie River bridge, the bridge closures will in turn result in queueing boat traffic within the habitat rich aquatic systems on each side of the bridge.

224.    The typically strong current makes conditions tough for boaters to stay in neutral without moving with the current and wind and tough to stay within the channel. Consequently, boaters will not turn off their motors.  In some cases, motors/engines will remain in gear for control of the watercraft.

225.    Hard bottom substrate is easily churned up when boats are starting up from a neutral position or trying to stay out of the littoral areas and results in what is known as propeller dredging or "prop dredging" of the bottom.  Churning up these areas increases the concentration of total suspended solids in the water column, threatening harm to benthic organisms and submerged aquatic vegetation ("SAV") and aquatic life, such as oysters and small fish.  Harm to these organisms threatens further harm to benthic organisms and macro-organisms, such as threatened birds and mammals reliant on the aquatic food sources in the area.

226.    The St. Lucie River bridge is one of only two bridges that will not be replaced or modified to minimize the impacts.  Nevertheless, the AAF Project, in its current alignment, cannot operate without a bridge over the St. Lucie River.  The AAF Project, using its proposed route, does not have independent utility without the St. Lucie River bridge.  Failure to conduct a secondary impact analysis for the St. Lucie River is another arbitrary and capricious dismissal of the vulnerability of the 92-year-old bridge and the harmful impacts that will occur to the people and the environment if not mitigated or relieved by using an alternative route to avoid the bridge.

### 9.    Failure to Take a Hard Look at Vibration Impacts on Moveable Rail Bridges

227.    In assessing the potential for environmental impacts on buildings near the FECR corridor, the FEIS recognized that the faster the trains, the higher the amplitude, the more likely the "vibration can cause damage to susceptible buildings."  FEIS, p. 4-36.  The FEIS

presents several graphs depicting various ways to gauge the effects vibration has on humans and structures.  FEIS, pp. 4-37 – 4-39.

228.    Neither the FEIS nor the ROD addressed vibration effects on the St. Lucie River and Loxahatchee River bridges.  It is axiomatic that "the passage of a train on a track induces vibrations in the track and in the underlying structures."  Louis Lorieux, *Analysis of Train-Induced Vibrations on a Single-Span Composite Bridge*, Structural Design and Bridges, Stockholm, Sweden, p. 1 (2008) (available at http://www.diva-portal.org/smash/get/diva2:431850/FULLTEXT01.pdf).  Furthermore, "[t]rain induced bridge vibrations can cause severe damage not only to the bridge but also to the track structure, such as ballast stability."  *Id*. at iii.

229.    In a 2013 white paper funded by the FRA, the researchers determined that:

> [a] sustained increase in heavy axle loads and cumulative freight tonnages, coupled with increased development of high speed passenger rail, is placing an increasing demand on railway infrastructure….Without a clear understanding of the nature of these loads and how design processes reflect them, it is impossible to adequately  evaluate the superstructure to make design improvements.

Brandon J. Van Dyk, *et al.*, Evaluation of Dynamic and Impact Wheel Load Factors and their Application for Design, Transportation Research Board 93rd Annual Meeting, p. 1 (Nov. 15, 2013) (available at http://railtec.illinois.edu/CEE/Crossties/Deliverables/2014_TRB_Van_Dyk_et_al_Dynamic_and _Impact_Factors.pdf).

230.    The paper further discusses the basic point that speed and weight on rail causes vibration.  *Id.* at 6.  Vibration can cause deterioration of structures, as evidenced by the

vibration analysis adopted in the FEIS and the ROD, citing the FRA's High-Speed Ground Transportation Noise and Vibration Assessment guidance manual.  ROD, p. 18 (Ex. 2).

231.    Following these engineering principles, AAF assessed the Eau Gallie and St. Sebastian railroad bridges.  Due to the increased speed and loading from the passenger and freight trains, AAF and the Federal Defendants recognized a need for replacement of both bridges to prevent harm to boaters who would be traveling below.  However, there is no mention in the FEIS of a similar assessment for the 92-year-old St. Lucie or Loxahatchee bridges, where there are more boaters and the passenger and freight trains will reportedly reach 80 and 70 mph, respectively.  FEIS, App'x 3.3.3-A4.

232.    Replacing bridges in some places and not in others where the impact to the public is greater, and where no hard look is taken, is arbitrary and capricious and another material deficiency of the ROD and FEIS.

### 10.    Failure to Take a Hard Look at Cumulative Impacts

233.    The NEPA regulations define a "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

234.    The FEIS failed to examine the cumulative impacts of the AAF Project and the Tri-Rail coastal project, which would share the same tracks from Miami to Jupiter (just south of Martin County) and which was the subject of a Memorandum of Understanding signed

in May 2013 by the relevant government agencies.[20]  The stated ground for ignoring the Tri-Rail

coastal project is that, at the time of the FEIS, the Tri-Rail coastal project was supposedly not

"reasonably foreseeable" because contingencies exist as to its financing.  FEIS, p. 5-199.  This

determination was arbitrary and capricious because a contingency as to a project's financing is

not an adequate basis to consider the project unforeseeable.  All future projects have financing

contingencies, but they must be included in the cumulative impacts analysis if they are

reasonably foreseeable.  The failure to take a hard look at the cumulative environmental impacts

of the AAF Project and Tri-Rail coastal project violated NEPA.

