# 1    Introduction

This Final Environmental Impact Statement (FEIS) evaluates a proposal by All Aboard Florida - Operations LLC (AAF) to institute intercity passenger rail service between Orlando and Miami, Florida with station stops in Orlando, West Palm Beach, Fort Lauderdale, and Miami (Project). The Project would consist of a 235-mile intercity passenger rail service with an anticipated three-hour travel time.

The Federal Railroad Administration (FRA) is the lead federal agency responsible for conducting the environmental review and preparing the National Environmental Policy Act (NEPA) environmental documentation related to the Project described in this FEIS. FRA published a Notice of Intent to prepare an Environmental Impact Statement (EIS) for the Project in the Federal Register on April 15, 2013 (Appendix 8.1-A). On September 26, 2014, FRA released a Draft Environmental Impact Statement (DEIS) for public review and comment[1]. This FEIS responds to public comments on the Draft Environmental Impact Statement (DEIS) and describes changes to the Project since the DEIS was released.

## 1.1    Project Background

AAF is a subsidiary of Florida East Coast Industries, LLC (FECI), which is a transportation, infrastructure and commercial real estate company based in Coral Gables, Florida. FECR, an affiliate of FECI, owns the right-of-way (ROW) and existing railroad infrastructure within the corridor between Jacksonville and Miami, over which FECR operates a freight rail service (FECR Corridor). AAF has an exclusive, perpetual easement granted by FECR whereby AAF may develop and operate the proposed passenger service within the FECR Corridor. AAF will operate the proposed passenger rail service within the FECR Corridor in coordination with FECR's continued freight service.

AAF has applied for federal funds through the Railroad Rehabilitation and Improvement Financing (RRIF) program, which is a loan and loan guarantee program administered by FRA as described in 49 Code of Federal Regulations (CFR) part 260. Under the RRIF program, the FRA Administrator is authorized to provide direct loans and loan guarantees that may be used to acquire, improve, or rehabilitate rail equipment or facilities, or develop new intermodal or railroad facilities. Because AAF has applied for a loan under FRA's RRIF program, FRA is required under NEPA to conduct an analysis of the potential environmental impacts resulting from the Project. NEPA compliance is a prerequisite for RRIF approval, and FRA will not approve the Project for a RRIF loan until the NEPA process is complete. A RRIF loan, if approved, would be part of an overall capital structure put in place by AAF to finance the infrastructure improvements. FRA's action with respect to the Project is limited to reviewing AAF's application for a RRIF loan. FRA is responsible for the proper completion of the NEPA process and analyzing Alternatives to meet the project Purpose and Need and the requirements of NEPA and associated statues, regulations, and other requirements.

---

1    Federal Register 79:57930, September 26 2014

AAF-AR0073636



Explanation of Features

- MCO Segment
- E-W Corridor
- N-S Corridor
- WPB-M Corridor
- Interstate Highways

Proposed Stations - WPB-M Corridor
Proposed Station (By Others)

Data Sources: ESRI 2012, FRA 2012, FGDL 2012, AMEC 2013

Project Location

All Aboard Florida Intercity Passenger Rail Project

U.S. Department of Transportation
Federal Railroad Administration

1.1-1

AAF-AR0073637

### 1.1.1    Phased Approach to Project Implementation

AAF proposes to implement the Project through a phased approach. Phase I will provide rail service on the West Palm Beach to Miami section while Phase II would extend service to Orlando. Phase I will provide passenger rail service along the 66.5 miles of the Florida East Coast Railroad (FECR) Corridor connecting West Palm Beach, Fort Lauderdale, and Miami. AAF has obtained private financing for Phase I and is proceeding to implement Phase I, which is illustrated in Figure 1.1-1.

FRA and AAF conducted an environmental review of Phase I in 2012/2013, including preparing and issuing both an Environmental Assessment (EA) (*Environmental Assessment and Section 4(f) Evaluation for the All Aboard Florida Passenger Rail Project West Palm Beach to Miami, Florida*) and a Finding of No Significant Impact (FONSI) (AAF 2012; FRA 2013a). The 2012 EA is available at www.fra.gov/page/P0590 (and attached to this FEIS as Appendix 1.1-A1) and the FONSI is attached to this DEIS as Appendix 1.1-A2. Phase I of the Project, as described in the 2012 EA, includes constructing three new stations (West Palm Beach, Fort Lauderdale, and Miami), purchasing five train sets, adding a second track along most of the 66.5-mile corridor, and adding 16 new round-trip intercity passenger train trips (32 one-way trips) on the West Palm Beach to Miami section of the FECR Corridor. FRA concluded that Phase I has independent utility; that is, it could be advanced and serve a transportation need even if Phase II was not constructed. FRA has made no decision under the RRIF program as to whether a loan would be provided for Phase I.

Since the FONSI, AAF proposed and FRA has evaluated a new location for the proposed Fort Lauderdale Station and issued a re-evaluation decision that found no significant difference from the location evaluated in the 2012 EA. Also since the FONSI, AAF proposed and FRA has evaluated a new location in West Palm Beach for the proposed Fort Lauderdale layover and maintenance facility. FRA issued a Supplemental EA for public review of this new site concurrent with this DEIS, and subsequently issued a FONSI for this element of Phase I. The re-evaluation document for the Fort Lauderdale Station is provided in Appendix 3.3.1-A1. The Supplemental EA and FONSI for the layover and maintenance facility are provided in Appendix 3.3.1-A2.

### 1.1.2    Phase II – Loan Application and Environmental Review

Considering the FRA approval of a RRIF loan for Phase II of the Project as a separate federal action, FRA has undertaken a NEPA review of the proposed extension. Given that operations would cover the full corridor from Orlando to Miami, this FEIS analyzes the cumulative effects of completing both phases of the Project, although the impacts exclusively from Phase I have already been addressed in the 2012 EA and FONSI and will not be reanalyzed in the FEIS. The bulk of the information related to Phase I is drawn from the 2012 EA. FRA concluded that it was important to provide a comprehensive look at the environmental impacts of both phases in one environmental document.

Phase II of the Project includes constructing a new railroad line parallel to State Road (SR) 528 between the Orlando International Airport (MCO) and Cocoa, constructing a new Vehicle Maintenance Facility (VMF) on property owned by the Greater Orlando Airport Authority (GOAA), constructing track through MCO to connect the VMF to SR 528, adding a second track within 128.5 miles of the FECR Corridor between West Palm Beach and Cocoa, and additional bridge work between Miami and West Palm Beach.

AAF-AR0073638

The proposed service would use a new intermodal facility at MCO that is being constructed by GOAA as an independent action. The Project includes purchasing five additional passenger train sets, and would add 16 new round-trip intercity passenger train trips (32 one-way trips) on the new railroad segment and on the FECR Corridor between Cocoa and West Palm Beach. No additional trips beyond those considered in the 2012 EA (16 round-trip intercity passenger train trips, 32 one-way trips) would be added on the West Palm Beach to Miami section.

## 1.2      Proposed Action

AAF will secure financing and will own the system and be responsible for the Project's development, construction, operation, and maintenance. The proposed action for Phase II of the Project includes four discrete geographic segments: a terminal segment at MCO (MCO Segment), an East-West Corridor between MCO and Cocoa (E-W Corridor), a North-South Corridor between Cocoa Beach and West Palm Beach (N-S Corridor), and the corridor between West Palm Beach and Miami (the WPB-M Corridor) (Figure 1.1-1).

