# 5  Environmental Consequences

This chapter describes the consequences of the No-Action Alternative and three Action Alternatives (Alternatives A, C, and E) to the environmental resources specified in Federal Railroad Administration's (FRA) *Procedures for Considering Environmental Impacts* (64 FR 28545). The discussion of environmental consequences includes any adverse environmental impacts that cannot be avoided, the relationship between short-term uses of environmental resources and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources that would be involved in the Project should it be implemented. This chapter also includes a summary of the environmental consequences of Phase I, West Palm Beach to Miami Passenger Rail, as presented in the 2012 EA. Mitigation for any unavoidable impacts is discussed in Chapter 7, *Mitigation*

As noted in Chapter 3, *Alternatives*, AAF has identified Alternative E as its preferred alternative because it is the only alternative that is reasonable and feasible to construct. The E-W Corridor segment of the Project requires the CFX to lease land for the rail corridor. The CFX approved only Alignment Alternative E (Appendix 3.2.3). Therefore, Alternatives A and C have been dismissed because it would not be possible to lease the land necessary for construction and operation. Alternative E includes four segments: the MCO Segment, which includes the proposed VMF and new railroad infrastructure between the VMF and the E-W Corridor; the E-W Corridor on new alignment (Option 3E) between MCO and Cocoa, paralleling SR 528; the N-S Corridor within the FECR ROW between Cocoa and West Palm Beach, and the WPB M Segment within the FECR ROW. FRA has evaluated AAF's analysis and concurs that Alternative E is its preferred alternative that would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors.

## 5.1  Land Use, Transportation, and Navigation

This section provides a description of the potential consequences of the Project with respect to land uses, transportation (regional and local roadways), and navigation (boat traffic and related economics).

### 5.1.1  Land Use

This section identifies the potential direct, indirect, and secondary effects to land and land uses for each Alternative. As required by the National Environmental Policy Act (NEPA) regulations (40 CFR § 1502.16(c)), this section also includes a discussion of "possible conflicts between the proposed action and the objectives of federal, regional, state, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned."

As documented below, each Action Alternative would convert up at least 245 acres of land to transportation use through All Aboard Florida (AAF)'s acquisition of private property and leasing land from public entities including the Greater Orlando Airport Authority (GOAA), Central Florida Expressway Authority (CFX, formerly the Orlando-Orange County Expressway Authority, OOCEA), and the Florida Department of Transportation (FDOT). The Project would be consistent with all applicable local and regional comprehensive plans.

AAF-AR0044901

#### 5.1.1.1    Environmental Consequences

The impacts of the Project on land include areas where property would be acquired through fee or lease and where existing non-transportation land uses would be converted to transportation. This section also includes an evaluation of the consistency of each alternative with local comprehensive plans.

In addition to the evaluation of consistency with local comprehensive plans, a consistency analysis was also performed for the Project relative to the *2060 Florida Transportation Plan*. The Project has been determined to be consistent with this state-level plan, as this plan identifies the development and operation of "a statewide high speed and intercity passenger rail system" as a long-range objective (FDOT 2011d). Further, one of the plan's implementation strategies includes coordination with the private sector to develop and operate such a system (FDOT 2011d).

**No-Action Alternative**

Under the No-Action Alternative, construction and operation of the Project would not take place. Existing commuter and intercity railway services would remain unchanged, and no changes to local land use patterns would occur. Land use development would continue consistent with the approved and adopted local comprehensive, master, and/or visioning plans.

**Alternative A**

*MCO Segment*

The MCO Segment is entirely within MCO; it would not require acquisition of privately owned property. The Vehicle Maintenance Facility (VMF) portion of the MCO Segment would require the lease of 80 acres from GOAA. Land that is part of this lease agreement would convert from utilities (wastewater treatment plant and infiltration ditch) and undeveloped lands to transportation use.

The MCO Segment would be consistent with comprehensive plans (described below) of Orlando and Orange County.

The City of Orlando's Growth Management Plan supports higher speed rail; it recognizes rail as an alternative to automobile and airline travel (City of Orlando, Planning Division 2011). The City desires to conduct annual coordination with GOAA to identify transportation alternatives to serve MCO. The City has also expressed an interest in becoming the hub of a statewide intercity railway system, and to work with FDOT to identify appropriate corridors and sites for stations and ancillary components associated with the system. The MCO Segment would be consistent with Orlando's planning goals and objectives.

Orange County recognizes the need for alternative modes of transportation, and supports the development of high-capacity transit systems. The county also supports the expansion of commuter rail stations to major employment centers such as MCO, International Drive, and the Central Florida Research Park (Orange County Planning Division 2012). The MCO Segment would be consistent with Orange County planning goals and objectives.

AAF-AR0044902

### East-West Corridor

CFX plans to acquire an additional 538 acres of right-of-way south of the existing State Road 528 (SR 528) right-of-way along an approximate 17-mile stretch in Orange County. This land acquisition will allow for future expansion of SR 528, as well as the Project. SR 528 is owned by FDOT in Brevard County; FDOT's expansion plans for SR 528 do not require the acquisition of additional right-of-way. However, in order for the Project to accommodate FDOT's SR 528 expansion plans, AAF intends to acquire approximately 44 acres east of the Interstate 95 (I-95) interchange.

The E-W Corridor under Alternative A is predominantly within the current SR 528 right-of-way. Direct effects to land use from the E-W Corridor under Alternative A would be limited to the acquisition of nine privately owned parcels of property in Orange County and four in Brevard County, and the subsequent conversion of these properties from undeveloped land use to transportation use. The nine parcels of property in Orange County account for 45.1 acres. These parcels are zoned as residential, but their acquisition and use will not result in residential displacements. Three of the parcels in Brevard County are zoned as commercial and account for 21.2 acres, while the remaining parcel is zoned as industrial and accounts for 0.5 acres. No commercial or industrial operations would be displaced due to property acquisitions or use in Brevard County. AAF is also in the process of acquiring a property interest from the Florida East Coast Railway (FECR) in Brevard County that accounts for 26.9 acres, and is zoned as locally accessed railroad property. In total, acquisition and use of parcels along the E-W Corridor accounts for 93.7 acres.

As described above, CFX plans to acquire property in Orange County adjacent to the existing SR 528 right-of-way that would be converted to a transportation corridor. All of this land is currently undeveloped. For the E-W Corridor under Alternative A, CFX would lease approximately 245 acres of the newly acquired land to AAF.

The E-W Corridor under Alternative A would be consistent with the comprehensive plan (described below) of Brevard County. As explained in the MCO Segment discussion, the Project would be consistent with growth management policies adopted by Orange County.

Although no station is planned in Brevard County as part of the Project, the Project is conceptually consistent with Brevard County's comprehensive plan, which encourages the expansion of transportation, including rail facilities, for the safe, efficient, and timely movement of passengers and goods (Objective 5) (Brevard County, Planning and Development 2011). The County also supports the development and maintenance of a comprehensive railway system to meet current and future needs as well as to further economic growth (Policy 5.2) (Brevard County, Planning and Development 2011). For these reasons, the E-W Corridor under Alternative A would be consistent with Brevard County planning goals and objectives.

### North-South Corridor

Many commenters on the Draft Environmental Impact Statement (DEIS) noted that the Project was not consistent with local planning because it would increase train trips without providing transportation benefits in the communities where no stations or transportation improvements are proposed. The N-S Corridor is entirely within the existing Florida East Coast Railway (FECR) Corridor, and would not require acquisition of privately owned property or new development; therefore, there would be no land use

AAF-AR0044903

conversions. For this reason, although the Project does not fulfill specific intents of many local comprehensive plans, it is partially consistent with these plans. The discussions below describe the limited consistency between the N-S Corridor and the applicable county comprehensive plans.

The N-S Corridor is partially consistent with the comprehensive plans of Indian River, St. Lucie, Martin, and Palm Beach Counties (described below). Even though no stations are planned within these counties as part of Phase II, the Project advances relevant policies. As explained in the E-W Corridor discussion, the Project would be consistent with growth management policies adopted by Brevard County. Indian River County does not have a passenger rail service, but supports future planning to secure access to the FECR Corridor for future passenger rail. Indian River County also supports future coordination with the FDOT and Florida East Coast Industries (FECI) about a passenger rail service (Policy 6.7) (Indian River County, Planning Division 2010).

According to the St. Lucie Comprehensive Plan, St. Lucie County supports the reestablishment of passenger rail along the eastern coast of Florida (St. Lucie, County Planning Division 2010) and supports the establishment of rail stations in Fort Pierce, Port St. Lucie, and/or within the County's urban service area. One of the goals of St. Lucie County is to provide safe and efficient multi-modal transportation systems that address the movement of people and goods. AAF has no plans in place at this time to provide direct passenger rail service to Brevard, Martin, St. Lucie and Indian River counties by constructing stations and the use of regular, intermittent or skip-stop service However, AAF does not preclude additional stations as demands warrant in the future. Brevard County is evaluating options for a possible station and locations where such a station, in the future, might be located. Indian River, Martin and St. Lucie counties may also undertake ridership studies to determine if stations are feasible

One of Martin County's goals, as stated in its Comprehensive Growth Management Plan, is "to develop and implement a transportation network that is coordinated and consistent with municipal, County, state, federal and regional planning programs and planning programs of adjacent jurisdictions" (Martin County Growth Management Department 2013). As noted in Policy 3.1A.5, elected officials representing Martin County "should address regional issues such as air travel, and bypass corridor alternatives to U.S. Route 1, including the St. Lucie Bypass Corridor and high-speed rail (Martin County Growth Management Department 2013). Further, as noted in Policy 5.1A.5, Martin County desires to "plan for comprehensive long range transportation needs" (Martin County Growth Management Department 2013). Policy 5.1A.5 references coordination with the Florida High Speed Rail Authority, an entity that proposed high-speed passenger rail that would have traversed Martin County if constructed.

The Palm Beach County Comprehensive Plan does not include objectives or policies regarding constructing higher speed railway in the county (Palm Beach County, Planning Division 2013); however, it does describe the Tri-Rail, South Florida's existing commuter rail system. The county encourages the use of this railway for commuter transportation through incentive programs. Palm Beach County designs and implements these incentive programs through coordination with Tri-Rail and the Palm Beach Metropolitan Planning Organization.

### Phase I – West Palm Beach to Miami Corridor

As stated in Section 3.3.2 of the 2012 EA, the WPB-M Corridor, which includes the Preferred Build System Alternative and the Preferred Build Station Alternatives, would not have a significant effect on land use or property acquisition. Proposed improvements to the mainline are occurring within existing right-of-way

AAF-AR0044904

and the existing corridor is identified as a transportation land use in all three counties (Palm Beach, Broward, and Miami-Dade). Property acquisition would be required for the proposed West Palm Beach Station and relocated Fort Lauderdale Station. These property acquisitions would not have significant, adverse impacts on property owners or land use, as documented in the 2012 EA (Section 3.3.2).

**Alternative C**

The E-W Corridor is the only component under Alternative C that differs from Alternative A. The E-W Corridor under Alternative C straddles the current SR 528 right-of-way and the newly acquired land by CFX in the segment of the corridor owned by CFX. This straddle design would require the same land acquisition and access arrangements with CFX, GOAA, and FDOT as described in the E-W Corridor under Alternative A. Under Alternative C, however, CFX would lease 374 acres of the newly acquired land to AAF, which would result in the use of 467.7 acres of land through either acquisition or leasing (93.7 acquired, 374 leased).

The E-W Corridor under Alternative C would be consistent with local comprehensive plans. As explained under Alternative A, the Project would be consistent with growth management policies adopted by Orange and Brevard Counties.

**Alternative E**

The E-W Corridor is the only component under Alternative E, the preferred alternative, that differs from Alternatives A and C. The E-W Corridor under Alternative E would be offset approximately 200 feet south of the existing SR 528 right-of-way, and completely within the newly acquired land by CFX in the portion of the E-W Corridor that lies adjacent to the land currently owned by CFX. This offset would require the same land acquisition and access arrangements with CFX, GOAA, and FDOT as described in the E-W Corridor under Alternatives A and C. Under Alternative E, CFX would lease 374 acres of the newly acquired land to AAF, which would result in the use of 467.7 acres of land through either acquisition or leasing (93.7 acquired, 374 leased).

The E-W Corridor under Alternative E would be consistent with local comprehensive plans. As explained under Alternative A, the Project would be consistent with growth management policies adopted by Orange and Brevard Counties.

### 5.1.1.2    Indirect and Secondary Impacts

The Project would not result in induced growth; no changes to land use due to induced growth would occur. The only potential growth-inducing Project component proposed under the No-Action Alternative is the new intermodal station at MCO to be constructed by GOAA. No transit-oriented development would occur at this station, as it is entirely within MCO property boundaries; it would not be a nucleus for induced growth.

The evaluation of potential indirect effects includes a review of population projections for Orange County, as the only station under Phase II of the Project is at MCO. The MCO Intermodal Station would be developed by GOAA as a separate action from the Project. Rail stations are potential growth inducers due to associated transit-oriented development, which provides increased economic activity and housing options. Transit-

AAF-AR0044905

oriented development is not anticipated at this location, as the station will be within MCO and is part of the planned South Terminal complex.

According to projections from the University of Florida, Orange County will add 550,979 residents between 2011 and 2035 (BEBR 2011b). Orange County will need to accommodate this projected growth. According to the county's Infill Master Plan, the county prioritizes infill and redevelopment, activity centers and mixed-use corridors (Orange County, Planning Division 2008). An increasing population, however, will put pressure on Orange County to expand services, such as water and sewer, to undeveloped lands. These conditions are independent of the Project; they represent baseline conditions that would occur under the No-Action Alternative. The MCO Segment and N-S Corridor under the Action Alternatives would not bisect any privately owned properties, no partial acquisition of parcels is required, and no adjacent land uses would change. The E-W Corridor under Alternatives A, C, and E would require the acquisition and use of nine privately owned properties outside the SR 528 right-of-way in Orange County and four privately owned properties plus one property interest belonging to FECR near the "Cocoa Curve" (the section of new right-of-way between the SR 528 alignment and the FECR right-of-way in Brevard County). Land use conversions on parcels adjacent to those associated with the Project are not anticipated. Similar to the Project-related parcels, the adjacent parcels are predominantly undeveloped at present.

Phase I of the Project (see Section 1.6 of the 2012 EA) includes development in the vicinity of each of the proposed stations. At West Palm Beach and Fort Lauderdale, there will be 10,000 square feet of retail space within the station. At Miami, the Project includes 30,000 square feet of retail within the station, and additional 75,000 square feet of transit-oriented retail, 300,000 square feet of office space, 400 residential units, and a 200-room hotel. As described in Section 3.5 of the Environmental Assessment for the All Aboard Florida Passenger Rail Project – West Palm Beach to Miami, Florida, dated October 31, 2012 (2012 EA), these connected actions as well as potential development and redevelopment outside of the station are consistent with the future land use plans for these counties.

### 5.1.1.3    Temporary Construction-Period Impacts

Constructing the Action Alternatives would not require permanent land acquisition for constructing staging areas or access. Temporary construction impacts to land use would include short-term construction easements on privately owned properties.

The Action Alternatives would not require construction easements for the MCO Segment, N-S Corridor, or WPB-M Corridor; all construction staging areas would be located on vacant lands within MCO or the existing FECR Corridor.

Temporary construction impacts to land use along the E-W Corridor would be limited to areas outside the SR 528 right-of-way. Construction easements would result in temporary land use conversions; however, pre-construction land use patterns would return once the construction period concludes. At this stage in the development of the Project, the number and location of required construction easements for the E-W Corridor alternatives are unknown.

### 5.1.2    Transportation

This section provides an analysis of the potential impacts of the Project on transportation systems. For the purposes of this transportation evaluation, the Project Study Area includes the MCO Segment, the

AAF-AR0044906

E-W Corridor, and the N-S Corridor. The impacts of the Project on transportation systems in the WPB–M Corridor were evaluated in the 2012 EA and the subsequent Finding of No Significant Impact in 2013 (2013 FONSI). This evaluation considers impacts on all transportation modes and infrastructure, including automobile, motorbus, pedestrian, train, and aviation.

Comments on the DEIS included concerns with the analysis of at-grade crossings and traffic delays, effects on other modes of transportation, and inputs to the traffic analyses. This section of the Final Environmental Impact Statement (FEIS) addresses those comments. Section 1.7.3 of this FEIS also provides a general response to comments concerning transportation.

There would be no significant impact to transportation as a result of the Project. The Project would not adversely impact (and will benefit) current freight train service on the FECR Corridor by increasing freight speeds and providing additional passing track, and would improve conditions on regional highways by relieving congestion. Increased train traffic will result in minor degradation of local road traffic conditions at certain at-grade crossings and nearby intersections.

### 5.1.2.1    Methodology

This analysis focuses on the impacts of increased train frequency on local roads, caused by more frequent trains and at-grade crossing closures. Annual Average Daily Volume (AADT) traffic data are available from FDOT for arterials in the Project Study Area. These were sorted and the largest two arterials by volume for each county were selected for analysis. By evaluating the highest-volume arterials in each county, the analysis presents a conservative "worst-case" analysis of future conditions. Ten major arterials with highway-rail grade crossings on the existing FECR Corridor were analyzed (Table 5.1.2-1).

**Table 5.1.2-1    Grade Crossing Locations Evaluated**

| County | Location | Annual Average Daily Volume (AADT) (2011) |
|---|---|---|
| Brevard | Pineda Causeway | 40,000 |
| | Palm Bay Road | 26,000 |
| Indian River | Oslo Road | 12,400 |
| | 19th Place/20th Place | 11,500 |
| St. Lucie | Seaway Drive | 6,600 |
| | North Causeway | 8,200 |
| Martin | SE Indian Street | 16,200 |
| | E Monterey Road | 15,900 |
| Palm Beach | Banyan Boulevard | 39,500 |
| | Northlake Boulevard | 40,000 |

Highway capacity analysis for the 10 at-grade railroad crossings and intersections were conducted in accordance with the methodology presented in the Highway Capacity Manual utilizing Synchro/Simtraffic software, Version 8 (TRB 2010).

Level of service (LOS) provides a qualitative relationship between operational conditions. Signalized LOS ranges from "A" through "F," with "A" being the most free operating condition and "F" being the most

AAF-AR0044907

restrictive. Generally, LOS "D" or better is considered acceptable. LOS for signalized intersections is measured by control or signal delay per vehicle. Unsignalized LOS ranges from "A" through "H," with "A" being the most free operating condition and "H" being the most restrictive. Generally, LOS "D" or better is considered acceptable. LOS for unsignalized intersections is calculated using the Intersection Capacity Utilization (ICU) method by taking a sum of critical volume to saturation flow ratios. Table 5.1.2-2 provides the delay ranges for the signalized and unsignalized LOS. No significant adverse impacts would occur if the future LOS is D or better, and if the LOS below "D" does not deteriorate.

| Table 5.1.2-2    Level of Service (LOS) Criteria | | |
|---|---|---|
| **Level of Service** | **Signalized Intersections - Delay (seconds/vehicle)** | **Unsignalized Intersections – Intersection Capacity Utilization (ICU)** |
| A | <10 | <55 |
| B | 10.1 to 20.0 | >55 <64 |
| C | 20.1 to 35.0 | >64 <73 |
| D | 35.1 to 55.0 | >73 <82 |
| E | 55.1 to 80.0 | >82 <91 |
| F | > 80.0 | >91 <100 |
| G | | >100 <109 |
| H | | >109 |

For the Project, intersections and railroad crossings were analyzed with conditions similar to the projected evening (PM) Peak Hour, to represent the maximum traffic volume during the day. Each location was analyzed without train crossings, with freight train crossings, and with passenger train crossings.

The operation includes a clearance phase prior to the arrival of the train to clear any queues present on the railway and adjacent approaches. Then the train-crossing event is simulated. During the train-crossing event, the traffic movements not in conflict with the train crossing continue to operate normally.

Since the train crossings occur approximately three times during the peak hour, the closure time for each crossing was calculated without train crossing, with freight train crossing, and with passenger train crossing closures. However, the combined freight train and passenger train schedules could result in more than three trains per hour at various times of day and at various locations.

Queue lengths were obtained for the 95th percentile queue as calculated by the Synchro/Simtraffic software. The 95th percentile queue represents the queue length that is not expected to be reached 95 percent of the time. Results for closure times, LOS, and queue length were calculated for each crossing and adjacent intersections for 2016 (Appendix 3.3.5-D). LOS and queue length with the freight train crossings are considered to be equivalent to the No-Action condition.

### 5.1.2.2    Environmental Consequences

This section presents the potential impacts of the Project on rail transportation, highways, and local roads, in comparison to the No-Action Alternative in the same analysis year (2016, projected to be the first year of revenue service).

AAF-AR0044908

**No-Action Alternative**

The No-Action Alternative would not cause significant adverse impacts to rail transportation. Under the No-Action Alternative, there would be no passenger train service added from Cocoa to West Palm Beach and the existing freight infrastructure would be maintained. Freight train configurations would be expected to incorporate the anticipated annual cargo growth of approximately 3 percent through increases in train length and/or speed. The No-Action Alternative would not result in any delays or impacts related to construction of stations or other infrastructure required for the Project. The upgrades to the FECR Corridor contemplated as part of the Project would not, however, occur in the near term as part of the No-Action Alternative, and freight speeds would not increase. The demand for freight capacity is expected to grow along the N-S Corridor. Based on anticipated operations data for the 2016 opening year, the number of freight trains per day is expected to increase from 18 (in 2011; 14 in 2013) to 20 in 2016 along with an increase in the average train length to 8,150 feet (AMEC 2014a). The projected annual increase in freight would result in minor increases in local roadway crossing closures, but total impacts relative to existing conditions would be minimal.

Given the projected increase in intercity traffic, the No-Action Alternative has the potential to contribute to future adverse transportation impacts on SR 528, I-95, and Florida's Turnpike by not aiding in the reduction of the projected increase in total automobile volume on these roads. Without the added capacity provided by the proposed passenger service, these roads would be forced to absorb the majority of this increase.

The No-Action Alternative would not have a significant impact on local vehicular traffic. Based on data provided in Table 5.1.2-3, the projected annual increase in freight operations would increase local roadway crossing closure times. Table 5.1.2-3 shows the at-grade closure times for the No-Action Alternative (freight), based on 22 trains per day (2019 conditions). Closure times would range from an average of 2.3 to 4.0 minutes per hour, with the longest closures occurring in Martin County. This is an increase from the existing average of 1.2 minutes per hour (Table 4.1.2-4), but would not have a significant impact on traffic.

**Table 5.1.2-3    Summary of No-Action (2019) Freight Operating Characteristics and Average Crossing Closures within the N-S Corridor**

| County | Time to Activate and Close the Gate (sec)[1] | Avg. Train Length (ft.) | Avg. Train Speed (mph)[3] | Time to Clear (sec) | Time to Bring the Gate Back Up (sec) | Total Time to Activate and Clear (sec) | Crossings (Trains per Day) | Closure (min/day) | Maximum Crossings per Hour[2] | Maximum Closure Time per Hour (min)[4] |
|---|---|---|---|---|---|---|---|---|---|---|
| Brevard | 30 | 8150 | 28.5 | 195 | 15 | 240 | 22 | 88.0 | 2 | 4.0 |
| Indian River | 30 | 8150 | 28.5 | 195 | 15 | 240 | 22 | 88.0 | 2 | 4.0 |
| St. Lucie | 30 | 8150 | 28.5 | 195 | 15 | 240 | 22 | 88.0 | 2 | 4.0 |
| Martin | 30 | 8150 | 28.5 | 195 | 15 | 240 | 22 | 88.0 | 2 | 4.0 |
| Palm Beach | 30 | 8150 | 59.4 | 94 | 15 | 139 | 22 | 60.0 | 2 | 2.3 |

Source: AAF. 2012. Environmental Assessment and Section 4(f) Evaluation for the All Aboard Florida Passenger Rail Project West Palm Beach to Miami, Florida. http://www.fra.dot.gov/eLib/details/L04278. Accessed September 12, 2013.

1    FRA regulations require 20 seconds to activate and close the gate prior to the train entering the railroad crossing and 10 seconds to bring the gate back up. FDOT uses 30 seconds to activate and close the gate prior to the train entering the railroad crossing and 15 seconds to bring the gate back up. To account for the worst-case scenario, FDOT timings were used in this analysis.

2    Maximum crossings per hour includes north-bound and south-bound trains combined

3    2011 freight speed for Palm Beach, Martin, St. Lucie, Indian River, and Brevard Counties was obtained from Section 3.3.1.1 of the Environmental Assessment for the All Aboard Florida Passenger Rail Project – West Palm Beach to Miami, Florida, dated October 31, 2012.

4    Maximum Closure Time per Hour calculated as the Total Time to Activate and Clear multiplied by the Maximum Crossings per Hour.

AAF-AR0049909

**Action Alternatives A, C, and E**

The Project would have the same impacts as a result of Alternatives A, C, or E. The route alternatives for the E-W Corridor would have the same impact on rail transportation, other modes of transportation, and highway and local traffic, as they would include the same impacts on existing rail and highway infrastructure, have the same ridership and effects on vehicle miles traveled, and would have the same number and locations of at-grade crossings. Table 5.1.2-4 shows the predicted diversion from other modes of transportation in 2019 (when passenger volumes are predicted to reach steady levels).

| Table 5.1.2-4 | Passenger Diversion from Other Modes of Transportation | | |
|---|---|---|---|
| Mode | Percent of AAF Passengers Diverted from other Modes | Annual Passengers Diverted | Daily Passengers Diverted |
| Long-Distance Market | | | |
| Air | 10 | 152,630 | 418 |
| Rail | 2 | 30,526 | 84 |
| Bus | 10 | 152,630 | 418 |
| Short-Distance Market | | | |
| Bus | 22 | 427,790 | 1,172 |

Source: Louis Berger Group. 2013. *All Aboard Florida Ridership and Revenue Study: Summary Report.* September 2013. Prepared for Florida East Coast. Report.

***Rail Impacts***

The Project passenger operations would include 16 round-trip passenger trains per day, which amounts to a maximum frequency of two passenger trains crossings per hour. Maximum operating speeds would range from 79 to 125 mph, depending upon the location along the E-W or N-S Corridors. Operating speeds will be greatest along the E-W Corridor where there are no highway-rail grade crossings. From the station at MCO to the station at West Palm Beach, service would be nonstop, as there are no intermediate stations proposed.

The N-S Corridor has been designed to cause no adverse impact on freight operations, and has an assumed beneficial impact on freight operations. The addition of passenger rail service would require modifying the mostly single-track system to a mostly double track system, which would be used by both passenger and freight operations. This will improve freight efficiency by increasing average operating speeds. As a result, the Project would have beneficial impacts on future freight traffic along the N-S Corridor. There are no existing freight rail operations within the E-W Corridor; therefore, no impacts to freight rail operations would occur in the E-W Corridor with Alternatives A, C, or E.

The Project would also have a beneficial impact on the passenger rail transportation network between Orlando and Miami by providing potential customers with an alternative means of rail transportation. The Project is designed to provide a direct, nonstop rail service from MCO to West Palm Beach, which is a different service geographically and functionally compared to the existing Amtrak service. The Project

AAF-AR0044910

would also provide more frequent and regular service, which would result in more flexibility to potential customers.

Riders for AAF are expected to be primarily diverted from automobile modes (69 percent of forecast ridership). However, 2 percent of the AAF ridership is forecast to accrue from competing passenger rail services, which would include the existing Amtrak service. In 2019, this amounts to approximately 30,526 annual trips (Table 5.1.2-4) diverted from Amtrak, which is about 4 percent of Amtrak's FY2012 ridership along the Silver Star (425,794) and Silver Meteor (375,164) corridors (Amtrak 2012). No diversion from Tri-Rail is anticipated. Tri-Rail provides frequent commuter-rail service between West Palm Beach and Miami, with multiple stops and relatively low fares. The infrequent intercity passenger rail service provided by AAF would have fewer stops and higher fares, and would not be expected to divert a significant number of riders.

### Inter-City Motorbus Service Impacts

The proposed passenger train service would divert 10 percent of its long-distance riders and 22 percent of its short-distance riders on the WPB-M Corridor from private inter-city motorbus services (Table 5.1.2-4). This totals approximately 152,630 annual bus passenger-trips per year in the long-distance market and 427,790 trips per year in the short-distance market.

### Local Transit Service Impacts

The Project is not anticipated to impact local transit services, as intercity passenger rail would not compete with local transit services for long-distance riders due to the stations served and the higher fares. Local transit providers (such as LYNX in Orlando) would be expected to carry more passengers locally as a result of the rail service as these passengers will be seeking connections to their ultimate destinations from the AAF station.

### Aviation Impacts

The proposed passenger train service would attract approximately 10 percent of its riders from the air service market (Louis Berger Group 2013). This totals approximately 152,630 annual aviation passenger trips per year (418 per day) who could potentially choose train service based on convenience and cost. This does not represent a significant diversion from the overall air passenger market between central and southeast Florida.

### Regional Roadway Impacts

The FDOT "Vision Plan" discussed in the Purpose and Need Statement estimates that the total intercity travel person trips between Miami and Orlando will increase from 9.5M in 2000 to 18.5M by 2020, with further increase to 30.5M by 2040 (FDOT 2006a). This will result in several roadway segments exceeding capacity.

The ridership analysis projected that 335,628 auto vehicle trips per year would be removed from the roads as a result of the Project in 2016 and 1.2M vehicles would be removed per year in 2019 (Louis Berger Group 2013).

AAF-AR0044911

The Project would have a beneficial impact on regional roadway transportation networks by providing additional transportation capacity between Orlando and Miami. Construction and operation of the Project would reduce the cumulative traffic volume on I-95, Florida's Turnpike, and SR 528 by removing vehicles and providing an easily accessible and efficient alternative means of transport to residents and visitors between the Orlando, West Palm Beach, Fort Lauderdale, and Miami areas.

### Local Traffic Impacts

Many commenters on the DEIS expressed concern that the Project would increase traffic congestion and travel delays, especially in downtown areas, as a result of increased grade crossing closures. Commenters stated that the impact analysis presented in the DEIS underestimated the congestion and delays that would result from the Project, particularly in town centers that already experience high levels of seasonal traffic, and did not take into account the impacts that could occur where there are several closely-spaced at-grade crossings, and did not fully account for delays associated with adjacent traffic signals. Section 1.7.3 of this FEIS provides a general response to these comments. This section of the FEIS has been revised to address comments.

The proposed VMF would have a negligible impact on local vehicular transportation. Assuming facility operations would require 100 employees per day and each employee, in addition to arriving and leaving from work each day, left an average of once during the day for lunch, meetings, and errands. The estimated maximum number of trips that would be generated each day is 400. This traffic would access the station via Boggy Creek Road from either the northwest or southeast. In 2012, the AADT for these portions of Boggy Creek Road were 13,000 and 9,300, respectively. If employee access is distributed evenly between both access directions, the increase in AADT would consume 1.5 percent of current capacity in the northwest direction and 2.2 percent in the southeast direction. This is considered minor, as the threshold for a major impact is a five-percent loss of capacity. In existing conditions, Boggy Creek Road is operating at a LOS E. The Project is not anticipated to change the LOS during peak periods.

The Project would not impact local vehicular traffic along the E-W Corridor, as there would be no at-grade crossings and no public road closures.

Along the N-S Corridor, passenger rail service would result in minor increased traffic delays at existing roadway crossings. The Project would result in some degradation in LOS at the grade crossings and intersections studied, with greater percentages of time within an hour of operation under unacceptable roadway conditions than in the No-Action Alternative. With just three train crossings per hour (two passenger and one freight), the majority of each hour of operation would not be affected by the introduction of passenger train service. However, at some locations, more than three trains per hour are scheduled and greater percentages of those hours would operate under unacceptable levels of service than under the No-Action Alternative.

The increase in number of crossing events due to the addition of 16 passenger rail round trips per day would cause additional closures, but closures from passenger trains would be much shorter than closures from existing freight traffic (Table 5.1.2-5). On average, an at-grade crossing requires 30 seconds to activate and close the gates, and 15 seconds to bring the gate back up. FRA regulations require 20 seconds to activate and close the gate prior to the train entering the railroad crossing and 10 seconds to bring the gate back up. FDOT uses 30 seconds to activate and close the gate prior to the train entering the railroad

AAF-AR0044912

crossing and 15 seconds to bring the gate back up. To account for the worst-case scenario, FDOT timings were used in this analysis. For freight trains (average length 8,150 feet and average speed approximately 51 mph), a single train crossing results in an average crossing closure of 155 seconds (ranging from 147 to 170 seconds), which equates to 2.6 minutes. For passenger trains (average length 725 to 900 feet and average speed 93 mph), a single train crossing results in an average crossing closure of 51 seconds.

As shown in Table 5.1.2-5, typical at-grade crossings (intersections of local roads with the FECR Corridor) would be closed an average of 54 times per day (three times per hour), with closure times ranging from 1.7 minutes (passenger) to 2.8 minutes (freight). The total hourly closure would range from 4.2 minutes per hour to 4.5 minutes per hour, an increase of approximately 2 minutes per hour in comparison to the No-Action Alternative.

Detailed traffic impact analyses were done for the ten highest-volume at-grade crossings along the N-S corridor between Cocoa and West Palm Beach (Table 5.1.2-1). Several of the intersections where the N-S Corridor crosses local roads are also adjacent to other intersections. The analyses evaluate the impacts on local traffic for the road crossing the FECR Corridor as well as the adjacent connected intersections, with respect to level of service and the delay for each signal cycle (Table 5.1.2-6).

Average delays for both the No-Action Alternative and the Project alternatives at several of these intersections are much lower than the gate closure times predicted for passenger and freight trains. Although there may be some variability in when automobiles arrive at a closed intersection, some of the automobiles crossing at this location would experience a delay at least as long as the gate closure time.

At several locations described below, the at-grade crossing is adjacent to several other at-grade crossings. The high traffic volumes combined with the potential that numerous adjacent roadways could also have their crossing gates deployed at the same time could have greater impacts on traffic operations.

**Table 5.1.2-5    At-grade Crossing Closures (2019)**

| County | Number of at-grade crossings[1] | Freight | | | Passenger | | Total | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Number of trains/ day | Train speed (mph) | Maximum closure (min/hour)[2] | Number of trains/ day | Train speed (mph)[3] | Maximum closure (min/hr) | Maximum closure (min/hr) |
| Brevard | 55 | 22 | 53.8 | 2.5 | 32 | 98.1 | 1.7 | 4.2 |
| Indian River | 30 | 22 | 54.2 | 2.5 | 32 | 106.6 | 1.7 | 4.2 |
| St. Lucie | 20 | 22 | 47.8 | 2.7 | 32 | 92.6 | 1.7 | 4.4 |
| Martin | 25 | 22 | 44.4 | 2.8 | 32 | 79.5 | 1.7 | 4.5 |
| Palm Beach | 26 | 22 | 54.3 | 2.5 | 32 | 89.2 | 1.7 | 4.2 |

Source:  AMEC. 2013 e. *Transportation and Railroad Crossing Analysis for the All Aboard Florida Passenger Rail Project from Cocoa to West Palm Beach, Florida.* September 2013. Report.

1        Maximum crossings per hour include northbound and southbound trains combined.
2        Maximum closure per hour calculated as the total time to activate and clear multiplied by the maximum crossings per hour, divided by 60.
2        Train speed is the average speed in all sections of track for the county.

AAF-AR0044913

**Table 5.2.1-6    Signalized Intersection Operations, 2016**

| Intersection | Normal Cycle[1] | | | Freight (2 cycles/hr) | | Passenger (2 cycles/hr) | | Weighted Average[2] | |
|---|---|---|---|---|---|---|---|---|---|
| | Delay[3] | LOS | Cycles/Hr | Delay[3] | LOS | Delay[3] | LOS | Delay[3] | LOS |
| Banyan Blvd @S. Quadrille Blvd | 59.4 | E | 40 | 186.8 | F | 184.2 | F | 70.9 | E |
| Banyan Blvd @ FECR | 1.6 | A | 40 | 173.6 | F | 171.9 | F | 17.2 | B |
| Northlake Blvd @ Old Dixie Hwy | 46 | D | 80 | 118.7 | F | 131.1 | F | 50 | D |
| Northlake Blvd @ FECR | 0.4 | A | 80 | 25.6 | C | 29.6 | C | 1 | A |
| Northlake Blvd @ HW 811/10th St | 55.7 | E | 64 | 142 | F | 147.9 | F | 61 | E |
| SE Indian Street @ SE Dixie Hwy | 9.3 | A | 79 | 103 | F | 103.4 | F | 13.8 | B |
| SE Indian St. @ FECR | 0.2 | A | 79 | 64.3 | E | 63.3 | E | 3 | A |
| SE Monterey Rd @ SE Dixie Hwy | 8.8 | A | 79 | 113.1 | F | 114.5 | F | 13.9 | B |
| SE Monterey Rd @ FECR | 0.1 | A | 79 | 61.1 | E | 58.1 | E | 10.9 | B |
| Hwy 714/Monterey Rd @ SE Federal Hwy | 10.9 | B | 79 | 10.6 | B | 10.6 | B | 10.9 | B |
| Seaway Dr @ US 1 | 20.6 | C | 53 | 146.6 | F | 146.6 | F | 29.4 | C |
| Seaway Dr @ FECR | 0 | A | 79 | 225.2 | F | 225.2 | F | 10.9 | B |
| Seaway Dr @ Indian River Dr | 8.6 | A | 79 | 8.6 | A | 8.6 | A | 8.6 | A |
| North Causeway @ US 1 | 12.2 | B | 63 | 12.3 | B | 12.3 | B | 12.2 | B |
| North Causeway @ Old Dixie Hwy | 10.3 | B | 79 | 88.1 | F | 86.6 | F | 14 | B |
| North Causeway @ FECR | 0.5 | A | 79 | 25.1 | C | 17.5 | B | 1.5 | A |
| Oslo Rd @ Old Dixie Hwy | 11 | B | 80 | 95.1 | F | 95.1 | F | 15 | B |
| Oslo Rd @ FECR | 0.1 | A | 80 | 148.8 | F | 148.5 | F | 7 | A |
| Oslo Rd @ US 1 | 18.8 | A | 80 | 143.9 | F | 143.9 | F | 24.8 | C |
| 19th Place @ Commerce Ave | 8.9 | A | 80 | 49.3[4] | D | 49.6 | D | 10.8 | B |
| 19th Place @ FECR | 0.1 | A | 80 | 129.5[4] | F | 128.4 | F | 6 | A |
| 20th Place @ Commerce Ave | 8.4 | A | 80 | 136.8[4] | F | 136.5 | F | 14.5 | B |
| 20th Place @ FECR | 0 | A | 80 | 58.4[4] | E | 58.0 | E | 2.8 | A |
| Palm Bay Rd @ FECR | 3.5 | A | 53 | 68.5[4] | E | 12.1 | B | 6.1 | A |
| Pineda Causeway @ Holy Trinity Dr | 48.9 | D | 21 | 80.3 | F | 63.6 | E | 52.6 | D |
| Pineda Causeway @ FECR | 0.8 | A | 21 | 34.0 | C | 18.4 | B | 4.9 | A |

1    Normal Cycle
2    Weighted Average
3    Delay
4    Cycles per hour = 1

The analyses show that the Project would have a minor, but not significant, impact on local traffic by increasing the frequency of at-grade crossing closures. The majority of intersections operate at acceptable levels of service (LOS A to LOS C) under the normal signal cycle under both the No-Action Alternative and with the Project. The level of service degrades to LOS E or LOS F when a train passes, at most intersections. Four intersections (Banyan Boulevard at S. Quadrille Boulevard, Pineda Causeway at Holy Trinity Drive, Northlake Boulevard at Old Dixie Highway, and Northlake Boulevard at HW 811/10th Street) operate at poor levels of service (LOS D to LOS E) for all traffic signal cycles, and degrade to LOS F for short periods due to train passage. The weighted average for all signal cycles shows that most intersections operate at acceptable levels of service except the four intersections listed above, which already operate at poor levels of service. This demonstrates that the Project would not result in the degradation of the average level of

AAF-AR0044914

service from acceptable to poor at any intersection. The Project would result in 18 of the 26 intersections operating at LOS D to LOS F on average twice an hour, with delays at these intersections ranging from 49 seconds to 225 seconds (4 minutes) for a passenger train to traverse the signal. The effects of passenger trains would be similar to freight trains. As shown in Table 5.1.2-7, traffic operations forecast out to 2036 show similar results.

**Table 5.2.1-7    Signalized Intersection Operations, 2036**

| Intersection | Normal Cycle[1] Delay[3] | LOS | Cycles/Hr | Freight (2 cycles/hr) Delay[3] | LOS | Passenger (2 cycles/hr) Delay[3] | LOS | Weighted Average[2] Delay[3] | LOS |
|---|---|---|---|---|---|---|---|---|---|
| Banyan Blvd @ S. Quadrille Blvd | 115.6 | F | 40 | 236.0 | F | 238.5 | F | 21.3 | C |
| Banyan Blvd @ FECR | 1.5 | A | 40 | 222.3 | F | 216.2 | F | 21.3 | C |
| Northlake Blvd @ Old Dixie Hwy | 78.2 | E | 80 | 310.8 | F | 272.3 | F | 88 | F |
| Northlake Blvd @ FECR | 0.4 | A | 80 | 57.4 | E | 38.7 | D | 2.7 | A |
| Northlake Blvd @ HW 811/10th St | 101.2 | F | 64 | 382.9 | F | 307.9 | F | 115.6 | F |
| SE Indian Street @ SE Dixie Hwy | 11.2 | B | 79 | 108.2 | F | 112.6 | F | 16 | B |
| SE Indian St. @ FECR | 0 | A | 79 | 70 | E | 69.1 | E | 3 | A |
| SE Monterey Rd @ SE Dixie Hwy | 11 | B | 79 | 118.1 | F | 122.6 | F | 16.3 | B |
| SE Monterey Rd @ FECR | 0.1 | A | 79 | 67.8 | E | 63.9 | E | 3 | A |
| Hwy 714/Monterey Rd @ SE Federal Hwy | 13.7 | B | 79 | 13.6 | B | 13.6 | B | 13.7 | B |
| Seaway Dr @ US 1 | 66.7 | E | 53 | 189.9 | F | 189.8 | F | 75.3 | E |
| Seaway Dr @ FECR | 0.1 | A | 79 | 236.3 | F | 236.3 | F | 11.5 | B |
| Seaway Dr @ Indian River Dr | 8.8 | A | 79 | 8.8 | A | 8.8 | A | 8.8 | A |
| North Causeway @ US 1 | 22.5 | C | 63 | 22.5 | C | 22.5 | C | 22.5 | C |
| North Causeway @ Old Dixie Hwy | 11.0 | B | 79 | 93.8 | F | 90.5 | F | 14.9 | B |
| North Causeway @ FECR | 0.6 | A | 79 | 27.4 | C | 19.1 | C | 1.7 | A |
| Oslo Rd @ Old Dixie Hwy | 12.1 | B | 80 | 101.4 | F | 101.3 | F | 16 | B |
| Oslo Rd @ FECR | 0.1 | A | 80 | 148.2 | F | 147.8 | F | 4 | A |
| Oslo Rd @ US 1 | 33.8 | C | 80 | 259.9 | F | 258.3 | F | 44.5 | D |
| 19th Place @ Commerce Ave | 9.2 | A | 80 | 50.3[4] | D | 50.7 | D | 11.2 | B |
| 19th Place @ FECR | 0.1 | A | 80 | 134.0[4] | F | 132.8 | F | 6.4 | A |
| 20th Place @ Commerce Ave | 8.4 | A | 80 | 140.2[4] | F | 139.9 | F | 14.7 | B |
| 20th Place @ FECR | 0 | A | 80 | 58.7[4] | E | 58.4 | E | 2.8 | A |
| Palm Bay Rd @ FECR | 14.6 | B | 53 | 132.2[4] | F | 44.9 | D | 19.8 | B |
| Pineda Causeway @ Holy Trinity Dr | 157.4 | F | 21 | 185.3 | F | 128.5 | F | 157.3 | F |
| Pineda Causeway @ FECR | 1.6 | A | 21 | 79.1 | E | 36.0 | E | 10.6 | B |

1    Normal Cycle
2    Weighted Average
3    Delay
4    Cycles per hour = 1

As shown in Table 5.2.1-8, the Diagnostic Team Review recommended that three local streets be closed for safety reasons. An additional three streets were recommended for closure if four-quadrant gates could not be installed. None of these streets are major arterials or provide the sole access to a residential or commercial area. Traffic would shift to adjacent grade crossing.

| Table 5.2.1-8    Recommended At-grade Crossings to be Closed | | | | |
|---|---|---|---|---|
| County | Municipality | Street | Recommendation | Traffic Shifts To |
| Brevard | Melbourne | Creel Street | Close if four-quadrant gates cannot be installed | Aurora Road, Eau Gallie Boulevard |
| Brevard | Palm Bay | Hessey Avenue | Close if four-quadrant gates cannot be installed | Palm Bay Road |
| Indian River | Vero Beach | 14th Avenue | Close | 26th Street, 23rd Street |
| Indian River | Vero Beach | 21st Street | Close if four-quadrant gates cannot be installed | 23rd Street, 20th Street |
| Martin | Salerno | Seaward Street | Close | Southeast Salerno Road |
| Palm Beach | West Palm Beach | Hunter Street | Close | Forest Hill Boulevard |

### *Pedestrian and Bicycle Accommodations*

Comments on the DEIS indicated that residents along the N-S Corridor had concerns with the effects of increased train trips and at-grade crossing closures on pedestrian and bicycle movements. For pedestrian crossing safety, AAF will add pedestrian crossings wherever sidewalks exist. Others suggested that a shared-use pedestrian/bicycle path should be constructed within the E-W and N-S Corridors to enhance local and regional travel.

Neither FECR nor AAF support the additional use of the FECR ROW for a rail-with-trail use. AAF's ownership interest in the ROW limits its uses to operation of passenger rail service: AAF does not control the land resources. FECR retains its rights to use any remaining property within the ROW for railroad purposes. Similarly, AAF's property interest in the ROW along the E-W Corridor does not include the right to operate a bicycle or mixed-use trail in conjunction with passenger rail operations. In either location, adding a bicycle trail would increase the impacts to natural resources and would present significant safety liabilities.

### Phase I - West Palm Beach to Miami

As stated in the 2013 FONSI, Phase I of the Project (which was analyzed to include impacts resulting from existing freight service, as well as projected freight growth and the proposed passenger service) would not have a significant impact on traffic operations at railroad crossings between West Palm Beach and Miami. The impact on delay, queuing, and LOS is limited to signal cycles immediately following a train crossing event and are minimal on a peak-hour basis. The passenger train is proposed to clear a typical crossing in an average of 51 seconds. With only one to two such crossing events during peak hours, the impact on traffic operations on adjacent roadways is expected to be minor. Signal and circuit upgrades performed as part of the track construction, improvement, and rehabilitation would occur within the FECR Corridor, and would not substantially impact traffic on intersecting roadways. There are no permanent road closures

AAF-AR0044916

contemplated as a result of the railroad system portion of the Project. There are, however, crossing closures anticipated for the station elements of the Project that are necessary to accommodate the proposed platforms. As documented in the 2012 EA (Section 2.5.1), the contemplated crossing closures would only occur at low-volume, local streets and would not impact local circulation significantly as there are alternate routes located in close proximity to the proposed closures so as to avoid dead-end conditions and result in minimal changes to the existing traffic patterns. Access to existing properties would not be impacted by the proposed crossing closures. There would be one roadway closure at both the West Palm Beach and Fort Lauderdale Stations, and two at the Miami Station. As required by the FONSI, AAF prepared supplemental traffic analyses for the three Phase I stations to evaluate intersection operations. The analysis showed that all intersections would operate under acceptable conditions without mitigation. All three reports can be found at http://www.fra.dot.gov/Page/P0590.

### 5.1.2.3    Indirect and Secondary Impacts

The Project would enhance regional roadway transportation by reducing vehicles on the regional roadway network. The three proposed stations for the WPB-M Corridor (in West Palm Beach, Fort Lauderdale, and Miami) may result in secondary effects such as creating potential for development and redevelopment outside the development directly associated with the stations. This additional development may also create impacts such as induced traffic generated by those developments.

As noted in Section 1.7.7, commenters stated that the DEIS did not adequately evaluate the effects of the Project on businesses located in small downtown areas along the N-S Corridor. They believed that increased grade crossing delays and traffic congestion from the Project would discourage customers, particularly tourists, which would force businesses to close, increase retail vacancies, and reduce sales tax revenue. FRA disagrees with these conclusions, because the FECR Corridor is an active freight rail corridor, with an average of 14 round-trip freight trains per day under current conditions, projected to increase to 20 by 2019. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The AAF passenger service would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the viability of businesses located in town centers along the rail line. The FECR Corridor has supported freight and/or passenger rail service on a continuous basis for more than 100 years, and existing downtowns along with their commercial properties largely developed around these conditions. AAF would not introduce new disruption, noise, traffic, or other effects that could affect businesses.

### 5.1.2.4    Temporary Construction-Period Impacts

The Project would result in minor, short-term impacts to freight rail transportation, regional highways, and local vehicular traffic during construction. New track construction required for the Project would be performed according to best management practices (BMPs), which are defined as methods designed to minimize adverse impacts to the environment, so that minimal temporary adverse impacts to existing freight operations would be experienced. Any required maintenance or rehabilitation of the existing single track would also be done using planning and construction practices that would minimize impacts to existing freight traffic. Future required maintenance and rehabilitation would also be done more efficiently as track operators would be able to use planning practices that utilize the additional tracks to

AAF-AR0044917

mitigate temporary delays. AAF plans to use BMPs and previously successful methods to reduce or eliminate potential impacts such as delays or downtime.

As stated in Section 3.4 of the 2012 EA, existing at-grade crossings along the WPB-M Corridor will be modified to include second tracks and crossing protection devices relocated as required. These improvements will require temporary closures of individual lanes or complete streets. All closure plans involve the coordination and involvement of state and local governments due to the crossing agreements in place, and will only be implemented with the full collaboration of the agencies. Temporary lane or full crossing closures may create temporary construction impacts to traffic during construction from the operation of equipment and potential temporary, short-term closure of local streets. The typical duration of any closures ranges from 2 to 3 days for minor crossings to up to 1 week for major arterial crossings. Proper planning and implementation and maintenance of mitigation measures (such as, maintenance of traffic plans) will be specified and required for construction. During construction, where local roads provide the sole access to a neighborhood, development, or park, AAF will maintain at least one lane open to traffic at all times.

### 5.1.3      Navigation

This section provides the analysis of proposed navigational conditions for the No-Action Alternative and the Project for the bridges over navigable waters that require replacement or reconstruction, including the New River Bridge (Figure 4.1.3-1). These include:

- The proposed new fixed railroad bridge over the St. Johns River.

- The existing single-track drawbridge over the St. Lucie River. The existing structure is planned to be rehabilitated, and train frequencies would increase.

- The existing double-track drawbridge over the Loxahatchee River (also known as the Jupiter River), which is currently operated as a single-track bridge. For the Project, the out-of-service second track would be reconstructed.

- The five fixed bridges that will be replaced (Eau Gallie River, Crane Creek, Turkey Creek, St. Sebastian River, Hillsboro Canal).

This FEIS evaluates Phase II of the Project, which would extend service from West Palm Beach to Orlando. Phase I of the Project, which was the subject of previous environmental review, includes the segment from West Palm Beach to Miami (see Section 3.1). As shown in Figure 4.1.3-1, the St. Lucie and Loxahatchee River Bridges are within the N-S Corridor (Phase II of the Project) and the New River Bridge is within the WPB-M Corridor (Phase I of the Project, currently under construction). This FEIS includes evaluation of the New River Bridge in response to comments received during the FEIS scoping process. There is currently no construction planned at the existing double track drawbridge over the New River, however train frequencies would increase. The economic effects of increased bridge closures are evaluated in Section 5.4.3, *Economic Conditions*.

Freight traffic is predicted to increase under the No-Action Alternative from an average of 14 trains per day under 2013 existing conditions to a projected 20 trains by 2016, increasing the number of bridge closures and vessel wait times at the moveable bridges. Under Project conditions, 16 round-trip

AAF-AR0044918

passenger trains (32 total) would pass over these bridges in addition to the 20 freight trains. The bridge and track infrastructure would be improved, resulting in increased train speeds. The Project would increase the number of bridge closures and vessel wait times at the three moveable bridges, however there would not be a substantial increase in the length of time for any single closure.

All alternatives would alter the existing fixed bridges at other navigable waterways by either replacing the existing track bridge with a new double-track bridge, or adding a second single-track bridge parallel to the existing bridge. Navigation on the waterways with fixed bridges would not be impacted due to the increase in train traffic.

In comments on the DEIS, the U.S. Coast Guard (USCG) has noted that increased rail traffic would result in a significant increase in closure time of the moveable bridges. USCG has not yet made a determination that the proposed increases in waterway closures would meet the reasonable needs of navigation (see Appendix 4.1.3-A).

Many commenters on the DEIS were concerned with the effects of the increased number and duration of bridge closures on maritime traffic. Section 1.7.4 of this FEIS presents a synopsis of the general comments, and a summary response. Other comments included concerns that the existing bridges are in poor condition and, under increased usage, will fail in a closed position; that increased bridge closures will result in unsafe conditions for boaters due to congestion; that the analysis was not extended to years later than 2016; that the modeling analysis did not reflect realistic boater behavior; and that the modeling analysis did not use the best available data. Commenters noted that the modeling analysis appeared to assume that boats could safely hold their positions in a queue, regardless of tides, currents, vessel wake, and other factors, and that the model assumed that two boats could pass through the open bridge at the same time. As described below, the updated modeling analysis, based on field observations, assumes that two small boats can safely pass while the bridge is open. The model does not account for the complex interactions of tides, currents, vessel wake, and boater behavior. It represents the most realistic situation of boat arrivals and bridge operations possible using existing modeling technology. This section of the FEIS provides an updated analysis of effects on navigation in response to these and other comments.

### 5.1.3.1    Methodology

This section explains how effects to navigation were evaluated for the future No-Action Alternative and Project. Details of the methodology are provided in Appendix 4.1-3-B1 and 4.1.3-B2.

Estimates of rail traffic arrivals are based on the proposed schedule. A model to predict this schedule was generated using Rail Traffic Controller (RTC)[1] modeling. Freight train arrivals were grouped by day-of-week and time-of-day. The RTC model simulation includes variations in departure times and delays in route. The model generates train arrivals at the bridges using arrival times with a variance of ±10 minutes to maintain some randomness in the forecasted train arrivals. Passenger train arrivals provided by the RTC model are at regular intervals, approximately once per hour in each direction. The RTC data provide no variability in passenger train arrival times because the predictability of the passenger service schedule is critically important to overall performance (AMEC 2014a).

---

1    Rail Traffic Controller is a rail traffic simulation tool developed by Berkeley Simulation Software. It is the de facto simulation tool used by all Class I carriers (the seven largest North American railroads) and the majority of rail consulting firms.

AAF-AR0044919

Infrastructure changes as a result of the Project include extending the double track of the mainline across the Loxahatchee River Bridge and up to the St. Lucie River Bridge; the St. Lucie River Bridge will remain single tracked. This change will allow a train to be staged closer to the bridge while waiting for a second train to cross the bridge. This action would reduce delays for trains that currently have to slow or stop to yield to oncoming train traffic. The model assumes that trains encountering oncoming traffic are delayed 5 minutes under the 2016 Project conditions. The New River Bridge is currently double tracked, so there are no delays realized in either the 2013 or the 2016 model scenarios (AMEC 2014a). It is also assumed that due to improved infrastructure under Project conditions, future trains would operate at a faster speed than trains under the No-Action Alternative. Table 5.1.3-1 depicts average train speeds under Project conditions, as compared to the No-Action Alternative.

| Table 5.1.3-1    Average Speeds of Passenger and Freight Trains | | | |
|---|---|---|---|
| | No-Action Alternative | Project | |
| County | Freight Train Speed (mph) | Passenger Train Speed (mph) | Freight Train Speed (mph) |
| Broward | 23 | 61 | 38 |
| Palm Beach | 33 | 76 | 39 |
| Martin | 32 | 77 | 36 |

Source:    AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.
Note:       Speeds shown are the average for the entire track section in the county.

RTC modeling was used to determine the times that trains would occupy the span over the waterway. A secondary process used the RTC model data to determine the times that the water way would be unavailable to vessel passage. The RTC model includes the time that the bridge is in the process of closing before a train's arrival and is therefore unnavigable for passing boat traffic. A bridge must be closed several minutes prior to the train's arrival to allow for safe passage; under existing conditions, this closure time is approximately 12 minutes. Train speeds are expected to increase as a result of the Project and will allow closure times prior to the train's arrival to be reduced to approximately 7 minutes. The waterway remains unavailable as the bridge is raised, although observational data show small vessels crossing as the bridges opens.

Many commenters noted that the winter boat counts presented in the DEIS were too low and were not representative of the peak summer season. In response to public comments, this section has been revised based on an analysis of summer boat count data. Summer boat counts were higher than those in the winter and the model was reconfigured with these data to produce new results. The modeled results use the average wait time for all vessels and the average wait time for those vessels that experience a wait. This section also includes the modeled results for a "typical high volume day" under the Project. The typical high volume day represents 80 percent of the highest peak volume day; this is representative of a busy weekend day and does not represent the highest peak holiday traffic weekend. Data for the St. Lucie River (June 12 to August 31, 2014) and Loxahatchee River (May 14 to August 12, 2014) for the summer boating season were developed by Taylor Engineering and provided to AAF by Martin County and the Jupiter Inlet District, and were sorted by direction of travel. Summer boat count data was not available

AAF-AR0044920

for the New River Bridge. To approximate summer traffic at New River, the winter boat counts were escalated based on the increases observed at the other two bridges. Table 5.1.3-2 shows the boat count increase by day-of-week at Loxahatchee and St. Lucie. The increases at Loxahatchee were greater than at St. Lucie. For this reason, the New River winter boat counts were escalated using the figures from Loxahatchee, Weekday counts were increased by 58 percent, Saturdays by 151 percent and Sundays by 84 percent.

| Table 5.1.3-2    Boat Count Volume Increases (Winter to Summer 2014) | | | |
|---|---|---|---|
| Bridge | Weekday | Saturday | Sunday |
| St. Lucie River | 28% | 62% | 64% |
| Loxahatchee River | 58% | 151% | 84% |

The average counts derived from the data sets for the St. Lucie River and Loxahatchee River, extrapolated for the New River, are provided in Table 5.1.3-3.

| Table 5.1.3-3    Average Boat Counts, Summer 2014 | | | |
|---|---|---|---|
| Bridge | Weekday | Saturday | Sunday |
| St. Lucie River | 140 | 454 | 563 |
| Loxahatchee | 182 | 564 | 582 |
| New River | 248 | 760 | 752 |

The model used all boat data for all days to calculate delays, and used the following assumptions based on video footage taken at New River and St. Lucie crossings:

- Boats take between 1.5 to 7 seconds to cross under the bridge, depending on size and speed.
- Most small boats take approximately 2 seconds to cross.
- Medium boats like the water taxi take about 3.5 seconds to cross.
- Larger boats like the Jungle Queen (commercial ferry) and sun cruises will take on average 5 to 6 seconds to cross.
- Two small boats can cross at the same time in the same or opposite direction.
- Medium and small boats were observed crossing at the same time heading opposite directions
- A small boat will cross the bridge just behind a large boat, reducing the amount of time it to cross by about 1 second.
- When a large boat like the Jungle Queen crosses, no other boat can cross the opposite direction at the same time, so they will queue at the side. Once the Jungle Queen crosses it takes them a couple of seconds to cross.

AAF-AR0044921

- Many small boats can cross when the bridge is down.
- Small boats will cross when the bridge is going down and will cross before the bridge goes up completely.

### 5.1.3.2    Environmental Consequences – Direct Impacts

This section describes the projected impacts to navigation under the No-Action Alternative and Project. Appendices 4.1.3-B1 and 4.1.3-B2 provide a detailed analysis, including modeling results.

Fixed bridges at navigable waterways would not be altered. The waterways include the Eau Gallie River, Crane Creek, Turkey Creek, St. Sebastian River, and the Hillsboro Canal. The projected increase in the number of freight trains in 2016, or the number of future passenger rail trains, would not affect navigation at these bridges.

### No-Action Alternative

Under the No-Action Alternative, freight traffic on the FECR Corridor is predicted to increase. FECR operated 24 daily trains in 2006 and had projected growth of 5 to 7 percent between today and 2016. However, due to delays in the expansion of the Panama Canal and other factors, it is now expected that freight operations will increase from the current number of trains to 20 trains per day by 2016, and at a 3 percent annual growth after 2016. Under the No-Action Alternative, the infrastructure would not be improved; train speeds would not increase and, therefore, the amount of overall closure time would increase. Approximately 20 freight trains would pass over the St. Lucie, Loxahatchee, and New River Bridges on any given day (AMEC 2014a). Approximately half of the trains would pass during daytime hours (7 AM to 10 PM). As shown in Table 5.1.3-4, at the St. Lucie River Bridge this would result in 18 closures per day, with an average time of 20 minutes per closure. The average of the total weekday closure time would be 397.4 minutes (6.6 hours). The average of the total weekend closure time at the St. Lucie River Bridge would be 213 minutes (3.6 hours). The Loxahatchee River (Jupiter Inlet) bridge would result in 16 closures per day, with an average time of 20 minutes per closure. The average of the total weekday closure time would be 350.8 minutes (5.8 hours) and the average of the total weekend closure time would be 216 minutes (3.6 hours). The New River Bridge would be closed 16 times per day, with an average of 19 minutes per closure. The average of the total weekday closure time would be 360 minutes (6.0 hours) and the average of the total weekend closure time would be 197 minutes (3.3 hours).

AAF-AR0044922

| Table 5.1.3-4 | Moveable Bridge Closures | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Number of Closures[1] | Average Single Weekly Closure Time (minutes) | Average of Total Weekday Closure time (minutes) | Average of Total Weekday Closure time (hours) | Average of Total Weekend Closure Time (minutes) | Average of Total Weekend Closure Time (hours) | |
| **St Lucie River Bridge** | | | | | | | |
| 2013 | 10 | 21 | 241 | 4.0 | 165 | 2.7 | |
| 2016 No-Action | 18 | 20 | 397 | 6.6 | 213 | 3.6 | |
| 2016 Project | 42 | 15 | 588 | 9.8 | 458 | 7.6 | |
| **Loxahatchee River Bridge (Jupiter Inlet)** | | | | | | | |
| 2013 | 10 | 19 | 214 | 3.6 | 156 | 2.6 | |
| 2016 No-Action | 16 | 20 | 351 | 5.8 | 216 | 3.6 | |
| 2016 Project | 42 | 12 | 515 | 8.6 | 434 | 7.2 | |
| **New River Bridge** | | | | | | | |
| 2013 | 10 | 19 | 147 | 3.5 | 147 | 2.5 | |
| 2016 No-Action | 16 | 19 | 360 | 6.0 | 197 | 3.3 | |
| 2016 Project | 30 | 13 | 414 | 6.9 | 314 | 5.2 | |

Source:    AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.

### St. Lucie River Bridge

Under the No-Action Alternative, approximately 20 freight trains would pass over the St. Lucie River Bridge on any given day. As shown in Table 5.1.3-4, at the St. Lucie River Bridge this would result in 18 closures per day, with an average time of 20 minutes per closure. The average of the total weekday closure time would be 397.4 minutes (6.6 hours). The average of the total weekend closure time at the St. Lucie River Bridge would be 213 minutes (3.6 hours).

The number of vessels that experience a wait time in the peak summer season would increase from 24 percent to 32 percent under the No-Action Alternative, which only includes the operation of freight trains. The average queue time for vessels experiencing a wait will increase by approximately 3.1 minutes. Table 5.1.3-6 presents vessel wait times for the St. Lucie River Bridge under the No-Action Alternative. Figure 5.1.3-1 depicts the percent of boats that wait and their maximum wait time, by percent. Under the No-Action Alternative, 50 percent of boats experience a wait time greater than 3.3 minutes, 20 percent of boats experience a wait time greater than 14.0 minutes, 10 percent of boats experience a wait time greater than 17.6 minutes, and 1 percent of boats experience a wait time greater than 33.1 minutes. The maximum wait time under the No-Action Alternative would be 65.5 minutes.

AAF-AR0004923



**Figure 5.1.3-1   St. Lucie River Bridge – Summer Non-Zero Wait Time Distributions**

AAF-AR0044924

### Loxahatchee River Bridge

Under the No-Action Alternative, approximately 20 freight trains would pass over the Loxahatchee River Bridge on any given day. As shown in Table 5.1.3-4, rail traffic over the Loxahatchee River (Jupiter Inlet) bridge would result in 16 closures per day, with an average time of 20 minutes per closure. The average of the total weekday closure time would be 350.8 minutes (5.8 hours) and the average of the total weekend closure time would be 216 minutes (3.6 hours).

The number of vessels that experience a wait time would increase from 28 percent to 34 percent under the No-Action Alternative, which only includes the operation of freight trains. The average wait time for vessels experiencing a wait will increase by approximately 1.9 minutes. Table 5.1.3-8 presents vessel wait times for the Loxahatchee River Bridge under the No-Action Alternative. Figure 5.1.3-2 depicts the percent of boats that wait and their maximum wait time, by percent. Under the No-Action Alternative, 50 percent of boats experience a wait time greater than 1.4 minutes, 20 percent of boats experience a wait time greater than 12.0 minutes, 10 percent of boats experience a wait time greater than 15.4 minutes, and 1 percent of boats experience a wait time greater than 26.4 minutes. The maximum wait time under the No-Action Alternative would be 48.4 minutes.

AAF-AR0044925



**Figure 5.1.3-2    Loxahatchee River Bridge Summer Non-Zero Wait Time Distributions**

AAF-AR0044926

### New River Bridge

Under the No-Action Alternative, approximately 20 freight trains would pass over the New River Bridge on any given day. As shown in Table 5.1.3-4, the New River Bridge would be closed 16 times per day, with an average time of 19 minutes per closure. The average of the total weekday closure time would be 360 minutes (6.0 hours) and the average of the total weekend closure time would be 197 minutes (3.3 hours).

The number of vessels that experience a wait time from 42 percent to 51 percent under the No-Action Alternative, which only includes the operation of freight trains. The average wait time for vessels that wait will increase by approximately 2.7 minutes. Table 5.1.3-10 presents vessel wait times for the New River Bridge under the No-Action Alternative. Figure 5.1.3-3 depicts the percent of boats that wait and their maximum wait time, by percent. Under the No-Action Alternative, 50 percent of boats would experience a wait time greater than 3.8 minutes, 20 percent of boats experience a wait time greater than 14.0 minutes, 10 percent of boats experience a wait time greater than 16.9 minutes, and 1 percent of boats would experience a wait time greater than 28.1 minutes. The maximum wait time under the No-Action Alternative would be 52.4 minutes.

AAF-AR0044927



**Figure 5.1.3-3   New River Bridge Summer Non-Zero Wait Time Distributions**

AAF-AR0044928

**Action Alternatives A, C, and E**

The effects to navigation from the Project would be the same for Alternatives A, C, and E, as each would include the same bridge improvements and the same number of passenger trains at each of the bridges under consideration. Navigation impacts were modeled for 2016 using the number of freight trains projected under the No-Action Alternative. However, with the Project's infrastructure improvements, the freight trains would be operating at higher speeds. The project analysis includes both freight and passenger trains since it is not possible to separate their effects at moveable bridges (a single bridge closure could accommodate both).

**St. Johns River**

The proposed new rail bridge over the St. Johns River would provide the same clearance that the existing SR 528 bridge provides. The proposed rail bridge would provide 16 feet vertical clearance above the mean high water level of river, resulting in no loss of existing clearance. The Project would not impede or interfere with navigation.

**St. Lucie River**

As part of the Project, AAF will rehabilitate the mechanical components of, but not replace, the St. Lucie River Bridge (see Chapter 3, *Alternatives*). There would be no change in the structure or the dimensions of the opening. The bridge would continue to operate in accordance with the bridge regulations at 33 CFR 111.317(c). The proposed passenger train operations would increase the amount of time that the bridge would be closed. Table 5.1.3-4 shows the effect of the additional train trips on bridge closure times. Under Project conditions, 16 round-trip (32) passenger trains and 20 freight trains would pass over the St. Lucie River Bridge on any given day. Future train speeds at this location are shown in Table 5.1.3-1. Appendices 4.1.3-B1 and 4.1.3-B2 also provides detailed information on hourly bridge closures.

The Project would result in an additional 24 closures per day of the St. Lucie River Bridge (Table 5.1.3-5). These additional closures result in a higher number of vessels experiencing wait times for all vessels. Additionally, the increased frequency of closures results in vessel queuing that would affect the vessel movement on the St. Lucie River and associated waterways. As shown in Table 5.1.3-6 the number of vessel arrivals would vary depending on the day and time. For the St. Lucie River Bridge on a typical high volume day under Project conditions, arrivals are estimated at 441 vessels.

Based on the current proposed operational plan provided by AAF, with the Project the St. Lucie River Bridge would be closed 42 times per day, with an average time of 15 minutes per closure. The average closure time would decrease, as compared to the No-Action Alternative, due to improvements to the rail infrastructure which are expected to increase the speed of rail traffic (AMEC 2014a). The average of total weekday closure time would be 588 minutes (9.8 hours) per day under Project conditions, an increase of 190.6 minutes (3.2 hours) over the No-Action Alternative. The average of total weekend closure time would be 458 minutes (7.6 hours) per day under Project conditions, which is an increase of 245 minutes (4.0 hours) over the No-Action Alternative. Model results for the No-Action Alternative and Project bridge operations for the St. Lucie River Bridge are presented in Table 5.1.3-5 (AMEC 2014a).

AAF-AR0044929

**Table 5.1.3-5    Summary of Projected Bridge Operations for the St. Lucie River Bridge**

| St. Lucie River Bridge | No-Action Alternative[1] | Project[2] |
|---|---|---|
| Average Single Closure Time (minutes)[3] | 20 | 15 |
| Total Number of Daily Closures | 18 | 42 |
| Average of Total Weekday Closure Time (Minutes) | 397.4 | 588 |
| Average of Total Weekday Closure Time (Hours) | 6.6 | 9.8 |
| Average of Total Weekend Closure Time (Minutes) | 213 | 458 |
| Average of Total Weekend Closure Time (Hours) | 3.6 | 7.6 |

Source:   AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.
1         Results based on RTC modeling data of train and bridge operations with closure times verified with existing field conditions and under the assumption that infrastructure improvements planned under the Proposed Action do not occur.
2         Results based on RTC modeling data of train and bridge operations for both freight and passenger rail with the planned infrastructure improvements planned under the Proposed Action.
3         Multiple trains (freight and passenger) can cross under a single bridge closure.

**Table 5.1.3-6    Summer Navigation Simulation Model Results for the St. Lucie River Bridge (2016)**

| | Units | No-Action Alternative | Project | High Volume Day |
|---|---|---|---|---|
| Boat Arrivals | (#/day) | Varies[2] | Varies[2] | 441 |
| Percent of boats with non-zero wait time | (%) | 32% | 59% | 66% |
| Average wait time | (min) | 2.2 | 5.1 | 5.9 |
| Average non-zero wait time | (min) | 6.9 | 8.6 | 8.9 |
| Maximum non-zero wait time | (min) | 65.5 | 78.3[2] | 76 |

Source:   AMEC Foster Wheeler. 2015. Rail/Marine Traffic Simulation Using Summer Boat Traffic Data for the AAF Passenger Rail Project from Orlando to Miami, Florida. January 21, 2015.
1         This scenario represents a typical high-volume day or 80 percent of the highest peak volume day.
2         See Table 5.1.3-3 for average summer weekday and weekend boat counts.
3         Maximum wait time inclusive of the highest peak volume day.

Table 5.1.3-6 shows the model results for marine traffic wait times for all vessels at the St. Lucie River Bridge. Under Project conditions, the percentage of vessels that experience a wait would increase from 32 percent under the No-Action Alternative to 59 percent under the Project. On a typical high volume day, the percentage of vessels that experience a wait would increase to 66 percent. The average wait time for all vessels (inclusive of those vessels that wait and those that do not wait) would increase from 2.2 minutes under the No-Action Alternative to 5.1 minutes under the Project and 5.9 minutes on a typical high volume day. The average wait time of delayed vessels would increase, from 6.9 minutes to 8.6 minutes under the Project and 8.9 minutes on a typical high volume day. The most likely vessel wait time would increase under Project conditions as compared to the No-Action Alternative (AMEC Foster Wheeler 2015).

Figure 5.1.3-1 depicts the percent of boats that wait and their maximum wait time, by percent. Under the Project, 50 percent of boats experience a wait time greater than 7.1 minutes, 20 percent of boats experience a wait time greater than 14.1 minutes, 10 percent of boats experience a wait time greater than 19.1 minutes, and 1 percent of boats experience a wait time greater than 31.4 minutes. The maximum wait time under the Project is 78.3 minutes. On a typical high volume day, 50 percent of boats experience a wait time greater

AAF-AR0044930

than 7.5 minutes, 20 percent of boats experience a wait time greater than 14.8 minutes, 10 percent of boats experience a wait time greater than 19.5 minutes, and 1 percent of boats experience a wait time greater than 32.6 minutes. The maximum wait time on a typical high volume day is 76.0 minutes.

### Loxahatchee (Jupiter) River

As part of the Project, AAF will rehabilitate the mechanical components of, but not replace, the Loxahatchee River Bridge. There would be no change in the structure or the dimensions of the opening. The bridge would continue to operate in accordance with the bridge regulations at 33 CFR 111.299. The proposed passenger train operations would increase the amount of time that the bridge would be closed. Table 5.1.3-4 shows the effect of the additional train trips on bridge closure times. A total of 16 round-trip (32) passenger trains and 20 freight trains would pass over the Loxahatchee River Bridge on any given day. Future train speeds at this location are shown in Table 5.1.3-1.

The Project would result in an additional 26 closures per day of the Loxahatchee River Bridge (Table 5.1.3-7). These additional closures result in a higher number of vessels experiencing wait times for both commercial and recreational vessels. Additionally, the increased frequency of closures results in vessel queuing that would affect the vessel movement on the Loxahatchee River and associated waterways.

Based on the current proposed operational plan provided by AAF, with the Project the Loxahatchee (Jupiter Inlet) River Bridge would be closed 42 times per day with an average time of 12 minutes per closure. The average closure time would decrease, as compared to the No-Action Alternative, due to improvements to the rail infrastructure which are expected to increase the speed of rail traffic (AMEC 2014a). The average of the total weekday closure time would be 515 minutes (8.6 hours) per day, an increase of 164.2 minutes (2.8 hours) over the No-Action Alternative. The average of the total weekend closure time would be 434 minutes (7.2 hours) per day, an increase of 218 minutes (3.6 hours) over the No-Action Alternative. There would be no direct effect on navigation of the Intracoastal Waterway, as the Loxahatchee River Bridge does not cross the waterway directly.

| Table 5.1.3-7    Summary of Projected Bridge Operations for the Loxahatchee River Bridge | | |
|---|---|---|
| Loxahatchee River Bridge | No-Action Alternative[1] | Project[2] |
| Average Single Closure Time (minutes)[3] | 20 | 12 |
| Total Number of Daily Closures | 16 | 42 |
| Average of Total Weekday Closure Time (Minutes) | 351 | 515 |
| Average of Total Weekday Closure Time (Hours) | 5.8 | 8.6 |
| Average of Total Weekend Closure Time (Minutes) | 216 | 434 |
| Average of Total Weekend Closure Time (Hours) | 3.6 | 7.2 |

Source:    AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.
1            Results based on RTC modeling data of train and bridge operations with closure times verified with existing field conditions and under the assumption that infrastructure improvements planned under the Proposed Action do not occur.
2            Results based on RTC modeling data of train and bridge operations for both freight and passenger rail with the planned infrastructure improvements planned under the Proposed Action.
3            Multiple trains (freight and passenger) can cross under a single bridge closure.

AAF-AR0044931

Model results for the bridge operations under the Project and No-Action Alternative for the Loxahatchee River Bridge are presented in Table 5.1.3-7. Appendix 4.1.3-B2 also provides detailed information on hourly bridge closures.

Table 5.1.3-8 shows the model results for marine traffic wait times for all vessels at the Loxahatchee River Bridge. Under Project conditions, the percentage of vessels that experience a wait would increase from 34 percent under the No-Action Alternative to 58 percent under the Project conditions and 66 percent during a typical high volume day. The average wait time for all vessels (inclusive of those vessels that wait and those that do not wait) would increase from 1.9 minutes under the No-Action Alternative to 3.3 minutes under the Project and 3.6 minutes during a typical high volume day. The average wait time of delayed vessels would increase, from 5.5 minutes to 5.6 minutes under the Project conditions and 5.5 minutes during a typical high volume day. The most likely vessel wait time is increased slightly under Project conditions as compared to the No-Action Alternative (AMEC Foster Wheeler 2015).

Figure 5.1.3-2 depicts the percent of boats that wait and their maximum wait time, by percent. Under the Project, 50 percent of boats experience a wait time greater than 5.0 minutes, 20 percent of boats experience a wait time greater than 8.8 minutes, 10 percent of boats experience a wait time greater than 10.9 minutes, and 1 percent of boats experience a wait time greater than 21.4 minutes. The maximum wait time under the Project is 69.2 minutes. On a typical high volume day, 50 percent of boats experience a wait time greater than 5.0 minutes, 20 percent of boats experience a wait time greater than 8.9 minutes, 10 percent of boats experience a wait time greater than 10.9 minutes, and 1 percent of boats experience wait time greater than 20.2 minutes. The maximum wait time on a typical high volume day is 67.8 minutes.

As shown in Table 5.1.3-8, the number of vessel arrivals would vary depending on the day and time. For the Loxahatchee River Bridge, on a typical high volume day under Project conditions, arrivals are estimated at 513 vessels.

| Table 5.1.3-8 | Summer Navigation Simulation Model Results for the St. Loxahatchee River Bridge (2016) | | | |
|---|---|---|---|---|
| | **Units** | **No-Action Alternative** | **Project** | **High Volume Day** |
| Boat Arrivals | (#/day) | varies | varies | 513 |
| Percent of boats with non-zero wait time | (%) | 34% | 58% | 66% |
| Average wait time | (min) | 1.9 | 3.3 | 3.6 |
| Average non-zero wait time | (min) | 5.5 | 5.6 | 5.5 |
| Maximum non-zero wait time | (min) | 48.4 | 69.2[2] | 67.8 |

Source:  AMEC Foster Wheeler. 2015. *Rail/Marine Traffic Simulation Using Summer Boat Traffic Data for the AAF Passenger Rail Project from Orlando to Miami, Florida*. January 21, 2015.
1       This scenario represents a typical high-volume day or 80 percent of the highest peak volume day.
2       See Table 5.1.3-3 for average summer weekday and weekend boat counts
3       Maximum wait time inclusive of the highest peak volume day.

AAF-AR0044932

### New River

As part of the Project, AAF will rehabilitate the mechanical components of, but not replace, the New River Bridge. There would be no change in the structure or the dimensions of the opening. The bridge would continue to operate in accordance with the bridge regulations at 33 CFR 111.313(b). The proposed passenger train operations would increase the amount of time that the bridge would be closed. Table 5.1.3-4 shows the effect of the additional train trips on bridge closure times. Under Project conditions, 16 round-trip (32) passenger trains and 20 freight trains would pass over the New River Bridge on any given day. Future train speeds at this location are shown in Table 5.1.3-1.

The Project would result in an additional 14 closures per day of the New River Bridge (Table 5.1.3-9). These additional closures would result in a higher number of vessels experiencing wait times for both commercial and recreational vessels. Additionally, the increased frequency of closures results in vessel queueing that would affect the vessel movement on the New River.

Based on the current operational plan provided by AAF, with the Project the New River Bridge would be closed 30 times per day with an average time of 13 minutes per closure (Table 5.1.3-9). The average closure time would decrease, as compared to the No-Action Alternative, due to improvements to the rail infrastructure that are expected to increase the speed of rail traffic (AMEC 2014a). Under Project conditions, the average of the total weekday closure time would be 414 minutes (6.9 hours) per day and the average of the total weekend closure time would be 314 minutes (5.2 hours) per day. The estimated effect of the Project on the New River Bridge on weekdays is approximately 54 minutes (0.9 hours) of additional bridge closure time per day as compared to the No-Action Alternative. The estimated effect of the Project on the New River Bridge on weekends is approximately 117 minutes (1.9 hours) of additional bridge closure time per day as compared to the No-Action Alternative. Model results for the projected bridge operations, under the No-Action Alternative and Project, for the New River Bridge are presented in Table 5.1.3-9 (AMEC 2014a). Appendix 4.1.3-B2 also provides detailed information on hourly bridge closures.

| Table 5.1.3-9    Summary of Projected Bridge Operations for the New River Bridge | | |
| --- | --- | --- |
| New River Bridge | No-Action Alternative[1] | Project [2] |
| Average Weekly Closure Time (minutes)[3] | 19 | 13 |
| Total Number of Daily Closures | 16 | 30 |
| Average of Total Weekday Closure Time (Minutes) | 360 | 414 |
| Average of Total Weekday Closure Time (Hours) | 6.0 | 6.90 |
| Average of Total Weekend Closure Time (Minutes) | 197 | 314 |
| Average of Total Weekend Closure Time (Hours) | 3.3 | 5.23 |

Source:   AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.
1          Results based on RTC modeling data of train and bridge operations with closure times verified with existing field
           conditions and under the assumption that infrastructure improvements planned under the Proposed Action do not occur.
2          Results based on RTC modeling data of train and bridge operations for both freight and passenger rail with the planned
           infrastructure improvements planned under the Proposed Action.
3          Multiple trains (freight and passenger) can cross under a single bridge closure.

AAF-AR0044933

The USCG has issued a temporary deviation from the operating schedule at the New River Bridge, effective May 18, 2015 through October 16, 2015.[2] This deviation is intended to test FECR's proposed installation of an automated system to increase vessel traffic efficiency. The automated system would allow the railroad dispatcher to receive a signal that the bridge must close for approaching trains. The dispatcher is then advised when trains clear the bridge so that it can reopen. During the test period, the bridge will operate under the following conditions:

- The bridge will be constantly tended;

- The bridge tender will utilize a VHF-FM radio to communicate and may be contacted by telephone;

- Signage will be posted displaying radio and telephone contact information;

- A countdown clock for bridge closure time will be posted at the bridge site and will be visible to maritime traffic;

- A bridge log will be maintained and will include bridge opening and closing times;

- When the bridge is fully opened, green lights will be displayed to indicate that vessels may pass;

- When a train approaches:

  o The lights will flash red and a horn will sound four blasts;

  o There will be a pause followed by four additional blasts;

  o The bridge will lower and lock.

- The bridge will open and lights will turn green once a train has cleared; and

- The bridge will not be closed more than 60 minutes combined for any 120 minute time period beginning at 12:01 A.M.

The drawbridge will return to the regular operating schedule immediately following the period of deviation. The USCG will determine whether a permanent change to operations can be approved and has requested public comments for their consideration. If approved, it is likely that this new schedule would be applied to the St. Lucie and Loxahatchee River Bridges.

Table 5.1.3-10 shows the model results for marine traffic wait times for both commercial and recreational vessels at the New River Bridge. Under Project conditions the percentage of vessels that experience a wait would increase from 51 percent under the No-Action Alternative to 63 percent and 75 percent during a typical high volume day. The average wait time for all vessels (inclusive of those vessels that wait and those that do not wait) would increase from 3.5 minutes under the No-Action Alternative to 4.6 minutes under the Project and 6.6 minutes during a typical high volume day. The average wait time of delayed vessels would increase, from 6.8 minutes to 7.3 minutes and 8.8 minutes during a typical high volume day. The most likely vessel wait time is higher under Project conditions as compared to the No-Action Alternative (AMEC 2014a).

---

2   The notice of temporary deviation from regulations can be viewed at: http://www.regulations.gov/#!documentDetail;D=USCG-2015-0271-0002

AAF-AR0044934

Figure 5.1.3-3 depicts the percent of boats that wait and their maximum wait time, by percent. Under the Project, 50 percent of boats experience a wait time greater than 6.0 minutes, 20 percent of boats experience a wait time greater than 11.7 minutes, 10 percent of boats experience a wait time greater than 15.9 minutes, and 1 percent of boats experience a wait time greater than 32.2 minutes. The maximum wait time under the Project is 58.8 minutes. On a typical high volume day, 50 percent of boats experience a wait time greater than 7.1 minutes, 20 percent of boats experience a wait time greater than 14.2 minutes, 10 percent of boats experience a wait time greater than 19.9 minutes, and 1 percent of boats experience wait time greater than 36.3 minutes. The maximum wait time on a typical high volume day is 63.3 minutes.

As shown in Table 5.1.3-10, the number of vessel arrivals would vary depending on the day and time. For the New River Bridge, on a typical high volume day under Project conditions, arrivals are estimated at 656 vessels.

| Table 5.1.3-10  Summer Navigation Simulation Model Results for the New River Bridge (2016) | | | | |
|---|---|---|---|---|
| | Units | No-Action Alternative | Project | High Volume Day |
| Boat Arrivals | (#/day) | varies | varies | 656 |
| Percent of boats with non-zero wait time | (%) | 51% | 63% | 75% |
| Average wait time | (min) | 3.5 | 4.6 | 6.6 |
| Average non-zero wait time | (min) | 6.8 | 7.3 | 8.8 |
| Maximum non-zero wait time | (min) | 52.4 | 58.8[2] | 63.3 |

Source:   AMEC Foster Wheeler. 2015. *Rail/Marine Traffic Simulation Using Summer Boat Traffic Data for the AAF Passenger Rail Project from Orlando to Miami, Florida.* January 21, 2015.
1          This scenario represents a typical high-volume day or 80 percent of the highest peak volume day.
2          See Table 5.1.3-3 for average summer weekday and weekend boat counts.
3          Maximum wait time inclusive of the highest peak volume day.

### Fixed Bridges

All alternatives would alter the existing fixed bridges at other navigable waterways (Eau Gallie River, St. Sebastian River, Crane Creek, Turkey Creek, and the Hillsboro Canal) by either replacing the existing single-track bridge with a new double-track bridge, or adding a second single-track bridge parallel to the existing bridge. At these waterways, the new bridge would have the same horizontal and vertical clearances as the existing bridge and would not affect navigation. Several commenters asked AAF to evaluate raising these bridges, including the bridge at Taylor Creek. Section 3.3.3 of this FEIS provides additional information on bridge alternatives.

The USCG requested that AAF evaluate alternatives that would raise these bridges and increase the vertical clearance below the bridge, as the low clearance under these structures currently limits navigation. AAF has evaluated alternatives that would raise the bridge elevation and concluded that these are not feasible. A primary consideration in the use of elevated structures is track grade or incline. Trains, as opposed to automobiles, are much more restricted in the grades they can navigate safely and efficiently. For the FECR Corridor, freight trains represent the limiting factor for grade, which is a one-percent grade based on AREMA design standards (AREMA 2003). To provide a 1-percent grade, for each foot in

elevation a bridge is raised, an additional 100 linear feet of embankment is needed at each end of the bridge. For example, if the bridge is raised 20 feet, the track work for 2,000 feet on either end of the bridge will require substantial infrastructure improvements to support the grade increase, resulting in a total impact of 4,000 feet (0.75 mile).

Raising the track on the approaches to the bridges would require retaining walls to keep the additional fill within the railroad right-of-way, and may require property acquisition to accommodate the new embankment and structures. At-grade crossings are often close to the bridge, and raising the bridge would require either closing the grade crossing or raising the surface road. For example, major surface roads are located less than 0.2 miles from the Eau Gallie River and St. Sebastian River bridges (SR 505). These infrastructure improvements and supporting activities would have significant additional costs as a result of:

- Building large, costly retaining walls to minimize the footprint of the large embankments and fill required to maintain track grades;

- Abandoning, rebuilding, or relocating the existing grade crossings adjacent to the bridges;

- Mitigating any increased environmental impacts to aquatic resources, including wetlands and surface waters important habitat, etc.;

- Mitigating increased noise impacts to any residences near the elevated structure; and

- Protecting or purchasing buildings or nearby community structures of significance which will be impacted by the larger footprint of the bridge.

The use of elevated bridge structures would result in significant cost increase; preliminary cost estimates indicate at least an increase in costs of two to three times planned activities. Time of overall project execution would also increase, thereby affecting AAF's goal to be operational in 2016. Purchasing additional property, if available, would negatively impact project costs and the project schedule. Moreover, AAF does not have condemnation authority, so there is no guarantee that AAF would be able to purchase the needed land. Community impacts would also result from closing, moving or modification of at-grade crossings and the impacts of construction and operations to structures in the vicinity of the expanded footprint that would be needed.

In summary, FRA has determined that the significant delays, costs, and risks associated with the use of elevated structures make raising any of the corridor bridges not feasible.

### 5.1.3.3    Indirect and Secondary Impacts

Indirect effects of the Project potentially caused by increased closures of the moveable bridges along the St. Lucie River, Loxahatchee River, and New River on recreational and commercial boat traffic. Commenters also stated that delays, inconvenience to boaters, and safety problems would have significant effects on quality of life, the viability of maritime businesses located upriver of the bridges, and on the value of waterfront property upriver of the bridges.

Commenters on the DEIS stated that the increased queueing would decrease safety due to the need for boats to maintain headways while queueing. The analysis presented in the EIS assumes that each queue developed during a bridge closure would be eliminated before the next closure cycle beings. With an increase in bridge closures, it is possible for one queue to merge with another which could create a

AAF-AR0044936

navigation hazard. As noted in the public comments, barges using the St. Lucie Canal (Okeechobee Waterway) are slow to react and cannot stack at the bridge. It can take a barge over 30 minutes to resume navigable speed. In the absence of mitigation, the potentially increased queue lengths and durations could adversely affect boater safety as well as the time required for commercial barges to traverse the St. Lucie Bridge.

Section 5.4.3, Economic Conditions, discusses the potential for the Project to affect the maritime economy or property values. AAF has committed to implementing mitigation measures, as stipulated in Section 7.2.2 that will reduce queuing and associated safety concerns by providing mariners with a fixed schedule of bridge closures and durations.

#### 5.1.3.4    Temporary Construction-Period Impacts

Rehabilitating the three moveable bridges (St. Lucie, Loxahatchee and New River) may require short closures of the bridges in order to rehabilitate the bridge-raising mechanisms. AAF will coordinate with the U.S. Coast Guard in advance of bridge rehabilitation and identify a schedule and notification protocols that minimize temporary impacts on navigation at these structures. Replacing the other fixed bridge along the N-S Corridor and the WPB-M Corridor will require installing new pilings and superstructure, but will maintain navigability on these waterways.

## 5.2      Physical Environment

This section evaluates the potential impacts of the Project on the physical environment in the Project Study Area, with respect to air quality, noise and vibration, farmland soils, hazardous materials and solid waste, coastal zone management, and climate change. Geology, which is not a resource that FRA requires to be evaluated in an EIS, is considered in Section 5.4.4, *Public Health and Safety*, as it concerns the safety of the Project with respect to sinkholes and other geological threats to public infrastructure.

### 5.2.1    Air Quality

This section describes the potential impacts to air quality from the Project. The air quality provisions that are applicable to the Project include the 1990 Clean Air Act Amendments (CAAA), and the NEPA requirements as specified in the CEQ's Regulations for Implementing the National Environmental Policy Act (40 CFR parts 1500-1508) (EPA 2008a; CEQ 2005a).

The CAAA require that a Project does not:

- Cause any new violation of the NAAQS;
- Increase the frequency or severity of any existing violations; or
- Delay attainment of any NAAQS.

As demonstrated in this section, for all alternatives the Project would provide a net regional air quality benefit as compared to the No-Action Alternative. The air quality study demonstrates that the Project would decrease emissions of all regulated pollutants. Air quality in the region would be improved through the diversion of vehicles from the roads and highways in central-east Florida.

Some commenters raised concerns that the air quality and greenhouse gas emissions estimates omitted emissions from motor vehicles stopped at grade crossings, as well as from boats stopped at the three

AAF-AR0044937

drawbridges. They requested that the FEIS include an analysis of air quality at congested grade crossings, particularly in downtown areas. Section 1.7.5 provides a summary response: additional information is included in the following section.

#### 5.2.1.1    Methodology

The analysis considered emissions of regulated pollutants from passenger trains and other vehicles.

**Passenger Train Emissions Methodology**

Air pollutant emissions resulting from the operation of passenger trains associated with the Project and switching occurring at the VMF were calculated based upon the number and types of locomotives (two diesel engines per train, with eight trainsets operating concurrently), the horsepower rating of the engines (4,000 horsepower), and the assumption that the locomotives would be compliant with U.S. Environmental Protection Agency (EPA) Tier 4 rail emission standards. Criteria pollutant emission factors for the locomotives were obtained from the EPA.

**Vehicular Emissions Methodology**

Overall vehicle miles travelled (VMT) reductions were calculated based upon estimates of auto vehicle trips avoided as auto passengers are diverted to the new rail service for long-distance service (travel between central and southeast Florida). Daily vehicle trip reductions were calculated based on values for total annual trips diverted based on the AAF ridership report (Appendix 3.2.1) Air pollutant emission reductions resulting from reduced VMT as a consequence of the Project were determined using a conservative approach. All VMT reductions were assumed to result from motorcycles, cars and light trucks (SUVs, light pickups, etc.). Emission factors for cars, motorcycles, and light trucks for speeds above 40 mph were taken from data generated from the 2007 on-road mobile source inventory developed for the Southeastern States Air Resource Managers, Inc. (AMEC 2013a). For the purposes of this estimation procedure, all vehicles were assumed to be gasoline burning vehicles since that fuel type represents the majority of vehicles in the passenger vehicle categories included in this evaluation.

The emissions related to vehicles stopping at the grade crossings was estimated and included in the overall project emissions estimates. Details of this analysis are presented in Appendix 5.2-1. Average vehicle emissions factors were developed using MOVES 2010A and were applied to the estimated traffic projected at the grade crossings during the time a train crosses the roadway. The total number of vehicles used to calculate emissions were obtained through Synchro 8 reports generated for the Transportation and Rail Road Crossing Analysis.

Based on the information provided from the Transportation and Railroad Crossing Analysis report, the number of hourly cycles was determined, and multiplied by 24 hours to determine the total number of cycles per day. This represents the number of times traffic will be stopped at a grade crossing. Current conditions reflects freight train cycles and normal cycles (where automotive traffic during periods when no freight trains are passing). Passenger train cycles were estimated separately to determine the emissions potentially associated with vehicle queuing for the passenger trains. Two cycles per hour (or 48 cycles per day) was estimated for all passenger trains and freight trains.

Emissions associated with vehicles queuing for 2016 and 2036 were calculated using 2007 emission factors. Table 5.2.1-4 presents the 2016 and 2036 emissions associated with vehicles queuing under

AAF-AR0044938

normal traffic cycles and freight train cycles. Total greenhouse gas emissions analysis was not included since emission factors were not available from MOVES 2010A. However, $CO_2$ emissions, which are a fundamental component of climate change analyses, are calculated in Table 5.2 1-2 below.

### 5.2.1.2    Environmental Consequences

This section describes the potential impacts to air quality that could result from the Project. Air quality impacts would be the same for each of the Action Alternatives, as each would include the same train miles and automobile diversions; this analysis, therefore, does not differentiate between Alternatives A, C, and E.

The CAAA require that federal agency activities conform to the State Implementation Plan (SIP) with respect to achieving and maintaining attainment of NAAQS and addressing air quality effects (58 FR 62188). The EPA General Conformity Rule requires that a conformity analysis be performed which demonstrates that a proposed action does not:

1)   Cause or contribute to any new violation of any NAAQS in the area;

2)   Interfere with provisions in the SIP for maintenance or attainment of any NAAQS;

3)   Increase the frequency or severity of any existing violation of any NAAQS; or

4)   Delay timely attainment of any NAAQS, any interim emission reduction, goals, or other milestones included in the SIP (58 FR 63214).

Provisions in the General Conformity Rule allow for exemptions from performing a conformity determination only if total emissions of individual nonattainment area pollutants resulting from the proposed action fall below the significant threshold values.

The Project Study Area (Phase II) is located in Orange, Brevard, Indian River, St. Lucie, Martin, and Palm Beach Counties. All six counties are designated as attainment areas for all criteria pollutants. As the Project is in attainment areas, it is not subject to review under the EPA's General Conformity Rule. Pursuant to this exclusion, a development, or select analysis, of emissions inventories of criteria pollutants of the proposed action would not be necessary and would not be performed for General Conformity evaluation purposes. However, emissions of the criteria pollutants, as related to changes in new passenger trains and freight trains, and reductions in on-road VMT, are reviewed to assess whether the passenger trains emissions would affect regional air quality and to assess the effects of VMT reduction on regional air quality.

The 2013 FONSI for Phase I found that the Project would provide a net regional air quality benefit as compared to current conditions, and would reduce regional criteria pollutants, mobile source air toxics, and greenhouse gas emissions because motor vehicle use would decrease.

### No-Action Alternative

Under the No-Action Alternative, VMT within the Orlando to West Palm Beach area would continue to increase as population in southeastern and central-eastern Florida continues to grow. This population increase would result in an ongoing increase in VMT, with few alternative public transportation options that could be utilized by a large number of residents and visitors. VMT reductions that would be realized under the Proposed Action would not occur; therefore, moderate adverse air quality impacts would occur.

AAF-AR0044939

**Action Alternatives A, C, and E**

Air quality impacts of the three Action Alternatives (Alternative A, Alternative C, and Alternative E) would be identical, as each alternative would provide a similar travel time and would have the same ridership and VMT reductions. As shown in Table 5.2.1-1, the Project for the Orlando to West Palm Beach service would remove 344 daily vehicle-trips from area highways in 2016, 1,214 daily trips in 2019, and 1,453 daily trips in 2030. With a 337-mile round-trip distance, this would result in an annual VMT reduction of 42,313,720 miles in the start-up year (2016), and an annual VMT reduction of 149,328,070 miles by 2019, the year that near-full ridership is anticipated. In 2030, VMT reductions of 178,726,265 miles are anticipated.

The entire Project would provide a net regional air quality benefit as compared to the No-Action Alternative. Air quality in the region would be improved through the reduction of vehicles from the roads and highways as riders move instead to the proposed passenger rail service between Orlando and West Palm Beach.

| Table 5.2.1-1 | Projected Ridership, Vehicle-Trips Removed and VMT Reductions for Orlando-West Palm Beach Service | | |
|---|---|---|---|
| | **2016** | **2019** | **2030** |
| Daily Vehicle-Trips Removed | 344 | 1,214 | 1,453 |
| Annual Vehicle-Trips Removed | 125,560 | 443,110 | 530,345 |
| Annual VMT Reductions[1] (miles) | 42,313,720 | 149,328,070 | 178,726,265 |

Source:  Louis Berger Group. 2013. *All Aboard Florida Ridership and Revenue Study: Summary Report*. September 2013. Prepared for Florida East Coast. Report.

1        Based on a 337-mile round trip between Orlando and West Palm Beach

2        In May 2015, AAF published the *All Aboard Florida Ridership and Revenue Study*, which supersedes the data presented in this table and in the associated 2013 ridership study. However, this EIS maintains use of the 2013 data, as it represents a more conservative approach to estimating ridership.

As shown in Table 5.2.1-2, the difference between reductions in emissions related to VMT and increases related to passenger train emissions, as measured in tons per year, was estimated for CO, NOx, $SO_2$, VOCs, $PM_{10}$, $PM_{2.5}$, $CO_2$, $CH_4$, and $N_2O$. Emissions for all pollutants, except $CO_2$ in 2016, show an overall decrease. The lone exception is $CO_2$ if the Project is considered independently of the cumulative impacts in the Project Study Area. Under that analysis, $CO_2$ shows an increase of just over 23,000 tons per year, related primarily to the increase in passenger train emissions and the modest decrease in vehicular traffic in 2016. This analysis is based only on a review of the 344 vehicles per day being removed as a result of train ridership for 2016 for the extension of proposed passenger rail service from West Palm Beach to Miami. Under that limited analysis, the modest decrease in vehicular traffic from the Project in 2016 is not sufficient to offset the emissions increase for $CO_2$ from the trains themselves (which are calculated on the basis of the entire Project).

AAF-AR0044940

**Table 5.2.1-2    Summary of Emissions (tons/year) for Orlando to West Palm Beach, 2016-2030[1]**

| Pollutant | Year | VMT Reduction | Automobile Total | Passenger Train | Train Switching | Train Total | Net Emissions |
|---|---|---|---|---|---|---|---|
| CO | 2016 | 42,313,720 | -354.0 | 55.4 | 1.6 | 57.0 | -296.9 |
| | 2019 | 149,328,070 | -1249.1 | 55.4 | 1.6 | 57.0 | -1192.1 |
| | 2030 | 178,726,265 | -1495.1 | 55.4 | 1.6 | 57.0 | -1438.1 |
| NOx | 2016 | 42,313,720 | -51.6 | 43.4 | 1.3 | 44.5 | -7.1 |
| | 2019 | 149,328,070 | -182.1 | 43.4 | 1.3 | 44.5 | -137.6 |
| | 2030 | 178,726,265 | -218.0 | 43.4 | 1.3 | 44.5 | -173.4 |
| $SO_2$ | 2016 | 42,313,720 | -0.8 | 0.2 | 0.0 | 0.2 | -0.6 |
| | 2019 | 149,328,070 | -2.8 | 0.2 | 0.0 | 0.2 | -2.6 |
| | 2030 | 178,726,265 | -3/3 | 0.2 | 0.0 | 0.2 | -3.1 |
| VOC | 2016 | 42,313,720 | -12.7 | 1.8 | 0.1 | 1.9 | -10.8 |
| | 2019 | 149,328,070 | -44.9 | 1.8 | 0.1 | 1.9 | -43.0 |
| | 2030 | 178,726,265 | -53.7 | 1.8 | 0.1 | 1.9 | -51.8 |
| $PM_{10}$ | 2016 | 42,313,720 | -1.3 | 0.6 | 0.0 | 0.7 | -0.6 |
| | 2019 | 149,328,070 | -4.5 | 0.6 | 0.0 | 0.7 | -3.8 |
| | 2030 | 178,726,265 | -5.4 | 0.6 | 0.0 | 0.7 | -4.7 |
| $PM_{2.5}$ | 2016 | 42,313,720 | -1.1 | 0.6 | 0.0 | 0.6 | -0.4 |
| | 2019 | 149,328,070 | -3.8 | 0.6 | 0.0 | 0.6 | -3.2 |
| | 2030 | 178,726,265 | -4.6 | 0.6 | 0.0 | 0.6 | -3.9 |
| $CO_2$ | 2016 | 42,313,720 | -16,978.0 | 40,234,9 | NA | 40,234.9 | 23,256.9 |
| | 2019 | 149,328,070 | -59,916.5 | 40,234,9 | NA | 40,234.9 | -19,618.7 |
| | 2030 | 178,726,265 | -71,212,3 | 40,234,9 | NA | 40,234.9 | -31,477.4 |
| $CH_4$ | 2016 | 42,313,720 | -1.4 | 0.4 | NA | 0.4 | -1.0 |
| | 2019 | 149,328,070 | -5.1 | 0.4 | NA | 0.4 | -4.7 |
| | 2030 | 178,726,265 | -6.1 | 0.4 | NA | 0.4 | -5.7 |
| $N_2O$ | 2016 | 42,313,720 | -1.5 | 0.2 | NA | 0.2 | -1/3 |
| | 2019 | 149,328,070 | -5.3 | 0.2 | NA | 0.2 | -5.0 |
| | 2030 | 178,726,265 | -6.3 | 0.2 | NA | 0.2 | -6.1 |

Source:   AMEC. 2013b. Technical Memorandum No. 10: Environmental Consequences for All Aboard Florida Passenger Rail Project
          from Orlando to Miami, Florida. Report.
1         Emissions reductions are presented as negative numbers (-)
2         Automobile emissions include emissions related to the vehicle delays at the Project grade crossings.

By 2019, the reduction in automobile travel from the Project would offset all $CO_2$ emissions from the passenger trains and provide an overall reduction in all pollutants including $CO_2$. The $CO_2$ reduction would approximate 20,000 tons by 2019, and 31,000 tons by 2030.

AAF-AR0044941

Table 5.2.1-3 summarizes the cumulative air quality benefits of the Project in combination with the Phase I - West Palm Beach to Miami service analyzed in Section 3.1.1 of the 2012 EA. The Project for all alternatives would provide a net regional air quality benefit as compared to the No-Action Alternative. The air quality study demonstrates that the Project would decrease emissions of CO, NOx, $SO_2$, VOC, $PM_{10}$, and $PM_{2.5}$. Air quality in the region would be improved through the diversion of vehicles from the roads and highways in central-east Florida. By 2030, the combined project would reduce CO emissions by 1,654 tons, NOx by 192 tons, VOCs by 59 tons, and $PM_{10}$ by 7 tons.

**Table 5.2.1-3    Summary of Emissions Reductions (tons/year) for Orlando to Miami, 2019-2030**

| Pollutant | Year | Segment | Estimated VMT Reduction | Estimated Pollutant Reduction (tons/year) |
|---|---|---|---|---|
| CO | 2018/2019 | Orlando to West Palm Beach | 149,328,070 | 1,249.1 |
| | | West Palm Beach to Miami | 44,229,342 | 273.5 |
| | | Net Reduction | | 1,522.6 |
| | 2030 | Orlando to West Palm Beach | 178,726,265 | 1,438.1 |
| | | West Palm Beach to Miami | 51,345,672 | 215.7 |
| | | Net Reduction | | 1,653.8 |
| NOx | 2018/2019 | Orlando to West Palm Beach | 149,328,070 | 182.1 |
| | | West Palm Beach to Miami | 44,229,342 | 49.6 |
| | | Net Reduction | | 132.5 |
| | 2030 | Orlando to West Palm Beach | 178,726,265 | 173.4 |
| | | West Palm Beach to Miami | 51,345,672 | 19.0 |
| | | Net Reduction | | 192.4 |
| VOC | 2018/2019 | Orlando to West Palm Beach | 149,328,070 | 44.9 |
| | | West Palm Beach to Miami | 44,229,342 | 14.5 |
| | | Net Reduction | | 59.4 |
| | 2030 | Orlando to West Palm Beach | 178,726,265 | 51.8 |
| | | West Palm Beach to Miami | 51,345,672 | 7.1 |
| | | Net Reduction | | 58.9 |
| $PM_{10}$ | 2018/2019 | Orlando to West Palm Beach | 149,328,070 | 4.5 |
| | | West Palm Beach to Miami | 44,229,342 | 0.1 |
| | | Net Reduction | | 4.6 |
| | 2030 | Orlando to West Palm Beach | 178,726,265 | 4.7 |
| | | West Palm Beach to Miami | 51,345,672 | 2.2 |
| | | Net Reduction | | 6.9 |

Source:  AMEC. 2013b. Technical Memorandum No. 10: Environmental Consequences for All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida.

AAF-AR0044942

The 2013 FONSI for Phase I stated that the selected alternative would provide a net regional air quality benefit as compared to the current conditions, and that operation of the selected alternative would reduce regional criteria pollutants, mobile source air toxics, and greenhouse gas emissions because motor vehicle emissions would decrease in the region based on the reduction of VMTs.

**Vehicle Maintenance Facility and Station**

The Project includes a dedicated VMF on GOAA property south of MCO. There would be some electrical requirements for the VMF but the emissions related to the minimal electrical requirements are considered negligible. In addition, the additional vehicular trips related to the MCO Intermodal Station are projected to be minimal (less than 100 employees) and are considered negligible in relation to the entire Project's estimated annual VMT reductions of 42,313,720 in 2016 and 149,328,070 in 2019. The Project's VMT and associated pollutant reductions dominate the air quality benefits.

**Intersections/At-grade Crossings**

Section 3.1.1 of the 2012 EA prepared for the West Palm Beach to Miami section modeled air quality emissions at intersections and grade crossings, where vehicle congestion may occur, using a CO hotspot screening method. Motor vehicles emit CO at high rates when they are operating a low speeds or idling in queues. Section 3.1.1 of the 2012 EA evaluated the most congested intersections (in terms of LOS, delay, and traffic volumes) in the vicinity of the proposed stations and railroad crossings. The modeling showed that traffic did not exceed air quality criteria for CO in either the opening year or the build-out year at any of the intersections.

As documented in Section 4.1.2, *Transportation*, the highest-volume grade crossings for the Project carry 40,000 AADT. The highest-volume grade crossing evaluated in Section 3.1.1 of the 2012 EA had an AADT of 47,200 (Hillsboro Boulevard, Broward County). Traffic volumes and congestion at the Project's grade crossings, and therefore CO emissions, are projected to be lower than those presented in Section 3.1.1 of the 2012 EA and therefore would not exceed air quality criteria. As Section 3.1.1 of the 2012 EA showed that traffic delays at the higher-volume grade crossing did not exceed air quality criteria, a detailed hot-spot CO modeling evaluation was not conducted for this FEIS.

Emissions for vehicle queuing at grade crossings under passenger train cycles are presented in Table 5.2.1-4. As shown, the emissions from the passenger trains are significantly less than 1 ton per day, which represents a *de minimis* impact pursuant of EPA standards. Combined with emissions associated with vehicle queuing under normal and freight train cycles, with the exception of Banyan Boulevard Crossing and Northlake Boulevard Crossing, the overall projected emissions from all sources generally amount to less than one ton per day. Emissions at those two crossings are still considered *de minimis* pursuant to EPA standards. The air quality analysis shows that vehicle delays associated with passenger trains are not expected to generate adverse air quality impacts.

AAF-AR0044943

**Table 5.2.1-4    Emissions Associated with Vehicles Queuing at Grade Crossings**

| Intersection | Year | CO (tons/day) | NOX (tons/day) | VOC (tons/day) | SO2 (tons/day) | PM10 (tons/day) | PM25 (tons/day) |
|---|---|---|---|---|---|---|---|
| **Freight Train Cycles** | | | | | | | |
| 19th 20th Place Crossing | 2016 | 0.063 | 0.159 | 0.043 | 0.000 | 0.003 | 0.003 |
| 19th 20th Place Crossing | 2036 | 0.076 | 0.191 | 0.051 | 0.000 | 0.003 | 0.003 |
| Banyan Blvd Crossing | 2016 | 0.428 | 1.043 | 0.285 | 0.001 | 0.019 | 0.019 |
| Banyan Blvd Crossing | 2036 | 0.672 | 1.638 | 0.447 | 0.002 | 0.031 | 0.030 |
| Monterey Rd Crossing | 2016 | 0.132 | 0.333 | 0.089 | 0.000 | 0.006 | 0.006 |
| Monterey Rd Crossing | 2036 | 0.169 | 0.424 | 0.114 | 0.001 | 0.008 | 0.007 |
| North Causeway Crossing | 2016 | 0.065 | 0.164 | 0.044 | 0.000 | 0.003 | 0.003 |
| North Causeway Crossing | 2036 | 0.083 | 0.209 | 0.056 | 0.000 | 0.004 | 0.004 |
| Northlake Blvd Crossing | 2016 | 0.474 | 1.155 | 0.316 | 0.001 | 0.022 | 0.021 |
| Northlake Blvd Crossing | 2036 | 0.752 | 1.835 | 0.501 | 0.002 | 0.034 | 0.033 |
| Oslo Rd Crossing | 2016 | 0.175 | 0.441 | 0.118 | 0.001 | 0.008 | 0.008 |
| Oslo Rd Crossing | 2036 | 0.238 | 0.600 | 0.161 | 0.001 | 0.011 | 0.011 |
| Palm Bay Rd Crossing | 2016 | 0.065 | 0.163 | 0.044 | 0.000 | 0.003 | 0.003 |
| Palm Bay Rd Crossing | 2036 | 0.123 | 0.311 | 0.083 | 0.000 | 0.006 | 0.005 |
| Pineda Causeway Crossing | 2016 | 0.187 | 0.471 | 0.127 | 0.001 | 0.009 | 0.008 |
| Pineda Causeway Crossing | 2036 | 0.327 | 0.824 | 0.221 | 0.001 | 0.015 | 0.014 |
| SE Indian Street Crossing | 2016 | 0.087 | 0.218 | 0.059 | 0.000 | 0.004 | 0.004 |
| SE Indian Street Crossing | 2036 | 0.114 | 0.286 | 0.077 | 0.000 | 0.005 | 0.005 |
| Seaway Drive Crossing | 2016 | 0.084 | 0.211 | 0.057 | 0.000 | 0.004 | 0.004 |
| Seaway Drive Crossing | 2036 | 0.117 | 0.294 | 0.079 | 0.000 | 0.005 | 0.005 |
| **Passenger Train Cycles** | | | | | | | |
| 19th 20th Place Crossing | 2016 | 0.034 | 0.087 | 0.023 | 0.000 | 0.002 | 0.002 |
| 19th 20th Place Crossing | 2036 | 0.053 | 0.132 | 0.036 | 0.000 | 0.002 | 0.002 |
| Banyan Blvd Crossing | 2016 | 0.162 | 0.395 | 0.108 | 0.000 | 0.007 | 0.007 |
| Banyan Blvd Crossing | 2036 | 0.240 | 0.585 | 0.160 | 0.001 | 0.011 | 0.011 |
| Monterey Rd Crossing | 2016 | 0.050 | 0.125 | 0.034 | 0.000 | 0.002 | 0.002 |
| Monterey Rd Crossing | 2036 | 0.083 | 0.208 | 0.056 | 0.000 | 0.004 | 0.004 |
| North Causeway Crossing | 2016 | 0.012 | 0.029 | 0.008 | 0.000 | 0.001 | 0.001 |
| North Causeway Crossing | 2036 | 0.011 | 0.029 | 0.008 | 0.000 | 0.001 | 0.000 |
| Northlake Blvd Crossing | 2016 | 0.201 | 0.490 | 0.134 | 0.001 | 0.009 | 0.009 |
| Northlake Blvd Crossing | 2036 | 0.312 | 0.761 | 0.208 | 0.001 | 0.014 | 0.014 |
| Oslo Rd Crossing | 2016 | 0.082 | 0.207 | 0.056 | 0.000 | 0.004 | 0.004 |
| Oslo Rd Crossing | 2036 | 0.098 | 0.248 | 0.067 | 0.000 | 0.004 | 0.004 |
| Palm Bay Rd Crossing | 2016 | 0.022 | 0.055 | 0.015 | 0.000 | 0.001 | 0.001 |
| Palm Bay Rd Crossing | 2036 | 0.072 | 0.182 | 0.049 | 0.000 | 0.003 | 0.003 |
| Pineda Causeway Crossing | 2016 | 0.092 | 0.231 | 0.062 | 0.000 | 0.004 | 0.004 |
| Pineda Causeway Crossing | 2036 | 0.186 | 0.469 | 0.126 | 0.001 | 0.008 | 0.008 |
| SE Indian Street Crossing | 2016 | 0.041 | 0.103 | 0.028 | 0.000 | 0.002 | 0.002 |
| SE Indian Street Crossing | 2036 | 0.091 | 0.224 | 0.061 | 0.000 | 0.004 | 0.004 |
| Seaway Drive Crossing | 2016 | 0.033 | 0.083 | 0.022 | 0.000 | 0.002 | 0.001 |
| Seaway Drive Crossing | 2036 | 0.046 | 0.117 | 0.031 | 0.000 | 0.002 | 0.002 |

AAF-AR0044944

### 5.2.1.3    Indirect and Secondary Impacts

The areas surrounding the proposed stations are already developed; the Project is not anticipated to result in induced growth or development that could generate additional emissions of criteria pollutants, and would not result in indirect or secondary effects to air quality. Section 3.1 of the 2012 EA documented that there would be no indirect or secondary effects to air quality associated with Phase I of the Project.

### 5.2.1.4    Temporary Construction-Period Impacts

The emissions from construction activities are expected to be minimal, controlled using BMPs, and temporary in nature. Combustion emissions would be associated with construction-related equipment, workers' vehicles, and transportation/delivery of construction materials. Emissions associated with construction equipment would be minimal because most equipment would be driven to and kept at affected sites for the duration of construction activities. In addition, BMPs routinely performed at construction sites would serve to keep emissions of PM (the primary pollutant emitted) to a minimum during the temporary construction activities. Emissions associated with construction workers commuting and the transport of materials would also be minimal given the temporary nature of the activities. Contractors will be required to use BMPs during construction, such as soil watering to reduce fugitive dust emissions, which would be effective in substantially reducing potential emissions during construction. Any potential temporary impacts will be avoided and/or minimized through BMPs and mitigation requirements applied pursuant to all applicable federal, state, and local statutes, regulations and ordinance, if and as applicable, such that any such temporary construction impacts would cease immediately after construction activities are completed.

### 5.2.2    Noise and Vibration

This section identifies the impacts of the Project on properties and residents within the Project Study Area due to changes in noise and vibration. Section 4.2.2 defines noise and vibration and provides information on existing noise and vibration levels. AAF has committed to installing stationary wayside horns at each of the 117 grade crossings between Cocoa and West Palm Beach where severe, unmitigated impacts would occur using locomotive-mounted horns (see Appendix 3.3.5-D). Therefore, the noise analysis assumes that wayside horns will be implemented as a design feature of the Project. Stationary pole-mounted wayside horns at grade crossings will reduce future noise levels along the N-S Corridor by eliminating train-mounted warning horns for both future freight trains and AAF passenger trains. While a wayside horn generates the same sound as that from an on-board locomotive horn, using wayside horns at the intersection instead of the locomotive horn has been shown to substantially reduce the noise footprint without compromising safety at the grade crossing.

The Project would result in long-term noise and vibration adverse impacts to residents and properties, primarily along the N-S Corridor. The Project would result in noise impacts along some elevated sections of the E-W Corridor. Noise impacts would be the same for the three alignments, Alternatives A, C, and E. The Project will result in minor vibration impacts along the N-S Corridor due to the increase (greater than doubling) of vibration events as a result of adding passenger train service to the existing freight operations. There is no potential vibration impact along the MCO Segment because of low train speeds and the absence of sensitive receptors. Along the E-W Corridor, minor vibration impacts would occur

AAF-AR0044945

where residences are close to the proposed tracks. Vibration levels are not projected to exceed structural damage levels (100 VdB) at any location.

Comments on the noise analysis presented in the DEIS included statements that the current freight trains create noise impacts, even at a considerable distance from the tracks. Commenters believed that the DEIS did not take this into account, and underestimated the effects of noise from trains passing-by. Other concerns include the noise effects on historic buildings, which are not insulated to prevent the penetration of sound. Commenters were also concerned that the passenger rail service would cause freight trains to operate at night, increasing nighttime noise effects. There were also comments that the noise analysis omitted consideration of warning horns at the three moveable bridges. Some commenters also requested information on the location of proposed noise barriers. Section 1.7.5 of this FEIS provides general responses to these comments, while other specific comments are addressed in the following sections.

### 5.2.2.1    Methodology

Noise and vibration have been assessed according to guidelines specified in FRA's *High-Speed Ground Transportation Noise and Vibration Impact Assessment* guidance manual (FRA Manual), the Federal Transit Administration's (FTA) *Noise and Vibration Impact Assessment* guidance manual, and the Federal Highway Administration (FHWA) guidelines as defined for Florida application by FDOT for traffic operations (FRA 2012a; FTA 2006; FDOT 2011c). These guidelines provide the methodology for identifying the affected environment and assessing potential impact from transit projects such as the Project.

The methodology for assessing potential short- and long-term noise and vibration impacts of the Project includes: identifying noise and vibration-sensitive land uses within the area of potential impact; modeling existing noise and vibration conditions at these sensitive receptors based on existing freight operations, highway traffic conditions, and general ambient sources; projecting future noise and vibration conditions from the proposed alternatives; assessing potential long-term noise and vibration impact; and considering noise and vibration mitigation. The distances to potential impact have been used to create noise contours and to identify the number of potential impacts. The noise impacts have been calculated assuming that wayside horns will be implemented as part of the Project. Noise impacts were calculated for 2016, the first year of full revenue service, for all at-grade intersections and along the Project corridor with respect to operational noise and vibration.

Some commenters questioned the areas of noise impact, specifically areas identified as no impact areas that currently experience noise and vibration impacts from existing train operations. Noise impact is determined based on the comparison of existing to future noise conditions. Noise impact only occurs at sensitive receptors where the Project would cause an increase in noise that would result in either a moderate or severe increase as defined by the FRA noise impact criteria (Figure 5.2.2-1).

### Noise

Noise generated from the proposed passenger rail operations was calculated based on average operating characteristics for each county and projected service schedules. Table 5.2.2-1 shows the noise calculation inputs for the proposed passenger rail operations. The train schedule assumes an average of two operations per hour between 7:00 AM and 10:00 PM and 0.22 operations per hour between 10:00 PM and 7:00 AM, for a total of 16 roundtrip trains per day during the 2016 build-out year. For this analysis, total passenger train

AAF-AR0044946

length was assumed to be 810 feet, consisting of two 65-foot long locomotives and eight 85-foot long passenger cars.

Noise predictions include all noise sources resulting from train operations. The predominant noise sources include the locomotive engine, exhaust and radiator cooling fans, the wheel/rail interaction on locomotives and rail cars as well as audible warning devices at highway-rail grade crossings. There is little research to support that there is any difference in noise emissions from trains operating on wooden or concrete ties and, accordingly, the FRA does not account for any difference in noise emissions for different tie types.

Speeds will vary depending upon the location along the route. Except for Orange County, speeds were averaged by county. For Orange County, operations were split into Orange (East) and Orange (West) of SR 417 because projected operating speeds would be substantially less west of SR 417.

Distances to potential moderate and severe noise impacts have been calculated and impact assessed by comparing the Project noise level with the existing noise level. As both existing and Project noise levels decrease with increasing distance from the source, comparisons were made at 5-foot intervals moving outward from the alignment until the Project noise would no longer exceed the impact criteria. As existing noise is in part a function of population density, which varies on either side of the track, impact contours are not always necessarily symmetrical.

| Table 5.2.2-1   Proposed Passenger Rail Operations (2016) | | | | | | | |
|---|---|---|---|---|---|---|---|
| County | Speed (mph) | Average Daily Trains | Trains/ Hour Daily | Trains/ Day (7:00 AM-10:00 PM)[2] | Trains/ Hour Day | Trains/ Night (10:00 PM-7:00 AM)[2] | Trains/ Hour Night |
| **East-West Corridor** | | | | | | | |
| Orange (West) | 34.2 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| Orange (East) | 103.5 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| Brevard | 94.6 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| **North-South Corridor** | | | | | | | |
| Brevard | 98.1 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| Indian River | 106.6 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| St. Lucie | 92.6 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| Martin | 79.5 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |
| Palm Beach | 89.2 | 32 | 1.33 | 30 | 2 | 2 | 0.22 |

Source:   AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. AAF. 2013a. *Modeling Assumptions.* May 2013.
1         Average speeds calculated from CA20 TPC Runtimes
2         Relative distribution of day/night activity for Passenger Operations

AAF-AR0044947

Noise impacts within the MCO Segment were determined using FRA impact criteria. In the vicinity of the VMF, noise from idling locomotives was added to the noise generated from moving trains. The Ldn from moving and idling trains is 68.8 dBA at a distance of 50 feet (FTA 2006).

Along the E-W Corridor, the Project includes 13 bridges over roads. In these areas, the proposed track will be elevated and noise generated from the passenger trains would therefore propagate farther. To account for this increased noise exposure, a correction of +4 dBA was added to these sections. These areas are indicated as "Elevated" in Table 5.2.2-8, while non-elevated portions of track are indicated as "At Grade." In order to account for the varying distances between SR 528 and the track alignment for each alternative alignment in the CFX segment, the corridor was divided into nine sections (HW1 through HW9) based on the average distance between SR 528 and the track alignment. Existing and Project noise levels were computed as a function of distance from the respective sources and impacts assessed according to FRA criteria.

A summary of the nine sections is given in Table 5.2.2-2 and illustrated in Appendix 5.2.2-A1. Distance between the alignment centerline and SR 528 was calculated for each section, and is measured from the alternative alignment centerline to the centerline of the near lane. Generally, the alternative alignments are located south of SR 528. However, in Section HW9, the alternative alignment is north of SR 528.

Noise impact criteria for trains are defined by FTA and FRA. The criteria are based on potential future increases in noise exposure and are defined using a sliding scale that incorporates existing noise conditions. For example, introducing new noise sources in relatively quiet areas would have a greater potential for impact than in noisier areas. Future noise levels would include the contributions of existing noise sources and new project noise sources.

**Table 5.2.2-2    Summary of Distance between SR 528 and Alternative Alignment**

| SR 528 Section | Rail Noise Section | From | To | Offset Distance (feet)[1] | | |
|---|---|---|---|---|---|---|
| | | | | Alt. A | Alt. C | Alt. E |
| HW1 | Orlando (West) | SR 436 | GOAA Property Boundary | 50 | 70 | 130 |
| HW2 | | GOAA Property Boundary | SR 417 | 100 | 100 | 100 |
| HW3 | | SR 417 | Int. Corp Park Blvd | 80 | 140 | 260 |
| HW4 | Orlando (East) | Int. Corp Park Blvd | Dallas Blvd | 80 | 140 | 250 |
| HW5 | | Dallas Blvd | SR 520 | 80 | 550 | 260 |
| HW6 | | SR 520 | Brevard County Line | 80 | 80 | 70 |
| HW7 | | Orange County Line | SR 407 | 50 | | |
| HW8 | Brevard (EW) | SR 407 | East side of I-95 Interchange | 70 | | |
| HW9 | | East of I-95 Interchange | SR 524 | 80 | | |

Source:    AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013.

1        Distance measured from alternative alignment centerline to SR 528 near lane centerline. Section H9 located north of SR 528.

AAF-AR0044948

The noise criteria include two levels of potential noise impact. The interpretation of these two levels of impact is summarized below and shown in Figure 5.2.2-1:

- **Severe:** FRA strongly encourages noise abatement for projects where severe noise impacts are identified. Severe noise impacts represent the most compelling need for mitigation as they have the greatest potential for adverse impact on the community.

- **Moderate:** In this range of noise impact, several project-specific factors are considered to determine the magnitude of the impact. These factors include where impact falls within the moderate range, what the existing noise levels are and what future noise levels would exist, and the types and number of noise-sensitive land uses impacted.

AAF conducted an analysis in order to determine possible impacts resulting from increased use of warning horns on the three movable bridges along the North-South Corridor: St. Lucie River (Martin County), Loxahatchee River (Palm Beach County), and New River (Broward County).



**Figure 5.2.2-1   Noise Impact Criteria**

Source: Federal Transit Administration. 2006. Transit Noise and Vibration Impact Assessment. USDOT Report Number FTA-VA-90-1003-06, May 2006.

AAF-AR0044949

A noise impact assessment was conducted at each bridge following FTA/FRA guidelines which included comparison of potential future noise levels (passenger trains + bridge siren noise) to existing noise levels (freight trains + bridge sirens). Noise levels from trains at each location were obtained from published noise levels in the DEIS. In order to be conservative, (i.e. use a lower existing noise level) modeling for noise impacts due to the bridge sirens was completed without including any train horns as part of the existing background noise conditions. Also, due to the elevation and open area around each bridge siren, propagation of noise from each bridge would be un-attenuated.

Noise levels from bridge sirens were calculated using equations from Table 6-8 of the FTA Manual along with information obtained from the FECR. Calculation inputs included:

- Sound Exposure Level (SEL) of electronic siren considered is 114 dB.

- For each train pass-by, the siren will sound in cycles of 4 blasts with durations of 2 seconds each, repeated every 2 minutes. The total time from first siren to bridge re-opening is 16 minutes. In this timeframe a total of 64 seconds of siren noise would occur for each train pass-by event. The estimated 16 minute event duration was based on regulatory requirements for bridge signaling provided in 33 CFR 117.

**Vibration**

Vibration levels are estimated based on the FTA generalized curve that predicts the overall ground-borne vibration level outside buildings as a function of distance from the source. Adjustments were applied to this generalized curve to account for factors such as vehicle speed, building type and propagation characteristics. For this assessment, vibration was projected based on a composite approach that incorporated modeling methods recommended by FRA and measured vibration levels from another project along the existing N-S Corridor (FRA and FDOT 2010). The combined approach establishes existing vibration conditions based on measured data and then extrapolates these data for the proposed track conditions and train speeds.

In a noise and vibration assessment prepared in July 2010 as part of the Amtrak EA (FRA and FDOT 2010) for a separate proposed passenger rail service expansion along the existing FECR Corridor, vibration measurements were conducted at representative locations 70 feet from the track centerline in Jacksonville, Vero Beach, and West Palm Beach. These vibration measurements are representative of the existing freight rail traffic and passenger rail operations.

A baseline curve was established according to the average measured vibration level from the Amtrak study for each type of train: freight and passenger. For freight operations, a total of 11 train events with speeds ranging from 30 to 49 mph (average 39 mph) generated vibration levels ranging from 79 to 86 VdB (average of 82 VdB). For passenger operations, a total of four train events with speeds ranging from 71 to 72 mph (average 72 mph) generated vibration levels ranging from 80 to 83 VdB (average 81 VdB).

The average measured results for passenger and freight operations were adjusted according to the FTA generalized curve for "Locomotive Powered Passenger or Freight" operations incorporate the specific source and soil propagation characteristics associated with FRA and FTA "Adjustment Factors" for these specific source and propagation characteristics. Figure 4.2.2-3 shows the generalized curve for "Locomotive Powered Passenger or Freight" operations at 50 mph and the freight and passenger curves

based on measurements in the Amtrak EA. Vibration estimates for the proposed passenger operations were then adjusted for the average train speed along the project segment.

Ground-borne noise predictions were made using the same curves generated for ground-borne vibration with adjustments for the frequency spectra of the type of train and soil characteristics. Based on the characteristics of freight and passenger trains and that the majority of soils along the N-S and E-W Corridors are sandy, an adjustment of -50 dB was used to calculate ground-borne noise levels (dBA) from ground-borne vibration levels (VdB).

FTA and FRA vibration impact criteria are based on human and structural responses to ground-borne vibration and GBN. The criteria are based on the type of land use and the frequency of vibration-generating events. Just as with noise impacts, more frequent vibration events will cause a greater impact than less frequent events. Table 5.2.2-3 lists the vibration impact criteria for the three major land use categories, according to frequency of vibration events.

According to FRA, historic properties are categorized according to their current use. For example, a historic home is categorized as a Category 2 residential receptor and a historic museum is categorized as a Category 3 institutional receptor (FRA 2012d). Potential vibration impact resulting and structural damage has been assessed at all structures adjacent to the Project including those which are registered or eligible to be registered as historic.

Potential noise and vibration impact has been assessed at all hospital and medical facilities as they apply to Category 2 (hospital locations where people sleep) and Category 3 (institutional facilities) receptors.

**Table 5.2.2-3    Ground-borne Vibration and Ground-Borne Noise Impact Criteria**

| Land Use Category | Ground Borne Vibration Impact Levels (VdB) | | | Ground Borne Noise Impact Levels (dB) | | |
|---|---|---|---|---|---|---|
| | Frequent Events[1] | Occasional Events[2] | Infrequent Events[3] | Frequent Events[1] | Occasional Events[2] | Infrequent Events[3] |
| Category 1: Buildings where vibration would interfere with interior operations | 65 VdB[4] | 65 VdB[4] | 65 VdB[4] | N/A[5] | N/A[5] | N/A[5] |
| Category 2: Residences and buildings where people normally sleep | 72 VdB | 75 VdB | 80 VdB | 35 VdA | 38 VdA | 43 VdA |
| Category 3: Institutional land uses with primarily daytime use | 75 VdB | 78 VdB | 83 VdB | 40 VdA | 43 VdA | 48 VdA |

Source: Federal Transit Administration. 2006. *Transit Noise and Vibration Impact Assessment*. USDOT Report Number FTA-VA-90-1003-06, May 2006.

1    *Frequent Events* is defined as more than 70 vibration events of the same kind per day.
2    *Occasional Events* is defined as between 30 and 70 vibration events of the same kind per day.
3    *Infrequent Events* is defined as fewer than 30 vibration events of the same kind per day.
4    This criterion limit is based on levels that are acceptable for most moderately sensitive equipment such as optical microscopes. Vibration-sensitive manufacturing or research will require detailed evaluation to define the acceptable vibration levels. Ensuring lower vibration levels in a building often requires special design of the HVAC systems and stiffened floors.
5    Vibration-sensitive equipment is not sensitive to ground-borne noise.

AAF-AR0044951

There are some buildings that can be very sensitive to vibration and noise but do not fit into any of the three land use categories listed in Table 5.2.2-3. These buildings can include concert halls, TV and recording studios, auditoriums, and theaters, and warrant special attention when assessing potential vibration impacts. The impact criteria for these special buildings are given in Table 5.2.2-4.

| Table 5.2.2-4    Ground-borne Vibration and Ground-Borne Noise Impact Criteria for Special Buildings | | | | | | |
|---|---|---|---|---|---|---|
| | Ground Borne Vibration Impact Levels (VdB) | | | Ground Borne Noise Impact Levels (dB) | | |
| Land Use Category | Frequent Events[1] | Occasional Events[2] | Infrequent Events[3] | Frequent Events[1] | Occasional Events[2] | Infrequent Events[3] |
| Concert Halls | 65 | 65 | 65 | 25 | 25 | 25 |
| TV Studios | 65 | 65 | 65 | 25 | 25 | 25 |
| Recording Studios | 65 | 65 | 65 | 25 | 25 | 25 |
| Auditoriums | 72 | 80 | 80 | 30 | 38 | 38 |
| Theaters | 72 | 80 | 80 | 35 | 43 | 43 |

Source: Federal Transit Administration. 2006. Transit Noise and Vibration Impact Assessment. USDOT Report Number FTA-VA-90-1003-06, May 2006.
1    Frequent Events is defined as more than 70 vibration events of the same kind per day.
2    Occasional Events is defined as between 30 and 70 vibration events of the same kind per day.
3    Infrequent Events is defined as fewer than 30 vibration events of the same kind per day.

**Construction**

Construction noise impacts were estimated following the general assessment methodologies in the FRA Manual. Based on these guidelines, 1-hour $L_{eq}$ noise levels were projected for the two loudest pieces of equipment used for typical construction activities. For bridge construction, the two loudest pieces of equipment are a pile driver and a bulldozer. For non-bridge construction including track construction, the two loudest pieces of equipment are a rail saw and a bulldozer. The distances to potential construction noise impact are shown in Table 5.2.2-5.

| Table 5.2.2-5    Distances to Potential Construction Noise Impact | | | |
|---|---|---|---|
| | | Distance to Impact (feet from corridor centerline) | |
| Construction Condition | Land Use | Day (7 AM-10 PM) | Night (10 PM-7 AM) |
| 1 – Bridge | Residential | 175 | 565 |
| | Commercial | 55 | 55 |
| | Industrial | 55 | 55 |
| 2 – Non-Bridge | Residential | 55 | 180 |
| | Commercial | 0 | 0 |
| | Industrial | 0 | 0 |

Source: AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. Report.

AAF-AR0044952

Construction vibration was assessed to determine the potential for human annoyance-related impacts as well as potential structural damage to vibration-sensitive buildings. Based on methodologies outlined in the FRA Manual, vibration levels from a pile driver and a large bulldozer were used to predict vibration levels and assess potential impact.

The distances to potential structural damage from pile driving operations are 50 feet for reinforced-concrete, steel or timber structures and up to 135 feet for extremely vibration-sensitive structures. The distance to potential structural damage from a large bulldozer does not extend beyond the typical working clearance of the bulldozer to structures. The tables in Appendix 5.2.2-B summarize the distances to potential vibration impact for structural damage for pile driving and a large bulldozer.

### 5.2.2.2    Environmental Consequences

This section describes the noise and vibration impact assessment results for the No-Action Alternative and the Action Alternatives for the Project. As documented below, the Project would result in long-term noise and vibration adverse impacts to residents and properties, primarily along the N-S Corridor. The impacts of Alternatives A, C, and E would be similar.

### Noise

Noise impacts along the E-W Corridor would primarily be due to the sound created by train passage. Along the N-S Corridor, noise impacts would primarily be due to the increased frequency of warning horn use at at-grade crossings. According to FRA guidelines, minimizing or eliminating horn blowing and other types of audible warning signals can reduce noise impacts, but must be compliant with safety regulations and FRA guidelines. Wayside horns are a commonly used example warning signal, and noise levels resulting from their implementation are well documented. Using wayside horns at the intersection instead of the locomotive horn has been shown to substantially reduce the noise footprint without compromising safety at the grade crossing. A wayside horn does not need to be as loud as a locomotive horn, but the real advantage is the focusing of the warning sound only on the area where it is needed. AAF has committed to installing stationary wayside horns at each of the 117 grade crossings where severe, unmitigated impacts would occur using locomotive-mounted horns. These mitigation measures would eliminate all severe noise impacts for residential and institutional receptors along the N-S Corridor. Where compliant with safety regulations and FRA guidelines, AAF is also working with local communities that would like to create quiet zones as an alternate noise abatement measure to wayside horns.[3]

In response to comments on the DEIS, AAF conducted an analysis in order to determine possible impacts resulting from increased use of warning horns on the three movable bridges along the North-South Corridor: St. Lucie River (Martin County), Loxahatchee River (Palm Beach County), and New River (Broward County). These impacts are discussed below.

### *No-Action Alternative*

Under the No-Action Alternative, there would be increases in existing freight train operations and highway traffic volumes. Along the E-W Corridor, projected increases in intercity transit between Orlando and Miami

---

3    Please note that AAF cannot create a quiet zone; the public entity must go through the application process with FRA.

AAF-AR0044953

will likely result in increased traffic volumes along SR 528, which will likely result in marginal changes in future noise conditions. Along the N-S Corridor, freight operations are expected to continue with a planned annual growth of 3 percent. This continued growth will likely result in marginal increases in noise levels through possible increases in train speed, frequency, and length. It is important to note that the FTA noise and vibration assessment methodology specifies that noise and vibration impact is assessed based on a comparison of existing to future Proposed Action conditions and not to the No-Action Alternative. Therefore, there would be no noise impact associated with the No-Action Alternative.

### Action Alternatives A, C, and E

### MCO Segment

The Project would not result in adverse noise impacts within the MCO Segment. Table 5.2.2-6 shows the distance to impact contours for the impact analysis conducted according to FRA methods and impact criteria assuming a background $L_{dn}$ of 65 dBA. There are no noise-sensitive receptors within these distances.

| Table 5.2.2-6   Summary of FRA Impact Contour Distances for MCO Segment | | | | | | |
|---|---|---|---|---|---|---|
| | Category 1 | | Category 2 | | Category 3 | |
| Operating Condition[1] | Moderate Impact (feet) | Severe Impact (feet) | Moderate Impact (feet) | Severe Impact (feet) | Moderate Impact (feet) | Severe Impact (feet) |
| Moving Trains | 85 | none | 90 | none | none | None |
| Idling Trains | 165 | 70 | 120 | 50 | 75 | None |

Source: AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. Report.

Table 5.2.2-7 shows the total noise at 50 feet from each source, along with the distances to the 65 and 70 $L_{dn}$ contours. The 65 and 70 $L_{dn}$ contours are shown in Appendices 5.2.2-A1 along with potentially incompatible land uses. No incompatible land use exists within the 65 $L_{dn}$ Contour associated with proposed passenger train operations or the VMF.

| Table 5.2.2-7   Noise Calculations for 65 Ldn Contours within MCO | | | | | |
|---|---|---|---|---|---|
| | Existing Noise Exposure ($L_{dn}$) | Noise at 50 feet from Source | | Distance to 65 Ldn Contour (feet) | Distance to 70 Ldn Contour (feet) |
| Project Noise Source | | Project Noise Exposure ($L_{dn}$) | Total Noise Exposure ($L_{dn}$) | | |
| Inbound/Outbound Rail | 65 | 65 | 68 | 50 | NA |
| VMF | 65 | 69 | 70 | 80 | 60 |

Source: AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. Report.

AAF-AR0044954

**East-West Corridor**

For the E-W Corridor, passenger rail operations adjacent to SR 528 would increase future noise levels and potential noise impacts. Table 5.2.2-8 provides a summary of noise impacts within the E-W Corridor. Existing highway noise results in a calculated $L_{dn}$ of 65 dBA. The Project would result in noise levels of 63 dBA on at-grade sections and 67 dBA at elevated sections, for a total future noise level of 67 dBA on at-grade sections and 69 dBA at elevated sections. As a result of the Project, noise levels would increase by 2.0 to 2.3 dBA in at-grade sections and by 4.0 to 4.4 dBA in elevated sections.

West of SR 520, there would be one potential severe Category 2 (residential) noise impact. East of SR 520, in Brevard County, there is the potential for 105 moderate and four severe noise impacts at Category 2 (residential) land use and one moderate impact at Category 3 (institutional) land use.

| Table 5.2.2-8 | Summary of Project Noise Levels for Residential Receptors at 50 ft. (dBA Ldn) along the E-W Corridor | | | | |
|---|---|---|---|---|---|
| County | Condition | Existing | Project (Passenger Trains) | Total Future | Change (Total Future vs Existing) |
| Orange | At-grade | 65 | 63 | 67 | 2.3 |
| | Elevated | 65 | 67 | 69 | 4.4 |
| Brevard | At-grade | 65 | 63 | 67 | 2.0 |
| | Elevated | 65 | 67 | 69 | 4.0 |

Source: AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. Report.

**North-South Corridor**

Passenger rail operations would be added to existing freight operations within the N-S Corridor, resulting in an increase in future noise levels and the potential for noise impacts. As shown in Table 5.2.2-9, the Project (passenger rail trains only, with wayside horns) would result in daytime noise levels (Leq) ranging from 62.1 to 63.9 dBA close to at-grade crossings (average 62.5 dBA) and ranging from 61.4 to 63.5 dBA along the mainline tracks. The noise levels of passenger trains, measured as $L_{dn}$ (residential receptors) would range from 62.2 to 64.1 dBA at grade crossings, and from 61.6 to 63.6 dBA along the mainline. Table 5.2.2-9 also shows the impact criteria for each land use category, based on existing noise levels.

AAF-AR0044955

| Table 5.2.2-9    Summary of Project Noise Levels - North-South Corridor | | | | | | |
|---|---|---|---|---|---|---|
| | Total Noise at 50 ft. (dBA) | | | | | |
| | Day (Leq) | | Night (Leq) | | Ldn | |
| County | At-Grade Crossing | Mainline | At-Grade Crossing | Mainline | At-Grade Crossing | Mainline |
| Brevard | 63.4 | 62.9 | 53.9 | 53.3 | 63.6 | 63.1 |
| Indian River | 63.9 | 63.5 | 54.4 | 53.9 | 64.1 | 63.6 |
| St. Lucie | 63.1 | 62.5 | 53.5 | 52.9 | 63.2 | 62.6 |
| Martin | 62.1 | 61.4 | 52.6 | 51.9 | 62.3 | 61.6 |
| Palm Beach | 62.8 | 62.2 | 53.3 | 52.7 | 63.0 | 62.4 |
| Impact Criteria (moderate) | | | | | | |
| Cat 1 – Quiet Setting | 65 | 62 | - | - | - | - |
| Cat 2 – Residential | - | - | - | - | 65 | 65 |
| Cat 3 – Institutional and Recreational | 70 | 62 | - | - | - | - |

Table 5.2.2-10 summarizes the noise analysis results for residential receptors along the N-S Corridor. The table shows the existing noise levels for mainline segments and at-grade crossings (based on freight locomotives with train-mounted horns), noise resulting from the Project (passenger trains with wayside horns) and the total future noise (future passenger trains and freight, all with wayside horns). The Project would reduce noise levels compared to existing noise levels. With the installation of wayside horns, total future noise levels would be comparable to existing levels, generally increasing by 0.2 to 0.3 dBA, along the mainline. Future noise levels would be substantially lower than existing noise levels at grade crossings, generally by 7 to 8 dBA. As shown in Table 5.2.2-10, no receptors along the N-S Corridor would experience noise levels that exceed impact criteria.

| Table 5.2.2-10  Summary of Noise Levels for Residential Receptors at 50 feet (dBA, $L_{dn}$) along the N-S Corridor | | | | | |
|---|---|---|---|---|---|
| County | Location | Existing | Project (Passenger Trains) | Total Future | Change (Total Future vs Existing) |
| Brevard | Mainline | 75 | 63 | 75 | 0.3 |
| | At-grade Crossing | 82 | 64 | 75 | -7.1 |
| Indian River | Mainline | 75 | 64 | 75 | 0.3 |
| | At-grade Crossing | 82 | 64 | 75 | -7.0 |
| St, Lucie | Mainline | 74 | 63 | 74 | 0.3 |
| | At-grade Crossing | 82 | 63 | 74 | -7.0 |
| Martin | Mainline | 74 | 62 | 74 | 0.3 |
| | At-grade Crossing | 82 | 62 | 74 | -8.1 |
| Palm Beach | Mainline | 75 | 62 | 75 | 0.2 |
| | At-grade Crossing | 82 | 63 | 75 | -7.1 |

AAF-AR0004956

As noted above, AAF conducted an analysis in order to determine possible impacts resulting from increased use of warning horns on the three movable bridges along the N-S Corridor: St. Lucie River (Martin County), Loxahatchee River (Palm Beach County). The noise analysis results are provided in Table 5.2.2-12. These tables provide noise levels and level of impact for Category 1, 2 and 3 land uses, while resulting impact contour distances are provided in Table 5.2.2-11, for each of the movable bridges. In all cases, impact contours, as measured from the center of each bridge, were not large enough to intersect any noise-sensitive land uses. Therefore, no additional noise impacts were identified by this supplemental bridge noise impact assessment.

**Table 5.2.2-11  Impact Contour Distances (feet)**

| | | Category 1 | | Category 2 | | Category 3 | |
|---|---|---|---|---|---|---|---|
| **Bridge** | **County** | Moderate Impact | Severe Impact | Moderate Impact | Severe Impact | Moderate Impact | Severe Impact |
| St. Lucie River | Martin | 230 | none | 55 | none | none | none |
| Loxahatchee River | Palm Beach | 215 | none | 60 | none | none | none |
| New River | Broward | 225 | none | none | none | none | none |

**Table 5.2.2-12  Noise Levels and Impacts from Warning Horns (dBA, Ldn)**

| Category | Existing Noise Level | Project Noise Level | Impact Criteria | | Impact Category | Total Noise Level | Noise Level Increase | # of Impacts | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Mod. | Sev. | | | | Mod. | Sev. |
| St Lucie River Bridge | | | | | | | | | |
| 1 | 66 | 66 | 62 | 67 | Moderate | 69 | 2.8 | 0 | 0 |
| 2 | 74 | 62 | 65 | 72 | No Impact | 75 | 1.6 | 0 | 0 |
| 3 | 66 | 66 | 67 | 72 | No Impact | 69 | 2.8 | 0 | 0 |
| Loxahatchee River Bridge | | | | | | | | | |
| 1 | 67 | 66 | 62 | 68 | No impact | 70 | 2.5 | 0 | 0 |
| 2 | 75 | 62 | 65 | 73 | No impact | 76 | 1.3 | 0 | 0 |
| 3 | 67 | 66 | 67 | 73 | No Impact | 70 | 2.5 | 0 | 0 |
| New River Bridge | | | | | | | | | |
| 1 | 65 | 65 | 61 | 66 | No impact | 68 | 3.1 | 0 | 0 |
| 2 | 72 | 60 | 65 | 71 | No impact | 74 | 2.1 | 0 | 0 |
| 3 | 65 | 65 | 66 | 71 | No Impact | 68 | 3.1 | 0 | 0 |

AAF-AR0004957

Comments on the DEIS questioned whether there would be additional noise impacts at the curve north of the St. Sebastian River Bridge in Brevard County. With respect to operations-based noise impacts, the current analysis presented in this FEIS is sufficient and conservative enough to capture hypothetical impacts that may result from the proposed double-tracking north of the St. Sebastian Bridge. North of the bridge, mainline conditions (i.e. no warning horn) predominate; therefore, no impacts are anticipated based on the comparison of proposed passenger train noise to existing freight train noise. Furthermore, the expected track offset is less than 30 feet from its current location. The properties immediately adjacent to the track on the east side are included in the unmitigated Category 2 impacts documented in the DEIS, and the next closest row of residential parcels is approximately 150 feet from the current severe impact contour (see Figure 5-17, Appendix 5.2.2-A2). Because of this distance, these properties would not experience noise impacts.

**Phase I - West Palm Beach – Miami**

The 2012 EA for the WPB-M Corridor included an evaluation of operational noise and vibration, noise and vibration associated with stations, and station traffic (2012 EA Section 3.1.7.3). The analysis found that there were no noise-sensitive receptors within 500 feet of the proposed station sites and, therefore, station noise would be negligible. The traffic noise impacts associated with traffic changes around the proposed stations were evaluated for 2012 (existing) and 2035 (future) conditions. The analysis found that no traffic noise impacts would be caused by traffic increases around the proposed stations. Adding passenger trains on the WPB-M Corridor (with the use of wayside horns to reduce noise at grade crossings) would have moderate adverse impacts to 199 residential and six institutional receptors, and severe noise impacts to four residential receptors.

As noted above, AAF conducted an analysis in order to determine possible impacts resulting from increased use of warning horns on the New River Bridge (Broward County). The noise analysis results are provided in Table 5.2.2-12. These tables provide noise levels and level of impact for Category 1, 2 and 3 land uses, while resulting impact contour distances are provided in Table 5.2.2-11. Impact contours, as measured from the center of the bridge, were not large enough to intersect any noise-sensitive land uses. Therefore, no additional noise impacts were identified by this supplemental bridge noise impact assessment.

***Summary***

The distances to potential impact have been used to create noise contours and to identify the number of potential impacts. Appendix 5.2.2-A1 shows the noise impact contours along the corridor for all alternatives. Table 5.2.2-13 shows a summary of the total number of impacted parcels for each corridor and alternative. There would be no noise impact in the MCO Segment. Along the E-W Corridor, noise impacts would be the same for the three alignments, Alternatives A, C, and E. There would be 105 moderate and four severe noise impacts at residential receptors and one moderate impact at a Category 1 (quiet) receptor. Along the N-S Corridor, the Project would have no permanent noise impacts as a result of the use of wayside horns. Phase I evaluated in the 2012 EA would add 199 moderate and four severe residential impacts, and six moderate institutional impacts. FRA found, in the 2013 FONSI, that this would not constitute a significant adverse impact. The analysis of noise impacts associated with the moveable bridges found no adverse noise impacts associated with the increase in bridge closing horns.

AAF-AR0044958

**Table 5.2.2-13  Summary of Noise Impacts (number of parcels)**

| Corridor Segment | Category 1 (Quiet) | | Category 2 (Residential) | | Category 3 (Institutional) | |
|---|---|---|---|---|---|---|
| | Moderate | Severe | Moderate | Severe | Moderate | Severe |
| MCO | 0 | 0 | 0 | 0 | 0 | 0 |
| East-West | 1 | 0 | 105 | 4 | 0 | 0 |
| North-South | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | **1** | **0** | **105** | **4** | **0** | **0** |
| West Palm Beach to Miami | 0 | 0 | 199 | 4 | 6 | 0 |
| **Totals** | **1** | **0** | **304** | **8** | **6** | **0** |

Source: AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. AAF. 2012. Environmental Assessment and Section 4(f) Evaluation for the All Aboard Florida Passenger Rail Project West Palm Beach to Miami, Florida. http://www.fra.dot.gov/eLib/details/L04278. Accessed September 12, 2013.

**Vibration**

Comments on the DEIS included questions about the analysis of several soil vibration phenomena, including Rayleigh waves, Love waves, and soil liquefaction. Rayleigh waves can be slow, low-amplitude soil movements. Love waves are used to describe a particular vibration motion that is generated during earthquakes. Ground-borne vibration generated by high-speed trains are most commonly in the form of Rayleigh waves. Potential ground-borne vibration impacts, which include Rayleigh waves, are assessed in the FEIS.

With regard to soil liquefaction, research has shown that a certain vibration phenomenon can occur with "very high speed" (i.e. 200 mph+) train operations on very soft soil. Under these conditions, the wave speed of the vibration generated by the train can become faster than the soil can withstand, consequently the soil will breakdown. For example, this phenomenon has been found previously for high-speed train operations in Sweden where there is very soft soil. For the typical train speeds up to 125 mph considered for the Project, there is minimal risk of this phenomenon occurring. Regardless, the FTA and FRA do not require that this potential phenomenon be assessed during the environmental phase of the Project, as this is primarily a structural design issue. AAF would identify any associated risk potential during the design phase of the Project when soil conditions in the study area are tested. If the potential for soil liquefaction was identified, then AAF would then design system infrastructure accordingly.

***No-Action Alternative***

Under the No-Action Alternative, freight train operations would increase along the N-S Corridor, with a planned annual growth of 3 percent. This continued growth will likely result in small increases in the number of vibration events, but there would be no increase in the amplitude of vibration events since the train speeds would not be expected to change. Therefore, there would be no vibration impact associated with the No-Action Alternative.

AAF-AR0044959

### Action Alternatives A, C, and E

New passenger rail service along the MCO Segment and E-W Corridor, and addition of passenger rail service to the N-S Corridor, has the potential to cause vibration impacts. Along the N-S Corridor, there is a potential for impact due to the increase in the number of train events. The analysis demonstrates that there would be no differences in vibration impacts among Alternatives A, C, and E.

#### MCO Segment

Along the MCO Segment, ground-borne vibration levels were estimated based on average operating speeds of the trains. There would be no potential vibration impacts along the MCO Segment (Table 5 in Appendix 5.2.2-C).

#### East-West Corridor

Along the E-W Corridor, ground-borne vibration levels were estimated based on average operating speeds of the trains and whether the track was at-grade or on elevated structure. There are 13 locations along the E-W Corridor where the proposed alignment would be elevated. Vibration levels associated with trains on elevated structures are approximately 10 VdB lower than for at-grade trains.

As shown in Table 5.2.2-13, the Project would result in vibration impacts to 118 residential properties and 12 institutional properties (Tables 6 through 8 in Appendix 5.2.2-C).

| Table 5.2.2-13  Summary of Vibration Impacts | | | | | |
|---|---|---|---|---|---|
| | Corridor | | | | |
| Land Use Category | MCO Segment | East-West | North-South | WPB-M | Total |
| Category 1 (highly sensitive) | 0 | 0 | 0 | 0 | 0 |
| Category 2 (residential) | 0 | 118 | 3,317 | 0 | 3,435 |
| Category 3 (institutional) | 0 | 12 | 513 | 0 | 525 |
| Concert Halls | 0 | 0 | 0 | 0 | 0 |
| TV Studios | 0 | 0 | 3 | 0 | 3 |
| Recording Studios | 0 | 0 | 3 | 0 | 3 |
| Auditoriums | 0 | 0 | 9 | 0 | 9 |
| Theaters | 0 | 0 | 3 | 0 | 3 |
| Total | 0 | 130 | 3,848 | 0 | 3,978 |

Source: AMEC. 2013c. *Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida.* July 2013. Report.

AAF-AR0044960

**North-South Corridor**

Ground-borne vibration levels already exceed the FRA criteria along the N-S Corridor due to the frequency and nature of current freight operations. FRA guidance for assessing project impacts along such "heavily used rail corridors" (more than 12 trains per day) states that additional impact would occur if the project approximately doubled the number of trains (FRA 2012a). For the Project, although vibration levels would not increase from the passenger trains, the frequency of events will approximately double. Appendix 5.2.2-C summarizes distances to vibration impact and the number of impacts by county for the N-S Corridor. Impact contours are also illustrated in Appendix 5.2.2-A2.

As shown in Table 5.2.2-13, the Project would result in minor vibration impacts to 3,317 residential receptors and 513 institutional receptors, as well as 18 other vibration-sensitive land uses (TV studios, recording studios, auditoriums, and theaters). Vibration levels at all receptors will be less than 100 VdB, the threshold for minor structural damage to fragile buildings, and therefore vibration is not anticipated to cause structural damage to buildings.

**Phase I - West Palm Beach – Miami Corridor**

The 2012 EA included an evaluation of operational vibration along the WPB-M Corridor, and vibration associated with stations (2012 EA Section 3.1.7.3). The analysis concluded that none of the residential or institutional buildings in the Project Study Area would experience levels exceeding the FTA limits for ground borne vibration or ground borne noise.

***Summary***

The greatest potential for vibration impact is along the N-S Corridor due to the increase (approximately doubling) of vibration events as a result of adding passenger train service to the existing freight operations. There is no potential vibration impact along the MCO Segment. Along the E-W Corridor, vibration impacts would be the same for each of the three alignments, Alternatives A, C, and E. There is the potential for vibration impact at 118 Category 2 and 12 Category 3 receptors. Along the N-S Corridor, there would be potential vibration impact at a total of 3,317 Category 2 receptors, 513 Category 3 receptors, three TV studios, three recording studios, nine auditoriums, and three theatres. Vibration levels at all receptors will be less than 100 VdB, the threshold for minor structural damage to fragile buildings, and therefore vibration is not anticipated to cause structural damage to buildings.

**5.2.2.3    Indirect and Secondary Impacts**

The Project is not anticipated to cause any specific growth or development that could increase noise or vibration conditions in the Project Study Area. There would be no indirect or secondary impacts associated with Phase II of the Project. The Phase I, 2012 EA considered the indirect and secondary effects associated with the three new stations and station-area development, and found that there were no traffic noise impacts associated with this development (Section 3.1.7.3).

AAF-AR0044961

#### 5.2.2.4    Temporary Construction-Period Impacts

**Construction Noise**

Constructing the Project could cause short-term noise and vibration impacts from construction activities. Potential impact from construction noise has been assessed according to FTA guidelines to screen for potential construction noise impacts. Table 5.2.2-14 presents the FTA criteria based on 1-hour $L_{eq}$ limits at residential, commercial and industrial land uses.

| Table 5.2.2-14  Construction Noise Impact Criteria | | |
|---|---|---|
| | One-Hour $L_{eq}$ | |
| Land Use | Day (7:00 AM-10:00 PM) | Night (10:00 PM -7:00 AM) |
| Residential | 90 | 80 |
| Commercial | 100 | 100 |
| Industrial | 100 | 100 |

Source:  Federal Transit Administration. 2006. *Transit Noise and Vibration Impact Assessment*. USDOT Report Number FTA-VA-90-1003-06, May 2006.

In addition to FRA construction noise impact criteria, various local noise ordinances apply to the Project construction. In general, each county enforces noise limits that are based on time of day and surrounding land use. Each county prohibits general nighttime construction. However, provisions are in place within the local ordinances to allow for temporary exemptions to these limitations, provided that proper permits are obtained prior to construction. In all cases, it will be the responsibility of AAF to apply for all applicable local permits prior to construction. Applicable county noise ordinances include:

- Orange County – Code of Ordinances. Part II – Orange County Code. Chapter 15 – Environmental Control. Article V. Noise Pollution Control (Orange County, Florida 2013).

- Brevard County – Code of Ordinances. Chapter 62 Land Development Regulations. Sec. 62-2271 (Brevard County, Florida 2012).

- Indian River County – Code of Ordinances. Chapter 974. Section 974.04(2) (Indian River County, Florida 2012).

- St. Lucie County – Code of Ordinances. Chapter 1-13.8 Noise Control. Sec. 1-13.8-19(n) (St. Lucie County, Florida 2009).

- Martin County – County Code and Ordinances. Ordinance No. 531. Section 5B: Specific Noise Prohibitions (Martin County, Florida 2012).

- Palm Beach County – Unified Land Development Code. Article 5 – Supplementary Standards. Supplement No. 14 (Palm Beach County, Florida 1992).

AAF-AR0044962

Two main categories of construction activity were assumed for the construction noise impact assessment: bridge construction and non-bridge construction (that is, track construction). The primary difference between the categories is the presence or absence of pile drivers, one of the noisiest pieces of construction equipment commonly used for rail projects. Table 5.2.2-15 presents a summary of the construction noise impacts within the distances to potential impact. The construction impacts in Palm Beach, Broward and Miami-Dade counties would result from bridge construction, particularly from pile-driving activities.

| Table 5.2.2-15  Summary of Construction Noise Impacts – Project | | | | | | |
|---|---|---|---|---|---|---|
| | Category 1 | | Category 2 | | Category 3 | |
| County | Bridge | Non-Bridge | Bridge | Non-Bridge | Bridge | Non-Bridge |
| **Day Construction** | | | | | | |
| **E-W Corridor** | | | | | | |
| Orange - Alternative A | 0 | 0 | 1 | 0 | 0 | 3 |
| Orange - Alternative C | 0 | 0 | 1 | 0 | 0 | 3 |
| Orange - Alternative E | 0 | 0 | 1 | 0 | 0 | 4 |
| Brevard | 0 | 0 | 34 | 0 | 0 | 0 |
| **N-S Corridor** | | | | | | |
| Brevard | 0 | 0 | 17 | 618 | 0 | 0 |
| Indian River | 0 | 0 | 0 | 86 | 0 | 0 |
| St. Lucie | 0 | 0 | 4 | 523 | 0 | 0 |
| Martin | 0 | 0 | 25 | 194 | 0 | 0 |
| **WPB-M Corridor** | | | | | | |
| Palm Beach | 0 | 0 | 34 | 0 | 3 | 0 |
| Broward | 0 | NA | 60 | NA | 3 | NA |
| Miami-Dade | 0 | NA | 18 | NA | 6 | NA |
| **Totals** | 0 | 0 | 195 | 1,421 | 12 | 10 |
| | | | | | | |
| **Night Construction** | | | | | | |
| **E-W Corridor** | | | | | | |
| Orange - Alternative A | 0 | 0 | 43 | 0 | 0 | 3 |
| Orange - Alternative C | 0 | 0 | 19 | 0 | 0 | 3 |
| Orange - Alternative E | 0 | 0 | 3 | 0 | 0 | 4 |
| Brevard | 0 | 0 | 128 | 111 | 0 | 0 |
| **N-S Corridor** | | | | | | |
| Brevard | 0 | 0 | 135 | 1149 | 0 | 0 |
| Indian River | 0 | 0 | 0 | 223 | 0 | 0 |
| St. Lucie | 0 | 0 | 24 | 830 | 0 | 0 |
| Martin | 0 | 0 | 236 | 646 | 0 | 0 |
| **WPB-M Corridor** | | | | | | |
| Palm Beach | 0 | 0 | 153 | 608 | 0 | 0 |
| Broward | 0 | NA | 231 | NA | 3 | NA |
| Miami-Dade | 0 | NA | 23 | NA | 6 | NA |
| **Totals** | 0 | 0 | 995 | 3,567 | 9 | 10 |

Source:  AMEC. 2013c. Technical Memorandum No. 5, Noise and Vibration for the All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida. July 2013. Report.

AAF-AR0044963

For Phase I, the analysis presented in Section 3.1.7.3 of the 2012 EA established that the Project would result in construction noise impacts as shown in Table 5.2.2-15. Table 5.2.2-14 shows that nighttime construction of the seven bridges over waterways in the WPB-M Corridor would result in daytime and nighttime noise impacts to residential and institutional properties in proximity to the bridges.

**Table 5.2.2.16   Summary of Construction Noise Impacts –West Palm Beach to Miami Corridor (Excluding Bridges)**

| County | Category 1 | Category 2 | Category 3 |
|---|---|---|---|
| **Day Construction** | | | |
| Palm Beach | 0 | 1 | 0 |
| Broward | 0 | 0 | 0 |
| Miami-Dade | 0 | 0 | 0 |
| **Night Construction** | | | |
| Palm Beach | 0 | 373 | 0 |
| Broward | 0 | 94 | 0 |
| Miami-Dade | 0 | 133 | 0 |
| **Total** | | | |
| Palm Beach | 0 | 374 | 0 |
| Broward | 0 | 94 | 0 |
| Miami-Dade | 0 | 133 | 0 |

Source:  AAF. 2012. Environmental Assessment and Section 4(f) Evaluation for the All Aboard Florida Passenger Rail Project West Palm Beach to Miami, Florida. http://www.fra.dot.gov/eLib/details/L04278. Accessed September 12, 2013.

**Construction Vibration**

The distances to potential structural damage from pile driving operations are 50 feet for reinforced concrete, steel or timber structures and up to 135 feet for extremely vibration-sensitive structures. The distance to potential structural damage from a large bulldozer does not extend beyond the typical working clearance of the bulldozer to structures. No structures are present within 50 feet of the Project; therefore there would be no potential construction vibration impacts for structural damage.

On the E-W Corridor, pile driving would potentially result in 143 residential and 41 institutional vibration impacts for human annoyance. Large bulldozer construction would potentially result in 83 residential and 12 institutional impacts. On the N-S Corridor, pile driving would potentially result in 693 residential and 61 institutional vibration impacts for human annoyance. The use of large bulldozers would potentially impact four highly sensitive land uses, 1,551 residential land uses, and 217 institutional properties, as well as one auditorium. Tables 14-17 in Appendix 5.2.2-C summarize the distances to potential vibration impact for human annoyance for pile driving and a large bulldozer, and the number of structures that would be impacted in the E-W Corridor and N-S Corridor.

For Phase I, Section 3.1.7.4 of the 2012 EA stated that neither impacts nor damage from construction vibration are anticipated as a result of the Project.

AAF-AR0044964

### 5.2.2.5    Summary

The Project (Phase II) is anticipated to result in four severe and 105 moderate noise impacts to residential and institutional receptors in the absence of mitigation. The Project includes the use of stationary wayside horns at certain grade crossings, replacing locomotive-mounted horns, to minimize noise impacts. The Project would also result in vibration impacts to 3,978 receptors. In total, noise from the Project would affect 304 receptors at a moderate level and 11 receptors at a severe level, in the absence of mitigation.

## 5.2.3    Farmland Soils

The Farmland Protection Policy Act (FPPA) (7 USC Chapter 73) limits the conversion of significant agricultural lands to non-agricultural uses as a result of federal actions. The determination of whether or not farmlands are subject to FPPA requirements is based on soil type; the land does not have to be actively used for agriculture.

The Project would result in a loss of prime and unique farmlands within the E-W Corridor. The total disturbed area would comprise a negligible percent of the farmland in Orange and Brevard Counties (AAF and NRCS 2013). The locations of the E-W Corridor alternative alignments within or proximate to the existing SR 528 corridor ensure that losses of prime or unique farmland soils and farm operations would be limited to the margins of active or potential agricultural areas. Farmland impacts would be the same for Alternatives C and E, and slightly less for Alternative A. Implementing any of the alternatives would not result in significant adverse impacts to farmlands.

### 5.2.3.1    Methodology

Part I of the *Farmland Conversion Impact Rating for Corridor Type Projects* and *Farmland Conversion Impact Rating* forms were completed and submitted to NRCS on June 10, 2013 for the MCO Segment, E-W Corridor, and the N-S Corridor. Farmlands with any level of designation by the NRCS were identified and mapped relative to the Project (Figure 4.2.3-1).

### 5.2.3.2    Environmental Consequences

Impacts to prime farmland and unique farmland areas were defined and quantified based on a construction footprint of 60 or 100 feet in width, depending upon the Action Alternative alignment. This section describes the direct effects to soils, prime farmlands, and unique farmlands anticipated from constructing and operating the Project.

**No-Action Alternative**

Under the No-Action Alternative, the Project would not be constructed. The Project Study Area as it exists today would remain the same with no development or construction changes relevant to the Project. In the No-Action Alternative, there would be no impacts, adverse or otherwise, to soils or farmlands.

AAF-AR0044965

## Alternative A

Alternative A consists of the MCO Segment (including the VMF), E-W Corridor Alternative A, and the N-S Corridor. Direct effects to each of these areas are discussed below.

### MCO Segment

The MCO Segment, including the VMF, does not contain any prime or unique farmland areas so there will be no impacts to this resource.

### East-West Corridor

Constructing E-W Corridor Alternative A would result in the loss of 19.3 acres of prime farmland and unique farmland soils.

### North-South Corridor

The N-S Corridor is not subject to the FPPA because, according to the NRCS, the corridor's existing right-of-way was purchased before August 4, 1984 and no farmland is being converted to non-agricultural use. The N-S Corridor does not contain any prime or unique farmlands, so there would be no impacts to these resources.

### Phase I - West Palm Beach – Miami Corridor

The southern section of the passenger rail service, from West Palm Beach to Miami, would not impact mapped farmland soils. As stated in Section 3.0 of the 2012 EA, the WPB-M Corridor is not subject to the FPPA because, according to the NRCS, the corridor's existing right-of-way was purchased before August 4, 1984 and no farmland is being converted to non-agricultural use. The WPB-M Corridor does not contain any prime or unique farmlands, so there would be no impacts to these resources.

## Alternative C

Alternative C consists of the MCO Segment (including the VMF), E-W Corridor Alternative C, and the N-S Corridor. Direct effects to farmland soils within the MCO Segment and the N-S Corridor would be identical to Alternative A. Within the E-W Corridor, Alternative C would result in direct conversion of 31.8 acres of mapped prime and unique farmland soils.

## Alternative E

Alternative E, the preferred alternative, consists of the MCO Segment (including the VMF), E-W Corridor Alternative E, and the N-S Corridor. Direct effects to farmland soils within the MCO Segment and the N-S Corridor would be identical to Alternative A. Within the E-W Corridor, Alternative E would result in the conversion of 31.8 acres of mapped prime and unique farmland soils.

AAF-AR0044966

**Summary of Direct Impacts**

Impacts to prime and unique farmland soils from constructing the Project are limited to the E-W Corridor for all three alternatives. The direct effects to soils from the No-Action and three Action Alternatives are summarized in Table 5.2.3-1. The relative value for agricultural production of the farmland to be converted (as determined by NRCS and described below) by the Project compared to the relative value of other farmland in the area (for example, the average relative value for the proposed site) is also provided in Table 5.2.3-1.

| Table 5.2.3-1 | Summary of Soil and Farmland Losses for the No-Action and Build Alternatives (acres) | | | |
|---|---|---|---|---|
| **Soil/Farmland Characteristic** | **No-Action** | **Alternative A** | **Alternative C** | **Alternative E** |
| Total acres of prime and unique farmland converted | 0 | 19.3 | 31.8 | 31.8 |
| Relative value of farmland (out of 100)[1] | 0 | 46.9 | 46.9 | 46.7 |
| Percentage of farmland in county with same or higher relative value | 0 | 18.7 | 18.7 | 18.7 |
| Total points | 0 | 77.9 | 81.9 | 81.7 |

Source: AAF and Natural Resources Conservation Service (NRCS). 2013. *Farmland Conversion Impact Rating for Corridor Type Projects.* June 7, 2013.

AAF, in accordance with the FPPA, has completed USDA's NRCS Farmland Conversion Impact Rating (NRCS Form AD 1006). These Forms (provided in Appendix 5.2.3) were submitted to NRCS and were completed by NRCS and returned on June 12, 2013. In completing the AD 1006 Form, NRCS conducted a two-part evaluation of each alignment alternative, consisting of an assessment of the relative value of the potentially impacted farmland and an overall site assessment. An overall score is calculated (out of 260 points) of the relative value of farmland to be converted. Sites most suitable for protection under these criteria receive the highest total scores, and sites least suitable receive the lowest scores. Sites where the total points equal or exceed 160 must consider alternative actions, such as alternative sites, modifications, or mitigation. According to the results of the NRCS evaluation and as shown in Table 5.2.3-1, none of the alignment alternatives exceed the 160-point threshold: Alternative A received a total of 77.9 points, Alternative C 81.9 points and Alternative E 81.7 points. These low scores indicate no significant adverse impact to farmland soils.

### 5.2.3.3    Temporary Construction-period Impacts

Temporary impacts are those that occur in association with construction related activities and cease following the completion of construction. Temporary impacts to farmland soils would occur where areas of farmland soils would be used for construction staging, construction access, or other temporary occupancy of farmland. The impacts on farmland soils could include soil compaction in staging and traffic areas, dust generation, and erosion. Vehicle and heavy equipment use, as well as storing heavy materials, can compact the soils. Compaction reduces the transmission of air and water into the soil, increases runoff, and makes vegetation establishment more difficult. Construction activities remove the vegetation coverage and root structure that helps to maintain the soil. These exposed soils are more susceptible to

AAF-AR0044967

loss from wind as dust or being eroded by rain and stormwater runoff. The Project is not anticipated to have a temporary adverse impact on farmland soils as there are no construction staging or access areas proposed within areas of mapped farmland soils.

## 5.2.4    Hazardous Materials and Solid Waste Disposal

This section describes the potential impacts that may occur as the result of existing or potential releases and regulated materials in the Project Study Area. Constructing the Project has the potential to encounter contaminated soils or groundwater, or to require the removal of waste material such as railroad ties, creosote-treated bridge timbers, or demolition material, as described below. The potential impacts of Alternatives A, C, and E would be the same. The Project would not generate hazardous materials or solid waste. Implementing the Action Alternatives would not change the potential for indirect effects along the N-S Corridor, as there is no anticipated change in frequency or quantity of hazardous materials transported by freight.

### 5.2.4.1    Methodology

Risk ratings were assigned to every contamination site identified within the Environmental Data Management Inc. (EDM) reports. Sites were identified as "No," "Low," "Medium" or "High" risk indicating the degree for potential contamination related impacts to the Project. Risk ratings were assigned according to the criteria outlined in the FDOT PD&E Guidelines summarized in Section 4.2.4.

### 5.2.4.2    Environmental Consequences

This section identifies the potential impacts that may occur as the result of existing or potential releases and regulated materials in the Project Study Area. Direct, indirect, and secondary effects were characterized by comparing each alternative with the locations and nature of the areas of concern (potential and confirmed sources of subsurface contamination and/or waste materials).

Direct effects are defined as immediate consequences to the environment as a result of the implementation of the alternatives. As used in this section, a direct effect would occur if construction of an alternative encountered contaminated soils or groundwater. In comparison to the Action Alternatives, the No-Action Alternative is expected to encounter relatively inconsequential amounts of contaminated soils or groundwater or generate relatively inconsequential amounts of solid waste during routine subsurface maintenance activities, if conducted in the vicinity of a release

#### No-Action Alternative

Under the No-Action Alternative, the Project would not be constructed. The Project Study Area as it exists today would remain the same with no development or construction changes relevant to the Project. Existing contaminated sites within the Project Study Area would continue to be addressed in accordance with the regulatory framework. Potentially contaminated sites not previously identified would not be assessed or mitigated without the implementation of the Project.

AAF-AR0044968

**Action Alternatives A, C, and E**

The Action Alternatives have the potential to encounter contaminated soils or groundwater, or to require the removal of waste material such as railroad ties, creosote-treated bridge timbers, or demolition material, as described below. The potential impacts of Alternatives A, C, and E would be similar.

*MCO Segment*

A total of 27 potentially contaminated sites were reported by EDM within the 500-foot detailed evaluation area for the MCO Segment (including the VMF) on the GOAA property. However, the site location information provided by EDM did not appear to accurately represent specific site locations. GOAA maintains environmental records for known contaminated areas within the airport property and reviewed the EDM data. GOAA reported that no contaminated sites were located within 500 feet of the Project. All EDM-mapped sites are included in the database summary included as Appendix 5.2.4.

*East-West Corridor*

Sixteen potentially contaminated sites were within the 500-foot detailed evaluation area for the E-W Corridor. Construction activities along the E-W Corridor are anticipated to involve subsurface work and may include underground utility installations and stormwater pond construction. However, potentially contaminated sites identified for the E-W Corridor were outside the planned construction areas and impacts from the existing contaminated areas are not anticipated. The E-W Corridor may also require limited property acquisition of undeveloped properties adjacent to the SR 528 right-of-way. Prior to property acquisition, further assessment may be conducted to determine if contamination is present and to identify any regulatory obligations and associated cost premiums as a result of contamination that could be present on these properties.

*North-South Corridor*

A total of 337 potentially contaminated sites were identified within the 200-foot detailed evaluation area along the 128.5-mile N-S Corridor. However, the proposed work for this portion of the Project is anticipated to be completely within the existing FECR Corridor and would result in minimal subsurface disturbance. Impacts from existing contaminated areas are not anticipated. Any contamination that is discovered in the existing FECR Corridor and associated structures as a result of current or historical usage will be managed in accordance with applicable federal, state and local law or regulations.

*Phase I - West Palm Beach – Miami Corridor*

According to information provided in Section 3.3.6 of the 2012 EA, there are 199 Low Risk sites; 13 Medium Risk sites; and 14 High Risk sites along the WPB-M Corridor. Preliminary subsurface investigations to establish the presence of soil or groundwater contamination will be conducted prior to construction activities for sites receiving a High or Medium risk ranking that may be impacted by acquisition, drainage features, underground utilities, or dewatering activities.

AAF-AR0044969

### 5.2.4.3    Indirect and Secondary Impacts

An indirect effect related to subsurface contamination or waste materials management would exist if an alternative has the potential to impact ongoing remediation of known releases, would produce additional sources of subsurface contamination or waste materials following construction, or would transport waste to another site. The scope and magnitude of the indirect effects for each Action Alternative would be generally the same, as described below. No indirect effects were identified below for the No-Action Alternative. A secondary effect related to subsurface contamination or waste materials management would exist if an alternative has the potential to cause an impact in another time or place. Some commenters on the DEIS asked about the potential for derailments or accidents to result in spills or fuel or other contaminants. Spills from derailments and accidents are rare events, and any spills would be handled through existing safety, containment, and clean-up procedures.

**No-Action Alternative**

The No-Action Alternative could potentially result in indirect impacts associated with spills from freight trains. Freight trains traveling along the N-S Corridor are currently equipped to haul hazardous materials and will continue to do so. Although there is no set schedule, hazardous materials are transported on an average of once per week. Table 5.2.4-1 contains a list of hazardous materials hauled by freight trains along the FECR Corridor.

| Table 5.2.4-1    Hazardous Materials Currently Transported on FECR Corridor | | |
|---|---|---|
| Liquid Propane Gas | Rocket Motors | Chemicals not elsewhere classified |
| Ethanol | Potassium Chloride | Phosphoric Acid |
| Sodium Hydroxide/Caustic Soda | Carbon Dioxide | Explosives |
| Alcohol in Bond | Ammonium Polyphosphate | Methanol |
| Hydrogen Chloride | Sulfur Dioxide | Pesticide/Chemicals not elsewhere classified |
| Bleach-Sodium Hypochlorite | Fuel Oil | Tail Oil Pitch |
| Ammonium Nitrate | | |

Source: AMEC. 2013f. Technical Memorandum No. 6: Contaminated Sites Evaluation for the All Aboard Florida Passenger Rail
    Project from Orlando to Miami, Florida. Report.

**Action Alternatives A, C, and E**

Implementing the Action Alternatives would not change the potential for indirect effects along the N-S Corridor, as there is no anticipated change in frequency or quantity of hazardous materials transported by freight. The proposed VMF has the potential for spills and soils or groundwater contamination. Planned operations at the VMF, such as vehicle fueling, maintenance and repair, and washing, would include use of hazardous materials (primarily petroleum products, lubricants, and degreasers). The Project would not include use or storage of hazardous materials outside the VMF. The typical materials that would be stored and used at the VMF include diesel fuel, motor oils, lubricants, and degreasers. Table 5.2.4-2 provides an inventory of the typical materials stored at existing VMF facilities and is considered representative of the types and quantities of hazardous materials that are anticipated at the Project VMF.

AAF-AR0044970

**Table 5.2.4-2    Anticipated Hazardous Products Storage at the VMF – Above-ground Storage Tanks (ASTs)**

| Capacity | Quantity | Contents |
|---|---|---|
| 10,000-gallon AST[1] | 2 | Diesel Fuel |
| 500-gallon AST | 1 | Gasoline |
| 250-gallon AST | 1 | Conventional Oil |
| 250-gallon AST | 1 | Hydraulic Oil |
| 250-gallon AST | 1 | Waste Oil |

Source:  AAF
1          AST = aboveground storage tank

All hazardous products would be stored at the VMF in double-walled storage containers or double-walled above-ground storage tanks (ASTs). Hazardous materials would be used and stored according to accepted industry BMPs. Planned operations at the VMF are similar to operations currently ongoing at MCO and are considered minor in respect to the overall operations and land use at the airport.

The Project could result in off-site disposal of construction materials. During construction, contaminated materials and regulated waste would require disposal at off-site facilities including landfills, recycling centers, and treatment/asphalt batch plants. If not handled properly, the disposal of these materials could potentially cause soil, groundwater, or air contamination at these facilities or during transport to them. Regional facilities for disposing of construction debris, contaminated materials and regulated waste have sufficient capacity to dispose of the anticipated volume of material.

The Project would include only passenger trains along the E-W Corridor. Freight trains would not operate over the E-W Corridor. With the exception of on-board fuel, lubricants, and relatively small quantities of materials required for operation of the passenger trains, there would be no hazardous material transportation associated with passenger trains, or along the E-W Corridor, associated with the Project.

### 5.2.4.4    Temporary Construction-Period Impacts

Construction requirements and methodology for the proposed system upgrades within the FECR Corridor will result in minimal subsurface disturbance; consequences to existing contaminated areas are not anticipated. Construction impacts will be minimized through the avoidance of areas of known or suspected contamination during the design of the drainage, lighting, and foundations. Contamination areas will be verified prior to construction and remedial actions will be developed and implemented to further minimize consequences if necessary. Any contaminated or hazardous wastes encountered through ground-disturbing activities during construction for any of the alternatives will be handled and disposed of in accordance with applicable regulatory requirements. If potentially contaminated sites cannot be avoided through project engineering all applicable state and federal laws will be followed to minimize impacts.

In the event that construction activities occur in or near contaminated areas, a Phase II investigation may need to be conducted. If subsurface activities impact contaminated sites and cannot be avoided, technical special provisions such as Remedial Action Plans would be developed as part of the Phase II investigation. If contamination is identified prior to construction, remedial actions can be implemented to minimize

AAF-AR0044971

impacts. Any contaminated or hazardous wastes encountered through ground-disturbing activities during construction would be handled and disposed in accordance with regulatory requirements.

For dewatering activities, potentially contaminated sites within a 500-foot radius of the construction site will need to be re-evaluated and addressed before applying for a dewatering permit to avoid potentially exacerbating a contaminant plume, and to determine proper groundwater management for such sites.

Construction activities have the potential to generate new releases/spills as a result of the storage and use of hazardous materials such as diesel fuel, gasoline, hydraulic oil, and lubricating oils associated with the construction equipment, storage tank removal, and pipeline relocation activities. New underground storage tanks (UST) and ASTs would be installed as part of the construction of any of the Action Alternatives, including an expanded tank farm at the airport. AAF would construct new facilities in accordance with all applicable regulations, and a new Spill Prevention, Control, and Countermeasure Plan would be implemented to reduce the risk of accidental releases.

The Project would generate construction and demolition debris such as used railroad ties, creosote-treated bridge timbers, steel rail, excess soil, rock, organic material, asphalt, concrete, or wood. All construction and demolition debris would be handled according to federal, state, and local regulations and industry BMPs. To the extent practical, materials would be recycled. Debris that requires disposal would be transported under applicable transportation manifests and disposed of at licensed disposal facilities.

The recommendations for mitigation measures during construction may include special waste handling, dust control, and management and disposal of contaminated soil and ground water in order to prevent construction delays and to provide adequate protection to workers and any nearby sensitive receptors. All Remedial Action Plans actions must ensure that any nearby or adjacent receptors are adequately protected and the assessment and management of contaminated media encountered during the Project would be handled in accordance with applicable federal, state, and local laws and regulations. Contaminated sites have been identified within 150 feet of the FECR right-of-way in the WPB-M Corridor and in the vicinity of the Preferred Build Station Alternatives identified in Section 3.3.6 of the 2012 EA. None of the Project elements described in the 2012 EA are anticipated to impact known contaminated or hazardous waste sites within the Project Study Area; avoidance techniques will be maximized during the design phase.

## 5.2.5    Coastal Zone Management

Under provisions of Section 307 of the Coastal Zone Management Act (CZMA), the State of Florida has authority to review any federal activity that impacts the coastal resources of Florida for consistency with the Florida Coastal Management Plan (FCMP). Federal activities subject to review include:

- Activities conducted by or on behalf of a federal government agency;

- Federal licenses or permits;

- Permits issued under the Outer Continental Shelf Lands Act for offshore minerals exploration or development; and

- Federal assistance to state and local governments (FDEP 1981).

AAF-AR0004972

The Florida State Clearinghouse coordinates the review of proposed federal activities, requests for federal funds, and applications for federal permits other than permits issued under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. Consistency reviews of federal permits issued under those Acts are conducted in conjunction with Environmental Resource Permit (ERP) applications by the FDEP or the Water Management Districts (WMDs). The FCMP provides each partner agency an opportunity to comment on the merits of the proposed action, address concerns, make recommendations and state whether the Project is consistent with its statutory authorities under the FCMP. Regional planning councils and local governments also may participate in the federal consistency review process by advising the Florida Department of Economic Opportunity (DEO) on the local and regional effect of proposed federal actions. In the event a state agency determines a proposed federal activity is inconsistent, the agency must identify the statute with which the activity conflicts and provide alternatives for the project to maintain consistency with the FCMP.

As the designated lead coastal agency for the state, FDEP communicates the agency comments and the final consistency decision of the state to federal agencies and applicants for all actions other than permits issued under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. The consistency decisions on those permits are made through the approval or denial of the ERP issued under Chapter 373, Part IV, FS. Federal consistency is the requirement that federal actions that impact any land or water use or natural resource of a state's coastal zone must be consistent with the enforceable policies of the state. The FCMP federal consistency process consists of a network of 24 Florida Statutes (that is, enforceable policies) administered by FDEP and a group of partner agencies responsible for implementing the statutes. Consistency is based on effects rather than geographic boundaries; consequently, there are no categorical exclusions from the consistency requirement. Any federal activity that would have an impact on a state's coastal zone is subject to a consistency review, unless specifically exempted by federal law. Impacts are determined by assessing reasonably foreseeable direct and indirect effects on any coastal use or resource.

As documented in this section, the Project is consistent with Florida's Coastal Zone Management Act. The Florida State Clearinghouse concurs with this finding, as detailed in a letter to FRA dated March 3, 2015 (FDEP, 2015).

### 5.2.5.1    Environmental Consequences

This section evaluates the direct effects to coastal resources, including coastal barrier beaches, Coastal and Aquatic Managed Areas, and natural resources within the coastal zone.

Direct effects to the "natural resources of the coastal zone" (both aquatic and marine resources) will result from all elements of the Project, including construction of the VMF, bridge and rail construction along the E-W Corridor, and bridge construction along the N-S Corridor. A full discussion of the impacts on these resources is provided in the appropriate sections of this EIS. Portions of the N-S Corridor are within or adjacent to Coastal and Aquatic Managed Areas identified in Section 4.2.5. Bridge construction/ reconstruction would impact small areas of aquatic resources within the Indian River and the Jensen Beach-Juniper Inlet Aquatic Reserve. Coastal barrier resources are associated with unconsolidated shorelines and are on the east side of the Intracoastal Waterway; therefore, none of the WPB-M Corridor Project elements (which are west of the Intracoastal Waterway) considered in the 2012 EA would impact any coastal barrier resources.

AAF-AR0044973

### 5.2.5.2    Indirect and Secondary Impacts

The Project is not anticipated to result in direct impacts to coastal resources, and would not result in development or induced growth in coastal natural resources. The Project therefore would not have indirect or secondary effects to coastal natural resources or designated Coastal and Aquatic Managed Areas.

### 5.2.5.3    Draft Consistency Determination

This section provides a draft Consistency Determination under CZMA Section 307, 15 CFR part 930 Sub-part C, Chapter 380 FS, Part II, Coastal Planning and Management. This federal consistency determination addresses the proposed extension of passenger rail service from Orlando to West Palm Beach, which would include the MCO Segment, the E-W Corridor, and the N-S Corridor. Additionally, this federal consistency determination includes all in-water bridge work for the seven bridges along the 66.5-mile WPB-M Corridor (AAF 2012).[4] The FDEP, as the designated coastal agency for the state, will participate in consistency decisions on permits issued under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act through the state's ERP process. Both of these permitting processes are applicable to the Project. As documented in this section, the Project is consistent with Florida's Coastal Zone Management Act. The Florida State Clearinghouse concurs with this finding, as detailed in a letter to FRA dated March 3, 2015 (FDEP, 2015).

**No-Action Alternative**

Under the No-Action Alternative, the Project would not be constructed. Therefore, there would be no adverse impact on land or water use or natural resources of the coastal zone.

**Action Alternatives A, C, and E**

Table 5.2.5-1 documents the consistency of the Project with the FCMP. There would be no difference in consistency between the three Action Alternatives evaluated in this FEIS. The scope of each relevant statute and the Project's consistency with the provisions of the statute is provided.

As stated in the 2013 FONSI for the WPB-M Corridor, the Florida State Clearinghouse has reviewed the *South Florida East Coast Corridor Transit Analysis,* a similar project to Phase I of the WPB-M Corridor described in the 2012 EA. The South Florida project was determined to be consistent with the FCMP, and the State Clearinghouse determined that this consistency determination would be valid for the AAF project because the AAF Project Area is fully encompassed within the *South Florida East Coast Corridor Transit Analysis* area which was found to be consistent in 2006 and there have been no relevant changes in the CZMA or FCMP criteria that would affect that determination.

As documented in the following Table 5.2.5-1, the Project (all alternatives) is consistent with each of the relevant CZM statutes and standards.

---

4   This 66.5-mile rail segment was analyzed in the Environmental Assessment (EA) and Section 4(f) Evaluation for the All Aboard Florida (AAF) Passenger Rail Project West Palm Beach to Miami, Florida (2012). However, the 2012 EA did not include analysis of in-water bridge work that is contemplated as part of this Proposed Action. Therefore, that work is included as the subject of the Build Alternatives being considered herein.

AAF-AR0044974

**Table 5.2.5-1     Florida Coastal Management Program Consistency Review**

| Statute | Scope | Consistency |
|---|---|---|
| Chapter 161 *Beach and Shore Preservation* | This statute provides policies for the regulation of construction, reconstruction, and other physical activities related to the beaches and shores of the state. Additionally, this statute requires the restoration and maintenance of critically eroding beaches. | The Project would not impact beach and shore management along Florida's East Coast, specifically as it pertains to:<br>• The Coastal Construction Permit Program.<br>• The Coastal Construction Control Line Permit Program.<br>• The Coastal Zone Protection Program.<br>All construction activities associated with the N-S Corridor would occur within the existing FECR Corridor. Additionally, the E-W Corridor would not be sited on beach or dune habitat. |
| Chapter 163, Part II *Growth Policy; County and Municipal Planning; Land Development Regulation* | Requires local governments to prepare, adopt, and implement comprehensive plans that encourage the most appropriate use of land and natural resources in a manner consistent with the public interest. | The Project would be conceptually consistent with local, regional, and state comprehensive plans. No new development would occur in the towns and counties where no stations are planned. For this reason, planning consistency within these communities is irrelevant.<br>Consistency with local, regional, and state comprehensive plans has been included in the purpose and need criteria matrix used to develop the Action Alternatives. |
| Chapter 186 *State and Regional Planning* | Details state-level planning efforts. Requires the development of special statewide plans governing water use, land development, and transportation. | The Project, including the proposed mitigation measures aimed at reducing the severity of impacts to physical and biological resources, is generally consistent with the State Comprehensive Plan as adopted under Florida Statue Title 8 Planning and Development Section 187.101.<br>Specifically, the Project meets the adopted air quality, energy, urban and downtown revitalization, and transportation policies, including the following listed below:<br>• Ensure that developments and transportation systems are consistent with the maintenance of optimum air quality.<br>• Ensure emergency efficiency in transportation design and planning and increase the availability of more efficient modes of transportation.<br>• Enhance the linkages between land use, water use, and transportation planning in state, regional, and local plans for current and future designated areas.<br>• Encourage the development of mass transit systems for urban centers, including multimodal transportation feeder systems, as a priority of local metropolitan, regional, and state transportation planning.<br>The proposed rail system is also consistent with the adopted transportation goal that Florida shall direct future transportation improvements to aid in the management of growth and shall have a state transportation system that integrates highway, air, mass transit, and transportation modes.<br>Additionally, mitigation measures included as part of the Project meet the intent of Natural Systems and Recreation Lands goal that Florida shall protect and acquire unique natural habitats and ecological systems, such as wetlands, and restore degraded natural systems to a functional condition. Further, soil and water quality mitigation measures meet the intent of water resources policies directing the protection of surface and groundwater quality in the state. |

AAF-AR0044975

**Table 5.2.5-1    Florida Coastal Management Program Consistency Review (Continued)**

| Statute | Scope | Consistency |
|---------|-------|-------------|
| Chapter 186 *State and Regional Planning (contd.)* | Details state-level planning efforts. Requires the development of special statewide plans governing water use, land development, and transportation. | The Project is located within the East Central Florida and Treasure Coast regional planning council districts. The proposed rail system meets the transportation goals in the Strategic Regional Policy Plans (SRPPs) for each of these districts. This includes Policy 5.12 of the East Central Florida SRPP, which encourages that multi-modal design options should take precedence over the expansion of existing roads or the construction of new roads where feasible. It also includes Policy 7.1.3.4 of the Treasure Coast SRPP, which encourages the reduction of vehicle miles traveled per capita by private automobile within the region through a combination of means, including the expansion of commuter rail and intermodal connections. |
| Chapter 252 *Emergency Management* | Provides for planning and implementation of the state's response to, efforts to recover from, and the mitigation of natural and manmade disasters. | The Project would include the development of a passenger rail system within an existing rail corridor and along an existing highway ROW. The E-W Corridor would be located outside of the defined storm surge zones and hurricane evacuation areas for Brevard and Orange counties. Within the N-S Corridor the rail line would be located within Florida Division of Emergency Management-defined storm surge zones; however the development would occur entirely within the FECR Corridor and would be consistent with the existing transportation uses. While the proposed rail system would encourage regional connection as well as growth in the vicinity of the supporting stations, growth would be focused in previously developed areas and would be consistent with existing commercial and industrial land uses.

Consequently, the Project would not affect the state's vulnerability to natural disasters and would not affect emergency response and evacuation procedures. Further the Project would be consistent with the emergency preparedness policies within the East Central Florida and Treasure Coast SRPPs. |
| Chapter 253 *State Lands* | Addresses the state's administration of public lands and property of this state and provides direction regarding the acquisition, disposal, and management of all state lands. | The proposed rail line would be located within the privately owned FECR Corridor as well as along the SR 528 ROW. CFX is pursuing the acquisition of additional ROW along SR 528, which would affect the viability of certain E-W Corridor alternatives. E-W Corridor Alternative A would occur entirely within the SR 528 ROW; consequently, this alternative would not adversely impact state lands. Under E-W Corridor Alternative C and Alternative E would require acquisition of additional ROW easement along 14 miles of the alignments between SR 417 and SR 520. However, any impacts to public lands and property of the state outside of the existing SR 528 ROW would be mitigated by permit requirements and the implementation of standard construction BMPs. Additionally, the E-W Corridor would include bridges where necessary to avoid significant impacts to aquatic resources (wetlands, streams, and rivers) including the St. Johns River and Econlockhatchee River; some of which may include State-owned Sovereign Submerged Lands. Proposed bridges would meet U.S. Coast Guard navigational requirements and would therefore not interfere with public use of sovereign submerged lands. |

AAF-AR0044976

**Table 5.2.5-1    Florida Coastal Management Program Consistency Review (Continued)**

| Statute | Scope | Consistency |
|---|---|---|
| Chapter 258 *State Parks and Preserves* | Addresses administration and management of state parks and preserves. | The N-S Corridor is entirely within the existing FECR Corridor. Therefore, there would be no adverse impacts to state parks and preserves. E-W Corridor Alternative A would be sited within the SR 528 ROW. Although this alignment would traverse the Tosohatchee Wildlife Management Area and Canaveral Marsh Conservation Area, the proposed rail line would be located within the SR 528 ROW, which is owned by FDOT in this segment and includes wetlands that have been delineated (with the exception of the portion of the alignment identified as the Cocoa Curve). Many of the wetland boundaries have been inspected and confirmed by the USACE; however, a binding Jurisdictional Determination has not been completed at this time. The St. Johns River WMD has also inspected and confirmed these delineated wetlands. The E-W Corridor Alternatives C and E would require additional ROW acquisition along the 14-mile segment between SR 417 and SR 520. While impacts to the Tosohatchee Wildlife Management Area and Canaveral Marsh Conservation Area, located east of SR 520, would remain the same as those described for E-W Corridor Alternative A, additional area within the Hal Scott Preserve would not be affected by the development of a rail corridor to the north (outside) of the SR 528 ROW. Impacts to these state lands would be mitigated through the implementation of standard construction BMPs (e.g., erosion controls) as well as the acquisition and/or restoration of wetland habitats as required by State and Federal permit requirements. Wetland delineations have not been completed for the portions of the E-W Corridor Alternatives C and E that lie beyond the SR 528 ROW. |
| Chapter 259 *Land Acquisition for Conservation or Recreation* | Authorizes acquisition of environmentally endangered lands and outdoor recreation lands. | The Project would likely result in land acquisition for conservation purposes; compensatory mitigation would be required including the potential acquisition of environmentally endangered lands. Impacts to jurisdictional wetlands would require mitigation as required by State and Federal permits. Consequently, while the implementation of the Project would remove wetlands from the N-S and E-W Corridors, compensatory mitigation would include the potential acquisition of environmentally sensitive habitat types. |
| Chapter 260 *Florida Greenways and Trails Act* | Established in order to conserve, develop, and use the natural resources of Florida for healthful and recreational purposes. | The N-S Corridor would not impact any of the greenways and trails as defined in the Florida Greenways and Trails System Plan. The E-W Corridor would cross the St. Johns River, which is designated as a Priority Land Trail and as an Existing Trail in Priority Network to the north of the SR 528.<br><br>SR 528 crosses this area via a bridge approximately 550 feet long. For the Project, this Priority Land Trail would be bypassed via a railroad bridge, which would pass over the Priority Land Trail providing for continued trail linkage. The Project would not significantly adversely impact the trail and would generally be consistent with the strategies and goals outlined in the Greenways and Trails System Plan.<br><br>Additionally, the E-W Corridor would cross the proposed Florida Wildlife Corridor, which is envisioned to secure a connected landscape from the Everglades to Georgia. The proximity of the E-W Corridor alignment to existing SR 528 infrastructure would limit the Project's contribution to fragmentation of natural landscapes and watersheds. |

AAF-AR0044977

**Table 5.2.5-1    Florida Coastal Management Program Consistency Review (Continued)**

| Statute | Scope | Consistency |
|---|---|---|
| Chapter 267 *Historical Resources* | Addresses management and preservation of the state's archaeological and historical resources. | FRA has formally initiated the National Historic Preservation Act Section 106 consultation process with the Florida State Historic Preservation Office (SHPO) as a part of the Notice of Intent (NOI) to prepare this EIS. Additionally, FRA has separately initiated consultation with five Native American Nations. Coordination between FRA, SHPO, and Section 106 consulting parties will continue through the Project. |
| Chapter 267 *Historical Resources (contd.)* | Addresses management and preservation of the state's archaeological and historical resources. | During a 2009 SHPO meeting regarding the South Florida East Coast Corridor Study, there was agreement that the use of the historic rail line within the FECR Railway District and restoration of passenger rail on the line would not constitute an adverse effect. Consequently, the National Register of Historic Places (NRHP)-eligible FECR Railway District would not be adversely affected by the N-S Corridor. |
| | | Within the FECR Corridor, four bridges have been identified as individually eligible for listing on the NRHP under Criterion A and Criterion C. These four bridges are also considered contributing elements to the FECR Railway Historic District. An additional eight bridges are not considered individually eligible for listing on the NRHP but are still considered contributing elements to the FECR Railway Historic District. For the AAF FONSI, a no adverse effect determination was conditioned on the reconstruction or rehabilitation work to the bridges being developed in consultation with the SHPO to avoid and/or minimize effects. For the Project, a similar no adverse effect finding is anticipated based on the condition that consultation with the SHPO would continue through the design process in order to ensure compatibility and appropriate sensitivity to the bridge resources and FECR Railway Historic District. |
| | | Based on the information available, the Project would have no adverse effect on archaeological sites along the N-S Corridor. The no adverse effect finding is based on the condition that consultation with the SHPO would continue through the design process, as needed, in order to ensure appropriate sensitivity to the previously recorded archaeological sites located within the area of potential effect (APE). |
| | | Similarly, the E-W Corridor is anticipated to have no adverse effect on the FECR Railway Historic District. Field surveys have determined that no archaeological resources occur in the E-W Corridor. The Project would be consistent with Florida's statutes and regulations regarding the state's archaeological and historical resources. |
| Chapter 288 *Commercial Development and Capital Improvements* | Promotes and develops general business, trade, and tourism components of the state economy. | The Project would provide linkages between regional and statewide multi-modal transportation networks and promote commercial development in the vicinity of the transit stations consistent with the East Central Florida and Treasure Coast SRPPs. The Project would be consistent with Smart Growth and Sustainability Policies 4.1 and 4.3 in the East Central Florida SRPP as well as Policy 4.13, which encourages efforts that connect regional airports, rail systems, and seaports to gain a competitive advantage in the global marketplace. Further, the Project would be consistent with Regional Goal 3.5 in the Treasure Coast SRPP, which encourages multimodal linkages |

**Table 5.2.5-1    Florida Coastal Management Program Consistency Review (Continued)**

| Statute | Scope | Consistency |
|---|---|---|
| | | throughout the region, including the provision of commuter and long distance passenger service on the FECR corridor. |
| | | The Project would have an indirect beneficial effect on future business opportunities and would likely promote tourism in the region. |
| Chapter 334 *Transportation Administration* | Addresses the state's policy concerning transportation administration. | The Project would be consistent with the transportation code as well as the mission, goals, and object of FDOT. Specifically the Project would be consistent with Section 334.30 regarding public-private transportation facilities. |
| Chapter 339 *Transportation Finance and Planning* | Addresses the finance and planning needs of the state's transportation system. | AAF has applied for federal funds through the Railroad Rehabilitation and Improvement Financing Program, which is a loan and loan guarantee program administered by FRA. The Project would be consistent with the 2060 Florida Transportation Plan, which includes new measures encouraging a greater reliance on public transportation systems for moving people, including a statewide passenger rail network and enhanced transit systems in Florida's major urban areas. The Project would support the long-range objective of the plan to develop and operate a statewide intercity passenger rail system connecting all regions of the state and linking to public transportation systems in rural and urban areas. The Project would not have an adverse impact on transportation finance and would result in beneficial impacts with regard to transportation planning. |
| Chapter 373 *Water Resources* | Addresses sustainable water management; the conservation of surface and ground waters for full beneficial use; the preservation of natural resources, fish, and wildlife; protecting public land; and promoting the health and general welfare of Floridians. | The Project would impact aquatic resources (wetlands and surface waters) within the N-S and E-W Corridors. However, these corridors are currently impacted by the existing FECR Corridor as well as the SR 528 ROW. To the extent feasible, direct effects to surface water bodies would be avoided through the construction of bridges. Additionally, standard construction BMPs would be employed to limit offsite construction-related impacts.

Federal and state permits would be required for the N-S and E-W Corridors, and compensatory mitigation measures would be implemented as a part of the Project. |
| Chapter 373 *Water Resources (contd.)* | Addresses sustainable water management; the conservation of surface and ground waters for full beneficial use; the preservation of natural resources, fish, and wildlife; protecting public land; and promoting the health and general welfare of Floridians. | Additionally, applicable permitting requirements would be satisfied in accordance with Florida Administrative Code (FAC) 62-25 and the National Pollutant Discharge Elimination System (NPDES). AAF would submit a Notice of Intent (NOI) to use the generic permit for stormwater discharge under the NPDES program prior to project initiation according to Florida Statute Section 403.0885. The Project would also require coverage under the generic permit for stormwater discharge from construction activities that disturb one or more acres of land (FAC 62-621).

The Project would be consistent with Florida's statutes and regulations regarding the water resources of the state. |

AAF-AR0044979

**Table 5.2.5-1    Florida Coastal Management Program Consistency Review (Continued)**

| Statute | Scope | Consistency |
|---------|-------|-------------|
| Chapter 375 *Outdoor Recreation and Conservation Lands* | Develops comprehensive multipurpose outdoor recreation plan to document recreational supply and demand, describe current recreational need for additional recreational opportunities, and propose means to meet the identified needs. | The Project would be consistent with Florida's Statewide Comprehensive Outdoor Recreation Plan. The passenger rail service would provide additional transportation linkages between recreational areas throughout the state. Additionally, as the Project is within existing transportation corridors, the rail line would not substantially directly impact recreational areas or recreational opportunities in the immediate vicinity. |
| Chapter 376 *Pollutant Discharge Prevention and Removal* | Regulates transfer, storage, and transportation of pollutants, and cleanup of pollutant discharges. | Construction activities associated with the Project may require the use of hazardous materials, and hazardous waste may be generated. However, the Project would not substantially increase operational hazardous material or hazardous waste. The Project would include proper handling, use and disposal of hazardous materials and waste and would be compliant within all appropriate tracking and reporting requirements. The Project would not impact the transfer, storage, or transportation of pollutants. |
| Chapter 377 *Energy Resources* | Addresses regulation, planning, and development of oil and gas resources of state. | The Project would not impact energy resource production, including oil and gas, and/or the transportation of oil and gas. |
| Chapter 379 *Fish and Wildlife Conservation* | Addresses the management and protection of the state of Florida's wide diversity of fish and wildlife resources. | Pursuant to the NEPA Section 2, 102(H), avoidance and minimization of potential impacts to federally and state-protected species have been considered for the Project. Protected species habitat was avoided to the extent possible when developing the alternatives for the Project. Further, consultation with NOAA – NMFS, FWS, and FWC has been conducted to ensure full compliance with the federal and state Endangered Species Act (ESA); Marine Mammal Protection Act (MMPA); and Fish and Wildlife Coordination Act.<br><br>A Biological Assessment (BA) is under preparation for U.S. Army Corps of Engineers in accordance with the Final ESA Section 7 Consultation Handbook (USFWS 1998). The BA is intended to provide documentation necessary for informal consultation with the USFWS and NMFS in order to comply with Section 7 of the ESA (7 USC §136; 16 USC §1531 et seq.). |
| Chapter 379 *Fish and Wildlife Conservation* (contd.) | Addresses the management and protection of the state of Florida's wide diversity of fish and wildlife resources. | While no significant impacts to sensitive species are anticipated, USFWS- and FWC-recommended species-specific mitigation measures would be implemented for each potentially affected federally or state-listed species. Therefore the Project would be consistent with the state's policies concerning the protection of wildlife. |
| Chapter 380 *Land and Water Management* | Establishes land and water management policies to guide and coordinate local decisions relating to growth and development. | The Project would occur within existing transportation corridors, which span six counties in eastern Florida. Changes to coastal infrastructure would include the repair or construction of railroad track as well as the construction of 18 bridges within the FECR Corridor. The Project would result in impacts to upland habitats as well as surface water resources, including wetland habitats. However, these degraded habitats occur within the existing ROWs. Management of state lands outside of the existing transportation corridors would remain unchanged. Additionally, surface waters and storm water runoff would be consistent with all applicable policies including |

AAF-AR0044980

**Table 5.2.5-1    Florida Coastal Management Program Consistency Review (Continued)**

| Statute | Scope | Consistency |
|---|---|---|
| | | FS Section 380.06, which outlines policies for developments of region impact that may have effects on the health, safety or welfare of citizens of more than one county. |
| Chapter 381 *Public Health, General Provisions* | Establishes public policy concerning the state's public health system. | The Project would not affect the state's policies concerning the public health system. |
| Chapter 388 *Mosquito Control* | Addresses mosquito control effort in the state. | The Project would not affect mosquito control efforts. |
| Chapter 403 *Environmental Control* | Establishes public policy concerning environmental control in the state. | AAF would coordinate all applicable permits in accordance with the FAC. |
| | | The Project would adversely impact aquatic resources (surface water bodies, including wetlands) along the N-S and E-W Corridors. However, standard BMPs would be implemented during construction activities and the need for compensatory mitigation measures for impacts to regulated resources will be evaluated during federal and state permitting. |
| | | During construction activities, AAF would take all reasonable precautions to minimize fugitive particulate (i.e., dust) emissions during any construction activities in accordance with FAC 62-296. |
| | | Net increases to operational emissions, both from stationary and mobile sources would be less than significant as a result of the Project. Total emissions would remain below *de minimis* levels and any adverse impacts to air quality would also be less than significant. Additionally, beneficial impacts to air quality would occur as a result of the potential reduction in vehicle miles traveled. |
| | | The Project would not significantly increase hazardous material or hazardous waste generated within the existing transportation corridors. |
| | | Therefore, the Project would not impact water quality, air quality, pollution control, solid waste management, or other environmental control efforts. |
| Chapter 582 *Soil and Water Conservation* | Addresses means to conserve soil and water. | All applicable standard construction BMPs, such as erosion and sediment controls and stormwater management measures would be implemented to minimize erosion and storm water run-off, and to regulate sediment control during construction. |
| | | Therefore, the Project would be consistent with the Florida's statutes and regulations regarding soil and water conservation efforts. |

Source:  AMEC. 2013b. *Technical Memorandum No. 10: Environmental Consequences for All Aboard Florida Passenger Rail Project from Orlando to Miami, Florida.* Report.

AAF-AR0044981

## 5.2.6    Climate Change

This section describes climate change effects related to the Project. Transportation systems are vulnerable to extreme weather and climate change effects such as increased temperatures, sea level rise, and more intense storm events; these effects increase the vulnerability of transportation systems (FHWA 2013). Climate change adaptation is critical to protecting transportation systems. Reducing greenhouse gas (GHG) emissions is important for long-term climate change effects, but the reduction of GHGs will likely have little impact on the expected climate change effects over the next 20 or 30 years (FHWA 2012).

The climate change provisions that are applicable to the Project include:

- EO 13514: Federal Leadership in Environmental, Energy, and Economic Performance;

- USACE Circular 1165-2-212: Sea-Level Change Considerations for Civil Works Programs; and

- CEQ Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions (CEQ Draft NEPA Guidance).

Executive Order 13514 calls for federal leadership in environmental, energy, and economic performance. The CEQ Draft NEPA Guidance outlines climate change considerations for federal agencies. Federal agencies should consider the effects of GHG emissions and climate change in their evaluation of proposals. The relationship of climate change effects to a proposed action should be considered; this includes proposal design, environmental impacts, mitigation, and adaptation measures. If a proposed action is anticipated to cause direct emissions of 25,000 metric tons or more of $CO_2$-equivalent GHG emissions on an annual basis, a quantitative and qualitative assessment may be meaningful to decision makers and the public. Environmental documents should reflect the global context of climate change and be realistic in focusing on information that will be useful to decision makers. GHG emissions and mitigation opportunities should be evaluated and compared between alternatives. According to the CEQ Draft NEPA Guidance, climate change effects should be considered in the analysis of projects that are designed for long-term utility and located in areas that are considered vulnerable to specific climate change effects (CEQ 2010).

As documented in this section, the Project would reduce emissions of greenhouse gases that contribute to climate change. The N-S and WPB-M Corridors of the Project are vulnerable to climate change effects in the near future. Both of these corridors are along the Florida coast and cross several coastal water bodies. Bridge structures, particularly those with lower elevation, will have increased vulnerability over time, and potential infrastructure damage may result from flooding, tidal damage, and/or storms. Some commenters on the DEIS expressed concerns about the risks posed by climate change to Project infrastructure, particularly bridges. As this section of the FEIS shows, existing structures are potentially at risk in future storm events. The location and types of structures (bridges and tracks) limit the opportunities for AAF or FECR to implement resiliency measures and AAF has not currently proposed any such measures.

AAF-AR0044982

### 5.2.6.1     Methodology

The analysis of climate change effects considers local climate change scenarios. Major concerns for Florida in the coming decades include sea level rise and more intense storm events. Two main planning horizons for climate change are considered in this FEIS: 2030 and 2060. The 2030 horizon represents near-term impacts and the 2060 horizon represents longer-term impacts. These representative years are also frequently referenced in climate change literature for the region. By 2030, a sea level rise of 3 to 7 inches is anticipated, and by 2060 a rise of 9 to 24 inches is anticipated (Southeast Florida Regional Climate Change Compact 2011). The region will also be vulnerable to an increasing number of intense storm events.

USACE Circular 1165-2-212 (Circular) provides guidance for incorporating the direct and indirect physical impacts of projected future sea-level change across a project's life cycle. Potential relative sea-level change must be considered in every USACE Civil Works coastal activity as far inland as the extent of estimated tidal influence. Planning and design must consider how sensitive and adaptable natural and human systems are to climate change. Planning and design for both existing conditions and Project alternatives should consider and evaluate alternatives for the entire range of possible future rates of sea-level change over the project life cycle. The Circular recommends that alternatives should be evaluated using "low," "intermediate," and "high" rates of future sea-level change for both "with" and "without" project conditions. The historic rate of sea-level change should be used as the "low" rate; "intermediate" and "high" rates should be estimated using equations described in the Circular. Alternative plans and designs should be formulated and evaluated for the three sea-level change scenarios. Sensitivity to the rates of future sea-level change should be determined for plan alternatives; how this sensitivity affects calculated risk and design measures to minimize adverse impacts and maximize benefits should also be addressed.

GHG emissions factors were obtained from the EPA (EPA 2008b). GHG emission factors for intercity rail travel were used for this estimation process. The GHG emissions from switch engines are anticipated to be negligible. Passenger miles for GHG emission estimates were based on estimates of total ridership in 2019 and 2030. Section 5.2.1 of this FEIS provides a detailed description of air quality analysis methods.

### 5.2.6.2     Local Context: Florida Climate Scenarios

Florida faces direct, immediate, and severe impacts from climate change through rising sea level and the possibility of more intense storms. There is also increased likelihood of more severe droughts and periods of torrential rain. Due to these predictions, Florida's commitment to address climate change is increasing. *Florida's Resilient Coasts: A State Policy Framework for Adaptation to Climate Change* provides a framework for state actions (FAU 2007).

Southeast Florida is particularly vulnerable to the effects of climate change, especially sea level rise. As mentioned above, two important planning horizons, referencing the year 2010 as the start date, are 2030 and 2060. These representative years are also frequently referenced in climate change literature for the region. Sea level is predicted to rise an additional foot from the 2010 level between 2040 and 2070, but a 2-foot rise is possible by 2060. By 2060 sea level is projected to be rising by 2 to 6 inches per decade. It will be important to review projections as scientific understanding improves. Sea levels will continue to rise even if mitigation efforts to reduce GHG emissions are successful at stabilizing or reducing atmospheric $CO_2$ (Southeast Florida Regional Climate Change Compact 2011).

AAF-AR0044983

Florida will also be susceptible to more intense storm events. It is likely that in the future there will be fewer total storms but a higher number of intense storms according to *Climate Scenarios: A Florida-Centric View* (Misra et al. 2011). The damage caused by future storms is expected to increase by about 30 percent despite the decrease in the total number of storms. Potential impacts of climate change and variability for Florida include the displacement of communities, damage to infrastructure, and damage to natural systems (Misra et al. 2011).

### 5.2.6.3    Greenhouse Gas Emissions

GHGs include water vapor, $CO_2$, $CH_4$, $N_2O$, ground-level $O_3$, and fluorinated gases such as chlorofluorocarbons and hydrochlorofluorocarbons. These gases trap heat in the atmosphere and regulate the Earth's temperature. Global climate change is a transformation in the average weather of the Earth, which is measured by changes in temperature, wind patterns, and precipitation. Scientific consensus has identified human-related emission of GHGs above natural levels as a significant contributor to global climate change (NCADAC 2013).

GHG emissions for carbon dioxide ($CO_2$), methane ($CH_4$) and nitrous oxide ($N_2O$) were calculated for this project. As shown in Table 5.2.1-2, the Project would decrease emissions as a result of decreased automobile VMT. $CO_2$ emissions are calculated to decrease by 19,617 tons/year in 2019 and 31,477 tons/year in 2030. $CH_4$ emissions would decrease by 4.7 and 5.7 tons/year, respectively, and $N_2O$ emissions by 5 and 6.1 tons/year in 2019 and 2030.

### 5.2.6.4    Climate Change Vulnerabilities and Adaptation

Tables 5.2.6-1 and 5.2.6-2 display sea level rise projections for Southeast Florida, with the year 2010 as a baseline. Using the USACE methodology and as described above, by 2030 an additional rise of three to seven inches is anticipated and by 2060 a rise of nine to 24 inches is anticipated. A rise of one foot is predicted between 2040 and 2070 and 2 feet between 2060 and 2115. The rate of sea level rise is expected to increase each decade. Sea level rise projections should be reviewed as the scientific understanding of climate change grows.

The N-S Corridor and WPB-M Corridor were assessed for vulnerability, as these corridors are along the coast and cross several coastal water bodies. Climate change effects for the MCO Segment and E-W Corridor are anticipated to be minimal for the 2030 and 2060 planning horizons as these segments of the Project are at higher elevations and further from the coast. Track and bridge heights are assessed given current sea level and projected sea level.

Track and bridge elevations average from 15 to 18 feet (NAVD88). The current 100-year flood elevation averages 5.0 to 5.6 feet (NAVD88) and the mean high water level averages 0.0 feet ($\pm$ 0.3 feet). Two bridges were chosen as a representative sample to assess vulnerability: Horse Creek in the N-S Corridor and Arch Creek in the WPB-M Corridor. Both of these bridges would be reconstructed as part of the Project.

AAF-AR0044984

**Table 5.2.6-1    Projected Total Sea Level Rise and Sea Level Rise Acceleration**

| Time Range[1] | Decadal Rate of Rise | | Projected Rate of Sea Level Rise (inches/decade) |
| --- | --- | --- | --- |
| | Projected Rise (inches) | Historic (inches/decade) | |
| 1913-1999 | | 0.82-0.94 | |
| 2010-2020 | 1.5-3.0 | | 1.4-3.2 |
| 2020-2030 | 3.0-7.0 | | 1.6-4.0 |
| 2030-2040 | 5.0-12.0 | | 1.8-4.8 |
| 2040-2050 | 7.0-17.5 | | 2.0-5.6 |
| 2050-2060 | 9.0-24.0 | | 2.2-6.3 |

Source: Southeast Florida Regional Climate Change Compact. 2011. *A Unified Sea Level Rise Projection for Southeast Florida*. https://www.broward.org/NaturalResources/ClimateChange/Documents/SE%20FL%20Sea%20Level%20Rise%20White%20Paper%20April%202011%20ADA%20FINAL.pdf. Accessed January 7, 2014.

1        Projected total sea level rise and acceleration was determined using the USACE July 2009 Guidance Document using Key West tidal data between 1913 and 1999. 2010 was referenced as the starting date for sea level rise projections.

**Table 5.2.6-2    Estimated Timeframes for Sea Level Rise in Southeast Florida**

| Projected Sea Level Rise | Estimated Time Occurrence |
| --- | --- |
| 1 foot | 2040-2070 |
| 2 feet | 2060-2115 |
| 3 feet | 2078-2150 |

Source: Southeast Florida Regional Climate Change Compact. 2011. *A Unified Sea Level Rise Projection for Southeast Florida*. https://www.broward.org/NaturalResources/ClimateChange/Documents/SE%20FL%20Sea%20Level%20Rise%20White%20Paper%20April%202011%20ADA%20FINAL.pdf. Accessed January 7, 2014.

Table 5.2.6-3 shows current and projected bridge conditions at Horse Creek and Arch Creek under the highest sea level rise projection for 2030 and 2060, respectively.

**Table 5.2.6-3    Current and Projected Future Bridge Flood Conditions (Horse Creek and Arch Creek) (feet above msl)**

| | 2013 | 2030 (7-inch sea level rise) | 2060 (24 inch sea level rise) |
| --- | --- | --- | --- |
| **Horse Creek Bridge** | | | |
| Top-of-bridge elevation | 16.8 | 16.8 | 16.8 |
| Bottom cord | 12.2 | 12.2 | 12.2 |
| 100-year flood level | 8.1 | 8.8 | 10.1 |
| Mean high water level | -0.58 | 0 | 2.0 |
| **Arch Creek Bridge** | | | |
| Top-of-bridge elevation | 12.75 | 12.75 | 12.75 |
| Bottom cord | 6.0 | 6.0 | 6.0 |
| 100-year flood level | 5.4 | 6.0 | 7.4 |
| Mean high water level | 0.28 | 1.7 | 2.28 |

Source: AAF. 2013d. General Plans and Elevations for the Horse Creek and Arch Creek Bridges. Transystems Corporation.

AAF-AR0044985

Bridge structures will have increased vulnerability over time; potential infrastructure damage may result from flooding, tidal damage, and/or storms. More frequent and severe flooding is predicted and it is possible that the 100-year floodplain could increase in lateral extent. Bridges with a lower elevation, such as Arch Creek, will have increased vulnerability by the 2030 time frame during storm and flood events. Based on the 2030 projection, the 100-year flood level will rise to meet the bottom chord of the bridge; at high tide the water level may surpass the bottom chord (Table 5.2.6-3). This vulnerability will increase as sea level rises. As a result, there may be increasing periods of time where the train is out of service during storm events.

## 5.3    Natural Environment

This section describes the potential impacts of the Project on the natural resources within the Project Study Area, including water resources, wild and scenic rivers, wetlands, floodplains, biological resources and natural ecological systems, and threatened and endangered species. For each alternative, the analysis includes the impacts of the Project in the WPB-M Corridor, based on information provided in Section 3.0 of the 2012 EA and the impacts of new Project elements in that corridor that were not evaluated in the 2012 EA.

### 5.3.1    Water Resources

Water resources analyzed for the Project include surface water and groundwater. This section also provides the analysis of proposed navigational conditions. The Project would have negligible impacts on surface or groundwater resources.

#### 5.3.1.1    Methodology

Impacts to surface and groundwater resources were evaluated by overlaying the Project footprint on GIS mapping of water resources, and assessing the potential impacts to water quality based on changes to the quality and quantity of stormwater runoff.

#### 5.3.1.2    Environmental Consequences

**No-Action Alternative**

Under the No-Action Alternative, the Project would not be constructed or operated. The Project Area would remain the same as it exists today with no development or construction changes relevant to the Project, and no adverse impacts to water resources would occur.

**Alternative A**

Direct effects to water resources within each segment of Alternative A are discussed below with respect to impacts on surface waters and water quality, outstanding Florida waters (OFWs), groundwater, sole source aquifers (SSAs), wellfield protection, and drinking water safety. Alternative A would result in minor impacts to surface and groundwater resources through construction of 21 new and 10 replacement bridges over waterways, of which six would cross OFWs. This alternative would convert 161 acres of vegetated pervious areas to railroad, and 139 acres of new impervious surfaces (buildings,

AAF-AR0044986

parking lot, roads) would be constructed. These facilities would be designed with appropriate BMPs so as to not substantially increase the volume of runoff. BMPs would also mitigate for potential impacts to water quality and water quantity. Alternative A, in the western section, would cross the Biscayne Bay SSA streamflow and recharge source zones. AAF will implement BMPs to protect discharge water quality and ensure that freshwater recharge to the SSA was maintained.

Table 5.3.1-1 summarizes the surface waters impacted by Alternative A as described in the following paragraphs.

| Table 5.3.1-1    Surface Water Impacts, Alternative A | | | |
|---|---|---|---|
| Segment | New Bridges | Replaced or Reconstructed Bridges | Outstanding Florida Waters |
| MCO Segment | 1 | 0 | 0 |
| E-W Corridor | 5 | 0 | 2 (Econolockhatchee River, St. Johns River) |
| N-S Corridor | 0 | 18 | 3 (Goat Creek, Loxahatchee River, St. Lucie River) |
| WPB-M Corridor | 0 | 7 | 1 (Oleta River) |
| Total | 6 | 25 | 6 |

### MCO Segment

The MCO Segment, including the VMF, would increase impervious area and one new bridge would be required over a surface water body. No construction would occur within or in the vicinity of designated OFWs or navigable waters.

Direct permanent impacts to surface waters would be limited to installing concrete pilings and abutments within surface waters during bridge construction at Boggy Creek. This alternative would change approximately 20 acres of pervious surface area and 30 acres of impervious surfaces to railroad ballasted railbed along the MCO Segment. The VMF would convert approximately 75 acres of pervious surface area to impervious surface area (buildings, parking lots, and roads) and ballasted railbed. Converting 75 acres of pervious surface area to impervious would alter groundwater recharge and change surface drainage patterns.

Portions of the MCO Segment traverse areas of the airport facilities with a constructed stormwater management system consisting primarily of wet detention ponds. A new wet detention pond is proposed to treat stormwater runoff from the VMF. A required road would require filling an existing detention pond and another pond would be expanded to accommodate the displaced treatment volume. Drainage swales would be used to treat runoff from the rail areas. All stormwater facilities on airport property will comply with FAA regulations (40 CFR part 60).

AAF-AR0044987

The MCO Segment and VMF would increase impervious surfaces; however, this would not result in a substantial impact to groundwater recharge over the length of the corridor or within localized areas of increased impervious surfaces. Therefore, only minor impacts to groundwater would occur.

The MCO Segment and VMF would overlap a SSA protection zone in Orange County. Proposed construction would increase impervious surfaces in the Biscayne Aquifer SSA streamflow and recharge source zones. Water quality and quantity BMPs for the additional impervious surface area in the form of stormwater treatment would be required as part of the ERP process and would provide a form of recharge. Therefore, impacts to SSAs would be minor.

The MCO Segment and VMF are not located within a wellfield protection zone or source water assessment and protection program (SWAPP) zone. Orange County does not have a wellfield protection ordinance; however, they follow FDEP regulations (Mercado 2013). The Project would comply with all FDEP and local ordinances; therefore, no adverse impact to drinking water resources would occur.

### East-West Corridor

Direct permanent impacts associated with the E-W Corridor would include installing concrete pilings and abutments within surface waters during bridge construction and converting approximately 72 acres of vegetated pervious surface area to ballasted railbed.

Stormwater runoff would be designed primarily to flow to the SR 528 drainage ditch. This may require expanding the capacity of the ditch/swale to accommodate the additional runoff volume from the Project. West of SR 417 the Project would require realigning a drainage canal and constructing a wet detention pond at the south-west corner of Narcoossee Road. A new wet detention pond would also be constructed to treat stormwater runoff at the SR 528/SR 407 interchange, with three new ponds constructed at the I-95/SR 528 interchange.

Alternative A would cross two OFWs, the Econlockhatchee River and the St. Johns River, on new bridges. Stormwater treatment BMPs would be installed to accommodate any increases in runoff associated with the Project.

Orange County has designated a portion of the Econlockhatchee River and its tributaries as the Econlockhatchee River Corridor Protection Zone. According to Chapter 15, Article VIII, Section 15-825 of the Orange County Code of Ordinance, in processing development applications, there shall be no additional crossing by road, rail or utility corridors of the Econlockhatchee River Corridor Protection Zone unless the following conditions are met:

1) There is no feasible and prudent alternative to the crossing;

2) All possible measures to minimize harm to the resources of the basin will be implemented;

3) The crossing supports an activity that is clearly in the public interest as determined by the board; and

4) The wildlife crossing is adequately sized to maintain wildlife movement.

AAF-AR0044988

Orange County development permits would be required as part of the permitting process. Orange County review of the Project would ensure impacts to the Econlockhatchee River Corridor Protection Zone are kept to a minimum and meet the code.

Converting vegetated areas to ballasted railbed would not result in a substantial impact to groundwater recharge over the length of the corridor or within localized areas. Therefore, only minor impacts to groundwater recharge or quality would occur.

The westernmost 20 miles of the E-W Corridor would overlap a SSA protection zone in Orange County. The proposed construction would not result in an increase in impervious surfaces in the Biscayne Aquifer SSA streamflow and recharge source zones. Water quality mitigation would be addressed as part of the ERP process. FDEP would oversee the ERP permitting process with the St. Johns River Water Management District (SJRWMD) and the South Florida Water Management District (SFWMD); the ERP requirements protect the discharge water quality, which in turn avoids and minimizes potential effects to the SSA. Therefore, impacts to SSAs would be minor.

Alternative A crosses several wellfield protection zones or SWAPP zones in Brevard County, which have wellfield protection ordinances to protect drinking water supplies from contamination. Wellfield protection criteria are found in Chapter 62, Article X, Division 2, and Section 62-3631 of the Brevard County Natural Resource Ordinances. Orange County does not have a wellfield protection ordinance; however, they follow FDEP regulations. In these counties, the transportation of any regulated substances through the wellfield protection zones is exempt from the provisions of the county/state ordinances, provided that the transporting vehicle is in continuous transit. No adverse impact to wellfield resources would occur.

***North-South Corridor***

The N-S Corridor follows the FECR Corridor. The Project would include improvements to the existing mainline and reconstruction of the second tracks on the existing track beds. Constructing the Project in the N-S Corridor would not create new impervious surface. As described for the WPB-M Corridor in Section 3.1.2 of the 2012 EA, the proposed mainline improvements will not increase the existing impervious surface area or alter the existing drainage system because the Project will utilize an existing rail corridor. The original construction of the corridor included two rail lines. The majority of the original second line was previously removed, but the track bed remains. The Project would include reconstruction of the second line on the existing track bed. Reconstructing the second rail line within the existing roadbed would not create new impervious area. Adjacent surface drainage would also not be impacted with the reconstruction of the second line. Existing cross drainage facilities on the adjacent roadways span the entire right-of-way width and would not require modification to account for the installation of the rail line on existing roadbed.

Water quality and quantity concerns associated with reconstructing the railbed to add a second track will be addressed as part of the Florida Environmental Resource Permit process. Drainage would be accommodated using an existing channel along the north or south side of the right-of-way. In some cases, this would require relocating existing drainage channels. With the implementation of BMP measures determined by and in compliance with permit requirements, the Project would result in negligible impacts to water quality within and in the vicinity of the N-S Corridor. No construction would occur that would

potentially contact or impact groundwater supply. Constructing the rail in this corridor would not result in a substantial impact to groundwater recharge and only minor impacts to groundwater would occur.

Surface water resources would experience minor direct effects as a result of reconstructing or replacing 18 bridges (Table 5.3.1-1). Figures depicting the bridge crossing locations are provided in Appendix 5.3.1. Direct permanent impacts would include installing concrete pilings and abutments within surface waters. No permanent adverse impacts to surface water quality would be caused by the bridges.

The N-S Corridor would pass over two OFWs: Goat Creek and the Loxahatchee River (Table 5.3.1-1). The Loxahatchee River Bridge would be rehabilitated as part of the Project. The existing FECR rail bridge over Goat Creek would be removed and replaced with a double-track railroad bridge. These actions would have no adverse impact on the OFWs.

The N-S Corridor would overlap an SSA protection area within Palm Beach County along the eastern border of the aquifer protection area. The proposed improvements would not increase impervious surfaces in the Biscayne Aquifer SSA streamflow and recharge source zones. Stormwater treatment would be required as part of the ERP process. No adverse impacts to SSAs would occur.

The N-S Corridor passes through several wellfield protection zones or SWAPP zones in the following counties: Brevard, Indian River, St. Lucie, Martin, and Palm Beach. Each of these counties has policies and regulations, in the form of wellfield protection ordinances, to protect drinking water supplies from contamination, as described above. The Project would comply with all local ordinances for protection of the wellfields, therefore, no impact to wellfield resources would occur.

### Phase I - West Palm Beach – Miami Corridor

According to Section 3.1.2 of the 2012 EA, the proposed mainline improvements will not increase the existing impervious surface area or alter the existing drainage system because the project will utilize an existing rail corridor. The original construction of the corridor included two rail lines. The majority of the original second line was previously removed, but the track bed remains. The Project would include reconstruction of the second line on the existing track bed. Reconstructing the second rail line within the existing roadbed would not create new impervious area. Adjacent surface drainage would also not be impacted with the reconstruction of the second line. Existing cross drainage facilities on the adjacent roadways span the entire right-of-way width and would not require modification to account for the installation of the rail line on existing roadbed.

Improvements associated with the proposed stations in Miami and West Palm Beach would include minor changes to impervious surface areas for the station buildings, parking facilities, and platforms. No, or minimal, upgrades to existing off-site municipal drainage systems (conveyance structures) would result from the proposed stations; there will be little change in the pre- versus post-runoff condition in these cases.

The WPB-M Corridor and stations are over the sole source Biscayne Aquifer. Minor mainline modifications are required to accommodate the increase in train speeds and the replacement of the second rail on existing base material. The proposed improvements would not change the existing runoff points of discharge; they would also not significantly increase the existing amount of impervious area or the pollutant loading of the runoff. SFWMD ERP requirements protect the discharge water quality, which

AAF-AR0044990

in turn avoids impacts. None of the project elements considered in the 2012 EA would impact sole source aquifers (Section 3.1.2.2).

The FECR Corridor within Broward and Palm Beach Counties travels through several wellfield protection zones; however, none of the proposed stations are within any wellfield protection zones. The Project would comply with all local ordinances for protection of the wellfields, including those noted above. None of the project elements considered in the 2012 EA would impact wellfield resources (Section 3.1.2.3).

As part of Phase II, new construction is proposed at four bridges within the WPB-M Corridor, and an additional three bridges would be reconstructed. This would consist of replacing the existing bridges with two new single-track rail bridges, or adding a new single-track bridge parallel to the existing bridge. The impacts of these bridge replacements were not evaluated in the 2012 EA because they are part of Phase II. Direct permanent impacts to surface waters would be limited to installing concrete pilings and abutments within surface waters during bridge construction.

**Alternative C**

Impacts to surface and groundwater resources associated with Alternative C would be identical to Alternative A, except within the E-W Corridor. The direct effects to surface waters for Alternative C are the same acreage as Alternative A, but will occur slightly to the south. Constructing the rail in the E-W Corridor for Alternative C would change approximately 93 acres of vegetated pervious surface area to ballasted railroad bed. Stormwater from the proposed rail line would drain to its own, new stormwater management system and would not comingle with SR 528 drainage.

**Alternative E**

Impacts to surface and groundwater resources associated with Alternative E, the preferred alternative, would be identical to Alternative A, except within the E-W Corridor. The direct effects to surface waters in the E-W Corridor for Alternative E are the same acreage (3 acres) as Alternative A, but will occur farther to the south. Constructing the rail in the E-W Corridor for Alternative E would change approximately 93 acres of vegetated pervious surface area to ballasted railroad bed. Stormwater from the proposed rail line would drain to its own, new stormwater management system (it would not comingle with SR 528 drainage) and some existing stormwater ponds would need to be relocated.

### 5.3.1.3    Indirect and Secondary Impacts

As discussed in Section 5.1.1, *Land Use*, the Project is not anticipated to result in induced growth or development other than as described in the 2012 EA in the vicinity of stations, and therefore would not have indirect effects on water quality.

### 5.3.1.4    Temporary Construction-Period Impacts

Construction could potentially have localized site-specific temporary impacts on hydrology and water quality on surface waters that would be crossed by bridges or that are adjacent to the railroad. Substantial quantities of suspended solids can be released as a result of construction activities, when large areas of exposed soil may be present. AAF will develop a Storm Water Pollution Prevention Plan (SWPPP) during

AAF-AR0044991

final design that will identify BMPs that would be used to protect receiving waters from sediment discharges or spills during the construction period. AAF would use all appropriate BMPs to construct new bridge pilings in surface waters, including sediment control structures, turbidity curtains, silt booms, and silt fence.

### 5.3.2     Wild and Scenic Rivers

The closest Wild and Scenic River designated segment is on the Loxahatchee River approximately four river miles upstream from the N-S Corridor in Palm Beach County. The Project would not impact Wild and Scenic Rivers. The railroad would not be located in or visible from a Wild and Scenic River segment.

### 5.3.3     Wetlands

The Project would result in impacts to the aquatic environment. The CWA defines "aquatic environment" and "aquatic ecosystem" as waters of the United States, including wetlands that serve as habitat for interrelated and interacting communities and populations of plants and animals. Alternative A would result in approximately 128 acres of direct impacts to aquatic resources (wetlands and surface waters). Alternative C would directly affect approximately 165 acres of aquatic resources (wetlands and surface waters), and Alternative E, the preferred alternative, would directly affect approximately 160 acres of aquatic resources (wetlands and surface waters) using the same level of analysis as for Alternatives A and C. Subsequent to the DEIS, the aquatic resource impacts of Alternative E were re-assessed using delineated wetlands and include indirect impacts, and were calculated as approximately 263 acres.

Wetlands within the Project Study Area are protected under state and federal regulatory programs. Within the State of Florida, activities conducted in wetlands are regulated by Part IV, Chapter 373, FS. Impacts to waters of the United States within the jurisdiction of the USACE are regulated under its authority granted by the Clean Water Act, Section 404 (33 U.S.C § 1344, as amended), and navigable water of the United States within the jurisdiction of the USACE are regulated under its authorities granted by Section 10 of the Rivers and Harbors Act (RHA) of 1899 (33 U.S.C. § 401). Executive Order 11990 also protects wetlands by directing federal agencies to avoid new construction in wetlands where there is a practicable alternative.

Section 404 of the Clean Water Act (CWA) (33 U.S.C. § 1344) regulates discharges of dredged or fill material into waters of the United States, including jurisdictional wetlands. The CWA requires compliance with the Section 404(b)(1) Guidelines, 40 C.F.R. Part 230, developed jointly by the EPA and USACE. CWA compliance requires a sequential evaluation process that includes avoidance of all impacts to aquatic resources to the greatest extent practicable, minimization of impacts to aquatic resources to the greatest extent practicable, and then compensatory mitigation for unavoidable impacts in the form of wetlands creation, restoration, enhancement or preservation. AAF's Department of the Army (DA) application for Section 404 authorization is currently incomplete. Once determined completed, the USACE will complete its Section 404(b)(1) Guidelines analysis and public interest review in its record of decision following publication of the FEIS.

Section 10 of the RHA of 1899 regulates the installation of structures (e.g., piers, wharfs, breakwaters, bulkheads, jetties, weirs, transmission lines) and work such as dredging or disposal of dredged material,

AAF-AR0044992

or excavation, filling, or other modifications to the navigable waters of the United States defined by 33 CFR Part 329.

Various components of the proposed work could be verified through the USACE's Nationwide Permit (NWP). General conditions of the NWPs are in the Federal Register notice announcing the issuance. Pre-construction notification requirements, additional conditions, limitations and restriction are in 33 C.F.R, part 330. NWPs are a type of general permit designed to authorize certain activities that have minimal adverse effects on the aquatic environment and generally comply with the related laws cited in 33 C.F.R 320.3.

This section discusses wetland impacts relative to the alternatives for the Project. These direct and indirect impacts are discussed along with potential mitigation efforts and how they relate to the state and federal regulatory process.

The types of direct impacts and the indirect impacts to wetlands that may result from the Project include:

- Discharging fill material into wetlands (loss of) – reduction in wetland size, fragmentation and edge effects, introduction of human activity (noise, disturbance) to wetland, change in hydrology, vegetation, or habitat;

- Excavation – conversion to storm water management, reduction in wetland size, fragmentation and edge effects, introduction of human activity (noise, disturbance) to wetland, change in hydrology, vegetation, or habitat

- Change in hydrology, fragmentation, introduction of disturbed non-wetland conditions, creation of new "edge" conditions, interruption of migratory routes, alteration of water levels or flow patterns;

- Installing a new culvert or changing existing culvert – alteration water levels or flow patterns;

- Removing canopy or other vegetation – change of light regimes, water temperature, or plan community structure; and

- New discharges of stormwater – alteration of water levels or flow patterns, or introduction of sediments or nutrients.

Comments on the DEIS were largely technical in nature, and concerned the characterization of wetland cover types as well as quantification of impacts. This section has been revised to respond to those comments.

### 5.3.3.1   Methodology

Direct wetland impacts were estimated using different methodologies for each segment, based on the availability of previously-approved wetland delineations and the level of design developed for each segment and alternative.

- Aquatic resource (wetland and surface water) impacts within the VMF were calculated based on previously approved wetland delineations. All wetlands within the proposed footprint of the VMF were assumed to be impacted (eliminated/removed), including wetlands to be lost as a result of excavation activities.

AAF-AR0044993

- Wetland impacts within the MCO and GOAA Segment were calculated based on previously-approved wetland delineations. All wetlands within a 100-foot wide corridor were presumed to be impacted.

- Wetland impacts within the E-W Corridor were calculated based on a combination of previously-approved wetland delineations, project-specific wetland delineation, and GIS wetland mapping (Florida water management district provided land use data). Impacts were calculated based on a 60-foot ROW where the alternative is within the SR 528 ROW and a 100-foot ROW where the alternative was outside of the state highway ROW.

- Direct wetland impacts for the N-S Corridor were calculated based on the proposed limit of work overlain on the field delineation of wetlands in areas where the footprint of the existing railroad corridor would change due to third track addition, curve reduction, or bridge improvement.

Indirect effects to wetlands and other waters include the following impacts that could be caused by the placement of fill or excavation within the wetlands, but occur at a different location or time:

- Changes in wetland functions; or

- Changes in wetland physical/biological characteristics as a result of the direct effects (loss of wetland).

Indirect effects to wetlands were assessed for wetlands within 100 feet of the assumed 100-foot wide railroad corridor and within 500 feet of the proposed VMF footprint. Wetlands were identified utilizing land use data categorized according to FLUCCS (FDOT 1999). The assessment was based on the functions and values each wetland provides and the type and extent of the direct wetland impacts and work adjacent to the wetland that is the cause of the secondary effect.

### 5.3.3.2    Environmental Consequences

Direct effects are defined as those "which are caused by the action and occur at the same time and place" (CEQ 2005a). Direct effects to wetlands (aquatic resources) may include the discharge of dredge or fill material into aquatic resources, removal of vegetation, alteration of hydrology, and pollutant discharge.

**No-Action Alternative**

In the No-Action Alternative, the Project would not be constructed or operated. As a result no wetland or aquatic resource loss would occur.

**Alternative A**

Alternative A would result in the loss of approximately 130 acres of aquatic resources, including 17 acres of surface waters and 113 acres of wetlands of which 68 acres are forested and 45 acres are non-forested. Table 5.3.3-1 provides acreages of direct effects to wetlands and surface waters for the MCO Segment, E-W Corridor, N-S Corridor, and WPB-M Corridor under Alternative A, as described in detail in the following paragraphs. Effects of the Project on wildlife and important wildlife habitats are described in Section 5.3.5.

AAF-AR0044994

**Table 5.3.3-1    Alternative A - Direct Aquatic Resource Effects (loss resulting from filling or excavation) (acres)**

| FLUCCS | Description | MCO Segment | E-W Corridor | N-S Corridor | WPB-M Corridor | Total |
|---|---|---|---|---|---|---|
| 510 | Streams and Waterways | 0 | 3.2 | 6.2 | <0.1 | 9.5 |
| 530 | Reservoirs | 0 | 7.3 | 0 | 0 | 7.3 |
| 610-612 | Wetland Hardwood Forest | 6.7 | 0 | 0.3 | <0.1 | 7.0 |
| 617 | Mixed Wetland Hardwoods | 0 | 10.1 | 0.6 | 0 | 10.7 |
| 618 | Willow and Elderberry | 0 | 1.2 | 0 | 0 | 1.2 |
| 621 | Cypress | 4.4 | 3.9 | 0 | 0 | 8.3 |
| 625 | Hydric Pine Flatwoods | 0 | 2.4 | 0 | 0 | 2.4 |
| 630 | Wetland Forested Mixed | 19.7 | 18.7 | 0 | 0 | 38.4 |
| 641 | Freshwater Marsh | 8.0 | 7.0 | 1.5 | 0 | 16.5 |
| 643 | Wet Prairie | 0 | 4.8 | 0.3 | 0 | 5.1 |
| 646 | Treeless Hydric Savannah | <0.1 | 23.5 | 0 | 0 | 23.5 |
| | Total Direct Effects (loss) | 38.7 | 82.1 | 9.0 | 0.1 | 129.9 |

Source: SFWMD. Undated. *SFWMD – GIS Data Distribution: GIS Data Catalog.* http://my.sfwmd.gov/gisapps/sfwmdxwebdc/dataview.asp?. Accessed September 27, 2013; SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013.

***MCO Segment***

The MCO Segment would directly affect approximately 39 acres of aquatic resources including bay swamp, mixed wetland hardwoods, cypress, wetland forested mixed, freshwater marsh, and treeless hydric savannah.

The wetlands located within the footprint of the VMF provide moderate quality wetland wildlife habitat. Wetlands within the MCO Segment have sustained limited disturbance and provide moderate quality wildlife habitat for those species tolerant of the airplane noise. Much of the wetland habitat present along the MCO Segment has been affected by either airport development activities or tree harvesting that has occurred near the south end of the GOAA property. Wetlands from which trees have been harvested provide some low to moderate wildlife habitat while the wetland remnants provide minimal resources for wildlife utilization.

Impacts to jurisdictional wetlands associated with the MCO Segment and VMF have been partially approved by the USACE under a prior permit issued to GOAA (USACE 1996).

***East-West Corridor***

Alternative A would directly affect approximately 82 acres of wetlands, including streams and waterways, reservoirs, mixed wetland hardwoods, willow and elderberry, cypress, hydric pine flatwoods, wetland forested mixed, freshwater marsh, wet prairie, and treeless hydric savannah. Table 5.3.3-1 provides acreages of direct effects to wetlands and aquatic habitats based upon the assumed 100-foot wide railroad corridor.

AAF-AR0044995

Direct impacts would include wetlands within the St. Johns River 100-year floodplain and the floodplain of the Econlockhatchee River, an OFW. The FNAI and FWC prioritized wetland habitats throughout the state for conservation. Geographical Information System (GIS) data indicate several wetlands within the E-W Corridor that the FNAI and FWC ranked as the highest priority for conservation. These wetlands include several large, contiguous cypress strands east of SR 417 and the contiguous system of hydric pine flatwoods and mixed forested wetlands associated with the St. Johns River floodplain (FNAI 2011). Wet prairies and hydric pine flatwoods are often considered valuable wetlands due to the high degree of wildlife utilization of these habitats. Due to their narrow hydroperiods, it is also somewhat difficult to establish the required hydrologic regimes for these wetlands in mitigation sites.

The proposed communications towers would be sited in uplands, and would not increase impacts to wetlands.

### North-South Corridor

Direct wetland and aquatic habitat losses within the N-S Corridor would total approximately 9.0 acres due to bridge construction. These include streams and waterways, mangrove swamps, mixed wetland hardwoods, freshwater marsh, and wet prairie. Table 5.3.3-1 provides acreages of direct effects to wetlands based upon the anticipated construction activities. Wetland wildlife habitat would experience minor impacts due to bridge reconstruction.

### Phase I - West Palm Beach – Miami Corridor

Bridge construction and reconstruction in the WPB-M Corridor would impact surface waters as a result of installing new concrete pilings, and would impact mangrove wetlands within the footprint of the new or widened bridge. The total wetland loss would be approximately 0.1 acres, as shown in Table 5.3.3-1.

Phase I (West Palm Beach – Miami Corridor) as evaluated in the 2012 EA would not affect surface waters.

### Alternative C

Alternative C would result in the loss of approximately 167 acres of aquatic resources, including 9 acres of surface waters/aquatic habitat and 158 acres of wetlands, of which 93 acres are forested and 65 acres are non-forested. Table 5.3.3-2 provides acreages of direct effects to wetlands and surface waters for the MCO Segment, E-W Corridor, N-S Corridor, and WPB-M Corridor under Alternative C.

Alternative C would have the same effects as Alternative A within the MCO Segment and the N-S Corridor. Within the E-W Corridor, Alternative C would result in the loss of approximately 119 acres of streams and waterways, reservoirs, mixed wetland hardwoods, willow and elderberry, cypress, hydric pine flatwoods, wetland forested mixed, freshwater marsh, wet prairie, and treeless hydric savannah.

Direct effects to aquatic resources would include larger portions of undisturbed area within the St. Johns River 100-year floodplain and the floodplain of the Econlockhatchee River. Alternative C would impact a higher acreage of wet prairies, hydric pine flatwoods, and areas ranked by FNAI and FWC as the highest priority for conservation, than would Alternative A.

AAF-AR0044996

| Table 5.3.3-2 | Alternative C - Direct Aquatic Resource Effects loss resulting from filling or excavation) (acres) | | | | | |
|---|---|---|---|---|---|---|
| **FLUCCS** | **Description** | **MCO Segment** | **E-W Corridor** | **N-S Corridor** | **WPB-M Corridor** | **Total** |
| 510 | Streams and Waterways | 0 | 1.4 | 6.2 | <0.1 | 7.7 |
| 530 | Reservoirs | 0 | 1.0 | 0 | 0 | 1.0 |
| 610-612 | Wetland Hardwood Forest | 6.7 | 0 | 0.3 | <0.1 | 7.0 |
| 617 | Mixed Wetland Hardwoods | 0 | 15.1 | 0.6 | 0 | 15.7 |
| 618 | Willow and Elderberry | 0 | 1.8 | 0 | 0 | 1.8 |
| 621 | Cypress | 4.4 | 20.3 | 0 | 0 | 24.7 |
| 625 | Hydric Pine Flatwoods | 0 | 2.8 | 0 | 0 | 2.8 |
| 630 | Wetland Forested Mixed | 19.7 | 21.3 | 0 | 0 | 41.0 |
| 641 | Freshwater Marsh | 8.0 | 11.6 | 1.5 | 0 | 21.1 |
| 643 | Wet Prairie | 0 | 11.0 | 0.3 | 0 | 11.3 |
| 646 | Treeless Hydric Savannah | <0.1 | 33.1 | 0 | 0 | 33.2 |
| | **Total Direct Effects** | 38.7 | 119.4 | 9.0 | 0.1 | 167.2 |

Source: SFWMD. Undated. *SFWMD – GIS Data Distribution: GIS Data Catalog.* http://my.sfwmd.gov/gisapps/sfwmdxwebdc/dataview.asp?. Accessed September 27, 2013; SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013.

## Alternative E

Table 5.3.3-3 provides acreages of direct effects to aquatic resources for the MCO Segment, E-W Corridor, N-S Corridor, and WPB-M Corridor under Alternative E, the preferred alternative, using the same methodology as the analysis for Alternatives A and C (Florida Water Management District Data used for the E-W Corridor). As estimated in the DEIS, based on available GIS wetland mapping, Alternative E would result in the loss of approximately 160 acres of aquatic resources, including 8 acres of surface waters/aquatic habitat and 152 acres of wetlands, of which 94 acres are forested and 58 acres are non-forested. Subsequent to the DEIS, AAF identified Alternative E as the preferred alternative and completed field delineations of wetlands that are currently under review by federal and state agencies. FRA has evaluated AAF's analysis and concurs that Alternative E is its preferred alternative that would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors.

Alternative E would have the same effects as Alternative A within the MCO Segment and the N-S Corridor. Within the E-W Corridor, wetlands impacted by Alternative E would include larger portions of undisturbed area within the St. Johns River 100-year floodplain and the floodplain of the Econlockhatchee River although the total acreage of aquatic resource effects would be comparable to those which would occur with Alternative C. Alternative E would result in the loss of less area of wet prairies and greater acreage of hydric pine flatwoods, and a larger acreage of wetlands ranked by FNAI and FWC as highest priority for conservation, than would Alternatives A or C.

Table 5.3.3-4 provides field delineated acreages of direct effects to aquatic resources for the MCO Segment, E-W Corridor, N-S Corridor, and WPB-M Corridor under the preferred alternative. Alternative E, based on updated wetland delineation data, would result in the loss of approximately

AAF-AR0044997

263 acres of aquatic resources, including 21 acres of surface waters/aquatic habitat and 167 acres of wetlands, of which 104 acres are forested and 63.5 acres are non-forested.

**Table 5.3.3-3    Alternative E - Direct Aquatic Resource Effects (loss resulting from filling or excavation) (acres)**

| FLUCCS | Description | MCO Segment | E-W Corridor | N-S Corridor | WPB-M Corridor | Total |
|--------|-------------|-------------|--------------|--------------|----------------|-------|
| 510 | Streams and Waterways | 0 | 1.4 | 6.2 | <0.1 | 7.7 |
| 530 | Reservoirs | 0 | 0.3 | 0 | 0 | 0.3 |
| 610-612 | Wetland Hardwood Forest | 6.7 | 0 | 0.3 | <0.1 | 7.0 |
| 617 | Mixed Wetland Hardwoods | 0 | 13.4 | 0.6 | 0 | 14.0 |
| 618 | Willow and Elderberry | 0 | 1.5 | 0 | 0 | 1.5 |
| 621 | Cypress | 4.4 | 18.0 | 0 | 0 | 22.4 |
| 625 | Hydric Pine Flatwoods | 0 | 6.7 | 0 | 0 | 6.7 |
| 630 | Wetland Forested Mixed | 19.7 | 22.6 | 0 | 0 | 42.3 |
| 641 | Freshwater Marsh | 8.0 | 9.4 | 1.5 | 0 | 18.9 |
| 643 | Wet Prairie | 0 | 7.7 | 0.3 | 0 | 8.0 |
| 646 | Treeless Hydric Savannah | <0.1 | 30.9 | 0 | 0 | 30.9 |
|  | **Total Direct Effects** | 38.7 | 111.9 | 9.0 | 0.1 | 159.7 |

Source:    SFWMD. Undated. *SFWMD – GIS Data Distribution: GIS Data Catalog.*
http://my.sfwmd.gov/gisapps/sfwmdxwebdc/dataview.asp?. Accessed September 27, 2013; SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013.

**Table 5.3.3-4    Alternative E - Direct Aquatic Resource Effects (acres) based on Delineated Wetlands[1]**

| Description | MCO Segment | E-W Corridor | N-S Corridor | WPB-M Corridor | Total |
|-------------|-------------|--------------|--------------|----------------|-------|
| Streams and Waterways | 0 | 27.1 | 6.2 | <0.1 | 33.3 |
| Vegetated Wetlands | 38.7 | 188.7 | 2.8 | 0 | 230.2 |
| Total Direct Effects | 38.7 | 215.8 | 9.0 | 0.1 | 263.6 |

Source: USACE

1    Direct Effects include both physical loss of aquatic resources through filling/excavating and loss of wetland function as a result of changes in wetland size, connectivity or hydrology

## Summary of Direct Impacts

Table 5.3.3-5 provides a comparison of acreages of direct effects to aquatic resources for all alternatives, based on a comparable level of information. No loss of aquatic resources would occur with the No-Action Alternative. Based on a comparable level of wetland delineation and design, Alternative A would result in 130 acres of direct loss, of which 113 acres would be forested and herbaceous wetlands. Alternative C would directly affect 167 acres (158 acres of wetlands), and Alternative E would directly affect 160 acres (152 acres of wetlands). For each alternative, the greatest loss of wetlands would be to the mixed wetland hardwoods category, followed by treeless hydric savannah and wetland forested mixed wetlands. Losses of forested wetlands would be the least with Alternative A (70 acres) and Alternative C and Alternative E would result in an equivalent loss of approximately 100 acres of forested wetland.

AAF-AR0044998

**Table 5.3.3-5    Total Direct Aquatic Resources Effects Resulting from Each Alternative (acres)[1] Calculated Using Comparable Data**

| Description | No-Action | A | C | E |
|---|---|---|---|---|
| Surface Waters/Aquatic Habitat | 0 | 16.8 | 8.7 | 8.0 |
| Forested Wetland | 0 | 68.0 | 93.0 | 93.9 |
| Non-forested Wetland | 0 | 45.1 | 65.6 | 57.8 |
| Total Direct Effects to Aquatic Resources | 0 | 129.9 | 167.2 | 159.7 |

1       E-W corridor wetland losses based on Florida Water Management District Data.

Based on this comparable level of analysis, Alternative A would result in the lowest acreage of loss of aquatic resources while Alternative C would result in the highest loss. Alternative E, the preferred alternative, would have higher wetland losses (188 acres) based on updated wetland delineation data along the E-W Corridor segment. Direct effects would consist of removing all wetland area through filling with ballast for the railroad bed, constructing bridges, and installing culverts. Placing ballast within wetland areas would eliminate most wetland functions and values. New culverts and bridges would have minimal effects on water storage, flow volume, and wildlife habitat but would result in less adverse impacts than removing aquatic resources. Updated wetland impact calculations for Alternative E, the preferred alternative, show that this alternative would result in direct and indirect impacts of 263 acres to aquatic resources.

### 5.3.3.3    Indirect and Secondary Impacts

The Section 404(b)(1) Guidelines state that "secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." (40 CFR part 230.11). Although not specifically addressing impacts to aquatic resources, the CEQ regulations define indirect effects as "effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects many include … related effects on air and water and other natural systems, including ecosystems (40 CFR part 1508.8)."

Indirect effects are therefore the consequences of the direct effects of a proposed action. For example, while the direct effect of filling a wetland would be the loss of the filled wetland area and the functions and values provided by that specific area, the indirect effects of that wetland fill would result from the associated changes to the overall size of the wetland, hydrology, cover type, species assemblage, or degree of habitat fragmentation. These types of effects could adversely impact the ability of the wetland to provide functions and values, or could diminish the functions and values to a degree greater than would be attributed simply due to the loss of area. Isolated fragments of wetlands or waterways may have reduced habitat value, no longer provide viable fish or wildlife habitat, or be so isolated that the wetland or waterway fragments are rendered inaccessible to many fish or other aquatic species.

Secondary and/or indirect effects are changes in the ability of an aquatic resource to provide functions, and do not affect an aquatic resource uniformly (except for some small resources). These functional effects occur as gradients with the highest intensity occurring closest to the disturbance and decreasing with distance. Each resource affected may also experience the effects differently (for example, the effects of a canopy gap

AAF-AR0044999

do not affect all wildlife species in the same way, or at the same distance). While some researchers have considered an indirect effect to alter the entire wetland, others have documented that the impacts of highways, or railways, are not uniformly distributed across a wetland (Forman and Deblinger 2000; Eigenbrod, Hecnor, and Fahrig 2009). For example, impacts on the ability of a wetland to support production export are different in type and location than impacts on the ability of a wetland to provide sediment/toxicant retention or nutrient transformation.

There are numerous published studies that document that road construction may adversely impact the hydrology of wetlands upstream and downstream of a new road, and may adversely impact the movement of nutrients, sediment, or wildlife between wetlands (Biglin and Dupigny-Giroux 2006; Fahrig and Rytwinski 2009; Forman and Deblinger 2000; Van der Ree et al. 2011). For newly constructed roads, these effects have been documented to extend 200 to 300 meters from the road. Other studies have focused on the impacts of roads, particularly highways, on wetland-dependent wildlife and have shown that roads have adverse impacts on aquatic wildlife populations as a result of loss of habitat, either directly or indirectly, or as a result of noise, particularly for multi-lane major highways (Eigenbrod, Hecnor, and Fahrig 2009). Forman and Deblinger (2000) coined the phrase "Road-Effect Zone" for the combined area of highway-related secondary and/or indirect effects to natural ecosystems, and considered (based on research by others) that 300 meters was the maximum distance that ecological effects would occur from a highway. Subsequent studies have shown that highway effects are highly species-specific and are correlated with the width of the highway, the volume of traffic, and the night/day traffic distribution (Eigenbrod, Hecnor, and Fahrig 2009).

Eigenbrod et al. (2009) have shown that the ability of a wetland to provide wildlife habitat functions is multivariate, and includes size, edge: interior ratio, cover type, connectivity, microhabitat diversity, soil moisture, and other factors. Their work has shown that the most important variable is wetland size, and that changes in wetland size in small wetlands has a much greater impact on wildlife species richness than changes in size in larger wetlands.

Loss of part of a wetland would create a new ecotone at the wetland/fill boundary causing an "edge effect." An ecotone is a zone which lies at the boundary between two biomes, or habitats and typically contain species characteristic of both habitats. Community composition varies due to interspecific competition which opens these areas to generalist species tolerant of fluctuating conditions and typically consisting of weedy and invasive exotic species. The introduction of a new edge also reduces biodiversity, which is a function of the length of the edge of the habitat versus the area of the habitat, within a habitat. A change in the light regime may cause a shift in the understory community from species requiring shade to species more tolerant of direct sunlight.

Placing fill within a wetland would result in alterations in hydrology. Because fill reduces the volume of available storage, water levels within adjacent wetland areas that were not directly affected would increase. The water level increase is a function of the volume of fill placed in the wetland and the size of the remaining wetland. Increased water levels may impact wetlands by: shifting the composition of the vegetation community to species tolerant of deeper water, causing hydrologic stress to trees which are less tolerant of fluctuations in water level, and providing the opportunity for invasive exotic wetland vegetation to recruit into areas where the vegetation is reduced by hydrologic stress. The introduction of fill into a wetland would also cause an alteration in the flow regime/drainage patterns of adjacent wetlands although ballast utilized for railroad corridors allows some reduced hydrologic connectivity between wetlands. The upstream

AAF-AR0045000

impoundment of water caused by reduced flow rates through the ballast may further increase water levels within remaining wetland fragments.

Minimal alteration of the existing hydrologic regime would occur due to the proposed construction activities for several reasons. The railroad corridor was constructed over 100 years ago and the hydrology within adjacent areas has adjusted to the presence of a hydrologic barrier formed by the railroad. Proposed wetland impacts are small in number and size in all areas of the corridor, and effects would occur in separate wetland systems in different watersheds thus minimizing the collective impact of the Project. The proposed bridge construction would not require dredging of the associated stream and canal channels and would not alter the existing flow regimes at any of the bridge locations.

In Florida, the Wetland Rapid Assessment Procedure (WRAP) and the Uniform Mitigation Assessment Method (UMAM) Functional Assessment method are typically used to assess direct and indirect wetland impacts, losses of wetland function, and to determine the amount of required compensatory mitigation. AAF is working with the USACE and other agencies, as part of the permitting process, to develop these WRAP and UMAM assessments.

**No-Action Alternative**

In the No-Action Alternative, the Project would not be constructed or operated. As a result no new indirect wetland impacts would occur. Continued maintenance of wetland vegetation within the SR 528 and FECR Corridor would alter wetland vegetation and wildlife habitat characteristics, and stormwater runoff from SR 528 could continue to impact wetland functions.

**Alternative A**

Alternative A would result in minor secondary and indirect effects to wetlands along the E-W Corridor, although these impacts would be minimal due to the proximity to SR 528.

***MCO Segment***

Constructing the railroad and VMF in the MCO Segment would result in minor impacts to wildlife. Although the new rail corridor within the MCO Segment, and the new VMF, would introduce barriers to wildlife movement, fragment habitat, and increase human activity on the site, these activities would be in areas that have already been developed and are in close proximity to roads, the Orlando wastewater treatment plant, airport facilities, and parking lots.

***East-West Corridor***

The E-W Corridor is characterized by a mixture of disturbed and undisturbed wetland habitats. Many of the previously disturbed wetland areas are wetland fragments along SR 528 that have previously experienced indirect effects from the roadway. Alternative A would remove wetland area and stormwater management ponds and increase the width of the wildlife barrier created by SR 528. Indirect effects to remaining wetland areas include alterations in wetland hydrology, reduction in habitat size, creation of a new "edge," introduction of additional human activity and noise, and alteration of the light regime associated with removal of canopy.

AAF-AR0045001

Indirect effects to wetland functions of groundwater recharge, floodflow alteration, sediment and pollutant retention, and nutrient removal would also occur due to reduction of wetland size and water storage capacity. The value of wetlands as wildlife habitat varies widely within the SR 528 right-of-way. The Project would reduce the amount of forested wetland habitat, particularly of several cypress wetlands with the appropriate characteristics to support wood stork and other wading bird rookeries.

### North-South Corridor

The N-S Corridor would have negligible impacts on wetland functions. The existing developed (ballasted) railroad bed and tracks has a maintained canopy gap and forms a partial barrier to wildlife movement. No indirect wetland effects are anticipated in areas in which the ballast footprint and right-of-way width would remain the same.

The existing railroad corridor and adjacent development activities previously affected many of the wetlands that would be impacted by the Project, although several wetlands provide moderate quality wildlife habitat. Direct effects to forested wetlands would total 2.58 acres and this canopy removal would alter the light regimes within the forest interior. Bridge construction activities would require trimming mangroves adjacent to bridges, which would reduce the quality of the existing habitat as well as altering the light regime within these wetland areas.

### Phase I - West Palm Beach – Miami Corridor

Track, signal, and related infrastructure improvements for Phase I of the Project, according to Section 3.1.5 of the 2012 EA, would not have a significant impact on aquatic resources. The wetlands adjacent to or abutting the FECR Corridor are limited to sporadic fringe mangrove wetlands, associated in most cases, with larger wetland systems (waterways). The fringe mangrove wetlands are along the perimeter edge of the right-of-way and no work is proposed in the immediate vicinity of these wetlands. Any intrusion into these edge wetlands will be avoided or minimized through project design, such as using cross-sections of minimum practicable width to fully avoid intrusion.

Mainline modifications to accommodate the increase in train speeds or additional capacity (proposed areas of double tracking) will occur within the FECR Corridor, predominately on already established trackbed. There are no planned modifications to wetlands as a result of the bridge rehabilitation as described in Section 3.1.5 of the 2012 EA. BMPs would be employed during construction to avoid temporary impacts to the wetland systems. Bridge construction activities would require trimming mangroves adjacent to bridges, which would reduce the quality of the existing habitat as well as altering the light regime within these wetland areas. No wetland alteration is required for the three stations or the WPB Rail Yard.

Phase II construction of new or replacement bridges at seven waterways (West Palm Beach Canal, Boynton Canal, Hillsboro Canal, North Fork Middle River, South Fork Middle River, Oleta River, Arch Creek) would result in the cumulative loss of approximately 0.1 acre of aquatic resources on the WPB-M Corridor (Table 5.3.3-1) from new pilings and abutments, and would require removing some vegetation beneath the new structures.

AAF-AR0045002

## Alternative C

Indirect wetland effects of Alternative C would be the same as for Alternative A within the MCO Segment, the N-S Corridor, and the WPB-M Corridor. Within the E-W Corridor, Alternative C would increase the width of the wildlife barrier formed by SR 528. Indirect effects to remaining wetland areas would alter wetland hydrology, reduce habitat size, create new "edge" conditions, introduce additional human activity and noise, and alter the light regime associated with removal of canopy.

Indirect effects to wetland systems from Alternative C would be similar to indirect effects under Alternative A although the intensity of the effects would be greater. Alternative C would also bisect a number of wetlands, creating small wetland fragments between the rail and highway. Hydrologic effects to wetland fragments remaining between SR 528 and the railroad corridor would occur because hydrologic connectivity to both the north and the south would be reduced whereas Alternative A would reduce connectivity to the north only. Alternative C would further reduce the size of cypress wetlands with the potential to be used as wood stork or wading bird rookeries.

## Alternative E

Indirect wetland effects of Alternative E, the preferred alternative, would be the same as for Alternative A within the MCO Segment, the N-S Corridor, and the WPB-M Corridor. Alternative E would fill wetlands within the E-W Corridor and create a new barrier to wildlife movement within wetlands and along riparian corridors. Indirect effects to remaining wetland areas would include altering wetland hydrology, reducing habitat size, creating a new "edge" condition, introducing additional human activity and noise, and altering the light regime associated with removal of canopy.

Indirect effects to wetland systems from Alternative E would be similar to indirect effects from Alternative A and Alternative C, although the intensity of the effects would be greater. Alternative E would also bisect a number of wetlands, fragmenting wetlands and wildlife habitat. Hydrologic effects to wetland fragments remaining between SR 528 and the railroad from reduced hydrologic connectivity would be somewhat less than Alternative C due to the additional wetland area and increased water storage capacity. Alternative E would further reduce the size of cypress wetlands with the potential for utilization as wood stork or wading bird rookeries.

### 5.3.3.4    Temporary Construction-Period Impacts

Temporary impacts are those that occur in association with construction related activities and cease following construction. Constructing the railroad track and associated structures requires excavating unsuitable material (muck), placing fill or retaining walls, and use of materials such as limerock and concrete. Demucking is anticipated at most of the wetland sites and would be controlled by Section 120 of the FDOT's *Standard Specifications for Road and Bridge Construction*. Unsuitable materials would be disposed of on- or off-site. Debris would be removed in accordance with local and state regulatory agencies permitting this operation. AAF has committed to employing temporary erosion control features, as specified in the FDOT's *Standard Specifications for Road and Bridge Construction*, Section 104, which consist of temporary grassing, sodding, mulching, sandbagging, slope drains, sediment basins, sediment checks, silt fences, and berms.

AAF-AR0045003

## 5.3.4        Floodplains

The Project would result in impacts to floodplains but would not result in a significant adverse impact on the beneficial values of floodplains, and would not adversely impact any federal flood control project. All three of the action alternatives under consideration would require construction within the mapped 100-year floodplain, with effects ranging from approximately 138 to195 acres. These impacts are not avoidable due to the extent of floodplains throughout the Project Study Area. The E-W Corridor parallels SR 528 to maximize the use of existing transportation corridors, and crosses several floodplains, primarily those associated with the Econolockhatchee River and the St. Johns River. The N-S Corridor would use the existing FECR Corridor to maximize the use of existing infrastructure. The FECR Corridor crosses numerous floodplains, primarily associated with coastal waters and estuaries. The construction design would minimize potential harm to the floodplain by retaining existing elevations where feasible, constructing stormwater mitigation measures and retention ponds and minimizing fill in sensitive areas.

This section summarizes the impacts of the Project on floodplains. EO 11988 (*Floodplain Management*) requires agencies to assess the impacts that their actions may have on floodplains and to consider alternatives to avoid adverse impacts and incompatible development on floodplains. U.S. Department of Transportation (USDOT) Order 5650.2, *Floodplain Management and Protection,* contains the USDOT's implementing procedures to fulfill the requirements of EO 11988.

### 5.3.4.1     Methodology

For this analysis, the areas subject to flooding and protected under EO 11988 were obtained using the base flood elevation published on FEMA's Flood Insurance Rate Maps (FIRMs) through GIS analysis. Special Flood Hazard Areas depicted on the FIRMs include Flood Zones A or V, also referred to as the 100-year floodplain. The proposed right-of-way width was used to calculate floodplain effects along the E-W Corridor. The Project construction footprint was used to calculate effects for the MCO Segment and the N-S Corridor. Floodplain impacts for the WPB-M Corridor, provided in Section 3.1.4 of the 2012 EA, are included here for a comprehensive evaluation of the cumulative impacts of the entire Project.

### 5.3.4.2     Environmental Consequences

This section describes the direct floodplain effects anticipated as part of the Project. Appendix 5.3.4 shows the areas within floodplains along the Project Study Area that fall within the proposed alignment. As described below, the Project would impact 138 acres (Alternative A) to 195 acres of floodplains (Alternatives C and E) from Orlando to West Palm Beach. Reconstructing the existing railroad infrastructure from West Palm Beach to Miami would require construction within an additional 145 acres of floodplains, but with no loss of flood storage. This section also considers the effects to federal flood projects. Section 14 of the Rivers and Harbors Act states any proposed modification to an existing USACE project (either federally or locally maintained) that go beyond those modifications required for normal Operation and Maintenance require approval under 33 U.S.C. § 408. 33 U.S.C. § 408 also states that there shall be no temporary or permanent alteration, occupation or use of any public works including but not limited to levees, sea walls, bulkheads, jetties and dikes for any purpose without the permission of the Secretary of the Army. Under the terms of 33 U.S.C. § 408, any proposed modification requires a determination by the Secretary of the Army that such proposed alteration or permanent occupation or use of a Federal project is

AAF-AR0045004

not injurious to the public interest and will not impair the usefulness of such work. The authority to make this determination and to approve modifications to Federal works under 33 U.S.C. § 408 has been delegated to the Chief of Engineers.

### No-Action Alternative

Under the No-Action Alternative, the Project would not be constructed or operated. The Project Study Area as it exists today would remain the same with no development or construction changes relevant to the Project.

### Alternative A

Alternative A would impact a total of 138.3 acres within the mapped 100-year floodplain, as shown in Table 5.3.4-1.

| Table 5.3.4-1    Floodplain Impacts (acres) | | | |
|---|---|---|---|
| County | Alternative A | Alternative C | Alternative E |
| **MCO Segment** | | | |
| Orange County | 11 | 11 | 11 |
| **E-W Corridor** | | | |
| Orange County | 28.8 | 65.9 | 75.2 |
| Brevard County | 29.9 | 49.8 | 39.8 |
| **N-S Corridor** | | | |
| Brevard County | 31.6 | 31.6 | 31.6 |
| Indian River County | 5.3 | 5.3 | 5.3 |
| St Lucie County | 5.2 | 5.2 | 5.2 |
| Martin County | 13.8 | 13.8 | 13.8 |
| Palm Beach County | 12.7 | 12.7 | 12.7 |
| **Subtotal** | **138.3** | **195.3** | **194.6** |
| **WPB-M Corridor** | | | |
| Palm Beach County | 1.3 | 1.3 | 1.3 |
| Broward County | 121.7 | 121.7 | 121.7 |
| Miami-Dade County | 22.2 | 22.2 | 22.2 |
| **Subtotal** | **145.2** | **145.2** | **145.2** |
| **Totals** | **284.0** | **340.5** | **339.8** |

### *MCO Segment*

The MCO Segment and VMF footprint would affect 11.0 acres of 100-year floodplain. According to AAF, GOAA has stated that a large portion of the VMF footprint within the floodplain was previously permitted. Other encroached floodplain areas, primarily those associated with the rail corridor of the MCO Segment,

AAF-AR0045005

would be permitted through the SFWMD. AAF would optimize the use of the existing MCO stormwater management system, and incorporate BMPs to minimize and compensate for floodplain encroachment.

### East-West Corridor

Alignment Alternative A would affect 58.7 acres of 100-year floodplains. This alternative would impact the least amount of floodplain area, as it is primarily within the SR 528 right-of-way boundaries. Displaced flood storage would have minor impacts due to the length of the corridor, the small amount of fill in any single location, and the large lateral extent of the floodplains. No Federal projects are located within the East-West Corridor.

### North-South Corridor

The impacted area of 100-year floodplain within the N-S Corridor would total 68.6 acres, ranging from 5.2 acres in St. Lucie County to 31.6 acres in Brevard County. Floodplain management for the N-S Corridor is not a concern, as the Project would be limited to the existing FECR Corridor, minimizing any new land fill required. Flood-prone areas occurring within the FECR Corridor were filled during the historic construction of the rail line between Cocoa and West Palm Beach. AAF proposes to improve or replace existing crossings of eight CS&F projects located in Table 4.3.4-3. The USACE has turned over all of the CS&F identified in Table 4.3.4-2 to the SFWMD for operation and maintenance. Each modified CS&F project will be independently evaluated by the USACE.

Filling would be essentially limited to third track and curve reduction areas. Reductions in flood storage volume resulting from any nominal amount of placement of fill would be insignificant. The N-S Corridor is not anticipated to promote future incompatible floodplain development or increase potential for flood-related property damage or human life. Work within the 100-year floodplain has been minimized to comply with EO 11988 and the Project would conform to applicable state and local floodplain standards (the Project would be required to meet local floodplain standards). Therefore, moderate impacts to floodplains would be anticipated.

The N-S Corridor crosses several federal flood control watersheds and waterways, including the Earman River and Taylor Creek. No construction is proposed at Taylor Creek. Adding a new single-track bridge parallel to the existing Earman River bridge, with the same hydraulic opening, would not affect flooding.

### Phase I - West Palm Beach – Miami Corridor

Section 3.1.4 of the 2012 EA stated that the reconstruction of railroad infrastructure along this portion of the Project would require work in 145.2 acres of the mapped 100-year floodplain in Palm Beach (1.3 acres), Broward (121.7 acres), and Miami-Dade (22.2 acres) Counties, but that no work would be performed below the 100-year floodplain elevation and that there would be no permanent impact to the 100-year floodplain.

The Phase I WPB-M Corridor crosses six federal flood control watersheds and waterways, including the C1 Canal, the Boynton Beach Canal, and three un-named waterways. The Miami Canal is south of the terminus of the Project. New single-track parallel bridges are proposed at the C1 Canal and Boynton Beach Canal. These would be built with the same hydraulic opening as the existing bridges and would not affect flooding.

AAF-AR0045006

**Alternative C**

Alternative C would impact a total of 195.3 acres within the 100-year floodplain. Floodplain impacts for Alternative C would be identical to Alternative A for the MCO Segment, the N-S Corridor, and the WPB-M Corridor. Within the E-W Corridor, alignment Alternative C would impact 115.7 acres of 100-year floodplain (Table 5.3.4-1). Displaced flood storage would have minor impacts due to the length of the corridor, the small amount of fill in any single location, and the large lateral extent of the floodplains.

**Alternative E**

Alternative E, the preferred alternative, would impact a total of 194.6 acres within the 100-year floodplain. Floodplain impacts for Alternative E would be identical to Alternative A for the MCO Segment, the N-S Corridor, and the WPB-M Corridor. Within the E-W Corridor, alignment Alternative E would impact 115.0 acres of 100-year floodplain (Table 5.3.4-1). Displaced flood storage would have minor impacts due to the length of the corridor, the small amount of fill in any single location, and the large lateral extent of the floodplains.

### 5.3.4.3    Indirect and Secondary Impacts

Secondary effects, such as groundwater contamination of post-development flood-prone areas from the operation of the railway, are expected to be minor as BMPs would be put in place to prevent degradation of water quality in downstream waters and flood-prone areas.

### 5.3.4.4    Temporary Construction-Period Impacts

Temporary impacts to floodplains would occur where areas of floodplains would be used for construction staging, construction access, or other temporary occupancy of floodplains. The Project is not anticipated to have a temporary adverse impact on floodplains as there are no construction staging or access areas proposed within areas of mapped floodplains.

### 5.3.5    Biological Resources and Natural Ecological Systems

This section describes effects of the Project on natural upland habitats; wildlife and wildlife habitats; preserves, wildlife sanctuaries, and wildlife corridors; essential fish habitat (EFH); and migratory bird habitats in accordance with the CEQ guidance *Incorporating Biodiversity Considerations Into Environmental Impact Analysis Under the National Environmental Policy Act* (CEQ 1993). The Project would have minor impacts on biological resources and natural ecological systems as a result of the loss of natural vegetation along the E-W Corridor, south of SR 528. The Project would not contribute to habitat fragmentation or loss of important natural systems, and would not have a substantial adverse impact on EFH or migratory bird habitat. The Project would not impact any wildlife preserves, sanctuaries, or corridors.

Comments on the DEIS largely concerned the indirect effects of the Project on wildlife habitat and habitat continuity. As summarized in Section 1.7.6, commenters stated that there have not been adequate field investigations or analysis of the impacts of a second track and increased higher-speed train traffic on wildlife.

AAF-AR0045007

### 5.3.5.1    Methodology

The analysis of direct effects to natural upland habitat was based on the calculation of upland habitat area within a 100-foot wide corridor, 50 feet on each side of the railroad center line, which approximates the footprint of the constructed railroad corridor including the tracks, access road, and stormwater management system. Upland habitat was identified from land use data categorized according to the FLUCCS (SFWMD n.d.; SJRWMD 2013a; FDOT 1999). This analysis also included uplands identified within the footprint of the VMF. Upland habitats identified within the 100-foot corridor and footprint of the VMF would be removed when constructing the Project.

The assessment of indirect effects to upland resources and habitats involved identifying potential impacts of construction of the railroad corridor and operation of the passenger service. Potential impacts are described qualitatively in terms of the potential source and magnitude of impact on the wildlife population and biodiversity of the upland habitats adjacent to the proposed railroad corridor.

### 5.3.5.2    Natural Upland Habitats

This section addresses the environmental impacts of each alternative of the Project with respect to upland ecological systems and plant communities. Alternative A would cause 93 acres of direct loss of upland vegetation. Alternative C would directly affect approximately 122 acres of uplands, and Alternative E, the preferred alternative, would directly affect approximately 109 acres of uplands. For each alternative, the greatest loss of upland habitat would be to forested plant communities, primarily pine flatwoods and hardwood-coniferous mixed forest.

**No-Action Alternative**

In the No-Action Alternative, the Project would not be constructed or operated. As a result no impacts to biological resources would occur except for the loss of cleared and graded land for construction of the MCO Intermodal Station.

**Alternative A**

As shown in Table 5.3.5-1, Alternative A would result in a loss of 93 acres of natural upland habitats, of which the largest is pine flatwoods (49 acres); there would be no loss of natural upland habitats in the N-S Corridor or the WPB-M Corridor.

AAF-AR0045008

| Table 5.3.5-1 | Alternative A – Effects to Upland Communities (acres) | | | |
|---------------|-------------------------------------------------------|-------------|--------------|-------|
| **FLUCCS** | **Description** | **MCO Segment** | **E-W Corridor** | **Total** |
| 190 | Open Land | 0.5 | 0 | 0.5 |
| 310 | Dry Prairie | 0 | 3.9 | 3.9 |
| 320 | Shrub and Brushland | 0 | 4.5 | 4.5 |
| 330 | Mixed Rangeland | 6.1 | 3.0 | 9.1 |
| 411 | Pine Flatwoods | 28.0 | 20.7 | 48.7 |
| 420 | Upland Hardwood Forest | 2.9 | 0.1 | 3 |
| 434 | Hardwood-Coniferous Mixed | 21.0 | 2.3 | 23.3 |
| | Total Direct Effects | 58.5 | 34.5 | 93.0 |

Source: SFWMD. Undated. *SFWMD – GIS Data Distribution: GIS Data Catalog.* http://my.sfwmd.gov/gisapps/sfwmdxwebdc/dataview.asp?. Accessed September 27, 2013; SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013

### *MCO Segment*

The MCO Segment would result in the loss of 58.5 acres of upland habitats, including open land, mixed rangeland, pine flatwoods, upland hardwood forest, and hardwood-coniferous forest. Table 5.3.5-1 provides acreages of direct effects to upland habitats based upon the assumed 100-foot wide railroad corridor and the footprint of the VMF.

FNAI and FWC identified natural habitats that they consider "underrepresented" and of greater conservation concern in Florida (FNAI 2011). These underrepresented habitats include pine flatwoods, which are present within the MCO Segment at the south end of the Project Study Area.

The natural ecological systems within the footprint of the VMF have sustained limited disturbance and provide moderate to high quality wildlife habitat for those species. Much of the upland habitat present along the proposed railroad corridor has been impacted by either airport development activities or pine trees harvesting that occurred near the south end of the line. Upland ecosystems from which trees have been harvested provide some low to moderate wildlife habitat while remnant upland systems within the airport itself provide minimal resources for wildlife utilization.

### *East-West Corridor*

The E-W Corridor would result in the loss of 34.5 acres of natural upland communities that include: dry prairie, shrub and brushland, mixed rangeland, pine flatwoods, upland hardwood forest, and hardwood-coniferous mixed. Table 5.3.5-1 provides acreages of direct effects to uplands based upon the assumed 100-foot wide railroad corridor.

Habitats identified by FNAI and FWC as being of greater conservation concern include pine flatwoods and scrub, or scrubby flatwoods. Pine flatwoods occurs throughout the length of the corridor, and scrubby flatwoods occur between MCO and the Econlockhatchee River.

AAF-AR0045009

Wildlife habitat within the maintained areas of the SR 528 right-of-way is limited although some species will forage within areas that are regularly mowed due to the ease of spotting prey and the high productivity of maintained grasses.

### North-South Corridor

All construction activities involving infrastructure upgrades, track addition, and curve reduction within the N-S Corridor would occur within previously disturbed areas in the FECR Corridor and would not impact natural upland communities except in limited areas such as curve reductions, where natural vegetation has become established within the right-of-way These areas are regularly maintained of vegetation to provide access for railroad maintenance activities. Limited wildlife habitat exists within the N-S Corridor although field surveys indicated some utilization of disturbed habitats.

Some slope disturbance will also occur within the corridor, and at one location retaining walls are proposed to protect the maintenance road and ensure the safety of railroad workers. None of these activities will be conducted outside the FECR Corridor or impact native upland habitats.

### Phase I - West Palm Beach – Miami Corridor

As described in Section 3.2.1 of the 2012 EA, there are no sensitive ecological areas in the vicinity of the proposed stations in the WPB-M Corridor; therefore, the proposed stations will not impact terrestrial ecological systems. Terrestrial ecological systems will not be impacted because this alternative only involves the removal of open maintained areas within the FECR Corridor or adjacent disturbed urban areas. There is a 10- to 20-foot roadway buffer maintained between the inside of the property fence and the natural area, where the public lands run parallel to the FECR right-of-way. None of the project elements considered in the 2012 EA would result in significant impacts to existing ecological systems along the WPB-M Corridor, including the area in the vicinity of the proposed stations and the area to be modified within the existing FECR Corridor or facilities.

### Alternative C

Under Alternative C wildlife habitat availability and quality within the MCO Segment, the N-S Corridor, and the WPB-M Corridor would be the same as under Alternative A. As shown in Table 5.3.5-2, Alternative C would result in the loss of 121.8 acres of natural upland habitat along the E-W Corridor.

Direct effects to habitats identified by FNAI and FWC as being of greater conservation concern include a larger area of pine flatwoods and scrubby flatwoods. Pine flatwoods losses (61 acres) would occur throughout the length of the E-W Corridor, and scrubby flatwoods losses between the Econlockhatchee River and MCO.

Natural upland ecosystems affected by Alternative C provide higher quality wildlife habitat than the areas affected by Alternative A because these are in more undisturbed areas outside the SR 528 right-of-way. Maintained areas of the right-of-way represent a smaller proportion of the area affected by Alternative C.

AAF-AR0045010

**Table 5.3.5-2   Alternative C – Effects to Upland Communities (acres)**

| FLUCCS | Description | MCO Segment | E-W Corridor | Total |
|---|---|---|---|---|
| 190 | Open Land | 0.5 | 0 | 0.5 |
| 310 | Dry Prairie | 0 | 10.5 | 10.5 |
| 320 | Shrub and Brushland | 0 | 10.8 | 10.8 |
| 330 | Mixed Rangeland | 6.1 | 4.9 | 11 |
| 411 | Pine Flatwoods | 28.0 | 32.7 | 60.7 |
| 420 | Upland Hardwood Forest | 2.9 | 0.2 | 3.1 |
| 434 | Hardwood-Coniferous Mixed | 21.0 | 4.2 | 25.2 |
| | Total Direct Effects | 58.5 | 63.3 | 121.8 |

Source: SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013.

**Alternative E**

As shown in Table 5.3.5-3, Alternative E, the preferred alternative, would result in the loss of approximately 109 acres of natural upland habitat along the E-W Corridor.

Direct effects to habitats identified by FNAI and FWC as being of greater conservation concern include a lower acreage of pine flatwoods and scrubby flatwoods. Pine flatwoods losses (54 acres) would occur throughout the length of the E-W Corridor, and scrubby flatwoods between the MCO and the Econlockhatchee River.

**Table 5.3.5-3   Alternative E – Effects to Upland Communities (acres)**

| FLUCCS | Description | MCO Segment | E-W Corridor | Total |
|---|---|---|---|---|
| 190 | Open Land | 0.5 | 0 | 0.5 |
| 310 | Dry Prairie | 0 | 9.7 | 9.7 |
| 320 | Shrub and Brushland | 0 | 7.9 | 7.9 |
| 330 | Mixed Rangeland | 6.1 | 3.5 | 9.6 |
| 411 | Pine Flatwoods | 28.0 | 26.4 | 54.4 |
| 420 | Upland Hardwood Forest | 2.9 | 0.1 | 3 |
| 434 | Hardwood-Coniferous Mixed | 21.0 | 3.3 | 24.3 |
| | Total Direct Effects | 58.5 | 50.9 | 109.4 |

Source: SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013.

AAF-AR0045011

## Summary of Direct Impacts

Table 5.3.5-4 provides acreages of direct effects to natural upland ecosystems for all alternatives. No direct upland effects would occur with the No-Action Alternative. Alternative A would cause 93 acres of direct loss of upland communities. Alternative C would directly impact approximately 122 acres of uplands, and Alternative E would directly impact approximately 109 acres of uplands. For each alternative, the greatest loss of upland habitat would be to forested plant communities, primarily pine flatwoods and hardwood-coniferous mixed forest.

| Table 5.3.5-4 | Total Direct Upland Effects from Each Alternative (acres) | | | | |
|---------------|-----------------------------------------------------------|-----------|------|-------|-------|
| **FLUCCS** | **Description** | **No-Action** | **A** | **C** | **E** |
| 190 | Open Land | 0 | 0.5 | 0.5 | 0.5 |
| 310 | Dry Prairie | 0 | 3.9 | 10.5 | 9.7 |
| 320 | Shrub and Brushland | 0 | 4.5 | 10.8 | 7.9 |
| 330 | Mixed Rangeland | 0 | 9.1 | 11.0 | 9.6 |
| 411 | Pine Flatwoods | 0 | 48.7 | 60.7 | 54.4 |
| 420 | Upland Hardwood Forest | 0 | 3.0 | 3.1 | 3.0 |
| 434 | Hardwood-Coniferous Mixed | 0 | 23.3 | 25.2 | 24.3 |
| | **Total Direct Effects** | 0 | 93.0 | 121.8 | 109.4 |

Source: SFWMD. Undated. *SFWMD – GIS Data Distribution: GIS Data Catalog.* http://my.sfwmd.gov/gisapps/sfwmdxwebdc/dataview.asp?. Accessed September 27, 2013; SJRWMD. 2013a. *SJRWMD - GIS Data Download Table.* http://www.sjrwmd.com/gisdevelopment/docs/themes.html. Accessed August 31, 2013

## Indirect and Secondary Impacts

Indirect effects to upland systems may include habitat fragmentation and associated "edge" effects, the loss of genetic diversity of plant and animal populations, increased competition for resources, and physical or psychological restrictions on movements caused by some feature within a corridor that wildlife are unwilling or unable to cross. A railroad may act as a barrier that interferes with the movement of some mammals, amphibians, birds, and reptiles from one habitat to another. The width of a railroad corridor can influence the frequency of wildlife crossings, as well as the mortality associated with potential collisions with rail or vehicular traffic. The rail itself can create a barrier to smaller species such as amphibians, reptiles, and smaller mammals. Another potential indirect effect is the introduction of non-native invasive plant species along the linear corridors of disturbed land.

Curve reduction and railroad corridor improvement activities proposed for the N-S Corridor will use a small amount of fill, ballast, and at one location retaining walls. Due to the presence of the existing railroad and associated structures, it is anticipated widening or reconstructing of the railroad bed will not significantly affect the hydrologic regimes of nearby natural areas. Because of its permeability, track ballast allows water to flow through the railbed. Although additional railbed is proposed for some areas within the N-S Corridor and some filling within the FECR Corridor will occur to form a level surface for the placement of ballast in areas proposed for curve reduction or track expansion, this will not affect groundwater recharge due to the permeable ballast.

AAF-AR0045012

Under Alternative C and Alternative E, a greater degree of impacts to upland habitats would occur for areas remaining between SR 528 and the railroad. The two alignments would create hydrologic barriers to the north and south, potentially impounding water between them. The impounded water could cause more frequent flooding of the adjacent uplands and may lead to community-wide shifts from upland to wetland vegetation, most likely consisting of invasive exotic species, and loss of canopy in this strip of land.

Some commenters on the DEIS questioned whether the Project would fragment habitat for pollinating insects such as bees. Along the N-S corridor, the existing FECR tracks and train movements currently act as a barrier to pollinating bees and it is not anticipated that additional train traffic will significantly affect the movement of pollinating bees. A study by Bhuttacharya et.al (2001) found that, while bumble bees have the ability to cross a road or railroad, the infrastructure can act as a barrier to plant populations utilized by bumble bees, and the bumble bees generally do not cross gaps 12-24 feet separating two foraging sectors. In addition, a white paper by the California High Speed Rail Authority (2012) concluded that, depending on the strength of the wind displaced by trains, pollinators may be blown off a blossom, but after the train has passed, they would right themselves. Therefore, since the existing FECR corridor and SR 528 are already separating the foraging plant populations on the E-W and N-S corridors, the additional effect on the bumble bees and associated plant populations would be minimal.

### Alteration of Light Regime in Forested Systems

Removal of the forest canopy on the proposed railbed could potentially alter the physical conditions (light, wind, temperature) in adjacent forested areas. No adverse impacts are anticipated to herbaceous or shrub-dominated communities, since there would be no change in the light, wind, or temperature regimes. The canopy gap for the rail alternatives would vary with the width of the limit of work and adjacent land uses. In locations along the N-S Corridor where curve reduction or third track installation activities would occur, or for the E-W Corridor alternatives where the proposed railroad corridor will share the SR 528 right-of-way, the canopy gap may only increase slightly. For the E-W Corridor Alternatives C and E in locations where the railroad would be located south of the SR 528 right-of-way, the canopy gap would vary from 60 to 100 feet wide. However, since this would be within or adjacent to SR 528, impacts would be minimal.

Along the E-W Corridor, new forest edges would predominantly face north, and would result in minor changes to interior forest microclimate or habitat. Indirect effects caused by removal of forest canopy would occur in a limited number of areas along the N-S Corridor. Within the majority of the corridor, the footprint of the railroad corridor would not change and the "closed edges" defined above have formed along the edge of the existing alignment.

### Introduction of Invasive Species

Construction along any active or inactive rail corridor, or constructing a new rail line, may increase the width of the canopy gap over the railbed and would likely require removing existing vegetation on the elevated railbed. This linear gap, extending through natural communities, may allow invasive exotic plant species to colonize the railbed or adjacent areas.

AAF-AR0045013

As per EO 13112, invasive species may be defined as "alien species whose introduction does or is likely to cause economic or environmental harm." The Florida Exotic Pest Plant Council (FLEPPC) defines invasive exotic plants as "an exotic that not only has naturalized, but is expanding on its own in Florida native plant communities" (FLEPPC 2011). The FLEPPC distinguishes between two classes of invasive exotic plant species:

- Category I species that are characterized as "invasive exotics that are altering native plant communities by displacing native species, changing community structures or ecological functions, or hybridizing with natives;" and

- Category II species that are characterized as "invasive exotics that have increased in abundance or frequency but have not yet altered Florida plant communities to the extent shown by Category I species" (FLEPPC 2011).

The FLEPPC does not categorize invasive exotic species based upon the economic severity or geographic range of the problem, but on the documented ecological damage caused by a species.

There is a wide range of invasive exotic species known to occur in Florida, occurring in many habitats from ponds and lakes to xeric scrub and sandhills. The primary Category I potential invasive species that could affect the upland and wetland habitats within and adjacent to the railroad corridor include:

- *Casuarina* spp., Australian pine;
- *Dioscorea alata*, winged yam;
- *Dioscorea bulbifera*, air potato;
- *Eichhornia crassipes*, Common water-hyacinth;
- *Imperata cylindrica*, cogongrass;
- *Ludwigia peruviana*, Peruvian primrosewillow;
- *Lygodium japonicum*, Japanese climbing fern;
- *Lygodium microphyllum*, Old World climbing fern;
- *Melaleuca quinquenervia*, punktree;
- *Melinis repens*, rose natalgrass;
- *Paederia foetida*, skunkvine;
- *Panicum repens*, torpedograss;
- *Pistia stratiotes*, water lettuce; and
- *Schinus terebinthifolius*, Brazilian pepper.

Vine species such as winged yam, air potato, Japanese climbing fern, Old World climbing fern, and skunkvine recruit into areas where the forest canopy has been disturbed by either natural or artificial processes. These vines quickly establish themselves and create a monospecific community covering everything and climbing the healthy trees at the edge of the clearing. These species have very high growth rates and will begin to topple trees with the added weight. In some cases the rachis created by the vines conducts ground fire into the canopy where it spreads from tree to tree destroying large tracts of forest.

Forest edges and openings, whether upland or wetland, may be colonized by invasive species dispersed by birds that perch in trees at the edge of the boundary. This creates the potential for establishment of Australian pine, punktree, and Brazilian pepper on or along the edges of the right-of-way. The potential for these species to recruit into disturbed areas is particularly high. These species tend to create an

AAF-AR0045014

impenetrable monospecific understory layer within upland and wetland forests which prevent normal canopy species regeneration eventually leading to complete loss of the forest as the mature trees die. Australian pine becomes large enough to directly compete, and then outcompete, with the established forest canopy. Australian pine leaves, which are analogous to pine needles, often form a thick layer on the forest floor smothering understory species.

Seeds of cogongrass could be carried by wind or wildlife to disturbed areas within the Project Area. Cogongrass is particularly invasive in disturbed upland soils and is tolerant of the low nutrient and undeveloped microbial conditions within clean sands utilized as fill in construction projects. Cogongrass spreads quickly by rhizomes and seeds, may potentially be allelopathic, and is tolerant of mesic to wet conditions.

Peruvian primrosewillow and torpedograss typically occur in wetlands, although they may survive in mesic uplands. Torpedograss seeds can be carried by seed eating birds or will float from upstream wetland areas. Peruvian primrose willow has very small sticky seeds which will float or stick to birds and other wildlife. Water lettuce and common water-hyacinth typically float on the water surface in aquatic environments. Seeds are usually spread by water fowl, and aquatic environments with a recently cleared canopy providing access to water birds and increased direct sunlight are particularly subject to infestation by these species.

The Project has the potential to increase invasive species occurrences in natural habitats, particularly along the E-W Corridor, where new disturbance would occur adjacent to natural communities. However, this does not represent a significant change, as the existing SR 528 corridor provides opportunities for the spread of invasive species.

**Temporary Construction-Period Impacts**

Temporary impacts to biological resources and natural ecological systems would occur where undeveloped areas would be utilized for construction staging or construction access. The impacts on ecological resources could include clearing vegetation, soil compaction in staging and traffic areas, dust generation, erosion, and incidental mortality of wildlife entering the construction zone. In addition to the temporary loss of wildlife habitat, construction activities may lead to soil compaction which reduces the permeability of the soil to water absorption and gas exchange increasing surface water run-off and erosion. The effects of soil compaction and the removal of vegetation subsequently affect the soil's microbial community which requires a commensal relationship with plant species to maintain a balanced ecosystem. The Project is not likely to impact natural habitats adjacent to the N-S Corridor because staging areas are anticipated to be located in existing developed areas such as parking lots and the majority of supplies and equipment will be brought to the construction site by rail. Temporary impacts may occur along the E-W Corridor although the location and extent of those impacts cannot be determined until the locations of staging areas and access roads are determined.

### 5.3.5.3    Wildlife and Wildlife Habitats

Direct impacts of the project on wildlife and wildlife habitat include the loss of habitat and increased mortality due to collisions with trains. Numerous North American and European studies have demonstrated many wildlife species are impacted by collisions with trains (van der Grift 2001). Data collected by several studies indicate mammals and birds are most commonly struck by trains. (SCV 1996;

AAF-AR0045015

Kušta et al. 2011). Higher mortality rates generally occur at the intersection of railroad routes and important wildlife habitat or migratory routes, and wide ranging species with large territories are often the most susceptible. Railroad corridors may also provide attractive habitat for some species including open sunny areas for reptiles, and railroad kills attract carrion eaters (SCV 1996; Stone et al. 2001). Although FECR has operated trains along the N-S Corridor for over 100 years, the increased frequency and speed of the proposed passenger train service would potentially increase wildlife mortality along the existing corridor. Construction and operation of a new railroad along the E-W Corridor would result in some wildlife mortality due to the open habitat present along much of this corridor. Although some wildlife mortality is expected as a result of the Project, wildlife collisions with trains would not jeopardize existing wildlife populations.

AAF has coordinated with Florida Fish and Wildlife Conservation Commission (FWC) at the Tosohatchee Wildlife Management Area and the Econlockhatchee River and Little Creek tributary to create wildlife crossings specifically for the following target species: Florida black bear (*Ursus americanus floridanus*), Florida panther (*Puma concolor coryi*), and whitetailed deer (*Odocoileus virginianus*). Design elements of these crossings include elevated shelves under the bridges to allow dry passage and placing security fence or funnel fencing to encourage wildlife to move through the crossing structures.

At the Tosohatchee Wildlife Management Area, AAF has proposed a 50-foot by 8-foot wildlife crossing under SR 528 at the former Mud Lake Canal. This crossing was coordinated with FDOT to be consistent with commitments made in the PD&E Study for future SR 528 expansion. FWC records indicate two (2) Florida black bear kills in the past 8 years within the park near the vicinity of SR528/the corridor (FWC, 2013). There are not any FWC-recorded Florida panther kills within the Tosohatchee Wildlife Management Area (FWC, 2014).

In addition, AAF has coordinated with FWC for the crossings at the Econlockhatchee River and Little Creek tributary to modify bridge designs to facilitate wildlife crossing. All proposed designs have been evaluated by FWC and they have provided concurrence that the proposed design will ensure adequate passage opportunities for wildlife (FWC Concurrence letter, 2014). There are not any FWC-recorded Florida black bear or Florida panther kills near the vicinity of the Econlockhatchee River Bridge and Little Creek tributary crossing (FWC, 2013; FWC, 2014).

The installation of fencing at wildlife crossing locations provides both benefits and shortcomings. While fencing may prevent certain species from entering the corridor, fencing can also trap those species that have otherwise accessed the area. However, fencing may be appropriately used to guide wildlife into the underpass rather than to serve as a barrier. Therefore, fenced locations within crossings are handled on a case-by-case basis through coordination with land managers and to determine the most appropriate action.

The Project would result in the loss of wetland and upland wildlife habitat, as described in Sections 5.3.2 and 5.3.5.2. These habitat losses would largely occur at the proposed VMF and along the 17-mile section of the E-W Corridor west of SR 520, where the proposed railroad is outside of the existing SR 528 right-of-way. The loss of habitat would not eliminate any habitat patches, but would reduce the size of available habitat areas slightly although this is not likely to displace wildlife populations. The Project would not result in the loss of habitat within any of the important wildlife conservation areas listed in Section 4.3.5.2, nor would it interrupt any existing wildlife corridors. The proposed communications towers described in Section 3.3.3.6 along the E-W Corridor would be monopole or lattice-type poles, less than 100 feet in

AAF-AR0045016

height, and would not require guy wires. These towers would be consistent with USFWS guidance on communications towers (USFWS 2012c), and would not have an adverse effect on wildlife or birds.

Other potential indirect effects on wildlife and wildlife habitats would result from habitat fragmentation and operational noise, as described below.

**Habitat Fragmentation**

Fragmentation is defined as the subdivision of once large and continuous tracts of habitat into smaller patches. It results from agriculture, urbanization, and transportation (or other rights-of-way) (Rosenfield et al. 1992). Habitat fragmentation is associated with 'edge effects' when there is a disturbed or developed area created adjacent to a natural and/or forested area. Edge effects may include the spread of invasive species, increase in the canopy gap, and a decrease in species dependent on undisturbed habitat. In general, fragmentation of habitat is viewed as detrimental when considering original native, climax species composition and abundance, natural history, and relative ecological stability of unmanaged plant and animal populations. In particular, habitat fragmentation increases the amount of edge relative to the amount of interior habitat (Primack 2008). Scientific experts agree that preservation of continuous forest blocks is essential to the long-term protection of biodiversity. Fragmentation of forested tracts has been cited as a major cause in the decline of bird communities. Fragmentation occurs at several spatial scales, from local, which includes edge effects, to landscape, which encompasses differences in size and shape of forest tracts, to regional, where differences in canopy cover are studied to determine the effects on breeding birds (Robinson 1998). The majority of the available literature has focused on large-scale fragmentation that breaks existing forest blocks into disconnected remnants across a landscape by major roadways, residential subdivisions, and clear cuts.

A railroad corridor may act as a barrier that interferes with the movement of amphibians and reptiles from one habitat to another. The width of a railroad corridor can influence the frequency of wildlife crossings, as well as the mortality associated with potential collisions with rail traffic. The railbed on which the tracks are laid can itself create a barrier to smaller species such as amphibians, reptiles, and smaller mammals. Traffic density and traffic speed may also influence wildlife avoidance of transportation corridors (Reijnen et al. 1995; Forman and Alexander 1998).

Indirect effects to reptile and amphibian populations could include lowered reproductive success of existing amphibian populations if rail collisions affect amphibian mortality rates. If the rail is experienced as a barrier by migrating amphibians, existing populations may be divided into subpopulations. This, in turn, may result in a reduced gene pool in the remaining subpopulations, which could result in loss of the population if the remaining genetic variation is not diverse enough to offset the joint action of natural selection and genetic drift. Preserving genetic diversity is important because it allows populations the potential to adapt by "saving" genes that may be useful during future environmental changes. However, the rail would not create a complete barrier to movement between the eastern and western sides of the right-of-way, which would limit the fragmentation effect.

Indirect effects to mammals from fragmentation include potentially lowered reproductive success rates from interruption of migration routes to breeding areas (restricted gene flow), increased predation on small mammals due to lack of cover on the ballasted railroad embankment, and general disturbance of mammalian communities immediately adjacent to the right-of-way. These disturbances include alterations to foraging, denning, and overwintering habitat due to changes in vegetative cover, light, and temperature regimes. There may be minor indirect effects to small mammals but this is not expected to

AAF-AR0045017

affect population stability because of their small home ranges. Deer and other large mammals are expected to continue to cross the tracks with minimal impedance.

Fragmentation effects are expected to be minimal from any of the alternatives, since the existing SR 528 alignment, immediately to the north of Alternatives A, C, or E, has already caused fragmentation of large blocks of existing natural habitat. Widening the gap is not anticipated to significantly change the effects of the existing transportation corridor on habitat quality or continuity. The Project along the N-S Corridor and the WPB-M Corridor would not create or exacerbate fragmentation effects and the FECR Corridor would not be widened.

**Noise Impacts on Wildlife**

Noise from train operations and horns at grade crossings may have indirect effects on wildlife. Scientific literature and other relevant publications concerning the impacts of train pass-by noise on wildlife were reviewed. Many of the available studies are from western states; far less is known about the effects in the eastern United States, presumably because highway and rail infrastructure was largely already in place well in advance of the advent of modern wildlife ecology and conservation biology, and also because of the proportionately larger numbers of endangered mammals long displaced in the east and now confined to the less-developed west. As documented in the National Park Service's (2011) *Annotated Bibliography – Impacts of Noise on Wildlife*, the effects of noise on wildlife have been studied for roads (where noise is continuous), aircraft, boats, and off-road vehicles and snowmobiles. No specific studies on the effects of the episodic noise from trains are listed in this bibliography.

It is possible that the Project would displace some individuals of wildlife populations that are sensitive to noise and vibration, causing increased competition for nearby suitable habitat. Most of the scientific studies conducted on noise and wildlife involve assessing effects from roads, and there is limited scientific data for impacts to wildlife from rail. Most studies show that noise associated with high-density roads affects avian communities by interfering with communication during courtship and brood-rearing. However, the continuous noise resulting from highways is substantially different from the infrequent noise produced by trains. Noise impacts are expected to be minor because of the moderate numbers of trains.

Although limited data exist to relate noise exposure levels to effects on wildlife, criteria to identify possible impacts are available. Table 5.3.5-5 provides wildlife impact criteria based on a summary of recent literature that can be found in Appendix A of the FRA *High Speed Ground Transportation Noise and Vibration Impact Assessment* (FRA 2012a). The criteria are based on the assumption that impacts occur when a noise event is sufficiently loud enough to generate an observable effect in domestic livestock or wildlife.

Based on the impact criteria listed in Table 5.3.5-5, effects to wildlife could occur at sound levels exceeding 100 dBA. Along the E-W Corridor, noise and vibration disturbance from the operation of the railroad would disturb wildlife for very short, discrete periods of time, but would not affect wildlife as much as the constant noise from the highway. As documented in Section 5.1. 2, train pass-by will not exceed 70 dBA, and therefore will not affect wildlife. There would be no new crossings along the MCO Segment or the E-W Corridor and consequently no noise impacts on wildlife from wayside horns.

AAF-AR0045018

**Table 5.3.5-5 Summary of Wildlife Noise Impact Criteria**

| Animal Category | Class | Noise Metric | Noise Level (dBA) |
|---|---|---|---|
| Domestic | Mammals (Livestock) | Sound exposure level (SEL) | 100 |
| | Birds (Poultry) | SEL | 100 |
| Wild | Mammals | SEL | 100 |
| | Birds | SEL | 100 |

Source: FRA. 2012a. *High-Speed Ground Transportation Noise and Vibration Impact Assessment, USDOT Report Number DOT/FRA/ORD-12/15.* http://trid.trb.org/view.aspx?id=1238511. Accessed September 27, 2013.

#### Temporary Construction-Period Impacts

Temporary impacts are those that occur in association with construction related activities and cease following the completion of construction. Short-term temporary indirect effects can be caused by the increased noise and visual disturbance from land-clearing, earth-moving, and construction machinery during construction.

Temporary impacts to biological resources and natural ecological systems could also occur where undeveloped areas would be utilized for construction staging or construction access. The effects on ecological resources could include clearing vegetation, soil compaction in staging and traffic areas, dust generation, erosion, and incidental mortality of wildlife entering the construction zone. The Project is not likely to impact natural habitats adjacent to the N-S Corridor because staging areas are anticipated to be located in existing developed areas such as parking lots and the majority of supplies and equipment will be brought to the construction site by rail. Temporary effects may occur along the E-W Corridor although the location and extent of those effects cannot be determined until the locations of staging areas and access roads are determined.

### 5.3.5.4 Preserves, Wildlife Sanctuaries and Wildlife Corridors

The Project would not incorporate land from any of the preserves or wildlife sanctuaries described in Section 4.3.5, and would not affect the ability of these properties to protect wildlife or manage wildlife habitat. The Project would not change existing conditions or exacerbate existing barriers to wildlife movement along the N-S Corridor, however wildlife within these areas may experience the indirect effects described above in Section 5.2.5.2. As described in Section 7.2.9, all alternatives would include wildlife crossings along the E-W Corridor to maintain or improve wildlife passage.

### 5.3.5.5 Essential Fish Habitat

EFHs and Habitat Areas of Particular Concern (HAPCs) that potentially could be impacted by the Project are Estuarine Intertidal Scrub-shrub (Mangroves), Estuarine Subtidal Open Water/Water Column (Estuarine Planktonic), and Tidal Creeks (Mud/Sand and Sand/Shell Bottom). Within each of the bridge project areas, EFH is equivalent to wetland and/or surface water habitats. Constructing the Project could affect EFH and HAPC as a result of placing rip-rap/fill for the bridge approaches, placing bridge pilings, and excavating where existing timber pilings will be replaced.

Enhancement/replacement is proposed for 34 bridges between Cocoa and Miami; however, only 21 of these bridges will require in-water work or a change in the footprint of the bridges. Four of the bridges were determined to be upstream of salinity barriers. Bridges over water bodies with downstream salinity barriers are not included in this assessment, as these sites are not accessible to marine species and do not include EFH. This assessment focuses on the bridges along the N-S Corridor and the WPB-M Corridor that require construction within EFH (Figure 5.3.5-1). Each bridge project area is defined as the footprint of that bridge, as well as the area upstream and downstream within the limits of construction.

The USACE determined that the Project would not have a substantial adverse impact on EFH or federally managed fishery species based on the proposed mitigation. On October 14, 2014 the NMFS agreed with this determination and did not offer any conservation recommendations pursuant to the EFH provisions of the Magnuson-Stevens Fishery Conservation and Management Act (Appendix 5.3-6).

**No-Action Alternative**

Under the No-Action Alternative the Project would not be constructed or operated; there would be no impacts to EFH.

**Action Alternatives A, C, and E**

This section discusses the direct, indirect, and temporary impacts to EFH and HAPC associated with the 21 bridge project areas and potential implications to their associated fisheries communities. Direct, indirect, and temporary impacts are expected to be generally similar for all fisheries; therefore, the presentation of impacts is for all species. The potential impacts to EFH and HAPC would be the same for each of the Action Alternatives, as the impacts would only occur along the common N-S and WPB-M Corridors.

Habitats within the bridge project areas have been identified as EFH and HAPC. As shown in Table 4.3.6-1, these areas provide EFH for at least seven fishery species managed by the SAFMC during some portion of their life cycle: goliath grouper, gray snapper, mutton snapper, spiny lobster, pink shrimp, white shrimp, and brown shrimp.

At each bridge project area (with the exception of Arch Creek), piles would be driven to load bearing capacity for E80 live loads plus the dead load. Piles would be driven with a steel pile driving template placed to prevent movement of the pile group. Multiple piles will be connected by a cast-in-place pile bent cap or end bent at the abutments. The piling driver equipment would be placed on the abutment or on a barge in larger systems (Eau Gallie River, St. Sebastian River, Hillsboro River, North Fork of the Middle River, and South Fork of the Middle River). Silt fences and floating turbidity barriers would be installed and maintained during construction in accordance with performance standards for erosion and sediment control and stormwater treatment set forth in Section 62-40.432, FAC.

The effect of pilings would be limited to the total footprint of pilings placed in EFH, totaling approximately 760 square feet (<0.1 acre). The effects of the rip-rap/fill at the location of the abutments has been calculated as the total area of rip-rap/fill placed in surface waters, which totals approximately 5,000 square feet (0.1 acre). Approximately 0.73 acre of the substrate would be shaded. Shading effects were calculated as the footprint of the new bridges at each bridge project area. No seagrasses were observed within the bridge project areas. Approximately 940 square feet (0.02 acre) of wetland (primarily mangroves) would be permanently removed, and approximately 4,000 square feet (0.09 acre)

AAF-AR0045020



Bridge Project Areas within Essential Fish Habitat

All Aboard Florida Intercity Passenger Rail Project

Explanation of Features

- Proposed Station (By Others) — MCO Segment
- Proposed Stations - WPB-M Corridor — E-W Corridor
- Bridges — N-S Corridor
- — WPB-M Corridor
- Essential Fish Habitat

Data Sources: ESRI Bing Maps 2012 Imagery, FRA 2012, AMEC 2013

U.S. Department of Transportation
Federal Railroad Administration

5.3.5-1

AAF-AR0045021

of mangroves would be trimmed in accordance with FDEP Mangrove Trimming Guidelines, which are designed to avoid defoliation, removal, or destruction of the mangrove tree itself.

The new pilings would have a variable impact on the managed fish species. Pilings could ultimately result in a beneficial impact to species/life stages that prefer such structures as habitat, such as adult goliath grouper, gray snapper, and mutton snapper. Permanent effect of the removal of mangrove wetlands could adversely impact species/life stages that prefer mangrove habitat, such as juvenile goliath grouper, post larval/juvenile grey snapper, and juvenile mutton snapper. Impacts to wetlands (mangroves), calculated as the aerial extent of mangroves to be permanently removed by the Project, would be minor.

### Indirect and Secondary Impacts

Indirect effects to EFH from ongoing operations and maintenance would be minimal, as active railroad bridges are currently located at all of the bridge project areas.

### Temporary Construction-Period Impacts

Temporary construction-related impacts would be limited to the area immediately adjacent to and under each of the bridge project areas. Most of the species of concern are mobile and can actively avoid construction activities, although some benthic fauna could potentially be affected at the site of the piles. Due to the small footprint of in-water work at each bridge, mortality levels would be negligible.

Temporary impacts resulting from construction activities could occur from temporary disturbance, increased sediment loads, and increased turbidity in the water column. These effects will be minimized by implementing BMPs including silt fencing and turbidity curtains during construction. Additional temporary effect would potentially occur through the disruption/burial of aquatic habitats at the location of the bridge abutments and piles.

Pile driving (percussive or vibratory) can result in temporary effects on fish and other aquatic organisms during construction of a bridge (Popper 2005). Potential impacts to eggs, larvae, and adults of invertebrates and fishes associated with pile driving are noise and vibration, sediment deposition, and crushing. Factors that affect the physical interaction of sound with fish include the size of the fish relative to the wavelength of sound, the mass of the fish, its anatomical variation, and the location of the fish in the water column relative to the sound source (Kent and McCauley 2006). Fish may be divided into two broad groups based on hearing sensitivity, 'hearing specialists' and 'hearing generalists'. 'Hearing specialists' show high sensitivity to sound with levels as low as 60 dBA re 1 microPascal at 1 meter across a broad frequency range. The hearing sensitivity of 'hearing generalists' is lower than that of 'hearing specialists'. 'Hearing generalists' rely on the detection of particle displacement for sensing sound. The highly variable auditory sensitivity of fish means that it is impossible to generalize on the effect of impulse signals from one species to another (Kent and McCauley 2006).

Invertebrates also vary in their sensitivity to sound. Sand shrimp exhibited a significant reduction in growth and reproduction rates, and an increase in aggression and mortality when exposed to noise levels of 30 dBA in the 25- to 400-hertz bandwidth in aquaria (Kent and McCauley 2006). Noise from pile driving during construction could affect federally managed species; however, the use of bubble curtains during pile driving would help to dampen noise by about 5 to 22 dBA depending on the pile type and other conditions (Howard 2013). NMFS has recommended that bubble curtains be used when effects could occur. AAF has

AAF-AR0045022

committed to using air bubble curtains during pile driving to minimize the potential impacts on federally managed species. It is anticipated temporary construction noise and vibration will elicit an intense avoidance response from most species but will not permanently affect or jeopardize existing populations of aquatic wildlife.

### 5.3.5.6    Migratory Bird Habitat

The Migratory Bird Treaty Act of 1918 states that, unless permitted by regulations, it is illegal to

> "pursue, hunt, take, kill, attempt to take, capture or kill, possess, offer for sale, sell, offer for purchase, purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry, or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time or in any manner, any migratory bird, included in the terms of this Convention … or any part, nest, or egg of such bird (16 USC 703(a)."

As the U.S. Fish and Wildlife Service (USFWS) states, "we regulate most aspects of the taking, possession, transportation, sale, purchase, barter, exportation, and importation of migratory birds (50 CFR parts 10 and 21)." The USFWS does not, through the Migratory Bird Treaty Act, explicitly prohibit or regulate the incidental take of birds, bird nests, or bird eggs caused by land clearing.

EO 13186, *Responsibilities of Federal Agencies to Protect Migratory Birds*, requires each federal agency taking actions that are likely to have a measurable negative impact on migratory bird populations to develop a Memorandum of Understanding with the USFWS, to promote conservation of migratory bird populations. The EO also requires all NEPA analyses to evaluate the effects of actions on migratory birds and minimize "incidental takes" of migratory birds.

The Project would not adversely impact the majority of habitats important to migratory birds (see Section 4.3.5), such as flooded agricultural fields, open water bodies or deep marshes, or intertidal beaches or mudflats. Each of the three action alternatives under consideration would result in the loss of forested uplands and wetlands, such as wetland and upland hardwood forest, which may provide important migratory habitat. These habitat losses would occur in small areas, at the periphery of larger forested stands, and would have a minor overall impact on the availability of habitat for migratory birds.

As previously mentioned, the proposed communications towers along the E-W Corridor would be monopole or lattice-type poles, less than 100 feet in height, and would not require guy wires. These towers would be consistent with USFWS guidance on communications towers (USFWS 2012c), and would not have an adverse impact on wildlife or birds.

### 5.3.6    Threatened and Endangered Species

The USACE, a cooperating agency with respect to this FEIS, is the lead federal agency for completion of ESA Section 7 consultation for this Project. As described below, the USACE has evaluated the effects of the Project on federally listed species and determined that the Project would not jeopardize any listed species or modify any designated critical habitat. The USACE has made determinations of "no effect" or "may affect but not likely to adversely affect" for each of the listed species within the Project Area. The USACE has also determined the proposed work would not result in the adverse modification of Designated Critical Habitat. Section 5.3.6.5 of this FEIS provides a detailed determination for each species considered. The agencies charged with administering the ESA, the North Florida office of the US Fish & Wildlife Service (USFWS),

AAF-AR0045023

which covers the Brevard and Orange County portions of the Project, and the NOAA-NMFS, have concurred with these determinations (Appendix 5.3.6-A).

The USFWS, Vero Beach Field Office, stated the Project will result in adverse effects and potential "incidental take" of the threatened Florida scrub-jay and recommended initiating formal consultation. Formal Section 7 consultation was requested by USACE on behalf of FRA, the lead agency for AAF. As part of the official consultation, USFWS is preparing a Biological Opinion.

The ESA authorizes the determination and listing of species as Endangered or Threatened and prohibits unauthorized taking, possession, sale, and transport of endangered species. Section 7 of the Act requires federal agencies to ensure that any action authorized, funded, or carried out by a federal agency is not likely to jeopardize the continued existence of listed species or to modify their critical habitat. USFWS administers the Act, but NMFS is the lead federal agency responsible for the stewardship of the offshore living marine resources of the nation and their habitat.

FWC regulates wildlife species protected by the State of Florida. Chapter 68A-27.003(1)(a), FAC provides "no person shall take, possess, or sell any of the endangered or threatened species...or parts thereof or their nests or eggs except as allowed by specific federal or state permit authorization." Chapter 68A-27.005(1)(a), FAC additionally stipulates "no person shall take, possess, transport, or sell any species of species concern...or parts thereof or their nests or eggs except as authorized by permit from the executive director, permits being issued upon reasonable conclusion that the permitted activity will not be detrimental to the survival potential of the species." The Florida Department of Agriculture and Consumer Services (FDACS) regulates protected plant species and limits the harvest, transport and sale of plant species listed as Endangered, Threatened, or Commercially Exploited in Chapter 5B-40, FAC.

The Bald and Golden Eagle Protection Act (BGEPA) serves to protect bald and golden eagles by prohibiting anyone from taking eagles, their nests, or their eggs, without a permit issued by the Secretary of the Interior. The Act specifically defines a taking as pursuing, shooting, shooting at, poisoning, wounding, killing, capturing, trapping, collecting, molesting, or disturbing the species (USFWS 1972). Violating the Act could result in fines, imprisonment, or both for first offenses.

Some commenters on the DEIS questioned why the USACE was the lead federal agency with respect to ESA Section 7 compliance. The USACE, Jacksonville District, has special expertise related to listed species and consultation with FWS and NMFS in Florida. As prescribed under Section 7(a)(2) of the Endangered Species Act (ESA) and its implementing regulations at 50 CFR § 402, for every activity in which a federal action is involved, each federal agency carrying out the action, in this case the Corps, is required to evaluate the effects (make an effects determination) of each proposed action on any federally listed threatened or endangered species or its designated critical habitat.

The ESA is administered by the Secretary of the Interior, and the USFWS and NOAA-Fisheries share responsibilities for administering the ESA. Section 7 requires all federal agencies (in this case, the USACE, which is a Cooperating Agency with respect to this FEIS and has special expertise related to the ESA) to consult with the Secretary on any prospective agency action if an endangered species is present in the area and project implementation may affect that species. The Final Endangered Species Consultation Handbook for Procedures for Conducting Consultation Activities under Section 7 of the ESA (64 FR 31285, June 10 1999) establishes the procedures by which federal agencies, such as the FRA, must consult with the USFWS and USACE.

AAF-AR0045024

Several commenters were concerned with impacts to Florida Scrub-jay, and provided additional detailed information on the location of populations. Others were concerned with potential impacts to listed plant species that may occur within the FECR right-of-way, as well as gopher tortoise protection and mitigation. This section addresses these comments.

### 5.3.6.1    Methodology

Direct effects were calculated through the use of GIS models. This model quantified effects by intersecting the proposed work areas with land use polygons of habitat that may be utilized by protected species. The model quantified all loss of habitat along the Project based on the limit of permanent alteration. Areas within permanent alteration limits that are already disturbed, such as ballasted railbed and roads, were not counted as habitat loss. Impacts to wetland habitats along the N-S Corridor were calculated based on the wetland delineations conducted for the project. The land use data was acquired from SFWMD (n.d.) and SJRWMD (2013a).

The USACE assessed the effects of the Project on federally listed species using the appropriate species-specific Effects Determination Keys developed by the USACE and USFWS (USFWS 2008 and 2010a through d).

### 5.3.6.2    Environmental Consequences

Direct effects to protected species may include effects from construction, grading, vegetation management, and mortality associated with potential collisions with rail traffic. These activities may result in degradation of ecological function and loss of habitat, as well as loss of rare plant and animal species. Permanent impacts may include losses or changes in habitat and rare plant and wildlife species through clearing, grading, construction, and the potential introduction of undesirable, invasive species.

Habitat loss is a direct effect of transportation projects. Habitat loss occurs if an area that previously provided food, cover, water, and/or breeding resources to a rare species is cleared, paved, filled, or altered in such a way that it no longer provides one or more of these resources.

**No-Action Alternative**

Under the No-Action Alternative the Project would not be constructed or operated. Consequently, adverse impacts to threatened and endangered species and their habitats would not occur under the No-Action Alternative.

**Alternative A**

Alternative A would impact habitats potentially used by federally and state listed wildlife species as indicated in Table 5.3.6-1. The discussion of the effects of Alternative A includes Phase I, the West Palm Beach to Miami corridor.

***Federal Species***

This section describes the potential project effects on Federally-protected species including wildlife (aquatic vertebrates, birds, reptiles), and plants.

AAF-AR0045025

**Table 5.3.6-1    Alternative A - Direct Effects to Potential Protected Wildlife Species Habitat (acres)**

| Common Name | MCO Segment | E-W Corridor | N-S Corridor | Total |
|---|---|---|---|---|
| **Federally Listed Wildlife Species** | | | | |
| Florida Scrub-Jay | 34.1 | 28.2 | 0 | 62.3 |
| Audubon's Crested Caracara | 38.7 | 39.3 | 0 | 78 |
| Wood Stork | 43.3 | 81.9 | 9.0 | 134.2 |
| Red-Cockaded Woodpecker | 28.0 | 23.0 | 0 | 51 |
| American Alligator | 6.2 | 17.5 | 6.8 | 30.5 |
| Eastern Indigo Snake | 99.0 | 81.2 | 2.8 | 183 |
| **Wildlife Species Listed Only by the State of Florida** | | | | |
| Florida Mouse | 37.0 | 32.2 | 0 | 69.2 |
| Sherman's Fox Squirrel | 60.6 | 50.9 | 0 | 111.5 |
| Burrowing Owl | 6.1 | 11.4 | 0 | 17.5 |
| Florida Sandhill Crane | 12.5 | 22.3 | 6.2 | 41 |
| Limpkin | 43.3 | 81.9 | 9.0 | 134.2 |
| Little Blue Heron | 43.3 | 81.9 | 9.0 | 134.2 |
| Roseate Spoonbill | 43.3 | 81.9 | 9.0 | 134.2 |
| Snowy Egret | 43.3 | 81.9 | 9.0 | 134.2 |
| Southeastern American Kestrel | 38.7 | 41.6 | 0 | 80.3 |
| Reddish Egret | 0 | 0 | 0.1 | 0.1 |
| Tricolored Heron | 43.3 | 81.9 | 9.0 | 134.2 |
| White Ibis | 43.3 | 81.9 | 9.0 | 134.2 |
| Gopher Tortoise | 37.0 | 32.2 | 0 | 69.2 |
| Florida Pine Snake | 37.0 | 32.2 | 0 | 69.2 |
| Short-Tailed Snake | 37.0 | 32.2 | 0 | 69.2 |
| Gopher Frog | 37.0 | 32.2 | 0 | 69.2 |
| Mangrove Rivulus | 0 | 0 | 0.1 | 0.1 |

**Wildlife**

Bridge construction activities would occur within West Indian manatee critical habitat and important manatee areas, and potential habitat for sea turtles and smalltooth sawfish, but construction activities would not disturb seagrass beds or require dredging. There would be a negligible loss of habitat due to new bridge pilings.

Field surveys for Audubon's crested caracara nests will be completed prior to construction of the E-W Corridor. Construction activities proposed along the N-S Corridor would not impact suitable caracara habitat or existing nest trees. Direct effects to potential caracara habitat which would occur with the Project total approximately 78 acres. Caracara may also utilize pasture, but pasture was not included in the analysis.

Bald eagle nest OR-065, in Orange County, may be affected by the Project within the MCO Segment (Figure 4.3.6-3). The proposed railroad alignment is less than 200 feet from the nest, placing it within the primary and secondary nest buffer zones. Eagle nest OR-079, also in Orange County (Figure 4.3.6-1), is

AAF-AR0045026

approximately 600 feet from the proposed alignment, which is potentially within the nest buffer zone (FWC 2012a).

Two wood stork rookeries are within 2,500 feet of the N-S Corridor in Brevard County (USFWS 2010a). All activities for the Project except construction of the bridges over the Oleta River and Arch Creek would take place within at least one Core Foraging Area (CFA) (USFWS 2010b). Alternative A would affect a total of 134.2 acres of Suitable Foraging Habitat (SFH).

Florida scrub-jay metapopulations are within the vicinity of the N-S Corridor throughout Brevard, Indian River, St. Lucie, and Marin Counties, with a few located in Palm Beach County. Although the presence of scrub-jays along the E-W Corridor has not been fully evaluated, the Florida Scrub-Jay Umbrella Habitat Conservation Plan and Environmental Assessment indicates the presence of documented breeding populations within the vicinity of the Project in Orange County (USFWS 2012b). Potential scrub-jay habitat occurs within the Project Study Area outside the maintained areas of the SR 528 right-of-way, and direct effects would total approximately 62.3 acres under Alternative A.

The scrub-jay field surveys conducted along the N-S Corridor, the documented presence of scrub-jays at Savannas Preserve State Park, and observations of scrub-jays crossing the tracks all indicate it is likely scrub-jays will occur within the rail corridor at times. The action alternatives will result in passenger trains passing through these areas at maximum speeds ranging from 79 mph to 110 mph at a frequency of 32 trips per day. The increase in train frequency as well as the higher operational speeds in comparison to the existing freight rail service increase the likelihood scrub-jays will collide with a train resulting in an "incidental take." Scrub-jays are cooperative breeders, meaning a breeding pair which defends a territory is usually assisted by helpers. This breeding strategy provides for the replacement of a lost member of the breeding population from a large pool of these helpers, a behavior which buffers the population from losses of individuals by providing a quick replacement for a lost breeder (Woolfenden and Fitzpatrick 1984). Therefore, the USACE found that the anticipated "incidental take" will not jeopardize the continued existence of the species or significantly affect local populations.

A review of GIS data of documented red-cockaded woodpecker nest cavities indicated no nests occur within the Project Study Area. Direct effects to red-cockaded woodpecker habitat which would occur with Alternative A total approximately 51 acres within the E-W Corridor.

Potential habitat for the American alligator occurs throughout the Project Study Area for Alternative A. Direct effects to potential alligator habitat would total approximately 30.5 acres. Although the American alligator is no longer listed by the USFWS as a threatened species, it retains federal protection because of its similarity of appearance to the American crocodile, which is a listed species. No American crocodile are known to occur within the project area.

Alternative A would impact undeveloped (unpaved) sand skink soils within the footprint of the VMF and along the MCO Segment (Figure 5.3.6-1). Surveys to confirm the presence of sand skinks have not been completed. Areas providing potential habitat for the Eastern indigo snake include many habitats located within the Project Study Area. The maintained areas within MCO Segment, the SR 528 right-of-way along the E-W Corridor, and the FECR Corridor are generally not considered suitable habitat for the indigo snake. However, indigo snakes are known to enter developed and maintained areas adjacent to large undeveloped tracts of land. Direct effects to potential eastern indigo snake habitat would total approximately 183 acres. AAF will implement the Standard Protection Measures for the Eastern Indigo Snake (USFWS August 12 2013) during construction to reduce potential impacts to indigo snakes.

AAF-AR0045027



**Explanation of Features**
- Sand Skink Soils within Project Footprint
- MCO Segment and YMF
- E-W Corridor (Alternative E)

Data Sources: ESRI Imagery, 2010; AMEC, 2013, SSURGO, 2012

**Sand Skink Soils along the MCO Segment and E-W Corridor**

All Aboard Florida Intercity Passenger Rail Project

U.S. Department of Transportation
Federal Railroad Administration

5.3.6-1

Path: F:\FECR ECI_GDB\MXD\ESI\Location of Sand Skink Soils.mxd

### Plants

Comments regarding plant surveys were received from multiple sources following publication of the DEIS, including potential occurrences of Lakela's mint, Prickly pear (*Cereus eriocephala*), Four-petal paw paw (*Asimina tetranda*), Small's milkwort, and Curtiss Milkweed (*Dicerandra immaculata* var. *savannarum*). A known population of beautiful pawpaw occurs in southeast Orange County in pine flatwoods adjacent to the St. Johns River in the E-W Corridor. Johnson's seagrass may occur in a number of the waterways that intersect with the existing N-S Corridor. Based on input from Savannas Preserve State Park biologists, FRA has determined that fragrant prickly-apple is located within the FECR Corridor and could be affected by the proposed construction activities. USFWS has also indicated that other protected species may occur within construction areas adjacent to the Hobe Sound NW.

AAF's initial surveys for listed plant species focused on the areas of disturbance, and did not survey the entire FECR corridor. AAF is coordinating and will continue to coordinate with federal and state agencies as well as land managers and biologists within public lands to conduct appropriate pre-construction surveys and develop a transplanting plan for affected individual plants. Seagrass surveys conducted at all bridge crossings within the N-S Corridor did not reveal the presence of Johnson's seagrass within the Project Study Area. This species would not be affected by the Project.

AAF-AR0045028

With respect to Phase I of the Project (WPB-M Corridor), USFWS confirmed FRA's finding that no adverse effect would result from Phase I of the Project, as documented in the 2013 FONSI (FRA 2013a).

### State Species

Alternative A would potentially have negligible impacts on state-listed species. The Florida Fish and Wildlife Conservation Commission sent a letter to the Florida Department of Environmental Protection on November 26, 2012 in support of the Project and to confirm its finding that no significant adverse impact would result from Phase I of the Project.

Habitat for Sherman's fox squirrel, a state-listed species, is located throughout the MCO Segment and along the E-W Corridor. Direct effects to potential fox squirrel habitat would total approximately 111.5 acres.

Potential sandhill crane habitat consists of upland and shallow wetland areas with little or no canopy. Direct effects to potential sandhill crane habitat would total approximately 41 acres. No nests were identified within the Project Study Area during the wetland delineation field work.

The southeastern American kestrel utilizes similar habitat to the Audubon's crested caracara. Appropriate habitats consist of open areas with low vegetation and scattered or adjacent trees for perching. Direct effects to potential kestrel habitat would total approximately 80 acres. Habitat for the burrowing owl occurs within the Project Study Area in dry upland areas. Direct effects to potential burrowing owl habitat would total approximately 66 acres. Field reconnaissance did not identify any owl burrows within the Project Study Area.

Gopher tortoise habitat occurs within the xeric uplands of the Project Study Area including the E-W Corridor and the N-S Corridor, which were not included in the habitat analysis. Field reconnaissance indicated Alternative A would directly impact gopher tortoise burrows. Effects to burrows would potentially impact eastern indigo snake, Florida mouse, Florida pine snake, and gopher frog populations by removing potential refuges and nesting locations from the area. Direct effects to potential gopher tortoise, Florida mouse, Florida pine snake, short-tailed snake, and gopher frog habitat would total approximately 69.2 acres.

Gopher tortoise burrows were observed within the existing FECR Corridor and the proposed E-W Corridor boundaries during preliminary wildlife surveys and wetland delineations. AAF is coordinating with the FWC to determine areas appropriate for gopher tortoise surveys and will conduct 15 percent surveys to characterize the gopher tortoise population within the project study area.

The results of the gopher tortoise surveys would be used to characterize the potential populations of state and federal listed burrow commensal species including the Florida mouse, gopher frog, Florida pine snake, and eastern indigo snake. A gopher tortoise relocation permit would provide authorization to move all commensal species other than the eastern indigo snake to an adjacent habitat outside the construction limits. AAF is committed to addressing wildlife species that might be identified within the Project limits, and is coordinating with federal, state and local agencies. AAF anticipates that mitigation for, or relocation of Gopher Tortoises may be necessary as part of project construction. Gopher Tortoise conservation measures and permitting are covered under Florida law (Chapter 68A-27.003 Florida Administrative Code). AAF will coordinate with FFWCC during completion of preconstruction site surveys and permitting, as required. If Gopher Tortoise burrows are identified within the Project limits

AAF-AR0045029

of disturbance, AAF anticipates permitting and conservation measures (which may include on-site and/or off-site relocation) would be required.

Two wading bird rookeries within 1,500 feet of the Project Study Area at distances of approximately 550 feet and 1,400 feet, respectively, may also be affected by the Project. Both are visually blocked from the alignment by screens of thick vegetation, placing the Project outside of the buffer zones for both rookeries.

Potential habitat for the American oyster catcher occurs at several bridge locations along the N-S Corridor and the WPB-M Corridor. Although oyster beds are not mapped in the GIS land use data acquired from SFWMD and SJRWMD, they were identified within the Hillsboro Canal, North Fork of the Middle River, South Fork of the Middle River, and the Oleta River.

Habitat for the reddish egret and mangrove rivulus is also present in mangroves at bridge locations along the N-S and WPB-M Corridors and direct effects to mangrove habitat would total 0.1 acre. Because Mangrove rivulus are amphibious and may be found out of water in wet logs or leaf matter within mangrove swamps, construction may result in an incidental take of the rivulus.

Field surveys have not been completed for the MCO Segment or the E-W Corridor, but potential habitat for state listed plant species occurs throughout the Project Study Area. Field surveys will be prior to construction. State listed plant species potentially occurring within the N-S Corridor include Curtiss' milkweed and barbed-wire cactus.

**Alternative C**

Alternative C would result in the loss of natural habitats potentially used by federally and state listed wildlife species as shown in Table 5.3.6-2. Alternative C would have the same impacts on the habitat of protected species as Alternative A within the MCO Segment and the N-S Corridor. The difference in impacts between Alternative A and Alternative C would occur within the 17-mile stretch of the E-W Corridor between SR 520 and SR 417 where the proposed route for Alternative C would be south of the proposed route for Alternative A and includes some habitat located south of the SR 528 right-of-way.

The route for Alternative C would place the railroad alignment farther from the highway than the route for Alternative A. Although the presence of scrub-jays along the E-W Corridor has not been fully evaluated, documented breeding populations occur within the vicinity of the Project Study Area in Orange County (USFWS 2012b). Alternative C would impact approximately 83 acres of potential scrub-jay habitat.

Alternative C would have more effects to potential caracara habitat than would occur under Alternative A and a greater likelihood of a caracara nest located within the railroad footprint. Direct effects to caracara habitat with Alternative C would total approximately 108.8 acres.

The Project areas close to the bald eagle nests, wood stork nesting colonies, and wading bird rookeries described for Alternative A are no different under Alternative C, therefore effects to nesting areas would remain the same. All activities for the Project except constructing bridges over the Oleta River and Arch Creek would take place within at least one wood stork CFA (USFWS 2010b). Direct effects to a total of approximately 169 acres of SFH would occur with the implementation of Alternative C.

AAF-AR0045030

| Table 5.3.6-2    Alternative C - Direct Effects to Potential Protected Wildlife Species Habitat (acres) | | | | |
|---|---|---|---|---|
| Common Name | MCO Segment | E-W Corridor | N-S Corridor | Total |
| **Federally Listed Wildlife Species** | | | | |
| Florida Scrub-Jay | 34.1 | 48.4 | 0 | 82.5 |
| Audubon's Crested Caracara | 38.7 | 70.1 | 0 | 108.8 |
| Wood Stork | 43.3 | 116.9 | 9.0 | 169.2 |
| Red-Cockaded Woodpecker | 28.0 | 32.9 | 0 | 60.9 |
| American Alligator | 6.2 | 14.0 | 6.8 | 27 |
| Eastern Indigo Snake | 99.0 | 122.5 | 2.8 | 224.3 |
| **Wildlife Species Listed Only by the State of Florida** | | | | |
| Florida Mouse | 37.0 | 59.0 | 0 | 96.0 |
| Sherman's Fox Squirrel | 60.6 | 73.8 | 0 | 134.4 |
| Burrowing Owl | 6.1 | 26.1 | 0 | 32.2 |
| Florida Sandhill Crane | 12.5 | 116.9 | 6.2 | 135.6 |
| Limpkin | 43.3 | 116.9 | 9.0 | 169.2 |
| Little Blue Heron | 43.3 | 116.9 | 9.0 | 169.2 |
| Roseate Spoonbill | 43.3 | 116.9 | 9.0 | 169.2 |
| Snowy Egret | 43.3 | 116.9 | 9.0 | 169.2 |
| Southeastern American Kestrel | 38.7 | 70.9 | 0 | 109.6 |
| Reddish Egret | 0 | 0 | 0.1 | 0.1 |
| Tricolored Heron | 43.3 | 116.9 | 9.0 | 169.2 |
| White Ibis | 43.3 | 116.9 | 9.0 | 169.2 |
| Gopher Tortoise | 37.0 | 59.0 | 0 | 96.0 |
| Florida Pine Snake | 37.0 | 59.0 | 0 | 96.0 |
| Short-Tailed Snake | 37.0 | 59.0 | 0 | 96.0 |
| Gopher Frog | 37.0 | 59.0 | 0 | 96.0 |
| Mangrove Rivulus | 0 | 0 | 0.1 | 0.1 |

Although implementing Alternative C would not result in the removal of any documented red-cockaded woodpecker nest cavities, it would affect approximately 60.9 acres of potential habitat and effects would be negligible.

Direct effects to wetlands would be greater with Alternative C than with Alternative A due entirely to the difference in alignments between SR 520 and SR 417 in Orange County. The difference in wetland effects would impact habitat for American alligator, Florida sandhill crane, and the state listed wading birds, and may potentially impact foraging habitat for Audubon's crested caracara, southeastern American kestrel, and eastern indigo snake (Table 5.3.6-2).

Alternative C would also impact undeveloped sand skink soils within the footprint of the VMF. Surveys to confirm the presence of sand skinks have not been completed. Field surveys indicate direct effects under Alternative C would most likely occur to gopher tortoise burrows.

AAF-AR0045031

**Alternative E**

Alternative E, the preferred alternative, would result in the loss of natural habitats potentially used by federally and state listed wildlife species as shown in Table 5.3.6-3. Alternative E would have the same impacts on the habitat of protected species as Alternative A within the MCO Segment and the N-S Corridor. The difference in impacts between Alternative A and Alternative E would occur within the 17-mile stretch of the E-W Corridor between SR 520 and SR 417 where the proposed route for Alternative E would be south of the proposed route for Alternative A and include some habitat located south of the SR 528 right-of-way.

Although the presence of scrub-jays along the E-W Corridor has not been fully evaluated, documented breeding populations occur in Orange County (USFWS 2012b). Alternative E would impact approximately 72 acres of potential scrub-jay habitat.

| Table 5.3.6-3  Alternative E - Direct Effects to Potential Protected Wildlife Species Habitat (acres) | | | | |
|---|---|---|---|---|
| **Common Name** | **MCO Segment** | **E-W Corridor** | **N-S Corridor** | **Total** |
| **Federally Listed Wildlife Species** | | | | |
| Florida Scrub-Jay | 34.1 | 37.8 | 0 | 71.9 |
| Audubon's Crested Caracara | 38.7 | 63.4 | 0 | 102.1 |
| Wood Stork | 43.3 | 111.9 | 9.0 | 164.2 |
| Red-Cockaded Woodpecker | 28.0 | 33.1 | 0 | 61.1 |
| American Alligator | 6.2 | 11.1 | 6.8 | 24.1 |
| Eastern Indigo Snake | 99.0 | 110.7 | 2.8 | 212.5 |
| **Wildlife Species Listed Only by the State of Florida** | | | | |
| Florida Mouse | 37.0 | 47.6 | 0 | 84.6 |
| Sherman's Fox Squirrel | 60.6 | 72.1 | 0 | 132.7 |
| Burrowing Owl | 6.1 | 21.1 | 0 | 27.2 |
| Florida Sandhill Crane | 12.5 | 32.0 | 6.2 | 50.7 |
| Limpkin | 43.3 | 111.9 | 9.0 | 164.2 |
| Little Blue Heron | 43.3 | 111.9 | 9.0 | 164.2 |
| Roseate Spoonbill | 43.3 | 111.9 | 9.0 | 164.2 |
| Reddish Egret | 0 | 0 | 0.1 | 0.1 |
| Snowy Egret | 43.3 | 111.9 | 9.0 | 164.2 |
| Southeastern American Kestrel | 38.7 | 63.4 | 0 | 102.1 |
| Tricolored Heron | 43.3 | 111.9 | 9.0 | 164.2 |
| White Ibis | 43.3 | 111.9 | 9.0 | 164.2 |
| Gopher Tortoise | 37.0 | 47.6 | 0 | 84.6 |
| Florida Pine Snake | 37.0 | 47.6 | 0 | 84.6 |
| Short-Tailed Snake | 37.0 | 47.6 | 0 | 84.6 |
| Gopher Frog | 37.0 | 47.6 | 0 | 84.6 |
| Mangrove Rivulus | 0 | 0 | 0.1 | 0.1 |

AAF-AR0045032

A survey for Audubon's crested caracara was conducted by AAF. No caracara nests were located within 1,000 feet of the E-W Corridor, although individual birds were observed and potential feeding habitat exists along SR 528. Alternative E would impact approximately 102 acres of potential caracara feeding habitat. There would also be a greater potential for caracara nest trees located within the Project Study Area. The Project areas close to the bald eagle nests, wood stork nesting colonies, and wading bird rookeries described above for Alternative A would not be different under Alternative E. All activities except construction of the bridges over the Oleta River and Arch Creek would take place within at least one wood stork CFA (USFWS 2010b). Alternative E would affect a total of approximately 164 acres of SFH.

Field surveys for the presence of red-cockaded woodpecker nest cavities would be conducted subsequent to the selection of the final alternative for the Project. Although implementing Alternative E would not result in the removal of any documented red-cockaded woodpecker nest cavities, it would affect 61 acres of potential habitat and effects would be negligible.

Wetland losses would impact habitat for wood stork, American alligator, Florida sandhill crane, and the state listed wading birds, and may potentially impact foraging habitat for Audubon's crested caracara, southeastern American kestrel, and eastern indigo snake (Table 5.3.6-3).

Alternative E, the preferred alternative, would also impact undeveloped sand skink soils within the footprint of the VMF. Surveys to confirm the presence of sand skinks have not been completed. Field surveys indicate direct effects from Alternative E would most likely occur to gopher tortoise burrows the effects of which would potentially impact eastern indigo snake, Florida mouse, Florida pine snake, and gopher frog populations by removing potential refuges and nesting locations from the area.

### 5.3.6.3    Indirect and Secondary Impacts

Indirect effects to threatened or endangered species may include habitat fragmentation and associated edge effects; the loss of genetic diversity of rare plant and animal populations, increased competition for resources, and physical or psychological restrictions on movements caused by some feature within a corridor that wildlife are unable or unwilling to cross. Indirect effects can be caused by the increased noise and visual disturbance from land-clearing, earth-moving, and construction machinery during construction. Noise and vibration associated with the active rail line may cause indirect effects if wildlife avoid habitat near the embankment.

Section 5.3.5, *Biological Resources and Natural Ecological Systems*, provides a broader analysis of the indirect effects to natural habitats and communities.

Few studies on wildlife responses to noise resulting from rail operations have been conducted in the United States, but there is a well-documented negative correlation between transportation corridors and wildlife health/diversity (Rosenfield et al. 1992). Summers et al. (2011) found that distance away from roads was the most important determinant of songbird species richness but were not able to demonstrate that this was due to traffic noise. A study conducted in central Florida on the federally threatened Florida scrub-jay found mortality was significantly higher in roadside territories and reproductive success was higher in non-roadside territories (Mumme et al. 2000). Noise does not always indicate lower reproductive success in birds. A study on the impact of percussive and military aircraft (helicopter) noise

AAF-AR0045033

on nesting success and behavior of the federally endangered red-cockaded woodpecker found (Delaney et al. 2000) that:

- Experimental noise (maximum level = 104 dB) did not impact red-cockaded woodpecker reproductive success;

- Flush response increased closer to the noise source;

- Red-cockaded woodpeckers returned to their nests relatively quickly after being flushed; and

- Noise levels within the nest cavities were substantially louder than noise levels at the base of the nest tree.

Based on these analyses, the Project would not have an adverse indirect effect on federal or state-listed species.

### 5.3.6.4    Temporary Construction-Period Impacts

Proposed construction activities (for example, using construction equipment, operating barges or boats, and placing and securing piling structures) associated with in-water bridge work may temporarily disturb manatees, swimming sea turtles, and smalltooth sawfish in the vicinity of the Project Study Area through temporary effects to water quality (for example, increased turbidity), noise, boat collisions, and unintentional "harassment" of individuals within or adjacent to the Project Study Area. AAF has agreed to implement the Manatee Construction Conditions, Smalltooth Sawfish and Swimming Sea Turtle Conditions and Eastern Indigo Snake Protection Measures which will reduce construction period impacts.

As described above in Section 5.3.5.5 for EFH, pile driving (percussive or vibratory) has the potential to have temporary impacts on threatened or endangered fish and other aquatic organisms during construction of a bridge. Single strike sound levels causing injuries to wildlife are expressed as dB sSEL, or decibels single sound effect level. The sSEL source level caused by a single strike to a 24-inch by 24-inch concrete pile using an impact hammer is 170 dB sSEL, which does not exceed the noise threshold of 187 dB sSEL for causing injury to fish, including the smalltooth sawfish. Sea turtles have a higher single strike noise threshold. The risk of cumulative injury from construction noise is unlikely because West Indian manatees, smalltooth sawfish, and swimming sea turtles will be allowed to leave the project areas, construction activities will be limited to daylight hours, and pile driving will be limited to three piles per day. Bubble curtains will be used to reduce noise impacts. It is anticipated temporary construction noise and vibration from pile driving will elicit an intense avoidance response from most species, including smalltooth sawfish, sea turtles, and manatees, but will not permanently affect or jeopardize existing populations of aquatic wildlife.

In terrestrial habitats, noise and human activity from construction could temporarily cause bird and other vertebrate species to avoid areas near construction sites.

### 5.3.6.5    Section 7 Consultation and Draft Findings

The USACE has facilitated several discussions with USFWS and NMFS regarding ESA consultation for this Project. These discussions have aided in clarification of the details required in the Biological Assessment (BA), which is being prepared in accordance with the *Final ESA Section 7 Consultation Handbook*

AAF-AR0045034

(USFWS 1998). Meeting minutes are provided in Appendix 5.3.6-A. The consultation has been performed in coordination with the following agencies: USFWS (Jacksonville and Vero Beach offices), NMFS, Protected Resources Division (PRD), and FWC. The BA is intended to provide documentation necessary for informal consultation with the USFWS and NMFS in order to comply with Section 7 of the federal ESA (50 CFR 402).

Protected species coordination was initiated on September 6, 2012, with a meeting at the USACE office in Cocoa, which included representatives from the USFWS offices for North Florida and South Florida, and NMFS. USFWS recommended the use of construction conditions to protecting manatees, and indigo snakes., As adjacency to Florida scrub-jay habitat was a concern, scrub-jay surveys were required to determine how the operation of the rail would affect the species. NMFS recommended the use of construction conditions to protecting smalltooth sawfish and swimming sea. NMFS required effects to Johnson seagrass and smalltooth sawfish be determined and provided an ESA checklist for the bridge locations and the EFH federal mandate.

On October 12, 2012, AAF requested that the USFWS confirm listed species occurrence and requirements for the Project Study Area. A response from the South Florida Office of the USFWS was provided on October 30, 2012 confirming the species of concern included: wood stork, Florida scrub-jay, Audubon's crested caracara, bald eagle, eastern indigo snake, and red-cockaded woodpecker. The North Florida Office of the USFWS confirmed the list of species of concern at a meeting at the USFWS Office in Jacksonville. The species list was confirmed to include: West Indian manatee, wood stork, red-cockaded woodpecker, eastern indigo snake, Audubon's crested caracara, Florida scrub-jay, and bald eagle.

BAs were completed and submitted in September 2013 for species under USFWS and NMFS jurisdiction. Based upon the BA submitted to the USFWS, the USACE issued an effects determination letter on September 19, 2013, for the South Florida portion of the Project extending from Miami north through Indian River County, and on September 24, 2013 for the northern section of the Project extending from Indian River County to Orlando. Within these areas USACE determined that the Project would have "no effect" to the Florida panther, Everglade snail kite, red-cockaded woodpecker, and piping plover based on the lack of suitable habitat, known species range within the Project Study Area, and/or lack of visual confirmation during surveys. USACE has made the specific findings listed below (Appendix 5.3.6-A). According to USACE, the Project is:

- Not likely to adversely impact the wood stork. This determination is based on the Project not being located within 2,500 feet of an active colony site. Although the Project includes construction within SFH and within the CFA of a colony site, prior to construction AAF would provide SFH compensation in accordance with the Habitat Management Guidelines to replace lost foraging value.

- Not likely to adversely impact the eastern indigo snake. This determination is based on the Project not being located in open water, and the commitment by AAF to follow the USFWS's *Standard Protection Measures for the Eastern Indigo Snake* during construction.

- May affect, but is not likely to adversely impact the West Indian manatee. This determination is based on the fact that the Project is not located in an Important Manatee Area; does not include dredging; will have minimal adverse effects on aquatic vegetation or mangroves; and the commitment by AAF to follow standard manatee conditions for in-water work.

AAF-AR0045035

- May effect, but is not likely to adversely impact the Florida scrub-jay. Habitat documented to be used by this species is outside of the proposed work area.

- May affect, but is not likely to adversely impact the blue-tailed mole skink or the Florida sand skink. AAF has identified areas of suitable habitat for these species and is completing surveys.

- Will have no effect to the Atlantic sturgeon or shortnose sturgeon based on the proposed work occurring outside of their known range.

- Will have no effect to Johnson's seagrass based on the absence of the species within the proposed work area.

- May affect, but is not likely to adversely impact swimming sea turtles based on AAF''s agreement to follow the *Sea Turtle and Smalltooth Sawfish Construction Conditions* during construction.

- May affect, but is not likely to adversely impact smalltooth sawfish based on AAF's proposed compensatory mitigation for the loss of red mangrove habitat, absence of seagrass beds within the in-water work areas, and AAF's agreement to follow the Smalltooth Sawfish Construction Conditions during construction.

USFWS, Jacksonville Field Office, and NMFS, Protected Resources Division, have provided letters of concurrence with USACE's findings, as documented in Appendix 5.3.6-A. USACE is continuing consultation with USFWS, Vero Beach Field Office.

In an electronic letter dated November 6, 2014, the USFWS, Vero Beach Field Office stated the Project will result in adverse effects to and potential "incidental take" of the Florida scrub-jay, and recommended the USACE initiate formal consultation pursuant to Section 7 of the ESA. The USACE responded on November 21, 2014, in a letter in which it revised the effects determination for the scrub-jay to "may affect" and requested formal consultation. As a result the USFWS prepared a Biological Opinion to determine if the Project would jeopardize the continued existence of the species. The completed analysis of the Project's impacts to the Florida scrub-jay indicated it would not jeopardize the continuation species. According to regulations pursuant to the ESA, the applicant and the action agency, in this case AAF and FRA, are required to minimize the "take" resulting from a Federal action. Minimization of "take" may be accomplished by several methods including protection and conservation of currently unprotected scrub-jay habitat. AAF has acquired two credits from a USFWS approved scrub-jay conservation bank in Florida (Appendix 5.3.6-B). This measure would benefit the Florida scrub-jay by protecting occupied habitat for the species within its range that was previously not protected and managing this habitat in perpetuity.

USFWS Vero Beach staff and Savannas Preserve State Park staff indicated fragrant prickly-apple is present within the FECR Corridor and would be affected by the Project. AMEC, on behalf of AAF, is coordinating with federal and state agency officials as well as land managers and biologists to develop a relocation plan for affected individual plants. USFWS is revising the Biological Opinion, which will be finalized before FRA issues a Record of Decision, to include the fragrant prickly-apple and the finalized transplanting plan.

AAF-AR0045036

## 5.4    Social and Economic Environment

This section evaluates the effects of the Project on the human environment, including communities and demographics, environmental justice communities, economics, public health and safety, cultural resources, recreation and other Section 4(f) resources, visual and scenic resources, and utilities and energy.

### 5.4.1    Communities and Demographics

This section describes the potential impacts to existing community structure and demographic profiles within the Project Study Area. The Project under all Action Alternatives would not result in residential displacement, neighborhood fragmentation, or the loss of continuity between neighborhoods. Many comments on the DEIS concerned effects of increased train traffic on the quality of life in small towns along the coast of Florida, as summarized in Section 1.7.7 of this FEIS.

#### 5.4.1.1    Environmental Consequences

This section evaluates potential direct effects of the Project to communities and demographics under the No-Action Alternative and the Action Alternatives. Potential direct effects would include long-term residential displacement and neighborhood fragmentation or the loss of continuity between neighborhoods.

**No-Action Alternative**

Under the No-Action Alternative, the Project would not be constructed or operated. Existing commuter railway services would remain unchanged, and no changes to communities and demographics would occur.

**Action Alternatives A, C, and E**

Potential direct effects of the Project on communities and demographics would be the same under all Action Alternatives.

***MCO Segment***

The MCO Segment is entirely within GOAA property boundaries; it would not result in residential displacement, neighborhood fragmentation or the loss of continuity between neighborhoods.

***East-West Corridor***

The E-W Corridor would be predominantly within the SR 528 right-of-way between Orlando and Cocoa. The right-of-way already bisects these municipalities; therefore, the E-W Corridor would not result in new neighborhood fragmentation or loss of continuity among these neighborhoods.

The E-W Corridor would not cross any residential neighborhoods outside Orlando and Cocoa; no neighborhood fragmentation would occur. The E-W Corridor would pass just south of the unincorporated

AAF-AR0045037

community of Wedgefield, which is north of SR 528 and west of the SR 520 interchange. Wedgefield is already isolated from other neighborhoods; there are no adjoining neighborhoods.

The E-W Corridor would not require acquisition of residential properties; no residential displacements would occur.

### North-South Corridor

The N-S Corridor is within the existing FECR Corridor, which has supported freight and/or passenger service on a continuous basis for more than 100 years. Existing neighborhoods have largely developed around these conditions, and any fragmentation that currently exists would not be the result of the Project. Grade crossings will be closed more often than with the No-Action Alternative, but for very short time periods. Therefore, the N-S Corridor would not result in residential displacement, neighborhood fragmentation, or the loss of continuity between neighborhoods.

### Phase I - West Palm Beach-Miami Corridor

Similar to the N-S Corridor, infrastructure improvements along the FECR Corridor for the WPB-M Corridor would not result in residential displacement, neighborhood fragmentation, or the loss of continuity between neighborhoods. Property acquisition will be required for the proposed stations at West Palm Beach and Fort Lauderdale; however, no significant adverse impacts would result to existing local community structure or demographic profiles.

### 5.4.1.2    Indirect and Secondary Impacts

The Project would have an indirect beneficial effect to communities; it would improve accessibility and mobility between Orlando and Miami, as well as other communities in southeast Florida. Despite accessibility and mobility improvements, the Project would not result in measurable population shifts.

According to projections from the University of Florida, Orange County will add 550,979 residents between 2011 and 2035 (BEBR 2011b). This forecast is independent of the Project and it represents baseline conditions that would occur under the No-Action Alternative.

As noted in Section 4.1.1, *Land Use*, the only potential growth-inducing component of the Project is use of the MCO Intermodal Station. Since this station is located within MCO property boundaries, there would be no associated transit-oriented development. The station at MCO would not be a nucleus for growth or promote population shifts.

According to the 2006 South Florida East Coast Corridor Transit Analysis (SFECCTA), Southeast Florida has been growing rapidly due to immigration and high birth rates and is expected to continue to grow in the foreseeable future (FDOT 2006b). By 2030, the number of households along the WPB-M Corridor is projected to increase by 36 percent compared to 28 percent for Palm Beach, Broward, and Miami-Dade counties combined. Population will increase even more with 34 percent growth in the region and 46 percent along the WPB-M Corridor, bringing the total population within 1 mile of the FECR Corridor to over 1 million by 2030. Automobile ownership and vehicle miles traveled (VMT) are expected to increase even more dramatically than population.

AAF-AR0045038

As stated in Section 3.5 of the 2012 EA, transportation improvement projects, such as the proposed stations, have been shown to induce new residential and new commercial development. However, changes in population density and growth rate are projected to occur along the WPB-M Corridor, where AAF stations will be located, regardless of the Project. The WPB-M Corridor would provide an efficient transportation alternative that addresses highway congestion and current and future travel demand between major South Florida cities. The WPB-M Corridor would increase the ability of nearby populations to travel to jobs, education, health care, and leisure activities.

### 5.4.1.3    Temporary Construction-Period Impacts

Constructing the Project may temporarily disrupt automobile traffic. Upgrades at grade crossings and bridge rehabilitations would adversely impact travel between adjacent neighborhoods and could potentially impede emergency responders, particularly along the N-S Corridor. As discussed in Section 5.1.2, AAF will work with local communities to minimize disruption to traffic and to maintain emergency access.

### 5.4.2    Environmental Justice

This section describes the potential effects to minority and low-income populations within the Project Study Area that could result from the Project. EO 12898 *Federal Actions to Address Environmental Justice in Minority Population and Low-Income Populations* was issued in February 1994 and requires that federal agencies consider whether a Project would have a disproportionately high adverse impact on minority or low-income populations.

CEQ's guidance also indicates that the analysis should identify if a disproportionately high adverse human health or environmental impact occurs on minority or low-income populations. Furthermore, USDOT Order 5610.2(a) establishes USDOT policy to consider environmental justice principles in all USDOT programs, policies, and activities. USDOT Order 5610.2(a) also sets forth the steps to prevent disproportionately high and adverse impacts to minority or low-income populations.

The Project would not result in disproportionately high and adverse impacts to minority or low-income populations. There would be no adverse impacts to environmental justice communities resulting from residential displacement, job loss, or neighborhood fragmentation due to the use of property. Increased train traffic would result in the degradation of local road traffic conditions at certain at-grade crossings and nearby intersections; however, these impacts are expected to be minor. Grade crossings will be closed more often than with the No-Action Alternative, but for very short time periods. Although changes in noise would affect residents along the E-W Corridor, none of the affected parcels are within environmental justice communities. There would be no adverse noise or vibration impacts to environmental justice communities along the E-W Corridor under any of the Action Alternatives, and mitigation would limit any changes in vibration along the N-S Corridor such that there would be no resulting vibration impacts. The Project would comply with all relevant health and safety regulations and would not result in adverse impacts to the public's health or safety, including persons living in environmental justice communities.

Many comments on Environmental Justice issues were received following circulation of the DEIS. Commenters suggested that FRA should have included local Community Redevelopment Areas in the list

AAF-AR0045039

of EJ communities; should have considered the effects of increased train traffic on the ability of EJ community residents to cross the active tracks; and that noise impacts would disproportionately impact real estate values and the economic viability of businesses within low-income and minority communities. Section 1.7.7 and the following sections provide responses to these comments.

### 5.4.2.1    Methodology

A high-level quantitative analysis was conducted for Phase I pursuant to Executive Order 12898, to determine the potential for disproportionately high or adverse impacts to sensitive communities. Based on the result of the demographic assessment, minority populations subject to protection under Executive Order 12898 are present within the West Palm Beach to Miami Corridor Area.

This evaluation used demographic data collected from U.S. Census Bureau (USCB) 2010 U.S. Census and 2010 American Community Survey (ACS). Because impacts to environmental justice communities are dependent on the potential for significant impacts in other environmental categories, the area of analysis for environmental justice is the area of potential significant impacts for the other environmental impact categories, including cumulative impacts. The Project Study Area for this evaluation includes census tracts within 1,000 feet of the proposed or existing railroad alignments.

Thresholds to determine meaningfully greater high minority and low-income populations include census tracts where minority populations are 10 percent higher than the combined total for the six counties crossed by the Project (37.4 percent) and census tracts where low-income populations are 10 percent higher than the combined total for the six counties crossed by the Project (22.4 percent).

### 5.4.2.2    Environmental Consequences

This section includes an evaluation of potential direct effects of the Project to environmental justice communities under the No-Action Alternative and the Action Alternatives. Potential direct effects to environmental justice communities would include residential or job displacement due to property acquisition, neighborhood fragmentation, degradation of local traffic conditions, increases in noise and vibration levels, and impacts to the public's health and safety. This evaluation includes a comparison between the potential direct effects to environmental justice communities with those same impacts to non-environmental justice communities to determine if adverse impacts would be predominantly borne by minority and/or low-income populations.

Many commenters raised concerns regarding the economic impact to minority business owners along the N-S Corridor. As noted in Chapter 1, *Introduction*, the Project would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the viability of businesses along the rail line. The FECR Corridor is an active freight rail corridor, with approximately 14 round-trip freight trains per day under current conditions, projected to increase to 20 by 2019. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The FECR Corridor has supported freight and/or passenger rail service on a continuous basis for more than 100 years, and businesses proximate to this rail line largely developed around these conditions. The Project would not introduce a significant new disruption, noise, traffic, or other effects that could affect businesses, including those that are minority-owned.

AAF-AR0045040

Many commenters also raised concerns regarding Title I Schools[5], particularly noise and vibration affects to related playing fields. Although Title I Schools exist within the Project Study Area, notably within East Stuart, Golden Gate, and Port Salerno in Martin County, they are not specifically addressed in this environmental justice analysis. This environmental justice analysis does not address individual properties; rather it broadly assesses the impacts of the Project on minority and low-income populations at their places of residence; this includes children and families associated with schools.

Comments also referred to Gifford, a census-designated place in Indian River County that has a non-White population of 50.3 percent, 43.7 percent of which is comprised of persons with a race of Black or African American (USCB 2010a). Gifford is located within Census Tract 503.02, which this environmental justice analysis has identified as an EJ community for having high minority and low-income populations. As such, Gifford has been evaluated for potential disproportionate adverse impacts from the Project as part of this environmental justice analysis at the census tract level.

**No-Action Alternative**

Under the No-Action Alternative, the Project would not be constructed or operated. Existing commuter railway services and opportunities would remain unchanged, and there would be no disproportionate adverse impacts to minority or low-income populations. However, minority populations in Orlando, Miami, and other communities would not have access to efficient intercity rail service.

**Action Alternatives A, C, and E**

Potential direct effects of the Project to environmental justice communities would be the same under all Action Alternatives. Alternatives A, C, and E would have identical impacts to environmental justice communities because they would cross the same census tracts.

**MCO Segment**

The MCO Segment is entirely within Census Tract 168.02. According to 2010 USCB data, this census tract does not meet the established environmental justice thresholds. No environmental justice communities exist along the MCO Segment; therefore, there would be no disproportionate adverse impacts to minority or low-income populations.

**East-West Corridor**

As noted in Sections 5.4.1, *Communities and Demographics*, and 5.4.3, *Economic Conditions*, the Project would not result in residential displacement, job loss, or neighborhood fragmentation due to required property acquisitions along the E-W Corridor. Therefore, there would be no disproportionate impacts to environmental justice communities from changes in land use under any of the Action Alternatives.

As noted in Section 5.1.2, *Transportation*, the Project would not impact local vehicular traffic along the E-W Corridor, as there would be no at-grade crossings and no public road closures. For the same reasons, the Project would not affect the ability of persons commuting to work by bike or by walking. Therefore,

---

5    Title 1 of the Elementary and Secondary Education Act of 1965 provides funding to schools to improve academic achievement by disadvantaged children in core academic subjects.

AAF-AR0045041

there would be no disproportionate impacts to environmental justice communities from changes in local vehicular traffic conditions.

The E-W Corridor passes through two census tracts that meet the established environmental justice thresholds, Census Tracts 623.02 and 624.00. The current sound environment along these portions of the E-W Corridor predominantly includes roadway traffic along SR 528. As described in Section 5.2.2, *Noise and Vibration,* changes to noise along the E-W Corridor would affect 109 (105 moderate and four severe impacts) residential parcels. None of the affected residential parcels are within environmental justice communities; therefore, there would be no disproportionate adverse impacts from noise in environmental justice communities along the E-W Corridor.

The Project would result in vibration impacts to 118 residential parcels along the E-W Corridor, none of which are within environmental justice communities. There would be no disproportionate adverse impacts from vibration in environmental justice communities along the E-W Corridor.

The E-W Corridor would not require use of land within a Section 4(f) resource. There would be no disproportionate adverse impacts to parks and recreation resources within environmental justice communities along the E-W Corridor.

### *North-South Corridor*

As noted in Sections 5.4.1, *Communities and Demographics,* and 5.4.3, *Economic Conditions,* the Project would not result in residential displacement, job loss, or neighborhood fragmentation due to required property acquisitions along the N-S Corridor. Therefore, there would be no adverse impacts to environmental justice communities from changes in land use.

No disproportionate impacts to environmental justice communities would occur from changes in local vehicular traffic conditions. As noted in Section 5.1.2, *Transportation,* some roadway crossings would experience increased traffic delays due to the increased frequency of at-grade crossing closures. However, traffic analyses show that these impacts would not rise to a level of significance. Although some commenters requested pedestrian and bicycle crossings at at-grade crossings, the lack of a significant impact to local vehicular traffic conditions is an indicator of no effect to the ability of persons commuting by these means. Despite the lack of a significant impact, as part of the Project, AAF will construct pedestrian crossings where sidewalks exist on either side of the tracks.

The N-S Corridor passes through 29 census tracts that meet the established environmental justice thresholds (Tables 4.4.2-2 and 4.4.2-4). The future No-Action sound environment along these portions of the N-S Corridor predominantly includes freight traffic along the existing FECR Corridor and noise from surrounding population density. As described in Section 5.2.2, *Noise and Vibration,* adding passenger trains along the N-S Corridor would not result in adverse noise impacts due to the use of wayside horns at 117 crossing identified in Appendix 3.3.5-D. Potential impacts resulting from changes to noise in environmental justice communities would not be appreciably more severe or greater in magnitude than the impacts experienced by non-environmental justice communities along the N-S Corridor.

The Project would result in vibration impacts to 3,383 residential parcels along the N-S Corridor, 834 (24.7 percent) of which are within environmental justice communities. However, all vibration impacts (including those within environmental justice communities) would be mitigated to the point where there

AAF-AR0045042

would be no disproportionate adverse impacts from vibration in environmental justice communities along the N-S Corridor (see Chapter 7, *Mitigation*).

The N-S Corridor would not require use of land within a park, recreational area or wildlife Section 4(f) resource. There would be no disproportionate adverse impacts within environmental justice communities along the N-S Corridor as a result of the loss of recreational or park resources.

### Phase I - West Palm Beach - Miami Corridor

As stated in Section 3.3.3 of the 2012 EA, the Project would not impact minority or low-income populations in a disproportionate manner. The relocated Fort Lauderdale Station (as compared to the Fort Lauderdale Station North Site) would also not disproportionately impact minority or low-income populations. Implementation of crossing-mounted horns would offset all severe impacts in Broward and Miami-Dade Counties and more than 99 percent of all severe impacts in Palm Beach County. As required by the 2013 FONSI, AAF conducted a supplemental study of the Phase I Project's effects on environmental justice communities (AMEC 2014b) and found no disproportionate adverse effect.

### Summary

Direct effects to environmental justice communities along the MCO Segment, E-W Corridor, N-S Corridor, and WPB-M Corridor would be the same for all Action Alternatives. There would be no impacts to environmental justice communities along the MCO Segment, as there are no minority or low-income populations within the census tract encompassing this segment. Neither the E-W Corridor nor the N-S Corridor would result in residential displacement, job loss, or neighborhood fragmentation due to the use of property; therefore, there would be no disproportionate impacts to environmental justice communities from changes in land use. Although changes in noise would affect 109 (105 moderate and four severe) residential parcels along the E-W Corridor, none of these parcels are within environmental justice communities. Changes in train frequency along the N-S Corridor would not result in adverse noise impacts to environmental justice communities. There would be no adverse vibration impacts to environmental justice communities along the E-W Corridor under any Action Alternative, and mitigation would limit any changes in vibration along the N-S Corridor, such that there would be no resulting vibration impacts. Finally, there would be no acquisition of land within a Section 4(f) resource along the E-W Corridor or N-S Corridor, and no disproportionate adverse impacts to environmental justice communities.

Although there are Environmental Justice communities of concern present along the FECR Corridor, the implementation of directional, wayside, or crossing mounted horns would dramatically reduce the existing footprint of warning horn noise and would minimize the number of existing and potential noise impacts in the Project Area. As stated in the FONSI, Phase I would not displace any businesses or residences and would not adversely impact the demographics of the Project Area. The Project would further benefit residents by providing additional transportation options to residents and tourists within walking distance of the CBDs in the three cities where stations are proposed. The 2013 FONSI (FRA 2013) found that the Selected Alternative will not result in a disproportionately high or adverse effect on those sensitive populations and Environmental Justice communities of concern considered under Executive Order 12898 after noise mitigation measures have been implemented, such as directional, wayside or crossing mounted horns.

AAF-AR0045043

### 5.4.2.3    Indirect and Secondary Impacts

By offering an alternative transportation option, the Project would improve access and mobility between Orlando, West Palm Beach, Fort Lauderdale, and Miami and would have a beneficial effect on minority and low income populations in these communities. Potential effects on businesses and economics are addressed in the following sections.

### 5.4.2.4    Temporary Construction-Period Impacts

The Project would benefit environmental justice communities by providing job opportunities during the construction period. AAF would hire local workers to the greatest extent practicable. Section 5.4.3, *Economic Conditions,* discusses these benefits in detail.

### 5.4.3    Economic Conditions

This section describes the potential effects to local economic conditions that could result from the Project. The Project would not reduce municipal property tax revenues along the MCO Segment or N-S Corridor due to properties being removed from the municipal tax rolls, as the Project does not require the acquisition of private properties along these segments. Acquisition of nine privately owned parcels outside the SR 528 right-of-way in Orange County and four privately owned properties near the Cocoa Curve in Brevard County would be required along the E-W Corridor, and would result in a negligible loss of property tax revenues. The relocated Fort Lauderdale Station within the WPB-M Corridor requires acquisition of three parcels adjoining the FECR Corridor. Some businesses would be displaced, but are expected to relocate elsewhere in Fort Lauderdale. The Project would not displace any other existing businesses or result in the loss of jobs. Impacts to the economic conditions of the marine industries along the St. Lucie, Loxahatchee, and New Rivers are expected to be negligible. The Project would have beneficial regional economic impacts from increased economic activity, tax revenues, construction jobs, and associated spending. Local economic effects would be temporary construction-period effects except in the vicinity of the Phase I stations.

The Project would have a minor economic impact to the maritime industry. Increased wait times and queue lengths anticipated under the No-Action Alternative would result in increased costs, which are estimated to be $76,285 annually at the St. Lucie River Bridge, $45,625 annually at the Loxahatchee River Bridge, and $136,145 annually at the New River Bridge (AMEC 2014a). Under Project conditions, no adverse economic impacts to marine jobs, economic growth, or development are anticipated. Increases in vessel wait times would result in minor increases in costs of less than 0.1 percent when compared to the marine industry values at the St. Lucie River, Loxahatchee River, and New River Bridges. Increased vessel wait times and queue lengths would have minor economic impacts to commercial destinations (e.g., boat/yacht repair and support facilities) along the New River; however, these types of establishments would not incur any decline in business along the St. Lucie and Loxahatchee Rivers. Cruise ships, commercial freighters, and other large oceangoing vessels (other than barges on the Okeechobee Waterway) do not access the St. Lucie, Loxahatchee, or New River Bridges; therefore, the Project would not impact the existing or future operations of these types of vessels.

AAF-AR0045044

Many comments were received concerning the Project's potential impacts to the marine industry, pointing out additional information on the economic value of the industry in each of the counties within the Project area, and expressing the belief that increased bridge closures would result in boaters choosing marinas and other services that were not located upriver of the St. Lucie, Loxahatchee, or New River Bridges. Commenters also noted that the economic analysis did not take into account the cost of wages for professional boat crews. Also, commenters were concerned that increased wait times could result in decreased property values for upriver waterfront properties. Section 1.7.4 provides a general response to these comments. The following sections have been revised to further respond to comments.

Other comments on the DEIS were concerned with the effects of increased train noise on property values, and the indirect effects of noise and congestion in downtown areas crossed by the FECR corridor on local businesses. Many commenters indicated that the economic benefits of the Project would occur only in the municipalities with stations (Orlando, West Palm Beach, Fort Lauderdale and Miami) and not in the communities along the N-S Corridor. Section 1.7.7 of this FEIS provides general responses to these comments, and additional information is provided in the following sections.

### 5.4.3.1     Methodology

This section explains how effects to marine-related economics were evaluated for the future No-Action Alternative and Project. Details of the methodology are provided in Appendix 4.1-3-B1. This analysis considers the potential effects of the Project as compared to the No-Action Alternative to obtain the average economic effect that bridge closure delays would have on the local economy. The bridge operations model included in the 2014 *Navigation Discipline Report* (Appendix 4.1-3-B1) and was used to determine the total number of minutes of waiting time resulting from the Project to both recreational and commercial boaters by multiplying the daily number of vessels by the average amount of wait time per vessel. The waiting time was then multiplied by the cost per hour of operating recreational and commercial vessels on each of the rivers included in this analysis. The sum of these costs constitutes the total value to the marine industry and recreational boaters associated with increased bridge closures on account of the Project (AMEC 2014a).

The data used for the evaluation of economic impacts to marine industries differs from the data presented in Section 5.1.3.2, *Navigation Impacts*. Data on marine traffic associated with the 2014 *Navigation Discipline Report* were derived from video camera footage obtained at the three bridge crossings during winter 2014, while the updated *Rail/Marine Traffic Simulation Using Summer Boat Traffic for the AAF Passenger Rail Project from Orlando to Miami, Florida* predominantly used marine traffic data from summer 2014 (AMEC 2014a and 2015). Summer boat counts were higher than those in winter. Boat count volume increases at the St. Lucie River and Loxahatchee River Bridges ranged from 28 percent to 151 percent depending on the day of the week. Boat count data for the New River Bridge were unavailable at the time of the updated study; however, applicable winter data were escalated using figures from the Loxahatchee River Bridge, as these increases were greater than at the St. Lucie River Bridge. Despite the availability of summer boat counts, these new data do not make the distinction between commercial and recreational vessels, an important data input for determining economic impact. For this reason, this evaluation of economic impacts maintains its use of the winter 2014 data.

AAF-AR0045045

This evaluation of economic impacts provides an estimation of the economic value of the marine industry to each of the counties in which the three affected waterways are located. Many commenters noted that these estimated values in the DEIS are lower than what other entities such as the Marine Industry Association of South Florida have reported, leading to an underestimation of the economic impacts to these industries. This evaluation maintains the use of data sourced from the Florida Inland Navigation District (FIND) for consistency purposes, as FIND applied the same methodology across all three counties and updated each report in 2011.

This evaluation does not consider potential boater behavior, as there is no standard method for modeling the economic impacts associated with boater choice (e.g., whether a boater chooses to use a particular waterway). For this reason, this evaluation does not address the Project's economic impacts to yachting, water taxi activity, or individual events held along the affected waterways. There is no standard method for quantifying costs associated with boater time, recreational or otherwise. Therefore, the Project's potential to result in this form of cost is acknowledged but not evaluated.

### 5.4.3.2    Environmental Consequences

Potential long-term direct and adverse effects to local economic conditions would include the loss of municipal property tax revenue from the acquisition of privately owned properties, costs associated with grade crossing maintenance to be paid by the municipalities in which they are located, permanent displacement of existing businesses and associated revenues, and employment displacement. It also includes the potential loss of economic value within the maritime industries along the St. Lucie, Loxahatchee, and New Rivers. Potential long-term direct and beneficial effects to local economic conditions would include expenditures associated with Project operations such as labor, fuel costs, equipment maintenance, insurance, maintenance of right-of-way, and lease payments (existing lease fees will not change).

Ticket prices associated with the Project have not yet been determined, and as such, were not a consideration in the determination of economic impact or any other area of evaluation of the FEIS.

**No-Action Alternative**

Under the No-Action Alternative, the Project would not be constructed or operated. Existing commuter railway services would remain unchanged, and no anticipated changes to local economic conditions would occur.

Under the No-Action Alternative, bridge infrastructure would not be improved and train speeds would not increase; therefore, the amount of overall closure time would increase due to the increased number of freight trains. Details of the economic impacts to local maritime industries along the St. Lucie, Loxahatchee, and New Rivers are presented below.

***St. Lucie River***

The anticipated increase in average vessel wait times associated with additional bridge closures and unimproved infrastructure would result in an increase in the time that vessels wait. These increased vessel wait times were considered when evaluating economic impacts to commercial developments

AAF-AR0045046

along the St Lucie River. The increase in average vessel wait times is estimated to result in an economic impact under the No-Action Alternative (Table 5.4.3-3) of $209 per day or $76,285 annually, based on summer estimates. This represents less than a 0.1 percent increase in the total cost of vessel delays per day on the marine industry under the No-Action Alternative (AMEC 2014a).

There are no cruise ships, commercial freighters, or other large oceangoing vessels that access the St. Lucie River; therefore, the No-Action Alternative is not expected to impact the existing or future operations of these types of vessels (AMEC 2014a).

Individual commercial vessels could potentially experience an increase in vessel queue times at the St. Lucie River Bridge. However, there are very few commercial destinations on the St. Lucie River, and they would not be anticipated to incur any decline in business as a result of the moderate impacts to navigation under the No-Action Alternative. Barge traffic using the Okeechobee Waterway, which can only traverse the bridge under slack tides, would have fewer opportunities to pass the bridge and would likely experience greater delays.

### Loxahatchee River

The anticipated increase in average vessel wait times associated with additional bridge closures and unimproved infrastructure would result in an increase in vessel queues of seven vessels per day. These increased vessel wait times were considered when evaluating economic impacts to commercial developments along the Loxahatchee River. The increase in average vessel wait times is estimated to result in an economic impact under the No-Action Alternative (Table 5.4.3-4) of $125 per day or $45,625 annually. This represents less than a 0.1 percent increase in the total cost of vessel delays per day on the marine industry under the No-Action Alternative (AMEC 2014a).

There are no cruise ships, commercial freighters, or other large oceangoing vessels that access the Loxahatchee River; therefore, the No-Action Alternative is not expected to have an impact on operations of these types of vessels (AMEC 2014a).

Individual commercial vessels could potentially experience an increase in vessel queue times at the Loxahatchee River Bridge. However, there are very few commercial destinations on the Loxahatchee River, and they would not be anticipated to incur any decline in business as a result of the bridge closures. Therefore, there is no impact under the No-Action Alternative.

### New River

The anticipated increase in average vessel wait times associated with additional bridge closures and unimproved infrastructure would result in an increase in vessel queues of 18 vessels per day. These increased vessel wait times were considered when evaluating economic impacts to commercial developments along the New River. The increase in average vessel wait times for commercial and recreational vessels is estimated to result in an economic impact under the No-Action Alternative (Table 5.4.3-5) of $373.00 per day or $136,145 annually. This represents less than a 0.1 percent increase in the total cost of vessel delays per day on the marine industry under the No-Action Alternative (AMEC 2014a).

AAF-AR0045047

Port Everglades is located east of the New River Bridge; however, cruise ships, commercial freighters, and other large oceangoing vessels do not access the New River. Therefore, the No-Action Alternative would have no impact to existing or future commercial freighter or cruise ship operations at Port Everglades.

Commercial destinations on the New River are primarily boat/yacht repair and support facilities, which would not be anticipated to incur any decline in business because of impacts to navigation, as the services they offer are primarily need-based. Therefore, the No-Action Alternative is not expected to have impacts to such businesses.

## Action Alternatives A, C, and E

Potential direct effects of the Project on local economic conditions would be the same under all Action Alternatives.

### *Economic Benefits and Impacts*

The Project would increase federal, state, and local government revenues and have other direct economic benefits to local populations. The Washington Economics Group, Inc. (WEG) performed an economic benefits analysis for the Project (WEG 2014), which followed professionally accepted and widely utilized methodologies using the IMPLAN methodology (developed by the Minnesota IMPLAN Group, Inc.). Construction of the Project would have a direct total economic impact of $915.6 million, with the largest benefit to be had in Orange County at $302.2 million (WEG 2014).

Project operations would have a direct total economic impact of $507.2 million between 2016 and 2021, with an average direct economic impact of $84.5 million per year (WEG 2014). Table 5.4.3-1 summarizes the direct economic benefits of Project operations between 2016 and 2021. The economic benefits analysis performed for the Project did not breakdown operational economic benefits by county.

Increases in tax revenue, including growth in real estate taxes, corporate income taxes, and sales taxes, as well as benefits to be realized from reemployment insurance could reduce local tax burdens and/or be utilized to address community-specific needs (such as parks, public works, police, and fire protection). Any growth of real estate taxes would also benefit local school districts in communities with stations.

| Table 5.4.3-1    Summary of Direct Economic Benefits of Project Operations | | |
|---|---|---|
|  | **Average Annual[1]** | **Cumulative (2016-2021)[1]** |
| Jobs[2] | 1,113 | 1,113 |
| Labor Income ($ Mil.) | $48.9 | $293.7 |
| Gross Domestic Product ($ Mil.) | $62.9 | $377.3 |
| Total Economic Impact ($ Mil.) | $84.5 | $507.2 |
| Federal, State, and Local Revenue ($ Mil.)[3] | $20.9 | $125.5 |

Source:    WEG 2014
1        Includes Miami-Dade and Broward Counties
2        To avoid double counting net new jobs, the average of all years was used to estimate the number of jobs created per year.
3        Includes indirect and induced economic benefits

AAF-AR0045048

As part of its infrastructure program, AAF has voluntarily assumed the cost of grade crossing safety improvements related to the introduction of passenger rail service. However, the State of Florida requires municipalities to fund the maintenance of grade crossing equipment within their jurisdictions. The Project will result in minor increases in the annual cost of maintaining grade crossing equipment due to the addition of a second track, as set forth in the Florida Department of Transportation Schedule of Annual Cost of Automatic Highway Grade Crossing Traffic Control Devices (725-090-41). Municipalities will also experience a small increase in the periodic cost of roadway resurfacing at the grade crossings, which typically occurs every 5 to 10 years based on the volume of highway traffic.

If proposed by municipalities and approved by FRA, municipalities are typically responsible for funding all improvements and equipment maintenance associated with Quiet Zones within their jurisdictions. However, AAF's investments in grade crossing safety improvements, in conjunction with amendments to existing crossing license agreements, include several components that are necessary in the establishment of Quiet Zones. As a consequence, the cost of Quiet Zones will be greatly reduced. Further, the State of Florida has made monies available to counties and municipalities for quiet zone improvements.

Private crossing owners typically bear the cost of improvements at private grade crossings, as this is a function of the right to have a private crossing. The allocation of costs will generally be based on the terms of existing private crossing agreements.

Potential adverse effects to other elements of the transportation industry include passenger diversions. The Project would divert an estimated 10 percent of the proposed long-distance passenger rail ridership from airplane passengers to passenger rail service. This equates to approximately 400 air passengers per day. Based on 2014 airline flight schedules (Orlando Airports 2014) and load factors (DOT 2014) as well as industry average revenue per passenger mile and the annual operating revenues of the airlines currently providing direct service between Orlando and South Florida (American Airlines, Spirit Airlines, and Silver Airways), the lost revenue from diversion of air passengers would account for less than 0.01 percent of the airlines' combined annual operating revenue. Therefore, the forecast diversion of air travelers to the AAF service would not have a significant economic impact to the airlines currently serving the two markets. The potential diversion from other intercity rail services and bus services is also not anticipated to result in a significant economic impact from lost revenue.

### *Property Acquisition*

Potential economic effects due to property acquisitions associated with each segment of the Project are described below:

### MCO Segment

The MCO Segment would not require acquisition of privately owned property as it is entirely within MCO property boundaries. Since no land acquisition is necessary, the MCO Segment would not result in the reduction of municipal tax revenue, commercial displacements, or job loss.

### East-West Corridor

As noted in Section 5.1.1.1, the E-W Corridor would require the acquisition and use of nine privately owned properties outside the SR 528 right-of-way in Orange County and four privately owned properties near the Cocoa Curve in Brevard County. Acquisition and use of these parcels of property would reduce municipal

AAF-AR0045049

tax rolls by approximately 45.1 acres in Orange County and 21.7 acres in Brevard County. Due to the relatively low acreage required within each county, the loss of associated municipal property tax revenues attributable to the E-W Corridor would be negligible, and would not be significant enough to affect government services. The E-W Corridor would also require AAF to acquire a property interest of 26.9 acres belonging to FECR near the Cocoa Curve in Brevard County; however, this acquisition would not affect municipal tax revenues, as this property is not currently included in the municipal tax roll of Brevard County. Property acquisitions associated with the E-W Corridor would not result in job losses or the displacement of any commercial or industrial operations, nor would they induce changes to adjacent land uses that could result in these impacts.

North-South Corridor

The Project would not require acquisition of privately owned property along the N-S Corridor, as the N-S Corridor is entirely within the existing FECR Corridor. Since no land acquisition is necessary, the Project would not result in the reduction of municipal tax revenue, commercial displacements, or job loss along the N-S Corridor.

Phase I - West Palm Beach-Miami Corridor

The WPB-M Corridor would require acquisition of private property for the proposed stations at West Palm Beach and Fort Lauderdale. Any direct loss in real estate taxes, however, would be offset by revenues from increased property values in areas adjacent to these stations. The relocated Fort Lauderdale Station requires acquisition of three parcels, one of which is occupied by an office building that would be demolished to make way for the station lobby building. Tenants within the office building would be displaced by the Project, but are expected to relocate within Fort Lauderdale with no loss of jobs or income tax revenue.

***Maritime Economy***

The economic effects of extended bridge closures to the local maritime economy would be the same for Alternatives A, C, and E, as each would include the same bridge improvements and the same number of passenger trains. Even when accounting for the seasonal differential in boat counts, the Project would result in negligible cost increases for recreational and commercial vessels; therefore, the Project is not anticipated to have an adverse economic impact to the maritime industries along the affected waterways.

St. Lucie River

As noted in Section 6.6 of the 2014 *Navigation Discipline Report*, the Project would potentially result in minor economic impacts to jobs, economic growth, and development. The estimated economic impact under the Project Alternatives (Table 5.4.3-2) is $520 per day or $189,800 annually (an increase of $311 per day or $113,515 annually when compared to the No-Action Alternative). This is the impact of the increased total vessel delay per day on the marine industry under the Project Alternatives and represents less than a 0.1 percent increase in the percent cost of waiting compared to the marine industry value at the St. Lucie River (AMEC 2014a).

AAF-AR0045050

**Table 5.4.3-2    Economic Model Results for the St. Lucie River Bridge No-Action Alternative and Combined Effect**

|  | Units | No-Action Alternative | Project Alternatives | Difference |
|---|---|---|---|---|
| Average Wait Time for All Vessels | min | 223 | 239 | 16 |
| **Commercial Industry** | | | | |
| Vessels Experiencing a Wait | #/day | 9 | 4 | -5 |
| Cost of Vessel Wait to Marine Industry | $/day | 26 | 55 | 29 |
| Percent Cost Compared to Marine Industry Value | % | 0.0011 | 0.0023 | 0.0012 |
| **Recreational Industry** | | | | |
| Vessels Experiencing a Wait | #/day | 148 | 165 | 17 |
| Cost of Vessel Wait to Marine Industry | $/day | 341 | 832 | 491 |
| Percent Cost Compared to Marine Industry Value | % | 0.0156 | 0.0381 | .0225 |

Source: AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.

**Loxahatchee River**

As noted in Section 6.5 of the 2014 *Navigation Discipline Report,* the Project would potentially result in minor economic impacts to jobs, economic growth, and development. The estimated economic impact under the Project Alternatives (Table 5.4.3-3) is $208 per day or $75,920 annually (an increase of $83 per day or $30,295 annually when compared to the No-Action Alternative). This is the impact of the increased total vessel delay per day on the marine industry under the Project Alternatives and represents less than a 0.1 percent increase (AMEC 2014a).

**Table 5.4.3-3  Economic Model Results for the Loxahatchee River FECR Bridge No-Action Alternative and Combined Effect**

|  | Units | No-Action Alternative | Project Alternatives | Difference |
|---|---|---|---|---|
| Average Wait Time for All Vessels | min | 147 | 269 | 122 |
| **Commercial Industry** | | | | |
| Vessels Experiencing a Wait | #/day | 1 | 2 | 1 |
| Cost of Vessel Wait to Marine Industry | $/day | 9 | 18 | 9 |
| Percent Cost Compared to Marine Industry Value | % | 0.0006 | 0.0012 | 0.0006 |
| **Recreational Industry** | | | | |
| Vessels Experiencing a Wait | #/day | 15 | 45 | 30 |
| Cost of Vessel Wait to Marine Industry | $/day | 241 | 440 | 199 |
| Percent Cost Compared to Marine Industry Value | % | 0.0182 | 0.0331 | 0.0149 |

Source: AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.

AAF-AR0045051

### New River

As noted in Section 6.4 of the 2014 *Navigation Discipline Report* (Appendix 4.1-3-B1), the Project is not anticipated to result in adverse economic impacts to jobs, economic growth, and development. The increase in average vessel wait times results in minor economic impact under the Project Alternatives (Table 5.4.3-4), which is estimated at $161 per day or $58,765 annually (a decrease in loss of $212 per day or $77,380 annually when compared to the No-Action Alternative). This is the cost of the total vessel delay per day on the marine industry under the Project Alternatives, and creates a minimal impact as there is a less than 0.1 percent increase in the cost of waiting compared to the marine industry value at the New River, when compared to the No-Action Alternative (AMEC 2014a).

| Table 5.4.3-4  Economic Model Results for the New River Bridge No-Action Alternative and Combined Effect | | | | |
|---|---|---|---|---|
| | **Units** | **No-Action Alternative** | **Project Alternatives** | **Difference** |
| Average Wait Time for All Vessels | min | 390 | 481 | 91 |
| **Commercial Industry** | | | | |
| Vessels Experiencing a Wait | #/day | 14 | 20 | 6 |
| Cost of Vessel Wait to Marine Industry | $/day | 196 | 239 | 43 |
| Percent Cost Compared to Marine Industry Value | % | 0.0031 | 0.0038 | 0.0007 |
| **Recreational Industry** | | | | |
| Vessels Experiencing a Wait | #/day | 35 | 56 | 21 |
| Cost of Vessel Wait to Marine Industry | $/day | 493 | 611 | 118 |
| Percent Cost Compared to Marine Industry Value | % | 0.0092 | 0.0114 | 0.0022 |

Source: AMEC. 2014a. *Navigation Discipline Report for the AAF Passenger Rail Project from Orlando to Miami, Florida.* July 2014.

#### 5.4.3.3    Indirect and Secondary Impacts

This section includes an evaluation of potential indirect and secondary effects of the Project to local economic conditions, which would include job creation and economic development stemming from increased goods and services and re-spending patterns as well as the effects of the construction and operation of transit-oriented development (TOD) that will be created by AAF at and around the stations in Miami, Fort Lauderdale, and West Palm Beach. This section also includes a discussion of the relationship between railroads and neighboring property values.

Table 5.4.3-5 summarizes the potential indirect and secondary effects of the Project on local economic conditions, including job creation, labor income, GDP, total economic impact, and tax revenue. Table 5.4.3-6 summarizes the direct, indirect, and secondary economic benefits associated with TOD construction and operations within Miami-Dade, Broward, and Palm Beach Counties.

AAF-AR0045052

| Table 5.4.3-5    Summary of Indirect and Secondary Economic Benefits | | | |
|---|---|---|---|
| | | Operations[1] | |
| | Construction | Average Annual | Cumulative (2016-2021) |
| Jobs[2] | 2,793 | 491 | 491 |
| Labor Income ($ Mil.) | $303.2 | $24.8 | $148.6 |
| Gross Domestic Product ($ Mil.) | $484.6 | $40.4 | $242.6 |
| Total Economic Impact ($ Mil.) | $788.4 | $63.3 | $379.7 |
| Federal. State, and Local Revenue ($ Mil.)[3] | $173.2 | $20.9 | $125.5 |

Source:    WEG 2014
1         Includes Miami-Dade and Broward Counties
2         To avoid double counting net new jobs, the average of all years was used to estimate the number of jobs created per year.
3         Includes direct economic benefits

| Table 5.4.3-6    Summary of Economic Benefits of TOD Construction and Operations | | | |
|---|---|---|---|
| | | Operations | |
| | Construction | Average Annual | Cumulative (2017-2021) |
| Jobs[1] | 1,695 | 389 | 389 |
| Labor Income ($ Mil.) | $658.8 | $11.0 | $66 .1 |
| Gross Domestic Product ($ Mil.) | $980.5 | $34.1 | $204.4 |
| Total Economic Impact ($ Mil.) | $1,800.5 | $56.8 | $284.1 |
| Federal. State, and Local Revenue ($ Mil.) | $187.4 | $9.6 | $48.2 |

Source:    WEG 2014
1         To avoid double counting net new jobs, the average of all years was used to estimate the number of jobs created per year.

Additional indirect economic benefits of the Project could be realized through savings associated with reduced highway maintenance costs. The operation of passenger rail service would relieve road congestion, which would prolong the lifespan of highway infrastructure more than if the passenger rail service were not operating.

**Property Values**

Commenters stated that the DEIS did not adequately evaluate the effects of the Project on residential property values. They indicated that train traffic associated with the Project would increase noise levels, worsen roadway congestion, reduce safety, and limit waterfront access. In the opinion of these commenters, these impacts would lower property values along the rail line, which would cause undue economic hardship for local governments and property owners. Lower property values would reduce municipal property tax revenues, thereby limiting local governments' ability to provide community benefits. Lower property values would also reduce personal wealth. Impacts to noise, traffic, safety, and waterfront access resulting from the Project would make it difficult for property owners to sell their real estate holdings. The combination of lower property values and a deteriorating real estate market would be particularly harmful to Environmental Justice communities.

AAF-AR0045053

The FECR Corridor is an active freight rail corridor, with approximately 14 round-trip freight trains per day under current conditions, projected to increase to 20 by 2019. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The AAF passenger service would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the quality of life in municipalities and communities along the rail line. AAF would not introduce significant new disruption, noise, traffic, or other effects that could affect property value. Properties along the railroad are already valued according to their proximity to the rail line. An FRA study "neither established nor excluded the possibility of adverse effects on property values." It did, however, generally conclude, "other things equal, being within 1,000 feet of an operating rail line depresses the sale price of a property from 5 percent to 13 percent on average." Because the FECR was established over 120 years ago and has been in continuous operation since the late 1800s, any impact of the railroad on the valuation of nearby properties, up or down, would have already occurred long ago and would not be substantially changed by the added passenger trains.

With respect to waterfront property along the New River, Loxahatchee River or St. Lucie River, the Project would result in increased closings of the moveable bridges. However, the moveable bridges would remain in operation and these rivers would continue to be open to navigation as required by the Coast Guard. Properties along these rivers with docks would continue to have boat access both upriver and downriver. Therefore, the Project is not expected to affect the value of these properties.

Limited research exists on the relationship between trains and property values, and the research that does exist present inconsistent findings. Relevant studies that were readily accessible at the time of this writing are summarized below. *Regulatory Evaluation and Regulatory Flexibility Assessment for Use of Locomotive Horns at Highway-Rail Grade Crossings Final Rule*, prepared by FRA in 2003, included an evaluation of the effects of locomotive horns on property values (FRA 2003). The study "neither established nor excluded the possibility of adverse effects on property values" (FRA 2003). It did, however, generally conclude, "other things equal, being within 1,000 feet of an operating rail line depresses the sale price of a property from 5 percent to 13 percent on average" (FRA 2003).

*Examining the Spatial Distribution of Externalities: Freight Rail Traffic and Home Values in Los Angeles*, prepared by Michael Futch in 2011, concluded, "an increase in rail traffic by 10 million gross ton miles per mile (MGTM/mi) causes a 0.7 percentage point lower growth in home values within a 1/3 mile band around the tracks" (Futch 2011). *The Effect of Rail Transit on Property Values: A Summary of Studies*, prepared by Parsons Brinckerhoff in 2001, compiled the key findings of the major studies on the subject since 1991. This summary paper concluded, "there is little support for the suggestion that proximity to rail actually decreases property values" (Parsons Brinckerhoff 2001). Prepared by a consortium of authors in 2007, *The Impact of Transit Corridors on Residential Property Values* evaluated the effect of transit corridors on property values with and without the benefit of access. This study, which reviewed various types of transit corridors including freight and transit lines, concluded, "proximity to the transit corridor alone without direct access conveys a negative impact on nearby housing values" (Kilpatrick et al. 2007).

As demonstrated, there is limited research on the relationship between trains and neighboring property values, and the research that does exist present inconsistent findings. As such, the potential for the Project to impact residential property values is inconclusive.

AAF-AR0045054

**Maritime Industry**

Commercial destinations on the St. Lucie River are primarily vessel/yacht repair and support facilities, which would not be anticipated to incur any decline in business as a result of the impacts of the Project on navigation and, therefore, the Project would have minimal impact to such businesses. There are no cruise ships, commercial freighters, or other large oceangoing vessels that access the St. Lucie River; therefore, implementation of the Project would have no impact to existing or future operations of these types of vessels. However, increased bridge closures could affect the time required for barges transiting the Okeechobee Waterway to pass the St. Lucie River Bridge. Barges can only transit the bridge at slack tides, and require a substantial length of time to achieve headway after stopping.

There are very few commercial destinations on the Loxahatchee River, as most of the waterfront development is residential. The few commercial destinations are not expected to incur any decline in business as a result of the impacts of the Project on navigation. There are no cruise ships, commercial freighters, or other large oceangoing vessels that access the Loxahatchee River; therefore, the Project would have no impact to existing or future operations of these types of vessels.

Commercial destinations on the New River are primarily boat/yacht repair and support facilities. These facilities are anticipated to incur minor impacts to their business as a result of the moderate impacts of the Project on vessel wait times and queue lengths. Port Everglades is located east of the New River Bridge. Cruise ships, commercial freighters, and other large oceangoing vessels do not access the New River; therefore, the Project would have no impact to existing or future operations at Port Everglades.

**Local Businesses**

Commenters stated that the DEIS did not adequately evaluate the effects of the Project on businesses located in small downtown areas along the N-S Corridor. They believed that increased noise and congestion from the Project would discourage customers, particularly tourists, which would force businesses to close, increase retail vacancies, and reduce sales tax revenue. These impacts would also limit future development along the rail line.

The FECR Corridor is an active freight rail corridor, currently with approximately 14 round-trip freight trains per day under current conditions, projected to increase to 20 by 2019. In recent years, the number of freight trains was substantially higher, with 24 daily trains in 2006. The AAF passenger service would not be introducing a new rail element along this corridor, and the incremental effects of adding passenger trains would not significantly degrade the viability of businesses located in town centers along the rail line. The FECR Corridor has supported freight and/or passenger rail service on a continuous basis for more than 100 years, and existing downtowns along with their commercial properties largely developed around these conditions. AAF would not introduce significant new disruption, noise, traffic, or other effects that could affect businesses.

As noted in Section 5.2.2.2, the Project would have no permanent noise impacts along the N-S Corridor due to the use of wayside horns. Future noise levels along the N-S Corridor would be comparable to existing noise levels for mainline segments and substantially lower than existing noise levels at grade crossings. If municipalities believe further noise reduction is necessary, there is the option of seeking Quiet Zone designation under 49 CFR part 222. A Quiet Zone is "a section of a rail line at least on-half mile in length

AAF-AR0045055

that contains one or more public crossings at which locomotive horns are not routinely sounded." Quiet Zones are proposed by municipalities, designed in accordance with FRA standards, and approved by FRA. Municipalities are responsible for funding all improvements and equipment maintenance associated with Quiet Zones within their jurisdictions. AAF has committed to working with local municipalities to develop Quiet Zones as an alternative to the use of wayside horns.

As noted in Section 5.1.2.2, typical grade crossings would be closed an average of three times per hour, which would leave the majority of each hour of operation unaffected by the introduction of passenger train service. An increase in the number of crossing events would cause additional closures; however, the closures due to the passing of passenger trains would be much shorter than closures from existing freight traffic.

Given the minimum impact to noise and local traffic conditions, the additional 16 passenger rail round trips per day is not expected to result in an adverse impact to businesses within small downtowns along the N-S Corridor. There are many locations across the United States, particularly in the Northeast, where intercity passenger rail or commuter rail has been re-instated on out-of-service rail lines or on active freight lines that pass through town centers. There have been no demonstrated downturns in local businesses following the re-introduction of rail service. Downtown businesses are, however, affected by factors such as regional economics, jobs, tourism, parking, and the development of malls and big-box retail stores in areas outside of the downtown.

### 5.4.3.4    Temporary Construction-Period Impacts

This section includes an evaluation of the potential direct, indirect, and secondary effects of the Project during the anticipated construction period (mid-2014 to mid-2016), which would include job creation and investments associated with the design, engineering, and construction of rail, bridges, communications infrastructure, support facilities, and train stations as well as equipment purchases. As shown in Table 5.4.3-7, constructing the Project is expected to generate nearly 5,500 jobs, with a total economic benefit of approximately $1.7 Billion. Table 5.4.3-8 summarizes the cumulative economic benefits during construction of the project by county.

| Table 5.4.3-7    Summary of Direct Economic Benefits of Project Construction | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Palm Beach | Martin | St. Lucie | Indian River | Brevard | Orange | Total |
| Job Creation[1] | 464 | 226 | 194 | 191 | 704 | 877 | 2,656 |
| Labor Income ($ Mil.) | $54.0 | $26.2 | $22.4 | $22.2 | $81.6 | $101.6 | $308.0 |
| Gross Domestic Product ($ Mil.) | $72.0 | $35.0 | $30.2 | $30.0 | $109.2 | $136.2 | $412.6 |
| Total Economic Impact ($ Mil.) | $160.0 | $78.0 | $66.8 | $66.0 | $242.6 | $302.2 | $915.6 |
| Federal. State, and Local Tax Revenue ($ Mil.)[2] | $30.2 | $14.6 | $12.6 | $12.4 | $46.0 | $57.4 | $173.2 |

Source:    WEG 2014
1         To avoid double counting net new jobs, the average of all years was used to estimate the number of jobs created per year.
2         Includes indirect and induced economic benefits

AAF-AR0045056

| Table 5.4.3-8 Summary of Cumulative Economic Benefits of AAF Construction | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Palm Beach | Martin | St. Lucie | Indian River | Brevard | Orange | Total |
| Job Creation[1] | 952 | 464 | 398 | 392 | 1,444 | 1,799 | 5,449 |
| Labor Income ($ Mil.) | $107.0 | $52.0 | $44.6 | $44.2 | $161.8 | $201.6 | $611.2 |
| Gross Domestic Product ($ Mil.) | $156.8 | $76.2 | $65.6 | $64.8 | $237.6 | $296.2 | $897.2 |
| Total Economic Impact ($ Mil.) | $297.6 | $145.2 | $124.2 | $123.0 | $451.6 | $562.4 | $1,704.0 |
| Federal, State, and Local Tax Revenue ($ Mil.) | $30.2 | $14.6 | $12.6 | $12.4 | $46.0 | $57.4 | $173.2 |

Source: WEG 2014

1 To avoid double counting net new jobs, the average of all years was used to estimate the number of jobs created per year.


## 5.4.4 Public Health and Safety

This section describes the proposed conditions within the Project Study Area with respect to the health and safety of the residents and communities that may be affected by the construction and long-term operation of the Project. The Project would comply with all relevant health and safety regulations and would not adversely impact the public's health or safety. Further, the Project would provide a public safety benefit by potentially contributing to the reduction of roadway crashes, as passenger train trips have a lower crash risk than passenger vehicles (i.e., car or light truck) (Litman 2014). Measures would be in place to protect the security of the railroad infrastructure and the traveling public.

The 2013 FONSI for Phase I (FRA 2013) found that the addition of passenger trains to the FECR Corridor and the development of the corresponding stations will not negatively impact public health or safety. The Project would result in enhancing public safety with improvements to grade crossing signal equipment for vehicular and pedestrian traffic. Also, the benefits resulting from decreased congestion and the potential for fewer vehicular crashes and fewer air emissions indicate that there will be no significant negative impacts on public health and safety. According to the 2013 FONSI, Phase I of the Project will not result in significant adverse impacts on public health and safety. The same conclusion applies to Phase II.

Many comments on the DEIS concerned the effects of increased train traffic on public health and safety, particularly with the increased number of at-grade crossing closures to allow train passage and the effect on emergency vehicle response times. Other commenters asked about AAF's safety plan. Section 1.7.7 of this FEIS provides a general response to these comments, and other information is provided in the following sections.

### 5.4.4.1 Regulatory Framework

The following publications and resource materials from FRA and other USDOT agencies were reviewed for general safety information. The Project would be constructed and operated in compliance with these regulations:

- **Rail Safety Improvement Act of 2008 (Public Law 110-432).** The Rail Safety Improvement Act reauthorized funding to enable FRA to oversee the nation's rail safety program between 2009 and 2013. One aim of the statute is to improve conditions of rail bridges and tunnels. The Rail Safety Improvement Act also requires that railroads implement Positive Train Control (PTC) systems to prevent train-to-train collisions on certain rail lines by the end of 2015.

AAF-AR0045057

- **Federal Railroad Administration (49 CFR Volume 4, Chapter II, part 200 to 299).** FRA regulations for railroad transportation safety, including standards, rules, and practices, are listed in 49 CFR parts 200-299.

- **U.S. Code on Railroad Safety (49 U.S.C. §§ 20101 et seq.).** Part A of Subtitle V of Title 49 of the United States Code contains a series of statutory provisions affecting the safety of railroad operations.

- **Department of Homeland Security/Transportation Security Administration (49 CFR part 1580).** Part 1580, Rail Transportation Security, codifies the Transportation Security Administration inspection program. It includes security requirements for freight railroad carriers; intercity, commuter, and short-haul passenger train service providers; rail transit systems; and rail operations at certain fixed-site facilities that ship or receive specified hazardous materials by rail.

- **Transportation Security Administration - Security Directives for Passenger Rail Security.** Directives RAILPAX-04-01 require rail transportation operators to implement 15 protective security measures, which include reporting potential threats and security concerns to the Transportation Security Administration, and designate a primary and alternate security coordinator.

- **Emergency Planning and Community Right-to-Know Act.** The objectives of the Emergency Planning and Community Right-to-Know Act are to allow state and local planning for chemical emergencies, provide for notification of emergency releases of chemicals, and address a community's right-to-know about toxic and hazardous chemicals(42 USC 116).

- **Guide to Developing a Passenger Train Emergency Preparedness Plan.** FRA's *Guide to Developing a Passenger Train Emergency Preparedness Plan* assigns railroad operators the responsibility for developing and implementing an emergency preparedness plan that complies with applicable laws and regulations, based on the specific circumstances of the proposed railroad's operations (FRA 2010a).

- **FDOT Rail Handbook.** The Rail Handbook identifies rail processes, guidelines, and responsibilities for the development and implementation of programs which include Highway-Rail Grade Crossing Inventory, Highway-Rail Grade Crossing Safety Improvement Program, Construction and Maintenance Project Management Program, Public Highway-Rail Grade Crossing Opening – Closure Program, Railroad Safety Inspection Program, Florida Rail System Plan, Rail Emergency Management Plan, and the Use of Locomotive Horns at Highway-Rail Grade Crossings and Quiet Zone Application Process (FDOT 2012a).

FDOT provides railroad Safety Inspectors to ensure each railroad is in compliance with 49 CFR part 200 *et seq.*, which includes but is not limited to, inspections of:

- Railroad operating and safety rules;
- Federal regulations concerning training and testing of operating personnel;
- Protection of employees working on track and equipment;
- Drug and alcohol prohibitions;
- Railroad communications; and
- Train identification.

AAF-AR0045058

FECR has established operational rules based on FRA guidelines under which they operate. These guidelines are included as Section 6, Method of Operation, in FECR's Operating Rules (FECR 2012a). FECR's Method of Operation includes the following major operational rules and supporting information:

- General Signal Rules (Signals Imperfectly Displayed Governing Signal, Manual Block Territory);
- Interlocking Rules (Automatic Block and Interlocking Signals);
- Automatic Block Signal (ABS) Rules;
- Centralized Traffic Control (CTC) Signal System Rules (Automatic Train Control System);
- Control Station Rules; and
- Rules for Railroad Communications.

### 5.4.4.2    Environmental Consequences

The No-Action Alternative would continue to be operated consistent with the regulations applicable to the existing FECR freight operations. The Project infrastructure and equipment would be constructed, maintained and operated consistent with FRA safety regulations.

Design elements of the Project include: enhancing signal and train control systems; reducing the potential for accidents at highway-rail at-grade crossings; and limiting access to rail infrastructure by trespassers and other unauthorized persons. These design elements support safe railroad operations for passengers, employees, pedestrians, and motorists. Consolidated control of both freight and passenger train movements, plus the added rail infrastructure, will allow freight operations to continue to operate reliably without adverse impact from the restoration of intercity passenger rail services within the N-S Corridor.

The Project would not appreciably affect public health, safety, and security in the rail corridor. While greater frequency of trains may increase the frequency of opportunities for conflict between trains and vehicles or people, safety improvements at crossings, an upgraded PTC system, enhanced security, and improved communications among emergency responders would be a beneficial effect, serving to minimize potential conflicts and their consequences. AAF will develop a comprehensive safety program for the Project including guidelines and plans including: a passenger train emergency preparation plan, a safety and security certification plan, track safety standards, an operations system safety program plan, a right-of-way safety and security plan, and several FECR safety procedures, including, for example, FECR's Emergency Preparedness Plan (FECR 2012c).

### Public Safety

Public safety concerns include at-grade crossings, train control systems, and transport of hazardous materials. Operations within the E-W Corridor and adding passenger trains to the N-S Corridor are not expected to adversely impact public health or safety. Any of the Project Alternatives under consideration would elevate public safety by improving grade-crossing signal equipment for vehicular and pedestrian traffic and upgrading current crossing equipment with signals interconnected with highway traffic signals, constant warning time activation through the railroad signal system, and other devices and measures as required by pertinent laws, regulations, and local safety plans. Upgrades to road crossings will be coordinated with and/or communicated to local emergency responders, as activations at the road crossings

AAF-AR0045059

are expected to be more frequent with the increased frequency of train traffic. However, the delays are also expected to be minimal, as the passenger trains should clear a typical crossing in less than one minute.

### No-Action Alternative

In the No-Action Alternative, the existing signal system along the N-S Corridor would remain in place, and all at-grade crossings would be protected as they currently are. There would be no change to public safety. There are no anticipated changes in frequency or quantity of hazardous materials to be transported along the N-S Corridor; however, given the number of ports along the corridor, growth could occur. Hazardous materials would continue to be transported consistent with applicable statutes, rules and regulations, and there would be no effect to health and safety due to the transportation of these materials.

The No-Action Alternative is not expected to have a positive effect on public health and safety in the Project Study Area, as vehicular, bicycle, and pedestrian traffic safety would not be enhanced with upgraded at-grade crossings. The number of freight trains is projected to increase from an average of 14 per day (2013) to 20 (2016).

### Action Alternatives A, C, and E

Alternatives A, C, and E are anticipated to have the same effects on public safety.

### At-Grade Crossings

As is described in Chapter 3, Alternatives, the E-W Corridor would be entirely grade separated at roadways. Existing roads would either be crossed using bridges or would be closed, eliminating any potential safety concerns. As part of the Project, existing crossings along the N-S Corridor would be upgraded in accordance with applicable laws regarding safety requirements, with the need for improvements being determined by a crossing-by-crossing diagnostic approach. During the winter of 2013-2014, AAF contacted FRA and FDOT requesting both agencies' assistance in conducting a diagnostic safety review of the existing grade crossings along the FECR corridor to make objective judgments about the physical and operational characteristics at roadway rail crossings, and to recommend modifications to the crossings based on a consensus determination concerning crossing safety needs. The Diagnostic Team consisted of representatives from FDOT, FRA, FECR and AAF, as well as local officials. The Diagnostic Team concluded the on-site review in Cocoa having looked at 349 total grade crossings in all. FRA has published recommendations for those respective grade crossings based on FRA's Highway-Rail Grade Crossing Guidelines for High-Speed Passenger Rail (http://www.fra.dot.gov/eLib/Details/L03536) (Appendix 5.4.4), which are listed in Tables 3.3-8 through 3.3-12 in this FEIS.

Upgrades to road crossings would be coordinated with and/or communicated to local emergency responders, as activations at the road crossings are expected to be more frequent with the increased frequency of train traffic (32 additional passenger train crossings per day). Recommendations for crossings include flashing lights and gates, pedestrian lights and gates, advance warning signs, additional signage, motion sensors, raised medians or barriers, improved crossing geometry, improved sight distances, or other modifications.

While the increased number of train crossings would increase the delay to local traffic at grade crossings as compared to the No-Action Alternative, the local area traffic would not be affected for the majority of

AAF-AR0045060

the day. The trains should clear a typical crossing in less than 1 minute and the grade crossing would reopen for traffic in approximately 50 seconds for a passenger train and between 147 and 170 seconds for a freight train. Although not quantifiable, some additional public health and safety benefits will be realized from the anticipated decrease in roadway congestion and the potential for fewer vehicular accidents on existing parallel roadways such as U.S. 1 and I-95, as well as a decrease in air emissions.

Traffic signal pre-emption exists at many intersections on the corridor. FDOT determines the necessary signalization requirements at each intersection. Consistent with FRA regulations, AAF will complete an analysis of collision hazards, including those from motor vehicles, as part of the overall hazard analysis prior to start of revenue service.

**Train Operations**

According to the operating plan, some trains are scheduled to pass or "meet" at or in the immediate vicinity of grade crossings. As part of the diagnostic review, "Next Train Coming" notification signs or Operation Lifesaver Education forums will be considered to notify the public of a change in grade crossing operations.

The new signal system to be implemented along both the N-S and E-W Corridors as part of the Project would retain the same system currently in use (route-signaling augmented by in-cab signals[6]), as well as provide a PTC overlay system with a back office server in the operations control center to achieve compliance with 49 CFR part 229, *Positive Train Control Systems; Final Rule*.

Some commenters requested that AAF include a safety analysis and plan in the FEIS. Consistent with FRA safety requirements which are not part of the NEPA process, AAF will develop a Hazard Analysis and System Safety Program Plan prior to the start of operations. These documents will identify potential system risks based on an evaluation of potential risk severity and frequency.

As stated in Section 3.3.5 of the 2012 EA, along the WPB-M Corridor AAF will enhance public safety with improvements to existing grade-crossing signal equipment for vehicular and pedestrian traffic. This would include upgrading current crossing equipment with signals interconnected with highway traffic signals, constant warning time activation through the railroad signal system, reballasting track at the crossings to improve drainage, and other devices and measures as required. No adverse impacts to public safety for residential and recreational land uses adjacent to the proposed improvements along the WPB-M Corridor will occur. The WPB-M Corridor includes stops in the central business districts of West Palm Beach, Fort Lauderdale, and Miami. Each station will be ADA complaint and include safety features such as cameras in stations and parking lots, and regular police patrols.

**Security**

Security considers the effects of the Project on the security of the rail system.

---

6    The current train control system on the FEC North-South Corridor is "Route-signaling" augmented by in cab signals that display the state of the wayside signals continuously in the locomotive cab via electronic coded track. This electronic coded track also provides for broken rail detection.

AAF-AR0045061

### No-Action Alternative

Under the No-Action Alternative, the existing fencing and other protection systems along the N-S Corridor would remain in place with no upgrades.

### Action Alternatives A, C, and E

Alternatives A, C, and E are anticipated to have the same effects on security. For the E-W Corridor standard FDOT highway fencing, or its equivalent, will be added throughout the length of the corridor where the track is at-grade that will restrict and seal the railroad right-of-way from public access. Fencing in downtown areas should be compatible with the character and aesthetics of the community, particularly within historic districts. Based on coordination with the natural resource agencies, the standard fencing may be modified or substituted with fencing appropriate to discourage wildlife crossings. Fencing on the N-S Corridor would be upgraded based on existing public access locations and the potential for conflicts with the increased train frequency.

AAF will conduct ROW Field Surveys to observe, document, and provide recommendations to minimize trespassing by employing fencing, warning signage, public outreach/information, and other appropriate measures as required.

## Barriers to the Elderly and Handicapped

The Project would benefit elderly and handicapped individuals by providing a transportation option that will enhance mobility and livability in their communities. During the design phase, federal, state, and local provisions related to the Americans with Disabilities Act (ADA) of 1990 compliance would be followed. The ADA provides for equal opportunity for individuals with disabilities to access public and private facilities.

### No-Action Alternative

Under the No-Action Alternative, there would be no change to access by the elderly and handicapped. The new passenger rail stations proposed as part of Phase I would be fully accessible.

### Action Alternatives A, C, and E

Alternatives A, C, and E are anticipated to have the same effects on accessibility. The passenger trains would comply with ADA requirements. AAF trains will be single level, fully accessible coaches, with no stairs or other obstacles to impede movement on board trains. Every coach car would have ADA-compliant restrooms.

As stated in Section 3.3.4 of the 2012 EA, the WPB-M Corridor would not result in significant adverse impacts in terms of barriers to the elderly and handicapped populations. Designated ADA-compliant parking spaces at the three stations would be provided to ensure availability of parking and decrease the distance for elderly and disabled passengers to travel to the train platform. In addition, all station facilities and platforms would have elevator access and level boarding, and individuals with disabilities would not encounter stairs in boarding or departing from trains.

AAF-AR0045062

**Geological Conditions**

Geological conditions may be a safety concern if subsurface conditions are favorable to sinkhole formation or geological faulting. No geological faults are known within the Project Study Area.

***No-Action Alternative***

Under the No-Action Alternative, risks posed by sinkholes would be unchanged.

***Action Alternatives A, C, and E***

Alternatives A, C, and E are anticipated to have the same risks to public safety posed by sinkholes. The potential for collapse of sinkholes along any segment of the Project is anticipated to be low. However, if sinkholes were to occur in the railway alignment or any public areas, the sinkholes would be immediately reported to local law enforcement and cordoned-off for public safety.

As stated in Section 3.0 of the 2012 EA, the WPB-M Corridor would not require tunneling or subterranean construction activities. Thus, no potential impact to geology or geologic resources exists.

**Hazardous Materials**

Planned operations at the VMF, such as vehicle fueling, maintenance, repair, and washing will include use of hazardous materials (primarily petroleum products, lubricants and degreasers). The Project does not include use or storage of hazardous materials outside the VMF. The typical materials that would be stored and used at the VMF include diesel fuel, motor oils, lubricants, and degreasers. All hazardous products would be stored in double-walled storage containers or double-walled ASTs. Hazardous materials would be used and stored at the VMF according to accepted industry BMPs. Planned operations at the VMF are similar to operations currently ongoing at MCO, and are considered minor in the respect to the overall operations and land use at the airport, as explained in Section 5.2.4.

There are no anticipated changes in frequency or quantity of hazardous materials to be transported along the N-S Corridor; however, given the number of ports along the Florida coast, growth could occur. Hazardous materials would continue to be transported consistent with applicable statutes, rules and regulations and there would be no anticipated effect to health and safety due to the transportation of these materials.

**Formally Used Defense Sites (FUDS)**

The USACE completed a Remedial Investigation/Feasibility Study (RI/FS) of the entire former Pinecastle Jeep Range (PJR) property in 2010, which is located along the E-W Corridor, north of SR 528 between Narcoossee Road and SR 417. The PJR property was formerly used as an Army weapons demonstration range and training facility. The purpose was to determine where and what type of contamination was present. During the RI/FS, crews searched for munitions and collected soil and water samples. They dug over 51,000 objects and collected almost 200 samples. Over 800 of the metallic items were debris related to munitions (such as casings and fragments), but only 24 were actual munitions. The remaining objects were nails, fencing and the like. The munitions and munitions debris were found primarily on undeveloped land and none were found in residential lots. No munitions, pieces of munitions, or soil or

AAF-AR0045063

water contamination were found north of Lee Vista Boulevard. No environmental contamination was identified in any of the residential areas.

The site was divided into four Munitions Response Sites (MRS) based on what was found during the RI/FS. The MRSs are: Demonstration Range North, Demonstration Range South, Demonstration Range East, and Remaining Area. The demonstration ranges are south of Lee Vista Boulevard, north of Beachline Expressway, and from the western boundary of the property east to the Orange County landfill. Demonstration Range South is a portion of the undeveloped property known as Mockingbird. Demonstration Range East includes Beltway Commerce Center and a portion of the landfill property. Demonstration Range North is south of Lee Vista Boulevard and includes Odyssey Middle School, Tivoli Gardens, and Lee Vista Square. All the residential neighborhoods except those in Demonstration Range North are in the Remaining Area MRS.

***No-Action Alternative***

Under the No-Action Alternative, the PJR would not be traversed.

***Action Alternatives A, C, and E***

Alternatives A, C, and E traverse the Remaining Area MRS, within the SR 528 ROW. The USACE has determined no munitions were located in these areas and no further action is required.

## 5.4.5    Historic Properties

The National Historic Preservation Act of 1966 (NHPA), as amended, defines historic properties as "any prehistoric or historic district, site, building, structure, or object included on or eligible for listing on the National Register [of Historic Places (NRHP)], including artifacts, records, and material remains related to the district, site, building, structure, or object" (54 USC § 300308).

Section 106 of the NHPA (Section 106) requires all federal agencies to take into account, prior to authorizing an undertaking, the effect of that undertaking on historic properties listed in or eligible for listing in the NRHP. Under Section 106,

> "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall also be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative" (36 CFR § 800.5(a)(1)).

This section of the FEIS contains FRA's Findings of Effect under Section 106. The portion of the APE in which physical disturbance would occur is termed the direct effects APE; the portion of the APE in which changes in noise, vibration, or visual setting could occur that would alter the characteristics which make a property eligible for inclusion in the NRHP is termed the indirect effects APE. As discussed in Section 4.4.5, *Historic Resources*, no NRHP-listed or eligible properties were identified within the APEs for

AAF-AR0045064

the MCO Segment and the VMF. For the E-W Corridor, the NRHP-eligible Florida East Coast Railway (FECR) Historic District was the only historic property identified within the APE for direct effects. The NRHP-eligible FECR was also identified as a historic resource within the N-S Corridor APE for direct effects, and includes 12 contributing historic bridges, four of which have also been determined individually eligible, as described in Section 4.4.5 of this FEIS. The N-S Corridor also contains six recorded archaeology sites within the APE for direct effects, including one site that is NR-listed, one site that is NR-eligible, and four sites that have not been evaluated by SHPO. Within the APE for indirect effects, 63 historic properties and districts have been identified.

In the 2012 EA prepared for Phase I, the FRA determined that Phase I of the Project would have no adverse effect on the FECR Historic District, and SHPO concurred that the use of the historic rail line and restoration of passenger rail service for the Phase I Project would not constitute an adverse effect. None of the bridges within the WPB-M Corridor are individually eligible for the NRHP.

For Phase II, FRA has determined that the Project would have an adverse effect on the two bridges (the Eau Gallie River and St. Sebastian River Bridges) in the N-S Corridor that are individually eligible for the NRHP, due to the demolition of those properties. The Project would have no adverse effect on the NRHP-eligible FECR Historic District as a result of replacing or reconstructing the bridges that are contributing elements to the FECR District, because AAF will continue to consult with SHPO through the bridge design process to ensure that the new bridge design and appearance will be compatible with, and sensitive to, the characteristics of this historic district. The Project would have no adverse effects (noise, vibration, change in setting) to the historic properties located in the N-S Corridor APE for indirect effects.

### 5.4.5.1    Methodology

All cultural resource investigations and consultations were conducted in accordance with Section 106 of the NHPA and its implementing regulations for Protection of Historic Properties (36 CFR Part 800). Under Section 106, an adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the NRHP in a manner that would diminish the property's integrity. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative. Treatment measures to be implemented to avoid, minimize, and mitigate adverse effects identified during the Section 106 process will be memorialized in a Memorandum of Agreement (MOA) among FRA, AAF, and SHPO. A draft MOA is included with this FEIS in Appendix 5.4.5.

Effects were evaluated at each historic property within the APE to determine if there would be any physical alteration or modification of the property as a result of the project, or if the Project would change the setting of the property. Indirect effects were evaluated for all historic properties within the defined indirect impacts APE to determine if the Project would change their setting, if vibration would result in damage to a structure, or if changes in noise levels would have the potential to alter its character-defining features. None of the historic properties include a quiet setting as a character-defining feature. However, this EIS presents noise information in the interest of disclosure. Effects of proposed noise mitigation measures (pole-mounted horns and noise walls) were also evaluated.

AAF-AR0045065

### 5.4.5.2    Consultation and Public Involvement

FRA has prepared a Determination of Effect (DOE) report that contains its assessment of effects to historic properties and archaeological sites located within the APE and its adverse effect finding. This report was circulated, in draft form, to all local governments along the project corridor. Local governments were provided an opportunity to comment on the report, and to become consulting parties under Section 106. The following entities accepted FRA's invitation to become consulting parties:

- Broward County
- St. Lucie County
- City of Stuart
- City of Vero Beach
- Town of St. Lucie Village
- Martin County
- Indian River County Historical Society
- Indian River County
- Old Vero Ice Age Sites Committee

FRA incorporated comments, as appropriate, into the report and provided the document to the SHPO. On July 24, 2015, the SHPO concurred with the FRA's Determination of Effect (Appendix 4.4.5-A).

### 5.4.5.3    Environmental Consequences

This section identifies the potential beneficial and adverse effects to historic properties from the Project. Under Section 106, an adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the NRHP in a manner that would diminish the property's integrity. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative. As described in section 3.3 of the DEIS, FRA has conducted a detailed analysis of the environmental impacts of a No-Action Alternative and three Action Alternatives (Alternative A, Alternative C, and Alternative E). Each of the three Action Alternatives incorporates the same proposed action for these components: the MCO Segment and VMF, the E-W Corridor parallel to SR 528, and the N-S Corridor within the FECR Corridor. The three alternatives differ with respect to the alignment within the 17.4-mile segment of the E-W Corridor between the MCO Segment and SR 520 (within the Central Florida Expressway Authority (CFX) -controlled portion of SR 528 between SR 417 and SR 520).

**No-Action Alternative**

The No-Action Alternative is not anticipated to have any effect on historic properties.

**Action Alternatives A, C, and E**

The effects of Alternatives A, C, and E would be identical with respect to historic properties. This section provides a summary of impacts to historic properties and FRA's recommendations of effects.

AAF-AR0045066

### MCO Segment

No NRHP-listed or eligible historic properties were identified within the MCO Segment and VMF APE. FRA has therefore determined that constructing and operating the MCO Segment and VMF would have no effect on historic properties.

### East-West Corridor

Large portions of the East-West (E-W) Corridor APE were surveyed in 1990 and 2005 (Piper Archaeology 1990; Janus Research, Inc. 2005). The remaining portions, with the exception of one area where access was not allowed, were surveyed in 2013, as part of the 2013 CRAR. One NRHP-eligible resource has been identified in the direct effects APE for the E-W Corridor—the FECR Historic District, which is located at the east end of the E-W Corridor in Cocoa at the intersection with the N-S Corridor. FRA determined that constructing the E-W Corridor would have no adverse effect on the FECR Historic District because the restoration of passenger service along the rail line would not affect the characteristics that make the district eligible for the NRHP.

New communications towers are proposed along the E-W Corridor to support the Positive Train Control system and other communications systems. Although the locations of these towers have not yet been identified, AAF would site new towers in locations that have been determined not to affect above- or below-ground historic properties.

One property along the E-W corridor has not been evaluated for the presence of above-ground historic properties or archaeological resources, because evaluators have not been able to access the property. AAF has committed to conducting field investigations once access is granted.

### North-South Corridor

The North-South (N-S) Corridor APE contains several above-ground historic properties in the APE for direct effects. The APE for direct effects includes the FECR Historic District; four of the bridges in the APE for the N-S Corridor have also been determined individually eligible, and an additional 8 bridges are eligible as contributing elements. The APE for indirect effects includes 63 historic properties, including districts, buildings, structures, and sites that are already listed in the NRHP or have been found eligible. There are also six archaeological sites that have been NR-listed, are determined NR-eligible, or that not been evaluated for eligibility. All proposed work will occur within the existing FECR ROW.

#### FECR Historic District (APE for direct effects)

The N-S Corridor was originally built as a double-track railroad, but today it is mostly a single-track railroad with several long sidings. The railbed for the second track still exists and would be used for the additional track improvements. The Project would return the N-S Corridor to a dual-track system. Infrastructure improvements, such as bridge replacements and curve improvements, are planned to be completed within the existing right-of-way (no additional right-of-way acquisition is anticipated). The addition of the second track will return the corridor to its historic configuration and historic use as a passenger rail line.

AAF-AR0045067

The NRHP-eligible FECR Historic District, which is the central resource of the N-S Corridor, would not be adversely affected by the Project. This decision is predicated on the previous FRA determination and SHPO concurrence regarding this resource during Phase I of this project. During a 2009 SHPO meeting regarding the South Florida East Coast Corridor Study (SFECC), there was agreement that the use of the historic rail line and restoration of passenger rail on the line would not constitute an adverse effect to the NRHP-eligible FECR Historic District, as this would not alter or adversely affect the character-defining features of this district. This was formalized in a determination from FRA that Phase I would not have an adverse effect on the FECR Historic District, and in a letter dated November 6, 2012, and appended to the 2013 FONSI (see Appendix 1.1-A2 of the DEIS), SHPO concurred with this determination. The Project would include similar improvements for the N-S Corridor in Phase II, and therefore these improvements would not result in adverse effects to this district in the N-S Corridor.

**NRHP-Eligible Bridges and Contributing Element Bridges (APE for Direct Effects)**

Within the N-S Corridor, four bridges (Eau Gallie River, St. Sebastian River, St. Lucie River, and Loxahatchee River) have been identified as individually eligible for listing on the NRHP under Criterion A and Criterion C. These four bridges are also contributing elements to the FECR Historic District. Eight additional bridges (see Table 5.4.5-1) are not considered individually eligible for listing on the NRHP but are contributing elements to the FECR Historic District.

As described in Section 3.3, *Alternatives Studied in Detail in the EIS*, AAF proposes to demolish the Eau Gallie River and St. Sebastian River Bridges and construct two new single-track bridges within the same footprint. Demolishing these two bridges is an adverse effect. When an adverse effect to a historic property is identified during the Section 106 process, attempts should be made to avoid, minimize, or mitigate these effects. FRA concluded that the effects could not be avoided or minimized, as the AAF cannot operate passenger trains over the existing Eau Gallie River and St. Sebastian River Bridges. The rate of speed of passenger trains is 110 mph, which is much higher and requires a higher bridge loading factor than the 28 mph operation of the current freight trains along the corridor. Even if the existing substructure and superstructure of each bridge were upgraded as part of a rehabilitation effort, the present bridges would not meet the required loading rating for the rate of speed of the passenger trains. The higher rate of speed would cause increased vibration, resulting in fatigue to the steel members of the open-deck superstructure; adding a concrete deck to the superstructure that is less susceptible to vibration would result in a dead load that the existing pile substructure cannot support. Attempts to avoid or minimize the adverse effects to these individually-eligible bridges by retaining the current bridges for freight use while constructing additional adjacent bridges for use by passenger trains would introduce operational challenges that extend well beyond the immediate areas of the bridges. Additionally, the two adversely affected bridges, which cross over rivers, could not be abandoned in favor of new construction, as the USCG has determined that abandoned bridges must be removed to allow for safe navigation (USCG 2014).

As it is not possible to avoid or minimize the adverse effects to the Eau Gallie River and St. Sebastian River Bridges still meet the purpose and need of the Project, FRA and AAF have endeavored to mitigate these impacts by committing to consult with SHPO through the design process to ensure that the new bridge construction is compatible with the character of the FECR Historic District. Consultation with SHPO on the design of reconstructed and rehabilitated bridges is proposed as a key component to mitigate any adverse effects. FRA determined, and SHPO concurred that the Project will have an adverse effect on the

AAF-AR0045068

Eau Gallie River and St. Sebastian River bridges. Therefore, FRA, AAF, and SHPO, and potentially the ACHP, are developing a MOA describing the treatment measures that AAF will undertake to mitigate the adverse effects to the bridges. The draft MOA is included in Appendix 5.4.5 of this FEIS.

The St. Lucie River and Loxahatchee River Bridges are similar to the Eau Gallie River and St. Sebastian River Bridges in that they are both contributing resources to the NR-eligible FECR Historic District, as well as being determined individually eligible for listing in the National Register. However, the Project proposes that these bridges would be rehabilitated, as described in Section 3.3.3, but would not be substantially altered. FRA will consult with SHPO to develop rehabilitation designs that both meet the requirements of the Project and are compatible with the surrounding historic character; therefore, there will be no adverse effects to these bridges. This is consistent with the findings in Phase I of the Project, in which SHPO concurred with FRA's no adverse effect determination for bridges within the FECR Historic District in the WPB-M Corridor, conditioned on the reconstruction or rehabilitation work to the bridges being developed in consultation with SHPO to avoid and/or minimize effects.

As shown in Table 5.4.5-1, seven bridges along the N-S Corridor that are not individually eligible, but that are eligible as contributing elements to the FECR Historic District, would be demolished and replaced with new 2-track structures. An additional eighth bridge that is also eligible as a contributing resource to the FECR Historic District (the fixed bridge over Taylor Creek, 8SL3191), would be rehabilitated. For Phase II, AAF will continue to consult with SHPO through the design process to ensure that all of the new or rehabilitated bridge structure designs for the contributing resource bridges within the FECR Historic District, including those for the St. Lucie River, Loxahatchee River, and Taylor Creek bridges, are compatible with the historic character of the district, in order to avoid an adverse effect to the district. Based upon AAF's commitment to continued consultation, FRA has concluded that rehabilitating the St. Lucie River, the Loxahatchee River and the Taylor Creek Bridges and replacing the seven bridges that are not individually eligible for listing on the NPHP but are eligible as contributing elements to the FECR Historic District would not have an adverse effect on the historic district. AAF in consultation with the SHPO will develop bridge designs that are in keeping with the Secretary of the Interior's Standards for Rehabilitation.

The adverse effect resulting from the replacement of two of the four individually-eligible bridges (the Eau Gallie River Bridge and the St. Sebastian River Bridge) would also constitute a "use" under Section 4(f). A Section 4(f) evaluation is provided in Chapter 6, *Section 4(f) Evaluation*.

**Archaeological Resources (APE for Direct Effects)**

The Project would return the existing FECR Corridor to a dual-track system. Infrastructure improvements are planned to be completed within the existing right-of-way (AAF anticipates no additional right-of-way acquisition). The Project could possibly affect six archaeological sites that have been NR-listed, determined NR-eligible, or that have the potential to be determined NR-eligible. These sites have been mapped within the direct effects APE, or are mapped adjacent to the APE but current information about the sites suggest that intact deposits may extend into the APE. The sites identified in the APE for direct effects are: Hobe Sound National Wildlife Refuge #3 Site (8MT1287); the Fort Capron Site (8SL41); Vero Man/Vero Locality Site (8IRl/8IR9); Fort Pierce (8SL31); Railroad (8IR846); and Avenue A-Downtown Fort Pierce (8SL1772).

AAF-AR0045069

**Table 5.4.5-1    FECR Historic Bridges within the N-S Corridor APE for Direct Effects**

| County | FMSF # | Site Name / Address | National Register Status | Project Effect |
|--------|--------|---------------------|--------------------------|----------------|
| Brevard | 8BR3058 | Fixed Railway Bridge over the Eau Gallie River – Steel | Eligible as FECR Contributing Resource/ Individually Eligible | Demolish and replace with 2-track structure |
| Brevard | 8BR3059 | Fixed Railway Bridge over the Crane Creek and Melbourne Street – Steel | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Brevard | 8BR3060 | Fixed Railway Bridge over the Turkey Creek – Steel | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Brevard | 8BR3061 | Fixed Railway Bridge over the Goat Creek – Steel | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Brevard and Indian River | 8BR3062/ 8IR1569 | Fixed Railway Bridge over the Sebastian River – Steel | Eligible as FECR Contributing Resource/ Individually Eligible | Demolish and replace with 2-track structure |
| St. Lucie | 8SL3191 | Fixed Bridge over the Taylor Creek - Concrete with Steel Beam Span | Eligible as FECR Contributing Resource | Rehabilitate |
| Martin | 8MT1623 | Fixed Bridge over the Rio Waterway - Steel and Timber Piles | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Martin | 8MT1382 | Movable Bridge over the St. Lucie River – Steel | Eligible as FECR Contributing Resource/ Individually Eligible | Rehabilitate |
| Martin | 8MT1624 | Fixed Bridge over the Salerno Waterway - Steel and Timber Piles | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Martin | 8MT1625 | Fixed Bridge over the Tributary to Manatee Creek 1 - Steel and Timber Piles | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Martin | 8MT1626 | Fixed Bridge over the Tributary to Manatee Creek 2 - Steel and Timber Piles | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Palm Beach | 8PB16041 | Movable Bridge over the Loxahatchee River – Steel | Eligible as FECR Contributing Resource/ Individually Eligible | Rehabilitate |

**Hobe Sound National Wildlife Refuge #3 (8MT1287):** The Hobe Sound National Wildlife Refuge #3 Site (8MT1287) consists of a shell midden consisting of a thin scatter of shell and a few aboriginal ceramic potsherd fragments situated on a dune bluff in the Hobe Sound National Wildlife Refuge that was bisected during the construction of the railroad in the early part of the last century. The bluff is adjacent to the FECR right-of-way, located in an area where the rail line curves to the west. The Hobe Sound National Wildlife Refuge #3 Site is located outside of the right-of-way. However, because the limits of the site are within the APE, and because AAF's construction activities at this location include excavation and construction of a retaining wall, the excavation has the potential to adversely affect this archaeological site. Preliminary engineering specified a curve modification at this location and this action would have caused disturbance of potentially intact portions of the archaeological site. As an avoidance and protection measure, this curve modification was eliminated from the Project and instead construction in this area will consist of installing rail tracks in their historic locations. Preliminary discussions with SHPO indicated that this design change would avoid adverse effects to the Hobe Sound National Wildlife Refuge #3 Site.

**Fort Capron (8SL41):** The Fort Capron Site consists of the archaeological remains of a 1850s military fort located east of the FECR right-of-way. The only visible remnants of Fort Capron are several ditches that extend to the east down towards the Indian River. Although the limits of the site are not well-defined, the FECR right-of-way appears to form the western boundary of the site. Because construction in this area will consist of installing rail tracks in their historic locations, no subsurface excavation will be required

AAF-AR0045070

and no additional right-of-way will be needed, the Project will not disturb any subsurface resources remaining within the right-of-way. There would be no temporary or permanent effects to the archaeological site caused by the Project.

**Vero Man/Vero Locality (8IRI/8IR9):** the Vero Man Site consists of a deeply buried fossil bed in the vicinity of the Main Relief Canal in Vero Beach, west of the FECR right-of-way. The site is currently being investigated by researchers from Mercyhurst University. Based on a 2014 Change of Status Form, the SHPO, in 2014, found this site eligible for listing in the National Register. The limits of the site are not well-defined and may extend under the railroad right-of-way. Because construction in this area will consist of installing rail tracks in their historic location and adding a second single-track railroad bridge in its historic location, there will be no construction outside of the right-of-way. The proposed construction will not require subsurface excavation other than shallow excavation (approximately five feet deep) required for new bridge approach slabs. The bridge will not require abutments. The new bridge will have five pile bents, two on each bank of the canal and one in the water. These will consist of 24-inch square concrete pilings, driven to approximately 50-feet in depth. Geotechnical borings at this location show sand layers extending to below the 50-foot depth, with no firm or confining layers. Any potential archaeological resource associated with the site would be located too far beneath the surface to be affected by the shallow excavation association with the approach slabs. There would be no temporary or permanent effects to the archaeological site caused by the Project. .

**Fort Pierce (8SL31):** the NR-listed Fort Pierce Site is east of the FECR right-of-way and is mapped outside of the APE. However, FMSF GIS data show several locations for this site, and mapped site boundaries for one location directly border on the APE. The disparity regarding the locations of this site on file with the FMSF suggest there is a potential for the boundaries of this site to extend within the APE. Because construction in this area will consist of installing rail tracks in their historic locations, no subsurface excavation will be required and no additional right-of-way will be needed, the Project will not disturb any subsurface resources remaining within the right-of-way. There would be no temporary or permanent effects to the archaeological site caused by the Project.

**Railroad Site (8IR846) and Avenue A – Downtown Fort Pierce (8SL1772):** Neither the Railroad Site, a Malabar shell midden and artifact scatter of variable density, nor the Avenue A – Downtown Fort Pierce habitation site has been subject to a SHPO eligibility evaluation. Because construction in this area will consist of installing rail tracks in their historic locations, no subsurface excavation will be required and no additional right-of-way will be needed; therefore, the Project will not disturb any subsurface resources remaining within the right-of-way. There would be no temporary or permanent effects to these potentially-eligible archaeological sites caused by the Project.

AAF will follow an Archaeological Monitoring Plan for each of these sites, which will be stipulated in the MOA. The implementation of the Archaeological Monitoring Plan, which includes construction crew training and procedures in the unlikely event that archaeological features or artifacts are discovered during excavation, will avoid or minimize the potential adverse effect of excavation by identifying and protecting any unmarked human remains or significant archaeological resources that may be encountered during construction.

Based on the information available, FRA has determined that the Project would have no adverse effect on archaeological sites within the APE for direct impacts for the N-S Corridor. The no adverse effect finding is based on the condition that AAF will continue to consult with SHPO through the design process, as

AAF-AR0045071

needed, and will adhere to the stipulations of the MOA to ensure appropriate sensitivity to the previously recorded archaeological sites located within the APE.

## Phase I - West Palm Beach - Miami Corridor

As stated in the 2013 FONSI for Phase I, FRA consulted with the Florida SHPO pursuant to NHPA Section 106, and SHPO concurred on November 6, 2012 with FRA's finding that the Project would have no adverse effect on any of historic resources within the WPB-M APE. The concurrence is conditional, and requires continued consultation with the SHPO and locally affected parties, including the Cities of West Palm Beach, Fort Lauderdale, and Miami, through the station design process to avoid and/or minimize effects. The SHPO also concurred with FRA's finding that the relocated Ft. Lauderdale Station would have no adverse effect on historic properties (Appendix 3.3.1-A2).

| Table 5.4.5-2    Historic Railway Bridges Identified within the WPB-M Corridor APE | | | | |
|---|---|---|---|---|
| County | FMSF # | Site Name / Address | National Register Status | Project Effects |
| Palm Beach | 8PB15951 | Fixed Railway Bridge over the C-15 Canal | Eligible as FECR Contributing Resource | None |
| Broward | 8BD4860 | Fixed Railway Bridge over the Cypress Creek/ C-14 Canal | Eligible as FECR Contributing Resource | None |
| Broward | 8BD4861 | Fixed Railway Bridge over the North Fork of Middle River | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Broward | 8BD4862 | Fixed Railway Bridge over the South Fork of Middle River | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Broward | 8BD4863 | Fixed Railway Bridge over the Dania Cut-Off Canal | Eligible as FECR Contributing Resource | Rehabilitate |
| Miami-Dade | 8DA12596 | Fixed Railway Bridge over the Oleta River | Eligible as FECR Contributing Resource | Demolish and replace with 2-track structure |
| Miami-Dade | 8DA12597 | Fixed Railway Bridge over the Royal Glades/C-9 Canal | Eligible as FECR Contributing Resource | None |
| Miami-Dade | 8DA12598 | Fixed Railway Bridge over the Arch Creek | Eligible as FECR Contributing Resource | None |

### 5.4.5.4    Indirect and Secondary Effects

Indirect and secondary effects can include visual changes, increased noise and vibration, and increased development associated with the Project.

### No-Action Alternative

There would be no indirect or secondary effects from the No-Action alternative.

AAF-AR0045072

**Action Alternatives A, C, and E**

*MCO Segment*

As reported in the 2013 CRAR, no historic properties have been identified within the APE for indirect effects for the MCO Segment.

*East-West Corridor*

According to the 2013 CRAR, there are no historic properties within the APE for indirect effects in the East-West Corridor.

*North-South Corridor*

As improvements within the N-S Corridor would remain within the existing right-of-way, and would not require right-of-way acquisition from any adjacent historic properties, any potential effects to these properties would be indirect.

The noise analysis conducted for the project and documented in the EIS shows that, with the use of pole-mounted horns and improved rail infrastructure, the project will reduce noise levels along the N-S Corridor in comparison to existing conditions, and that noise levels 50 feet from the right-of-way would not result in noise impacts. While the proposed passenger trains are lighter and faster than the existing freight train traffic, overall there will be more train traffic/operations occurring each day. Secondary and cumulative noise effects are anticipated to be minimal to moderate. Tables 5.4.5-3 and 5.4.5-4 show the noise effects on historic properties and identifies the land use category associated with each property. As discussed in Section 5.2.2 of the EIS, the analysis used FTA impact criteria because of the mix of freight and passenger trains, and the average train speeds of 90 mph or less. As shown, noise mitigation (wayside horns in lieu of using individual locomotive mounted horns) would eliminate all adverse effects. No additional noise mitigation measures that could affect the integrity of historic properties (soundproofing or noise barriers) would be required.

There are no historic properties within the APE that have a quiet setting as a character-defining feature, and therefore noise would not affect any historic properties or their settings. At historic properties where there is public use and that are categorized as Category 1 land use (the McKee Jungle Gardens, Riverhill, the Sunrise Theater and the Lyric Theater), there will be no noise impacts with the required wayside horns.

The analysis of vibration showed that vibration levels would not increase, although the frequency of vibration events would increase. Table 5.4.5-4 shows the vibration effects on historic properties. As shown, and documented in Section 5.2.2 of the EIS, vibration from operation of the passenger rail system would not result in vibration that exceeded damage thresholds (100 VdB at 70 feet), although some properties would experience vibration at "annoyance" levels (perceptible vibration) based on the FTA and FRA impact criteria for existing land uses. Therefore, FRA anticipates that there will be no indirect adverse effects due to changes in noise or vibration to either the integrity of setting or physical structure of any historic property. Construction vibration also was evaluated. The analysis showed that pile-driving at bridges could exceed this damage threshold at distances up to 135 feet, however there are no above-ground historic properties within 135 feet of these bridges.

AAF-AR0045073

Returning the FECR Corridor to its historic configuration and historic use as a passenger rail line will not change the visual setting of any historic property within the indirect effects APE. The project will not introduce any new visual elements. Replacing and upgrading the existing crossing gates at at-grade crossings within historic districts or in proximity to a historic property will be designed and constructed in consultation with the SHPO, so as not to adversely change the visual characteristics of the streetscape.

### Archaeological Resources

Noise from trains has no effect on subsurface archaeological sites, as there are no noise receptors within these buried strata.

A prior project along portions of the FEC corridor (Ambrosino et al. 2010) reported that noise and vibration testing for the FEC Mainline found that "the analysis of predicted vibration levels showing the proposed project will increase the frequency of vibration levels; however, the predicted vibration levels associated with the passenger trains is less than the existing vibration levels associated with the freights." They concluded that the APE for cultural resources should be restricted to the direct disturbance areas as "there are no noise or vibration effects to land uses adjacent" to the project area.

The vibration analysis for the Project found that freight trains have greater weight and axle loads, and that the duration of freight train passage was 120 seconds. The freight trains cause greater vibration than passenger trains, which are lighter and have a passing duration of 10 seconds. The analysis calculated the average ground vibration levels for freight and passenger trains along the FEC corridor, at a distance of 70 feet from the track. In all cases, freight (the no-action alternative) was the same or greater than the proposed action, with average vibration levels ranging from 83.2 Vdb to 84.9 Vdb. Passenger train-generated vibration levels ranged from 82.3 to 84.9 VdB. This is approximately the level of "residential annoyance" but does not reach the level of damage. Based on this analysis, the vibration levels from operations of the AAF passenger service would be less than the no-action alternative, and would not result in vibration impacts to physical objects.

Because FEC has operated passenger and freight rail along this corridor for more than 100 years, any vibration effects to subsurface stratigraphy or artifacts would likely have already occurred. However, as there are no data on the stratigraphy beneath the FECR right-of-way and no studies of the effects of vibration on stratigraphy or artifacts in this geomorphological context, this assumption is speculative.

### Phase I – West Palm Beach – Miami Corridor

Three at-grade crossings are located adjacent to one NRHP-eligible historic district in Brevard County (Union Cypress Saw Mill Historic District [8BR2173]); four at-grade crossings are located within a National Register–eligible historic district in St. Lucie County (Edgar Town Historic District [8SL2801]); and two at-grade crossings are located within and adjacent to a National Register–eligible Kelsey City Layout (8PB13340) in Palm Beach County. As determined by FRA and confirmed by SHPO for Phase 1, the proposed Project will not have an indirect effect on these resources because grade crossing improvements will not change the setting of the district and will not introduce new modern elements.

AAF-AR0045074

## 5.4.5.5    Temporary Construction-Period Effects

Temporary construction period effects generally consist of noise, dust, vibration, and traffic related to construction. Temporary construction period effects can also include direct effects, such as staging or material storage that impacts a historic property.

**Indirect Effects**

As shown in Tables 5.4.5-3 and 5.4.5-4, construction activity will temporarily increase noise and vibration levels at several historic properties. However, construction-period noise effects will not adversely affect any historic properties because any temporary noise-related impacts will not affect the character-defining features that qualify these properties for listing in the NRHP. Construction-period vibration levels will not exceed structural damage thresholds at any historic property. These construction effects are temporary and would occur during and immediately following construction.

Construction-period vibration levels will not exceed structural damage thresholds at any historic property and so are not expected to have an adverse effect. The vibration analysis, summarized in the EIS (Section 5.2.2.4), showed that pile-driving at bridges could exceed the damage threshold at distances up to 135 feet, however there are no historic properties within 135 feet of the bridges where pile-driving is expected to occur.

Construction-period noise levels are not expected to adversely affect any historic properties, because, as noted above, none of the historic properties include a quiet setting as a character-defining feature.

Construction activities, particularly ground-disturbing activities such as excavation and pile-driving, may affect subsurface archaeological sites. As stipulated in the MOA, AAF has committed to construction monitoring at archaeological properties to minimize harm from construction, and will use appropriate construction techniques to minimize vibration from pile-driving.

| Table 5.4.5-3 | Noise Effects on Historic Properties in Indirect Effects APE Based on Land Use Criteria | | | | |
|---|---|---|---|---|---|
| Site ID | Site Name | Land Use Category | Pre-Mitigation | With Mitigation | Construction |
| 8BR215 | Florida Power & Light Co. Ice Plant | 0 | No | No | No |
| 8BR759 | Whaley Citrus Packing House | 2 | Moderate[1] | No | Yes |
| 8BR1163 | Mattie Lamar House | 2 | Moderate | No | Night |
| 8BR1710 | Jorgensen's General Store | 2 | Moderate | No | Night |
| 8BR1723 | Cocoa Cemetery Storage Building | 3 | Moderate | No | No |
| 8BR1739 | Ashley's Café and Lounge | 0 | No | No | No |
| 8BR1741 | Rockledge Gardens Nursery | 0 | No | No | No |
| 8BR1765 | Bohn Equipment Company | 0 | No | No | No |
| 8RI859 | McKee Jungle Gardens | 1 | Severe | No | No |
| 8IR99 | George Armstrong Braddock House | 2 | Severe | No | Yes |
| 8IR100 | Baughman House | 2 | Severe[1] | No | Yes |
| 8IR388 | 5056 North Old Dixie Highway | 2 | Moderate | No | Night |
| 8IR624 | Hall O'Giants, McKee Jungle Gardens | 1 | Severe | No | No |

AAF-AR0045075

*All Aboard Florida*                    *Final Environmental Impact Statement and Section 4(f) Determination*

| **Table 5.4.5-3** | **Noise Effects on Historic Properties in Indirect Effects APE Based on Land Use Criteria** | | | | |
|---|---|---|---|---|---|
| Site ID | Site Name | Land Use Category | Pre-Mitigation | With Mitigation | Construction |
| 8IR975 | Vero Beach Diesel Power Plant | 3 | Moderate | No | No |
| 8IR1464 | Vero Beach Community Center | 3 | Moderate | No | No |
| 8IR1475 | 1146 21st Street | 2 | Moderate | No | No |
| 8SL78 | Fairmont Manor | 2 | No | No | Yes |
| 8SL220 | 9015 South Indian River Drive | 2 | No | No | Yes |
| 8SL229 | 6109 South Indian River Drive | 2 | No | No | Yes |
| 8SL234 | 5309 South Indian River Drive | 2 | Moderate[1] | No | Yes |
| 8SL236 | Riverhill | 1 | Moderate | No | Yes |
| 8SL237 | Britt House | 2 | No | No | Yes |
| 8SK238 | N.E. Card House | 2 | No | No | Yes |
| 8SL247 | Hoskins House | 2 | Severe[1] | No | Yes |
| 8SL289 | Old Fort Pierce City Hall | 3 | Severe | No | Yes |
| 8SL799 | Sunrise Theater | 1 | Severe | No | No |
| 8SL825 | 601 South 2nd St | 2 | Severe | No | No |
| 8SL826 | Frank Tyler House | 2 | Moderate[1] | No | Yes |
| 8SL917 | Banyon Belle Manor | 2 | No | No | Yes |
| 8SL918 | 1009 South Indian River Drive | 2 | No | No | Yes |
| 8Sl920 | 1029 South Indian River Drive | 2 | No | No | Yes |
| 8SL926 | O.L. Peacock House | 2 | No | No | Yes |
| 8SL930 | Stephen Lesher House | 2 | No | No | Yes |
| 8SL931 | Carlton-Vest House | 2 | No | No | Yes |
| 8SL932 | Casa Del Rio | 2 | No | No | Yes |
| 8SL933 | Babe Phelps House | 2 | No | No | Yes |
| 8SL1599 | Shadetree Studio | 3 | Severe | No | No |
| 8SL1922 | East Coast Packers | 0 | No | No | No |
| 8MT46 | George W. Parks Store | 3 | Moderate | No | No |
| 8MT84 | Fern Building | 0 | No | No | No |
| 8MT86 | Lyric Theater | 1 | Severe | No | No |
| 8MT130 | East Coast Lumber | 0 | No | No | No |
| 8MT131 | Hobe Sound Cabinetry | 0 | No | No | No |
| 8MT307 | Crary House | 3 | Moderate | No | No |
| 8MT838 | 12200 Southeast Nassau St. | 2 | Severe[1] | No | Yes |
| 8MT1066 | 240 North Flagler Rd | 0 | No | No | No |
| 8PB6064 | St John Baptist Church | 3 | Moderate | No | No |

Source: AMEC 2013c

1    Impact based on parcel boundary, not location of structure Impact analysis is based on FRA Land Use Categories, which categorize structures based on existing use: 0 = not noise-sensitive, 1=highly sensitive, quiet is an essential element. 2 = residential, sensitive to night-time noise. 3 = institutional, sensitive to day-time noise. These categories were used to determine whether further mitigation, such as soundproofing or noise walls, were needed to reduce operational impacts to residents or users of the properties.

Environmental Consequences                    5-176

AAF-AR0045076

**Table 5.4.5-4    Vibration Effects on Historic Properties in Indirect Effects APE Based on Land Use Criteria**

| Site ID | Site Name | Land Use Category | Operations (exceeds annoyance level) | Construction (exceeds annoyance level) | Construction (exceeds damage level) |
|---------|-----------|-------------------|-----------|--------------|--------------|
| 8BR215 | Florida Power & Light Co. Ice Plant | 0 | No | No | No |
| 8BR759 | Whaley Citrus Packing House | 2 | Yes | Yes | No |
| 8BR1163 | Mattie Lamar House | 2 | Yes | Yes | No |
| 8BR1710 | Jorgensen's General Store | 2 | Yes | Yes | No |
| 8BR1723 | Cocoa Cemetery Storage Building | 3 | Yes | No | No |
| 8BR1739 | Ashley's Café and Lounge | 0 | No | No | No |
| 8BR1741 | Rockledge Gardens Nursery | 0 | No | No | No |
| 8BR1765 | Bohn Equipment Company | 0 | No | No | No |
| 8RI859 | McKee Jungle Gardens | 1 | Yes | Yes | No |
| 8IR99 | George Armstrong Braddock House | 2 | Yes | Yes | No |
| 8IR100 | Baughman House | 2 | Yes | Yes | No |
| 8IR388 | 5056 North Old Dixie Highway | 2 | Yes | No | No |
| 8IR624 | Hall O'Giants, McKee Jungle Gardens | 1 | Yes | Yes | No |
| 8IR975 | Vero Beach Diesel Power Plant | 3 | Yes | Yes | No |
| 8IR1464 | Vero Beach Community Center | 3 | Yes | Yes | No |
| 8IR1475 | 1146 21st Street | 2 | Yes | No | No |
| 8SL78 | Fairmont Manor | 2 | Yes[1] | Yes | No |
| 8SL220 | 9015 South Indian River Drive | 2 | Yes[1] | Yes | No |
| 8SL229 | 6109 South Indian River Drive | 2 | Yes[1] | Yes | No |
| 8SL234 | 5309 South Indian River Drive | 2 | Yes[1] | Yes | No |
| 8SL236 | Riverhill | 1 | Yes[1] | Yes | No |
| 8SL237 | Britt House | 2 | Yes | Yes | No |
| 8SK238 | N.E. Card House | 2 | Yes[1] | Yes | No |
| 8SL247 | Hoskins House | 2 | Yes[1] | Yes | No |
| 8SL289 | Old Fort Pierce City Hall | 3 | Yes | Yes | No |
| 8SL799 | Sunrise Theater | 1 | Yes | Yes | No |
| 8SL825 | 601 South 2nd St | 2 | Yes | Yes | No |
| 8SL826 | Frank Tyler House | 2 | Yes | Yes | No |
| 8SL917 | Banyon Belle Manor | 2 | Yes[1] | Yes | No |
| 8SL918 | 1009 South Indian River Drive | 2 | Yes[1] | Yes | No |
| 8Sl920 | 1029 South Indian River Drive | 2 | Yes | Yes | No |
| 8SL926 | O.L. Peacock House | 2 | Yes[1] | Yes | No |
| 8SL930 | Stephen Lesher House | 2 | Yes[1] | Yes | No |
| 8SL931 | Carlton-Vest House | 2 | Yes[1] | Yes | No |
| 8SL932 | Casa Del Rio | 2 | Yes[1] | Yes | No |
| 8SL933 | Babe Phelps House | 2 | Yes[1] | Yes | No |

AAF-AR0045077

| Table 5.4.5-4 | Vibration Effects on Historic Properties in Indirect Effects APE Based on Land Use Criteria | | | | |
|---|---|---|---|---|---|
| Site ID | Site Name | Land Use Category | Operations (exceeds annoyance level) | Construction (exceeds annoyance level) | Construction (exceeds damage level) |
| 8SL1599 | Shadetree Studio | 3 | Yes | Yes | No |
| 8SL1922 | East Coast Packers | 0 | No | No | No |
| 8MT46 | George W. Parks Store | 3 | No | Yes | No |
| 8MT84 | Fern Building | 0 | No | No | No |
| 8MT86 | Lyric Theater | 1 | Yes | Yes | No |
| 8MT130 | East Coast Lumber | 0 | No | No | No |
| 8MT131 | Hobe Sound Cabinetry | 0 | No | No | No |
| 8MT307 | Crary House | 3 | No | No | No |
| 8MT838 | 12200 Southeast Nassau St. | 2 | Yes | Yes | No |
| 8MT1066 | 240 North Flagler Rd | 0 | No | No | No |
| 8PB6064 | St John Baptist Church | 3 | No | No | No |

Source: AMEC 2013c

1 Impact based on parcel boundary, not location of structure

Impact analysis is based on FRA Land Use Categories, which categorize structures based on existing use. These categories were used to determine whether further mitigation is needed to reduce operational impacts to residents or users of the properties. Land Use Categories: 0 = not vibration-sensitive, 1=highly sensitive, vibration may interfere with operations within the building. 2 = residential, sensitive to night-time vibration. 3 = institutional, sensitive to daytime vibration that could interfere with activities.

**Direct Effects**

For the E-W Corridor, access to work areas would be primarily from public areas or the highway right-of-way (SR 528). Material staging areas would be located within the proposed railroad right-of-way. Within the N-S Corridor, access to work areas will be primarily from public access points. However, some specific construction effects cannot be estimated at this time because they depend on several factors yet to be determined, such as: final design, location of material staging, access to work areas, materials to be used, specific construction methodologies, and identification of borrow areas or excess material placement areas, if necessary. Construction site access locations have not yet been identified and therefore, potential construction effects that would result from access have not been assessed. Some private access may be required.

If any access, construction staging, borrow, or excess material placement areas are not located within the APE, and therefore were not included in the initial study area, AAF will survey these areas prior to conducting any ground disturbing activities, and will consult with SHPO to assess the potential impacts of these activities on archaeological and historic resources effects of any work in those areas. AAF will locate such activities in such a manner to avoid effects to known historic properties listed or eligible for listing on the NRHP, as stipulated in the MOA. AAF will conduct construction activities in a manner to avoid effects to known historic properties listed or eligible for listing on the NRHP, as stipulated in the MOA.

AAF-AR0045078

As stated in Section 3.4 of the 2012 EA, the WPB-M Corridor will include construction primarily on existing exclusive right-of-way (which defines the APE for direct effects), and, therefore, would have no temporary effects on historic or archaeological resources.

### 5.4.5.6    Findings of Effect

FRA has evaluated the proposed Project pursuant to the regulations adopted by the Advisory Council on Historic Preservation (36 CFR 800) and finds that the proposed Project would have an adverse effect on two historic properties, the Eau Gallie River Bridge and the St. Sebastian River Bridge, both of which must be demolished and replaced with a new 2-track bridge structure. The proposed Project would have an effect, but not an adverse effect, on the FECR Historic District as a whole. Although the project includes reconstructing the double-track railroad system and demolishing and replacing ten bridges that are eligible as contributing elements to the FECR Historic District, these activities would be conditioned on AAF's commitment to continued consultation with SHPO and adherence to the MOA, to ensure that the new and rehabilitated structures are compatible with the historic character of the District. AAF will consult with the SHPO to develop bridge designs that are in keeping with the Secretary of the Interior's Standards for Rehabilitation. On July 24, 2015 the State Historic Preservation Officer concurred with this Finding.

### 5.4.5.7    Regulatory Compliance

This section outlines a selection of the relevant statutory and regulatory compliance requirements for historic properties. Section 106 of the NHPA (54 USC § 300308) requires that federal agencies to take into account, the effect of their undertakings on historic properties listed or eligible for listing in the NRHP, and provide the ACHP an opportunity to comment prior to authorizing an undertaking. The ACHP has promulgated regulations (36 CFR Part 800) that provide the regulatory framework for the identification and evaluation of historic properties, involvement of consulting parties and the public, and assessment and resolution of adverse effects. Other relevant regulations and procedures include the National Park Service regulations concerning eligibility for inclusion in the National Register of Historic Places (36 CFR Part 63); the Secretary of the Interior's Standards for the Treatment of Historic Properties (36 CFR Part 68); Executive Order 11593, *Protection and Enhancement of Cultural Environment*; FRA's Procedures for Considering Environmental Impacts (64 Fed. Reg. 28545 May 26, 1999); and Appendix C of the *Procedures for the Protection of Historic Properties* at 33 CFR part 325, Processing of Department of the Army Permits.

Mitigation measures for adverse effects to historic properties may include data recovery, and photographic recordation. The documentation for these mitigation measures must provide evidence that consultation has been completed with the SHPO, concerned Indian Tribes, and any other identified consulting parties. As noted above, actions that the parties agree upon to resolve adverse effects are detailed in a MOA among the FRA, , the SHPO, AAF, and the AHCP. A draft MOA, prepared in coordination with the SHPO, other participating federal agencies, AAF, the ACHP, and any consulting parties is included in Appendix 5.4.5. Implementing the Project in accordance with the stipulations if the MOA that has been signed by all appropriate parties and filed with the ACHP evidences FRA's compliance with Section 106.

AAF-AR0045079

## 5.4.6 Parks and Recreation Areas

This section describes the potential effects to existing and planned publically-owned parks and recreational properties. As described in Section 4.4.6, in general, these properties are protected under Section 4(f) of the DOT Department of Transportation Act of 1966 (publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance).In some instances they are also protected under Section 6(f) of the Land and Water Conservation Act of 1965. Section 6(f) resources are all parks and other recreational facilities that have received a Land and Water Conservation Fund Act grants of any type. Section 6(f)(3) contains strong provisions to protect federal investments and the quality of assisted resources. Section 6(f)(3) states that no Section 6(f) resource shall be converted to other than public outdoor recreation uses without approval of the Secretary of the Interior. The Secretary may approve conversions only if he/she finds it to be in accordance with the existing comprehensive statewide outdoor recreation plan and if substitute property is provided.

As documented below the Project would not adversely affect any parks, recreation areas and wildlife or waterfowl refuges protected by Section 4(f). No Section 6(f) properties would be converted to a non-recreation use by the Project.

### 5.4.6.1 Methodology

Direct impacts to recreational properties were characterized based on physical impacts to the properties. The impacts include:

- When a portion of the recreational properties is permanently incorporated into a transportation facility; and

- When there is a temporary occupancy of a portion of the recreational property that is adverse in terms of Section 4(f)'s preservation purpose; that is, when one of the following criteria for temporary occupancy are not met:

  o The duration of the occupancy must be less than the time needed for the construction of the project, and no change of ownership occurs.

  o Both the nature and magnitude of the changes to the recreational property are minimal.

  o No permanent adverse physical changes, nor interference with activities or purposes of the resources on a temporary or permanent basis, are anticipated.

  o The land must be returned to a condition that is at least as good as existed prior to the project.

  o There is documented agreement with the appropriate federal, state, or local officials having jurisdiction over the land that the above conditions have been met.

Indirect impacts were also evaluated. Because these resources are protected by Section 4(f), this EIS uses the term "constructive use" to identify potentially significant adverse impacts to these recreational properties. A constructive use can occur when the transportation project does not incorporate land from a Section 4(f) resource, but the project's proximity effects are so severe that the protected activities,

AAF-AR0045080

features, or attributes that qualify the resource for protection under Section 4(f) are substantially impaired.

### 5.4.6.2    Environmental Consequences – Direct

Direct effects to parks or recreation areas would include the conversion of land to a railroad use or loss of public access to a property.

#### No-Action Alternative

Under the No-Action Alternative, the Project would not be constructed or operated. Existing commuter and intercity railway services would remain unchanged, and there would be no direct adverse effects to parks or recreation areas.

#### Action Alternatives A, C, and E

Potential direct effects of the Project to parks and recreation areas would be the same under all Action Alternatives. The Project would not incorporate any park land or recreational lands, or any wildlife refuge.

#### *MCO Segment*

The MCO Segment would not affect any parks or recreation lands. There are no parks or recreation resources Section 6(f) resources within MCO, which is entirely within the property of the Orlando International Airport.

#### *East-West Corridor*

Constructing the E-W Corridor would not require acquisition of any portion of the Section 4(f) recreation resources because the new rail infrastructure would be built entirely within the SR 528 right-of-way owned by FDOT. Additionally, no new communications towers would be placed in a Section 4(f) resource. However, the E-W Corridor is adjacent to two recreation resources east of the SR 528 and SR 520 interchange: the Tosohatchee WMA and Canaveral Marshes Conservation Area.

The E-W Corridor would cross Long Bluff Road in the Tosohatchee WMA (Figure 5.4.6-1). Long Bluff Road is a designated multi-use path that provides access from the north to parking and fishing areas in the southern portion of the Tosohatchee WMA; it is the only road providing access across SR 528 within the Tosohatchee WMA.. The Project would cross Long Bluff Road on a new overpass but no WMA property would be acquired as the overpass would be built within the existing FDOT-owned right-of-way. The DEIS described a potential use of land within the Tosohatchee WMA to provide fill material for construction as a *de minimis* use: AAF no longer proposes to acquire fill material from the WMA.

AAF-AR0045081



Explanation of Features

— Long Bluff Road
— E-W Corridor
▨ Tosohatchee Wildlife Management Area

Data Sources: ESRI 2012, FRA 2012, FGDL 2012, AMEC 2013

**Tosohatchee Wildlife Management Area**

**All Aboard Florida Intercity Passenger Rail Project**

U.S. Department of Transportation
**Federal Railroad Administration**

5.4.6-1

Environmental Consequences                                      5-182

AAF-AR0045082

begin segment

### North-South Corridor

Thirty parks and recreation resources are along the N-S Corridor. The existing FECR Corridor bisects two of these resources: the Hobe Sound National Wildlife Refuge and Jonathan Dickinson State Park. All construction activities would take place within the existing FECR-owned right of way, and would not require acquisition any portion of the recreational properties.

The N-S Corridor also crosses Southeast Jonathan Dickinson Way within Jonathan Dickinson State Park (Figure 5.4.6-2). Southeast Jonathan Dickinson Way is an at-grade access road that connects Jonathan Dickinson State Park to US 1. To ensure the safety of the users of Jonathan Dickinson State Park, AAF would implement at-grade crossing improvements where the N-S Corridor crosses Southeast Jonathan Dickinson Way. Safety improvements would include upgraded warning devices such as flashing lights, signage and pavement markings; median barriers; and a four-quadrant gate, which blocks both sides of each traffic lane. Electronic warning systems would be implemented, which would monitor and communicate train locations and speeds, and would stop the train if the crossing is not clear. Current safety measures at the existing at-grade crossing of the freight railway and Southeast Jonathan Dickinson Way include passive signage, flashing lights, and a two-quadrant gate. All construction activities, including the new safety improvements, would take place within the existing FECR-owned right-of-way, and no acquisition of park property would occur. At the Hobe Sound NWR, AAF will use retaining walls to limit construction to the FECR right-of-way.

Two of the 30 identified parks and recreation resources along the N-S Corridor are also Section 6(f) resources: North Sebastian Conservation Area and Sawfish Bay Park. The Project would not convert or acquire any portion of the protected resources.

### Phase I - West Palm Beach - Miami Corridor

As stated in Section 3.3.8 of the 2012 EA, the WPB-M Corridor would not require direct property acquisition or additional right-of-way within any of the parks or recreation areas that are adjacent to the right-of-way.

#### 5.4.6.3    Indirect Effects

Indirect effects can occur when a transportation project does not incorporate land from a park or recreation property, but the project's effects on the surrounding area are so severe that the activities, features, or attributes are substantially impaired. This evaluation focuses on the potential proximity impacts to parks and recreation resources from the Project's potential noise, vibration, aesthetics and access effects.

Comments on the DEIS included concerns that noise from the increased train passage would affect adjacent Section 4(f) resources, or that increased train activity within the FECR right-of-way could impact public access to some Section 4(f) Parks, particularly in Indrio. One specific comment was that the increased noise and vibration could affect use of the observation tower in the Walton Scrub Preserve. These issues are addressed in the analysis below.

AAF-AR0045083



**Explanation of Features**

- N-S Corridor
- SE Jonathan Dickinson Way
- Jonathan Dickinson State Park

Data Sources: ESRI 2012, FRA 2012, FGDL 2012, AMEC 2013

**Jonathan Dickinson State Park**

**All Aboard Florida Intercity Passenger Rail Project**

N
0    0.3    0.6 Miles

U.S. Department
of Transportation
**Federal Railroad
Administration**

5.4.6-2

Path: F:\FEC\FECI_GDB\MXD\EIS\Jonathan Dickinson State Park_AW.mxd

Environmental Consequences                5-184

AAF-AR0045084

## Noise

The noise analysis conducted for the project and documented in the FEIS shows that, with the use of pole-mounted horns and improved rail infrastructure, the project will reduce noise levels along the N-S Corridor in comparison to existing conditions, and that noise levels 50 feet from the right-of-way would not result in noise impacts. While the proposed passenger trains are lighter and faster than the existing freight train traffic, overall there will be more train traffic/operations occurring each day. This increase in operations results in a higher overall noise exposure, although individual train-pass events will not exceed the no-action alternative. Secondary and cumulative noise effects are anticipated to be minimal to moderate.

Section 5.2.2, Noise and Vibration discusses changes in noise associated with the Project. In general, the Project would be compatible with the intended uses of parks and recreation resources, as parklands are compatible with these noise levels (FAA 2004). While Project operation might result in minor increases in noise, these increases would not adversely affect the recreational use of any park or recreation area along the N-S Corridor for the following reasons:

- These resources currently experience vehicular traffic noise disturbance (automobile and truck traffic within the SR 528 corridor) at higher levels than would be produced by passenger trains, and/or rail noise disturbance (freight traffic within the existing FECR Corridor). As a result, it is unlikely that the increased passenger operations would be perceptible to the recreational uses of the resources.

- Noise disturbance from additional train traffic would be intermittent, and limited to only a few minutes per hour under the highest levels of rail traffic.

- Train noise from individual passenger trains along the N-S Corridor would likely be lower and occur for shorter periods of times, even though more frequently, than with current freight rail operations.

As stated in Section 3.3.8 of the 2012 EA (Appendix 1.1-A1), one Section 4(f) resource appears to have a potential effect from noise along the WPB-M Corridor: the El Portal Tot Lot – Miami-Dade County. However, based on committed mitigation measures (for example, stationary grade crossing horns), all severe and moderate effects related to recreational land uses are eliminated, including noise impact to the El Portal Tot Lot. As a result, there would be no substantial impairment of the recreational uses of the El Portal Tot Lot and, the FONSI included the determination that there would be no use of this property under Section 4(f).

## Vibration

The analysis of vibration showed that vibration levels would not increase, although the frequency of vibration events would increase. As shown, and documented in Section 5.2.2 of the FEIS, vibration from operation of the passenger rail system would not result in vibration that exceeded damage thresholds (100 VdB at 70 feet), although some properties would experience vibration at "annoyance" levels (perceptible vibration). As documented in Section 5.2.2.2, the vibration caused by the Project (passenger rail) will be less than from the existing and future freight trains, because the passenger trains are lighter and pass any given location in approximately 10 seconds, compared to 120 seconds for freight. The Project will not increase the magnitude of vibration from a train passing in comparison with the No-

AAF-AR0045085

Action Alternative, and will not change the setting of any park or recreation area and will not impair their use.

Vibration, even at a severe level, would not interfere with the intended use of parks or recreation resources within the Project Study Area. Any increase in vibration resulting from the Project would not create adverse effects, and would be scarcely noticeable to the surroundings. The Project would cross Long Bluff Road in the Tosohatchee WMA by means of an overpass. Vibration effects at this crossing would be less than those projected for the at-grade portions of the E-W Corridor, as the trains would be elevated and disconnected from the ground. Vibration associated with existing freight traffic along the N-S Corridor, including the crossing of Southeast Jonathan Dickinson Way in Jonathan Dickinson State Park, is greater than vibration associated with the proposed passenger train traffic and therefore the Project would not increase the vibration impacts as compared to the existing conditions in the No-Action alternative.

This finding is also true for the Walton Scrub Preserve, where an observation tower (to provide views of the Indian River Lagoon) was recently constructed in close proximity to the existing FECR right-of-way. The Project will not increase vibration above the existing conditions and would not adversely impact the observation tower at Walton Scrub Preserve. Changes in vibration from the Project would not result in constructive use to Section 4(f) recreation resources within or adjacent to the Project Study Area, as the intended use of these resources is compatible with any increases in vibration. Section 5.2.2, *Noise and Vibration* discusses changes in vibration associated with the Project.

**Aesthetic**

The Project along the E-W Corridor would be constructed primarily within or adjacent to the SR 528 right-of-way. SR 528 dominates the existing viewshed along the majority of the E-W Corridor and therefore modifications proposed for this corridor would not substantially change existing aesthetic conditions for the two parks and recreation properties present along this segment. Within the section of the SR 528 Corridor adjacent to the Tosohatchee WMA, the AAF railroad would cross an existing unpaved road (Long Bluff Road) on a bridge immediately adjacent to the SR 528 bridge, and would not change existing aesthetic conditions. The Canaveral Marshes area is not within the viewshed of the Project.

The N-S Corridor is within the existing FECR Corridor, and modifications proposed for this corridor would maintain the general aesthetics of this active rail line. Changes to aesthetics/viewshed associated with the Project would not result in constructive use to recreation resources within or adjacent to the Project Study Area. Section 5.4.7, *Visual and Scenic Resources*, discusses changes to aesthetics associated with the Project.

**Access Alteration**

The Project would not affect access to any public park, recreation area or wildlife refuge. The Project crosses Long Bluff Road and Southeast Jonathan Dickinson Way in the Tosohatchee WMA and Jonathan Dickinson State Park, respectively. The Project would cross Long Bluff Road on an elevated track structure next to the existing SR 528 bridge, and would maintain existing accessibility. The N-S Corridor would be entirely within the existing FECR Corridor, which currently crosses Southeast Jonathan Dickinson Way, and would require that the existing at-grade crossing be reconstructed. However, access to the park

AAF-AR0045086

resources will not be affected and AAF will be required to ensure that all park roads remain open, and in impeded during Project construction.

All of the other Section 4(f) resources along the N-S Corridor have existing access from public roads. Increasing train traffic will not change public access points to these parks, nature preserves or recreation areas. Although park visitors may illegally cross the existing railroad, this is trespass and is unsafe under current conditions and is not allowed by the FECR.

### 5.4.6.4    Temporary Construction-Period Effects

The Project is not anticipated to result in any temporary construction-period effects to adjacent parks or recreational properties. AAF will develop a construction management plan to reduce and minimize the effects of grade crossing reconstruction on park users. AAF, in association with FRA, will coordinate with the land managing agency.

### 5.4.7    Visual and Scenic Resources

This section addresses the potential effects of the Project on visual and scenic resources, the natural and man-made features that give a particular landscape its aesthetic properties. Visual resources include sites, objects and landscapes features that contribute to the visual character of the surrounding area and/or are valued for their scenic qualities.

The Project is anticipated to have only minor effects on visual and scenic resources, primarily associated with new bridges over waterways and new communications towers along the E-W Corridor.

### 5.4.7.1    Methodology

As described in Section 4.4.7, *Visual and Scenic Resources,* three crossing locations along the E-W Corridor, at the Econlockhatchee River, at the St. Johns River, and at I-95, were selected as representative sites that illustrate the potential effect the new rail line would have on its surroundings. No photo renderings were developed for the N-S Corridor as this is currently a developed rail corridor and restoring the second track is not anticipated to substantially change the visual environment.

### 5.4.7.2    Environmental Consequences

This section describes the visual and scenic resource effects resulting from the Project. Potential historic landscapes, wildlife refuges, parks, and other visual and scenic resources proximate to the MCO Segment, E-W Corridor, and N-S Corridor including potential viewshed effects, are also evaluated within other sections (Section 5.4.5, *Cultural Resources,* and Section 5.4.6, *Recreation and Other Section 4(f) Resources*) of this FEIS.

#### No-Action Alternative

Under the No-Action Alternative, the Project would not be constructed or operated. The Project Study Area, including viewsheds, would remain the same with no passenger rail related development or construction changes. In the No-Action Alternative, there would be no effects, adverse or otherwise, to visual and scenic resources.

AAF-AR0045087

**Action Alternatives A, C, and E**

The visual effects of Alternatives A, C, and E are expected to be similar.

### MCO Segment

The existing viewshed of the MCO Segment would remain primarily unchanged as the existing area includes mainly the developed MCO. Development of the MCO Segment would not significantly affect visual and scenic resources in this area as the existing transportation land use would not change because of the Project. Airport visitors would see a new rail line parallel to an existing roadway, which would have minimal effect on the visual conditions. AAF passengers traveling along the MCO Segment would see the existing SR 528, MCO terminals, roadways, parking lots, and undeveloped land.

### East-West Corridor

The E-W Corridor primarily crosses undeveloped wooded areas, wetlands, and agricultural pasture, parallel to SR 528. The design and construction of the railroad through the E-W Corridor would comply with FDOT and FRA guidelines, and would include aesthetic features such as standard mechanically stabilized earth walls pursuant to FDOT's *Standard Specifications for Road and Bridge Construction*, and the FDOT's standard Design-Build Guidelines (FDOT 2012b and 2013a). Motorists traveling along SR 528 would generally be able to see the new railroad to the south. For Alternatives A and C, vegetation within the south side of the highway right-of-way would be removed, opening up views to the south and increasing motorists' views of the railroad and adjacent undeveloped lands. For Alternative E, the preferred alternative, motorists would be less likely to see the passenger rail line as the vegetation near the highway would be retained and the rail line would be farther from the highway.

Three locations along the E-W Corridor were selected as representation sites to illustrate potential impacts of new rail line on surrounding viewsheds: the Econlockhatchee River, the St. Johns River, and I-95. If the E-W Corridor were to be developed, the viewshed of motorists traveling east on SR 528 crossing the Econlockhatchee River would change minimally. For Alternatives A and C, the rail line would be relatively close to SR 528 and visible to motorists traveling on SR 528. Motorists would be able to see the rail bridge's long retaining walls parallel to SR 528. For Alternative E, the rail line would be farther away from SR 528 and therefore less visible. Motorists would be able to see a small portion of the new passenger rail line through existing vegetated areas. A narrow, restricted view of the rail bridge settled within the existing views of the Econlockhatchee River's natural features would be visible at this location. Figure 4.4.7-2b shows a photo rendering of the Econlockhatchee River viewshed looking south from SR 528 for Alternative E.

The viewshed of motorists traveling east on SR 528 crossing the St. Johns River would be somewhat obstructed because the top of the rail bridge would be slightly higher than the SR 528 bridge. Those motorists traveling in small passenger vehicles would no longer have an extensive view of the St. Johns River from SR 528. Motorists in larger vehicles such as sport utility vehicles or trucks would likely be able to view the St. Johns River over the railroad bridge and embankment as drivers in these vehicles sit at greater heights. The views for boaters on the St. Johns River looking north towards SR 528 would not change substantially as the rail bridge would be parallel to SR 528 and would be similar to the size and structure of SR 528 over the river. Figures 4.4.7-3b and 4.4.7-4b are photo renderings of St. Johns River

AAF-AR0045088

views looking southeast from SR 528 and from the St. Johns River looking north. Views would be the same for Alternatives A, C and E as all three alternatives would be on the same alignment at this location.

The viewshed of motorists traveling on I-95 towards the SR 528 overpass would change minimally. The new rail overpass would be constructed parallel to SR 528 and would be similar to the size and structure of the SR 528 bridge over I-95. Motorists traveling on I-95 would see another overpass similar to SR 528. Figure 4.4.7-5b shows a photo rendering of the I-95 approach to the SR 528 overpass. Views would be the same for Alternatives A, C and E as all three alternatives would be on the same alignment at this location.

Motorists traveling northbound on other intersecting highways, such as Narcoossee Road, SR 417 and SR 520, approaching SR 528 would see a similar view as the I-95 approach to SR 528. Motorists on these highways would see a new overpass in front of and similar to the existing SR 528 overpass. The only minor change in appearance of the new overpass would be instead of seeing grass side slopes, such as the ones associated with SR 528 overpasses, motorists would see concrete retaining walls similar to those shown in Figure 4.4.7-5b.

New communications towers would be required along the E-W Corridor to support the communications systems. These towers would be either monopole or lattice-type towers, and would be less than 100 feet in height. While these towers would be visible to motorists on SR 528, they would not substantially change views along this corridor.

### North-South Corridor

The existing viewshed along the N-S Corridor would remain largely unchanged. Modifications proposed for this corridor are expected to maintain the general aesthetics of this active rail line. Project improvements, including restoring the double-track system along the N-S Corridor, would occur within the existing right-of-way. Construction within the N-S Corridor is not expected to affect visual and scenic resources in this area as the existing transportation land use would not be changed because of the Project. The existing rail corridor would continue to be used with minimal removal of vegetation and no changes to at-grade crossings except for upgrades to signals in some locations. In some locations, vegetation removal within the right-of-way may increase views of passing trains.

The N-S Corridor would be visible from roadways that cross at-grade. Motorists' views at these at-grade roadways would be limited to grade crossings, lights, gates, and flashers. In a few locations, especially urban areas, the N-S Corridor would be visible from nearby buildings. Views currently consist of one or two tracks, railroad ballast, and infrastructure. In more suburban areas, vegetation would generally screen the views of the railroad. These visual conditions are not anticipated to change because of the Project. Boaters traveling underneath existing FECR Corridor bridges on navigable waterways would not see a substantial change because of the Project, although some dilapidated bridges on timber pilings would be replaced with new structures supported on concrete pilings. Boaters' views would continue to consist of the railroad bridges, as proposed improvements would restore the tracks or reconstruct the bridges within the same location as the existing structures.

AAF passengers would see a variety of undeveloped and developed land use types, such as residential areas, highways, commercial and industrial developments, golf courses, wetlands, forested areas, parks, agriculture, and water bodies while traveling the N-S Corridor. The trains would travel through areas of high density associated with urban and town centers and areas of low density associated with natural areas.

AAF-AR0045089

### Phase I - West Palm Beach - Miami Corridor

As stated in Section 3.3.11 of the 2012 EA, the existing viewshed of the FECR Corridor from the surrounding land uses would be maintained. The proposed station concepts include aesthetic features such as architectural components, landscaping, and ADA-compliant parking and pedestrian features. These improvements are anticipated to result in an enhancement to the existing communities. It is also anticipated that the proposed station construction would be compatible with surrounding land uses. During the design phase of the WPB-M Corridor, complete engineering and architectural details for station facilities (including canopy columns and railings), platforms, signing, lighting, and landscaping plans would be developed in accordance with all applicable codes and laws and pursuant to all required permitting reviews.

The stations located adjacent to NRHP-eligible historic districts will incorporate aesthetic features consistent with the historic architecture of the surrounding community and will be developed in coordination with local historic preservation groups and organizations and subject to review by SHPO.

Boaters traveling underneath existing FECR Corridor bridges on navigable waterways would not see a substantial change because of the Project, although some dilapidated bridges on timber pilings would be replaced with new structures supported on concrete pilings. Boaters' views would continue to consist of the railroad bridges, as proposed improvements would restore the tracks or reconstruct the bridges within the same location as the existing structures.

## 5.4.8      Utilities and Energy Resources

This section describes the potential effects of the Project on public utilities and energy supplies. The Project would have no, or negligible, effects on utilities and energy resources.

### 5.4.8.1      Environmental Consequences – Utilities

The Project may require that some of the existing utilities be relocated outside of the track footprint. Where the proposed track crosses underground utilities, relocation may be necessary to provide an adequate depth below the tracks. Where the proposed track crosses under overhead utilities, relocation or reconstruction may be necessary to provide the required vertical clearance over the tracks to accommodate utilities lines and equipment. During final design, AAF will coordinate with all of the affected utilities.

**No-Action Alternative**

The No-Action Alternative would not affect existing public utilities.

**Action Alternatives A, C, and E**

The effects to utilities from Alternatives A, C, and E are expected to be similar, with some slight variations in the alternative alignments through the CFX section of the E-W Corridor.

AAF-AR0045090

### MCO Segment

Some buried utilities may be present in the MCO Segment. Coordination with the affected utilities is required and planned; coordination and final relocation plans will be established during the detailed design stage of the Project. The proposed VMF, on GOAA property near the MCO, is currently served by all necessary utilities (OUC 2013). Constructing the VMF would affect a large infiltration ditch originally constructed to serve the City of Orlando wastewater treatment facility but which is no longer functioning. Constructing the VMF, therefore, would not affect any utilities.

### East-West Corridor

The E-W Corridor crosses several stormwater management features associated with SR 528. The Project has been designed to provide replacement stormwater management ponds and infrastructure, and would not have a long-term adverse effect on stormwater management.

The E-W Corridor crosses several overhead electrical transmission lines. Vertical relocation (raising) the aerial electrical transmission lines crossing the E-W Corridor right-of-way may also be required, although preliminary analyses by AAF suggest that raising lines to maintain adequate vertical clearances is not likely necessary. The Project would require that an existing access road between Farm Access Road #2 and the major Florida Power and Light (FPL) overhead transmission line west of SR 520 be relocated, for a distance of approximately 1 mile. For Alternative A, the access road would be accommodated within the existing SR 528 right-of-way using retaining walls for the railroad. For Alternatives C and E, a new maintenance access road would be constructed south of the railroad, and would be a shared maintenance road with AAF. AAF would coordinate with the affected utilities during final design.

According to the National Pipeline Mapping Service, the Project may intersect two existing pipelines (PHMSA 2007) that are within the SR 528 right-of-way, parallel to the existing road. Alternative A may require that portions of these pipelines be relocated. Measures that would be used to ensure that natural gas pipelines or any other pipelines crossing beneath the proposed new rail may include the use of casing and maintaining at least 4.5 feet of cover between the top of the casing and the rail bed. AAF will coordinate with the pipeline owners and operators during final design. Any relocation would require approval from the Federal Energy Regulatory Commission (FERC). Coordination with the affected utilities is required and planned; coordination and final relocation plans will be established during the detailed design stage of the Project.

### North-South Corridor

Electrical transmission/distribution lines, above and below ground, are located along and within the FECR Corridor. In some locations, poles will require relocation in order to accommodate the new mainline track and upgraded crossings. AAF would coordinate with the affected utilities, which include AT&T, Florida Power and Light, Sprint, Orlando Utilities Commission, Duke Energy, Florida Gas Transmission, and Orange County, during final design and prior to construction. Pole relocation is expected to be minimal, and associated with grade crossings and limited sections of the rail corridor where new track is required.

AAF-AR0045091

Electrical service providers within the N-S Corridor include FPL and the City of Vero Beach. Improving the railroad crossings could impose temporary and minor disturbances on electrical service and could result in a slight increase in electricity to operate the new crossings and switch stations.

### Phase I - West Palm Beach - Miami Corridor

Phase I of the Project is also served by FPL. An existing FPL substation, located between Datura and North Clematis Streets at the intersection of the FECR rail line, would serve the Project. The main service for the site is routed through aboveground distribution lines adjacent to the WPB-M Corridor. No utility relocations would be required for Phase I.

### 5.4.8.2    Environmental Consequences - Energy Use

This section evaluates the changes in energy use associated with the Project. The No-Action Alternative would be expected to result in increasing energy consumption for private automobiles, commensurate with the increase in annual vehicle-miles traveled.

The evaluation of energy consumption took into account energy requirements for locomotives (train operations), facility operations, and the off-setting decrease in energy usage by personal automobiles. Alternatives A, C, and E would have negligible effects on energy consumption. Negligible energy effects are those that would result in a slight measurable increased use of energy but are very close to the existing conditions.

Operational, safety improvements and upgrades are necessary due to the increased passenger train speeds and frequency. These improvements and upgrades require minimal electrical demand. Electrical consumption would increase with the addition of a second mainline track along the N-S Corridor from Cocoa to Miami, along with the increase in maximum authorized speed. This minor increase is a result of additional interlockings, which provide the operational flexibility for mixed freight and passenger service. In addition to the increase of interlockings, PTC adds electrical loads not currently seen. These PTC loads are derived from associated equipment, including wayside interface units and radio towers for transmission of information between wayside locations and each train. Another area of increase is at highway-rail grade crossings. Additional equipment is required due to adding a second mainline track, increasing track speed, and the proposed PTC system. To help offset any increases in energy demand at crossings, AAF will replace existing incandescent lamps with LED flashers. Additional minor increases in energy usage would occur with new surveillance cameras at locations where high vandalism occurs, and where potential storage of track maintenance equipment is likely to take place.

Additional electrical service would be required to operate new rail crossings or switch stations. Electrical service providers within the corridor include FPL, Orlando Utilities Commission (OUC), and Progress Energy. The increase in electrical service/demand is minimal and would require no major changes or construction of electrical or other utility infrastructure. No other electrical utilities would be affected by the construction or operation of Project elements within the N-S Corridor.

As stated in Section 3.3.10 of the 2012 EA, electrical energy requirements directly related to the operation of the stations and ancillary activities along the WPB-M Corridor are anticipated to average 81,600,000 kilowatt hours (kWh) annually.

AAF-AR0045092

**Locomotives**

AAF will operate each train with two locomotives. Each locomotive will be designed in accordance with New Generation DE Locomotive PRIIA 305-005 technical specification and all FRA standards and regulations. The dual set will provide maximum reliability, improved acceleration, and a high level of safety from the locomotive's incorporated crash energy management system.

Each locomotive will be equipped with a state-of-the-art, 4,000-horsepower diesel engine that will provide sufficient traction power for up to nine single-level cars for a sustained maximum operating speed of 125 mph. Emission limits are according to EPA Tier 4 (Rail) (EPA 2011b). Fuel consumption and exhaust will be reduced significantly by using a highly efficient diesel-electric traction system with rheostatic braking which will enable significant fuel savings with significant reduction of exhaust. The electrical brake will provide electrical energy to feed auxiliaries.

According to Section 3.3.10 of the 2012 EA, approximately 1.3 million gallons of diesel fuel would be consumed by the Project (in total) on an annual basis. In 2011, the State of Florida consumed approximately 1.4 billion gallons of diesel fuel (Florida Department of Agriculture and Consumer Services 2012). The Project fuel needs represent approximately 0.09 percent of existing diesel fuel use. Based on the estimated annual quantities of diesel consumption, the effect on energy resources would be negligible.

**Facility Operations**

Operating the VMF at the northern terminus would require additional energy through existing electrical services. Electrical requirements related directly to the operation of the stations and ancillary activities are anticipated to average 81.6 million kWh annually, which is compared with 8.5 trillion kWh produced by the OUC annually (OUC 2013). Adequate energy supplies are available to support the operation of the VMF. As stated in the EA (Section 3.3.10), electrical energy would be required for Phase I stations. Electrical requirements related directly to the operation of the stations and ancillary activities are anticipated to average 81,600,000 kWh annually.

**Personal Vehicle Use**

Based on the Florida Standard Urban Transportation Model Structure Regional Transportation Model Highway Evaluation output and the investment-grade ridership study (Louis Berger Group 2013), AAF estimates that roadway VMT would be reduced by the proposed Orlando to West Palm Beach service by 149,328,070 miles in 2019 and by 178,726,265 miles in 2030 (see Table 5.2.1-1), respectively. Using the U.S. average of 22.1 miles per gallon (mpg) for 2011, this represents a saving of 6,756,926 gallons per year (gpy) in 2019 and 8,087,161 gpy in 2030. The analysis indicates that the Project would result in a net reduction in petroleum-based fuels consumed and VMTs within the State of Florida and, therefore, would have a beneficial or enhanced effect on energy use.

As stated in Section 3.1.1 of the 2012 EA, the Phase I Project would reduce roadway VMT by 44,229,342 in 2018 and by 51,345,672 in 2030, respectively. Using the average 22.1 mpg, this represents a saving of 2,001,327.6 and 2,323,333.5 gpy, respectively, in gasoline (energy) consumption. This reduction in VMT would generate a corresponding reduction in regional highway congestion levels.

AAF-AR0045093

### 5.4.8.3    Temporary Construction-Period Effects

The Project would require the use of various types of fossil fuels, electrical energy, and other resources during construction. These resources are considered to be irretrievably committed to the Project. At this time, these resources are not in short supply and are considered readily available. As a result, the use of these resources is not expected to result in an adverse effect upon their continued availability.

The Project would consume energy, primarily as diesel fuel, during construction. According to the current design plans for the N-S Corridor, the materials and equipment required to reconstruct the railroad bridges and the additional rail lines would be transported via the existing railway. Due to the reduced energy demands associated with rail travel, the energy needed to construct the Project in the N-S Corridor is substantially less than compared to an infrastructure project that requires a roadway mobilization (FRA 2010b). Construction phasing could greatly reduce energy consumption associated with construction in the E-W Corridor and VMF by allowing materials to be transported by rail.

The Project would require the commitment of various types of construction materials, including steel, aggregate, cement, asphalt (bituminous materials), electrical supplies, piping, and other raw materials such as metal, stone, sand and fill material. Large amounts of labor and other natural resources would be committed to the fabrication and preparation of these construction materials. This commitment of resources is irretrievable but the resources are not in short supply and their use would not result in any adverse effect upon their continued availability.

The initial operation of the Project may result in a slight increase in energy consumption when compared to the No-Action Alternative. The Project would be expected to result in a long-term decrease in energy consumption through increased travel efficiency along new transit routes during operation.

Contractors would use phasing and hire professional utility locators to identify any potential conflicts in order to prevent or limit any interruptions in utility service. Potential outages could occur depending upon the utilities network, which may have the ability to reroute those circuits in order to minimize any temporary disruption of service. The relocation of poles is expected to be minimal, and associated with grade crossings and limited sections of the rail corridor where new track is required. Contractors will be required to follow standard safety practices when working below power lines, including signage, restrictions on equipment height, and protecting wires.

## 5.5    Cumulative Impacts

The Project would result in direct or indirect, adverse and/or beneficial effects to a range of resources, as described in the prior sections of Chapter 5. Some of the Project's impacts, whether minor or major, when combined with the effects of other past, present, or reasonably foreseeable future actions may result in substantive effects to environmental or social (human) resources. These combined impacts are referred to as cumulative impacts.

The analysis provided in this section evaluates direct and indirect changes to the environment resulting from the Project and because of past and reasonably foreseeable future actions, consistent with CEQ and other agency guidance documents:

- Considering Cumulative Effects Under the National Environmental Policy Act (CEQ 1997a);

AAF-AR0045094

- Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (CEQ 2005b);

- Secondary and Cumulative Impact Assessment in the Highway Project Development Process (FHWA 1992);

- Interim Guidance: Questions and Answers Regarding Indirect and Cumulative Impact Considerations in the NEPA Process (FHWA 2003); and

- Cumulative Effects Evaluation Handbook (FDOT 2012c).

The CEQ regulations define a cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time (40 CFR § 1508.7)."

As documented in this section, the Project is not anticipated to result in cumulative impacts which would be collectively significant and adverse. With respect to transportation, air quality, and economic resources, the Project would have beneficial cumulative impacts.

## 5.5.1        Methodology

The purpose of a cumulative impacts analysis is to identify effects that may be minimal and therefore neither significant nor adverse when examined within the context of the proposed action, but that may accumulate and become both significant and adverse over a large number of actions. This section describes the methodology used to evaluate the cumulative impacts of the Project alternatives.

The cumulative effects of the Project were analyzed for each of the alternatives, as compared to the baseline condition (the No-Action Alternative). The evaluation was conducted for a selected set of resources within certain temporal and spatial boundaries, in reference to historical trends or effects from specific other projects, and that are (for the most part) regulated by various governmental agencies.

### 5.5.1.1    Resources Evaluated

Sections 5.1.1 through 5.4.8 cover the potential direct and indirect effects of the Project for a broad range of resources, including environmental media (air, water), ecosystems (biodiversity, wetlands, protected species), and human communities (historical and archaeological resources, the economy). Some resources are expected to be little affected by any of the Project alternatives; others may be substantively affected positively or negatively, either directly or indirectly, or through induced growth. Some resources have experienced substantial historical impact from other projects or human activity, may experience substantial future impact from other projects or activities, or are of specific interest to decision-makers, regulators, and the residents of the Central and South Florida region. The cumulative impacts evaluation focuses on those resources affected by the Project:

- Land Use;
- Transportation;
- Air quality;

AAF-AR0045095

- Noise;
- Water resources;
- Floodplains;
- Wetlands;
- Protected species; and
- Social and economic environment.

The other resources evaluated in Chapter 5 of this FEIS are expected to be little affected or not affected by any of the Project alternatives and/or would not be adversely impacted by past or reasonably foreseeable actions in the Project Study Area.

Although not a "reasonably foreseeable future action" in the traditional sense of cumulative impacts analysis, the possible effects of climate change on resources such as wetlands and threatened and endangered species has been taken into consideration to the extent possible.

Federal, state, or local governmental agencies regulate most of the resources selected for the cumulative impacts evaluation. The regulatory programs drive many of the trends for improving resource values (such as air quality, water quality, and wetlands area) and are thus an important factor in the resource effects of the Project and other regional projects. The regulatory programs typically control effects to the resources by prohibiting impacts except for as authorized by a permit. Regulatory agencies are charged with reviewing permit applications and, generally, only authorize activities that provide the least impact to the resource while still meeting the Project's purpose and need. For this cumulative impacts evaluation, the existing permitted facilities and proposed actions provide an indication of the current and likely future impacts to the resources.

The agencies responsible for administering these programs are typically charged with managing the resources on a project-by-project basis, but in the context of the common good. For example, the federal government has a "no net loss" policy regarding wetlands: project proponents seeking permits to fill wetland areas are commonly required to offset losses by replacing filled wetlands at a negotiated ratio. These replacement ratios, in part, make up for historical wetland loss in addition to the project-specific loss. Thus, certain regulated resources are experiencing improvements, rather than degradations, over time.

## 5.5.1.2   Temporal and Spatial Boundaries

The cumulative impacts analysis defines a time frame and geographic range for the evaluation, and takes into account changes from other projects within this time frame that contribute to cumulative effects on the resources listed above. Historical impacts have been evaluated for two time periods.

For most resources, prior changes have been evaluated for the period 2000 to 2012. The year 2000 was selected as the starting date because this is a prior census year, it was in the midst of a period of economic downturn, and it establishes a reasonable baseline condition. The baseline reflects conditions in 2012/2013, taking into consideration publication delays for the availability of the most recent data. Future impacts have been evaluated to the year 2019, the planning year for the Project at which time full ridership is anticipated to be reached. Spatial boundaries for the analysis varied by resource, according to the specific characteristics of the resource, regulatory jurisdictions, and the availability of meaningful data.

AAF-AR0045096

The analysis used readily available data sources for past and future changes. For each resource, the analysis took into consideration past changes to the selected resources that resulted from development trends or major projects within the Project Study Area. Future changes to the selected resources are based on historic or recent trends, or specific projects, including all reasonably foreseeable projects (those projects that are undergoing or have completed major environmental permitting actions or NEPA reviews) and that are programmed for construction. Each of these projects is briefly described below. Because the majority of these projects are in early planning stages and are at the conceptual design stage, effects to environmental resources have largely not been quantified. The cumulative impacts of these projects are therefore assessed qualitatively based on the assumed level of impact.

### 5.5.1.3   Projects Considered in this Analysis

The analysis of cumulative impacts includes projects within the Central-Southeast Florida study area that are reasonably foreseeable – that are planned and programmed for construction within the time frame of this analysis, or which are likely to occur outside of the public planning process. Projects that have been proposed and evaluated, but which are not likely to proceed in this time frame, are not included in the analysis.

### *MCO Intermodal Station*

Multimodal improvements proposed at MCO include two new Intermodal Centers for passengers and the associated passenger rail and light rail (LRT) alignments within MCO. These improvements provide connections to intercity passenger rail and regional light rail. The Intermodal Centers provide interconnectivity to multi-modes of transportation within the region's current and future transportation system and increase capacity through additional passenger processing, ground operations and parking immediately adjacent to the terminals to the south (FTA, FDOT, and GOAA 2005). Construction of the Intermodal Centers would occur with or without the Project, as they would potentially accommodate other rail projects (that is, commuter rail [SunRail] and light rail [North-South Light Rail Alignment]), along with an expanded LYNX bus service, large-scale garage parking, rental car facilities, taxi accommodations, and other ground transportation options (MCO 2010).

Work on this facility has already begun, and construction is expected to be completed in 2018 (GOAA 2015). The Intermodal Terminal Complex, at the site of the future South Terminal, would consist of a terminal building housing the airport's Automated People Mover, a bus terminal, passenger rail tracks, platforms and lobby, and future commuter rail tracks and platforms. A 3,500-car parking garage would be constructed as part of this complex. This terminal complex would be constructed by GOAA even if the AAF project were not advanced, and is therefore not part of the Project.

In accordance with NEPA, the FTA and the FDOT, in cooperation with GOAA, prepared an EA that evaluated the potential environmental impacts of the proposed intermodal improvements at MCO (FTA, FDOT, and GOAA 2005). In December 2005, the FTA issued a FONSI based on the information in the Final EA (FTA 2005). The FAA issued a re-evaluation of the EA for the South Terminal Complex and Intermodal Center, and concluded that the proposed intermodal improvements at MCO do not require a new or supplemental EA (FAA 2013).

AAF-AR0045097

### Orlando International Airport East Airfield Development Area

GOAA is proposing to develop an approximately 1,325-acre area on the east side of the airport property, south of SR 528 and west of Narcoossee Road. The proposed development would require FAA approval of a modified Airport Layout Plan and is therefore subject to NEPA. The Project was described in a draft EA issued for public comment in November 2009, and in an unpublished revised draft (November 2010) available on the GOAA website (GOAA 2009). The Project includes a flexible conceptual development master plan to provide large-scale aviation uses with efficient airfield access, potentially including a fuel farm; airport support uses such as maintenance, manufacturing, hangars or cargo facilities, and flight training centers; stormwater management areas; roadways and open space; and buffers to the adjacent communities.

### Development along the SR 417 Corridor

Development along SR 417 southeast of the MCO has been occurring since the early 2000s, and has included large private institutional developments (including the Veterans Affairs Medical Center, the Sanford-Burnham Medical Research Institute, and Nemours Children's Hospital, all located at the Lake Nona Medical City area) and residential communities (Randal Park, North Lake Park). Comparison of 2003 and 2013 aerial photographs illustrates the increased development in this area. Other private developments are planned (such as International Corporate Park and Magnolia Ranch) and growth is anticipated to continue as Central Florida recovers from the recession.

The Wewahootee property (formerly known as Innovation Place) is a 1,284-acre mixed use master planned community located at the southeast quadrant of the SR 528 and SR 417 interchange. The project area was recently annexed into the City of Orlando from unincorporated Orange County and is entitled for over 2,000 residential units and 1.3 million square feet of non-residential use (retail, office). A construction phasing schedule has not yet been established or approved by the City of Orlando.

### State Road 528 Corridor Improvements

FDOT, in consultation with FHWA, is proposing to widen the existing SR 528 corridor from four lanes to six lanes. Additionally, the CFX evaluated proposed improvements in the 2008 SR 528 corridor study, which included expanding existing corridors and/or constructing new multi-use corridor(s) that may include, but not be limited to, a limited-access toll roadway, a multi-use utility corridor for pipelines, power, communication, and/or water facilities; transit features and/or freight rail service. The project study limits for FDOT's SR 528 PD&E Study extend from the SR 520 interchange in unincorporated Orange County to the Port Canaveral Terminal B interchange (George King Boulevard) in unincorporated Brevard County, approximately 24 miles in length. This area includes portions of unincorporated areas of eastern Orange County, the City of Cocoa, and unincorporated areas of Brevard County. Generally, the purpose of the project is to enhance the integrity of the highway while accommodating future traffic demands, improving overall safety, and meeting current design standards. In addition to providing improved emergency evacuation and response/recovery time, the proposed improvements are intended to serve existing and approved land uses along the SR 528 corridor.

The PD&E study completed in 2006 by FDOT provides the documented information necessary for FDOT to reach a decision on the type, design, and location of improvements to SR 528, and this project has been

AAF-AR0045098

identified in FDOT's Five Year Work Program. No funding for design, right-of-way, or construction has been allocated.

The SR 528 Multi-Use/Multi-Modal Corridor Study was completed in 2008 by CFX. Next steps include a PD&E study for multi-use/multi-modal improvements. No funding for design, right-of-way, or construction has been allocated (OOCEA 2008).

In July 2013, CFX agreed to purchase approximately 500 acres of undeveloped land from Deseret Ranches (OOCEA 2013). The purchase agreement includes a 200-foot wide strip south of the existing SR 528 right-of-way for future highway improvements and to accommodate the multi-use/multi-modal corridor identified in the authority's 2030 Master Plan.

### Interstate 95 Widening

The portion of I-95 under study by FDOT and FHWA stretches for 222 miles, from the Indian River County/Brevard County border at the southern limit to the Georgia border at the northern limit, and includes six counties and 12 municipalities. Roadway widening projects along the I-95 corridor involve increasing lane counts from between four and eight lanes to between six and 12 lanes. The I-95 corridor serves and connects several key facilities including major airports, intermodal freight-rail terminals, passenger terminals, seaports, and a spaceport. The primary purpose of the I-95 Sketch Interstate Plan is to outline a course of action to improve users/travelers mobility within the I-95 corridor by identifying mainline concepts to provide the mobility that will adequately serve high volume travel, facilitating interstate and regional commerce and long distance trips (FDOT, Systems Planning Office 2010).

Some portions of I-95 expansion near Cocoa in Brevard County have been funded or identified for funding by FDOT. Design-build proposals for the 12.4 miles from SR 528 south to SR 519 were received in September 2006. Construction of the 10 miles from SR 528 north to SR 50 was funded in Fiscal Year 2009/2010. The FDOT PD&E to improve the I-95 corridor from north of Oakland Park Boulevard (SR 816) near Fort Lauderdale in Broward County to south of Glades Road (SR 808) near Boca Raton in Palm Beach County is anticipated in July 2013, followed by implementation phases (FDOT 2013b).

### 5.5.1.4    Potential Future Projects Not Considered in this Analysis

Several transportation projects within the Project Study Area have been proposed or are currently in preliminary planning stages. The Tri-Rail Coastal Link Study is being undertaken by FDOT, and is evaluating the use of the FECR Corridor for the Tri-Rail service, which currently operates on the CSX-controlled railroad right-of-way west of the FECR Corridor (FDOT 2014). The NEPA process for that study is anticipated to begin in 2015. Tri-Rail Coastal Link has been a project sponsored by Florida DOT and the South Florida Regional Transportation Authority (SFRTA) for over a decade. SFRTA's initial preference when the project was conceived in the mid-1980s was to have its existing service on the FEC corridor. AAF is coordinating and discussing possibilities with the South Florida Regional Transportation Authority regarding its ability to operate commuter rail service in conjunction with AAF operations, as required by the commitments established in the Finding of No Significant Impact for the Miami to West Palm Beach Phase. However, until access and operating agreements can be negotiated and the necessary local, state and federal funding has been secured, the operation of Tri-Rail commuter service is not reasonably foreseeable. The project's current estimated cost is $800 million. Initial capital costs would be provided

AAF-AR0045099

by the FTA New Starts program, local communities and the state. Further, there has been no publication of a Notice of Intent by the Federal Transit Administration indicating that NEPA analysis has or will be initiated on this potential project and no capital funds have been committed to the project from local, state or federal agencies.

To fulfill the commitments established by the January 2013 FONSI, AAF has been coordinating and discussing the expansion of the existing Tri-Rail service from the planned and funded Iris connection in Hialeah, Florida to downtown Miami. This approximately 8-mile route would allow Tri-Rail to split its trains, with half continuing to Miami International Airport's Miami Intermodal Center and half continuing to All Aboard Florida's Miami Central station. These discussions are ongoing given that AAF's downtown Miami station must be planned today for Tri-Rail service since the necessary platforms for commuter rail could not be built after the station is completed and the viaduct into downtown Miami could not be widened.

In 2010, a draft Environmental Assessment was completed for a project that contemplated Amtrak service on the FECR Corridor between Jacksonville and Miami (FRA and FDOT 2010). That project has not advanced due to lack of funding, and no funding is reasonably foreseeable.

## 5.5.2    Cumulative Impacts

This section describes the past, reasonably foreseeable future, and cumulative impacts to those environmental resources within the Project Study Area that would be affected by the Project. Cumulative impacts are described for the Project as a whole, and identify any differences among the three alternatives evaluated in this FEIS.

### 5.5.2.1    Land Use

#### Past Effects

Within the analysis period, land use within and adjacent to the Project Study Area has not changed substantially, with the exception of the area east and southeast of MCO along SR 417. Development of the Lake Nona area and other residential/commercial projects have resulted in the conversion of undeveloped land and agricultural land to residential, commercial and institutional land uses.

#### Reasonably Foreseeable Future Effects (without the Project)

Development of the area east and southeast of MCO, along SR 417 and further east along Innovation Way is expected to continue, with additional conversion of undeveloped land. The East End Development Area at MCO would convert approximately 115 acres of undeveloped land to airport support facilities, with an additional 204 acres of stormwater management areas, and approximately 346 acres to other land uses (transportation and open space). Full build-out, however, may not occur within the planning horizon of the Project.

The MCO Intermodal Facility, SR 528 corridor improvements, and I-95 expansion would be located within existing transportation facilities or corridors and would not affect land use. Although the conceptual plans (see Appendices 3.3.1-A2 and 3.3.1-A3) for the SR 528 corridor show potential future interchanges, these

AAF-AR0045100

would only be constructed as needed to support future development along SR 528. This development is speculative and would not occur within the time frame of this analysis.

### *Cumulative Impacts of the Project*

The Project would result in minor changes to land use within GOAA property (for the VMF), within the SR 528 corridor, and to land acquired to facilitate construction of the Cocoa Curve connection between the E-W and N-S Corridors. The Project, considered in combination with past and reasonably foreseeable future effects to land, would not result in a substantially greater change in land use or loss of undeveloped land within the Project Study Area.

The passenger rail and multi-modal stations proposed for the WPB-M Corridor project would affect land at the proposed station sites. However, station construction would have only a minor change to surrounding land uses and would not effectuate change in land use and planning for adjacent areas, though regionally additional infill development is expected as governed by local land use and zoning regulations and ongoing adjustments

### 5.5.2.2    Transportation

### *Past Impacts*

Regional increases in population and recent developments within and adjacent to the Project Study Area have increased traffic demand on local and regional roadways, increasing congestion and delays, as documented in Chapter 2, *Purpose and Need*.

### *Reasonably Foreseeable Future Impacts (without the Project)*

The projects included in this analysis would provide transportation benefits resulting from capacity increases on SR 528 and I-95, and may benefit communities located along the east coast and the State of Florida as a whole by improving flow of traffic and increasing mobility. Construction of the MCO Intermodal Facility would improve transportation connectivity for airport passengers and employees. Further development of the East Airfield Area and the area southeast of MCO would increase traffic demand on SR 417 and SR 528, as well as other local roads; however, traffic mitigation measures would be incorporated into development permits for these projects. The proposed SR 528 Master Plan development would improve capacity and traffic flow.

Based on FECR's projections of increases in the demand for freight rail transportation of goods, freight train configurations would be expected to incorporate the anticipated cargo growth of approximately 3 percent per year after 2016. Although FECR is projecting that the number of freight trains will increase, FECR also anticipates that most of the increase in freight haulage would be met by increasing train length, rather than be increasing the number of trains, since the number of trains is ultimately limited by the need to accommodate both freight and passenger trains on a two-track system. As the length and number of freight trains increases, the number and duration of at-grade crossing closures and moveable bridge closures is also anticipated to increase. However, the moveable bridge closures would be regulated by the USCG and may change if the USCG implements a new rule-making procedure.

AAF-AR0045101

***Cumulative Impacts of the Project***

The cumulative impact would be beneficial to the regional transportation system because of capacity increases. Any adverse impacts would be limited to temporary delays and detours during construction phasing. The improvements to regional transportation would further benefit communities located along the east coast and the State of Florida as a whole with improved flow of traffic and increased mobility.

### 5.5.2.3    Air Quality

***Past Impacts***

Current air quality conditions within the Project Study Area, as described in Section 4.2.1, reflect the contributions of air pollutants from a range of sources, and the effects of state and federal air pollution regulations that have improved regional air quality.

***Reasonably Foreseeable Future Impacts (without the Project)***

The I-95 widening project, the SR 528 improvements, and the WPB-M Corridor project involve improvements to existing highway and rail corridors. Cumulative air quality effects are associated with increased vehicle capacity of the expanded roadway, and take into account the beneficial effects of regulatory programs.

***Cumulative Impacts of the Project***

The Project is anticipated to have a beneficial effect on air quality due to the offsetting effect of increased rail ridership to reduce vehicular travel. Increased ridership through expanded rail service is expected to alleviate to a minor extent the demand for vehicular travel and offset related emissions. No cumulative adverse effect is therefore anticipated. The Project is anticipated to be constructed at a different time than the other future projects included in this analysis, and therefore would not contribute to cumulative air quality effects from construction.

Increased development associated with increased economic activity in the vicinity of the WPB-M Corridor transit nodes would potentially result in increased emissions indirectly associated with building operation or commercial activity. Air quality effects from construction will be temporary and will primarily be in the form of exhaust emissions from trucks and construction equipment as well as fugitive dust from construction sites.

### 5.5.2.4    Noise

***Past Impacts***

Many areas in the vicinity of MCO, along SR 528, and along the FECR Corridor experience noise because of vehicular and freight train traffic, as well as aviation noise and general urban noise levels.

AAF-AR0045102

### Reasonably Foreseeable Future Impacts (without the Project)

The projects included in the analysis primarily involve improvements to existing highway and rail corridors, or within an existing airport. Increased vehicle capacity of the expanded roadway system would likely increase vehicular noise and, to a lesser extent, vibration. The FECR Corridor currently operates with freight rail, which generates noise and vibration. Any noise impacts to adjacent residences or sensitive land uses along the SR 528 or I-95 corridors resulting from shifting vehicle traffic closer to residences would be mitigated as required by FHWA guidelines. Temporary noise and vibration impacts may be generated by heavy equipment and construction activities such as pile driving and vibratory compaction of embankments.

### Cumulative Impacts of the Project

The Project is not anticipated to result in noise impacts within the MCO Segment or the E-W Corridor due to the lack of receptors, and would not result in cumulative noise impacts in these areas. The N-S Corridor is approximately 1 to 15 miles east of I-95. Due to this physical separation, the construction and operation of the rail facilities are not likely to cumulatively generate noise or vibration impacts for adjacent communities. The addition of new structures or uses associated with the I-95 widening in proximity to the existing N-S Corridor would result in minimal cumulative effects from the introduction of noise and vibration-sensitive uses in adjacent developed areas or areas of potential future urban development. The Project would reduce noise within the N-S and WPB-M Corridors by using pole-mounted horns at certain grade crossings.

The N-S Corridor and the WPB-M Corridor are within the existing FECR Corridor. Noise and vibration impacts may be generated by heavy equipment and construction activities such as pile driving and vibratory compaction of embankments during construction phases only, but would not cumulatively increase noise and vibration when considered with the Project.

## 5.5.2.5    Water Resources

### Past Impacts

As documented in Section 4.3.1, *Water Resources*, Affected Environment discussion, the surface waters throughout the Project Study Area have been adversely affected by past human activities (agriculture, wastewater discharge, urban development) and are considered impaired for fecal coliform, dissolved oxygen, mercury, copper, and high nutrient levels (eutrophication).

### Reasonably Foreseeable Future Impacts (without the Project)

Each of the reasonably foreseeable future projects considered in this analysis would impact water resources due to the effects of increased surface runoff from impermeable surfaces and redirection of natural water bodies. However, impacts are expected to be minor, as all projects are expected to include BMPs put in place to prevent degradation of water quality in downstream waters and flood-prone areas. Impacts to water resources are anticipated to be minimal on a regional scale. Proposed development would not be anticipated to result in potential effects to water bodies, creeks, streams, and rivers in the vicinity as regulatory agencies require appropriate BMPs prior to issuing permits. The FAA EA/FONSI for the MCO

AAF-AR0045103

Intermodal Facility determined that there is no significant pollution discharge associated with the surface waters within MCO, and that the existing stormwater management system could accommodate the proposed rail extensions within the MCO property with little if any modification. Stormwater Pollution Prevention Plans (SWPPPs) would be required for all phases of projects to cumulatively avoid effects to water resources. The MCO East End Development has committed to more than 200 acres of stormwater management to mitigate for potential effects to water resources. On a regional basis, groundwater aquifers are predicted to be affected by climate change and sea level rise (Koch-Rose, Mitsova-Boneva, and Root 2011).

### Cumulative Impacts of the Project

The Project is expected to have minor impacts on surface and groundwater, as all surface water effects would be mitigated in accordance with applicable state and local laws regarding appropriate compensation and permitting. The Project would result in minimal amounts of impervious surfaces, with new impervious surface proposed only at the VMF. Improvements associated with the proposed station alternatives in Miami and Fort Lauderdale will include minor changes to impervious surface areas for the proposed stations, parking facilities, and platforms as outlined in Table 3-1.9 of the 2012 EA. Because there will be little change in the pre- versus post-runoff condition in these cases, no, or minimal, upgrades to existing off-site municipal drainage systems (conveyance structures) are anticipated as a result of the proposed stations and facilities.

The remainder of the Project would be constructed as railroad bed and ballast and would not affect surface or groundwater. The Project would not contribute to cumulative impacts on groundwater. The cumulative impacts of the Project and other reasonably foreseeable future effects would be minor and would be mitigated as required by regulatory agencies. Cumulative impacts of construction (release of silt or sediment) are not likely because the Project would not be constructed at the same time as the other future projects.

### 5.5.2.6    Floodplains

### Past Impacts

It is likely that past development actions have encroached on the 100-year floodplain at locations within the Project Study Area; however, the effects of these actions have not been documented.

### Reasonably Foreseeable Future Impacts (without the Project)

Each of the reasonably foreseeable future projects considered in this analysis would require construction in 100-year flood prone areas, however, the existing master stormwater system in place is expected to compensate for flood storage volumes and prevent cumulative increases in onsite or offsite flooding. Proposed SR 528 widening would be likely to affect areas within the 100-year floodplain, and would require improvements to the stormwater system to compensate for flood storage volumes and prevent cumulative increases in onsite or offsite flooding. With predicted sea level rise and climate change, future 100-year flood elevations are expected to increase, and future improvements to SR 528 or I-95 may require design features to improve resiliency in extreme flood events.

AAF-AR0045104

### Cumulative Impacts of the Project

The Project would require construction within the 100-year floodplain in several locations. Cumulative impacts are expected to be minor, as all floodplain effects would be mitigated in accordance with applicable state and local laws regarding appropriate compensation and permitting.

### 5.5.2.7   Wetlands

### Past Impacts

Wetlands throughout the Project Study Area have been altered by previous human activities, including road construction, urban and suburban development, construction of MCO, and agricultural activities. These impacts have included wetland loss, fragmentation of wetlands and riparian habitats, and a decreased ability for wetlands to provide important functions such as flood storage, groundwater recharge/discharge, pollutant attenuation, and wildlife habitat. In recent years, wetland effects have been compensated by constructing new wetlands in wetland mitigation banks, and some large-scale wetland restoration projects have been advanced. For example, over the last decade, large-scale wetland restoration and enhancement projects have been undertaken at Indian River Lagoon, St. Lucie River, Hobe Sound, and Loxahatchee River. Much of the restoration conducted within these areas was completed or supported as part of the Indian River Lagoon National Estuary Program, which includes dozens of small and large-scale wetland enhancement and restoration projects. Projects range in size from less than 1 acre to over 500 acres and include activities such as hydrology restoration, exotic species removal, native plant installation, and trash removal (SJRWMD 2013c).

### Reasonably Foreseeable Future Impacts (without the Project)

Under the reasonably foreseeable future conditions, existing wetlands would likely be filled or experience impaired functions and values because of constructing the East End Development. Approximately 260 acres of wetlands would be converted to uplands and stormwater management system for this development. The SR 528 improvements, the I-95 widening, and future private development projects would also result in wetland losses, which have not been quantified. Discharges of dredged or fill material into jurisdictional wetlands are required to be mitigated pursuant to the CWA Section 404(b)(1) Guidelines, either by the purchase of wetland mitigation credits at approved mitigation banks or in lieu fees or by permittee-responsible compensatory mitigation, in accordance with applicable permit conditions.

### Cumulative Impacts of the Project

The Project is anticipated to result in minor losses of wetlands in all of the project segments, and would affect wetland functions and values. Potential adverse impacts to future populations of wetland-dependent wildlife and/or aquatic species from loss of habitat through Project construction and cumulative projects in the vicinity of the Project are also expected to be minor. Cumulative impacts to wetland resources are anticipated to be minimal on a regional scale, and are proposed to be fully mitigated through the purchase of mitigation bank credits.

AAF-AR0045105

### 5.5.2.8    Protected Species

***Past Impacts***

Numerous plant and wildlife species within the Project Study Area are currently protected by the federal and state endangered species acts. Although some of these are rare due to species-specific restricted habitat distributions, population dynamics, or other natural causes, many are threatened or endangered due to historic effects of human activity (habitat loss, hunting, pesticides), which have been most severe on species which have highly restricted habitat requirements or existed in small populations. However, several previously-listed species (including the bald eagle and American alligator) have recovered and populations expanded due to federal protection and are no longer considered imperiled. Other species continue to be at low or declining population sizes due to a variety of factors, including development and habitat change.

***Reasonably Foreseeable Future Impacts (without the Project)***

Some of the Projects within the Project Study Area may have a direct or indirect effect on protected species. Although the SR 528 and the I-95 improvements are planned for existing transportation corridors that provide low quality habitat, wildlife species are at risk for fatal or injurious encounters with vehicles, and the proposed improvements may result in the loss of habitat for reptiles such as gopher tortoise or indigo snake. Potential adverse effects to future populations of wildlife or plants from loss of habitat through project construction and cumulative projects in the vicinity of the Project are expected to be minor. All Projects would require review by USFWS and NMFS to ensure that effects to listed species were avoided to the extent feasible, and mitigated as needed, in conformance with the ESA.

***Cumulative Impacts of the Project***

Cumulative impacts to protected species are anticipated to be minimal on a regional scale and limited to incidental takes from transportation uses and minor losses of habitat. As the proposed passenger trains would pass through the E-W and the N-S Corridors relatively infrequently, introduction of the trains along these transportation corridors would not be anticipated to result in a measurable increase in takings of special status species such as gopher tortoise or Florida scrub-jay. The USFWS and NMFS are anticipated to concur with the USACE's finding of "effect but not adverse effect" for all listed species. The WPB-M Corridor project would have no adverse impact on federal listed species and no significant adverse impact to state listed species.

### 5.5.2.9    Social and Economic

***Past Impacts***

Between 2003 and 2006, Florida experienced substantial increases in total population, averaging yearly expansions of about 426,000 persons per year (Office of Economic and Demographic Research 2011). Significant economic growth accompanied population increases, as Florida's gross state product rose 27.4 percent from $574.4 million in 2003 to $731.5 million in 2006 (BEA 2013). Economic expansion turned to decline following one of the worst national financial disasters since the 1930s, the Great Recession. From the onset of the Great Recession in December 2007 to its end in June 2009, the unemployment rate in the State of Florida increased from 4.7 percent to 10.5 percent (NBER 2010; BLS 2013). During the same 18-

AAF-AR0045106

month period, the unemployment rates in the Metropolitan Statistical Areas (MSAs) within the Project Study Area collectively increased from 4.5 percent to 11.0 percent (BLS 2013).[7]

While the Great Recession officially ended at the national level in June 2009, the Florida economy continued to decline until the statewide unemployment rate peaked at 11.4 percent in February 2010 (NBER 2010; BLS 2013). The statewide economy (as evidenced by unemployment) has slowly improved, but has not fully recovered to pre-recession levels. As of June 2013, the statewide unemployment rate was 7.1 percent (BLS 2013). Although this represents the state's lowest unemployment level since September 2008, it is 2.4 percent above the state's unemployment level at the onset of the Great Recession. Similar to the statewide economy, the economies of the MSAs within the Project Study Area have improved, and have not fully recovered to pre-recession levels. As of June 2013, the combined unemployment rate in the MSAs within the Project Study Area was 7.6 percent (BLS 2013). According to IHS Global Insight Inc., the economy of the State of Florida will not return to pre-recession employment levels until 2016 (BusinessWire 2013).

Land development activity peaked in 2007, followed by several years of low activity corresponding with the economic recession. The land development market began to recover in 2012 as master developers and homebuilders cleared existing inventory. In September 2013, the Orlando metropolitan area was identified as Number 5 in the U.S. among the top 10 "booming" real estate markets (Orlando Business Journal 2013).

### *Reasonably Foreseeable Future Impacts (without the Project)*

Construction and operation of these projects would not substantially extend into surrounding land uses or change land use and planning for adjacent areas. At MCO, new construction of intermodal improvements would be limited to existing MCO property and would not extend into or partition existing neighborhoods or populations. CFX's property acquisition would change land use but would not affect the economic viability of Deseret Ranch (a 300,000-acre property). Removing these 500 acres from the tax rolls would have a negligible effect on the tax revenues of Orange County. None of the reasonably foreseeable future actions would result in splitting, relocating, or isolating neighborhoods and would not isolate a portion of an ethnic group or neighborhood, separate residences from community facilities, or substantially change local traffic travel patterns. The construction and operation of these facilities would likely introduce new jobs and revenue into local communities over the life of both projects and would have a beneficial effect to the adjacent communities, where additional jobs, community reinvestment/redevelopment, and improved tourism to local business and attractions may occur.

### *Cumulative Impacts of the Project*

The cumulative impacts of the Project in combination with other reasonably foreseeable projects would be beneficial to communities since these projects would result in additional jobs, community reinvestment/ redevelopment, and improved tourism to local business and attractions. The WPB-M Corridor would also have slight beneficial contributions to cumulative impacts. The addition of passenger rail service would also encourage transit-oriented development adjacent to the proposed stations and would promote local economic growth in these areas.

---

7    The MSAs along the Project Corridor include Miami-Fort Lauderdale-Pompano Beach, Orlando-Kissimmee-Sanford, Palm Bay-Melbourne-Titusville, Port St. Lucie and Sebastian-Vero Beach.

AAF-AR0045107

**This page intentionally left blank.**

AAF-AR0045108