# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

**INDIAN RIVER COUNTY, FLORIDA**[1] et al,

                Plaintiffs,

                v.

**DEPARTMENT OF TRANSPORTATION** et al,

                Defendants.

Case No. 18-cv-00333 (CRC)

---

# TABLE OF CONTENTS

I.  Background ........................................................................................................... 3

    A.  Factual Background ..................................................................................... 3

        1.  The proposed project ....................................................................... 3

        2.  The Secretary's bond allocation ..................................................... 4

        3.  The environmental review process .................................................. 5

    B.  Procedural Background ............................................................................... 7

II.  Analysis ............................................................................................................. 9

    A.  The Bond Allocation .................................................................................. 9

        1.  Section 142(m) .............................................................................. 11

        2.  Section 147(f) ................................................................................ 24

    B.  NEPA Compliance ................................................................................... 35

        1.  Public-safety effects of the project ............................................... 38

        2.  Effects of vessel queuing at railroad bridges over navigable waters ............... 49

        3.  Alternatives to the route and the use of moveable bridges ............................. 55

        4.  Noise impacts ................................................................................ 59

        5.  Changes to freight operations ....................................................... 66

III.  Conclusion ...................................................................................................... 72

---

[1] This case was captioned <u>Martin County et al v. Department of Transportation et al</u> in all previous filings. The Court has adjusted the case name to reflect Martin County's voluntary dismissal. <u>See</u> Joint Stipulation of Dismissal, ECF No. 48.f

**MEMORANDUM OPINION**

AAF Holdings, Inc. ("AAF") plans to construct and operate an express passenger railway connecting Orlando and Miami, Florida. The initial segment of the line between Miami and West Palm Beach is currently operational. The extension of the line to Orlando is still in the planning stages. To help AAF finance the extension, the U.S. Department of Transportation has allocated $1.15 billion in federally tax-exempt bonds to be issued by a Florida economic development agency.

The planned extension of the railway will run through Indian River County on Florida's Treasure Coast. The County and its Emergency Services District (together, "Indian River County" or "Plaintiff") have long objected to the project. In this, its second lawsuit challenging the project, Indian River County seeks summary judgment on two grounds. First, it contends that the Department of Transportation exceeded its authority in allocating the bonds because the project is not eligible to receive tax-exempt funding under two separate provisions of the Internal Revenue Code. Second, the County maintains that the Federal Railway Administration ("FRA") violated the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA") by conducting a flawed and incomplete review of the public health and safety consequences of the project. Defendants the Department of Transportation, its component FRA, and several of its officers (together, "federal Defendants," "the Department," or "FRA") filed a cross motion for summary judgment, as did AAF, which has intervened as a defendant. Because the Department's allocation met the tax code's requirements and the FRA's review complied with NEPA, the Court will deny Indian River County's motion for summary judgment and grant the federal Defendants' and AAF's.

# I. Background

## A. Factual Background

### 1. The proposed project

AAF is in the process of constructing a private passenger train service that will ultimately provide service between Miami and Orlando. Phase I of the project currently operates from Miami to West Palm Beach. AR 65115–16. Phase II will run from West Palm Beach north along Florida's east coast to Cocoa and then west and inland to Orlando. Id. AAF plans to lay a second track along a 128.5 mile stretch of single-track train corridor owned by the Florida East Coast Railway ("FECR") from West Palm Beach north to Cocoa. AR 65115. This track is currently used only by freight trains, some of which carry hazardous materials, but historically was used by both freight and passenger trains. AR 73914. This corridor is referred to in the record and by the parties as either the FECR Corridor or the N-S Corridor. AR 65115. The N-S Corridor bisects Indian River County. AR 73572. AAF also proposes constructing a new 40-mile track that would connect Cocoa and Orlando. This stretch of track is referred to as the E-W Corridor. AR 65115.

AAF plans to operate thirty-two passenger trains per day in addition to the FECR freight trains that now run along the N-S Corridor. AR 65116. These trains would run through Indian River County for twenty-one miles. AR 73753. There are thirty "grade crossings" in the County. Id. A grade crossing is an intersection where the railway crosses a road or path at the same level or grade, rather than an intersection where trains cross over or under the road using an overpass or tunnel. In addition to these grade crossings, the trains will traverse bridges that are either fixed or moveable (i.e., draw bridges). Two of these moveable bridges are at issue in this case: the St. Lucie River Bridge and the Loxahatchee River Bridge. AR 73915. When these

bridges are in the "down" position, trains can cross over but boats on the river cannot cross
under.

## 2. *The Secretary's bond allocation*

AAF is partially financing the railway project through private activity bonds ("PABs")
issued by the Florida Development Finance Corporation ("FDFC"), an agency of the State of
Florida. Congress has authorized the United States Department of Transportation to allocate tax-
exempt authority to PABs used to finance specific types of transportation projects. See 26
U.S.C. § 142(m)(2)(C). AAF initially applied for a PAB allocation in August 2014. In
December 2014, the Department of Transportation approved that application and provisionally
allocated $1.75 billion in tax-exempt PABs for the project. See Indian River Cty. v. Rogoff
("Indian River Cty. I"), 110 F. Supp. 3d 59, 65 (D.D.C. 2015). AAF planned to use these PABs
to finance both phases of the railway.

In November 2016, the Department, at AAF's request, withdrew the provisional
allocation and replaced it with a $600 million allocation of PAB authority to finance only Phase I
of the project. See Indian River Cty. v. Rogoff ("Indian River Cty. III"), 254 F. Supp. 3d 15, 17–
18 (D.D.C. 2017). Then, in December 2017, AAF applied for a new allocation of $1.15 billion
in PAB authority to finance Phase II of the project. See AR 74220–62. As part of its
application, AAF represented that the project had received $9 million in Title 23 federal funds,
disbursed by Florida's Department of Transportation for highway-rail crossings along the rail
corridor. AR 74235. AAF included in its application a resolution by FDFC approving the issue
of bonds to finance the project. AR 74240–53. That resolution concluded that the bond issue
had received requisite public approval for tax-exempt status because a designee of the State's
Governor had approved their issue after a properly noticed public hearing. AR 74242–44.

AAF's application highlighted that the bonds had already received this public approval. AR 74221. Further, AAF included in its application a bond counsel validity opinion, by the law firm Greenberg Traurig, which concluded that "interest on the Bonds . . . is excludable from gross income for purposes of federal income taxation under existing laws as enacted and construed[.]" AR 74256.

The Department approved the application and provisionally allocated $1.15 billion in PAB authority on December 20, 2017. AR 74324–26. Its provisional allocation letter conditioned final allocation on several requirements, including compliance with all applicable federal laws, as well as "a final bond counsel tax and validity opinion . . . issued at the time of the closing of the bond issue in substantially the form provided with the application." AR 74324. While FDFC will issue the bonds, AAF is responsible for marketing and selling them to investors. The parties have represented that the bonds will be marketed in the next several weeks.

### 3. The environmental review process

AAF originally sought federal loan funding for the project through the Railroad Rehabilitation and Improvement Financing ("RRIF") program. RRIF loans are subject to NEPA review. 49 C.F.R. § 260.35. FRA reviewed the potential environmental impacts of the project under NEPA. AR 73636. With respect to Phase I, FRA issued a Finding of No Significant Impact in 2013. AR 73570. FRA then began preparing an Environmental Impact Statement ("EIS") for Phase II. AR 73571. It held five public scoping meetings in May 2013 and received 248 comments in response to those meetings and more than 160 comments in the subsequent seventeen months. AR 74155–56. As required, FRA coordinated with federal, state, local, and tribal governments, including Indian River County. AR 74157–59.

FRA completed a draft EIS in September 2014.  AR 74164.  The draft attracted some 15,400 public comments.  Id.  During the comment period, FRA also held eight public meetings, id., which were attended by over 2,500 people, AR 74165.  FRA issued a Final Environmental Impact Statement ("FEIS") in August 2015.  See AR 73568.  FRA subsequently received additional comments on the FEIS, including from Plaintiff.  AR 65154.  When AAF withdrew its RRIF loan application in 2015, FRA decided to not issue a Record of Decision ("ROD").  AR 65118.  After AAF re-filed an RRIF application in 2017, FRA resumed the NEPA process and published the ROD in December 2017.  AR 65109–65.  Appendix C to the ROD provides responses to the comments on the FEIS.  See AR 65154; AR 65266–300.

The FEIS selects AAF's preferred route as the best alternative for the project and determines that no further environmental review is necessary.  AR 73578.  The FEIS itself is 646 pages long and separately includes numerous appendices including maps and analyses of noise impacts, navigation patterns, and more.  The FEIS and ROD outline the purpose of and need for the project, the alternatives considered, the affected environment, the potential environmental consequences of the project and reasonable alternatives, and the historic properties affected by the project.  The FEIS also includes a chapter on measures that would avoid, minimize, or mitigate impacts that would result from the project.  AAF has committed to implementing a series of mitigation measures during both the construction and operation phases of the project.

As part of the NEPA process, AAF retained the environmental consulting firm Vanasse Hangen Brustlin ("VHB") as a third-party advisor to FRA.  This arrangement was memorialized in an agreement between FRA, VHB, and AAF.  See AR 1045–62.  Under that agreement, VHB's "scope of work, approach, and activities shall be under the sole supervision, direction, and control of the FRA."  AR 1046.  AAF also hired its own consultant, Amec Foster Wheeler

("Amec"). In general, Amec conducted initial technical work, which it then submitted to VHB and FRA for review and comment. AR 897–98; see also AR 1062. The record includes a series of technical memoranda produced by Amec on issues like noise and vibration. See, e.g., AR 61081–238 (Amec's "Technical Memorandum No. 5 Noise and Vibration for AAF Passenger Rail Project"). The record also reflects significant back-and-forth regarding those memoranda between VHB and FRA on the one hand and Amec and AAF on the other. See, e.g., AR 1083–87, 1305–43, 1561–62, 7302–06, 7349–51 (charts setting forth VHB/FRA comments on Amec technical memoranda and Amec/AAF responses).

B. Procedural Background

As noted above, this is the second time Indian River County has sued in this Court to prevent or delay the Secretary of Transportation's allocation of tax-exempt bond issuance authority to finance the AAF project. In 2015, both Indian River County and nearby Martin County, through which the proposed railway would also run, sought (among other relief) a preliminary injunction vacating the Secretary's authorization of the tax exemption, which allocated PAB authority for both phases of the project. See Indian River Cty. I, 110 F. Supp. 3d at 66. Both counties alleged violations of NEPA, the National Historic Preservation Act ("NHPA"), and the Department of Transportation Act ("DTA"), each of which sets forth certain procedural requirements for major federal actions. Martin County also alleged a violation of § 142 of the Internal Revenue Code. There, as here, AAF intervened as a defendant. Initially, the Court concluded that the counties had failed to show that their asserted injuries—public-safety hazards and harms to environmental and historic sites from the construction and operation of the railway—were traceable to the Secretary's action or redressable by the Court. Specifically, while the counties had shown that the cost of financing the project would increase

without the Secretary's allocation of tax-exemptions, they were unable to show "that these costs would *significantly* increase the likelihood that AAF would abandon the project[.]" Id. at 71. In short, the plaintiffs had failed to show that if the Court were to grant them precisely what they asked for, the project would cease and their harms would be remedied. The Court also held that the counties' alleged procedural injury—stemming from the purported failure to conduct an appropriate environmental review—was insufficient to confer standing absent some tethering to a substantive injury sufficient for standing. Id. at 73. The Court thus denied the counties' motions because they had not established standing to sue. See id.

Following Indian River County I, the Court granted the counties permission to conduct jurisdictional discovery to demonstrate that, but for the PAB allocation, AAF would not complete the railway. Subsequently, the Department of Transportation moved to dismiss the counties' suits. The Court concluded that through jurisdictional discovery, the counties had shown "that invalidating [the Department's] decision to authorize . . . PABs would significantly increase the likelihood that AAF would not complete . . . the project." Indian River Cty. v. Rogoff ("Indian River Cty. II"), 201 F. Supp. 3d 1, 4 (D.D.C. 2016). Further, the Court found that the plaintiffs had alleged sufficient facts to demonstrate that the AAF project qualified as "major federal action" triggering certain requirements under NEPA, NHPA, and DTA. Id. at 20. Consequently, it denied the motion to dismiss those claims. It did, however, dismiss Martin County's claim that the PAB allocation violated § 142 of the Internal Revenue Code, concluding that the County's asserted injuries fell outside the zone of interests that Congress sought to protect in § 142. Id. at 21.

Following the Court's decision in Indian River County II that the counties had stated valid claims, AAF withdrew its application for a PAB allocation. It replaced that application,

which had sought to use the bonds to finance both phases of the project, with an application for a smaller allocation to be used only for Phase I.  Because Phase I dealt only with a portion of the proposed railway that did not run through the plaintiff counties, the Court dismissed the cases at moot.  Indian River Cty. III, 254 F. Supp. 3d at 22.

Since then, AAF applied for an allocation to help finance Phase II, which the Department of Transportation provisionally approved.  Indian River County, initially joined by Martin County and a group of concerned citizens, has again sued.  They contend that the PAB allocation violated two provisions of the Internal Revenue Code and that FRA did not comply with its requirements under NEPA.  AAF again intervened as a defendant.  The parties all moved for summary judgment.  The Court held a hearing on these motions on November 27, 2018.  Shortly before this hearing, Martin County and the citizens group reached a settlement with the federal Defendants and AAF and, therefore, are no longer plaintiffs in the case.

## II.    Analysis

### A.  The Bond Allocation

To facilitate Phase II of the AAF railway, the Secretary of Transportation provisionally allocated tax-exempt authority to $1.15 billion in PABs to be issued to finance the project.  The Secretary of Transportation's allocation is subject to review under the APA.  5 U.S.C. §§ 702, 706.  Chevron, U.S.A. v. NRDC, 467 U.S. 837 (1984), establishes a two-part inquiry to determine whether an agency has arrived at a permissible interpretation of the law it is charged with administering.  First, if a law directly addresses the precise question at issue, Congress's directive controls.  Id. at 842–43.  Second, if the statute is silent or ambiguous regarding the matter at hand, "the question for the court is whether the agency's interpretation is based on a permissible construction of the statute in light of its language, structure, and purpose."  Nat'l

Treasury Emps. Union v. Fed. Labor Relations Auth., 754 F.3d 1031, 1042 (D.C. Cir. 2014)

(quoting AFL-CIO v. Chao, 409 F.3d 377, 384 (D.C. Cir. 2005)).  The court must defer to any

reasonable agency interpretation, Loving v. IRS, 742 F.3d 1013, 1016 (D.C. Cir. 2014), which

need not be the one "deemed most reasonable by the courts[,]"  Entergy Corp. v. Riverkeeper,

Inc., 556 U.S. 208, 218 (2009).

