```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2       - - - - - - - - - - - - - - - x
        MARTIN COUNTY FLORIDA, et al.,
3                                           CA No:  1:18-cv-00333-CRC
                        Plaintiffs,
4                                           Washington, D.C.
                                            Tuesday, November 27, 2018
5       vs.                                 10:55 a.m.

6       U.S. DEPARTMENT OF TRANSPORTATION,
        et al.,
7
                        Defendants.
8       - - - - - - - - - - - - - - - x

9       _____

10                      TRANSCRIPT OF MOTION HEARING
              HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                      UNITED STATES DISTRICT JUDGE
        _____
        APPEARANCES:
12      For the Plaintiff   PHILIP E. KARMEL, ESQ.
        Indian River:       BRYAN CAVE, LLP
13                          1290 Avenue of the Americas
                            New York, NY 10104
14                          (212) 541-2311
                            pekarmel@bryancave.com
15
        For Defendant DOT:  BARBARA M.R. MARVIN, ESQ.
16                          U.S. DEPARTMENT OF JUSTICE
                            Environment & Natural Resources Division
17                          601 D Street, NW
                            Washington, DC 20004
18                          (202) 305-0240
                            barbara.marvin@usdoj.gov
19
        For Defendant AAF:  EUGENE ERNEST STEARNS, ESQ.
20                          MATTHEW W. BUTTRICK, ESQ.
                            STEARNS WEAVER MILLER WEISSLER
21                          ALHADEFF & SITTERSON, P.A.
                            150 West Flagler Street, Suite 2200
22                          Miami, FL 33015
                            (305) 789-3200
23                          estearns@stearnsweaver.com
        (Continued on Next Page)
24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription
```

```
 1      APPEARANCES (CONTINUED):

 2      For Defendant AAF:    DAVID HYLER COBURN, ESQ.
                              CYNTHIA LUCILLE TAUB, ESQ.
 3                            STEPTOE & JOHNSON LLP
                              1330 Connecticut Avenue, NW
 4                            Washington, DC 20036
                              (202) 429-8063
 5                            dcoburn@steptoe.com

 6
        Court Reporter:             Lisa A. Moreira, RDR, CRR
 7                                  Official Court Reporter
                                    U.S. Courthouse, Room 6718
 8                                  333 Constitution Avenue, NW
                                    Washington, DC  20001
 9                                  202-354-3187

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2             THE COURTROOM DEPUTY:  Good morning.  We are here

 3      for Civil Matter 18-333, Martin County, Florida, et al. vs.

 4      The U.S. Department of Transportation, et al.

 5             Counsel, please approach this lectern and identify

 6      yourselves for the record.

 7             MR. KARMEL:  Good morning, Your Honor; Philip

 8      Karmel from the Bryan Cave Leighton Paisner law firm on

 9      behalf of plaintiffs, Indian River County and Indian River

10      County Emergency Services District.  At counsel table with

11      me is Kate Pingolt-Cotner, assistant county attorney from

12      Indian River County, as a client representative.

13             THE COURT:  Okay.  Good to see you, Mr. Karmel.

14             MR. KARMEL:  Thank you.

15             THE COURT:  Ms. Cotner, welcome.

16             MS. MARVIN:  Good morning, Your Honor; Barbara

17      Marvin for the federal defendants, and with me at counsel

18      table is Charles Enloe, counsel with the office of general

19      counsel at the Department of Transportation.

20             THE COURT:  Okay.  Welcome.

21             MR. STEARNS:  Good morning, Your Honor; Gene

22      Stearns and Matt Buttrick from Stearns Weaver in Miami, and

23      also from Steptoe & Johnson:  David Coburn, Cynthia Taub,

24      and Brady Cassis.

25             THE COURT:  Okay.  Mr. Stearns, good to see you
```

1    again.

2            MR. STEARNS:  Thank you, Your Honor.

3            THE COURT:  All right.  So we are obviously here

4    for two challenges related to the Department of

5    Transportation's provisional allocation of $1.15 billion in

6    public activity bonds to fund construction of the West-Palm-

7    Beach-to-Orlando phase of the AAF railroad project.  The

8    challenges are twofold:

9            First, the adequacy of the August 2015

10   environmental impact statement prepared by the Federal

11   Railway agency and the December 2017 related record of

12   decision, which selected AAF's preferred route as the best

13   alternative for the project and determined that no further

14   environmental review was necessary;

15           And second, a challenge to the Department of

16   Transportation's statutory authority to allocate the bonds

17   for the project given, one, the particular type of project

18   it is and, two, that the governments of neither Indian River

19   nor Martin County approved the project.

20           Mr. Karmel, I'm happy to take those two issues in

21   whatever order you would like to begin.  What I'd like to do

22   is to at least target about 45 minutes for each issue and to

23   do them one at a time, and we might take a brief break

24   depending on where we are between the two.  Does that make

25   sense?

1                    MR. KARMEL:  Thank you, Your Honor.

2                    THE COURT:  Okay.  So you're the last man

3         standing, huh?

4                    MR. KARMEL:  Yes, sir.

5                    THE COURT:  Okay.

6                    MR. KARMEL:  So I'm going to start with the NEPA

7         issue, the EIS issue.

8                    THE COURT:  Okay.

9                    MR. KARMEL:  We've briefed a number of

10        deficiencies in the EIS.  For purposes of this morning's

11        argument, I'm going to focus on two of them -- public safety

12        and noise -- and we'll rest on our briefs with respect to

13        the other issues.

14                    THE COURT:  Very well.

15                    MR. KARMEL:  So let's start with public safety.

16                    To appreciate the issue here, the Court needs to

17        understand the urban context of this railroad line.  The

18        Court may be familiar with -- certainly I am, as a New

19        Yorker -- the Amtrak line between New York and Washington,

20        D.C.  That is on a raised embankment with fencing.  There

21        are no at-grade crossings between New York and Washington,

22        D.C., meaning roads do not cross the train tracks.  They go

23        above or they go below, and it's separated from the

24        communities around it.

25                    This is completely different.  This rail corridor

1    runs through the eastern coast of Florida, which is the

2    eastern portion of the counties, which is the most populace

3    areas, through highly urbanized areas.

4            So this is a photograph from the record, AR 49457.

5    It shows the rail corridor here and then densely developed

6    housing on both sides of the rail corridor.  This is from

7    the city of Vero Beach.  That is necessary to really

8    understand the context of why there's a safety issue here.

9            We know that trespassing across the corridor is a

10   major problem between the crossings.  You have communities

11   on both sides, and trespassing is a problem.  In fact, the

12   FRA engineer who did a field visit of the area said that

13   trespassing was epidemic along this corridor, and it's a

14   major public safety issue.

15           Don't take my word for it.  Take the FRA's word

16   for it.  There's a guidance document in the record called

17   "The Highway-Rail Grade Crossing Guidelines For High-Speed

18   Passenger Rail."  It can be found at AR 51729 of the record.

19   This is published by the FRA, and according to this guidance

20   document on Page 13, it says that "High-speed passenger

21   trains are difficult to detect visually and can be virtually

22   silent until their arrival at any given location."  And it

23   goes on to say on the next page, at Page 14, "Trespassing on

24   railroad property is the single largest cause of deaths

25   associated with railroad operations.  HSR lines" -- meaning

1    high-speed rail lines -- "should be clearly posted against

2    entry, and consideration should be given to the use of

3    tamper-resistant fencing, video surveillance, and similar

4    measures in high-traffic areas."

5          So this is an important issue from the standpoint

6    of the FRA.

7          Now, in the DOJ reply memo they say, "Well,

8    trespassing is illegal."  That's true.  But that doesn't

9    mean you don't --

10         THE COURT:  Assume I disagree with that argument,

11   okay?

12         MR. KARMEL:  Okay.

13         THE COURT:  Assuming I agree with you that, while

14   it may be illegal, it is reasonably foreseeable to the FRA,

15   and agencies are required to take into account reasonably

16   foreseeable consequences of a project.

17         MR. KARMEL:  Okay.

18         THE COURT:  Certainly the FRA considered the issue

19   of trespasser fatalities.

20         MR. KARMEL:  It was not considered, Your Honor,

21   and I will explain -- I will justify that conclusion to the

22   Court.

23         THE COURT:  There is certainly a table in the EIS

24   that sets forth what the FRA concluded to be a low number of

25   fatalities.  Isn't that --

1          MR. KARMEL:  Well, there is a table in the EIS.

2     We know it's not accurate.

3          THE COURT:  Well, that's a different question.  If

4     there's a table that has data in it that they included in

5     the EIS, why isn't it the case that they considered it?

6          MR. KARMEL:  The issue was identified, but a hard

7     look was not taken, and there is no reasoned elaboration of

8     the basis of the conclusion.  And both of those are legal

9     deficiencies.

10          In the record, AR 64675, these were comments that

11     Indian River County submitted to the FRA in connection with

12     the EIS.  We say in our comments, "One would not even know,

13     reading the FEIS, that 160 people have been killed on the

14     FECR freight line from 2005 to 2014."  That's in the record,

15     and there's now affidavits that have been submitted to the

16     Court that explain why -- that substantiate that statement,

17     that comment that Indian River County made in the record

18     using the same database that is cited in the EIS.

19          THE COURT:  Okay.  Let's talk about the data.

20          I've read your affidavit.  It says that there were

21     107 fatalities, and I believe it is not at grade crossings;

22     is that correct?  Or --

23          MR. KARMEL:  I don't believe the database

24     distinguishes between grade crossings and other fatalities.

25          THE COURT:  Okay.  So if I agree with the

1    defendants that AAF's required grade crossing mitigation

2    improvements will take care of or at least the agency

3    reasonably concluded that that will address trespassing at

4    grade, do you contest the FRA's conclusion that there were

5    only 10 non-at-grade fatalities in the relevant counties

6    during the relevant time period?

7              MR. KARMEL:  Well, we do contest that.  It's not

8    supported by the data.

9              But the premise of the Court's question, with all

10   respect, is not accurate.  This is what All Aboard Florida

11   said in the reply memo, that there's mitigation for

12   pedestrian crossings or pedestrians crossing the main line,

13   not at grade crossings.  That is not accurate.

14             The mitigation is set forth in the record of

15   decision.  Table 5-1 in the record of decision has

16   construction mitigation.  Table 5-2 of the record of

17   decision has operational mitigation.  There is no mitigation

18   whatsoever for the informal crossings that exist between the

19   street crossings for pedestrians.  It's not there.

20             The only mitigation relating to safety in the

21   record of decision is on Page 35 of the record of decision,

22   which requires that All Aboard Florida implement certain

23   grade crossing enhancements.  Nothing about trespassing

24   along the main line.

25             And this is a critical issue.  Again, don't take

1    my word for it.

2              THE COURT:  So let's just -- let me just get this

3    clear.

4              MR. KARMEL:  Yes.

5              THE COURT:  There are two places that trespassers

6    can be hit by trains.  One is at a place where the train

7    intersects a roadway, and we're calling that grade crossing.

8              All right.  The other place is what you're

9    referring to as the main line.  That's not where a road

10   intersects the train.

11             Okay.  If I read Table 4.4.4-2 of the record, it

12   says there were ten fatalities between Cocoa and Miami not

13   at grade crossings.  That's the FRA citing statistics from

14   its database.  Why do you contest that figure?