        235.    The FEIS also failed to examine the cumulative impacts of the new AAF

passenger trains combined with the continued growth of freight traffic on the rail corridor.  The

FEIS (properly) included a "2016 Opening Year" and a "2036 Buildout Year" in its local

roadway traffic analysis, *see* FEIS, App. 3.5.5-C, but failed to include a "2036 Buildout Year"

(or any analogous assessment of long-term cumulative impacts) in its assessment of the Project's

adverse impacts to navigation on the Loxahatchee River and St. Lucie River.  The FEIS

assessment of navigation impacts to these rivers assumed an average of 20 freight trains per day

in 2016, and purported to calculate the cumulative impact of the bridge closures due to the

passage of these 20 daily freight trains and 32 daily passenger trains.  *See* FEIS, App. 4.1.3-B1,

p. 1-2.  But the FEIS acknowledges that freight traffic is expected to grow at the rate of 3% per

year after 2016.  *See* FEIS, p. 5-22.  Thus, according to the FEIS, freight traffic on the North-

South rail corridor is expected to increase by 81% in the 20-year period between 2016 and

---

[20]      The MOU was signed by the Palm Beach Metropolitan Planning Organization, Broward
Metropolitan Planning Organization, Miami-Dade Metropolitan Planning Organization,
Southeast Florida Transportation Council, South Florida Regional Transportation
Authority, Florida Department of Transportation, South Florida Regional Planning
Council, and Treasure Coast Regional Planning Council.

2036.[21]  Nevertheless, the FEIS failed to undertake *any* assessment of the cumulative impacts of the freight traffic and AAF passenger trains on river navigation in a 2036 Buildout Year (or other long-term time horizon).  This failure to take a hard look at long-term cumulative impacts resulted in a drastic underestimate of the closure times of the draw bridges over the Loxahatchee and St. Lucie Rivers, and further illustrates the failure of the FEIS to take a hard look at the Project's adverse impacts on navigation and the environmental impacts of vessel queueing on these rivers.

236.    The FEIS also failed to examine cumulative noise and vibration impacts. As alleged above, the FEIS failed to examine the *direct* effect of the Project in increasing the speed of the freight trains.  But the FEIS also failed to examine the likelihood that 32 new daily passenger trains would cause the existing freight trains (and all future growth in freight train traffic) to be operated on the North-South corridor after 9 pm and before 5 am – the "off hours" for the passenger trains.  Such a shift resulting from the introduction of the passenger trains to the rail corridor would concentrate freight traffic in the late evening and early morning hours, when the noise from the freight trains would be more harmful to residents seeking a good night's sleep.  The Federal Defendants' failure to take a hard look at this issue violated their own noise assessment guidelines, which call for close attention to be paid to the difference between daytime and nighttime noise, because the assessment of noise levels of events between 10 pm and 7 am are to be increased by 10 decibels to account for greater nighttime sensitivity to noise.[22]

---

[21]    At a 3% growth rate after 2016, freight traffic in 20 years (*i.e.*, in 2036) will be 181% of what it was in 2016 ($1.03^{20} = 1.81$) – an 81% increase.

[22]    FTA, TRANSIT NOISE AND VIBRATION IMPACT ASSESSMENT, p. 2-15 (May 2006) (available at https://www.transit.dot.gov/regulations-and-guidance/environmental-programs/fta-noise-and-vibration-impact-assessment).

**B.      Failure to Examine a Reasonable Range of Alternatives**

237.    The examination of alternatives to a proposal "is the heart of the environmental impact statement."  40 C.F.R. § 1502.14.  The environmental impact statement must "rigorously explore and objectively evaluate all reasonable alternatives."  *Id*. § 1502.14(a).

238.    "Reasonable alternatives include those that are practical or feasible from the technical and economical standpoint and using common sense, rather than simply desirable from the standpoint of the applicant."  Council on Environmental Quality, *Forty Most Asked Questions Concerning the CEQ's Environmental Regulations*, 46 Fed. Reg. 18026-1.

239.    "[T]he emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative." *Id*.

240.    In violation of NEPA, the FEIS failed to examine a reasonable range of alternatives to the Project.

**1.      Failure to Examine Alternatives to Continued Use of the Historic Railroad Bridges Obstructing Navigation**

241.    A critical flaw in the planning for the Project is AAF's avowed intention to use (i) the existing double-track railroad draw bridge over the Loxahatchee River with 4 feet of vertical clearance and a narrow 40 foot horizontal opening when the draw bridge is in the open position; and (ii) the existing single-track railroad draw bridge over the St. Lucie River with 7 feet of vertical clearance and a narrow 40 foot horizontal opening when the draw bridge is in the open position.  FEIS, pp. 4-19, 4-21.  The low height of these bridges means that only the smallest vessels can pass beneath them when the bridge is in the closed position, and the narrow horizontal opening makes "two-way" vessel traffic dangerous or impossible for larger vessels.  It was therefore incumbent on the Federal Defendants to engage in a meaningful examination of alternatives to the use of these ancient bridges.  They did not do so.

242.    The DEIS did not present or assess the feasibility of alternatives to the use of the existing railroad bridges across these two rivers.  In response to public comment on this manifest deficiency, the FEIS examined one alternative for each river: building a new fixed bridge (*i.e.*, not a draw bridge) at a height matching the nearest adjacent fixed bridge crossing the river.  This strawman alternative was shot down in a one page table that did not provide any substantiation for its conclusions.  FEIS, p. 3-55.  But even assuming that a fixed bridge at such a height would be infeasible, the FEIS did not examine other reasonable alternatives, such as a draw bridge with a higher vertical clearance than the current draw bridges (allowing most vessels to pass beneath the new draw bridge even when it is closed) or a draw bridge with a wider horizontal opening (allowing two-way vessel traffic when the bridge is opened, reducing the clearance time of vessel queues).  The failure to examine reasonable alternatives violated NEPA.