### 1.2.1      MCO Segment

The MCO Segment is located on GOAA property. At the MCO terminus, AAF would construct a new VMF and related rail infrastructure. The Project would provide passenger rail service to the new South Terminal Intermodal Station being planned and constructed by GOAA as a separate action. The proposed intermodal station has been evaluated in two previous EAs (Federal Aviation Administration [FAA] and GOAA 1998; Federal Transit Administration, Florida Department of Transportation [FDOT], and GOAA 2005). The FAA has recently issued a re-evaluation for this facility due to the lapse of time since the prior FONSI was issued (FAA 2013). Since the new South Terminal Intermodal Station has not been constructed, this FEIS addresses the cumulative environmental consequences of a new rail passenger station in Orlando serving the Project. Previous proposals for rail service have also studied a VMF at MCO, although not in the currently-proposed location or configuration. The MCO Segment would require that AAF execute a lease with GOAA for the new track and VMF, subject to FAA's review and approval.

### 1.2.2      E-W Corridor

The approximately 35-mile E-W Corridor between MCO and Cocoa is proposed along the SR 528 alignment, and would be a dedicated rail corridor parallel to the highway. A new railroad within this corridor would cross several state highways (SR 417 and SR 520) and Interstate 95 (I-95), and would connect with the N-S Corridor in Cocoa. The new rail infrastructure would include new tracks; bridges over and under highways; bridges over waterways; new signalization; and new communication and train control systems. The E-W Corridor would require that AAF execute leases with the Central Florida Expressway Authority (CFX, formerly the Orlando-Orange County Expressway Authority) and FDOT, and secure Federal Highway Administration (FHWA) approval for occupancy of the I-95 ROW. Subsequent to the publication of the DEIS, AAF has identified Alternative E as its preferred alternative within the E-W Corridor. Alignment Alternative E would be located approximately 200 feet south of the current SR 528 right-of-way within the CFX segment, on property acquired by CFX for its future highway improvements. This alignment would be within the SR 528 right-of-way in the FDOT segment, east of SR 520.

---

Introduction                                    1-4

### 1.2.3    N-S Corridor

The N-S Corridor is a 128.5-mile segment of the existing active FECR Corridor between Cocoa and West Palm Beach. The FECR Corridor was originally built as a double-track railroad, but today it is mostly a single-track system with several sidings. The roadbed for the second track in the corridor still exists and would be used for the additional track improvements needed for the Project. The improvements would include relocating and upgrading existing tracks, as well as installing new tracks. The Project would also include improving or replacing existing bridges and grade crossings, as well as new signalization, and new communication and train control systems.

### 1.2.4    WPB-M Corridor

The WPB-M Corridor is a 66.5-mile segment of the existing active FECR ROW between West Palm Beach and Miami. Phase II of the Project includes reconstructing seven bridges over waterways within the WPB-M Corridor between West Palm Beach and Miami that were not evaluated in the 2012 EA. Because this construction is part of Phase II, the environmental effects on these waterways are considered in this FEIS.

The 2012 EA described the infrastructure improvements included in Phase I of the Project, including relocating and upgrading existing tracks as well as installing new tracks. Within the WPB-M Corridor, Phase I of the Project would include improving grade crossings, as well as new signalization, new communication and train control systems, and proposed stations at West Palm Beach, Fort Lauderdale, and Miami.

## 1.3    Federal Agency Actions and Legislative Authority

FRA is the lead agency for NEPA review for the Project. Pursuant to NEPA (42 USC § 4321 *et seq.*), Council on Environmental Quality (CEQ) NEPA regulations (40 CFR parts 1500-1508), and the FRA's Procedures for Considering Environmental Impacts (NEPA Procedures) (FRA 1999), FRA has evaluated in this FEIS the potential environmental and related impacts of constructing and operating the intercity passenger rail service between Orlando and Miami. The FRA action that is the subject of this FEIS is the approval of a RRIF loan. The U.S. Army Corps of Engineers (USACE), U.S. Coast Guard (USCG), and FAA, because of their jurisdiction, are cooperating agencies for this environmental review.

FRA requested that the USACE act as a cooperating agency on the EIS, and the USACE agreed. The Project may impact waters of the United States within the jurisdiction of the USACE under its authority granted by the Clean Water Act, Section 404 (33 U.S.C § 1344, as amended), or navigable water of the United States within the jurisdiction of the USACE under its authorities granted by Section 10 of the Rivers and Harbors Act (RHA) of 1899 (33 USC § 401); and Section 14 of the RHA of 1899, as amended (33 USC § 408) (taking possession of, use of, or injury to harbor or river improvements). In the preparation of the EIS, USACE has provided special expertise with respect to environmental issues concerning the potential discharge of dredged or fill materials into waters of the United States or the construction of any structure in, over, or under navigable waters of the United States. USACE has also provided FRA with all EIS documentation requirements that are unique to its Regulatory Program outlined in 33 CFR part 325 Appendix B (i.e., which would not be addressed by FRA in FRA's implementation of its NEPA requirements). An example of a requirement that is unique to the USACE Regulatory Program and may be applicable to the USACE's

AAF-AR0073640

participation as a cooperating agency is the identification and analysis of the Least Environmentally Damaging Practicable Alternative (LEDPA) and Public Interest Review as a requirement for compliance with the Section 404 permit program. USACE will complete its own Record of Decision including a Clean Water Act - Section 404(b)(1) determination, public interest evaluation, R&HA Section 10, and engineering analysis to determine whether to issue authorization pursuant to R&HA Section 14 (33 USC § 408) permit applications. On October 27, 2014 the USACE issued a Public Notice concerning AAF's Section 404 and Section 10 permit application. This Public Notice and the subsequent comments received by the USACE are provided in Appendix 1.1-B.

FRA requested that USCG act as a cooperating agency on the EIS, and the USCG agreed. The Project may impact waters of the United States within the jurisdiction of USCG under its authority granted by Section 9 of the R&HA and through the U.S. Department of Transportation Act of 1969. USCG, as authorized under 33 CFR § 115.70, is responsible for maintaining navigational adequacy of bridges. The purpose of these Acts is to preserve the public right of navigation and to prevent interference with interstate and foreign commerce. The General Bridge Act of 1946, as amended, the R&HA of 1899, as amended, and the Act of March 23, 1906, as amended, all require the location and plans of bridges and causeways across the navigable waters of the United States be submitted to and approved by the Secretary of Homeland Security prior to construction. The General Bridge Act of 1946 is cited as the legislative authority for bridge construction in most cases. These Acts placed the navigable waters of the United States under the exclusive control of the USCG to prevent any interference with their navigability by bridges or other obstructions except by express permission of the United States Government.

FRA requested that FAA act as a cooperating agency on the EIS, and the FAA agreed. The Project will require FAA review and approval over changes to the GOAA property. Under 49 USC §401, the FAA has jurisdiction over the layout of airports, including but not limited to approval of airport layout plans, airspace, and facility development. The Project will require that FAA approve the Airport Layout Plan Modifications, Project elements that occupy air space, and lease agreements between GOAA and AAF.

Other applicable legislative authority includes:

- Under 41 USC §4601, if federal assistance is provided to a project, the Uniform Relocation Assistance and Real Property Acquisition Polices Act of 1970, as amended, and its implementing regulations detailed in 49 CFR part 24 are applicable if land acquisition is required.

- Under 23 USC §111, for the portions of the Project that would be within the existing I-95 ROW under the jurisdiction of FHWA, the implementing regulations in 23 CFR § 1.23 provide FHWA authority over approval of temporary or permanent occupancy or use within the boundaries of federal-aid highways.