Indian River County contends that the Secretary's allocation violated two provisions of

the Internal Revenue Code.  A brief overview of the statutory scheme contextualizes these

challenges and the Department and AAF's responses.  Congress has authorized interest earned

on certain types of PABs to be exempted from federal taxation.  See 26 U.S.C. §§ 103, 141.

Because this exemption allows the bondholder to keep all the interest, bond issuers can sell the

bond at a lower interest rate.  A PAB must be a "qualified bond" in order for it to be tax-exempt.

Id. § 103.  Section 141 outlines certain types of PABs that can constitute "qualified bond[s],"

including "exempt facility bond[s]."  Id. § 141(e)(1)(A).  Under § 142(a), a bond is an "exempt

facility bond" if at least 95% of proceeds from its issue are used to finance one of fifteen

enumerated categories of projects.  Id. § 142(a).  One such category is "qualified highway or

surface freight transfer facilities."  Id. § 142(a)(15).  Section 142(m) defines "qualified highway

or surface freight transfer facilities," id. § 142(m)(1), and authorizes the Secretary of

Transportation, "in such manner as [she] determines appropriate," id. § 142(m)(2)(C), to allocate

up to $15 billion of PAB authority to eligible projects, id. § 142(m)(2)(A).  Put simply, Congress

has enacted a mechanism through which the Secretary can allocate tax exemptions to bonds used

to finance construction of, or improvements to, certain types of facilities.  These exemptions

lower the cost of selling the bonds, better enabling state and local governments to finance the

projects.

The Secretary's allocation is necessary, but not sufficient, for a bond to be tax-exempt because it finances a "qualified highway or surface freight transfer facilit[y]." Id. § 142(m)(2)(A). The Internal Revenue Code also establishes other requirements for PABs to be considered "qualified" and thus tax-exempt. See id. § 141(e)(3). These include a requirement that bonds used to finance a facility must be approved by both "the governmental unit . . . which issued such bond," id. § 147(f)(2)(A)(i), and "each governmental unit having jurisdiction over the area" in which any bond-financed facility is located, id. § 147(f)(2)(A)(ii).

In this case, Indian River County alleges first that the Secretary violated the statute because the AAF passenger railway is ineligible for a PAB allocation under § 142(m). The County also contends that, in any event, because it has not approved the bond issue as § 147(f) requires, the PABs cannot be tax exempt. The Court turns to each of these statutory provisions.

### 1. Section 142(m)

Indian River County alleges that the Secretary's allocation of PAB authority to the AAF railway violated 26 U.S.C. § 142(m). It contends that because the project is not an eligible "qualified highway or surface freight transfer facilit[y]," the Secretary exceeded her statutory powers in allocating PAB authority to the project. In the last round of litigation, Martin County raised a similar argument, which the Court rejected as going beyond the "zone of interests" protected by § 142. See Indian River Cty. II, 201 F. Supp. 3d at 20–21. Both the federal Defendants and Intervenor-Defendant ask the Court to reach the same result this time around. Alternatively, they argue that the allocation complied with § 142. For the following reasons, the Court concludes that Indian River County has shown that its asserted interests arguably fall within the zone of interests Congress sought to protect in § 142, but that its claim fails on the merits.

11

a. <u>Zone of Interests</u>

Before the Court reaches the substance of Indian River County's § 142 claim, it "must . . . inquire whether the plaintiff[] fall[s] within the class of persons whom Congress has authorized to sue under the Administrative Procedure Act." <u>Mendoza v. Perez</u>, 754 F.3d 1002, 1016 (D.C. Cir. 2014). To do so, it must determine whether Indian River County's "grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit," in this case § 142. <u>Id.</u> (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997)). This inquiry "is not meant to be especially demanding" and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. 209, 225 (2012) (quoting <u>Clarke v. Sec. Industry Ass'n</u>, 479 U.S. 388, 399 (1987)).

When Martin County advanced its § 142 claim in the last round of litigation, the Court concluded that it had not cleared this hurdle. In that instance, like Indian River County does here, Martin County asserted interests in public safety, environmental protection, and historic preservation. <u>Indian River Cty. II</u>, 201 F. Supp. 3d at 21. It relied on SAFETEA, Pub. L. 109–59, 119 Stat. 1144 (2005)—the legislation through which Congress amended § 142 to add PAB authorization for "qualified highway or surface freight transfer facilities"—to contend that Congress sought to protect these interests when it amended § 142. <u>See Indian River Cty. II</u>, 201 F. Supp. 3d at 20–21. But as the Court explained at the time, SAFETEA is a "massive statute with many objectives" and its relevant amendments to § 142 were "but a tiny component of the overall legislation." <u>Id.</u> at 21. As such, it would have been—and remains—too dilutive of the zone of interests test to allow a plaintiff to challenge an allocation under § 142(m) based on an

interest advanced *anywhere* in SAFETEA.  Id. at 20 (citing Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 141 (D.C. Cir. 1977)).  Instead, "the relevant unit of analysis" for conducting the inquiry is § 142 itself.  Id.  And because "Martin County present[ed] no real argument that its interests [were] more than marginally related [to] those protected or regulated by *Section 142* itself," but rather "place[d] all its eggs in the SAFETEA basket instead," id. at 21, the Court dismissed the claim.

In this litigation, Indian River County has advanced stronger arguments, focusing appropriately on the interests at stake in § 142 itself.  Indian River County contends that these interests are illuminated by § 147(f), which requires State or local government approval for certain PABs to qualify for tax exemption.  "In applying the zone-of-interests test, [courts] do not look at the specific provision said to have been violated in complete isolation[.]"  Fed'n for Am. Immigration Reform, Inc. ("FAIR") v. Reno, 93 F.3d 897, 903 (D.C. Cir. 1996).  At the same time, courts must police the extent to which they look beyond the provision invoked to ensure that casting a wider net does not "deprive the zone-of-interests test of virtually all meaning."  Air Courier Conference of Am. v. Am. Postal Workers Union, 498 U.S. 517, 530 (1991).  Accordingly, a court must limit its analysis to the provision invoked for suit, as clarified by any provisions to which it bears an "integral relationship."  See, e.g., FAIR, 93 F.3d at 904.  In this case, then, the Court must first determine whether § 147(f) bears an integral relationship with § 142, the provision upon which Indian River County sues.

The Court concludes that the two provisions do bear an integral relationship.  They form adjacent requirements for PABs used to finance certain categories of facilities to qualify for tax-exempt status: § 142 enumerates the types of facilities, and § 147(f) ensures public approval and

democratic accountability for their construction. [2]  Absent § 147(f) approval, PABs used to

finance a § 142 facility cannot be tax-exempt; and PABs approved pursuant to § 147(f) are not

tax-exempt unless they are used to finance a § 142 facility.  Cf. Wash. All. of Tech. Workers v.

DHS, 156 F. Supp. 3d 123, 135 (D.D.C 2015) (holding that provisions share an integral

relationship in part because they perform an "interlocking task").

Most importantly, each requirement evinces a common purpose: ensuring that when the

public fisc forgoes revenue through tax-exempt bonds, those bonds are used to benefit the public.

As the Court explained in Indian River County II:  "Congress enacted 26 U.S.C. § 142 in

general, and Sections 142(a)(1) and 142(m) in particular, to create a tax benefit to support the

development and construction of certain kinds of projects with significant public benefits and a

demonstrated need for financial assistance."  201 F. Supp. 3d at 21.  When Congress added

§ 142(m) to the Internal Revenue Code in 2005, it did so against the backdrop of § 147(f), which

it had first added to the Code in 1982 in a clear effort to ensure public benefit from tax-exempt

bonds.  As the Senate Finance Committee Report explained at the time:

> The committee believes that new restrictions are needed on [bonds] to help
> eliminate inappropriate uses and to help restore the benefit of tax-exempt financing

---

[2] The fact that each provision specifically deals with "facilities" is important.  Indian River County relies in part on the fact that § 142 and § 147 share a common subpart of the Internal Revenue Code, which governs PABs eligibility.  Courts have often found provisions contained in a common sub*section* to be integrally related.  See, e.g., Int'l Union of Bricklayers & Allied Craftsmen v. Meese, 761 F.2d 798, 804–05 (D.C. Cir. 1985); Save Jobs USA v. DHS, 210 F. Supp. 3d 1, 11–12 (D.D.C. 2016).  But a common subpart is less instructive where, as here, the PABs subpart has multifarious purposes and covers several different types of bonds.  But § 142 and § 147 each governs the use of bonds to finance facilities in particular, evincing a closer relationship than § 142 shares with, for example, the rules governing mortgage bonds that are also contained in that subpart.  The Court's conclusion is not that the two bear an integral relationship simply because they share a common subpart, but because they both deal with a common activity regulated by that subpart.  Thus, contrary to Defendants' contentions, the Court's conclusion that the two provisions bear an integral relationship does not license *any* plaintiff whose interests are protected by *any* provision within the subpart to challenge a § 142(m) allocation.

for traditional governmental purposes. However, the committee believes that, in general, state and local governments are best suited to determine the appropriate uses of [bonds]. The committee believes that providing tax exemptions for the interest on certain [bonds] may serve legitimate purposes in some instances provided that the elected representatives of the state or local governmental unit determine after public input that there will be substantial public benefit from issuance of the obligations[.]

S. Rep. No. 97-494(I), at 168 (1982).

This suggests a common purpose: § 142 reflects congressional judgment about the types of projects that benefit the public enough to warrant tax-exempt financing, and § 147(f) creates a mechanism of democratic accountability by which the public can confirm that a particular project does indeed confer public benefit. Cf. Nat'l Petrochemical & Refiners Ass'n v. EPA, 287 F.3d 1130, 1148 (D.C. Cir. 2002) (holding that provisions shared an integral relationship because one helped "accomplish[] one of the express goals" of the other).

The same legislative history and interlocking purpose compel the Court to reconsider its holding in Indian River County II that local governments fall outside § 142's zone of interests. Indian River County has properly focused its attention not on SAFETEA as a whole, but on § 142 itself and its purpose of "support[ing] the development and construction of certain kinds of projects with significant public benefits[.]" Indian River Cty. II, 201 F. Supp. 3d at 21. By demonstrating that § 142 and § 147(f) bear an integral relationship, the County has illuminated § 142 in a way that suggests Congress's intent was indeed to allow State and local governments to ensure public benefit would accrue from projects financed by tax-exempt bonds. And because it appears from the legislative history that Congress gave some deference to State and local governments' assessment of public benefit, Indian River County's asserted interests at least arguably fall within the zone of interests protected by § 142. Accordingly, the Court concludes that Indian River County has plausibly stated a claim under that provision.

b.    The merits of the County's Section 142(m) claim

Moving to the merits of Indian River County's § 142 claim, the County contends that the Secretary's allocation is inconsistent with the statute because Phase II is not a "qualified highway or surface freight transfer facilit[y]," 26 U.S.C. § 142(a)(15), and thus is ineligible for an allocation of PAB authority.  The Court concludes that the Secretary's allocation conformed to the statutory requirements and was a reasonable exercise of her discretion.  It will therefore grant summary judgment on this issue to the Department and AAF.

Section 142 defines "qualified highway or surface freight transfer facilities" to include "any surface transportation project which receives Federal assistance under title 23, United States Code[.]"  Id. § 142(m)(1)(A).  The Secretary allocated PAB authority after concluding that the project fell within this definition.  Indian River County challenges that allocation, contending that § 142(m)(1)(A) does not encompass the project and it was thus ineligible for an allocation.  Specifically, the County contends that, when read in proper context, a "surface transportation project" means only a highway project, which necessarily precludes an allocation to any rail project.  It also maintains that if the term "any surface transportation project" did encompass rail projects, the AAF project has not received Title 23 federal assistance.  The Court addresses each point in turn.

i.    Whether the AAF project is a "surface transportation project" within the meaning of § 142(m)(1)(A)

The plain meaning of § 142(m)(1)(A) is unambiguous.  It defines "qualified highway or surface freight transfer facilities" to include "any surface transportation project[.]"  26 U.S.C. § 142(m)(1)(A).  Because Congress did not specify what "surface transportation" means, the ordinary meaning of the phrase controls.  See, e.g., Johnson v. United States, 559 U.S. 133, 138 (2010).  The dictionary definition of "surface transport" is "the movement of people or goods by

16

road, train, or ship, rather than by plane." Cambridge Business English Dictionary (2011). This plainly includes rail projects. Defining "surface transportation" to include rail comports with its use elsewhere in federal law. For example, in SAFTEA, the legislation through which Congress enacted § 142(m), a provision in another portion of the bill defined "surface transportation system" to include "freight and intercity passenger bus and rail infrastructure and facilities." SAFETEA § 1909(b)(14), Pub. L. 109–59, 119 Stat. 1476 (2005). The Surface Transportation Board—a congressionally created agency—is particularly notable: its charge includes jurisdiction over rail issues. See generally, ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803 (1995); Surface Transportation Board Reauthorization Act of 2014, Pub. L. 114-110, 129 Stat. 2228 (2014). There is no need to belabor the point with more examples: the dictionary definition of "surface transportation," the phrase's meaning in other areas of law, and its ordinary usage all indicate that § 142(m)(1)(A) includes rail projects.

Congress's use of "any" further indicates as much: "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" United States v. Gonzales, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). The Supreme Court has explained that when interpreting a statutory provision, "Congress' use of 'any' to modify 'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind." Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 220 (2008). The same principle applies here: Congress's use of "any" to modify "surface transportation project" is most naturally read to mean surface transportation projects of whatever kind—including rail projects.

Indian River County nonetheless insists that the plain text of § 142(m)(1)(A) cannot be read in isolation and that its context indicates that it refers only to highway projects. Relying on

the principle of *noscitur a sociis*—a word is known by the company it keeps—the County

highlights several contextual clues to contend that when Congress said "any surface

transportation project," it was actually referring only to highways.

First, the County notes that § 142(m)(1)(A) must be read in light of the word "highway"

in the phrase that it is defining: "qualified *highway* or surface freight transfer facilities." 26

U.S.C. § 142(m)(1) (emphasis added). Because another portion of § 142(m)(1) deals with

surface freight transfer facilities, see 26 U.S.C. § 142(m)(1)(C), Plaintiff contends,

§ 142(m)(1)(A) must deal with the "highway . . . facilities." But that argument is unavailing in

the face of Congress's chosen definition. In interpreting a statute, courts defer to Congress's

definition of a statutory provision, even if that definition is at odds with the ordinary meaning.

See, e.g., Digital Realty Trust, Inc. v. Somers, 138 S. Ct. 767, 776–77 (2018). Thus, even

accepting Plaintiff's premise, it was Congress's prerogative to define "highway . . . facilities" as

encompassing more than highways. And, as discussed, that is plainly what it did when it defined

the term to include "*any* surface transportation project."