15             MR. KARMEL:  I don't believe it's supported by the

16   database, but it's really not the issue.

17             These are the fatalities for the freight train.

18   What we're here to discuss today is whether there was an

19   adequate environmental impact statement for the passenger

20   train which goes much faster and is less noisy and is much

21   more dangerous, according to the FRA guidance document that

22   I showed the Court at the beginning of the argument.  And

23   whatever the historical data may be, that doesn't tell you,

24   without more analysis, that there's no threat with respect

25   to the passenger trains.

1           There have been several fatalities with respect to

2     the passenger trains.  In fact, there was one last Friday in

3     Brevard County.  And that's for Phase 1 of the project,

4     which is in operation.

5           As is discussed in the briefing, VHB is an

6     environmental consulting firm that was retained by FRA to

7     assist FRA in the process of preparing the environmental

8     impact statement.  The way this works is All Aboard Florida

9     prepares technical studies, submitting it to VHB and FRA for

10    review.  They provide comments on those studies, and the EIS

11    emerges out of that process.

12          There was a Technical Memorandum No. 1 which set

13    forth the -- and all this is in the record -- set forth the

14    methodology for the EIS, and VHB had a comment on that study

15    on Technical Memorandum No. 1.  This is found at Page AR

16    1317.  And the VHB comment says, "With the proposed

17    passenger trains traveling at faster speeds and with

18    increased passenger and freight train frequency in the

19    corridor, details need to be provided in the description of

20    the alternatives that identify the safety systems that will

21    be implemented within the train alignment and at grade

22    crossings."  That was their comment, and it goes on to

23    explain why that's important.

24          And what's the answer?  The answer from All Aboard

25    Florida is, "The analysis will include a discussion of at-

1    grade crossing safety systems."

2          So this issue was identified by FRA's

3    environmental consultant.  When I say "this issue," I mean

4    safety along the main line, or in this document it's called

5    the train alignment.  VHB said, "Hey, include something

6    about the safety systems there," and All Aboard Florida

7    essentially refused and said the EIS would focus on the

8    grade crossings exclusively.

9          So what do we know about the safety along the

10   alignment?  What do we know about that?  What's in the EIS

11   about that?

12         Well, the city of Vero Beach, which is in Indian

13   River County, submitted a comment on the EIS and said, "What

14   do we" -- "Is there fencing?  What does the hazard analysis

15   say?"

16         The response to comment, which is Appendix C of

17   the record of decision -- and this can be found on AR 65266

18   of the record.  I apologize for the small type.  But FRA's

19   response is, "AAF has notified FRA that a hazard analysis,

20   including an analysis of fencing, will be performed under

21   the requirements and time frames of the FRA system safety

22   plan regulatory structure pursuant to 49 CFR 270."

23         So what we know is that at some point in the

24   future there will be a hazard analysis that will be

25   submitted to the FRA.  FRA will presumably review it, and

1   there may be some safety systems put in for the main line.

2          Does that comply with NEPA?  The answer is no.  It

3   subverts the fundamental purpose of NEPA in two respects.

4          One, the public, including my clients, were

5   complete -- are completely cut out of the process.  We have

6   no ability to comment on proposed safety measures on the

7   main line.  We're not involved in the system safety

8   analysis.

9          Incidentally, under the regulations, the safety

10  measures do not even have to be implemented until three

11  years after the train goes into operation.  We made that

12  point in our brief.  There was no response to that in the

13  reply memos.

14         The second way it subverts the purpose of NEPA is

15  that, according to Supreme Court case law, the purpose of

16  NEPA is to give relevant information about potential

17  environmental consequences to decision-makers so they can

18  look before they leap.  So the decision-makers at the DOT

19  who approve these private activity bonds were supposed to

20  have before them relevant information about critical

21  environmental issues pertaining to this project, and they

22  did not.  All they were told is -- all they were told on

23  this issue is there would be a study sometime in the future

24  and something might be done, and that does not comply with

25  NEPA.

1          I'm now going to move on to the noise issue.

2          THE COURT:  Okay.

3          MR. KARMEL:  Noise is a critical issue for trains

4     because trains can make a lot of noise, and it bothers

5     communities.

6          Again, don't take my word for that.  Look at the

7     FRA guidance document, which is in the record beginning at

8     Page AR 13022.  This is discussed extensively in the briefs.

9     "High-speed ground transportation noise" --

10         THE COURT:  Mr. Karmel, I'm going to ask you to

11    hold on one second.

12         (Pause)

13         THE COURT:  Okay.

14         MR. KARMEL:  Okay.  So this guidance document is

15    discussed extensively in the briefs, and in the record, in

16    the FEIS, and the record of decision the FRA repeatedly says

17    that they complied with this guidance, and the noise

18    analysis was prepared in conformance with this guidance.

19    And as we're going to see, that is inaccurate in important

20    respects.

21         This noise -- the noise issue is absolutely

22    critical.  According to this guidance document, Page 1-1,

23    "Experience during previous environmental impact reviews of

24    high-speed rail projects has shown that possible increases

25    in noise and vibration are frequently among the potential

1    impacts of most concern to residents in the vicinity of a

2    proposed project."

3          So noise is a critical issue for rail projects,

4    especially when they run by residential neighborhoods, and

5    it's for that reason why FRA published this guidance

6    document.  In fact, the guidance on the same page says,

7    "This manual provides guidance on conducting noise and

8    vibration impact assessments for NEPA studies."

9          There are two respects in which the EIS fell

10    woefully below the standards set by FRA's own guidance

11    document.

12          The first is that the guidance requires that noise

13    measures -- noise measurements be taken before the analysis

14    is prepared that provide a foundation for the noise study

15    that's supposed to be in the EIS.  In fact, this is required

16    even for a general assessment.  As discussed in the briefs,

17    the EIS relied on a general assessment rather than a

18    detailed assessment.  But even for a general assessment,

19    noise measurements must be taken, and that was not done

20    here.

21          If we look at the guidance document, Page AR

22    130808 of the record -- it's Page 4-13 of the guidance

23    document -- it talks about a situation exactly applicable to

24    our situation where you have a new passenger railroad on an

25    existing rail corridor, a shared rail transit corridor as

1    it's stated in this document.  What the guidance document

2    says is, "In such cases, noise measurements at

3    representative locations along the corridor are essential to

4    estimate existing noise accurately."  That's what it says.

5    So they didn't follow their guidance.

6          Does it matter?  What is the significance of this?

7          It's highly significant because there was a study

8    that was done, Technical Memorandum 5, which my clients did

9    not receive until after the FEIS was published, and if -- on

10   Page 3-3 of that study -- this is AR 61110 of the record --

11   this is a write-up by AAF's noise consultant about the noise

12   analysis.  The tables in this TM5 are the basis of the EIS.

13   All the EIS tables are simply drawn from this Technical

14   Memorandum No. 5.

15         And what this document says is that the -- instead

16   of taking noise measurements, the consultant simply did

17   noise projections based on computer models, and they said,

18   "Well, how do these compare to actual data?"

19         What they were able to do is they found a prior

20   EA, an environmental assessment, from a prior Amtrak

21   proposal along the same corridor where, in conformance with

22   the guidance, some noise measurements were taken, and what

23   they observed is that the assumed measurements which were

24   used for the basis of our EIS were very, very different than

25   the actual observed measurements from the prior EA, which

1    was based on real data.

2              If you look at the main line row of this table --

3    that's what we're talking about, is noise along the main

4    line; not at crossings, in other words -- the Leq is 66.5.

5    That's what they calculated.  That's the dBA noise over a

6    one-hour averaging period, is 66.5.  Actual measurement is

7    73.0.

8              Noise is on a logarithmic scale.  An increase of

9    10 dBA is twice as much noise, so 66.5 and 73.0 are very,

10    very different numbers.

11              The Ldn -- that's also explained in a footnote in

12    the brief, what that is.  It's a 24-hour average weighted to

13    give nighttime noise, which is more --

14              THE COURT:  Your point is that this is the way

15    that it should have been done.

16              MR. KARMEL:  This is the way it should have been

17    done.  It was not done.

18              The explanation from AAF's consultant as to the

19    discrepancy is that the Amtrak EA concluded that the freight

20    trains blow their warning horns when they're not at grade

21    crossings.  Not surprising, because there's a lot of people

22    on both sides, and we know trespassing is epidemic.  I'm not

23    complaining about that.  That may be an appropriate safety

24    measure.  But that's a lot of additional noise that was

25    never taken into account in the EIS.

1      The EIS assumed that the All Aboard Florida

2      passenger trains will not be blowing their horns at all on

3      the main line or at most of the crossings because they are

4      going to put pole-mounted horns on 117 of the crossings.  So

5      it was a major noise source that was not included in the EIS

6      analysis departing from the guidance even for a general

7      assessment.

8          Now --

9      THE COURT:  Okay.  Back up one step.  Do you agree

10     that it was reasonable for the FRA to conclude that the

11     primary source of noise was the horns or would be the horns

12     as opposed to just the noise of the trains passing by?  So

13     is the noise analysis you're talking about confined to the

14     horns?

15     MR. KARMEL:  As far as I know.  I mean, since --

16     you know, a plaintiff is always in a difficult situation.

17     When an analysis was not done the way it was supposed to be

18     done, by definition, there's information we don't have.

19         You know, I can't tell you exactly what the

20     results would be if an analysis was done properly.  If no

21     hard look is taken at an issue, there's a deficit of

22     information, and I can't represent to you that if the study

23     was done the only thing that would be a problem are the

24     warnings, the horns.  I just -- you know, we don't know

25     because the proper analysis was not done.

1              If we look at Chapter 5 of this guidance document,

2     which is "Detailed Noise Analysis," it says -- and, again,

3     this is AR 1309, for the record.  It says that a detailed

4     noise analysis is appropriate for an EIS.  It's very clear.

5              In their reply memo, All Aboard Florida -- this is

6     on Page 11 of the reply memo -- they say that the plaintiffs

7     have missed a critical issue because the -- even this

8     document, even the guidance document, doesn't require a

9     detailed noise assessment in an EIS.  And they quote Page

10    13201 of the record, which is a page from this guidance

11    document.

12             With all respect, that was a completely misleading

13    selective citation.  If we actually look at that page of

14    the record which is cited in the AAF reply memo, what it

15    says is -- and I have the highlighted language here.  This

16    is Page 13201 of the record.  It says, "The final

17    environmental document will rely on a general assessment for

18    ground-borne violation and noise to identify potential

19    problem areas."

20             So what that's referring to is noise through the

21    ground.  The trains go by.  It creates vibration.  That

22    itself creates noise.  I don't have time to discuss the

23    whole paragraph, but the Court will look at it, I'm sure.

24    That is ground-borne noise.

25             Our claim is not that they should have done a

1    detailed noise assessment of ground-borne noise.  That was

2    kicked off to a later study, and that's fine.  That's

3    consistent with the guidance.  Our claim is that they should

4    have done a detailed noise assessment of noise from warning

5    horns and from the trains themselves.  When like a car

6    whizzes by on the road, it creates noise, the same is true

7    for trains, especially a large train going over 100 miles an

8    hour close to a residential neighborhood.