## 2.    Failure to Examine Alternative Alignments

243.    The Federal Defendants also failed to examine alternative alignments to the use of the existing North-South freight corridor that runs through the heart of the communities in Martin County and Indian River County.  All alternatives were summarily dismissed because AAF opposed them, without any objective examination of their technical or financial feasibility.

244.    Attached as Exhibit 5 is a map showing (a) the AAF-proposed alignment for the Project and (b) an alternative alignment (the "K" Branch) that would avoid traveling through the most heavily populated areas of Martin County and avoid any use of the ancient railroad bridges over the Loxahatchee and St. Lucie River Rivers, and the associated adverse impacts from use of these low-clearance bridges.  From West Palm Beach (the northern terminus of Phase I of the Project), the "K" Branch would follow an existing CSX-owned rail line in a northwesterly direction to the east side of Lake Okeechobee (in Martin and Palm Beach

Counties) and then follow an existing FECR-owned rail line in a northeasterly direction to Fort

Pierce in St. Lucie County, where the AAF trains would re-connect with the FECR north-south

corridor to head north to Orlando.

245.    The reason for the lack of consideration of any route other than the

proposed is plainly stated in the ROD.   "[A]lternatives were evaluated primarily in light of

whether they could be constructed and operated in accordance with AAF's financial model."

ROD, p. 7 (Ex. 2).  The weight given to this factor was arbitrary and capricious, irrational, and

not supported by the record.

246.    In the prior litigation, on June 30, 2016, this Court and AAF counsel

Eugene Stearns had the following colloquy on the extent of alternative routes considered in the

DEIS for the Project:

> The Court:     Did the EIS consider various alternatives—
>
> Stearns:       It did.
>
> The Court:     – for routing?
>
> Stearns:       It did.
>
> The Court:     Okay.
>
> Stearns:       And it reached the conclusion that [the FECR N-S] route was the correct one.
>
> The Court:     And what if it had reached the opposite conclusion?
>
> Stearns:       Then there would be no PABs funding here because this applicant had no interest in running on someone else's track.

Hearing Transcript, pp. 23-24.[23]

---

[23]     *Indian River County v. Rogoff*, 1:15-cv-00460-CRC, Dkt. # 82.

247.    In essence, AAF's counsel asserted that AAF would not move forward with the Project unless the FECR freight corridor was utilized, the same factor that so heavily influenced the FRA alternative analysis.

248.    The ROD further endorses AAF's pre-determined outcome, stating that the FECR freight corridor will be the only possible N-S corridor based on "operating costs" and predicted "trip times" that will purportedly allow the Project to be "sustainable as a private commercial enterprise."  ROD, pp. 7-8 (Ex. 2).  This is plain error.  Other corridors, including the "K" Branch and CSX alternatives, are comparable in "time" and operating costs but were never fully evaluated, since AAF asserted that it would only build in the FECR corridor.

249.    The ROD – along with the quote above from AAF's counsel – illustrate that the Federal Defendants adopted AAF's pre-determined route without adequate review of the data or analysis to justify or support the results, compared with other alternatives.

250.    Martin County, Indian River County, and CARE FL sent a letter to  FRA on July 26, 2017, in which they requested that FRA prepare a supplemental environmental statement.  In their letter, the Plaintiffs asked FRA to consider the "K" Branch.  The "K" Branch alternative would take the Project through the western portion of Martin County on an existing railroad line, avoiding the heavily populated portions of the county, its multitude of at-grade crossings, and the two antiquated rail bridges.

251.    Like the FECR freight corridor, the "K" Branch is a single track and at-grade.  However, it would allow the Project to avoid many at-grade road crossings in highly populated areas, therefore lessening the consequential transportation and public safety impacts that a non-elevated at-grade high speed train will cause.

252. The "K" Branch alternative route would also allow the Project to avoid the bottleneck of the antiquated and obsolete single track St. Lucie River bridge, and the Loxahatchee River bridge, thereby avoiding the consequent increased negative impacts on maritime navigation and other environmental impacts caused by the Project's use of these ancient bridges.

253. A proper NEPA alternatives analysis of the "K" Branch should have been undertaken when the DEIS and FEIS began, but neither AAF nor FRA included the alternative in the public filings.

254. With respect to the alternatives that were examined, the FEIS and ROD failed to take a hard look at alternatives that are plainly feasible, rejecting them as infeasible because of a single overarching factor: that AAF had a preferred route and would not accept any alternative. Any of the alternatives identified in the DEIS/FEIS, or routes previously identified by FDOT, or the "K" Branch alternative would allow AAF to achieve its stated Project purpose of transporting residents and tourists between Miami and Orlando with stops in Ft. Lauderdale and West Palm Beach. The impacts created by at-grade fast-moving passenger trains through populated and environmentally sensitive areas are avoidable and unnecessary in light of the many alternative routes that could achieve the Project's purpose.