AAF-AR0073641

**Table 1.4-1     Permits or Approvals Required for the Project**

| Agency | Permit/Approval |
|---|---|
| Federal Highway Administration | Concurrence for Highway ROW Occupancy |
| U.S. Army Corps of Engineers | Clean Water Act Section 404 Permit<br>Rivers and Harbors Act Section 10 Permit and Section 14 (33 USC § 408) modification approval |
| Federal Aviation Administration | Airport Layout Plan Modification approval<br>Approval of air space and facility development stormwater ponds<br>Review of lease agreements |
| U.S. Fish and Wildlife Service | Endangered Species Act Section 7 concurrence |
| National Marine Fisheries Service | Endangered Species Act Section 7 concurrence<br>Magnuson-Stevens<br>Fishery Conservation and Management Act – Essential Fish Habitat |
| U.S. Coast Guard | Bridge Permits<br>Drawbridge Operation Regulatory changes (potential) |
| Florida State Historic Preservation Office | National Historic Preservation Act Section 106 Concurrence |
| Florida Department of Environmental Protection | Clean Water Act Section 401 Water Quality Certification<br>Environmental Resource Permit (for the E-W and N-S Corridors)<br>Sovereign Submerged Lands Approval for bridges<br>Coastal Zone Management Act |
| South Florida Water Management District | Clean Water Act Section 401 Water Quality Certification<br>Environmental Resource Permit (for the MCO Segment)<br>De Minimis Exemption for Upland Track Work<br>ROW Permits for Work Over Canals under USCG Jurisdiction<br>Coastal Zone Management Act |
| St. John's River Water Management District | Clean Water Act Section 401 Water Quality Certification<br>De Minimis Exemption for Upland Track Work<br>ROW Permits for Work Over Canals under USCG Jurisdiction<br>Coastal Zone Management Act |
| Florida Department of Transportation | Occupancy and Use Permit<br>ROW Permit |
| Florida Fish and Wildlife Conservation Commission | Gopher Tortoise Permit |
| Orange County | Wetland Conservation Area Impact Permit<br>Wetland Conservation Area Determination<br>Building Permit (for Vehicle Maintenance Facility) |
| Broward County | Bridge Permit |
| Miami-Dade County | Bridge Permit |

AAF-AR0073642

## 1.4    Permits, Licenses, and Other Regulatory Requirements

Approvals by several federal agencies, including FRA, FAA, USACE, USCG, FHWA, U.S. Fish and Wildlife Service (USFWS), and the National Marine Fisheries Service (NMFS) would be necessary to implement the Project. Constructing and operating the Project evaluated in this FEIS will also require permits issued by state agencies. AAF will be responsible for securing the permits and approvals listed in Table 1.4-1, and will be required to comply with additional regulations, including:

- Carrying out the mitigation measures and commitments resulting from the Endangered Species Act, Section 7, consultation with the USFWS and NMFS; and

- Carrying out the mitigation measures and commitments resulting from the National Historic Preservation Act, Section 106, consultation with the Florida State Historic Preservation Officer, and the federally recognized tribes within Florida.

## 1.5    Development of this Environmental Impact Statement

As it has in the past, FRA has used a third party contracting process in preparing this FEIS. FRA does not have appropriated funds to support the development of EISs for RRIF loan applications. As a result, FRA requires the applicant to engage the services of a qualified consultant approved by FRA to assist FRA in preparing the EIS. Consistent with a memorandum of agreement among the parties, the third party contractor is paid for by AAF but reports to and takes direction from FRA. In developing the proposed action, AAF engaged the services of consultant firms to prepare engineering designs for the Project and to prepare technical reports documenting existing environmental conditions and analyses of environmental consequences. FRA's third party contractor reviewed all materials provided by AAF; assisted FRA in determining that this information was complete, accurate, and relevant; and assisted FRA in the preparation of this FEIS. FRA has reviewed the FEIS to comply with the requirements of 40 CFR 1506(c), and takes responsibility for its scope and contents.

## 1.6    Organization of this Environmental Impact Statement

This FEIS has been developed in compliance with CEQ NEPA regulations and FRA NEPA procedures. It documents the purpose of and need for the Project (Chapter 2, *Purpose and Need for the Proposed Action*); describes the proposed action and other alternatives evaluated in this FEIS, as well as alternatives considered but withdrawn (Chapter 3, *Alternatives*); describes the affected environment within the Project Study Area (Chapter 4, *Affected Environment*); describes the environmental impacts of the alternatives, including the No-Action Alternative (Chapter 5, *Environmental Consequences*); provides a Section 4(f) Evaluation (Chapter 6, *Section 4[f] Evaluation*); identifies the mitigation measures and commitments (Chapter 7, *Mitigation Measures and Project Commitments*); and describes the public outreach and coordination conducted during the NEPA process (Chapter 8, *Summary of Public Involvement Process and Tribal Coordination*).

This FEIS focuses on the environmental impacts of the Project that is the subject of the federal agency action: FRA's approval of the RRIF loan application for the All Aboard Florida Intercity Passenger Rail Service Project from Orlando to West Palm Beach. The FEIS has also been developed to satisfy the NEPA requirements of the federal cooperating agencies: the FAA, USACE, and USCG. In order to present a comprehensive picture of the cumulative effects of the Project that is the subject of AAF's RRIF loan

AAF-AR0073643

application, in combination with the effects of Phase I (West Palm Beach to Miami), this FEIS incorporates information from the 2012 EA entitled *Environmental Assessment and Section 4(F) Evaluation for the All Aboard Florida Passenger Rail Project West Palm Beach to Miami*; identifies any changes in project design since the 2012 EA and 2013 FONSI; and evaluates the effects of those changes.

## 1.7    Public and Agency Comment Summary

During the comment period for the Draft Environmental Impact Statement, FRA received over 15,400 comments. The comments covered a wide range of issues and represented viewpoints from government agencies, organizations, business groups, businesses, residents and property owners. Comments were submitted in several formats:

- By email
- By US mail
- At public meetings (written)
- At public meetings (oral, transcribed by a court reporter).

FRA has reviewed all of the comments, many of which were form letters. Comments fell into several broad categories:

- Support
- General opposition
- Opposition based on specific concerns
- Detailed and substantive comments concerning information provided in the DEIS.

Approximately 5,960 of the submittals generally supported the Project, and 9,500 were generally opposed. Most comments came from individuals in the general public, living, working or having property interests in the Project area, particularly residents of Martin, St. Lucie and Indian River Counties. Most comments from the public indicated that individuals did not want passenger rail operating within the FECR Corridor along the Florida coast, and preferred that AAF select an alternative alignment further inland. A substantial number of people commented on the potential impacts on boaters associated with increased closures of the three moveable bridges along the corridor.

Substantive comments are addressed in the appropriate sections of the FEIS. This section identifies and provides FRA's responses to general comments and to comments that appeared frequently in individual and form letters, and to which FRA can provide general responses.

### 1.7.1    FRA's Role and the DEIS

**Public Funding**

Many commenters suggested that issuing a RRIF loan to AAF would be a direct use of taxpayer dollars for the benefit of private enterprise. Commenters suggested that RRIF loans were originally intended for a different purpose and that AAF should not qualify for this type of loan. Commenters also discussed the

AAF-AR0073644

issuance of tax-free private activity bonds by the Florida Development Finance Corporation (FDFC) and stated that these bonds are a form of taxpayer subsidy.

Commenters suggested that taxpayer dollars should be invested more prudently. Many commenters suggest that the RRIF loan, if granted, would be at significant risk of default because historically, passenger trains do not make money and it is unlikely that AAF will be profitable. Low ridership could result in a loan default or a request for government subsidies. If AAF does not succeed, taxpayers would assume all liability for the loan.

*Response*

The RRIF program was originally established by the federal Transportation Equity Act for the 21st Century (TEA-21) enacted by Congress in 1998. Under the RRIF program, FRA can provide direct loans and loan guarantees to finance the development of railroad infrastructure by public or private sponsors of intermodal and rail projects, such as AAF. Eligible projects include the acquisition, development, improvement, or rehabilitation of intermodal or rail equipment or facilities, including track, bridges, yards, buildings, and shops. AAF is eligible for RRIF financing, which is awarded at the discretion of the FRA Administrator.