Second, Indian River County notes that when Congress added "qualified highway or

surface freight transfer facilities" to § 142, the statute already listed fourteen other types of

facilities eligible for PABs financing. See 26 U.S.C. § 142(a). Plaintiff insists that the fact that

this list already included railway facilities—in the form of "high-speed intercity rail facilities,"

id. § 142(a)(11), and "mass commuting facilities," id. § 142(a)(3)—Congress's inclusion of

"qualified highway . . . facilities" must be understood to preclude passenger rail projects. As an

initial matter, the original list did not encompass all rail projects. "[M]ass commuting facilities"

do not encompass longer passenger rail services that connect distant cities to one another.

Likewise, "high-speed intercity rail facilities" include only passenger trains capable of 150 mile-

per-hour maximum speeds, id. § 142(i)(1), which excludes slower trains (including those AAF is using).  In other words, the list to which Congress added "qualified highway or surface freight transfer facilities" encompassed some types of passenger rail projects, but not all.  It would make perfect sense and would not be duplicative for Congress to add a provision covering other types of rail projects.  Nor would it supplant those provisions.  While the types of railways encompassed by "mass commuting facilities" and "high-speed intercity rail facilities" fall into the ambit of "any surface transportation project," they do not necessarily also receive Title 23 funds as § 142(m)(1)(A) requires.

Third, Indian River County points to the fact that § 142(m)(1)(A)'s limiting provision references Title 23—i.e., that a surface transportation project constitutes a "qualified highway or surface freight transfer facilit[y]" only if it "receives Federal assistance under title 23, United States Code[.]"  Id. § 142(m)(1)(A).  Title 23 is a portion of the U.S. Code entitled "Highways."  This detail, Plaintiff insists, further demonstrates that "any surface transportation project" must refer only to highways—especially since later in the provision, Congress included in its definition of "qualified highway or surface freight transfer facilities" certain types of facilities that receive funding under either Title 23 or Title 49, which addresses railroads.  See id. § 142(m)(1)(C).  According to Plaintiff, the exclusion of a reference to Title 49 in § 142(m)(1)(A), when it was included in § 142(m)(1)(C), means that § 142(m)(1)(A)'s reference to Title 23 indicates that it extends only to highway projects.  But while Title 23 does deal generally with highways, it also contains provisions authorizing funds for non-highway transport, including passenger rail.  See, e.g., 23 U.S.C. § 601(a)(12).  Consequently, the reference to Title 23 is not as strong a contextual clue as Plaintiff suggests and is insufficient to supplant Congress's capacious definition, notwithstanding the fact that the Title 23 is called

"Highways." Cf. United States v. Spencer, 720 F.3d 363, 367 (D.C. Cir. 2013) (embracing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text" (citation omitted)).

Indian River County also invokes the canon *expressio unius est exclusio alterius*—that "expressing one item of an associated group or series excludes another left unmentioned," Chevron U.S.A., Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (citation and internal alteration omitted). The County suggests that because other portions of § 142(m) reference non-highway surface transport, § 142(m)(1)(A) cannot be interpreted to include such transport. Section 142(m) includes both "any project for an international bridge or tunnel for which an international entity authorized under Federal or State law is responsible," 26 U.S.C. § 142(m)(1)(B), and "any facility for the transfer of freight from truck to rail or rail to truck," id. § 142(m)(1)(C), among "qualified highway and surface freight transfer facilities," provided they receive appropriate funding. But their inclusion does not imply an exclusion of non-highway projects from "any surface transportation project[.]" The D.C. Circuit has repeatedly indicated that "[t]he *expressio unius* canon is a 'feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved.'" Adirondack Med. Ctr. v. Sebelius, 740 F.3d 692, 697 (D.C. Cir. 2014) (quoting Cheney R.R. Co. v. I.C.C., 902 F.2d 66, 68–69 (D.C. Cir. 1990)). In particular, "when countervailed by a broad grant of authority contained within the same statutory scheme, the canon is a poor indicator of Congress' intent." Id. (citing Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric., 539 F.3d 492, 500 (D.C. Cir. 2008)). Here, Congress granted the Department wide discretion, allowing it to allocate PAB authority among facilities "in such manner as the Secretary determines appropriate." 26 U.S.C. § 142(m)(2)(C). Plaintiff's

invocation of *expressio unius est exclusio alterius* is thus misplaced and does little to undermine the Secretary's interpretation, particularly in light of § 142(m)(1)(A)'s plain, capacious language.

Put simply, if Congress had intended for the addition of "qualified highway or surface freight transfer facilities" to cover only highway projects, it would have made that clear. For example, it could have defined "qualified highway . . . facilities" to include only *highway* surface transportation projects, instead of "surface transportation project[s]." It did not do so. Instead, it used a definition that referred to "*any* surface transportation project," evincing broad inclusion.

As such, the Court has little trouble concluding that § 142(m) supports the Secretary's allocation of PAB authority to a passenger rail project, assuming it receives Title 23 funds.[3]

### ii.   *Whether the project received Title 23 funding*

Indian River County also contends that Phase II was ineligible for a PAB allocation because the project has not "receive[d] Federal assistance under title 23, United States Code," as required by § 142(m)(1)(A).

Here, the Secretary approved the allocation based on an application submitted by AAF. The application contains the following information concerning Title 23 funding:

> The planning process for All Aboard Florida started in December 2011. Since then, approximately $9 million from Section 130 of U.S. Code Title 23 has been invested in the entire corridor to improve railway-highway grade crossings and prepare the corridor for growth in rail traffic. Future investments from the Section 130 program are planned for future calendar years. The Florida Department of Transportation administers the Section 130 program on behalf of the State of Florida.

AR 74235; see also AR 73549–62.

---

[3] The plain text of the statute is enough to support the Secretary's action, but it bears noting that this is not the first instance in which the Department allocated PAB authority to a passenger railway. The Department has previously allocated such authority to Maryland's Purple Line light rail project and Denver's Eagle Commuter Rail project. See Private Activity Bonds, US Dep't of Transp. Build America Bureau, https://www.transportation.gov/buildamerica/programs-services/pab (last visited Dec. 24, 2018).

Indian River County objects that this Title 23 funding went to FECR, the freight railway line on whose tracks AAF's passenger trains will run. In other words, the County contends that FECR, not AAF, received the Title 23 funding and AAF merely benefitted from it. As an initial matter, § 142(m)(1)(A) requires that PABs be allocated to a "*project* which receives Federal assistance under title 23, United States Code[.]" 26 U.S.C. § 142(m)(1)(A) (emphasis added). Nothing in this provision requires that the project *proponent*—here, AAF—receive Title 23 funds. Nor does anything require the bond-financed project to be the *exclusive* beneficiary of those funds. The Department has long interpreted the statute to allow for PAB allocation to projects based on direct benefits from Title 23 spending. It highlights examples in which it has allocated PAB authority to a light rail project based on Title 23 funding to upgrade an adjoining trail, and to freight transfer facilities based on Title 23 funding to upgrade nearby highways and bridges. See Fed. Defs.' MSJ at 24 (citing Decl. of Paul Baumer ¶ 7, Martin Cty. v. Dep't of Transp., No. 15-cv-632-CRC (D.D.C. May 15, 2015), ECF No. 19-2). Thus, the Department's long-standing interpretation of § 142(m)(1)(A) is consistent with the Secretary's allocation of PAB authority to AAF's project. And nothing in the statutory text precludes that interpretation, notwithstanding the facts that Title 23 funding went to FECR rather than AAF and that FECR, in addition to AAF, benefited from the funding.

But at the same time, as the Department has tacitly acknowledged, see Hr'g Tr. at 64:9–23, the statutory requirement that a project receive Title 23 funding cannot be construed so broadly as to allow the Department to bootstrap a project into PAB eligibility based solely on an incidental and unintentional benefit from the funds. In other words, the record must support the conclusion that the funds were disbursed to benefit the project.

The record here supports the Secretary's conclusion that the project received Title 23 funding. Florida's Department of Transportation disbursed approximately $9 million to account for increased rail traffic on the FECR railway *after* AAF commenced planning its project. AR 74235, 73549–62. To be sure, there were planned increases in FECR freight traffic as well, but the record indicates that a disproportionate amount of the Title 23 funding was disbursed only after the AAF project began. Over the ten-year period from 2005 through 2014, the railway received approximately $21 million dollars in Title 23 funding, approximately 43% of which came in the three years following the commencement of AAF's planning. AR 73549–62. Given that the AAF project received substantial attention in Florida, the Court is skeptical that the State's Department of Transportation disbursed (and increased) this Title 23 funding without the knowledge—if not purpose—of benefitting the project. In short, the record indicates that this is not an instance in which the AAF project was such an ancillary or unintended beneficiary of the funds as to prevent the Secretary from concluding that it had "receive[d] Federal assistance under title 23[.]" 26 U.S.C. § 142(m)(1)(A). Between these facts and the deferential nature of its review, the Court cannot accept Indian River County's contentions.

Indian River County also alleges that the Department inappropriately interpreted § 142(m)(1)(A) to allow PAB authority to finance the entire railway corridor based on the expenditure of Title 23 funds for discrete highway-rail crossings along that corridor. The Secretary's conclusion—that the highway-rail crossings sufficed to render the whole corridor eligible for PAB allocation—is consistent with longstanding Department interpretation of what constitutes a "project" for purposes of § 142(m)(1)(A). Immediately following SAFETEA's passage, the Federal Highway Administration ("FHA") wrote to the IRS to indicate its view that "the most reasonable reading . . . permits the proceeds of [PABs] authorized by this provision to

be used on the *entire* transportation facility that is being financed and constructed even though only a portion of that facility receives Federal assistance under title 23." AR 73546. FHA explained that a narrower reading of "project" would cause States, which disburse Title 23 funds, to sprinkle the funds along whole facilities in order to make them eligible for PAB allocation, rather than continuing the practice of using them at discrete portions of facilities. AR 73546–47. Concluding that Congress did not intend § 142(m)(1)(A) to change disbursement practices, FHA interpreted the provision to reflect a broader definition of "project" than just the specific portion of a facility financed by Title 23 funding. FHA's analysis reflects a reasonable assessment of congressional intent and the statutory text, and the Secretary's interpretation of § 142(m)(1)(A) in this case conforms to it.

The Court therefore concludes that Phase II of the AAF railway is a project that received Title 23 funding. Because it is also a surface transportation project, the Court will grant summary judgment to the federal Defendants and Intervenor-Defendant on this claim.

### 2. *Section 147(f)*

Indian River County also challenges the use of PABs as a violation of 26 U.S.C. § 147(f), which establishes public approval requirements before bonds can be "qualified" to receive tax-exempt status. The County insists that unless and until it approves the PABs, they do not constitute qualified bonds. The Department of Transportation asks the Court to dismiss this claim as improperly presented. AAF, for its part, contends that Indian River County's claim fails on the merits because the State of Florida approved issuance of the bonds in accordance with § 147(f)'s requirements, which obviated the need for approval by all counties through which the railway runs. The Court will address each argument in turn, reaching the merits of the Plaintiff's claim and granting summary judgment to the federal Defendants and Intervenor-Defendant.

a. <u>Failure to state a claim</u>

The Department asks the Court to dismiss Indian River County's § 147(f) claim because the Secretary "is not required to investigate whether Section 147's requirements have been met before [she] makes a PAB allocation." Fed. Defs.' MSJ at 27. It explains the Secretary's responsibilities under the statutory scheme begin and end with § 142: she must determine only whether a project is a "qualified highway or surface freight transfer facility" and, if so, whether to allocate to that project a portion of the $15 billion in tax-exempt PABs authorized by Congress. Section 147, the Department contends, presents a wholly distinct requirement for PABs to qualify for tax-exempt status into which the Secretary need not inquire before allocating PABs. Consequently, according to the Department, even if Indian River County's allegations regarding § 147(f) were true, they would have no bearing on the legality of the allocation but would concern only an assessment of the future tax liability of bondholders.

While it does not appear that the statutory scheme imposes any obligation on the Secretary to police § 147(f) compliance, the record indicates that the Secretary did consider such compliance in this particular instance. AAF's application for a PAB allocation highlighted its view that § 147(f)'s requirements had been met by Florida's approval. AR 74221 ("AAF has already successfully completed the necessary hearings and approvals required under" § 147(f).). As part of the application, AAF submitted two documents indicating as much. First, it provided a resolution by the FDFC, the Florida governmental entity responsible for issuing the bonds, approving their planned issue. AR 74240–53. The resolution included FDFC's finding that § 147(f) requirements were satisfied by a properly noticed public hearing held in Tallahassee and subsequent approval by a Florida official delegated powers by the State's Governor. AR 74242–44. Second, AAF submitted a proposed bond counsel tax and validity opinion by the law firm

Greenberg Traurig, based on its review of the record and applicable laws.  AR 74254–57.  That opinion determined that "interest on the Bonds . . . is excludable from gross income for purposes of federal income taxation under existing laws as enacted and construed[.]"  AR 74256.  The Department invited submission of both documents.  While there are no formal requirements for PAB allocation applications, the Department has indicated that "to facilitate [its] consideration of [an] application," applicants "may wish" to include, among other information, "a copy of a resolution . . . authorizing the issuance of a specific issue of obligations," and a "Form of Bond Counsel Opinion or date by which a draft letter will be provided."  71 Fed. Reg. 642, 643 (Jan. 5, 2006).  Put simply, applicants wishing to receive serious consideration for an allocation would be wise to provide documentation that would analyze and support the tax-exempt nature of the bonds, should allocation be provided.

Importantly, the Department's provisional PAB allocation in this case *conditioned* final allocation on the bond counsel's opinion.  It explained that final allocation was based on several requirements, the first of which was "a final bond counsel tax and validity opinion . . . issued at the time of the closing of the bond issue in substantially the form provided with the application."  AR 74324.  That condition indicates that the Department sought assurances that the allocation it made would involve bonds otherwise compliant with tax-exemption requirements.  It also indicates that the Department was satisfied with bond counsel's analysis, which assumes § 147(f) compliance by virtue of its conclusion that the bonds are tax exempt.