9           That was not done.  It's a departure from

10   guidance.  No rational explanation is provided in the record

11   for departing from the guidance.  In fact, the record says

12   inaccurately that they complied with the guidance, which is

13   completely untrue.

14          If you go back to -- and this is the last point

15   I'm going to make under NEPA under noise.  If you go back to

16   the page I showed the Court earlier, 13094 of the record,

17   the guidance document tells us what information you need to

18   do a detailed noise analysis.  And it says you need the type

19   of vehicle equipment to be used, train schedules, speed

20   profiles, plan and profiles of guideways, locations of

21   access roads, land form topography.  That's what you need.

22          We have all of that.  All of that data is in the

23   EIS.  All of the information was available, and they decided

24   not to take a hard look at it.  And, again, this subverts

25   the fundamental purpose of NEPA because the decision-makers

1    did not have relevant information, and the public is cut out

2    of the process.

3             They realized this at the last minute, apparently,

4    and in December of 2017 they said in the record of decision,

5    "Oh, do a detailed noise assessment the way it was supposed

6    to have been done in the EIS."  That -- "and mitigate to the

7    extent identified in that study."  That is not adequate

8    because the public is cut out of the process, and we don't

9    know today whether it's even possible to mitigate the noise

10   impacts.  There may be some noise that can be mitigated, but

11   there may be unmitigated severe noise impacts that are

12   revealed in that detailed noise assessment and that simply

13   can't be mitigated because of the proximity of the trains to

14   the community and other factors that make it impossible to

15   mitigate the noise.  And that -- there's no knowledge by the

16   decision-makers of that potential for severe unmitigated

17   noise impacts, and that's not solved by a post-EIS study.

18             THE COURT:  If I agree with you that there were

19   certain deficiencies in the NEPA analysis in the EIS, what's

20   the proper remedy?

21             MR. KARMEL:  The proper remedy, Your Honor -- we

22   briefed this in our opening brief -- is vacatur of the PAB

23   approval and remand for further NEPA compliance.

24             THE COURT:  What if the Court were to remand

25   without vacatur?  What effect would that have on the

1    issuance of the bonds, or should it have, in your view?

2           MR. KARMEL:  Well, it may, as a market matter,

3    interfere with the marketing of the bonds, but it would be a

4    wholly inadequate remedy.

5           The presumptive remedy under the Administrative

6    Procedure Act is vacatur.  The D.C. Circuit case law is

7    clear on that.

8           There is an exception, and we briefed the

9    exception to the Court.  The exception does not apply here.

10   There is no urgent need to issue these bonds.  They've been

11   kicking around for years.  There is no disruption of the

12   status quo from vacating the PABs' approval, and it would be

13   a wholly inadequate remedy to allow the approval to remain

14   in place while requiring new environmental analysis.

15          THE COURT:  Okay.

16          MR. KARMEL:  Because, again -- because the purpose

17   of NEPA is look before you leap.  The decision-makers who

18   approved the PABs' approval is supposed to have that

19   information available to them.

20          THE COURT:  Very well.  Thank you.

21          MR. KARMEL:  Thank you.

22          THE COURT:  Ms. Marvin.

23          Why don't you focus on the safety and the noise

24   issues.

25          MS. MARVIN:  Yes, Your Honor.

1          Briefly, in beginning to do that in accordance

2     with the Court's direction, I do, however, want to reiterate

3     the adequacy of the -- not only -- not merely adequacy, but

4     thoroughness of the Department of -- of Federal Railroad

5     Administration's NEPA analysis.  As you're aware, no doubt

6     from the briefs, the NEPA process was thorough and amply

7     satisfied by hard look as both -- just to briefly touch on

8     this, as both federal defendants in All Aboard Florida

9     reiterated in briefs, but I do believe it bears emphasis

10    again.

11          FRA's environmental evaluation took two years to

12    complete.  There were numerous public meetings attended by

13    people in the affected communities, including both the

14    current plaintiff, Indian River County, and Martin County,

15    their representatives.  And FRA reviewed -- received,

16    reviewed, and responded to more than 15,000 comments.  They

17    took a hard look at the public safety -- at the

18    environmental impacts of the project generally, particularly

19    including public safety and certainly including noise

20    impacts.

21          Plaintiffs are, we believe, we would argue,

22    flyspecking the FRA's analysis and coming up with some

23    inconsistencies, some impacts that they would like us to

24    have looked at or to have fully -- to more fully discussed

25    in the FEIS, but that does not defeat -- their complaints

1    about the adequacy do not defeat the hard look.

2              THE COURT:  But is the Court to view it as a

3    whole?  If one particular aspect or one particular impact

4    was not sufficiently studied, can I disregard that because,

5    you know, the whole thing is 800 pages?

6              MS. MARVIN:  No, not -- no, I'm not suggesting

7    that, Your Honor.

8              THE COURT:  Okay.

9              MS. MARVIN:  What I suggest --

10              THE COURT:  So we still have to look at the

11    constituent parts to see whether the agency took a hard look

12    at each --

13              MS. MARVIN:  That's correct, but it would not

14    necessarily justify invalidating the entire FEIS --

15              THE COURT:  Understood.

16              MS. MARVIN:  -- if there were a finding of

17    insufficiency or a possible insufficiency as to certain

18    aspects only.

19              THE COURT:  Understood.

20              MS. MARVIN:  With regard to public safety and

21    transport -- and trespassing, I'm sorry, Mr. Karmel

22    implies that we did not take a look at an -- an adequate

23    look at trespassers' safety in one particular narrow area.

24    We did -- the FRA did acknowledge that there's epidemic

25    trespassing along the corridor.  That happens.  People try

```
 1   to beat the trains all the time, and apparently that is a

 2   significant risk in this corridor.

 3            But FRA didn't overlook that risk.  To the

 4   contrary, it responded by recommending improved --

 5   mitigation -- requiring mitigation as improving the

 6   crossings, requiring incentives for -- reducing incentives

 7   for trespassing, and directing pedestrians through warning

 8   signs and a variety of measures to safer alternatives and

 9   installing fencing.

10            THE COURT:  I was somewhat confused by the extent

11   of the recommendation to install fencing.  Is it a

12   recommendation?  Is it part of the mandatory mitigation

13   measures?  Is it affected at all by the settlement that was

14   reached with Martin County?  Are there provisions in other

15   counties to provide fencing on the main line?

16            MS. MARVIN:  My understanding is that fencing is a

17   binding mitigation measure.

18            I would defer to All Aboard Florida to -- their

19   counsel to discuss the terms of the settlement and how

20   fencing is affected by that.  I frankly don't have the

21   answer to that.

22            THE COURT:  Okay.

23            MS. MARVIN:  FRA -- plaintiffs argue that FRA

24   didn't provide a sufficiently detailed analysis regarding

25   trespassers' safety, but as I said, we did take a third
```

1    look -- thorough hard look.  We considered the possibility

2    of increased risk and responded by improving the crossings,

3    reducing -- recommending signage and binding mitigation

4    measures.

5         It's my understanding that All Aboard Florida has

6    also implemented an education program, Florida Operation

7    Lifesaver.  There's information about that in the record at

8    AR0044916.  And Federal Railroad Administration itself is

9    involved in continuing education about trespassers' safety.

10        THE COURT:  Can you illuminate at all the

11   discrepancies in the data that both sides have presented on

12   fatalities at nongrade crossings?

13        The FRA seemed to conclude that they were

14   relatively low and used that as a basis for whatever

15   mitigation measures it recommended.

16        The plaintiffs suggest that data from the same

17   database cited by FRA reveals a much higher level of

18   accidents and, indeed, fatalities at non-at-grade crossings.

19        MS. MARVIN:  There's a lot of data in the FEIS.

20   There are several ways -- and in the tables.  There are

21   several ways to read those charts, and we believe that the

22   ten fatalities -- you're referring now to the figure of ten

23   fatalities that -- apart -- away from grade crossings; is

24   that correct, Your Honor?

25        THE COURT:  That's correct.

1          MS. MARVIN:  And there are several ways to read

2     those data.  I don't have a clear understanding of exactly

3     how FRA pulled that out from the data they were looking at,

4     but they did collect data and had a reasonable basis for

5     that.

6          The other point I would make with --

7          THE COURT:  Okay.  Now, let me interrupt you.

8     Address Mr. Karmel's point that that data is from the

9     existing freight operations of the corridor and that the EIS

10    does not take into account the passenger operations or the

11    expected passenger operations on non-at-grade fatalities and

12    accidents, or, in other words, where does the EIS take on

13    that issue?

14         MS. MARVIN:  I think that was what I was about to

15    discuss with regard to not -- fatalities at nongrade

16    crossings.

17         It's very hard on a line not yet built to predict

18    where those kinds of fatalities -- we know where crossings

19    are going to be in advance.  You know, that's part of the

20    design of the project itself.  It's very hard to predict in

21    advance where these might occur, and so that is properly the

22    subject of later analysis.  The analysis that FRA is

23    required -- hazard safety analysis -- required to do.  There

24    are simply too many permutations for FRA to be expected to

25    address every single one at the NEPA EIS stage.

1          Moving on, if I may, Your Honor, to the noise

2     impacts of the project.

3          THE COURT:  Yes.

4          MS. MARVIN:  Again, here FRA -- here, I'm sorry,

5     plaintiffs make a point of -- are not having -- FRA's not

6     having observed the guide -- the FTA -- FRA FTA guidance.

7     First I want to reiterate, as we've said in our briefs on

8     reply, I believe, that the guidance -- that guidance is

9     nonbinding on the agency, and to the extent that there was a

10    departure from the guidance, we don't have to explain that.

11         However, there wasn't a departure.  That guidance

12    is flexible.  It doesn't mandate a particular level of

13    analysis.  It merely says, for example, that following the

14    guidance may be appropriate in certain circumstances.

15         And in any case, as we've amply briefed in both of

16    our briefs on summary judgment, FRA performed a thorough

17    analysis of noise impacts, and plaintiffs can't show that

18    the analysis was unreasonable.

19         THE COURT:  Well, even if the primary source of

20    noise are the horns, where in the EIS does it consider the

21    use of horns on the main line as opposed to at grade

22    crossings?

23         MS. MARVIN:  That is not considered, Your Honor.

24    However --

25         THE COURT:  Okay.  Why was it reasonable not to

 1    consider?

 2              MS. MARVIN:  I would note that even had a

 3    detailed analysis been done -- and it is now being done,

 4    but -- or going to be done, but had it been done at the NEPA

 5    stage, that detailed analysis would not necessarily have

 6    picked up -- have picked up warning horns away from grade

 7    crossings.

 8              THE COURT:  Why not?

 9              MS. MARVIN:  Because the FTA manual -- the

10    guidance itself doesn't -- leaves substantial flexibility as

11    to how to -- how to estimate whether -- how to measure,

12    estimate, and compute ambient noise and noise -- existing

13    noise and the future -- possible future noise.

14              THE COURT:  Okay.

15              MS. MARVIN:  The guidance that they're insisting

16    that we should have followed at the NEPA stage simply might

17    have not -- might not have addressed their concern anyway.

18              THE COURT:  Right.  But if the agency has

19    acknowledged that trespassing is -- whether it's rampant or

20    whether it's occasional on the main line, trains are going

21    to have to use their horns on the main line.  Given that,

22    why was it reasonable either in the NEPA -- in the EIS or in

23    some subsequent follow-on study not to take that factor into

24    account?