## C. Failure to Disclose Incomplete or Unavailable Information

255. The NEPA regulations required the Federal Defendants to obtain the information essential to a reasoned choice among alternatives (including the "no action" alternative) unless the cost would be exorbitant. 40 C.F.R. § 1502.22(a). If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency

must include within the environmental impact statement: (i) a statement that such information is incomplete or unavailable; (ii) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (iii) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (iv) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.  For the purposes of this requirement, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.  40 C.F.R. § 1502.22(b).

256.    The Federal Defendants failed to comply with these requirements as to several important issues of environmental concern, including public safety, noise, the impacts of vessel queueing on the Loxahatchee and St. Lucie Rivers, the impacts of train queueing on railroad sidings, sea level rise, and the range of reasonable alternatives to the Project AAF has proposed.

257.    Plaintiffs make the following additional allegations with regard to the Federal Defendants' unlawful conduct:

a.    Federal Defendants failed to take the required hard look at the Project's environmental impacts including, but not limited to, those discussed above.

b.    Federal Defendants failed to take the required hard look at and properly analyze alternatives to the Project.

c.      Federal Defendants failed to prepare and circulate for public comment a supplemental EIS despite the fact that there were "[c]hanges to the proposed action [that] would result in significant environmental impacts that were not evaluated in the EIS," "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts [that] would result in significant environmental impacts not evaluated in the EIS," and such information was presented to Federal Defendants both before and after issuance of the ROD.  *Cf.* 23 C.F.R. § 771.130(a).

d.      Federal Defendants failed to properly and accurately "specify the underlying purpose and need to which the [Project] is responding" (see 40 C.F.R. § 1502.13) and thus failed to properly consider reasonable alternatives.

e.      Federal Defendants failed to independently evaluate and review the DEIS and FEIS and instead relied on and accepted AAF's assertions regarding the Project and its environmental impacts.

f.      Federal Defendants failed to adequately respond to comments from Plaintiffs and members of the public.

258.    The Federal Defendants violated the APA, 5 U.S.C. § 501 *et seq.*, by acting arbitrarily and capriciously and in violation of federal law by failing to comply with the requirements of NEPA, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, 40 C.F.R. § 1500 *et seq.*, and by unlawfully approving the Project.

## SECOND CLAIM FOR RELIEF

## THE PROJECT IS NEITHER A HIGH-SPEED INTERCITY RAIL FACILITY NOR A QUALIFIED HIGHWAY OR SURFACE FREIGHT TRANSFER FACILITY AND THUS DOES NOT FALL INTO ANY OF THE CATEGORIES ELIGIBLE TO BE FINANCED WITH PABs PURSUANT TO 26 U.S.C. § 142(a)

259.    Paragraphs 1 through 137 are repleaded.

260.    The Project does not fit within any of the 15 categories eligible to be financed through PABs pursuant to 26 U.S.C. § 142(a).

261.    DOT's current allocation of $1,150,000,000 in PABs to Phase II of the Project is based upon an interpretation of 26 U.S.C. § 142(a) and (m) that is contrary to the plain language of the statute and Congressional intent.  DOT is treating the Project as if it were a "qualified highway facility" instead of the passenger rail project that it is.

262.    DOT's interpretation of 26 U.S.C. § 142(m) did not go through a formal rulemaking procedure.

263.    As explained below, the Project is not a "qualified highway facility" and is not eligible to be financed using PABs.

264.    The Internal Revenue Code circumscribes the sorts of projects that may be financed with PABs.  It does so be defining the term "exempt facility bond" to mean any bond issued as part of an issue 95 percent or more of the net proceeds of which are to be used to provide funding for the following categories of facilities:

    (1)   airports,
    (2)   docks and wharves,
    (3)   mass commuting facilities,
    (4)   facilities for the furnishing of water,
    (5)   sewage facilities,
    (6)   solid waste disposal facilities,
    (7)   qualified residential rental projects,
    (8)   facilities for the local furnishing of electric energy or gas,
    (9)   local district heating or cooling facilities,
    (10)  qualified hazardous waste facilities,

     (11)   *high-speed intercity rail facilities,*
     (12)   environmental enhancements of hydroelectric generating facilities,
     (13)   qualified public educational facilities,
     (14)   qualified green building and sustainable design projects, or
     (15)   *qualified highway or surface freight transfer facilities.*

26 U.S.C. § 142(a) (emphasis added).

     265.    High-speed intercity rail facilities are defined as "any facility (not including rolling stock) for the fixed guideway rail transportation of passengers and their baggage between metropolitan statistical areas (within the meaning of section 143(k)(2)(B)) using vehicles that are reasonably expected to be *capable of attaining a maximum speed in excess of 150 miles per hour* between scheduled stops, but only if such facility will be made available to members of the general public as passengers."  26 U.S.C. § 142(i)(1) (emphasis added).

     266.    The Project – which is capable of attaining a maximum speed of only 125 miles per hour (and only 110 mph along the FECR freight corridor) – is not a "high-speed intercity rail facility" within the meaning of 26 U.S.C. § 142(a)(11) or § 142(i)(1).

     267.    The term "qualified highway or surface freight transfer facilities" is defined as follows:

**(m) Qualified highway or surface freight transfer facilities**

**(1)** "[T]he term "qualified highway or surface freight transfer facilities" means:
**(A)** any surface transportation project which receives Federal assistance under title 23, United States Code (as in effect on the date of the enactment of this subsection),
**(B)** any project for an international bridge or tunnel for which an international entity authorized under Federal or State law is responsible and which receives Federal assistance under title 23, United States Code (as so in effect), or
**(C)** any facility for the transfer of freight from truck to rail or rail to truck (including any temporary storage facilities directly related to such transfers) which receives Federal assistance under either title 23 or title 49, United States Code (as so in effect).