The FDFC is an entity of the State of Florida. FRA has no relationship with that entity and no responsibility over its actions. Issues concerning the FDFC's potential issuance of tax-exempt bonds are outside the scope of this FEIS, which has been prepared in connection with FRA's consideration of a RRIF loan application.

Intercity passenger rail is recognized as a viable and needed service, given the level of travel activity and the existing and growing congestion on Florida's highways. FRA can consider public benefits, in the form of new passenger rail service, and/or potential economic development as a result of additional rail services, as part of the decision whether or not to issue RRIF loans.

The DEIS and FEIS reviews of the Project have followed and adhered to NEPA guidelines for transparency and public involvement. NEPA compliance is a prerequisite for RRIF approval, and FRA will not approve the Project for a RRIF loan until the NEPA process is complete.

As for profitability and risk of default, FRA determined, and documented in the DEIS/FEIS, that a major criterion for success of the AAF rail service is ridership. AAF undertook a ridership study to make a business case for high-speed rail that would not rely on grants or operating subsidies, and would be financeable and profitable. The ridership study has been reviewed by the FRA. A RRIF loan, if approved, would be part of an overall capital structure put in place by AAF to finance the infrastructure improvements. RRIF funding is a loan, not a grant, so it must be repaid with interest, with the funding backed by collateral provided by AAF.

**The DEIS Was Not Independent or Objective**

Many comments were received stating that the DEIS was not objective nor was it prepared by an independent contractor. Commenters believe that AAF selected the contractor, paid for the analysis, and provided the content of the DEIS. They requested an independent review of the Project impacts and mitigation plans.

AAF-AR0073645

*Response*

The DEIS and the entire review process is owned by the FRA. The FRA is the lead federal agency and will ultimately decide if, how, and when a Record of Decision is issued. The FRA chose the consulting firm of Vanasse Hangen Brustlin Inc. (VHB) to assist them in completing the DEIS as the lead independent consultant. The consultant works directly for the FRA and conducted an impartial analysis as required by the FRA. The FRA does not have the appropriated funds to support the development of an EIS, and therefore requires AAF to provide the funds to pay for the independent analysis. A project sponsor paying for the government review process is a common practice among development projects for the FRA, FAA, and other federal agencies. For further explanation regarding funding for this Project and the selection of the independent consultant, please refer to Section 1.5, *Development of this Environmental Impact Statement*.

## 1.7.2    Alternatives

Comments on alternatives and the proposed action focused on the selection of the overall route alternative between Orlando and West Palm Beach, station locations, and ridership estimates.

**Alternatives**

Many commenters suggested that the alternatives analysis presented in the DEIS was flawed, and that a more westerly route—the CSX, Florida Turnpike, or Interstate 95 corridor—should have been selected rather than the FECR railroad corridor. Many noted that the FECR route along the coast travels through densely populated and environmentally sensitive areas, compared to a westerly route. Many commenters believe a westerly route would have a smaller effect on the quality of life and economic vitality of Florida residents because it would travel through areas of lower population density.

*Response*

The CSX route, Florida Turnpike route, and I-95 route were all evaluated in the Level 1 alternatives screening process (Section 3.2.1). AAF evaluated alternatives under the primary screening criteria of meeting the purpose and need, feasibility to construct and operate, and impacts to the environment. Because AAF is a for-profit private enterprise, alternatives were evaluated primarily in the light of whether they could be constructed and operated in accordance with AAF's financial model. AAF selected the FECR Corridor as its preferred alternative because it meets the purpose and need while remaining feasible to construct and operate based on ridership and cost projections and potential environmental impacts. The FRA has reviewed AAF's analysis and validated the conclusions.

AAF does not have operating rights needed for the CSX route, which would also require extensive upgrades to the track, grade crossings, and new infrastructure. AAF would also need to purchase or lease land from many different public and private landowners. The CSX route alternative would also result in the highest potential adverse direct and indirect impacts to wetlands and protected species, and may require acquisition of conservation land for a total distance of 13 miles. Due to land access, logistics, and environmental impacts, the CSX route is not feasible to implement.

The Florida Turnpike route would require a new 100-foot wide ROW along most of the route, as there is insufficient land within the highway ROW to support the 2-track railroad, and would require new tracks,

AAF-AR0073646

grade crossings, and infrastructure. AAF would need to bridge over, or tunnel under, each of the existing highway interchanges, substantially increasing construction costs. AAF would need to purchase or lease land from many public and private landowners, including the Florida Turnpike Authority. This route would also result in high potential adverse direct and indirect effects to wetlands. Due to land access, logistics, and environmental impacts, the Florida Turnpike route is not feasible to implement.

The I-95 route would require new tracks, grade crossings, and infrastructure. AAF would need to purchase or lease land from many public and private landowners, including FDOT and FHWA. AAF would need to bridge over, or tunnel under, each of the existing highway interchanges, substantially increasing construction costs. The I-95 route would also result in the second highest potential adverse direct and indirect impacts to wetlands and protected species. Due to land access, logistics, and environmental impacts, the I-95 route is not feasible to implement.

## Stations

Commenters objected that communities along the "Treasure Coast" north of West Palm Beach would suffer negative effects from increased passenger and freight rail traffic (noise, bridge closures, grade crossing delays and traffic congestion, etc.) but receive none of the benefits (convenient travel, potential jobs from transit-oriented development, tourism, etc.) of nearby passenger rail station stops. Many commenters requested that AAF provide stations along the N-S Corridor between West Palm Beach and Cocoa.

### *Response*

AAF has no plans in place at this time to provide direct passenger rail service to Martin, St. Lucie and Indian River counties through the construction of stations and the use of regular, intermittent or skip-stop service. It was determined, and documented in the DEIS/FEIS, that a major criterion for success of the AAF rail service is ridership. The ridership study indicated that an approximate 3-hour rail service trip time between Miami and Orlando is one of the most critical factors in the service meeting ridership goals. With the current planned stations the trip time is approximately 3 hours between Miami and Orlando. The addition of stops beyond the four stops planned at this time would increase overall trip time and negatively impact achieving the number of passengers (ridership) critical for overall Project success. AAF has not precluded additional stations as demands warrant in the future. Brevard County is currently evaluating options for a possible station and locations where such a station, in the future, might be located. Indian River, Martin, and St. Lucie counties can also undertake ridership studies to determine if stations are feasible.

## Ridership

Many commenters noted that AAF's ridership study has not been made publicly available and that AAF projections are unsubstantiated. Further, commenters suggest ridership and vehicle miles traveled reductions presented in the DEIS are contradictory. Commenters also suggest that the projected level of ridership is unlikely to be attained. Many commenters suggest that Florida does not have conditions to support the success of AAF and that the Amtrak service currently operating between Miami and Orlando has low ridership. Some commenters suggested that since AAF will be operating in the same market as Tri-Rail and Amtrak, a third rail system is redundant.

AAF-AR0073647

**Response**

AAF developed a twelve-month ridership study, updated in 2015 (Appendix 3.2.1-B) to make a business case for high-speed rail that would not rely on grants or operating subsidies, and would be financeable and profitable. Because this detailed study contains confidential business information AAF has not released the complete study to the public. Based on this study and its financial analysis, AAF is confident that a profitable passenger rail service can be operated between Orlando and Miami.

In response to comments, FRA has reviewed ridership estimates provided in the EIS (Chapter 3 and Section 5.2.1) and corrected the document where necessary for consistency.