The Court's analysis here is informed by the nature of the allocation.  Even accepting the Department's contention that it is not responsible for policing compliance with § 147(f), the fact remains that it is responsible for allocating highly-sought-after tax-benefits from a finite pool.  In this case, the Department has used $1.15 billion of the $15 billion in that pool to support Phase II

of the project.  The Court is skeptical that the Department would formally allocate $1.15 billion in bond authority absent some confidence that the bonds would indeed be tax-exempt. Otherwise, the Department would be wasting nearly ten percent of the finite resource Congress empowered it to administer.  The bonds here will be issued and offered for sale imminently, and the Department has given no indication that they are legally infirm.  It has not questioned the bond counsel opinion that the bonds will be properly tax-exempt.  It has not suggested that the bonds fail to comply with any "applicable Federal law," a further condition of the final allocation.  See AR 74325.  In short, it appears that the Department has implicitly concluded that the State-level public approval satisfied § 147(f) requirements.  Moreover, in this litigation, the Department has embraced AAF's view that the State-level public approval satisfied those requirements.  See Fed. Defs.' Reply at 10 ("Thus, here, the State of Florida's approval is sufficient to satisfy Section 147(f).").

It bears emphasizing that the Court's holding on this issue is fact bound.  The Court's conclusion is not that the statutory scheme requires the Department of Transportation to police compliance with § 147(f) or any other requirement for tax exemption.  Nor can the Court conclude that the Department makes assessments of § 147(f) compliance for every allocation. Rather, it concludes only that, in this particular case, the Department has interpreted § 147(f) as satisfied—an assessment rooted in AAF's application and supporting materials, the Department's provisional allocation letter and the conditions it enumerated, the fact that the bonds will be issued imminently and the Department has not raised any § 147(f) concerns, and the Department's position in this litigation that AAF's arguments on the merits are correct.

Under these circumstances, then, the Court finds it appropriate to reach the merits of the County's § 147(f) claim.

b. <u>Section 147(f) merits</u>

While Indian River County has stated a valid claim under § 147(f), the claim is not

meritorious, and the Court will grant summary judgment to the federal Defendants and AAF.

For PABs to be "qualified" and thus tax-exempt, § 147(f) requires public approval by:

> (i) the governmental unit—
> (I) which issued such bond, or
> (II) on behalf of which such bond was issued, and
> (ii) each governmental unit having jurisdiction over the area in which any
> facility, with respect to which financing is to be provided from the net
> proceeds of such issue, is located (except that if more than 1 governmental
> unit within a State has jurisdiction over the entire area within such State in
> which such facility is located, only 1 such unit need approve such issue).

26 U.S.C. § 147(f)(2)(A).  Subsections (i) and (ii) are commonly known as "issuer approval" and

"host approval," respectively.  In this case, FDFC, a State-level agency, issued the bonds after

concluding that § 147(f)'s requirements had been met.  Specifically, it cited a noticed public

hearing held in Tallahassee, followed by approval by a Florida State official who was "the

designee of the Governor of the State of Florida, the applicable elected representative to approve

the [bond] issuance."  AR 74243–44; <u>see also</u>, 26 U.S.C. § 147(f)(2)(B) (requiring "a public

hearing following reasonable public notice"); AAF's MSJ, Ex. 1 (memorandum from Florida

Governor authorizing approval on his behalf).

Indian River County does not dispute that the issuer approval complied with § 147(f)(i).

Nor does it dispute that because the State issued the bonds, its issuer approval was tantamount to

host approval by the State.  <u>See</u> 26 C.F.R. § 5f.103-2(c)(3).  The County's claim, rather, is that

the State's approval alone was insufficient to satisfy § 147(f)(2)(A)(ii) without approval at the

county level as well.

Indian River County contends that the plain text of § 147(f)(2)(A)(ii) unambiguously

requires the County to approve the bond issue before the bonds achieve qualified status.  It

maintains that because it is a "governmental unit having jurisdiction over the area in which" the railway "is located," its approval is necessary unless the parenthetical exception applies. And the exception does not apply, the County argues, because Phase II runs through five counties, so this is not an instance in which "more than 1 governmental unit . . . has jurisdiction over the entire area . . . in which [the] facility is located." 26 U.S.C. § 147(f)(2)(A)(ii).

But even without the parenthetical exception, § 147(f)(2)(A)(ii) is ambiguous in its requirement that "each governmental unit having jurisdiction" over the relevant area approve the bond issue. Congress did not define the term "governmental unit" beyond indicating that it excludes the federal government. See 26 U.S.C. § 150(a)(2). So, the term "governmental unit" could conceivably encompass everything from the State to its counties to school boards and dogcatchers.

Hoping to sidestep ambiguity in the term "governmental unit," Plaintiff urges the Court to apply a limiting principle implicit in § 147(f), noting that approval requirements are satisfied by approval "by the applicable elected representative" of a government unit, which includes "an elected legislative body of such unit" or "the chief elected executive officer." 26 U.S.C. § 147(f)(2)(E). This provision, according to Plaintiff, clarifies that "governmental unit" in this context unambiguously means an entity with an elected legislature or chief executive. See Hr'g Tr. at 47:14–16. But those provisions go to the mechanisms by which a governmental unit may approve, not to the definition of "governmental unit" itself. See 26 U.S.C. § 147(f)(2)(B). Section 147(f) also anticipates situations in which a governmental unit may not have an "applicable elected representative," id. § 147(f)(2)(E)(ii), which betrays the contention that Congress defined the term "governmental unit" to include only governmental entities with elected legislative bodies or chief executives. Further, even if the Court were to accept

Plaintiff's contention, it would not render the statutory text unambiguous: local school boards, sheriffs, and other entities are often elected to exercise legislative or executive authority, and each would constitute a "governmental unit" absent further clarification. See 26 C.F.R. § 5f.103-2(e) (clarifying that "[i]f multiple elected legislative bodies of a governmental unit have independent legislative authority, . . . the body with the more specific authority relating to the issue is the only legislative body" whose approval suffices); id. § 5f.103-2(h)(7) (discussing example implicating elected school board).

Even setting aside these types of entities, Indian River County's position would mean that every single city and town through which Phase II runs would have to approve the bonds' issuance in order for them to be tax exempt, even if all of the counties encompassing those jurisdictions approved the issue. Congress passed § 147(f) to promote democratic accountability and safeguard State and local governments' input on projects as a means of ensuring tax exemptions benefit the public. Affordable Hous. Dev. Corp. v. City of Fresno, 433 F.3d 1182, 1193 (9th Cir. 2006). But it is hard to imagine that its chosen mechanism would yield a result in which a single town could pocket veto a significant public infrastructure project notwithstanding the assent of the State and county governments.

The absurdity of Plaintiff's view is further revealed by its interpretation of § 147(f)(2)(A)(ii)'s parenthetical exception "that if more than 1 governmental unit within a State has jurisdiction over the entire area within such State in which such facility is located, only 1 such unit need approve such issue." Plaintiff reads this to mean that State approval alone suffices *only* in such a situation. But that would mean a State could approve a facility over local government objections only if the local government had jurisdiction over the entire facility. Under Plaintiff's view, if, for example, the facility were entirely within Indian River County,

Florida's approval *would* suffice, even if Indian River County opposed it, because both Florida and the County would share jurisdiction over the entire area. But, because Phase II spans four other counties within the State, Florida's approval is insufficient. It would be a bizarre outcome, to say the least, if a State could approve financing of a facility over a political subdivision's objection if the facility were located entirely within that subdivision but could not do so when the facility traverses multiple subdivisions. Why would Congress empower a county to override its State's desire to finance a facility in every instance *except* those in which it is uniquely affected? This only compounds the absurdity of Plaintiff's reading of the non-parenthetical portion of § 147(f) to require assent from every single local government through which Phase II runs. The Court cannot accept this reading. Cf. Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) (explaining that statutory interpretations that "would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").

In short, there is substantial ambiguity in the requirement of approval by "each governmental unit" with jurisdiction over the facility. In the face of such ambiguity, the Court considers whether the Department's implicit interpretation—that the State's approval alone satisfied § 147(f)(2)(A)(ii)—"is based on a permissible construction of the statute in light of its language, structure, and purpose." Nat'l Treasury Emps. Union, 754 F.3d at 1042 (quoting AFL-CIO, 409 F.3d at 384). There are several indications that it was a permissible construction of the statute.

First, the legislative history indicates that, notwithstanding ambiguous statutory language, Congress intended State approval to suffice in situations like this. The Conference Committee reports included language "intend[ed] to clarify the application of the rule requiring a public

hearing and approval by an elected official or legislative body in order to issue [PABs]."  The

reports explained:

> Where the facilities are located entirely within the geographic jurisdiction of the
> issuing governmental unit, only one public hearing and approval are required even
> though the facilities may be located in several different subdivisions of the issuing
> governmental unit.
> . . .
> For example, where a governor of a state is to approve the issuance of bonds for
> facilities located in that state (even though located in several counties), only the
> state is required to have a public hearing on the bond issue.

H.R. Rep. No. 97-760, at 517 (1982) (Conf. Rep.); S. Rep. No. 97-530, at 517 (1982) (Conf.

Rep.).

The example is precisely on point.  Here, Florida's Governor, through his representative,

approved the issuance of bonds for the facilities.  Per the Conference Committee reports, that

approval suffices and the fact that the facilities run through several political subdivisions of the

State does not undermine its sufficiency.

Second, the Department's implicit acceptance of the sufficiency of the State's approval is

consistent with IRS regulations implementing § 147(f).  Those regulations define "governmental

unit" to mean "a State, territory, a possession of the United States, the District of Columbia, or

any political subdivision thereof."  26 C.F.R. § 5f.103-2(g)(1).  Plugging the relevant part of that

definition into § 147(f) yields a requirement of approval by "each State or political subdivision

thereof having jurisdiction" over the relevant area.  This phrase by itself doesn't answer the key

question one way or the other, because it is not immediately clear what work the word "or" does

in this context.  It could signify that every unit with jurisdiction—whether a State *or* its political

subdivision—must approve the issue; it could also signify that each State with jurisdiction, *or*

each political subdivision with jurisdiction, must approve the issue.

Fortunately, the same IRS regulations provide examples that answer any lingering questions and confirm that it is the latter. Example 5 is particularly instructive:

> County M proposes to issue an industrial development bond to finance a project located partly within the geographic jurisdiction of County M and partly within the geographic jurisdiction of County N. Both counties are located in State X. The part of the project in County N is also located partly within the geographic jurisdiction of City O and partly within the geographic jurisdiction of City P. Under the provisions [implementing issuer approval], County M must give issuer approval. Additionally, under the provisions [implementing host approval], either State X, County N, or both Cities O and P, must give host approval.

Id. § 5f.103-2(h)(5).

This example removes any doubt that a higher-level government unit's approval suffices to satisfy § 147(f)(2)(A)(ii), whether or not its political subdivisions approve. That is why County N's approval obviates the need for Cities O and P to give their own approval, and why State X's approval obviates the need for County N's approval.

Given clear legislative intent and the long-standing regulations interpreting the statute, the Court concludes that it is reasonable to interpret § 147(f)(2)(A)(ii) as satisfied by State-level approval in this instance. This is also consistent with Congress's purpose, which was to build in some level of democratic accountability to ensure that tax-exempt bonds finance only those projects that actually benefit the public. That goal is achieved if every area in which a facility is located falls within the constituency of an approver.

This reading of the statute is not inconsistent with § 147(f)(2)(A)(ii)'s parenthetical exception, on which Plaintiff heavily relies as the sole exception where State approval suffices. The regulatory examples help clarify that this exception is designed to permit approval by a lower-level government without the need for higher-level approval. In one of the examples, "State X proposes to issue an industrial development bond to finance a facility located partly within the geographic jurisdiction of State X and partly within the geographic jurisdiction of

State Y," with the "portion of the facility located in State Y . . . entirely within the geographic jurisdiction of City Z." 26 C.F.R. § 5f.103-2(h)(7). In this instance, "either State Y or City Z must give host approval as that part of the facility to be located outside State X will be entirely within the geographic jurisdiction of each unit." Id. In other words, the lower-level government need not wait for higher-level authority to *approve* such a project but does not possess veto power if the two share jurisdiction. This is consistent with the view that the statute means each State with jurisdiction, *or* its political subdivision with jurisdiction, must approve the issue.

To avoid doubt and facilitate this understanding, the IRS's regulations further provide that "if property to be financed . . . is located within two or more governmental units but not entirely within either of such units, each portion of the property which is located entirely within the smallest respective governmental units may be treated as a separate facility." Id. § 5f.103-2(c)(3). This clarifies why, in Example 5, once County M gave issuer approval (which doubled as host approval), County N's approval sufficed absent State X's approval, even though it did not have jurisdiction over the entire area. Each portion could be treated as a discrete facility so the portion in County N was entirely within the jurisdiction of both State X and County N, allowing County N alone to give host approval. Likewise, it clarifies why Cities O and P could both give host approval without waiting for either County N or State X. Either the State, *or* its political subdivision with jurisdiction, must approve the bond issue

In sum, reading § 147(f)(2)(A)(ii)'s parenthetical exception to empower a local government to *approve* a facility without waiting for the State is consistent with the congressional purpose of financing facilities that benefit the public while ensuring democratic accountability. Once a local government with jurisdiction over the entire facility concludes that it is worthwhile, it would make little sense to force it to wait for the State to act. The exception

is a mechanism for facilitating local government assent to a project in the face of State intransigence. Plaintiff's interpretation, on the other hand, would turn a shield into a sword and allow a local government to veto a State's approval.

Plaintiff's understanding of § 147(f) would yield absurd results and runs head first into the Conference reports in which Congress announced its intention that "where a governor of a state is to approve the issuance of bonds for facilities located in that state (even though located in several counties), only the state is required to have a public hearing on the bond issue." H.R. Rep. No. 97-760, at 517 (1982) (Conf. Rep.); S. Rep. No. 97-530, at 517 (1982) (Conf. Rep.).

The Secretary's implicit conclusion that these PABs comply with § 147(f)'s public approval requirement is consistent with longstanding IRS regulations. Those regulations, in turn, effectuate Congress's clearly expressed intent and are a reasonable interpretation of the statute. The Court will therefore grant summary judgment to the federal Defendants and Intervenor-Defendant on this issue.

B. NEPA Compliance

Indian River County also alleges that the environmental review for Phase II conducted by FRA did not comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

NEPA requires federal agencies to take a "hard look" at the environmental consequences of significant actions they propose to undertake. Theodore Roosevelt Conservation P'ship v. Salazar ("Theodore Roosevelt Conservation P'Ship II"), 661 F.3d 66, 75 (D.C. Cir. 2011) (quoting Nevada v. Dep't of Energy, 457 F.3d 78, 92–93 (D.C. Cir. 2006)). NEPA has two goals: it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action[,]" and "it ensures that the agency will inform the

public that it has indeed considered environmental concerns in its decisionmaking process." Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983) (citations and quotation marks omitted). NEPA is "'essentially procedural,' designed to ensure 'fully informed and well-considered decision[s]' by federal agencies" rather than "particular results." Del. Riverkeeper Network v. FERC, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (first quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978); then quoting Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756–57 (1989)).