25              MS. MARVIN:  And the detail -- I would note there

1       that the detailed noise analysis is now going to be done,

2       and so perhaps it is reasonable in a subsequent study.  It

3       was not necessary and difficult to do for the -- by virtue

4       of the many possible permutations at the NEPA stage.

5                   THE COURT:  What authority is there for the

6       proposition that the agency can defer a detailed noise

7       analysis until after the EIS and approval of the action?

8                   MS. MARVIN:  I do not have case law authority for

9       that, Your Honor.

10                  THE COURT:  Okay.

11                  MS. MARVIN:  I'd be happy to supply.

12                  THE COURT:  All right.  Well, if we need it, we

13      may ask for that, okay?

14                  MS. MARVIN:  Again, Your Honor, that --

15                  THE COURT:  What about the noise impact of the

16      shift -- and Mr. Karmel didn't mention this, I don't

17      believe, but the shift of freight operations to nighttime

18      and the use of horns at night, which at least they argue in

19      their briefs will be in effect of the project?  Does the EIS

20      consider that anywhere?

21                  MS. MARVIN:  It's my understanding that it does

22      not.  I should -- I need to double-check that.  I believe it

23      does not.

24                  Again, Your Honor, unless you have further

25      questions on those issues, Your Honor, I just want to

1    reiterate that as our briefs show and the record shows, I

2    believe, the FRA did take a hard look at both -- a

3    sufficient hard look at the NEPA EIS stage at both

4    trespassers' safety and pedestrian safety and noise impacts

5    of the project.

6         THE COURT:  Okay.  Mr. Stearns, can you add any --

7    can you shed any light on the fencing issue or the noise

8    issue, for that matter?  To what extent is fencing a

9    mandatory mitigation?

10        MR. STEARNS:  It is, Your Honor, and let's,

11   perhaps, start with definitions of "trespassing" because I

12   think that's part of the confusion in terms of the way the

13   data is gathered.

14        Trespassing occurs at an -- even at an at-grade

15   intersection, if someone ignores the signal and therefore

16   crosses, or if there's not a pedestrian signal but there is

17   a car signal, which is the existing condition, which is not

18   going to be the condition when this is built because there

19   will be passing -- there will be pedestrian access,

20   sidewalks, and barriers.  But that's considered trespassing.

21        A separate element of trespassing is something

22   that occurs in the main line when someone is crossing the

23   track when they should not be doing so.  Both trespassing.

24        The statistics -- you heard Mr. Karmel say, "I

25   don't know how many of these trespassing events are on the

1    main line."  The FEIS says ten, and to put that in context,

2    in the four-year period --

3              THE COURT:  That's ten with freight operations.

4              MR. STEARNS:  Ten with freight operations.

5              THE COURT:  It may not be ten with passenger

6    operations.

7              MR. STEARNS:  Well, I agree, Your Honor.  I was

8    getting ready to get to there.

9              First, I think it's very important to know what

10   NEPA is intending to do with respect to safety.  I think

11   anyone in Congress that worried about the environment and

12   protecting it and became involved in adopting the National

13   Environmental Protection Act would be appalled that it's

14   being used to deal with a development of transportation

15   services that is clearly important for both safety and the

16   environment and for getting people off the hazards of

17   highways.

18             If you look at the FEIS, for example, and the ROD,

19   they compare the safety conditions on I-95 and the Turnpike,

20   which are parallel means for transportation, and find, what,

21   approximately 500 fatalities during the four-year period

22   where there were roughly ten fatalities on the railroad, all

23   of which were involved with trespassing.

24             And so you say, when you balance these interests,

25   it is very important -- and we've distributed a map this

1    morning just to show the urban counties that are being

2    served for the first time since the late '60s.

3             THE COURT:  Mr. Stearns, I understand there is a

4    cost-benefit analysis.

5             MR. STEARNS:  So --

6             THE COURT:  The question is whether they're using

7    the right weight on the --

8             MR. STEARNS:  Yes.

9             THE COURT:  -- safety side of the balance -- the

10    train safety side of the balance --

11            MR. STEARNS:  And forgive me for digressing to the

12    public policy arguments but -- because in terms of -- but I

13    do think the Court does need to consider those arguments in

14    the context of public safety because that's what the burden

15    of the agency is, to compare the new condition to the old

16    condition.

17            With respect to the obligation that the railroad

18    has -- let's take these two elements of trespassing and deal

19    with them separately.

20            First, with respect to the grade intersections,

21    what is required is now to have -- where there is a

22    sidewalk condition, to continue that sidewalk through

23    the grade crossing and to provide a separate pedestrian gate

24    and separate pedestrian warnings.  In many of the

25    intersections -- and by the way, what you'll see from the

1    record is every single at-grade crossing was examined at

2    least four times by these agencies.  Numerous public

3    hearings with each of the local governments to comment on

4    particular safety conditions at those intersections.  And

5    what came out of that process was a very detailed approach

6    to the configuration of every single at-

7    grade intersection to make pedestrian safety a high

8    priority, including bicycle safety.  So that part of

9    trespassing was clearly addressed.

10          Now you have the other condition, which is what

11   happens elsewhere on the main line where you have had very

12   few instances -- but, let's be clear, one death is too many,

13   and so I don't want to trivialize the fact that over four

14   years perhaps ten people died in these accidents.  I think,

15   Your Honor, if you look at the statistics that Mr. Karmel

16   cited, suicide is clearly a factor in, if not all of them,

17   virtually all of them.  That is to say --

18          THE COURT:  That's not in the record.  I asked the

19   same question myself, but --

20          MR. STEARNS:  It is in the record that they cited.

21   So it's not in the record of the FEIS, but when they came

22   before the Court -- and we objected to its being offered,

23   but when it's being argued that there are these statistics,

24   they in fact accompanied them, but in their brief they don't

25   make note of what's in the underlying document, which is

1    suicide is the cause.

2          But be that as it may, what All Aboard Florida has

3    agreed to do in the standard is to provide fencing at areas

4    where there is a hazard where there is frequent trespassing.

5    And the corridor will be fenced in locations where an FRA

6    hazard analysis review determines that fencing is required.

7          It's not optional.  It's mandatory.  And what

8    is -- what was undertaken in terms of the evaluation --

9    you'll see this at AR 44661 -- AAF, All Aboard Florida, will

10   conduct right-of-way field surveys to observe, document, and

11   provide recommendations to minimize trespassing by

12   employees; fencing, warning signage, public outreach,

13   information, and other appropriate measures as required.

14   And so there's a specific undertaking that where there are

15   areas of frequent trespassing, there will be fencing, there

16   will be signs, there will be warnings.

17          By the way, that is as important to the railroad

18   as it is important to the body politic.  The problem is

19   going to be it's not a static condition.  That is to say,

20   land use has changed.  The use -- the way people congregate

21   changes.  It's an ongoing continuing obligation that has to

22   be addressed in that fashion.

23          And NEPA is not so straight-jacketed that it would

24   compel -- that when you identify those relatively -- one is

25   too many.  Ten is too many.  But when you identify from a

1    NEPA analysis what is required from an overall substantive

2    view, I don't believe you could ever impose upon an agency

3    to do more than was done here, which is to say identify the

4    issue, address the issue, and where you have these uses --

5    these frequent trespass spaces, fence them.

6            And I would add, Your Honor, that what's clear in

7    this process is these local governments had not only months

8    but years to present to the agency specific examples of this

9    is an area where there's trespass.  That's an area where

10   there's trespass.  And where those areas were identified,

11   there was a specific undertaking to provide fencing.  But

12   what we were left with is people that wanted to identify a

13   problem rather than a solution.

14           So when you talk about the main line is a problem,

15   then you don't have to say where in the main line is the

16   problem.  Tell us where it is.  Tell us, in your

17   communities, where is that issue.

18           You cannot, incidentally, Your Honor, fence the

19   entire corridor.  It is not -- that has other safety issues.

20   It has other environmental issues.  So what you have to do

21   is to -- and this is discussed extensively in the FEIS -- is

22   to basically deal with the problems where they occur.  But

23   it's not a static condition that has to be addressed, but

24   All Aboard Florida has undertaken to do so.  In fact, for

25   its own purposes it wants to do so.  And I would add, Your

1    Honor, respectfully, let's talk about the new service, the

2    new train.

3         What you see is these trains are equipped, for

4    example, with cameras looking in every direction so any

5    argument about suicide is not any longer debatable.  There's

6    a camera that focuses forward and to the side and shows

7    exactly what's happening as the train is moving and another

8    camera looking at the person who is -- who is driving the

9    train to see how that person is reacting to these

10   conditions.

11        And I'd point out also, Your Honor, in looking at

12   the overall condition here in terms of public safety, this

13   is a system that is not only improving every single

14   intersection but in most critical instances with what are

15   called quad gates, which provides limitations coming in and

16   going out.  And where there is a quad gate, it also requires

17   a system in place so that a vehicle trapped within the quad

18   gates will send a warning which will allow the exit gate to

19   open.

20        It also provides positive train control in advance

21   of that requirement existing in other parts of the country.

22   Positive train control is essentially what would have

23   avoided many of the accidents, train accidents, that we've

24   read about in the last five years.  That is going to be a

25   required -- that is a requirement of this passenger service.

1          THE COURT:  Okay.  In the interest of time I'm

2     going to ask you to move to noise, and one particular

3     question.

4          MR. STEARNS:  Yes.

5          THE COURT:  Is there anything in the record

6     regarding the frequency or volume of horns on the main line

7     as opposed to at grade crossings, which is covered in the

8     EIS?  And --

9          MR. STEARNS:  The answer is no.

10         THE COURT:  Okay.

11         MR. STEARNS:  And if I may --

12         THE COURT:  Why was it reasonable for the FRA not

13    to consider that fact or that impact?

14         MR. STEARNS:  Well, there are a couple of reasons.

15    First, I think the noise impact of this system is clearly

16    dramatically reduced, not increased, and so you have to deal

17    with just the obvious.

18         Your Honor, how many times have you told a jury,

19    "Don't leave your common sense out in the street.  You bring

20    it into the jury room"?

21         The same is true in this kind of argument, which

22    is, the train is going to be quieter.  All new track.  No

23    more wood ties.  All concrete ties.  The material -- the

24    machines being operated are the state-of-the-art, quiet

25    machines.  They are.  You heard Mr. Karmel say --

1          THE COURT:  If you have 32 trains going in each

2     direction, and they're blowing their horns, they're not

3     going to be more quiet.

4          MR. STEARNS:  Well, Your Honor, respectfully, you

5     said they were blowing their horns.

6          THE COURT:  That's the question.  Will they be

7     blowing their horns at any other place besides the grade

8     crossings, which are --

9          MR. STEARNS:  The answer is it's a safety issue,

10    which is if there is someone on the track, they will blow

11    the horn for purposes of safety.  How can you predict a

12    random event which is no different than on I-95 where

13    someone honks a horn?

14          But the reality is it's not measurable because

15    it's a random immeasurable event, which is -- by the way,

16    when you look at the overall noise impact, which is you are

17    reducing noise at every intersection, you are reducing noise

18    of the track itself, which is quieter, safer, and all of

19    those things.  It's the kind of thing -- why in the world

20    would you be examining the random event that is necessary

21    for purposes of public safety, when a train is blowing a

22    horn so that someone will get off the track or be aware the

23    train is coming, which is in a nonsignalized intersection?