26 U.S.C. § 142(m)(1).

268.     The Federal Defendants have interpreted the reference to Title 23 funding in Section 142(m)(1)(A) as if it were a magic wand that could turn a passenger rail project into a qualified highway facility, simply because a series of *different* projects used Title 23 funding for rail crossing improvements along the FECR corridor.

269.     Title 23 contains the principal set of rules and regulations related to highway transportation in the United States, with over 600 sections organized into six chapters covering (1) federal-aid highways; (2) other highways; (3) general provisions; (4) highway safety; (5) research, technology, and education; and (6) infrastructure finance.  23 U.S.C. § 101, *et seq.*

270.     Title 23 permits funding for railroad-related projects as follows:

> *cost of construction of projects for the elimination of hazards of railway-highway crossings*, including the separation or protection of grades at crossings, the reconstruction of existing railroad grade crossing structures, the relocation of highways to eliminate grade crossings, and projects at grade crossings to eliminate hazards posed by blocked grade crossings due to idling trains….

23 U.S.C. § 130(a) (emphasis added).

271.     A "project" for purposes of Title 23 is defined as "any undertaking eligible for assistance under this title."  23 U.S.C. § 101(a)(19).

272.     As it relates to railroads, the term "construction" is defined in Title 23 to allow funding for "projects" for the "elimination of hazards of railway-highway grade crossings."  23 U.S.C. § 101(a)(4)(E).

273.     AAF states in its new December 2017 PAB application to DOT that "$9 million from Section 130 of U.S. Code Title 23 has been invested in the entire [FECR] corridor to improve railway-highway grade crossings and prepare the corridor for growth in rail traffic. Future investments from the Section 130 program are planned for future calendar years."  Ex. 3,

p. 16.  In AAF's August 2014 PAB application to DOT, it provided a near identical statement regarding its description of Title 23 funding.  Accordingly, on information and belief, the AAF Project has not received Title 23 funding since the original 2014 PAB application.

274.    In neither of its PAB applications to DOT has AAF indicated that *the AAF Project itself* has received a single dollar of Title 23 funds.  Rather, it relies on Title 23 funds spent prior to August 2014 on railway-highway grade crossing improvement projects undertaken by FDOT on the FECR corridor.

275.    Upon information and belief, the Title 23 funds relied upon to justify the Project's eligibility for a PAB allocation were expended from 2005-2014, as explained by DOT official Paul Baumer in his declaration dated May 15, 2015, filed with the Court in the earlier litigation.

276.    The Title 23-funded railway-highway grade crossing improvement projects listed in support of the AAF PAB application were constructed in a rail corridor that was owned by FECR, a corporation that is separate and distinct from AAF, at the time of the railway-highway grade crossing projects, and continues to be owned by FECR today.

277.    Upon further information and belief, AAF and FECR were under the same parent company in 2014 – but are no longer.  On July 7, 2017, the FECR corridor was sold to Grupo México Transportes.

278.    The Project is not the same project as those that previously received Title 23 funding.

279.    The Project is not an undertaking for the elimination of hazards of railway-highway grade crossings.

280.    The Project is not a project that is eligible for funding under Title 23, because it is not a project "for the elimination of hazards of railway-highway crossings."  23 U.S.C. § 130(a).  It therefore is not a "project" as defined in 23 U.S.C. § 101(a)(19).

281.    Accordingly, the Project is not a "project" that "receive[d] Federal assistance under title 23" and thus does not constitute a "qualified highway or surface freight transfer facilit[y]" as defined in 26 U.S.C. § 142(m)(1).

282.    The legislative history confirms the plain meaning of the statutory language – that Congress did not authorize the allocation of PABs to passenger rail projects like the Project:

a.    In 2005, Congress added 26 U.S.C. § 142(a)(15) and § 142(m) to establish new types of projects to the pre-existing list of 14 categories of projects eligible to receive a PAB allocation: (1) highway projects and (2) "surface freight transfer facilities."  *See* 2005 Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. 109-59 § 11143.

b.    According to DOT, "Section 11143 of Title XI of SAFETEA-LU amended Section 142(a) of the Internal Revenue Code to add highway and freight transfer facilities to the types of privately developed and operated projects for which private activity bonds (PABs) may be issued."[24]

c.    The conference committee on the SAFETEA-LU bill accepted the Senate Amendment's definition of a "qualified highway facility" as "any surface

---

[24]    U.S. Dep't of Transp., Fed. Highway Admin., Tools & Programs, Fed. Debt Financing Tools, Privacy Activity Bonds (PABs) (last accessed Feb. 13, 2018) (available at https://www.transportation.gov/buildamerica/programs-services/pab).

transportation or international bridge or tunnel project (for which an international

entity authorized under Federal or State law is responsible) which receives

Federal assistance under title 23 of the United States Code (relating to

Highways)." H.R. Rep. No. 109-203, at 1144 (2005) (Conf. Rep.). It also

accepted the Senate Amendment's definition of a "qualified surface freight

transfer facility" as "a facility for the transfer of freight from truck to rail or rail to

truck which receives Federal assistance under title 23 or title 49 of the United

States Code (relating to Transportation)." *Id.* at 1145.