AAF serves a different market than both Amtrak and Tri-Rail. The AAF service will be significantly faster than Amtrak on the Orlando-Miami route, and faster than Tri-Rail on the West Palm Beach – Miami route, and will offer a higher level of passenger comfort. The AAF service will be more competitive for last-minute or flexible trips between Orlando and West Palm Beach or Miami.

### 1.7.3    Transportation

**Grade Crossing Traffic**

Many commenters expressed concern that the Project would increase traffic congestion and travel delays, especially in downtown areas, as a result of increased grade crossing closures. Commenters stated that the impact analysis presented in the DEIS underestimated the congestion and delays that would result from the Project, particularly in town centers that already experience high levels of seasonal traffic.

**Response**

As part of the DEIS, traffic congestion was analyzed at select grade crossings along the corridor. The grade crossings analyzed are the two crossings in each county with the highest annual traffic volumes, as well as the adjacent two intersections (to represent the worst case scenario). Existing annual traffic volumes were converted to peak hour traffic volumes using conversion factors that calculate the 100th highest hourly volume, consistent with FDOT standards (Florida Department of Transportation 2009 Quality/Level of Service Handbook). The analysis found that typical at-grade crossings (intersections of local roads with the FECR Corridor) would be closed an average of 54 times per day (3 times per hour), with average closure times ranging from 1.7 minutes (passenger) to 2.8 minutes (freight). The total average hourly closure would range from 4.2 minutes per hour to 4.5 minutes per hour, an increase of approximately 2 minutes per hour in comparison to the No-Action Alternative.

In addition to calculating the delay at each of the identified crossings, the EIS determined the levels-of-service (LOS) at each crossing. LOS is an industry standard metric for the delay experienced by automobiles at an intersection and its values for signalized intersections range from LOS A (less than ten seconds of delay per vehicle) to LOS F (over 80 seconds of delay per vehicle).

By 2016, the delay at each intersection would increase slightly, but only four of the 30 intersections would see their LOS decline from acceptable levels of service (A-D) to unacceptable levels of service (E or F) or see an increase in delay at an intersection that is already experiencing an unacceptable level of service (E or F). By 2036, the number of intersections with similar declines would increase from four to nine (out of 30 total). For the most part, these intersections with declines in LOS due to the Project in 2016 and 2036

AAF-AR0073648

would be operating at an unacceptable LOS without the project, and the effect of the Project at these locations would be minimal.

**Freight**

Many commenters suggested that the infrastructure improvements to the FECR corridor would allow the FECR to increase freight train trips beyond the levels identified in the DEIS. They noted that increased freight traffic is expected because of the planned widening of the Panama Canal, but was not acknowledged in the DEIS. Many commenters were skeptical of the financial viability of passenger train service and believe the Project is a means to secure taxpayer funding for rail upgrades that would benefit the freight service.

*Response*

The DEIS/FEIS analysis incorporates 20 through freight trains, which is consistent with the latest available freight forecasts from FECR. In addition, there are local freight trains that operate a variety of short routes from Jacksonville to Miami and these are included in the modeling where appropriate. If, hypothetically, the volume of cargo moved along the corridor increases due to the growth of port activity, additional units can be moved in existing double-stack trains with corresponding increases in average train length, thereby reducing the need for new train sets. Due to the imbalance in freight traffic, occasionally trains currently operate with empty cars, enabling the railroad to absorb increases in freight without increases in train length. Increases in freight train length was incorporated into the DEIS modeling. Containerization has facilitated added capacity without any new train starts. In fact, FECR has previously responded to community concerns by running fewer, but longer, trains as opposed to many shorter trains. These trains used to be 7,500 feet, but now they range from 9,000 to 10,000 feet. FECR's freight forecast takes into account that not everything that arrives at the port will be transported by the FECR railroad. Freight will also move by truck and possibly the CSX freight system.

## 1.7.4    Navigation

Many commenters asserted that the DEIS underestimated the effects of increased closures of the moveable bridges along the St. Lucie River, Loxahatchee River, and New River on recreational and commercial boat traffic. Many specific comments were provided to the FRA, which are addressed in Section 5.1.3 of the FEIS. In general, commenters stated that the number of boats using each waterway was underestimated; the number of boats that would be delayed would be greater than indicated in the DEIS; queues of waiting boats would be longer, due to limitations on how many boats can pass through the bridge opening at a time; and that the increased queueing would decrease safety due to the need for boats to maintain headways while queueing. Commenters stated that these delays, inconvenience to boaters, and safety problems would have significant effects on quality of life, the viability of maritime businesses located upriver of the bridges, and on the value of waterfront property upriver of the bridges. In addition, many commenters believe that the duration of bridge closure times are underestimated. The age of these bridges and tendency to get "stuck" is a concern. Some commenters were concerned that if freight trains were required to wait for a passenger train to cross the drawbridge, the stopped freight train could block multiple grade crossings in town centers.

AAF-AR0073649

With regard to commercial navigation in particular, the St. Lucie River's role in linking the Atlantic Ocean and Gulf of Mexico via the Okeechobee Waterway was noted as a significant function that would be affected by more frequent bridge closures.

***Response***

In response to comments and using updated information provided by local communities, AAF has revised the navigation impact analysis. Findings of this revised analysis can be found in Section 5.1.3. The navigation impact analysis in the DEIS used boat count data from winter 2014 and considered average day values to estimate impacts. For this FEIS, the navigation impact analysis was revised and uses summer 2014 data, which represents a busier time for marine traffic and a higher number of boat crossings. The revised analysis compares the higher level of boat traffic experienced on a high-volume weekend day to average day conditions for all summer 2014 data. This revised analysis presents a more realistic picture of peak season boat operations and Project effects on navigation.

Section 5.1.3 has been updated to respond to substantive comments, including the role of the St. Lucie River, and to address safety concerns. Section 5.4.3 also provides information on economic impacts to the maritime industry and waterfront properties. AAF has confirmed that trains waiting to cross a moveable bridge will not be stopped across grade crossings, and that AAF would update railway and bridge infrastructure to accommodate the passenger rail and ensure that operations run smoothly.

In its comment letter on the DEIS, the U.S. Coast Guard stated that "The Coast Guard has not made the determination that the proposed increases in waterway closures would meet the reasonable needs of navigation. Any such determination will happen through a separate rulemaking process and not as part of the NEPA process." The Coast Guard also indicated that it is "very likely that future regulatory action will be required for these bridges."

All of the mitigation measures described in Section 7.2.2 would be in place to minimize effects to boaters and maritime businesses. AAF would implement a series of mitigation measures to reduce vessel delays at the three operable bridges (see Section 7.2.2). These measures would include publishing a set schedule for each bridge, consistent with existing USCG regulations; providing public access to bridge closure schedules; and implementing a notification sign/signal/horn at each location with countdowns to indicate the times at which the bridge will begin to open and close. Additionally, AAF will establish a point of contact with first responders and emergency personnel to promptly respond to unforeseen waterway emergencies. AAF will also rehabilitate the lift mechanisms on all three moveable bridges, thereby ensuring more reliable openings and closings.

## 1.7.5    Physical Environment

### Air Quality

Some commenters raised concerns that the air quality and greenhouse gas emissions estimates omitted emissions from motor vehicles stopped at grade crossings, as well as from boats stopped at the three drawbridges. They requested that the FEIS include an analysis of air quality at congested grade crossings, particularly in downtown areas.