NEPA's core is the requirement that an agency prepare an Environmental Impact Statement ("EIS") for any proposed major federal action "significantly affecting the quality of the human environment[.]"[4] 42 U.S.C. § 4332(C). An EIS must detail the foreseeable environmental impact of the proposed action, unavoidable adverse impacts, alternatives to the proposed action, and any irreversible commitments of resources. Id. Understandably, preparing an EIS is a significant undertaking: the agency must not only publish its analysis for public review and comment but must also consult with other agencies that offer specific expertise. Id.; 40 C.F.R. §§ 1502.9, 1506.6. Finally, an EIS must be completed before the agency irretrievably commits federal resources to the project so that the NEPA review serves its purpose of ensuring that the environmental consequences are considered during the early stages of planning. See Andrus v. Sierra Club, 442 U.S. 347, 351 (1979).

Because NEPA does not provide an independent cause of action, plaintiffs bring their NEPA claims under the general review provision of the APA. 5 U.S.C. §§ 702, 706. Under the APA, a court may only set aside agency actions that are "arbitrary, capricious, an abuse of

---

[4] As explained above, the Court previously held that the Secretary's first PAB allocation constituted a major federal action. See Indian River Cty. II, 201 F. Supp. 3d at 21. The parties do not question whether the Secretary's latest allocation also qualifies as such.

discretion, or otherwise not in accordance with law." Id. § 706(2)(A). This means that the agency's NEPA decision must "comply with 'principles of reasoned decisionmaking, NEPA's policy of public scrutiny, and [the Council on Environmental Quality's] regulations.'" Del. Riverkeeper Network, 753 F.3d at 1313 (quoting Found. on Econ. Trends v. Heckler, 756 F.2d 143, 154 (D.C. Cir. 1985)). More specifically, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (quoting Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983)). Like in other APA challenges, a decision is not proper under NEPA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. (quoting State Farm, 463 U.S. at 43). In short, the agency's NEPA review must be the "product of 'reasoned decisionmaking.'" Id. (quoting State Farm, 463 U.S. at 43).

Indian River County challenges five separate aspects of FRA's NEPA review. It contends that FRA failed to adequately analyze: (1) the public-safety consequences of more and faster trains traveling along the rail line; (2) the impact of boats having to queue at closed railroad bridges waiting for trains to pass; (3) the available route and bridge alternatives; (4) the anticipated noise generated by the trains; and (5) the projected increase in freight train speeds due to planned track enhancements. A common theme of the County's complaints is that FRA did not analyze certain issues in a manner or with a level of detail that it would have preferred, and failed to comply with NEPA's "look before leaping" directive by deferring necessary studies

until after the NEPA process. With those broad critiques in mind, the Court will address the five alleged deficiencies in turn.

### 1. Public-safety effects of the project

Under NEPA, an agency must take a "hard look" at any impact the proposed action may have on "public health or safety." Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 255 F. Supp. 3d 101, 123 (D.D.C. 2017) (first quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); then quoting 40 C.F.R. § 1508.27(b)(2)). And, where safety information is incomplete or not available, the agency must disclose that such information "is lacking." 40 C.F.R. § 1502.22.

Indian River County contends that FRA failed to adequately consider several risks to public safety by deferring necessary safety studies until after the NEPA process was complete. Specifically, the County highlights what it perceives are inadequacies with respect to pedestrian safety, train collisions, and delays experienced by emergency responders waiting at crossings for trains to pass. Pls.' MSJ at 11. FRA and AAF counter that the agency thoroughly examined the project's public-safety impacts using the information available, considered and responded to numerous public comments regarding safety, and incorporated mandatory mitigation requirements in the FEIS. Based on its review, FRA concluded that the project would have an overall positive effect on public health and safety because the project includes planned track improvements and safety enhancements and would result in more people using trains rather than cars, leading to safer roads with fewer accidents and less pollution. AR 73589.

The Court starts with Plaintiff's underlying concern that the agency abdicated its responsibility to conduct an independent public safety evaluation by deferring any "hard look" until after the NEPA process is complete and "shuffl[ing]" responsibility to respond to public-

safety concerns "off to AAF." Pls.' MSJ at 11. In support of that contention, the County relies on a response from AAF that was ultimately incorporated into the FEIS: "Consistent with FRA safety requirements, which are not part of the NEPA process, AAF will develop a Hazard Analysis and System Safety Program Plan prior to the start of the operations." AR 38707, 73658. Plaintiff protests that NEPA is a "look before you leap" statute, requiring the agency to conduct a thorough investigation of the significant safety and environmental impacts *before* taking a major federal action. Hr'g Tr. at 13:17–14:3. In the County's view, had FRA "looked"—that is, conducted a safety analysis as part of the NEPA process—it would have disclosed and more specifically addressed the three specific safety issues identified above.

The trouble for the County is that FRA does not contend that the Hazard Analysis and System Safety Program Plan ("SSP Plan"), prepared pursuant to FRA regulations,[5] replaces NEPA. Rather, these are two separate requirements. Under NEPA, FRA must take a hard look at the safety impacts of the project, and that is what FRA did. The agency considered and disclosed a wide number of safety impacts of the project based on the information available at the time and then reasonably concluded that the increased safety risks from more and faster trains could be mitigated. These mitigation measures include grade-crossing improvements; installation of Positive Train Control ("PTC")—a system of dynamically monitoring and controlling train movements—across both passenger and freight trains; construction of fencing in locations along the line where pedestrians are more likely to cross the tracks illegally; and coordination with local officials regarding emergency vehicles. AR 74056–58. So while the County is correct that the future SSP Plans "do not obviate the need for the hard look and public

---

[5] See 49 C.F.R. § 270.103.

airing that NEPA demands," Pls.' Reply at 8, FRA independently met its NEPA obligations in this regard.

The Court now moves to Indian River County's more specific safety concerns.

### a. Pedestrian safety

Indian River County first contends that FRA and AAF overlooked serious risks to pedestrian safety at both "formal" and "informal" crossings. Before discussing these arguments, it is helpful to define some of these train terms. Pedestrians cross train tracks at either "formal" or "informal" crossings. Formal crossings are those that pedestrians are supposed to use. We all recognize them: pathways or roads, signage, and signals indicating when a train is coming and when it is safe to cross. Informal crossings are the opposite, ones that pedestrians are not supposed to use but sometimes do. Informal crossings will be somewhere on the "mainline" of the railroad—that is, anywhere along the tracks other than at the formal, at-grade crossings— where a pedestrian can scamper across. Finally, pedestrians can cross tracks legally or illegally. A pedestrian crosses legally by waiting, at a formal crossing, for the "all clear" and complying with the signals. One crosses the tracks illegally by either jaywalking at a formal crossing or "trespassing" across the tracks at an informal crossing.

### i. *Formal crossings*

With respect to formal crossings, Indian River County originally contended that AAF's planned grade-crossing improvements were only voluntary and that any mitigation requirements were contingent on localities agreeing to pay for ongoing maintenance. Pls.' MSJ at 16. Both FRA and AAF have clarified, however, that despite some ambiguity in the FEIS, the grade-crossing improvements are mandatory mitigation measures. See Fed. Defs.' MSJ at 31–32; AAF

MSJ at 12.[6]  Accordingly, AAF will be required to "implement and fund initial grade crossing safety enhancements identified in the Diagnostic Team Report."  AR 74137; see also AR 74054 (FEIS concluding that the project "would result in enhancing public safety with improvements to grade crossing signal equipment for vehicular and pedestrian traffic").  And it is AAF that will pay the cost of making these initial grade-crossing safety improvements.  AR 73718.  Based on these representations, the County's "concern that the grade-crossing improvements will not be implemented at all has been put to rest."  Pls.' Reply at 11.[7]

And these improvements are extensive.  The required safety features are the result of a diagnostic safety review, a thorough study of 349 total grade crossings conducted by FRA's Office of Railroad Safety–Highway Rail Crossing and Trespasser Program Division, in which Indian River County participated.  AR 73718–19.  The diagnostic team made a series of crossing-related recommendations, all of which were adopted.  See AR 74137.  These measures include implementing sidewalk gates in particular locations, formal pedestrian crossings wherever sidewalks exist on either side of the tracks, PTC along the entire project, and four quadrant gates (which consist of automatic flashing light signals and gates) at grade crossings.  AR 73718–24; see also AR 49371–85.  Thus, contrary to the County's concerns, the FEIS

---

[6] For example, although the FEIS states that AAF will implement the crossing improvements "in conjunction with county and municipal execution of amendments to existing crossing license agreements," AR 73589, FRA has assured Indian River County that this does "*not* precondition the grade crossing enhancements" on any such amendments, Fed. Defs.' MSJ at 32.

[7] Who will bear the cost of *maintaining* these grade crossings remains an open question subject to some combination of state law and future negotiations.  The Court need not resolve this question, however, because it is beyond the scope of whether FRA reasonably concluded that the required mitigation measures were sufficient to address the safety concerns of reintroducing passenger trains to the FECR corridor.

requires AAF to implement a variety of safety measures and improvements at formal crossings to ensure pedestrian safety.

## ii. Informal crossings

With respect to informal crossings, the County insists that even if FRA reviewed the safety risks at formal at-grade crossings, it completely overlooked the risk to *trespassing* pedestrians on the mainline. Pls.' MSJ at 13; Pls.' Reply at 3. Plaintiff says that these pedestrians risk being blind-sided by high-speed passenger trains, which can be hard to see and harder still to hear until too late. Pls.' MSJ at 13. It argues that "there is no 'existing analysis' in the FEIS, or elsewhere in the record, of the safety impacts of the Project on pedestrians on the FECR corridor outside of formal grade crossings." Pls.' Reply at 7.

The record demonstrates otherwise. The FEIS expressly considers the possibility of trespassers—including pedestrians who cross on the mainline at "informal" crossings or against signals at formal grade-crossings—and proposes mitigation measures to address the problem.[8] The suggested approach is two-fold: encouraging pedestrians to use formal crossings and erecting fencing to prevent them from using informal ones.

First, encouraging pedestrians to use formal crossings. As explained above, the FEIS and ROD require AAF to implement a series of improvements to grade crossings, including pedestrian gates, paths to connect sidewalks on either side of the tracks, and flashing lights. The FEIS is clear that one reason to require these improvements is to encourage pedestrians to use

---

[8] FRA argues that the Court should not address the County's concerns about pedestrian safety along the mainline because pedestrians who trespass at informal crossings "engage in an unlawful activity." Fed. Defs.' Reply at 12. However, the problem of informal crossings, legal or not, is "reasonably foreseeable" and therefore must be considered. See Comm. of 100 on Federal City v. Foxx, 87 F. Supp. 3d 191, 214 (D.D.C. 2015). In any event, the FEIS addresses it. The Court will too.

formal crossings: "The infrastructure and safety improvements that are incorporated in the Project will reduce illegal and unsafe trespass on the rail line, and improve safety for area residents by adding sidewalks at grade crossings." AR 73657. This statement in the FEIS is consistent with the recommendations of FRA's on-site engineering field report, which expressed concerns in 2014 that AAF was not seriously committed to implementing necessary security measures. See AR 48371. That field report was shared with the diagnostic team which, as described above, produced a report that set forth the mitigation measures that AAF will be required to implement. The field report explained:

> Trespassing is an epidemic along this corridor. Rather than encourage it, it is recommended per my field notes at those particular locations—["certain locations along the corridor in which sidewalks are present on both sides of the railroad right-of-way, but do not follow through"]—to equip sidewalk approaches with a visual and gated barrier. This is to provide safe passage of pedestrians through a very active rail line and prevents them from walking into an open railway corridor; or directing them onto the street—irrespective if there is an agreement or not.

AR 49373. In light of this discussion, it cannot be said that FRA did not analyze the underlying problem of pedestrian crossings and come up with at least one response: create formal crossings where pedestrians are most likely to cross (i.e., where there are sidewalks on either side of the tracks).

FRA also adopted another response: fencing to keep pedestrians from running across the tracks at informal crossings. The FEIS explains that the FECR Corridor already has fencing in "specific areas" where trespassing has been a problem. AR 73858. Among other safety features—like warning signs, flashing signals, a public-awareness program coordinated with Florida Operation Lifesaver, and PTC—the project will either improve existing fencing or add fencing where it is lacking:

> For the E-W Corridor standard FDOT highway fencing, or its equivalent, will be added throughout the length of the corridor where the track is at-grade that will

> restrict and seal the railroad right-of-way from public access. . . . Fencing on the N-S Corridor would be upgraded based on existing public access locations and the potential for conflicts with the increased train frequency.
>
> AAF will conduct [Right of Way] Field Surveys to observe, document, and provide recommendations to minimize trespassing by employing fencing, warning signage, public outreach/information, and other appropriate measures as required.

AR 74059. The FEIS does not specify the "specific designs" for the fencing, explaining that fencing will be added "where an FRA hazard analysis review determines that fencing is required for safety; this will be in populated areas where restricting access to the rail corridor is necessary for safety." AR 73717; see also AR 74059 ("Fencing on the N-S Corridor would be upgraded based on existing public access locations and the potential for conflicts with increased train frequency. Specific designs for fencing will be developed as the project advances.").

Conceding, perhaps, that the FEIS considers trespassing, the County nonetheless contends that FRA failed to take a hard look at the problem in two ways. Neither contention is persuasive.

First, the County suggests that the FEIS understates the risks pedestrians face by relying on "stale and limited data on the history of accidents involving FECR trains." Pls.' Reply at 3. The FEIS indicates that between 2007 and 2011—when only freight trains were running on the N-S Corridor—there were ten total fatalities "not at grade crossings" between Cocoa and Miami. AR 73856 (Table 4.4.4-2). These deaths could have involved "a range of accident types, including derailments, accidents between trains, trains and humans, or between trains and objects on the tracks." Id. The County retorts that "the reality" of trespasser fatalities "is starkly different" than that presented in Table 4.4.4-2. Pls.' Reply at 3. Relying on data pulled from the same database used to create Table 4.4.4-2, the County argues that during that same period in that same stretch of corridor, there were actually 58 fatalities. Decl. of Philip E. Karmel, ECF

No. 37-1 & Ex. 1 to Karmel Decl. But Plaintiff's data does not sufficiently call into question

FRA's decision to rely on the particular data the agency chose to use. See Sierra Club v. FERC,

867 F.3d 1357, 1368 (D.C. Cir. 2017) ("[T]he agency's choice among reasonable analytical

methodologies is entitled to deference." (citation omitted)). Plaintiff offers its data to shore up

its concerns about pedestrian safety specifically on the mainline, but the data does not appear to

distinguish between fatalities on the mainline and at grade-crossings. Table 4.4.4-2, by contrast,

does, isolating the relevant data by presenting only mainline trespasser fatalities. Thus,

Plaintiff's data is both over-inclusive and less relevant to answering the question the County

poses regarding trespasser fatalities along the mainline. Accordingly, the County's data does not

directly undermine that used in the FEIS.[9]

And second, the County contends that by not identifying specific locations or designs for

fencing until "sometime *after* project approval," FRA again "kicks the can down the road" on

safety issues. Pls.' MSJ at 13 (citing AR 74059). According to the County, "artful language

about future 'recommendations' being included in a post-approval study by AAF does not pass

muster . . . under NEPA." Pls.' MSJ at 14.