24          THE COURT:  Okay.

25          MR. STEARNS:  Thank you, Your Honor.

```
 1              THE COURT:  Thank you.
 2              Mr. Karmel.
 3              MR. KARMEL:  I'm not going to offer reargument of
 4     the NEPA thing.  I just have two very short points to make,
 5     and then we'll move on to the second issue or the other
 6     issues in the case.
 7              As to safety, there's many things that
 8     Mr. Stearns said are not in the record.  What is in the
 9     record at AR0064676 is All Aboard Florida is opposed to
10     fencing the corridor.  That's what's in the record.
11              Would fencing be efficacious?  I don't know.  It's
12     not in the record.  We don't have an analysis of safety
13     along the main line.  The guidance says fencing should be
14     considered as well as other measures.  There was no analysis
15     of that issue.
16              THE COURT:  Well, if I heard Mr. Stearns right, he
17     said that it was a mandatory mitigation requirement that AAF
18     install fencing at areas where it will be later determined
19     that there is a safety hazard.  Is that not the case?
20              MR. KARMEL:  That is not accurate.  The reason why
21     it's not accurate is that -- what I'm objecting to in
22     particular is the word "mitigation."  It is -- the
23     mitigation, as I said earlier, is set forth in the record of
24     decision.  This commitment is not mitigation.  Mitigation as
25     a significant adverse impact is disclosed, and then it's
```

1    mitigated through certain measures.

2              That's not the situation here.  There was no

3    significant adverse impact disclosed.  This is not

4    mitigation.  This is a commitment that is made under a CFR

5    provision, which we discussed earlier, where a safety

6    analysis needs to be performed to comply with an FRA

7    regulation, and they've made the commitment to do what the

8    regulations require, which is not much of a commitment

9    really, and then to submit the analysis --

10             THE COURT:  But that commitment is in the record.

11             MR. KARMEL:  Is in...?

12             THE COURT:  That commitment is in the record

13   before this Court.

14             MR. KARMEL:  It is in the record.  Absolutely,

15   Your Honor.

16             What the result of the analysis will be, will the

17   measures be efficacious, that's not in the record.  There

18   was no analysis of that, and the public will not be

19   involved.

20             On noise, I just want to make two very short

21   points.

22             One -- I meant to say this in my initial remarks,

23   and I forgot -- there's a suggestion in the AAF reply memo

24   that we didn't raise this issue with adequate specificity in

25   our comments on the EIS.  That is not accurate.  I would

 1    refer the Court to AR 36502 to 36503 where Indian River

 2    County submitted very detailed comments on why the failure

 3    to take noise measurements skewed the analysis and was a

 4    severe problem for the EIS.

 5            And second, in terms of the analysis between

 6    blowing warning horns on the main line and someone honking

 7    their horn on a highway when there's a dangerous situation,

 8    that remark is not -- mischaracterizes the situation in

 9    terms of the data we actually know about.  The Amtrak study

10    we discussed earlier, which had observed data, said the

11    reason why the observed noise was much greater than the

12    projected is that the freight trains were blowing the horn

13    all the way down the line.  So that's not once in a while.

14    That's simply a prophylactic measure from a train engineer

15    because he doesn't want to run people over.

16            And maybe that's prudent.  I don't know.  But if

17    it is prudent, and that's the practice, it's a lot more

18    noise than was analyzed in the EIS.

19            THE COURT:  Okay.  Thank you.

20            MR. KARMEL:  Okay.  Let's go on to the issue of

21    142(a)(15) of the Internal Revenue Code.

22            THE COURT:  Give me one second.

23            MR. KARMEL:  Yes.

24            THE COURT:  I know you're anxious to get all of

25    your arguments out, but I'm going to put this aside.

```
 1                    (Pause)
 2            THE COURT:  Okay.  Please proceed.
 3            MR. KARMEL:  The plaintiffs here have two
 4    challenges.  First, we have to establish our prudential
 5    standing, and then we have to talk about the merits.
 6            THE COURT:  Okay.
 7            MR. KARMEL:  So I'm going to start with prudential
 8    standing.
 9            THE COURT:  So the Supreme Court doesn't really
10    refer to it as prudential standing any longer.  It's really
11    whether you've stated a claim, correct?
12            MR. KARMEL:  Okay.  Yes, that is correct, Your
13    Honor.
14            THE COURT:  Just to be precise.
15            MR. KARMEL:  That is accurate.  I mean, we have an
16    entitlement to bring a case under the Administrative
17    Procedure Act, but I'm not going to dispute the
18    nomenclature.  It is what it is.
19            Okay.
20            THE COURT:  And just to be clear, you did not join
21    Martin County's statutory authority claim the last time
22    around; is that correct?
23            MR. KARMEL:  That's correct, so I don't think
24    we're bound by res ajudicata or collateral estoppel.  Also,
25    that was an unappealable order because the case was
```

1    ultimately dismissed as moot because -- for reasons the

2    Court is well aware.

3            So I think the -- oh, nonetheless, the Court has

4    an analysis, and it's a cogent analysis, and I have to -- in

5    the prior decision, and I need to persuade the Court to come

6    to a different conclusion whether Indian River County joined

7    that or not, and what I would like --

8            THE COURT:  Focus your argument on how your 147(f)

9    argument, which was not raised the last time, changes the

10    landscape.

11            MR. KARMEL:  Yes.

12            THE COURT:  Okay.

13            MR. KARMEL:  That's exactly where I was going,

14    Your Honor.  The question under the case law is is there an

15    integral relationship between 147(f) and 142, and obviously

16    our position is there is an integral relationship.

17            If we look at -- just this is an outline of the

18    United States Code.  If we look at Subchapter A of Part 4 of

19    Subchapter B of Chapter 1 of Subtitle A of Title 26 of the

20    United States Code, these are the sections relating to

21    private activity bonds.  And it starts at Section 141; it

22    goes through 147.  And the argument that really DOJ and All

23    Aboard Florida is making is DOT only looks at Section 142.

24    DOT doesn't have an interest in stuff involving the Internal

25    Revenue Service, stuff involving other provisions of the

1     Internal Revenue Code.  They only look at that one

2     provision, and there's no relationship between that

3     provision and these other provisions.

4          I believe the record is not consistent with that

5     representation.  I think if we look at the letter, which is

6     kind of ultimately the administrative agency decision

7     document that we're challenging here, or at least one of

8     them -- this is the letter from the U.S. Department of

9     Justice approving the PABs issuance dated December 20,

10    2017 -- there are conditions.  The very first condition

11    in -- of the DOT approval is that "A final bond counsel tax

12    and validity opinion must be issued at the time of the

13    closing of the bond issue in substantially the form provided

14    with the application."

15         So this is something that is of concern to DOT,

16    and they want the bonds to comply with the other provisions

17    of the Internal Revenue Code as well.  That was their first

18    condition in the PABs approval letter.

19         If we look at the PABs application, there was, of

20    course, a proposed form of opinion of bond counsel from

21    Greenberg Traurig, and what the PABs approval letter is

22    saying is Greenberg Traurig, or someone else like Greenberg

23    Traurig, better produce something like this in final form at

24    the time of the closing of the bond issue.

25         If you look at this opinion, it's not limited to

1    Section 142(a)(15).  It talks about other provisions of the

2    Internal Revenue Code within that same range that I

3    mentioned earlier, Sections 141 through 147.  These are the

4    provisions that relate to the issuance of private activity

5    bonds, and if Congress saw fit in at least one of the

6    provisions relating to the issuance of private activity

7    bonds to require municipal approvals, at least in some

8    circumstances, then obviously effects in local communities

9    are relevant to whether private activity bonds should be

10   issued and are something that is part of the set of policy

11   objectives that underlie this particular subchapter of the

12   Internal Revenue Code.

13            The specific statutory provision we're adding --

14   that was added was added in one place, but it's just part of

15   an overall web of provisions.

16            THE COURT:  Okay.

17            MR. KARMEL:  So we think there is an integral

18   relationship.

19            THE COURT:  All right.  Let's go to the merits

20   then.

21            MR. KARMEL:  Okay.

22            Well, we start with Section 142(a).  Section

23   142(a) has 15 categories of projects for which private

24   activity bonds can be issued, and one of them, of course, is

25   high-speed intercity rail facilities.  And it's undisputed

1    that this is not an intercity high-speed rail facility as

2    defined there because that has to go over 150 miles per

3    hour.

4              THE COURT:  Okay.

5              MR. KARMEL:  And the All Aboard Florida train goes

6    very fast, but it doesn't go quite that fast.

7              So there's also reference here to mass commuting

8    facilities, and it's undisputed this is not a mass commuting

9    facility.

10             So DOT approved this under (a)(15), which is

11   qualified highway or surface freight transfer facilities.

12   And, of course, that term is defined in Section 142(m), and

13   it's defined by reference to three subprovisions, two of

14   which are inapplicable here.  And the first one is the one

15   that DOT approved this under, we're told, which is any

16   surface transportation project which receives federal

17   assistance under Title 23, and they're saying, "Well, this

18   is a surface transportation project; therefore, it is -- it

19   qualifies."

20             Why is that wrong?  It's wrong because it reads --

21             THE COURT:  You've read my mind.

22             MR. KARMEL:  Okay.  It reads that term out of

23   context.  I think --

24             THE COURT:  How do you get past *Chevron* Step 1?

25             MR. KARMEL:  Well, we don't have --

1          THE COURT:  To even get to the legislative history

2    that you've cited throughout your brief and the overall

3    statutory framework, why isn't that definition clear and

4    unambiguously -- why doesn't it clearly and unambiguously

5    cover a railroad project, which is a surface transportation

6    project, that receives Title 23 funds?

7          And we can fight over whether it receives Title 23

8    funds or not, but...

9          MR. KARMEL:  We will get to the issue of whether

10   this project should receive Title 23 funds, but that's not

11   directly responsive to the Court's question.

12         In deciding whether language is ambiguous, it

13   can't be read in isolation.  It must be read in context.

14   That's a fundamental principle of statutory interpretation,

15   and one needs to take the other words in the statute into

16   account in informing what a particular phrase means in a

17   statute.  And so the question is is there -- in light of the

18   other words in the statute, is there an ambiguity?

19         And I think that the answer is yes.  And the

20   reason is is that if you look at 142(m)(1) -- and it's not

21   just the title, incidentally.  If you took the title out,

22   you would still have the words "qualified highway or surface

23   freight transfer facilities."  And the reason you would have

24   those words, of course, is that that is the phrase in

25   (a)(15), qualified highway or surface freight transfer

1    facilities.  So I'm not making an argument based on the

2    titles of the United States Code.  This is in the words of

3    the United States Code.

4         And Congress talked about highway facilities.  And

5    the All Aboard Florida project is many things.  It's not a

6    highway facility.  And why would Congress use the phrase

7    "highway or surface freight transfer facilities" if, in

8    fact, the provision didn't require it to be either a highway

9    or a surface freight transfer facility?

10         THE COURT:  Why did it?  Is it a scrivener's

11   error?