       d.     The Senate Finance Committee interpreted the provision in a

similar manner, stating in a memorandum on July 28, 2005 – the day before the

Senate voted on the conference version of the bill – that: "The proposal authorizes

$15 billion of tax-exempt bond authority to finance *highway projects and rail-*

*truck transfer facilities*. Cost: $738 million over 10 years." U.S. Senate Finance

Comm. Mem. on the Conference Title of Transportation Reauthorization Bill, 4

(July 28, 2005) (available at

http://www.finance.senate.gov/download/?id=5264AC0E-E831-4275-9597-

EA1154F9D2A4) (emphasis added).

       e.     Years of negotiations of the highway and surface freight transfer

PAB proposal illustrate that Congress never intended to include intercity

passenger rail in the final version of § 142(a)(15) or (m):

| Legislative Document | Cong. | Reference |
|---|---|---|
| Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy For Users, Pub. L. 109-59, Aug. 10, 2005. | 109th | "SEC. 11143. TAX-EXEMPT FINANCING OF HIGHWAY PROJECTS AND RAIL-TRUCK TRANSFER FACILITIES." <br>• No mention of passenger rail in this statute section. |
| S. 104, 109th Cong. (Introduced Jan. 24, 2005). | 109th | Mr. TALENT (and Mr. WYDEN): "To amend the Internal Revenue Code of 1986 to provide tax-exempt financing of highway projects and rail-truck transfer facilities." <br>• No mention of passenger rail in this section. |
| Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy For Users, H.R. 3, Conf. Rep. 109-203. | 109th | TAX-EXEMPT FINANCING OF HIGHWAY PROJECTS AND RAIL-TRUCK TRANSFER FACILITIES." <br>• No mention of passenger rail in this section. |
| Sen. Ron Wyden, *Senate Approves Highway Bill Including Wyden Bond Measure, "Smart Growth" Funds,* Press Release (May 17, 2015), https://www.wyden.senate.gov/news/press-releases/senate-approves-highway-bill-including-wyden-bond-measure-smart-growth-funds. | 109th | Released after the Senate approved Senators Talent and Wyden's Amendment to add "Tax-exempt financing of highway projects and rail-truck transfer facilities" to 26 U.S.C. 142(m): "The bipartisan Highway Infrastructure Bonds amendment, which Wyden offered with U.S. Senator Jim Talent (R-Mo.), will use bonds to finance repair and building projects for roads, bridges and freight infrastructure." <br>• No mention of passenger rail from original sponsors. |
| S1238, Cong. Rec. 150-18 (Feb. 12, 2004). | 108th | S. Amendment 2482, Sponsored by Senator Talent and Co-Sponsored by Senator Wyden: "Purpose: To amend the Internal Revenue Code of 1986 to allow tax-exempt private activity bonds to be issued for highway projects and rail-truck transfer facilities." "[Q]ualified highway facilities' means (A) any surface transportation project" <br>• No mention of passenger rail from original sponsors. |

f.      There is additional clear evidence that Congress and the Federal Defendants did not intend for intercity passenger rail to be eligible for tax-exempt financing under Section 142.  A May 25, 2005 industry analysis of the legislation stated as follows:  "An earlier draft of the proposal prepared by USDOT had also included intercity passenger rail and bus vehicles and facilities [in addition to highway and surface freight transfer facilities]. . . .  These provisions were not included in the final Administration bill, presumably because the assumed 'cost' to the Treasury was unacceptable."  Karen J. Hedlund, Nossaman Guthner Knox & Elliot LLP, Memorandum, SAFETEA Private Activity Bond Provisions: A New Tool for Public-Private Partnerships for Highways and Freight Transfer Facilities, at 2 (May 25, 2005) (available at http://www.nossaman.com/Files/6795_KJH_SAFETEA_5-25-05.pdf).

g.      The Hon. Emil Frankel, former DOT Assistant Secretary for Transportation Policy, said in 2003 while Congress was debating the reauthorization of SAFETEA, "[w]e're very hopeful that Congress will enact private activity bonds, which are private bonds, private borrowers in which tax exempt status is available for some transportation projects, but not all.  And we would allow authorized private activity bonds to be utilized *in connection with the highway and intermodal freight projects*."  Statement of Hon. Emil Frankel, DOT Assistant Secretary for Transportation Policy, TEA-21 Reauthorization: Regional Transportation Issues, Comm. on Env. & Pub. Works, S. Hrg. 108-309 at 167, 108th Cong. (2003) (emphasis added).

283.    The legislative history discussed above is further substantiated by sworn testimony and other evidence reflecting the understanding of key legislators and the Federal Defendants as to the scope of Section 142:

a.    According to former Congressman Nick Rahall, former Ranking Member of the U.S. House Committee on Transportation and Infrastructure, the Section 142(m) amendment to SAFETEA-LU sought to "add *highway* and *surface freight transfer facilities* to the list of projects eligible to receive private activity bond allocations."  Rahall Decl. ¶ 8 (emphasis in original).[25]  Rep. Rahall unequivocally declared that "[a]t *no point* during the debate over the SAFETEA-LU legislation did Congress discuss intercity passenger rail projects qualifying under the new § 142(m)," *id.*, and went on the make the following observations:

- "As a senior member of the committee with jurisdiction over the [SAFETEA-LU] bill, I was intimately involved with the bill throughout the legislative session."  *Id.*

- "26 U.S.C. § 142 lists fifteen specific types of projects that Congress authorized as eligible for PAB allocation . . . DOT has turned that specificity on its head with its interpretation of § 142(m) that would permit [DOT] to authorize projects not described in the 15 categories in the statute to include types of projects that were clearly omitted by Congress and [thus, DOT] has an interpretation of 26 U.S.C. § 142(m) that is unreasonable considering the text of the statute as a whole."  *Id.* ¶¶ 16-17.

b.    While Congress had the authority to include passenger rail projects like the AAF project in the list of eligible projects under 26 U.S.C. § 142 in the SAFETEA-LU amendments, it did not do so by including "passenger rail" in the list of eligible categories in the provision or by adding "title 49" (the federal law relating to the funding of rail facilities) in § 142(m)(1)(A).