AAF-AR0073650

### Response

An analysis of the projected air quality impacts at grade crossings has been completed as part of the FEIS. The detailed analysis of these grade crossing is presented in Section 5.2.1. The overall emissions were calculated for all of the criteria pollutants for both 2016 and 2036. The operations of new passenger trains would increase local emissions from vehicle queuing typically by less than 50 percent compared to normal traffic and freight emission levels. Emissions from grade crossing vehicle queuing with passenger trains were generally significantly less than one ton per day, which constitutes a *de minimis* impact on overall emission levels. Total emissions from all sources (normal cycle, freight and passenger) generally amount to less than one ton/day with the exception of NOx emissions for Banyan Boulevard and Northlake Boulevard crossings (Palm Beach County). Emissions at those two crossings are still considered *de minimus* pursuant to EPA standards

### Noise

Many members of the public stated that the current freight trains create noise impacts, even at a considerable distance from the tracks. They felt that the DEIS did not take this into account, and underestimated the effects of noise from trains passing-by. Other concerns include the noise effects on historic buildings, which are not insulated to prevent the penetration of sound. Commenters were also concerned that the passenger rail service would cause freight trains to operate at night, increasing nighttime noise effects.

### Response

A noise impact assessment was completed within the Project Study Area according to FTA, FRA and FDOT guidelines. As stated in section 5.2.2 *Noise and Vibration*, prior to mitigation, the Project has the potential to cause long-term adverse noise impacts to residents and properties primarily along the N-S Corridor, as well as along some elevated sections of the E-W corridor. Impacts are determined based on the potential for increases in future noise conditions due to changes caused by the Project. The FRA is responsible for enforcing compliance with the Environmental Protection Agency railroad noise emission limits (40 CFR Part 210) of existing freight trains. The enforcement and compliance of existing freight train noise emissions is outside the scope of this Project and FEIS.

According to FTA/FRA noise impact assessment guidelines, noise impact has been assessed at all sensitive receptors, including historic buildings with noise-sensitive use, at exterior locations. Interior noise conditions are not considered when assessing potential impact. Noise is only an adverse effect on historic properties if a quiet setting is an important element of the significance of the property (for example, a historic church). None of the historic resources within the noise impact area require a quiet setting.

Nighttime train operations are an important factor when considering potential noise impact since a 10-decibel penalty is applied to events that occur between 10:00 PM and 7:00 AM. The Project takes into account the projected number of freight and passenger train events and whether they would occur during the day or night. The specific distribution of daytime and nighttime train events are based on AAF Modeling Assumptions Report (May 2013) and the proposed passenger rail schedule.

The AAF has committed to installing wayside horns at 117 grade crossings between Cocoa and West Palm Beach. The pole-mounted wayside horns will substantially reduce the noise footprint when compared to

AAF-AR0073651

the existing train-mounted warning horns for both passenger and freight trains. Therefore, the noise will significantly decrease with the use of pole mounted horns as compared to the current use of train mounted horns. AAF has also agreed to work with local jurisdictions to implement quiet zones. Where quiet zones are established, pole-mounted horns will not be required.

**Vibration**

Some commenters raised concerns that increased noise and vibration levels would increase the effects of vibration on people and buildings, especially to historic and other sensitive buildings. Commenters raised concerns that the noise and vibration impacts of double-stacked or otherwise faster or larger freight trains following the Panama Canal widening were underestimated.

*Response*

AAF conducted a vibration impact assessment within the Project Study Area according to FTA, FRA, and FDOT guidelines (Appendix 5.2.2-C). Vibration impact from train operations has been assessed at all sensitive receptors as categorized by the FTA/FRA including residences and historic structures with vibration-sensitive use. The potential for vibration impact that would cause structural damage has been assessed at all buildings adjacent to the railroad. FRA has independently reviewed AAF's vibration analysis and validated the conclusions.

AAF completed a vibration impact assessment for potential structural damage to adjacent buildings and determined that there would be no potential impact due to the construction of the Project. Vibration levels from freight and passenger train operations rarely exceed limits for potential structural damage outside the railroad right-of-way.

The vibration impact assessment is based on FTA/FRA general vibration curves for freight and passenger train operations. These generalized curves are based on a wide range of train operating conditions. The length and speed of freight trains used in the assessment are based on AAF modeling assumptions and FECR data on train operations. Double-stacked freight cars are not expected to increase vibration conditions, since the weight of the cargo must still be below the limitations of the freight car and track design as it is with single-stack cargo.

### 1.7.6     Natural Environment

Many commenters suggested that the DEIS should more thoroughly address the impacts to natural habitats, wetlands, wildlife, and particularly rare species.

**Wildlife and Wildlife Corridors**

Commenters stated that there have not been adequate field investigations or analysis of the impacts of a second track and increased higher-speed train traffic on wildlife, and that wildlife crossings should be provided in the E-W and N-S corridors.

*Response*

FECR has been operating along the existing railroad corridor, the N-S Corridor, for more than 100 years and wildlife crossings were not established at the time the railroad was built. AAF is not changing existing

AAF-AR0073652

conditions or exacerbating existing barriers to wildlife movement and therefore does not propose to construct any new wildlife passages along the FECR Corridor.

AAF is discussing the design of the railroad bridges and culverts crossing the Econlockhatchee River, its tributary, and Little Creek with representatives of the USACE, St. Johns River Water Management District, Florida Fish and Wildlife Conservation Commission, and the Orange County Environmental Protection Division. During these discussions, AAF proposed to develop wildlife crossings at these overpasses. The migratory characteristics of three large mammals known to inhabit the corridor (Florida black bear, white-tail deer, and Florida panther) were evaluated. Due to the size and sensitivity of the Florida black bear it was used as the species in the development of corridor/bridge design. This enabled the needs of other species to be met as part of the design.

### Florida Scrub-Jay

Several commenters suggested that the DEIS should discuss whether or not the addition of tracks would involve the removal of natural habitat, specifically that of scrub-jays, and that the DEIS did not adequately document all known scrub-jay territories.

### *Response*

As documented in Section 4.3.6 of this FEIS, occupied scrub-jay habitat is found in many areas adjacent to the FECR Corridor. The results of the scrub-jay field survey documented presence of scrub-jays at Savannas Preserve State Park, and observations of scrub-jays crossing the tracks indicate it is likely scrub-jays will occur within the rail corridor at times. The Project will result in passenger trains passing through these areas at maximum speeds ranging from 79 mph to 125 mph at a frequency of 32 trips per day. The increase in train frequency as well as the higher operational speeds in comparison to the existing freight rail service increase the likelihood scrub-jays will collide with a train resulting in an "incidental take." Scrub-jays are cooperative breeders, meaning a breeding pair that defend a territory are usually assisted by helpers, and a member of the breeding population is replaced from a large pool of these helpers. This cooperative breeding strategy buffers the population from losses of individuals by providing a quick replacement for a lost breeder. Therefore the anticipated "incidental take" will not jeopardize the continued existence of the species or dramatically affect the local population.

Under the ESA Section 7, the USFWS has requested formal consultation on the Florida scrub-jay, which is being led by USACE on behalf of FRA, the lead agency for this FEIS. As part of the official consultation, USFWS is preparing a Biological Opinion for scrub-jays in association within the proposed action. AAF has agreed to purchase two scrub-jay credits to mitigate for potential "incidental takes" of individual scrub-jays.

### Listed Plant Species

Several commenters stated that protected plant species were known to occur within or near the FECR right-of-way, and had not been identified in the DEIS.

### *Response*

Sections 4.3.6 and 5.3.6 of the FEIS have been revised to include additional listed plant species identified by commenters. Preliminary surveys to determine the presence of threatened or endangered species and delineate wetland boundaries were conducted within areas of the N-S Corridor where the construction

footprint would go beyond the existing and historic railroad tracks and ballast. These surveys did not identify any threatened or endangered plant species within the FECR Corridor; however, the entire ROW has not been surveyed. AAF is coordinating with federal and state agencies as well as land managers and biologists within public lands to determine the potential presence of protected plant species within the FECR ROW and to identify appropriate areas in which surveys will be conducted prior to construction.