NEPA, however, does not require the level of detail the County seeks. As the Supreme

Court has cautioned, "there is a fundamental distinction [] between a requirement that mitigation

be discussed in sufficient detail to ensure that environmental consequences have been fairly

evaluated . . . and a substantive requirement that a complete mitigation plan be actually

formulated and adopted." Robertson, 490 U.S. at 352. "[I]t would be inconsistent with NEPA's

reliance on procedural mechanisms—as opposed to substantive, result-based standards—to

---

[9] Because the Court finds Plaintiff's data less relevant to the question at hand, it need not resolve the parties' dispute over whether that data constitutes extra-record evidence that should not be considered by the Court at all.

demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."  Id. at 353.  In City of Alexandria v. Slater ("Slater"), 198 F.3d 862 (D.C. Cir. 1999), for example, the D.C. Circuit considered whether the Federal Highway Administration's approval of plans to replace the Woodrow Wilson Bridge in Washington, D.C., complied with NEPA.  The Circuit disagreed with the district court's conclusion that the agency's discussion of adverse environmental effects and related mitigation measures was too "terse" to satisfy NEPA. Id. at 869–70.  While the "discussion might have been more thorough," more was not required. Id. at 870.  The agency acknowledged that constructing a new bridge would affect traffic flow on nearby streets and could delay delivery of emergency services; the agency also "offer[ed] a range of mitigation strategies," such as maintaining "some access" on roads and notifying the public of temporary road closings.  Id.  This was enough:  "Perhaps [the plaintiffs] would prefer the [agency] to set forth in the final EIS a comprehensive plan detailing precisely which streets will be closed, and which alternative routes will be established, but that is not mandated by NEPA." Id. (citing Robertson, 490 U.S. at 353).  Here, too, FRA acknowledged potential adverse effects the project could have on pedestrian safety, offered a range of mitigation strategies, and required AAF to implement those strategies.  NEPA demands no more.

b.  Train-on-train collisions

Next, the risk of train accidents.  The County maintains that the "FEIS contains no analysis of whether the Project will adversely affect public safety by increasing the likelihood of train-on-train collisions."  Pls.' MSJ at 17.  Not so.  As the County itself acknowledges, the FEIS identifies the risk of train-on-train accidents and concludes that the installation of PTC and other measures will mitigate that risk.  Id. (quoting AR 74056).  The question, then, is whether this was a sufficiently "hard look" at the problem.

It was.  The FEIS discloses that the reintroduction of high-speed passenger trains to the existing freight traffic on the N-S Corridor "may increase the frequency of opportunities for conflict between trains."  AR 74056.  The FEIS also concludes that "safety improvements at crossings, an upgraded PTC system, enhanced security, and improved communications among emergency responders would be a beneficial effect, serving to minimize potential conflicts and their consequences."  Id.  It explains that "PTC is a system *designed to prevent train-to-train collisions*, derailments caused by excessive speeds, unauthorized train movements in work zones, and the movements of trains through switches left in the wrong position."  AR 73731 (emphasis added).  And it points out that PTC, which is required on all new passenger lines in the United States, see 49 U.S.C. § 20157(a)(1), "will be interoperable between the AAF and FECR trains," AR 73731.

In addition to PTC and improvements to the FECR tracks, the FEIS notes that AAF will implement other measures to decrease the risk of collision, including "a passenger train emergency preparation plan, safety and security certification plan, and several FECR safety procedures."  AR 74056.  And because there are "no anticipated changes in the frequency or quantity of hazardous materials to be transported" on the corridor, the FEIS concludes that these safety precautions will reduce the risk that a freight train involved in an accident will spill hazardous materials.  AR 74060.  Relatedly, the FEIS emphasizes that under the project, "[h]azardous materials would continue to be transported consistent with applicable statutes, rules and regulations."  Id.; AR 65275.

In light of these improvements and safety measures, the government draws an apt parallel to the undersigned's decision in Committee of 100 on Federal City v. Foxx, 87 F. Supp. 3d 191 (D.D.C. 2015).  Fed. Defs.' Reply at 15.  In that case, the plaintiffs alleged that the relevant

agency failed to evaluate the impact of rail accidents resulting from a proposed train tunnel renovation project in Washington, D.C. Committee of 100, 87 F. Supp. 3d at 215. The Court acknowledged that there might be a risk of derailment but concluded that because such a "risk of an accident exists today," the plaintiffs had failed to show that "the newly-constructed tunnels will foreseeably *increase* the risk of an accident as compared to current operations." Id. Instead, the agency had reasonably concluded that tunnel modernization would actually decrease the risk of accidents. Id. So, too, here: FRA acknowledged the risk of derailment or collision but explained its conclusion that the risk would be mitigated through PTC and other measures.[10] That was sufficient under NEPA.

### c. Emergency vehicles

Finally, the County contends that FRA failed to take the requisite hard look at the adverse impact the project could have on emergency vehicle response times. In simple terms, it is concerned that emergency responders—that is, EMTs, firefighters, and police—may be unduly delayed either because their routes will be detoured to avoid project-related construction or because they'll have to wait more frequently for trains to pass formal crossings. The County believes the FEIS should have (1) disclosed the specific location of road closures that could impede emergency responders during construction and (2) addressed the impact that more

---

[10] The County insists that FRA does "not take issue" with a risk assessment prepared by former-plaintiff Martin County which hypothesizes that thousands of people could be put at risk in the event of a train-on-train accident involving hazardous materials. Pls.' Reply at 9. The record, however, clearly demonstrates that Martin County raised this specific risk assessment in its comments on the FEIS and that FRA responded, citing the implementation of PTC as a means of "significantly reducing the probability of collisions between trains." AR 65275. Under the rule of reason, FRA did not need to go into more detail regarding Martin County's study given that it disclosed the risk of train-on-train collisions and concluded that the risk could be mitigated by PTC and mandatory compliance with federal regulations.

frequent train traffic and related grade-crossing closures will have on response times. Pls.' MSJ at 21–22.

Several parts of the record reveal that the FEIS took the requisite hard look at both issues. The FEIS clearly discloses the risk that project construction could interfere with emergency vehicle traffic. AR 74036. Critically, the FEIS also identifies how "to minimize disruption and to maintain emergency access" during construction: AAF will coordinate planned closures and detours with local emergency responders. Id.; AR 73659, 73914–15. While it is true that the FEIS does not specify, as the County wishes, the particular roads that will be closed and when, Slater is again instructive: "Perhaps [the County] would prefer [FRA] to set forth in the final EIS a comprehensive plan detailing precisely which streets will be closed, and which alternative routes will be established, but that is not mandated by NEPA." Slater, 198 F.3d at 870 (citing Robertson, 490 U.S. at 353). The FEIS also clearly discloses the risk that more frequent train traffic will require more grade-crossing closures that could affect emergency response times should a vehicle have to wait at a crossing for a train to go by. AR 73659. But after disclosing the risk, the FEIS concludes that "the delays are expected to be minimal, as the passenger trains should clear a typical crossing in less than a minute." Id. Thus, FRA disclosed the two potential impacts, and concluded that one would be minimal and the other mitigated. These findings satisfy NEPA's procedural requirements.

### 2. Effects of vessel queuing at railroad bridges over navigable waters

Plaintiff next turns to the project's impact on boats waiting or queuing to cross through the draw bridges at the St. Lucie and Loxahatchee rivers over which the N-S Corridor track runs. When a train passes over one of these bridges, the bridges obviously must be in the "down" position. And because the bridges are not particularly high, boats cannot pass underneath when

trains cross over. By adding thirty-two passenger trains daily to the existing freight traffic, these bridges naturally will be in the down position much more often.

The County concedes that FRA discloses that the project would lead to increased wait times at the bridges but contends that the agency failed to take a hard look at the impact that these longer wait times would have on public safety and the environment. Pls.' MSJ at 27–28. The County describes a slew of boats waiting for the bridges to go up, idling their engines during the wait to hold their place in the queue against the current, all the while consuming more fuel, producing more pollution, and endangering marine life. While the Court agrees with Plaintiff that these kinds of potential effects are not to be downplayed, it concludes that FRA performed an adequate analysis of vessel wait times for purposes of NEPA.

The FEIS relies on the 2014 and 2015 Navigation Discipline Reports prepared by Amec. See FEIS Appendices 4.1.3-B1 & 4.1.3-B2 (AR 49486–671). Based on these reports and extensive navigation modeling analyses, the FEIS discloses that the project will increase vessel queuing time at the moveable bridges as a result of increased train traffic. AR 73934. For example, the average weekday closure time at the St. Lucie River Bridge is projected to be 6.6 hours under the 2016 No-Action Alternative[11] and 9.8 hours under the Project Alternative. AR 73920 (Table 5.1.3-4). An additional three hours of bridge closures may seem like a lot but FRA cautions that the more relevant figure is the average wait time per closing rather than the total closure time per day. The average non-zero wait time[12] for boats is projected to be 6.9 minutes

_____

[11] Under the No-Action Alternative, the project does not go forward and freight operations increase by approximately five to seven percent based on current projected growth. AR 73919.

[12] "Average non-zero wait time" measures the average of only boats that must wait for some period of time. This is in contrast to "average wait time," which measures the average of boats that must wait as well as those that wait for zero minutes, thus lowering the average.

under the No-Action Alternative and 8.6 minutes under the Project Alternative. AR 73927. The FEIS also acknowledges that "[i]n the absence of mitigation, the potentially increased queue lengths and durations could adversely affect boater safety . . . ." AR 73934. The FEIS proceeds to explain, however, that "AAF has committed to implementing mitigation measures . . . that will reduce queuing and associated safety concerns by providing mariners with a fixed schedule of bridge closures and durations." Id. In other words, the agency studied the issue and estimated that the project will increase the wait time of boaters who experience any delay by 1.7 minutes on average, and proposed reducing wait times by requiring AAF to notify boaters when the bridges would be open so that they could plan accordingly.

The County essentially demands a closer analysis of the safety and environmental impacts of increased wait times for boats than that described above. However, under the applicable "'rule of reason' standard, such detailed second-guessing of an agency's choices is not the proper role of this Court." WildEarth Guardians v. Bureau of Land Mgmt., 8 F. Supp. 3d 17, 33 (D.D.C. 2014) (citation omitted). After all, "it is of course always possible to explore a subject more deeply and to discuss it more thoroughly, but the line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." Id. (cleaned up) (quoting WildEarth Guardians v. Salazar, 880 F. Supp. 2d 77, 88 (D.D.C. 2012)); see also N. Slope Borough v. Andrus, 642 F.2d 589, 600 (D.C. Cir. 1980) ("[T]he decision of how much detail to include is one for the agency itself, guided by a 'rule of reason.'" (citation omitted)). Applying the rule of reason, the Court concludes that FRA reasonably drew the lines where it did and was not obliged to go into more detail regarding the impacts of vessel queuing.

As an initial matter, FRA advanced a reasonable basis for its conclusion that the projected increased vessel queuing would not be as dramatic as the initial navigational modeling

analyses conducted by Amec suggested. The agency believed the analyses conservatively estimated wait times for three reasons. First, "[t]he model uses a conservative value of 40 seconds as the minimum gap time between all boats approaching the crossing." AR 49638; see also AR 49640. However, the FEIS found that "the *observed* time is almost half that." AR 49640 (emphasis added). Second, in response to comments on the draft EIS, Amec and FRA updated their analysis in the 2015 Navigation Discipline Report to rely on data regarding summer rather than winter boat traffic. AR 49635, 73917, 74042. There is significantly more boat traffic during the summer than winter, which means that the anticipated vessel wait times will be lower for much of the year. Id. And third, the model is run using two scenarios—one in which boats can travel through the crossings simultaneously in opposite directions and one in which they cannot. While the U.S. Coast Guard suggests that simultaneous boat crossing is not considered "safe or prudent," AR 38780, FRA found that "small and medium-sized boats have been observed traveling through the crossings simultaneously in opposite directions—only larger boats, such as commercial vessels, require one-way passage," AR 49638.

The County advances three criticisms of FRA's analysis and conclusion that wait times will not be too severe. First, it suggests that the modeling should not have considered the "passing allowed" scenario in light of the Coast Guard's warning. Pls.' Reply at 15–16. However, as Amec emphasized in its Report, "a system with no boats passing is not representative of observed conditions." AR 49645; see also AR 49638. It was reasonable for the FEIS to present the modeling results based on data consistent with observed conditions.

Second, the County asserts that FRA unreasonably and without explanation focused on the "80th percentile" volume of boat arrivals, ignoring the busiest days of boat traffic represented by the 90th percentile volume and underestimating vessel queuing and its attendant negative

effects.  However, the record is clear that FRA made a reasoned choice to use the 80th percentile.  This value refers to "the value that exceeds 80% of the wait times of all boats, etc.  For example, if the [80th percentile] wait time of all boats was 11.7 minutes, this means that 80% of the boats waited 11.7 minutes or less and 20% waited longer than 11.7 minutes."  AR 49640.  In other words, the 80th percentile value represents a "typical high volume day."  AR 73917.  FRA decided to focus on the 80th percentile rather than daily averages in response to comments that the draft EIS had "underestimated impacts . . . by using average day values."  AR 38687.  Those commenters suggested using "a methodology similar to traffic analysis," such as using 80th percentile values, instead.  Id.  The 2015 updated analysis bears this out:  As an example, for the St. Lucie River crossing, the average wait for all boats is 5.1 minutes, the average wait for delayed boats is 8.6 minutes, and the 80th percentile wait is 14.1 minutes.  AR 49645.  Thus, FRA made the reasonable choice to use the 80th percentile value rather than the average value (which would underestimate wait times) or the 90th percentile value (which would exceed a "typical high volume day") as a more realistic measure of boat traffic.  The Court has no basis to second guess that decision.