12         MR. KARMEL:  I don't think it's a scrivener's

13   error, Your Honor.  I think that it was understood that the

14   reference to surface transportation projects which receive

15   federal assistance under Title 23, the title of which is

16   "Highways," the name of that title of the United States

17   Code, it was understood that that was highway projects, and

18   that is borne out by the legislative history.  We'll get to

19   that in a second.

20         But I think that there is an ambiguity in the

21   statutory language because it uses the word "highway," and

22   the word "surface transportation project" can't be

23   interpreted so broadly as to eliminate the effect of the

24   word "highway."  It has to be interpreted with that in mind.

25         So I think that's the basis of why --

1          THE COURT:  It's limited by the condition that it

2     receive Title 23 funds, and whether Title 23 is entitled

3     "Highway" or not, there are railroad projects that do

4     receive Title 23 funds, correct?

5          MR. KARMEL:  Railroad safety projects at highway

6     intersections or -- it doesn't have to be a highway in a

7     sense of an interstate or something, but railway

8     intersections at road crossings can receive Title 23

9     funding.  That is accurate.

10          If the Court does conclude that there's an

11     ambiguity, and -- based on the word "highway," then you look

12     at the legislative history.  We've discussed that

13     extensively at Paragraph 282 of our complaint and in the

14     paragraphs that follow Paragraph 282 of the complaint.

15          Paragraph 282 -- and I don't want to go through

16     all of those things.  It's much too long.

17          THE COURT:  I've read your --

18          MR. KARMEL:  I just want to highlight one

19     particular report.

20          Section 282(d) of our complaint cites a Senate

21     report.  The URL in the complaint apparently is no longer

22     functional.  It takes you to this particular document.  But

23     if you Google the URL, you get to this document.

24          This is the document we cited in our complaint.

25     It's a memorandum from the Senate Finance Committee on July

1    28, 2005.  That's only days before the Congress enacted

2    SAFETEA-LU, the Safe Accountable Flexible Efficient

3    Transportation Equity Act, a legacy for users.  That was

4    enacted as Public Law 109-59 on August 10, 2005.  That's

5    what created the 142(a)(15).

6        This is a Senate Finance Committee memorandum.

7    It's part of the legislative history of the statute.  And it

8    discusses this particular provision at Page 4, and it

9    summarizes the provision, and it says, "Tax-Exempt Financing

10   of Highway Projects and Rail-Truck Transfer Facilities.  The

11   proposal authorizes $15 billion of tax-exempt bond authority

12   to finance highway projects and rail-truck transfer

13   facilities."

14       So that's the understanding of the Senate Finance

15   Committee, that this related to highways and rail-truck

16   transfer facilities, which is consistent with my

17   interpretation of -- what I'm urging to be the Court's

18   interpretation of the term "surface transportation project."

19       I also wanted to get to that second issue which

20   the Court identified, which is, has the -- even if a

21   passenger railroad could be considered a surface

22   transportation project receiving federal assistance under

23   Title 23, and therefore theoretically a non-high-speed

24   railroad could be a project under 142(m)(1)(A), is the All

25   Aboard Florida project such a project?  And the answer is

```
 1    no.
 2              The All Aboard Florida project has not received
 3    funding.  The record establishes that the rail corridor, the
 4    freight corridor, which has been in existence for quite some
 5    time, has received funding to upgrade the safety at certain
 6    intersections.
 7              THE COURT:  In connection with and in anticipation
 8    of the AAF project, correct?
 9              MR. KARMEL:  No, that's -- I don't believe there's
10    anything in the record that so establishes that, Your Honor.
11    The reason why --
12              THE COURT:  Funding has been provided after the
13    announcement of the program.
14              MR. KARMEL:  Funding --
15              THE COURT:  I mean, my question is --
16              MR. KARMEL:  Some of the funding was after --
17              THE COURT:  -- would FECR have received that Title
18    23 funding regardless of whether the project existed or not,
19    the AAF project existed or not?
20              MR. KARMEL:  There's no reason to believe they
21    would not have received that funding.  It's routine for the
22    rail corridor to receive highway safety funds under Title
23    23.  I don't believe there's anything in the record at all
24    that establishes at all that that funding was due to the
25    anticipated All Aboard Florida project.
```

1              In fact, if that is the reason, that would be a

2    NEPA violation, incidentally, because you're not supposed to

3    fund the project until NEPA is complied with.  But I don't

4    believe there is any basis for the conclusion.

5              This project may benefit.  I don't know if it will

6    or not because they're all -- in connection with the

7    project, they are, in fact, changing a lot of the safety at

8    the grade crossings.  Whether -- so some of the projects

9    that were done may or may not be relevant to this project,

10   but I don't know one way or the other.  But this project may

11   benefit from some of that funding.  But benefiting from the

12   funding is not what the statute says.  The project has to

13   receive the funding.

14             All Aboard Florida has not received a dime under

15   Title 23.  In fact, now the rail corridor is not even owned

16   by an affiliate of All Aboard Florida.  It's owned by a

17   Mexican freight company.  So I don't think --

18             THE COURT:  Well, the statute says that the

19   project has to receive funding.  The statute does not say

20   that the proponent of the project has to receive funding,

21   does it?

22             MR. KARMEL:  That's correct, Your Honor.

23             THE COURT:  Okay.

24             MR. KARMEL:  But I don't think there's any basis

25   in the record to conclude that this project has received

1    funding at all.

2              I want to now just tie up, hopefully, the last

3    issue that we've raised in the brief.  This is the argument

4    which -- we touched on the statutory provision earlier -- I

5    incorrectly called prudential standing.  But we actually

6    claim that there's been a violation of Section 147(f) here

7    as well, a substantive violation, not -- so the statute is

8    relevant for that purpose as well.

9              Section 147(f)(2)(A)(ii), the language of which is

10   on the screen here, says that "Each governmental unit having

11   jurisdiction over the area in which any facility, with

12   respect to which financing is to be provided from the net

13   proceeds of such issue, is located."  That's the phrase.

14   They have to approve the project.  What All Aboard Florida

15   has said in its brief, its primary argument is the governor

16   has approved the financing through something called the

17   FDFC, which I didn't know in drafting the initial brief, but

18   apparently the governor has delegated his authority to the

19   FDFC.  I'm not going to dispute that.  That seems to be

20   established by the document that All Aboard Florida provided

21   to the Court.

22             But so they're saying that the governor has

23   approved it; and, therefore, there's no need for Indian

24   River County to approve it.

25             What they're relying upon there is the

1    parenthetical "except that" -- the parenthetical says

2    "except that if more than one governmental unit within a

3    state or jurisdiction over the entire area within such state

4    in which such facility is located, only one such unit need

5    approve such issue."  That's what they're arguing.  But --

6    so they're saying the governor is a governmental unit, and

7    the governor -- the state government has jurisdiction over

8    the area; and, therefore, the governor can approve it.

9              But the exception swallows the rule there.  Under

10   no circumstance would Indian River County ever have a right

11   to be asked whether or not to approve or disapprove a

12   private activity bond issue.

13             THE COURT:  Okay.  But under your interpretation

14   of this provision, wouldn't each governmental unit within

15   Indian River County also have to approve?

16             MR. KARMEL:  No.

17             THE COURT:  The school board?  The water district?

18   The fire department?

19             MR. KARMEL:  No, I don't think so, Your Honor.

20             THE COURT:  Why not?

21             MR. KARMEL:  If there are -- if the project was --

22   ran through -- well, let's take the city of Vero Beach.  The

23   project goes through the city of Vero Beach, which is a city

24   in Indian River County.

25             THE COURT:  Yes.

 1          MR. KARMEL:  And Indian River -- it goes through

 2    Indian River County obviously as well.  That would be a

 3    situation in which there are -- that would be a situation in

 4    which the parenthetical would apply, where there's more than

 5    one governmental unit within a state.

 6          Well, if --

 7          THE COURT:  That's not the entire area.

 8          MR. KARMEL:  I'm sorry.  I'm checking myself out.

 9          If the project was only in the city of Vero Beach,

10    then the exception would apply because there would be more

11    than one governmental unit within a state that would have

12    jurisdiction over that project -- over the entire area in

13    which the project is located.

14          But where the project goes through, for example,

15    two counties, the defendants have not identified more than

16    one governmental unit which has jurisdiction over the entire

17    project.

18          THE COURT:  So that's your argument with why the

19    parenthetical does not apply.

20          MR. KARMEL:  Correct.

21          THE COURT:  So if I strike the parenthetical,

22    we're left with "each governmental unit having jurisdiction

23    over the area in which the facility is located."  That would

24    include not only Indian River County, but the city of Vero

25    Beach and the school district and the fire department and

1    any other governmental unit through which the project runs,

2    and that can't be right.

3                MR. KARMEL:  No, I don't think --

4                THE COURT:  That can't be what Congress intended.

5                MR. KARMEL:  I don't think that's accurate, Your

6    Honor.

7                The term "governmental unit" is itself defined

8    further down in Section --

9                THE COURT:  It's defined as the state or any

10    political subdivision thereof.

11                MR. KARMEL:  That has elected representatives.  So

12    I -- the fire district doesn't have elected representatives.

13    The school district may.

14                THE COURT:  The school would.

15                MR. KARMEL:  But I don't think the school -- I

16    don't think it would be fair to say the school district has

17    jurisdiction over everything happening within the school

18    district.  It's a limited purpose special entity, but --

19                THE COURT:  Does that suggest that the term

20    "governmental unit" may be ambiguous under these

21    circumstances, and so we're at a *Chevron* Step 2?

22                MR. KARMEL:  I think the term "governmental unit"

23    may be ambiguous in certain circumstances, but that's not

24    relevant here.  There's no question that Indian River County

25    is a governmental unit.  The defendants have not identified

1    any governmental unit other than the governor who has

2    jurisdiction over the entire project.  Therefore, the

3    parenthetical does not apply.

4            I mean, the fact that the term may be ambiguous in

5    certain circumstances and is not relevant here I don't think

6    implicates *Chevron* in this situation.  In this situation,

7    there are -- there's -- the governor's approval is not

8    adequate.  We've explained why in the brief, and we haven't

9    received an actual substantive response to that argument

10   that really tracks the statutory language, neither -- DOJ

11   did not engage in that.  All Aboard Florida's brief did not

12   engage in that.  We're told that this is something that is

13   commonly done.

14            THE COURT:  Okay.

15            MR. KARMEL:  Maybe that's true.  I don't know.

16            THE COURT:  Let's just take the provision.  Let's

17   substitute the words "governmental unit" with the definition

18   in the regulations, which is "state and political

19   subdivision thereof," and so the statutory provision would

20   read "each state or political subdivision thereof."  And so

21   if it's in the disjunctive, why isn't the state approval

22   sufficient even under a plain reading of the statutory

23   provision when you insert the definition?

24            MR. KARMEL:  Very simply, Your Honor.  The word

25   "each."  Each governmental unit.  I mean, the fact that the

1    definition of "governmental unit" may be in the subjunctive

2    doesn't eliminate the word "each."  Each governmental unit

3    has to approve this, except in one circumstance which

4    doesn't apply here.

5          If it said "any governmental unit," that would be

6    a completely different statute, or "a governmental unit."

7    It says each unit must approve it, and this is going to

8    affect Indian River County in very significant ways.  That's

9    why we've brought this lawsuit, and Indian River County

10   should be consulted here as to whether or not these bonds

11   should be issued.