---

[25]    *Martin County v. U.S. Dep't of Transp.*, 1:15-cv-00632-CRC, Dkt. # 20-2.

c.      Congress has not amended Section 142(m) since its enactment, but

in its Draft 2011 Transportation Reauthorization bill, DOT made it clear that it

believed Section 142(m) *did not include intercity passenger rail*.  *See* Rahall

Decl. Ex. A (DOT Draft Reauthorization Bill at 451).[26]  In Section 4202 of its

draft legislation, DOT proposed adding "HIGH-PERFORMANCE PASSENGER

RAIL" to the list of types of eligible projects in Section 142(m)(1)(A):

SEC. 4202. EXPANSION OF PRIVATE ACTIVITY BOND PROGRAM.

> (a) EXEMPT FACILITY BONDS FOR SURFACE
> TRANSPORTATION/***HIGH-PERFORMANCE PASSENGER
> RAIL***/MARINE HIGHWAY PROJECTS.--Section 142(m)(1)(A) of the
> Internal Revenue Code of 1986 (26 U.S.C. 142(m)(1)(A)) is amended to
> read as follows:

> (A) any surface transportation project that receives Federal assistance
> under title 23, United States Code, *any high-*performance *passenger rail
> project that receives Federal assistance under chapters 241, 244, [246] or
> 261 of title 49*, United States Code as of the date of enactment of this
> subsection, or any short sea shipping or marine highway project."

*Id.* (emphasis added).

d.      The insertion of "high-performance passenger rail" receiving *Title

49* assistance immediately after "any surface transportation project" demonstrates

that the current, un-amended language of 142(m)(1)(A) does not include

passenger rail projects.

e.      The FHWA has previously restricted the definition of a "highway

project" to exclude rail projects.  In 2006, FHWA, the agency directed by Section

6005 of SAFETEA-LU to implement a "Surface Transportation Project Delivery

Pilot Program," submitted a report to Congress on its Section 6005 Activities.

---

[26]      *Martin County v. U.S. Dep't of Transp.*, 1:15-cv-00632-CRC, Dkt. # 20-2.

FHWA defined a "highway project" in that report as "any undertaking to

construct (including initial construction, reconstruction, replacement,

rehabilitation, restoration, or other improvements) a highway, bridge, or tunnel, or

any portion thereof, including environmental mitigation activities, which is

eligible for assistance under title 23 of the United States Code."  The FHWA's

definition specifically excludes certain types of projects:

> Firstly, this definition *excludes planned multi-modal projects*.
> Since these projects involve the transportation interests of agencies
> other than the FHWA, as well as features that are not unique to
> highways, the FHWA proposes to define "highway project" to
> *exclude those projects that are intended at project conception to be
> multi-modal*.

FHWA, Report to Congress on SAFETEA-LU Section 6005 Activities, FR Doc. E6-4911 (Apr.
4, 2006) (available at http://www.environment.fhwa.dot.gov/nepa/6005_05-06.htm) (emphasis
added).

284.    The use of PABs for the Project would also violate the requirement that:

"An issue shall not be treated as an issue described in subsection (a)(15) unless at least 95

percent of the net proceeds of the issue is expended for qualified highway or surface freight

transfer facilities within the 5-year period beginning on the date of issuance. . . ."  26 U.S.C. §

142(m)(3) (titled "Expenditure of proceeds").

285.    In its December 2017 PAB application, AAF claimed to have existing

agreements with FECR "for rail services operations and certain other aspects of the Company's

operations."  Ex. 3 at 39.  The AAF trains will run within the FECR corridor, a separate, non-

affiliated entity.

286.    AAF stated the following in its December 2017 PAB application:

> FECR will be responsible for maintenance of shared track and
> signals, as well as track security, across FECR's existing Miami to
> Cocoa rail corridor (the 'Shared Corridor').  Further, the Company

and FECR are [redacted] partners in Florida DispatchCo LLC ('DispatchCo'), the entity that will provide the dispatch functions for the Company's passenger trains (as well as for freight trains within the corridor). . . .  FECR currently manages all of these functions for its existing freight rail business.  Since these types of services are common to both the Company's business and FECR's business, the Company believes that partnering with FECR enables the Company to achieve lower costs than either conducting the services itself or outsourcing to another party that does not share the Company's corridor.

*Id.*

287.    Section 142(m)(3), quoted above, requires that 95% of the net proceeds of the PAB issuance be expended for the "qualified highway or surface freight transfer" facility receiving the PAB allocation.

288.    FECR is not an affiliate of AAF and has not applied for PABs from the Federal Defendants.  The AAF application states that "FECR will be responsible for maintenance of shared track and signals," and that FECR is a partner in a dispatch company that will "provide dispatch functions for the Company's passenger trains (as well as for freight trains within the corridor)."  *Id.* at 39.