### 1.7.7    Social and Economic Environment

The majority of comments received by the FRA were related to the social and economic environment, including concerns about maintaining the quality of life in small town centers along the FECR Corridor, impacts to residential property values, effects on small businesses and environmental justice communities, as well as safety and emergency vehicle response.

**Quality of Life**

Many commenters asserted that the quality of life along the corridor would be significantly affected due to added traffic congestion at grade crossings, added boat traffic at bridges, added noise, a general disruption to normal everyday life, and that effects of the additional train traffic would be incompatible with the quiet small-town settings along the N-S Corridor.

*Response*

The FECR Corridor is an active freight rail corridor, currently experiencing approximately 14 round-trip freight trains per day. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The AAF passenger service would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the quality of life in municipalities and communities along the rail line.

While the addition of passenger rail service would increase noise and result in more grade crossing closures, these effects would not be significant (as demonstrated in Chapter 5), and would comply with FTA, FRA, and FDOT guidelines. In addition, AAF has proposed a number of mitigation measures, such as the use of pole-mounted horns to decrease noise, to reduce the effects on communities, and to provide safety improvements at grade crossings.

**Economic Impacts to Municipalities**

Many commenters noted that communities and tax payers will be responsible for the maintenance of grade crossings. Commenters suggested that the maintenance of grade crossings is expensive and would be a burden to communities, and that the DEIS did not take this into account.

*Response*

The State of Florida requires municipalities to fund the maintenance of grade crossing equipment within their jurisdictions. The FECR Corridor has been in existence for approximately 100 years and crossing maintenance has been part of its existence since the crossings were first installed. The Project will result minor increases in the annual cost of maintaining grade crossing equipment due to the addition of a second track, as set forth in the FDOT *Schedule of Annual Cost of Automatic Highway Grade Crossing Traffic Control Devices (725-090-41)*. Costs may increase where the type of grade crossing traffic control device is upgraded (for example, where the railroad infrastructure changes from a single track to a double track,

AAF-AR0073654

or where a two-quadrant gate is replaced with a four-quadrant gate). There will also be a small increase in the periodic cost of roadway resurfacing at the grade crossings, which typically occurs every 5 to 10 years based on the volume of highway traffic. Maintenance at grade crossings will be performed by the FECR and funded according to a crossing license agreement specific to each crossing. There would not be any new grade crossings associated with the AAF passenger rail service.

**Residential Property Values**

Commenters stated that the DEIS did not adequately evaluate the effects of the Project on residential property values. They indicated that train traffic associated with the Project would increase noise levels, worsen roadway congestion, reduce safety, and limit waterfront access. These impacts would lower property values along the rail line, which would cause undue economic hardship for local governments and property owners. Lower property values would reduce municipal property tax revenues, thereby limiting local governments' ability to provide community benefits. Lower property values would also reduce personal wealth. Impacts to noise, traffic, safety, and waterfront access resulting from the Project would make it difficult for property owners to sell their real estate holdings. The combination of lower property values and a deteriorating real estate market would be particularly harmful to Environmental Justice communities.

In addition, commenters stated that the DEIS does not adequately address the Project's potential to adversely impact the real estate market along the New River, Loxahatchee River, and St. Lucie River. Increased bridge closures and associated navigational delays would lower waterfront property values, particularly for properties up river from the impacted bridges. Lower property values would reduce municipal tax revenues and personal wealth. Increased bridge closures and associated navigational delays would also make it difficult to sell properties along these waterways, which include multi-million dollar homes. Few people, if any, would want to buy waterfront property when the Project would inhibit their enjoyment of the water. Some commenters suggested that the inability to sell these properties may lead to increased foreclosures and a downturn in the regional economy.

*Response*

The FECR Corridor is an active freight rail corridor, currently with approximately 14 round-trip freight trains per day under current conditions, projected to increase to 20 by 2019. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The AAF passenger service would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the quality of life in municipalities and communities along the rail line. AAF would not introduce significant new disruption, noise, traffic, or other effects that could affect property value. Properties along the railroad are already valued according to their proximity to the rail line. An FRA study "neither established nor excluded the possibility of adverse effects on property values." It did, however, generally conclude, "other things equal, being within 1,000 feet of an operating rail line depresses the sale price of a property from 5 percent to 13 percent on average." Because the FECR was established over 120 years ago and has been in continuous operation since the late 1800s, any impact of the railroad on the valuation of nearby properties, up or down, would have already occurred long ago and would not be substantially changed by the added passenger trains.

AAF-AR0073655

With respect to waterfront property along the New River, Loxahatchee River or St. Lucie River, the Project would result in increased closings of the moveable bridges. However, the moveable bridges would remain in operation and these rivers would continue to be open to navigation as required by the Coast Guard. Properties along these rivers with docks would continue to have boat access both upriver and downriver. Therefore, the Project is not expected to affect the value of these properties.

### Adverse Effects on Businesses

Commenters stated that the DEIS did not adequately evaluate the effects of the Project on businesses located in small downtown areas along the N-S Corridor. They believed that increased noise and congestion from the Project would discourage customers, particularly tourists, which would force businesses to close, increase retail vacancies, and reduce sales tax revenue. These impacts would also limit future development along the rail line.

### *Response*

The FECR Corridor is an active freight rail corridor, currently with approximately 14 round-trip freight trains per day under current conditions, projected to increase to 20 by 2019. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The AAF passenger service would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the viability of businesses located in town centers along the rail line. The FECR Corridor has supported freight and/or passenger rail service on a continuous basis for more than 100 years, and existing downtowns along with their commercial properties largely developed around these conditions. AAF would not introduce significant new disruption, noise, traffic, or other effects that could affect businesses.

As noted in Section 5.2.2.2, the Project would have no permanent noise impacts along the N-S Corridor due to the use of wayside horns. Future noise levels along the N-S Corridor would be comparable to existing noise levels for mainline segments and substantially lower than existing noise levels at grade crossings. If municipalities believe further noise reduction is necessary, there is the option of seeking Quiet Zone designation under 49 CFR part 222. A Quiet Zone is "a section of a rail line at least one-half mile in length that contains one or more public crossings at which locomotive horns are not routinely sounded." Quiet Zones are proposed by municipalities, designed in accordance with FRA standards, and approved by FRA. Municipalities are responsible for funding all improvements and equipment maintenance associated with Quiet Zones within their jurisdictions. AAF has committed to working with local municipalities to develop Quiet Zones as an alternative to the use of wayside horns.

As noted in Section 5.1.2.2, grade crossings would be closed an average of three times per hour, which would leave the majority of each hour of operation unaffected by the introduction of passenger train service. An increase in the number of crossing events would cause additional closures; however, the closures due to the passing of passenger trains would be much shorter than closures from existing freight traffic.

Given the minimum impact to noise and local traffic conditions, the additional 16 passenger rail round trips per day is not expected to result in an adverse impact to businesses within small downtowns along the N-S Corridor. There are many locations across the United States, particularly in the Northeast, where intercity passenger rail or commuter rail has been re-instated on out-of-service rail lines or on active

---

AAF-AR0073656

freight lines that pass through town centers. There have been no demonstrated downturns in local businesses following the re-introduction of rail service. Downtown businesses are, however, affected by factors such as regional economics, jobs, tourism, parking, and the development of malls and big-box retail stores in areas outside of the downtown.

**Environmental Justice Communities**

Environmental justice was an issue raised by many commenters. These comments stated that the DEIS did not provide adequate data to support its claims pertaining to environmental justice, and that several local environmental justice communities were not identified in the DEIS. Commenters indicated that the Project would disproportionately impact minority and low-income populations as a result of job loss, depreciated property values, safety risks, and increased noise and vibration. Low-income populations would be especially vulnerable to these impacts, as they are less likely to be able to relocate, if so desired, due to financial limitations. Another concern raised by commenters was that in some environmental justice communities, residents lack cars and regularly cross the FECR tracks mid-block to access jobs, shopping, schools, and services. With the improvements to the track infrastructure and more frequent faster trains, this convenient access would be cut off and would adversely affect the ability of environmental justice populations to access jobs and services.