And third, the County faults FRA for failing to factor in the role of "hazardous currents."  Pls.' MSJ at 27–28.  Commenters on the draft EIS also expressed concern that the modeling did not reflect realistic boating behavior because it "assume[s] that boats could safely hold their positions in a queue, regardless of tides, currents, vessel wake, and other factors."  AR 73916.  But FRA disclosed this assumption—"[t]he model does not account for the complex interaction of tides, currents, vessel wake, and boater behavior"—and explained that the model "represents the most realistic situation of boat arrivals and bridge operations possible using modeling technology."  Id.  In other words, FRA said it did the best it could with available modeling

technology and conceded that it was not perfect. This was "sufficiently thorough to comply with NEPA." See WildEarth Guardians, 8 F. Supp. 3d at 34 (concluding that agency's "analysis complies with the 'rule of reason' in light of the information available to the agency" where it "candidly disclosed that no appropriate model exists to accurately predict" specific impact raised by plaintiffs and "instead relied on available modeling data"); cf. Comm. of 100, 87 F. Supp. 3d at 218 (explaining that an agency need not "employ the best, most cutting-edge methodologies" (quoting Theodore Roosevelt Conservation P'Ship v. Salazar ("Theodore Roosevelt Conservation P'Ship I"), 616 F.3d 497, 511 (D.C. Cir. 2010)). The County does not suggest a readily-available alternative modeling technique.

FRA also reasonably concluded that most of the vessel queuing—overstated as FRA believed it was—could be mitigated, likewise supporting the agency's decision not to delve deeper into the safety impacts of queuing. The modeling analysis "does not take into consideration any of the mitigation strategies" that AAF will be required to implement to reduce queue times. AR 49648. Those mitigation requirements include a publicly-available set schedule for bridge closures, notification signs with countdowns to help boaters plan trips accordingly, increased communication with local authorities during holidays and special events, and a "coordination plan" with the U.S. Coast Guard. AR 74138–39. The FEIS ultimately concludes that these mitigation measures "will reduce queuing and associated safety concerns." Id.; see also AR 49648 (2015 Navigation Discipline Report concluding that "[i]f these strategies are used by the boating community, the non-zero wait times"—that is, the waiting time for boats that actually experience some delay—"will decrease and any potential impact to the industry can be significantly avoided"). This makes sense: If boaters know when the bridges will be opened or closed, they can plan accordingly to avoid waits.

Under the rule of reason, then, the FEIS's discussion of vessel queuing and its related effects was adequate under NEPA. While the County may want a more detailed analysis of each environmental and safety impact, FRA reasonably drew the line, concluding that such analysis was not necessary given that the initial projected wait times were conservative and that most wait times could be mitigated.

### 3. *Alternatives to the route and the use of moveable bridges*

"At the 'heart' of the EIS is the agency's evaluation of the potential environmental impacts of all 'reasonable alternatives' for completing the action." Theodore Roosevelt Conservation P'ship II, 661 F.3d at 69 (quoting Slater, 198 F.3d at 866); 40 C.F.R. § 1502.14. "The range of reasonable alternatives must include 'technically and economically practical or feasible' alternatives," and "is 'delimit[ed]' by the agency's reasonably defined goals for the proposed action," Theodore Roosevelt Conservation P'Ship II, 661 F.3d at 69 (alteration in original) (first quoting 43 C.F.R. § 46.420(b); then quoting Slater, 198 F.3d at 867). Both the agency's definition of its goals and its selection of alternatives are also reviewed under the "rule of reason": "as long as the agency 'look[s] hard at the factors relevant to the definition of purpose,' we generally defer to the agency's reasonable definition of objectives." Id. (alteration in original) (quoting Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195–96 (D.C. Cir. 1991)). And, as long as "the agency's objectives are reasonable," a court "will uphold the agency's selection of alternatives that are reasonable in light of those objectives." Id. (citing Citizens Against Burlington, 938 F.2d at 196; Slater, 198 F.3d at 867).

Indian River County contends that FRA shirked its duty to meaningfully consider alternatives by unreasonably deferring to AAF in two instances. The record, however,

demonstrates otherwise.  FRA properly considered AAF's goals for the project within reason and independently verified information provided by the company.

a. <u>Alternative routes</u>

The County first complains that FRA narrowly defined the purpose of the project to mirror AAF's goals.  This, in turn, led FRA to select "AAF's preferred corridor without adequately considering alternatives," including what the County suggested in a comment to the FEIS as a more appropriate route that would have avoided populated areas and aging railroad bridges.  Pls.' MSJ at 29–30; AR 64683.

Because the goals of a project delineate the universe of reasonable alternatives, the Court begins with FRA's stated goals for the project.  <u>See</u> <u>Union Neighbors United, Inc. v. Jewell</u>, 831 F.3d 564, 575 (D.C. Cir. 2016).  FRA defined the goal of the project as follows: to "provide reliable and convenient intercity passenger rail transportation between Orlando and Miami, Florida (the Project Corridor), by extending (in Phase II) the previously reviewed Phase I AAF passenger rail service between West Palm Beach and Miami and by maximizing the use of existing transportation corridors."  AR 73662; AR 65119.  In other words, the goal is to provide efficient rail transportation between Orlando and Miami without having to lay too many new tracks.  FRA also considered AAF's central economic goal—that the project be "sustainable as a private commercial enterprise."  AR 73672, 73674; AR 65119.  Contrary to the County's suggestion, considering AAF's goals was entirely appropriate:  Congress "expect[ed] agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action." <u>Citizens Against Burlington</u>, 938 F.2d at 199.

FRA's decision to evaluate alternatives "primarily in light of whether they could be constructed and operated in accordance with AAF's financial model," AR 73685; AR 65120,

was also appropriate:  "[W]here a federal agency is not the sponsor of a project, 'the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.'"  City of Grapevine, Tex. v. Dep't of Transp., 17 F.3d 1502, 1506 (D.C. Cir. 1994) (quoting Citizens Against Burlington, 938 F.2d at 197).

FRA considered four alternative routes, including the preferred FECR route, for connecting Orlando and West Palm Beach.  AR 15741; AR 73680–84.  As relevant here, FRA concluded that an alternative, inland route using tracks owned and operated by CSX Transportation was not feasible for a variety of reasons:  AAF did not have the operating rights needed for the CSX-owned route; it would need to purchase or lease land to create a new rail connector between the FECR route and the CSX route to connect Phases I and II; the route would require extensive upgrades to the track, grade crossings, and new infrastructure; trip times using the CSX route would exceed the 3 hour and 15 minute target for the project; and the CSX route would result in the highest potential adverse direct and indirect impacts to wetlands and protected species compared to the other routes.  AR 15757, 15760, 15765; AR 73681, 73686.

In response to the FEIS, the County proposed as another alternative the so-called "K Branch" route, which would partially run on CSX tracks.  See AR 64683.  FRA responded to this suggestion in Appendix C to the ROD by explaining that the K Branch route "would not meet the project purpose and need for the same reasons that the CSX alternative was dismissed in the EIS"—that is, the "route is controlled in part by CSX, and FRA concluded that it was not reasonable to assume that AAF could secure operating rights."  AR 65266.  Moreover, "the lack of control over operations and the longer route length would result in trip times exceeding the approximately 3-hour run time[] that is part of AAF's purpose."  Id.

This response makes clear that FRA did not, as the County argues, "refuse[] to consider" the K Branch route. See Pls.' Reply at 21. FRA considered the alternative, concluded it was not feasible for the same reasons as another infeasible alternative, and said as much. The case law does not require more. See Friends of Capital Crescent Trail v. Fed. Transit Admin., 877 F.3d 1051, 1063 (D.C. Cir. 2017) ("Agencies need not reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment favoring other alternatives."). As in Friends of Capital Crescent Trail, "[r]equiring more detail on rejected alternatives would elevate form over function." Id. at 1064.

b. Bridge alternatives

Second, Plaintiff contends that FRA did not independently review and verify AAF's assertions, presented in the FEIS at Table 3.3-14, that it was not feasible to construct alternatives to the existing bridges at the St. Lucie and Loxahatchee Rivers that would not result in increased vessel queuing. Pls.' Reply at 18; AR 73728. To advance its point, the County emphasizes that AAF "prepared the one-page table" of bridge alternatives "and there is nothing in the record to indicate that anyone at FRA reviewed the information before copying it *verbatim* into the FEIS." Pls.' Reply at 18.

But it is not dispositive that AAF or its consultant (rather than FRA) prepared the chart so long as FRA conducted an "independent review" of the information before including it in the FEIS. See Comm. of 100, 87 F. Supp. 3d at 211. There is a "presumption of regularity accorded to agencies in performing their duties." Id. (quoting Sierra Club v. Costle, 657 F.2d 298, 334 (D.C. Cir. 1984)). The County fails to rebut that presumption with any evidence that FRA failed

to independently consider reasonable alternatives for the bridges. In fact, the record supports FRA's assertion that it independently considered the bridge alternatives.

FRA posed 123 questions to AAF regarding the draft EIS. AR 38897. One of these focused on alternatives to the two moveable bridges. FRA commented that the "FEIS should evaluate other bridge options," including higher moveable bridges and fixed bridges that could support passenger and/or freight trains. AR 38930. In response, AAF prepared a chart that walked through those possible alternatives for the St. Lucie River and Loxahatchee River Bridges. Ultimately, the chart explains that the four alternatives are not feasible for a variety of reasons. AR 38931–32. And, contrary to the County's assertion that FRA simply copied and pasted this chart into the FEIS with no independent analysis, FRA replied to AAF's responses in an email: "we've done a preliminary review of the materials that AAF has provided in response to our questions. On the whole, these seem to answer the questions. *We're having our technical experts do further review on the analyses . . . .*" AR 39151 (emphasis added). And finally, FRA emphasized throughout the FEIS that "[a]s required by NEPA, FRA has reviewed the alternatives analysis, required AAF to evaluate alternatives other than the proposed action, and has verified the analyses." AR 73674. FRA's "statement[s] that it performed an independent review" of the materials provided by AAF "is afforded a presumption of validity, which [Plaintiff] ha[s] not rebutted." Comm. of 100, 87 F. Supp. 3d at 212. Rather, the record evidence contradicts the County's contention that FRA failed to independently evaluate and verify the analysis undertaken by AAF regarding bridge alternatives.

### 4. Noise impacts

The County next argues that FRA's analysis was inadequate under NEPA because, it contends, the agency failed to follow applicable guidance on evaluating the noise impacts of a

rail project.  Pls.' MSJ at 30.  Plaintiff identifies what it believes are two fundamental departures from agency guidance: FRA conducted a general, rather than detailed, noise analysis and FRA calculated, rather than measured, existing noise levels, which led the agency to omit a key source of noise in its analysis.

The ROD says that "[n]oise and vibration have been assessed according to guidelines specified in FRA's *High-Speed Ground Transportation Noise and Vibration Impact Assessment* guidance manual [and] the Federal Transit Administration's (FTA) *Noise and Vibration Impact Assessment* guidance manual."  AR 65131.  The FRA manual "provides guidance and procedures for the assessment of potential noise and vibration impacts resulting from proposed high-speed ground transportation [] projects."  AR 13032.[13]  The FTA manual does the same "for projects with conventional train speeds below 90 mph."  Id.  Both manuals outline three levels of analysis that may be used to determine the noise impact of a proposed project: an initial screening procedure, a general noise assessment, and a detailed noise analysis.  AR 13068, 13071, 13094; FTA, Transit Noise and Vibration Impact Assessment ("FTA Manual") (May 2006), at 1-4.[14] True to their names, the general noise assessment involves applying more "simplified models to estimate train noise," AR 13071, while the detailed noise analysis uses "more refined procedures . . . to predict project noise and evaluate mitigation measures" on a "site-specific" level, AR 13094–95.  The level of detail of the analysis affects when the analysis is typically

---

[13] This reference to high-speed ground transportation projects is not to be confused with "high-speed intercity rail facilities" referenced in 26 U.S.C. § 142(i)(1), discussed supra, which applies only to passenger trains capable of 150 mile-per-hour maximum speeds.  FRA's manual "is intended for projects with train speeds of 90–250 mph," AR 13032, which includes AAF's project.

[14] Available at:
https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/FTA_Noise_and_Vibration_Manual.pdf.

done: the general noise assessment can be conducted during the "early stages in the project development," AR 13068, while the detailed noise analysis will usually be conducted after "the preliminary engineering has been initiated, and the preparation of an environmental document (usually an Environmental Impact Statement) has begun," AR 13094.  Here, the agency conducted a general noise assessment while preparing the FEIS and concluded that, with the mitigation measures it required AAF to take, the project would actually result in less noise overall.  AR 73953.  It nonetheless required AAF to conduct a detailed noise analysis once "advanced engineering" is available for the project.  AR 65133.

The County argues that this approach represents an arbitrary departure from agency guidance.  The D.C. Circuit has sent mixed signals as to "[w]hether an agency must account for a departure" from its non-binding guidance.  See Friends of Blackwater v. Salazar, 691 F.3d 428, 435 (D.C. Cir. 2012) (describing the question as "not entirely clear" and citing conflicting authority).  In Sitka Sound Seafoods, Inc. v. NLRB, 206 F.3d 1175 (D.C. Cir. 2000), for example, it explained that because the guidance in question "does not bind the Board," "the relevant question is whether, quite apart from the [guidance], the Board acted unreasonably."  Id. at 1182.  In Edison Electric Institute v. EPA, 391 F.3d 1267 (D.C. Cir. 2004), by contrast, the Circuit stated that "the real question is whether [the agency] adequately accounted for any departures" from non-binding guidance because "any deviation from [such guidance] is not *per se* arbitrary and capricious."  Id. at 1269 & n.3.

But whether an agency is required to merely act reasonably or adequately account for departures from non-binding guidance, the Court concludes that FRA's approach in this case comports with NEPA.  As FRA explains, the noise-assessment manuals are "inherently flexible, and do not *require* the use of a particular level of analysis."  Fed. Defs.' MSJ at 43.  The County

does not contest that the relevant guidance is non-binding. In addition, the agency has explained why it prepared only a general assessment for purposes of the FEIS. According to the ROD, "Noise and Vibration Impacts for the north-south corridor relied on the [applicable guidance] methodologies appropriate for the level of design of the alternatives evaluated in the FEIS." AR 65132. Critically, "[b]ecause advanced engineering is now available for the north-south route, AAF will conduct [a] Detailed Noise and Vibration Assessment throughout the corridor." Id. Thus, the agency explained that it relied on a general noise assessment rather than detailed one because that was the level of analysis that was feasible at the time the FEIS was prepared. And the agency took the additional step of requiring AAF to conduct the more detailed analysis once more information became available and the more comprehensive analysis was feasible. While the agency certainly could have discussed the present infeasibility of a detailed analysis in more detail, the Court concludes that it has done enough to satisfy NEPA.