12          THE COURT:  Okay.  Thank you.

13          Ms. Marvin.

14          MS. MARVIN:  Your Honor, first, very briefly with

15   regard -- responding to the zone of interests argument,

16   which Mr. Karmel has called prudential standing, I believe

17   we made it under the current rubric of zone of interest.

18          THE COURT:  Same idea.

19          MS. MARVIN:  Correct.  As an initial matter,

20   they're not within the zone of interest under Section 142,

21   and in that regard --

22          THE COURT:  Why isn't 147(f) interrelated with --

23          MS. MARVIN:  147 -- we are not arguing, as

24   Mr. Karmel seemed to diverge a bit, that they're not within

25   the zone of interest for Section 147(f), but that doesn't

1    bring them within the section of interest -- within the zone

2    of interest, I'm sorry, for Section 142(m).

3            142 -- 147(f) requires approval in certain

4    circumstances under certain conditions of the local

5    counties.

6            THE COURT:  Okay.  But let's just take a step back

7    and look at the, you know, function of the statute, right?

8    Why isn't it the case that what the statute is doing here is

9    designating tax-exempt funding for certain types of projects

10   that Congress has deemed to be in the public interest, and

11   then ensuring that the geographies that are affected by

12   those programs agree that they are in the public interest by

13   putting in 147(f) as an approval process, and therefore

14   those are two interlocking ways to ensure that eligible

15   projects are, in fact, in the public interest?

16           MS. MARVIN:  The timing of the enactment of the

17   two provisions is entirely different, first of all, so that

18   one was preexisting.  There's not that concerted integrated

19   thought in the two sections.

20           147(f), as I was saying and as we have briefed,

21   does protect the environment -- unquestionably protects the

22   environmental interests asserted by -- such as those

23   asserted by the plaintiffs here in the project complying

24   with -- in their having been a hard look in the project

25   complying with NEPA and the public safety interests and so

1  forth.  But that is not part of determining whether or not

2  it's -- there's no integral relationship between determining

3  whether that's a qualified project with significant public

4  benefit.  There's an insufficient congruence here in the

5  words of *Tax Analysts vs.* -- *Tax Analysts & Advocates vs.*

6  *Blumenthal*, a D.C. Circuit decision, between the purpose of

7  the statute that this Court previously identified and the

8  purpose of -- and plaintiffs' asserted interests here.

9          THE COURT:  And remind me when 147(f) was added to

10  the statute?

11          MS. MARVIN:  I believe 1982 -- in the 1980s, 1982

12  or 1983.

13          THE COURT:  And what was the context of that

14  amendment or that addition?

15          MS. MARVIN:  It's part of -- it was put on for --

16  I can't recite the history of that statute offhand, Your

17  Honor.  I'm sorry.

18          So, in short, even if Congress were trying to

19  protect the environmental interests of the local governments

20  when it enacted Section 147(f), and it required local

21  approval, it just doesn't follow that there's any plausible

22  relationship between that requirement and plaintiffs'

23  asserted interests here, and so that we believe and continue

24  to argue that your prior holding holds, that that portion of

25  142, Section 142 of the Internal Revenue Code, does not

1    protect or regulate those who would claim that public safety

2    or other related interests would be impaired by a bond

3    allocation to an ineligible project.

4         With regard to plaintiffs' arguments on the

5    merits, as we have fully briefed, Your Honor, and as -- in

6    both the prior iteration of this litigation and currently,

7    DOT properly determined that the project is a surface

8    transportation project.  Section 142(m)(1)(A) extends

9    eligibility for PABs allocations to any surface

10   transportation project that receives Title 23 assistance.

11        The statute doesn't define "surface transportation

12   facility," and so the term's ordinary meaning controls; the

13   ordinary meaning of transport being the movement of people

14   or goods by road, train, or ship rather than by plane.

15   That's from the *Cambridge Business English Dictionary*.

16        THE COURT:  Well, address Mr. Karmel's contextual

17   argument that the committee report seems to confine that

18   definition to highways.

19        MS. MARVIN:  The statute itself does not and is

20   unambiguously -- unambiguously provides for -- and uses the

21   word "any" repeatedly moreover; so any surface

22   transportation facility, any project or international bridge

23   or tunnel, any facility for transportation or freight.  If

24   Congress wanted to write in "highway," Congress could have

25   done so.  It did not.  The statute is unambiguous in that

1    regard.

2            Moreover, addressing Mr. Karmel's other argument

3    that this -- that the project did not receive federal

4    assistance under Title 23, the statute requires -- as I

5    believe Your Honor mentioned -- noted this morning, the

6    statute requires that the project, not the project

7    proponent, receive funds, and here the project did.

8    Contrary to Mr. -- I would really have one very brief point

9    here.  There is evidence in the record, at least implicit

10   in the record, that at the time the -- yes, FECR received

11   fund -- received the check, if you will, but there is

12   evidence in the record that the project was being

13   contemplated, planned, at the time that check was received,

14   and there is evidence in the record that it was for

15   improvements that would be part of the project.

16           I'm going to quote from the record.

17           THE COURT:  Please do.

18           MS. MARVIN:  AR0074325, which is the version of

19   the FEIS cited in our briefs, "Railway Highway Crossing

20   Funding.  The planning project for All Aboard Florida

21   started in December 2011.  Since then, approximately $9

22   million from Section 130 of U.S. Code Title 23 has been

23   invested in the entire corridor to improve railway highway

24   grade crossings and prepare for growth in rail traffic."

25   And the quote goes on a bit, but clearly --

1          THE COURT:  That doesn't say "passenger rail

2     traffic," right?

3          MS. MARVIN:  It does not.  But clearly -- and,

4     again, I recognize it's somewhat implicit --

5          THE COURT:  Okay.

6          MS. MARVIN:  -- but clearly the project was

7     contemplated.  The increase in rail traffic was

8     contemplated.  The funds were received with all of that in

9     mind.

10          THE COURT:  So is your view that it's just a

11     temporal matter?  If Title 23 funding were received just

12     after the project had been announced, that's sufficient?

13          MS. MARVIN:  No, but it's --

14          THE COURT:  What if the funds had come the year

15     before the project?  There was no project, so the funding

16     couldn't be for the project, correct?

17          MS. MARVIN:  And in that case I would not be

18     standing here making the same argument; that it has to be at

19     least a brain child, if you will, and here it was more than

20     a brain child.  There were plans on paper.

21          THE COURT:  But I take it there's nothing in the

22     record one way or the other to show whether FECR would have

23     received that funding if it weren't for AAF.

24          MS. MARVIN:  There is nothing in the record that

25     conclusively shows that that could not have been the case.

1    This implies that it was received with this -- for other

2    purposes as well, but also with this particular project in

3    mind.

4              THE COURT:  Okay.

5              MS. MARVIN:  And then briefly, turning to --

6    responding to Mr. Karmel's arguments, plaintiffs' arguments,

7    about Section 147(f).

8              First, we -- the -- 147(f) -- our initial argument

9    in our opening brief, and we maintain that argument, is that

10   Section 142 does not require DOT to -- the Department of

11   Transportation to confirm satisfaction of the approval --

12   the host approval requirement, but it is a requirement that

13   applies to the subsequent issuance and that tax-free status

14   of the bonds.

15             THE COURT:  I actually had highlighted the very

16   same line of the provisional allocation approval letter that

17   Mr. Karmel cited, and why doesn't this letter establish that

18   the final allocation is dependent upon the issuance meeting

19   all requirements as would be reflected in a bond opinion?

20   And one of those requirements is 147(f).

21             MS. MARVIN:  Final issuance of the bonds with a

22   tax-free status is dependent on Section 147(f) having been

23   satisfied.  The allocation decision itself is not.

24             THE COURT:  Haven't you conditioned the allocation

25   on the receipt of a tax and validity opinion?  I mean,

1    presumably that tax and validity opinion would cover whether

2    147(f) has been complied with.

3                    MS. MARVIN:  It's my understanding that that

4    conditions the final issuance and tax-free status of the

5    bonds but does not condition DOT's decision that it can

6    be -- that the funds can't -- the authority for issuing can

7    be allocated.  I recognize that's a fine -- somewhat of a

8    fine point, Your Honor, but it is the position we take.

9                    THE COURT:  It says, "DOT is allocating this

10    authority for the project described in this application with

11    the conditions listed below," and one of those conditions is

12    a final opinion by bond counsel.  And I presume that bond

13    counsel will opine on whether the bonds are qualified or

14    not, and one of the factors is whether 147(f) has been

15    complied with.

16                    Let's assume that there is -- they have stated a

17    claim.  Address the merits of the 147(f) argument.

18                    MS. MARVIN:  We --

19                    THE COURT:  And you all did not in your brief, so

20    if you want to defer to Mr. Stearns.

21                    MS. MARVIN:  I would defer to Mr. Stearns.  We did

22    not raise it in the opening brief, and while we agree with

23    All Aboard Florida's argument on the statutory construction

24    there, I would defer to him to make that argument.

25                    THE COURT:  Very well.

1          MS. MARVIN:  I would also, however, finally note

2     that, as we did in the reply brief, the relief they're

3     seeking which they made apparent, plaintiffs made apparent

4     in their opposition brief, is a declaration about tax

5     liability and about the ultimate tax liability for the bonds

6     and the tax-free status of the bonds, and that they can't be

7     issued -- that the authority can't be allocated and they

8     can't be issued until -- until unless that host approval

9     requirement.  And as we noted in our briefs, whether that

10    relief is appropriately sought against the Department of

11    Transportation, an ineligibility claim such as plaintiffs

12    have made here we find questionable.

13          THE COURT:  Fair enough.

14          MR. STEARNS:  Perhaps, Your Honor, I should begin

15    with 147.

16          THE COURT:  There you go.

17          MR. STEARNS:  If you -- TEFRA was adopted in 1982.

18    147 appears in the TEFRA.  And there was -- this was back in

19    the good old days when there were conference committees

20    consisting of people in both parties, and conference staff

21    reports were generated which eliminates ambiguity between

22    House and Senate conference reports.  And as we cited in our

23    brief, the House and Senate conference reports for the

24    adoption of this specific section unquestionably rejects the

25    interpretation that is offered to the Court by Indian River

1    County.  What the House and Senate conference report said is

2    "Where the facilities are located entirely within the

3    geographic area of the issuing governmental unit, only one

4    public hearing and approval are required even though the

5    facilities may be located in several different subdivisions

6    of the issuing governmental unit."  And it goes on to say,

7    "For example, where governor of a state is to approve

8    issuance of bonds for facilities located in that state, even

9    though located in several counties, only the state is

10    required to have a public hearing on that bond issue."

11        You'll see that at House Representatives Report

12    97-760, Senate Report No. 97-530.  And House and Senate

13    reports themselves were similarly addressing that issue and

14    interpreting what they were adopting simultaneously to say

15    that.

16        I would note --

17        THE COURT:  You get there only if the statutory

18    language is ambiguous, correct?

19        MR. STEARNS:  True.  In fact --

20        THE COURT:  And how is it ambiguous?

21        MR. STEARNS:  Well, Your Honor, respectfully I

22    think you can look at the statute in two different ways.