289.    Upon information and belief, a significant portion of the PAB proceeds will be expended on track work benefitting the FECR corridor as well as the maintenance of the shared track and signals.  A significant portion will also be spent on capital improvements that have nothing to do with the improving the safety of railroad-highway crossings.  Accordingly, the Federal Defendants unlawfully allocated PABs to a passenger rail project in which more than 5% of the PAB proceeds will inevitably be for the benefit of FECR, a non-affiliated freight rail company that has not received a PAB allocation from the Federal Defendants, and for the benefit of capital improvements that do not constitute qualified highway or surface freight transfer facilities.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF REQUIREMENT OF 26 U.S.C. § 147(f)(2)(A)(ii) THAT PABs BE APPROVED BY "EACH GOVERNMENTAL UNIT HAVING JURISDICTION OVER THE AREA IN WHICH ANY FACILITY … IS LOCATED"

290.    Paragraphs 1 through 137 are repleaded.

291.    The Federal Defendants approved the use of $1,150,000,000 of PABs for Phase II of the Project and required that the PABs be issued by May 31, 2018.

292.    The "facility" at issue in the Federal Defendants' PAB approval is Phase II of the Project.

293.    Phase II is located in five counties.

294.    Three of the five counties, including Martin County and Indian River County, have not approved the use of PABs for the Project.

295.    The $1,150,000,000 in PABs proceeds approved by the Federal Defendants far exceeds the cost of capital improvements in Orange County and Brevard County, the only two counties in Phase II that have approved the use of PABs to finance Phase II.

296.    The use of PABs for the Project would violate 26 U.S.C. § 147(f)(2)(A)(ii), which requires that PABs be "approved by . . . each governmental unit having jurisdiction over the area in which any facility, with respect to which financing is to be provided from the net proceeds of such issue, is located."

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court grant the following relief:

a.    Declare that the ROD and FEIS violated NEPA;

b.    Vacate the ROD and FEIS and remand for preparation of a Supplemental Environmental Impact Statement;

c.      Declare that the issuance of PABs to AAF was unlawful and has no effect;

d.      Declare that the approved $1,150,000,000 of bonds do not qualify as tax-exempt private activity bonds until such time as all of the counties in which the Project is located have provided approvals as to the use of private activity bonds for Phase II of the Project;

e.      Declare that the proceeds of the approved $1,150,000,000 PAB issuance may not be used for Phase II of the Project, or any portion thereof, until such time as all of the counties in which the Project is located have approved the use of the bond proceeds for this purpose;

f.      Declare that the $1,150,000,000 PABs are not tax exempt because they do not meet the requirements to be deemed qualified tax-exempt private activity bonds;

g.      Declare that the proceeds of the approved $1,150,000,000 PAB bond issuance may only be used for an undertaking eligible for assistance under Title 23 (*i.e.*, a project for the elimination of hazards of railway-highway grade crossings);

h.      Vacate the PAB approval for Phase II of the Project;

i.      Temporarily and permanently enjoin the Federal Defendants from approving any plans, making any approvals or allocating any other PAB monies or other financial assistance to Phase II of the Project (including loans) until they comply with NEPA;

j.      Temporarily and permanently enjoin the Federal Defendants from allocating any PAB monies to Phase II, or any portion thereof, unless and until all counties in which Phase II is located have approved the use of PAB monies for Phase II;

k.      Temporarily and permanently enjoin the Federal Defendants from allocating any PAB monies to Phase II for purposes that exceed the limited scope of an undertaking eligible for assistance under Title 23 (*i.e.*, a project for the elimination of hazards of railway-highway grade crossings);

l.      Reimburse Plaintiffs' attorneys fees and costs as permitted by the Equal Access to Justice Act, 28 U.S.C. § 2412;

m.      Maintain jurisdiction over this civil action to ensure the Defendants' compliance with the Court's orders; and

n.      Any other relief that the Court determines to be appropriate for a full and final judgment with respect to all of the Plaintiffs' claims.

Dated: February 13, 2018

McDERMOTT WILL & EMERY LLP

By:  /s/ Stephen M. Ryan
      Stephen M. Ryan (D.C. Bar No. 359099)
      Amandeep S. Sidhu (D.C. Bar No. 978142)
      Sam C. Neel (D.C. Bar No. 1027756)
The McDermott Building
500 North Capitol Street NW
Washington, DC 20001
Telephone: 202-756-8000
Email: sryan@mwe.com
Email: asidhu@mwe.com
Email: sneel@mwe.com
*Attorneys for Plaintiffs Martin County and CARE FL*


BRYAN CAVE LLP

By:  /s/ Philip E. Karmel
      Philip E. Karmel
      District Court Bar Number: NY0196
1290 Avenue of the Americas
New York, New York  10104-3300
Telephone: 212-541-2311
Email: pekarmel@bryancave.com
*Attorneys for Plaintiffs Indian River County and Indian
River County Emergency Services District*

<u>List of Exhibits</u>

1.  December 20, 2017 approval of $1,150,000,000 in PABs for Phase II
2.  December 15, 2017 Record of Decision for Phase II
3.  December 5, 2017 AAF application for approval of $1,150,000,000 in PABs for Phase II
4.  Photograph of FECR corridor in Vero Beach, Indian River County, FL
5.  Map of "K" Branch