*Response*

In response to comments, FRA has reviewed the designations of environmental justice communities and the analysis of impacts, and updated Section 5.4.2 of this FEIS. As noted in Section 5.4.2.1, the FEIS based identification of environmental justice communities on census tracts within 1,000 feet of the proposed or existing railroad alignments with minority and low-income populations greater than 50 percent or meaningfully greater than the general population. Thresholds used to determine meaningfully greater minority and low-income populations included census tracks where minority and low-income populations are 10 percent higher than the combined total for the six counties crossed by the Project, 37.4 percent and 22.4 percent, respectively. This approach was developed in accordance with the CEQ's guidance document on environmental justice and approved by FRA (CEQ 1997). Any census tract or community that the FEIS did not identify as an environmental justice community was determined to be too far from the proposed or existing railroad alignments to be adversely impacted by the Project.

No environmental justice community would be disproportionately impacted by the Project. There would be no forced residential displacements, job loss, or neighborhood fragmentation due to the acquisition and/or use of land. The Project would not cause severe noise or vibration impacts within environmental justice communities.

The FECR was established over 120 years ago and has been in continuous operation since the late 1800s, long before most of the current abutting properties were constructed. Any hypothetical impact of the railroad on the valuation of nearby properties, up or down, would have already occurred long ago.

With respect to access between environmental justice communities and jobs/services/school access, all such unauthorized pedestrian crossings are both illegal trespass and unsafe under current conditions. The infrastructure and safety improvements that are incorporated in the Project will reduce illegal and unsafe trespass on the rail line, and improve safety for area residents by adding sidewalks at grade crossings. This is not a disproportionate adverse impact to environmental justice communities.

AAF-AR0073657

AAF will conduct ROW Field Surveys to observe, document, and provide recommendations to minimize trespassing by employing fencing, warning signage, public outreach/information, and other appropriate measures as required. AAF will also develop a Hazard Analysis and System Safety Program Plan prior to the start of operations, which will identify potential system risks based on an evaluation of potential risk severity and frequency. These measures will be applied universally, including both environmental justice and non-environmental justice communities.

**Safety**

Many commenters stated that the passenger train service would create unacceptable safety hazards along the N-S Corridor, particularly where the corridor crosses through small town centers. Some commenters voiced concerns that faster and more frequent train trips could reduce safety for residents – specifically children playing, biking, or skating, and the elderly walking – especially because they are accustomed to the slow speed of freight trains. Others noted that currently there are many informal walking paths across the tracks, and if these are no longer available that pedestrians and bicyclists would be required to cross at a roadway grade crossing where there is no sidewalk or bike lane, increasing the hazard to pedestrians.

Some commenters voiced concerns that faster trains increases the risk of derailments. Commenters worried that a high speed passenger train derailing or colliding with another vehicle in a downtown area could cause widespread harm and damage. In addition, some residents questioned whether trains containing hazardous material would travel through their communities. Many commenters asked if the corridor would be "sealed" as required for High Speed Rail service.

***Response***

Consistent with FRA safety requirements, which are not part of the NEPA process, AAF will develop a Hazard Analysis and System Safety Program Plan prior to the start of operations. These documents will identify potential system risks based on an evaluation of potential risk severity and frequency. The Hazard Analysis that AAF is developing in advance of the start of train service, per federal regulations, will identify collision hazards and will make an assessment of the potential frequency and severity of these incidents. This is not a NEPA requirement.

AAF is responsible for ensuring that legal crossings along the corridor are safe and comply with existing regulations. AAF will work with Florida Operation Lifesaver, a statewide, non-profit public awareness and education program to ensure compliance with existing regulations regarding railroad crossings. AAF will work to install pedestrian gates at crossings where local municipalities that agree to maintain such gates.

AAF has committed to complying with the FRA's guidelines for rail crossing safety as specified for higher speed passenger rail services. AAF will incorporate all of the Sealed Corridor design treatments identified in the Grade Crossing Diagnostic Evaluation, where applicable, along the entire AAF service route.

As part of the Project, a Positive Train Control (PTC) system will be implemented along the entire corridor. This system will include integrated command, control, communications, and information systems for controlling train movements which improves railroad safety by significantly reducing the probability of collisions between trains, casualties to roadway workers, and damage to equipment.

AAF-AR0073658

Freight trains traveling along the FECR Corridor are currently equipped to haul hazardous materials. Although there is no set schedule, hazardous materials are hauled on an average of once per week. FECR adheres to a safety program for existing freight service that includes:

- Education and Awareness: All FECR employees receive training throughout the year as required by law and by company policy.

- Test/Audits: FECR management teams conducts unannounced safety and compliance audits to ensure that employees are working in the safest environment possible.

- Compliance/Prevention: FECR ensures that potentially unsafe behaviors or circumstances are addressed immediately and any incidents are investigated in a timely manner.

- Recognition: Employee recognition is a key component of any successful safety program. FECR employees share in the success of the safety program through functions designed to promote safe work habits and recognize safety accomplishments throughout the year.

FECR has consistently been recognized for their safety record through receipt of performance rewards, including five E.H. Harriman Awards since 2005. The E.H. Harriman Award was an annual award presented to American railroad companies in recognition for outstanding safety achievements.

**Emergency Vehicle Response**

Many commenters voiced concerns that more frequent train trips will affect public safety vehicle response times because of the increased number of grade crossing closures. Commenters noted that the majority of hospitals, medical centers and fire stations along the N-S Corridor are west of the FECR Corridor, while the majority of residents live on the east side. Residents expressed fears that the increased number of crossing closures associated with the Project would delay ambulances and fire trucks from reaching victims or hospitals. Commenters also indicated concerns that the increased number of grade crossing closures would block emergency evacuation routes in coastal communities.

*Response*

Upgrades to road crossings will be coordinated with and/or communicated to local emergency responders, as activations at the road crossings are expected to be more frequent with the increased frequency of train traffic. However, the delays are also expected to be minimal, as the passenger trains should clear a typical crossing in less than a minute. This improved communication with emergency responders will have an overall beneficial effect on minimizing potential conflicts and their consequences.

**1.7.8    Public Outreach**

Many residents along the AAF corridor commented on the format of the public information meetings held during the DEIS comment period. Many people were misinformed that these would be public hearings, which would have allowed residents along the N-S Corridor to speak on a particular issue. Many commenters felt the open house/information meeting format did not allow the public to express their concerns about the Project.

AAF-AR0073659

### Response

The FRA advertised and hosted eight public meetings, using an open house format. The FRA advertised these open houses in local newspapers, on the FRA's website, on the AAF project website, and in an email blast. All of these communications characterized the meetings as Public Information Meetings that would provide the public with an opportunity to ask questions and discuss the DEIS with FRA and Project staff. The FRA chose the 'public information meeting' format versus the 'public hearing' format in order to obtain more comments and allow more people the opportunity to express their concerns, either in writing on the comment form provided, or with the court stenographer available to take verbal comments at each of the public information meetings. Considering other federal agencies' use of the 'information meeting' format under the NEPA process, FRA determined that this format was more conducive to hearing everyone's comments as well as informing those members of the public who were there how to obtain additional information about the Project. At a public hearing, FRA would not have been able to answer questions or discuss the Project with interested members of the public. FRA NEPA procedures do not require a public hearing during the review of an EIS.

AAF-AR0073660

**This page intentionally left blank.**

AAF-AR0073661