The County also argues that FRA unreasonably departed from agency guidance by calculating, rather than measuring, noise. Agency guidance explains that where, as here, "the proposed high-speed rail project corridor is to be shared with an existing rail transit corridor . . . noise measurements at representative locations along the corridor are essential to estimate noise accurately." AR 13080. This does not appear contingent on whether the agency conducts a general assessment or detailed analysis. Contrary to the guidance, Amec, the consultant that prepared the underlying technical memorandum that forms the basis of the noise information included in the FEIS, did not measure existing noise along the N-S Corridor. AR 61110. Instead, it calculated existing noise based on a variety of variables and then compared its calculations to the observed noise measurements of a 2010 Environment Assessment ("EA") for Amtrak along the same corridor. Id. In response to a comment from VHB and FRA regarding

the need to measure existing noise, Amec and AAF explained that "[e]xisting noise measurements for existing rail line operations (i.e., freight) have been completed through recent, previous studies. . . . Calculated noise levels were compared to analogous measured noise levels as verification of accuracy, with good agreement." AR 1325. But again, whether an agency is required to act reasonably or also adequately account for any departures from guidance, the FRA has adequately explained why it did not separately measure noise—Amec and FRA could validate their calculations based on recent noise measurements along the same corridor. The County's two counterarguments do not undermine this conclusion.

First, the County argues that by failing to measure existing noise, FRA omitted a key source of noise as a variable in its assessment of current noise levels: the use of warning horns along the mainline. Pls.' Reply at 23. To establish a baseline for its noise analysis, Amec modeled current noise by focusing only on existing freight operations, the primary source of noise along the N-S Corridor. AR 73772. As explained above, Amec calculated existing noise and then validated its calculations by comparing them to the measured noise in the 2010 Amtrak EA. AR 61110. Table 3-3 of the Amec noise analysis presents the difference between the calculated noise exposure and the observed noise exposure from the 2010 EA. Id. There is almost no difference between calculated and observed noise for crossings; there is, however, a sizable difference between calculated and observed noise for the mainline. Id.

What accounts for this difference on the mainline? Amec assumed that trains would only sound their warning horns at or near crossings, not on the mainline. Id. "However, based on documentation within the Amtrak EA, warning horns were observed at both the mainline and crossing monitoring locations." Id. Amec acknowledged that "[i]f warning horns were added to the calculated noise exposure for mainline conditions, noise levels would be the same as

calculated noise exposure for crossing conditions" and thus "within 1 dBA of the observed noise levels." Id. Amec did not explain why it assumed trains would sound their horns at crossings but not on the mainline.

The FEIS also does not explain why it likewise focuses exclusively on the use of warning horns at formal crossings. According to the FEIS, along the N-S Corridor, "noise impacts [from the project] would primarily be due to the increased frequency of warning horns use at *at-grade crossings*." AR 73950 (emphasis added). To mitigate this noise, the FEIS notes that "AAF has committed to installing stationary wayside horns at each of the 117 grade crossings between Cocoa and West Palm Beach where severe, unmitigated impacts would occur using locomotive-mounted horns." AR 73942. Wayside horns—which are pole-mounted horns that are quieter than train horns and sound only at the crossings—have "been shown to substantially reduce the noise footprint" at an intersection "without compromising safety at the grade crossing." Id. The FEIS concludes that adding these horns at grade crossings "will eliminate *all* severe noise impacts for residential and institutional receptors along the N-S Corridor." AR 73950 (emphasis added). This, says FRA, means that the Project will actually make grade crossings quieter than existing conditions (by 7 to 8 dBA) and will lead to a slight increase (by 0.2 to 0.3 dBA) along the mainline. AR 73953.

The County argues that FRA's conclusion overlooks the unmitigated noise from warning horns on the mainline. It turns out this is partially true. Both the agency and AAF confirmed at the hearing that the noise analysis did not take into account the use of warning horns along the mainline. Hr'g Tr. at 28:22–29:1; id. at 38:8–12. Even so, this omission is not fatal to the agency's satisfaction of its NEPA obligations. Like any agency, FRA's actions are "entitled to a presumption of regularity" and, if the Court "can 'reasonably discern' the agency's path, it

should uphold the agency's decision." <u>Weiss v. Kempthorne</u>, 580 F. Supp. 2d 184, 188 (D.D.C. 2008) (first quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971); then quoting <u>Pub. Citizen, Inc. v. FAA</u>, 988 F.2d 186, 197 (D.C. Cir. 1993)).

Although the agency certainly could have been clearer, the Court is able to reasonably discern the agency's rationale for not including the use of warning horns on the mainline as a variable in its noise analysis. As explained above, the FEIS concludes that "noise impacts [from the project] would primarily be due to the increased frequency of warning horns use at at-grade crossings." AR 73950. Implicit in this conclusion is that other sources of noise, including the use of warning horns along the mainline, were not significant contributors of noise. Although the agency neglected to expressly articulate why, the record suggests that the agency concluded mainline warning horns were not a significant source of noise because they would be used only rarely and randomly. In response to one of the County's noise-related comments on the FEIS, FRA explained that "[t]rain-mounted horns may still need to be sounded at all locations along the rail corridor under emergency conditions." AR 65289. This implies that the agency concluded that the use of mainline warning horns was both rare (because they would be sounded only in emergencies) and difficult to measure (because emergencies are unpredictable). This is consistent with counsel for AAF's representation at the hearing that the use of warning horns on the mainline is "a random immeasurable event" in response to unpredictable trespassing along the line. Hr'g Tr. at 39:17.

Under the rule of reason, the Court must consider the "practical limitations on the agency's analysis," including "the information available at the time" as well as the availability of appropriate modeling. <u>See</u> <u>Wilderness Soc'y v. Salazar</u>, 603 F. Supp. 2d 52, 61 (D.D.C. 2009) (citing <u>Transmission Access Policy Study Grp. v. FERC</u>, 225 F.3d 667, 736 (D.C. Cir. 2000); <u>N.</u>

Slope Borough, 642 F.2d at 600); WildEarth Guardians, 8 F. Supp. 3d at 34. Applying that principle, it makes sense for the agency to assume in its noise analysis that trains would use their warning horns on the mainline only in unpredictable "emergency conditions." Although the agency could have been more explicit in its reasoning, the Court can nevertheless discern why FRA did not consider the use of mainline warning horns.

Second, the County argues that Amec and FRsA overlooked the effect that a new "turnout" (that is, an additional line of track that allows a slower moving train to pull off the mainline to let a faster moving train pass) would have on the historic Lyric Theater in Martin County. But as AAF points out, FRA expressly considered the noise impact to historic sites like the theater and concluded "there will be no noise impacts" after the required mitigation. See AAF's Reply at 12; AR 74070, 74073 (Table 5.4.5-3). FRA responded similarly after receiving comments on the FEIS regarding the theater from Martin County. See AR 65276.

### 5. Changes to freight operations

Finally, the County contends that FRA expressly declined to consider the potential impacts of an increase in the speed of freight trains caused by the project's infrastructure improvements. Pls.' MSJ at 23–26. This argument lacks support in the record. In its comment about general effects on community character, Indian River County also expressed concern about freight trains, explaining that "freight operations can be anticipated to intensify with the Project, and the speed of freight trains will increase to up to 70 mph." AR 65268. FRA responded that the number of freight trains running along the N-S Corridor was higher as recently as 2006 and that "[a]ny potential changes to the existing freight operations along the FECR Corridor are outside the scope of this FEIS." Id. This response should not be taken to mean that FRA "specifically declined to consider" freight trains in the FEIS. See Pls.' Reply at 12. Rather, it

merely reflects that changes to existing freight operations—that is, the number of freight trains running—were not part of the federal action proposed.  And even if changes to existing freight operations or speeds were not specifically planned, they were anticipated and discussed in the FEIS.

The FEIS explains that the "addition of passenger rail service" to the N-S Corridor, where freight trains currently run, "would require modifying the mostly single-track system to a mostly double track system, which would be used by both passenger and freight operations.  This will improve freight efficiency by increasing average operating speeds."  AR 73907; see also AR 73733 (Table 3.3-16 depicting average freight train speed in Indian River County as 38.57 mph under the "No-Action Alternative" and 43.45 mph under the project); AR 73906 (explaining that under the No-Action Alternative, "freight speeds would not increase").  The FEIS ultimately concludes that this increased efficiency means "the Project would have beneficial impacts on future freight traffic along the N-S Corridor."  AR 73907.

Perhaps conceding that the FEIS at least discloses the potential for faster freight trains, the County faults FRA for not considering four *negative* impacts of project-related changes to freight operations: (1) the public-safety effect of faster freight trains, (2) increased noise and vibrations from faster freight trains, (3) the potential shift of freight traffic from day to night to accommodate the passenger-train schedule, and (4) the threat to the structural stability of the older St. Lucie River Bridge from faster freight trains.  Pls.' MSJ at 24.  The Court addresses these potential effects in turn.

a.   Public-safety impacts of faster freight trains

First, as explained supra Section II.B(1)(b), FRA determined that the project would have an overall beneficial effect on safety because AAF would be required to introduce a variety of

safety features, including a Positive Train Control system interoperable between passenger and freight trains as well as improved grade crossings. The agency was not required to separately analyze the public-safety ramifications of marginally faster (by 5 mph on average) freight trains given that these safety measures would benefit both passenger and freight trains, which the agency acknowledged would be moving at increased speeds.

   b.   Noise and vibration impacts of faster freight trains

Second, FRA offers two responses to the County's argument that its noise and vibration analysis overlooked an increase in freight speed: first, quite simply, the analysis *did* take "into account the characteristics of future passenger and freight rail operations, including speed," Fed. Defs.' MSJ at 37; and second, in any event, faster freight trains would not have "a significant impact on overall noise conditions" because FRA concluded that *warning horns* are the predominant cause of noise along the N-S Corridor, Fed. Defs.' Reply at 18. FRA's first argument is belied by the record but its disregard for noise from faster freight trains is harmless largely because of its second argument.

The record is clear that FRA's noise analysis does not consider the incremental noise increase from faster freight trains. Rather, the analysis takes into account freight trains only to establish the baseline level of noise based on calculated current freight operations. See AR 61108. The FEIS as well focuses on freight trains only to calculate the baseline, not as a potential source of additional noise based on an incremental increase in speed. That document discloses that the Project will "result in long-term noise and vibration adverse impacts," including "along the N-S Corridor due to the increase (greater than doubling) of vibration events as a result of adding passenger train service to the *existing* freight operations." AR 73942 (emphasis added).

The County raised its concern that the noise and vibration analysis does not account for faster freight trains in their comments on the FEIS. See AR 65289. It explained, "[t]he increases in freight train average operating speeds and maximum operating speeds as a direct result of the Project can be expected to increase noise and vibration. . . . None of these Project effects were taken into account in the general [noise] assessment." Id. FRA's response is similar to the one it advances here: "The FEIS addresses this issue as follows: . . . 'freight operations are expected to continue with a planned annual growth of 3 percent. This continued growth will likely result in marginal increases in noise levels through possible increases in train speed, frequency, and length.'" Id. (alterations in original) (quoting AR 73951). But critically, the FEIS cites to the *No-Action Alternative*, not the impact of the *project* and its attendant increase in freight train speed. FRA concluded that in the absence of the project, predicted growth in freight operations would lead to some changes in those operations' noise impact. But again, FRA's response demonstrates that the parties have been talking past each other on the specific issue of incremental noise increases from faster freight trains as a result of the project since the comment period on the FEIS.

The Court must therefore determine whether this omission was prejudicial. Under the APA, the Court "shall" take into account "the rule of prejudicial error." 5 U.S.C. § 706. "[T]he inquiry into whether a NEPA plaintiff suffered prejudice is well established in the relevant precedent." Standing Rock Sioux Tribe, 301 F. Supp. 3d at 74 (citing, e.g., Pub. Employees for Envtl. Responsibility v. Hopper, 827 F.3d 1077, 1087–88 (D.C. Cir. 2016)); see also Nevada, 457 F.3d at 90.

The Court concludes that the agency's failure to take into account potential incremental increases in noise from slightly faster freight trains was harmless. The reason is two-fold. First,

the FEIS anticipates that freight trains are to go only approximately 5 mph faster because of the Project. See AR 73733 (Table 3.3-16 reflecting a 4.88 mph increase in speed for freight trains traveling through Indian River County and a 5.30 mph increase in speed for freight trains traveling through Martin County). The County fails to convince the Court that this slight increase in speed would lead to a significant increase in noise. And second, the FEIS concludes that the main source of noise from the project would be the "increased frequency of warning horn use at at-grade crossings" rather than train-related noise. AR 73950. Indeed, the FEIS concluded that noise on the mainline would increase only marginally (by 0.2 to 0.3 dBA) from the addition of 32 high-speed passenger trains per day, AR 73953, suggesting that noise from the trains themselves pales in comparison to that of their horns at crossings.

### c. Noise impacts of nighttime freight trains

Third, in response to Indian River County's comment on the FEIS that adding passenger trains "is likely to shift freight trains to nighttime hours due to scheduling conflicts," FRA explained that "[f]uture passenger and freight train operations and the period of the day they are anticipated to occur has been analyzed based on FECR's anticipated future passenger and freight demands." AR 65289. The County fails to provide evidence that, contrary to this response, the noise analysis ignored the anticipated train schedule. Instead, Plaintiff points to Table 5.2.2-1, a table setting forth the "Proposed Passenger Rail Operations" which assumes two passenger trains per night and does not discuss freight trains. AR 73944. That this specific table does not reflect the timing of freight traffic does not prove that the agency did not do so at all. In fact, the Amec report clearly demonstrates that the noise analysis contemplated at least some nighttime freight traffic. That report explains that "[a]ccording to historical trends . . . , approximately half of the freight operations occur at night (10 pm to 7 am) and half during the day (7 am to 10 pm)." AR

61109.  Table 3-1 on that same page presents the "2016 Projected Existing Conditions Rail Operations (North-South Corridor)," which contemplates 11 freight trains per night.  Id.

### d. St. Lucie River Bridge and faster freight trains

And fourth, the County faults FRA for not including "discussion of the vibration impacts to the structural stability of the St. Lucie Bridge from the increased use and train speeds."  Pls.' MSJ at 24.  But an agency need not discuss an impact that is "merely conceivable" and, at its worst, minimal:  AAF determined that the bridge is "structurally sound," AR 73727, and in any event, freight trains were projected to go just 5 mph faster over the bridge.

\*       \*       \*

Agency action is rarely perfect.  But NEPA does not demand perfection.  Instead, it requires that an agency take a "hard look" at the reasonably foreseeable impacts of a proposed major federal action.  The extensive FEIS, appendices, comment responses, and Record of Decision together demonstrate that FRA met that requirement here.  The Court will therefore grant Defendants' and Intervenor-Defendant's motions for summary judgment on Indian River's NEPA claim, and deny the County's motion for summary judgment on that claim.

### III. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment, grant Intervenor-Defendant's Motion for Summary Judgment, and deny Plaintiff's Motion for Summary Judgment.  A separate Order shall accompany this Memorandum Opinion.


Date: <u>December 24, 2018</u>

_____
CHRISTOPHER R. COOPER
United States District Judge