23    And actually there's another thing.  You should never

24    construe a statute to achieve a ridiculous outcome.  That's

25    a principle -- even before you get to ambiguity, you

1    construe it in a way that makes sense.

2              You start with the first paragraph, the first

3    words in (ii), which say, "each governmental unit having

4    jurisdiction over the area in which any facility with

5    respect to which financing is to be provided from the net

6    proceeds of such issue."  So it's clear, the Florida

7    Development Finance Corporation has approved the use of

8    these proceeds in three counties:  Palm Beach County,

9    Brevard County, and Orange County.  None of the net proceeds

10   are to be used in Indian River County, so at the outset 147

11   doesn't apply because the net proceeds are not to be used in

12   Indian River County.

13             Then when you get to the parenthetical phrase

14   where you have, in this instance, accepted if more than one

15   governmental unit within a state -- and you only get there

16   if you say that somehow or other the fact is that the money

17   is being spent in those other counties, which incidentally

18   approved the FDFC bond issue; that is, Palm Beach County,

19   Brevard County, and Orange County did.

20             So now you get to the issue -- they didn't approve

21   the TEFRA financing.  That was done by the governor through

22   his appointed representative, and the FDFC, which is the

23   Florida Development Finance Corporation, is going to be

24   essentially the conduit issuer of the bonds.

25             But the interpretation that Indian River County

1    argues to the parenthetical phrase, if read as they read it

2    contrary to what the committee reports were, would

3    essentially say that the governor could approve a project in

4    one county but couldn't approve it in multiple counties, but

5    it would essentially allow multiple counties or political

6    jurisdictions to essentially veto a proposal, even when the

7    money is not spent in their own county, and I respectfully

8    submit that that is a construction of the statute that is

9    unreasonable, and obviously no one heretofore has construed

10   it in that fashion.

11             And this has existed since 1982, and Congress has

12   had plenty of time to change it, if that's what they wanted

13   to do, because obviously the agency has construed it -- the

14   IRS has construed it consistently from that time to the

15   present.

16             Turning to the 142 argument, if I may -- and

17   before I forget, Your Honor, I do want to -- I don't want to

18   lose this point, which is the bonds run out -- approval runs

19   out December 31st.

20             THE COURT:  I was going to ask you about the

21   timing.

22             MR. STEARNS:  Okay.  I just didn't want to let

23   that go by the boards.

24             On the 142 issue, you clearly have -- and we both

25   argue legislative intent.  We both argue legislative

1    history.  We obviously think that what we've offered by way

2    of legislative history is far more relevant than what's

3    offered by Indian River County.  This, of course, was

4    adopted in 2005, and the purpose of this statute in 2005 was

5    to have, through nonpublic dollars directly but through tax

6    benefits, private investors fund public infrastructure

7    projects when the public doesn't have the money to do it

8    itself.

9            So it's a small price that the government pays

10   depending on one's point of view, but it does, in this case,

11   for example, take in a very important public infrastructure

12   project and take private dollar risks both in terms of the

13   bonds, also in terms of equity financing, to complete a

14   public project.

15           So if you look at, for example, Title 23, which

16   is -- discusses highways and how Congress has dealt with

17   these languages like highway and rail, Title 23 defines a

18   project under Section 601(a)(8) as any surface

19   transportation project eligible for federal assistance, and

20   it defines also a project for intercity passenger bus or

21   rail facilities and vehicles.  And so consistently these --

22   the statutory schemes have addressed highways and rail

23   depending on the nature of it in a way that's consistent

24   with the interpretation that I think respectfully must be

25   put on 142 reading the plain and literal language of the

1    words "any surface transportation project which receives

2    federal assistance under Title 23."

3          So turning to that question for a moment, what we

4    have shown is that in Phase I there were $6 million of Title

5    23 monies funded four years after the plan was initiated in

6    2007, but beginning in 2011 -- it's very important.  They

7    started in 2007 with "We want to do this."  The plans are

8    then, over four years, developed by 2011 to very specific

9    plans, and all of the Title 23 dollars come -- that are

10   counted here are after 2011, after this combined company,

11   then, of FECR and All Aboard Florida agree that they're now

12   moving forward together towards private rail service, and

13   the Title 23 money that was invested, a total of $9 million

14   during the period before the PABs were authorized --

15         THE COURT:  Mr. Stearns, other than the temporal

16   relationship and the relationship between FECR and AAF at

17   the time, is there anything in the record to suggest that

18   those, you know, Title 23 improvements were done in

19   anticipation of or to benefit the increased passenger rail

20   traffic that would occur as a result of the project?

21         MR. STEARNS:  The answer is absolutely.  The

22   application for PABs specifically says that and specifically

23   identifies the Title 23 monies and the purpose of the

24   funding of the Title 23 monies was for the purpose of

25   advancing this project.  That's what the application says.

1            It was not -- while I say were there hearings?

2     Was it challenged?  No.  But it is in the record that this

3     agency considered, when it made a determination, that this

4     operation complied because it was a project which was being

5     advanced from 2011 through 2015 to provide private rail

6     service -- public transportation services servicing these

7     important communities in the state of Florida.

8            So that finding has been made in this record in

9     the sense that the application was approved based on the

10    factual predicate that was established by All Aboard Florida

11    and was not challenged in the administrative process.

12            THE COURT:  All right.

13            MR. STEARNS:  And I believe the deference is

14    required.

15            If I may then turn to the point I wanted to bring

16    out, which is December 31st is the time where the right to

17    sell the PAB -- the authorization expires.  As we saw with

18    Phase I, when this Court granted the motion to dismiss the

19    claim that allowed Phase I financing to be done without the

20    overhang of this litigation, those bonds, $600 million, were

21    almost immediately sold to the public, and Phase I -- that

22    was useful in completing Phase I.

23            Phase II now.  The second issuance of PABs

24    was approved or authorized by DOT after the FEIS was

25    completed and the ROD was issued, and so that is now done.

1    And while All Aboard Florida has applied for a period -- an

2    additional -- a period of time because of it's getting

3    close, there clearly is today, I can say to the Court, some

4    developments that are not unimportant on this score.

5         Virgin has invested a substantial amount of money

6    in the venture, and it's now going to be called no longer

7    All Aboard Florida or Brightline.  It's going to be Virgin

8    Trains.

9         There's an equity offering that is now on the

10   street to raise a fairly significant amount of money in an

11   equity offering, and the intention is, if this summary

12   judgment is granted on our behalf, to sell the bonds by

13   December 31st.

14        I would say, in light of the conversation we had

15   in this Court earlier, the markets are coming and going.

16   Debtor markets.  Equity markets.  The debt market today is

17   very positive to be able to sell these types of instruments.

18   There is an opening that exists to sell it in December, at

19   the latest by the end of January, but only at the end of

20   January if DOT grants an extension.

21        But the objective is to complete the bond

22   offering.  It obviously -- every investor is going to look

23   to determine what this Court does to determine -- because

24   obviously if their motion is granted and the bonds are

25   rejected, then All Aboard Florida must complete its project

1    with sources other than private activity bonds, which will

2    make the project infinitely more expensive, as Your Honor

3    has previously undertaken to detail to some degree.

4            So it is important.  Timing is important.  But we

5    are -- the clock is running.

6            I must point out all of the permits are now

7    essentially obtained.  All but a few.  Construction has

8    commenced.  The Orlando station is virtually completed on

9    all of the exterior work.  The interior work is not yet

10   done.  It has been an extensive undertaking to this point

11   funded by equity and some other debt, and it is a very

12   important rail project for the people of the state of

13   Florida.

14           And I'm sorry, as we've indicated in our map, that

15   there's a little yellow spot of people that don't want it.

16   All 135,000 or 150,000 of them.  But as a practical matter,

17   the train is important, and literally, in looking at a NEPA

18   analysis or the allocation of taxing and financing dollars,

19   it is precisely the kind of project that Congress would want

20   to have funded because it is a private investment funding a

21   very, very, very critically important infrastructure project

22   to a people whose roads are now congested so severely that

23   I-95 and the Florida Turnpike are essentially gridlocked

24   much of every day.

25           THE COURT:  Okay.  Same question I asked

1    Mr. Karmel, and this is purely hypothetical, but if the

2    Court were to remand for further analysis under NEPA but not

3    vacate the bond allocation, what effect would that have on

4    the timing of the issuance apart from investor expectations

5    or --

6            MR. STEARNS:  Your Honor, I can only say it this

7    way.  The cost of doing any of the improvements that are

8    being asked is frankly irrelevant to this investment and

9    capital.

10            THE COURT:  Okay.

11            MR. STEARNS:  So if there's a NEPA analysis that

12    requires greater cost, it is no different than what we've

13    already undertaken to do, which is whether it's noise or

14    whether it's -- all of this stuff is going to be done,

15    safety, fencing, whatever, as you can see in the settlement

16    that was reached with the other two entities.  There's no --

17    those arrangements are simple.  So if it's simply a function

18    of money, there's no impact.  None.

19            If it's a function of putting at risk the issuance

20    of the bonds so that investors would say, "Well, what kind

21    of deal is this?  How can I valuate that risk?  What does

22    this mean?  Does it mean can you vacate the PABs issuance or

23    not vacate them and yet find NEPA is inappropriate?" and so

24    you then have to price in the risk that's created by,

25    candidly, a relatively novel approach to a NEPA issue.

1          But I would go back to basic fact, Your Honor.

2     The perfect should not be the evil of the near perfect or --

3     this is an extremely important public infrastructure project

4     with private dollars at risk, and the nitpicking -- and I

5     think we've cited the cases to this effect -- for NEPA is

6     not what NEPA was intended to do.

7          The noise issues are made up.  The public safety

8     issues are important but have been addressed exhaustively by

9     the regulators and will continue to be.  It's a highly

10    regulated industry.

11         But thank you, Your Honor.

12         THE COURT:  Okay.

13         Last word, Mr. Karmel.

14         MR. KARMEL:  The Court has been very patient so

15    I'm going to be quite quick.

16         I just want to point out that the FRA report that

17    was done by the FRA field engineer who visited the rail line

18    to identify what type of grade crossing improvements should

19    be made, that can be found at AR0049371 of the record.

20    Those field visits were in 2014, and then the report itself

21    was prepared thereafter in connection with the publication

22    of the EIS.

23         At the time -- back -- going back before then, FRA

24    hadn't done any analysis as to what type of improvements

25    would be needed for the passenger railroad, and there's no

1    reason to believe that the funding under Title 23 had

2    anything whatsoever to do with the passenger railroad.

3            THE COURT:  Okay.

4            MR. KARMEL:  Thank you very much for the Court's

5    attention.

6            THE COURT:  Thank you very much.

7            Obviously a lot to chew on, but you will hear from

8    us before December 31st obviously, okay?

9                (Whereupon the hearing was

10                 concluded at 12:46 p.m.)

11        **CERTIFICATE OF OFFICIAL COURT REPORTER**

12

13            I, LISA A. MOREIRA, RDR, CRR, do hereby

14    certify that the above and foregoing constitutes a true and

15    accurate transcript of my stenographic notes and is a full,

16    true and complete transcript of the proceedings to the best

17    of my ability.

18        Dated this 4th day of January, 2019.

19

20                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
21                          United States Courthouse
                            Room 6718
22                          333 Constitution Avenue, NW
                            Washington, DC 20001
23

24

25